**INGLE LAW FIRM**
111 West Monroe Street, Suite 716
Phoenix, Arizona 85003
Christopher B. Ingle (Ariz. Bar #025553)
Michelle Mozdzen (Ariz. Bar #028188)
cingle@inglelawfirm.net
mmozdzen@inglelawfirm.net
courtdocs@inglelawfirm.net
Telephone: (602) 615-8395
Fax: (602) 926-2753

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| XCENTRIC VENTURES, LLC, an Arizona Limited Liability Company; and, ED MAGEDSON, Individually,<br><br>                    Plaintiffs,<br><br>v.<br><br>BEN SMITH, in his individual capacity and as Sac County Attorney,<br><br>                    Defendant. | No.<br><br><br>**NON-PARTY JOHN BREWINGTON'S MOTION TO QUASH SUBPOENA TO TESTIFY AT A DESPOSITION** |

Non-party Deponent John Brewington ("Brewington"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 45(c)(3), hereby submits his Motion to Quash Subpoena to Testify at a Deposition.  This Court should quash the subpoena because it requires Brewington to appear in a location farther than 100 miles from where he is located and regularly transacts business in person. Additionally, the subpoena creates an undue burden on Brewington as Plaintiffs Xcentric Ventures, LLC ("Xcentric") and Ed Magedson

("Magedson," and collectively "Plaintiffs") have been dragging Brewington into their vexatious litigation activities since 2007. Plaintiffs' sole purpose in issuing this subpoena and trying to take Brewington's deposition is a thinly-veiled attempt to further harass and threaten Brewington. This behavior needs to stop.

This Motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    FACTS.

Plaintiffs' fixation on suing, threatening, and deposing Brewington can only be described as unreasonable and vindictive. If this was a normal case, with normal plaintiffs, Plaintiffs would be entitled to the benefit of the doubt. It would normally be proper to allow some discovery to see what, if any, relevant information Brewinton may have. But Plaintiffs have shown, through their past activities, that they are not interested in obtaining information from Brewington. Instead, they abuse the justice system to intimidate him into submission. Plaintiffs' repeated conduct of harassment, false allegations without supporting evidence, and intimidation must be stopped.

As this Court is surely aware, Plaintiffs are utilizing the same harassment and intimidation tactics with the defendant in this case, Mr. Ben Smith ("Smith"). This is Plaintiffs' standard operating procedures with anyone that Magedson deems a threat to his website, the RipOff Report (owned by Xcentric Ventures). Smith was the prosecutor in the criminal trial of Tracey Richter ("Richter") in *State v. Richter*, Sac County District Court Case No. FECR0110900.  Michael Roberts ("Roberts"), who was Richter's second ex-husband and also one of her attempted murder victims, incurred Plaintiffs' wrath by insisting on getting paid for an

investigation project that Xcentric hired him to perform.  Xcentric did not pay Roberts' bill, causing a disagreement between those parties.  Plaintiffs chose to retaliate against Roberts by posting false and defamatory information about all of the State's witnesses in the murder trial.  Their goal was to have Richter found not guilty, simply to inconvenience and endanger Roberts by allowing the person who attempted to murder him to go free. Ultimately Richter was found guilty and is currently serving a life sentence in prison.

Smith prosecuted the person that Xcentric hired to intimidate the trial witnesses, Darren Meade ("Meade"), for witness tampering, a second degree felony. The subsequent investigation revealed that Plaintiffs, and possibly their attorneys, were directing Meade's conduct.   However, when Smith began investigating Plaintiffs, they fought back with such litigiousness that it threatened to consume the county's entire prosecution resources, and Smith eventually had to drop the case.  It did not make sense for Sac County, Iowa, to spend all its prosecution funds trying to convict Plaintiffs of their crimes.  And of course, as soon as Smith dropped the case, Plaintiffs sued him as punishment. That is their standard operating procedure. Plaintiffs filed the case giving rise to this subpoena in the United States District Court for the Northern District of Iowa, Western District, Case No. 15-CV-408-LTS.

Plaintiffs are now trying to drag Brewington into this case because Magedson suspected that Brewington may have had communications with Smith. Magedson is afraid that Brewington may have shared his knowledge of Magedson's unsavory business dealings and associates, which Brewington acquired from all the previous lawsuits, and now seeks to use the judicial system to force Brewington to appear in person, answer questions, provide documents,

and incur substantial attorneys' fees, all to prove that – once again – Brewington did not do any of the things Magedson accuses him of and in fact is completely innocent.  Such as been the result of all the other cases over the past decade.

Brewington has been the subject of constant harassment from Plaintiffs. They accused him of firing a gun at Magedson's former friend, Mr. Eric Skelling ("Skelling").  Upon investigation, it turned out that no one actually saw Brewington, or for that matter, a gun. In fact, the entire allegation was based upon the fact that Skelling, a convicted criminal, known methamphetamine addict, and former friend of Magedson, heard a "bang" one night. From this, Plaintiffs inferred that it "must" have been a gunshot, and that meant that Brewington "must" have been shooting at Skelling.  Even the most cursory investigation, such as the one required by Rule 11, would have revealed this allegation to be false or at least made with reckless disregard for the truth. Brewington wasn't there, he didn't own a gun, no one saw Brewington there, and no one saw a gun.

The entire Skelling deposition transcript is attached as **Exhibit A**. Brewington does not expect the Court to read the entire transcript. Rather, the transcript is provided so that the Court may open it to any page and read about Plaintiffs' accusations that Brewington attempted to murder Skelling, and the utter and complete lack of any evidence supporting that allegation.  The Court may also be interested in opposing counsel Maria Speth's repeated instructions to the witness not to answer certain questions because, as she stated, Brewington's counsel would surely use that information to harass Skelling's family.  Obviously, that was false as well.  Brewington's counsel, Mr. Ingle, had no plans to contact Skelling's family, did not contact Skelling's family, asked questions designed to get Skelling to admit that he used to live with Magedson and had received money

from Magedson (one presumes in exchange for Skelling's false allegations), and in fact was only trying to clear Brewington of Plaintiffs' false allegations of attempted murder.  Given the seriousness of the allegation, it seemed important to get all the facts, which Plaintiffs and their attorneys went to great lengths to conceal.

Undeterred, Magedson accused Brewington of sending him death threats. The ensuing police investigation revealed that Magedson had in fact arranged for the death threats to be sent to himself so he could try to blame it on Brewington. See Mesa Police Department Report, **Exhibit B**.

Plaintiffs then accused Brewington of assisting a computer hacker known as William Stanley.  The ensuing litigation, which cost over $400,000, revealed no evidence to support those claims.  Plaintiffs deposed Brewington for eleven hours in the *Stanley* case.  Again, the entire deposition transcript is attached as **Exhibit C**, again so that the Court may open it to literally any page, read about Plaintiffs' allegations against Brewington, and then observe the complete and total lack of evidence supporting those allegations, which were never proven.

Plaintiffs then sued Brewington for referring to Magedson as an "extortionist."  Brewington won that case on summary judgment by arguing that Magedson is, in fact, a career extortionist, and that his reputation could not be damaged because it was already as bad as it could be.  See generally Maricopa County Superior Court Case No. CV2008-008275.  Magedson appealed that ruling and managed to get a reversal in part, arguing that even if he had the worst reputation in the world, it is always possible for it to get worse. The case settled shortly thereafter, with no admission of wrongdoing or liability, presumably to end

the expenditure of attorneys' fees in what was clearly a frivolous case lacking any kind of factual support whatsoever.

This is only the tip of the iceberg with respect to Plaintiffs' harassment of Brewington.  They accused him of conspiring with computer hackers to try to "take down" the Ripoff Report.  That turned out to be false.  They accused him of conspiring with a man in Texas, Shawn Richeson, to extort them.  Again, that was false.  The Richeson transcript is attached as **Exhibit D**.  They accused him of working with two other people, Tony and Krysta Agerone, to spread false statements about the Ripoff Report.  Again, the allegations were proven false.  The Agerone transcript is attached as **Exhibit E**.

Meade and Magedson posted many false and defamatory statements about Brewington on the Ripoff Report.  Meade is a known paid associate of Magedson and has been hard at work creating false and terrible stories about Brewington to post online to intimidate, threaten, and harass Brewington. This ongoing attack on Brewington is designed to silence him.  Based on Meade's actions, as recently as last week, it is clear that Meade is employed by the RipOff Report to harass and intimidate witnesses, including Brewington.

The harassment and intimidation are not limited to Magedson and Meade.  Counsel for Plaintiffs, Maria Speth, has made multiple complaints about Mr. Brewington to his licensing agency, the Arizona Department of Public Safety, all of which have been dismissed by the licensing board as frivolous and without merit. E.g. Letter from Arizona Department of Public Safety dated 05/22/09, **Exhibit F** (dismissing two of Ms. Speth's complaints for lack of supporting evidence).  Brewington became aware that Ms. Speth is the person who falsified the death threats to Magedson, who then claimed that these threats came from

Brewington. Plaintiffs admit that they also hired private investigators to follow Brewington and to try and place GPS tracking devices on his vehicle. Their goal was to "catch" Brewington in some act that would lead to some negative content that they could publish on the RipOff Report. Brewington became aware of this improper conduct, and has since taken measures to try and protect himself from Magedson.

Ms. Speth and the rest of the public has access to Brewington's address on file with the Department of Public Safety, at which Brewington may be served. However, Ms. Speth was insistent that Brewington provide a home address, supposedly under the guise of requiring an address at which he may be served with the subpoena for this very deposition. Suspiciously, there were no attempts made to serve Brewington at this address, and instead, Ms. Speth requested alternative service. Brewington believes that Magedson simply wanted to acquire his home address for purposes of continued intimidation and harassment. This kind of conduct, from these individuals, sends a very clear message to their victims. This is Magedson's way of reminding Brewington that he knows where he lives. This is a real threat to Brewington, as he believes that Magedson will stop at nothing to silence him.

Plaintiffs' improper conduct is not limited to harassing Brewington, but also to attorneys who represent Brewington. Plaintiffs directed their agent, Darren Meade, to harass Mr. Ingle, undersigned counsel for Brewington. Meade confessed, in writing, that he attempted to dig up dirt on Ingle, could not find anything, so he made up a story that Ingle had been fired from his previous law firm for raping his clients and giving them incurable STDs, and then posted that

material on the internet.  See Written Confession of Darren Meade, **Exhibit G**. Obviously, that was false.  Ingle expended some time and effort getting Meade's internet posts taken down.  In this case, during the required "meet and confer" phone calls, Plaintiffs threatened to file claims against Brewington's attorneys, including Ingle and Ingle Law Firm, for "abuse of process" if they filed this very Motion.  Ingle is not intimidated by Plaintiffs or their attorneys and will continue to represent Brewington.

One of Magedson's other attorneys/employees, Adam Kunz, created and posted false stories about Brewington on the RipOff Report designed specifically to assassinate his character on over 1.8 million pages. After Kunz and Magedson realized this might not be the best idea, since Magedson was already being investigated for felony witness tampering, the content was removed. Kunz has done this in the past with other witnesses, such as Shawn Richeson. Richeson was able to obtain a judgment against Kunz for creating defamatory content intended to harass and intimidate him (*Shawn Richeson v. Adam Kunz, & dba RipOffReport.com*, District Court, Bell County, Texas Cause No. 288,067 C). There is no reason to believe that these individuals will refrain from this malicious conduct in the future.

Plaintiffs' improper harassment of Brewington has been going on for over ten years. TEN YEARS. Magedson brought four baseless claims alleging that Brewington was either complicit or actively assisted William Stanley ("Stanley"), Robert Russo ("Russo"), and Shawn Richeson ("Richeson") in committing various defamation-based tort claims against them (*Xcentric Ventures, LLC v. John Brewington, et al.*, Maricopa County Superior Court Case No. CV 2008-08275).  The claims against Stanley and Russo were the subject of another lawsuit

(*Xcentric Ventures, LLC v. William "Bill" Stanley, et al.,* U.S. District Court Case No. 2:07-CV-0094-PHX-GMS).  Xcentric deposed Brewington for eleven hours in the *Stanley* case, and again for six more hours in the *Brewington* case.

In the *Brewington* case, Magedson conceded that he had no evidence that Brewington knew Stanley or tried to commit a tort.  *See* Excerpt of Deposition of Edward Magedson attached as **Exhibit H** at 94:1-94:16, 98:22-99:24, 115:9-115:22, 238:13-239:6.  Magedson did not even know who Stanley is, where he is, or what he had done (i.e. whether Stanley – whoever that is – even committed any tort).  *Id.* at 82:17-82:19 ("Mr. Ingle: You don't actually know who Bill Stanley is, do you? Ed Magedson: No.").  Xcentric and Magedson admitted that the only information that Brewington gave to Stanley was publicly available information. *Id.* at 98:6 – 98:21, 113:8 – 115:6. Magedson also did not even seek damages for his defamation claim, which meant that cause of action was a moot point.

Then, in Brewington's third deposition, Ms. Speth spent her time asking Brewington about everything from the Knights Templar to television shows that Brewington watched in the 1960's.  See Deposition of John Brewington attached as **Exhibit I** at 35:21-36:5, 43:12-43:25, 44:20-46:2.   The following excerpt is representative of how Ms. Speth spends her time deposing Brewington:

> BY MS. SPETH:
> Q:  And did you ever say to him "Gee, why is the copyright in Paladin Investigations"?
> A:  No.
> Q:  What does "Paladin" mean?
> A:  Different things to different people.
> Q:  What's it mean to you?
> A:   It means one of the Knights Templar that escorted the Christians to Jerusalem during the crusade.
> Q:   Was Paladin a particular person originally or was that a whole class of people?
> A:  A class of people.

Q:  And that's what it means to you?

A:  Yes.

Q:  And that's why you chose it for the name of your company?

A:  Yes.

…

Q:  Okay.  Why do you – I understand what Paladin means to you, why do you call yourself "Paladin" sometimes or your company?

MR. INGLE:  Form.

BY MS. SPETH:

Q:  In other words – well, why do you call yourself "Paladin"?

MR. INGLE:  Form

THE WITNESS:  It's simply a trade name.

BY MS. SPETH:

Q:  Long before it was a trade name, you were using it as an alias on websites, it's something that you have associated yourself with for quite a while, why is that?

MR. INGLE:  Form, foundation.

BY MS. SPETH:

Q:  What is it about your understanding of Paladin that you associate with yourself or your services?

A:  Sometimes people need a champion.

Q:  And you would like to be that champion as part of the services that you provide?

A:  No.

Q:  Okay.  So what's the connection between "Sometimes people need a champion" and you using that name?

MR. INGLE:  Form.

THE WITNESS:  You used present tense.  I don't wish to be anybody's champion.

BY MS. SPETH:

Q:  Fair.  At one time you wanted to be people's champion on certain issues?

A:  Yes.

*Id.* at 43:12-43:25, 44:20-46:2.  The Court should keep in mind that the case above was for defamation.  To litigate that claim, Plaintiffs needed to ascertain what Brewington had said, who he said it to, and whether it was true.  Clearly, that

is not what they pursued at deposition.  In addition to the Knights Templar and TV shows that Brewington watched as a child, Plaintiffs spent their time harassing Brewington and calling him a liar:

> BY MS. SPETH:
> Q:  And do you have any doubt, by the way, that you meant to send this e-mail to Bill Stanley?
> A:  I don't know.
> Q:  You don't know?  Mr. Brewington, you are under oath?
> A:  Theatrics.  You're good at theatrics.
> Q:  And you're good at lying.  No, actually, you're not.
> MR. INGLE:  Objection, you're harassing the witness.

*Id.* at 150:11-150:20.  They made light of the mental anguish that these lawsuits have caused Mr. Brewington to endure, and demanded "all of his medical records."   *Id.* at 151:8-155:6.  They refused to conclude the deposition at four hours, claiming that they did not know how much longer they would need to question him before they would be satisfied:

> MR. INGLE:  Pardon me, can I get a count on where we are on the time?
> MS. SPETH:  On the record?  Do you want to go off – do you want to take a break?
> MR. INGLE:  No, no, just the video clocks how long we've been recording.
> THE VIDEOGRAPHER:  Three hours and 42 minutes.
> MR. INGLE:  Do you think we can finish in 18 minutes?
> MS. SPETH:  No, I don't.  Not even close.
> MR. INGLE:  Okay.  It's 4:00 now.
> MS. SPETH:  I understand.
> MR. INGLE:  How long do you think you need?
> MS. SPETH:  I don't know.
> MR. INGLE:  Can you estimate?
> MS. SPETH:  No.

*Id.* at 188:12-189:3. *See also id.* at 189:3-190:12.

After Ms. Speth had deposed Brewington for **fifteen hours** and still claimed that she needed more time, to avoid judicial intervention Mr. Ingle offered to let Xcentric and Magedson depose Brewington for thirty additional minutes, and only on topics that were relevant to the case.  Ms. Speth unreasonably refused this offer. In her motion for additional time to depose Brewington, Speth admitted that she had no more questions about Stanley, which Magedson called the "main crux" of this case.  *Id.* at 96:14-96:19, 65:21-65:22 ("… the main reason why I'm suing [Brewington] is because he aided and abetted William Stanley.").  Instead, she intended to ask Brewington about a complaint to the Department of Public Safety that 1) she herself filed, 2) did not relate to a single one of the causes of action in that case, and 3) was dismissed as unfounded and frivolous.

Plaintiffs then accused Brewington of giving a video to Shawn Richeson as part of a "conspiracy" to blackmail them, ignoring the fact that Brewington never gave any video to Richeson, and no one ever tried to blackmail them.  **Exhibit I** at 61:23-62:2 ("Speth: Did you ever provide [Richeson] with the long interview, the short interview, any version of either one of those interviews or any version of the putt-putt video? Brewington: No.").  Although Magedson alleged that Brewington purposefully created a video that he knew to be false, he admitted that he had no evidence to support the allegations.  **Exhibit H** at 150:4-153:22, 154:11-154:20, 176:15-179:15. Magedson's repeated and harassing lawsuits over the years are based on nothing more than Magedson's irrational suspicions and paranoia.  *Id.*

It also bears mentioning how Plaintiffs have used their depositions in previous cases in which they have listed Brewington as a witness.  In a case that is still pending before this Court, *Xcentric Ventures LLC v. Mediolex Lt. et al.*, Case No. 2:12-cv-00130 (assigned to the Hon. Stephen McNamee), Xcentric demanded

to take the deposition of Serguei Kudriavtsev, who owns and operated Xcentric's biggest competitor, Mediolex Ltd.   Xcentric styled the case as trademark infringement, but the claims were obviously weak and were alleged only to allow Xcentric to conduct discovery to obtain information about its competition. Throughout discovery Xcentric spent very little time asking about anything related to its trademark claims.   Instead, they demanded that Mr. Kudriavtsev answer questions like "where do you own property," "what are the names of your children," "how old are they," and "where do they go to school?" *See* Kudriavstsev Deposition, **Exhibit J**.   In written discovery, Xcentric focused most of its efforts on obtaining information about Mediolex's sources of income, annual revenue, tax rate, bank accounts, vendors and suppliers, operating costs, and other financial and proprietary information.   The entire lawsuit was a sham – it was never about trademarks. Instead, Plaintiffs chose to abuse the judicial system to force their opponent to divulge information that Plaintiffs could not otherwise obtain. They sought information on their competition's operations, and they also tried to intimidate Mr. Kudriavtsev by asking improper questions about his children.   Their purpose was not legitimate; it was to harass their enemies and send a message that they know where to find his kids.

The same thing is happening here.   Xcentric and Magedson have been asking questions to Brewington, requesting documents, taking depositions, involving him unnecessarily in litigation, and asking for personal information about his family, for the past ten years. When harassment can be measured in terms of decades, it is time to say enough is enough. The Court must stop Xcentric and Magedson from using the discovery process just to harass Brewington about something else that will, inevitably, prove to be based on nothing more than

Magedson's irrational paranoia. Given their insistence that they needed the past depositions, and given the fact that they then used those depositions to ask about irrelevant topics, one can only expect that this deposition would consist of such hard-hitting investigative questions as "if you could be any salad dressing, which one would you be?" No, Plaintiffs do not need this deposition. They say they do, but they do not. This deposition is purely for harassment, to delve into irrelevant details of Brewington's personal life (so they can harass him and his family even more over the next decade), to intimidate him, and to force him to spend more money on attorneys' fees and court costs. Plaintiffs' misuse of the judicial system must be stopped at some point.

## II. LEGAL ANALYSIS.

### A. Plaintiffs' subpoena to Mr. Brewington must be quashed.

Rule 45(c) of the Federal Rules of Civil Procedure states:

> **(3) *Quashing or Modifying a Subpoena.***
>
> (A) *When Required.* On timely motion, the issuing court must
> quash or modify a subpoena that:
> …
> (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person…
>
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
>
> (iv) subjects a person to undue burden.

1. *The subpoena impermissibly requires non-party deponent Mr. Brewington to travel more than 100 miles to attend the proposed deposition.*

The subpoena must be quashed under Rule 45(c)(3)(A)(ii) because Mr. Brewington is currently working in Mexico. Requiring him to appear in Arizona would force him to stop his work on his current cases, thereby depriving Brewington of income, and to then travel more than 100 miles to opposing counsel's office, just so Ms. Speth can ask him even more questions. The purpose of Rule 45(c)(3)(A)(ii) is to "to protect witnesses from the harassment of long, tiresome trips" and "to minimize the costs of litigation." *Farmer v. Arabian Am. Oil Co.,* 379 U.S. 227, 234,85 S.Ct. 411, 13 L.Ed.2d 248 (1964).  "A court "cannot require 'a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed, or regularly transacts business' to appear before it." *Charter Oak,* 294 F.Supp.2d at 221 (quoting Fed.R.Civ.P. 45(c)(3)(A)(ii)); *Roller Bearing Co. of Am., Inc. v. Am. Software, Inc.*, 570 F. Supp. 2d 376, 389 (D. Conn. 2008); see also *Michael v. Davis*, 2015 WL 7889635, at *2 (E.D. Cal. Dec. 3, 2015).  Brewington sees no reason why he must stop work and come to the United States when Plaintiffs could just as easily go to him in Mexico.  After all, if Plaintiffs want the deposition, they should bear the inconvenience and expense.

Plaintiffs cannot remedy this issue by requesting to take Brewington's deposition telephonically or otherwise. This issue was addressed in *Gipson v. Wells Fargo Bank, N.A.*, where the plaintiff sought to depose a non-party to the action whose residence was over 100 miles from the court's jurisdiction. 239 F.R.D. 280, 281 (D.D.C. 2006). The court quashed the subpoena, explaining that to "allow such a deposition would abrogate Federal Rule of Civil Procedure 45, which permits a subpoena to issue only for deponents located within 100 miles of this Court." *Id*.

The court further held that "[a] deposition by telephone cannot evade the proscription of the Rule." *Id.*

The same principles are applicable here. Brewington is a non-party. Even though Brewington is a legal resident of Arizona, he is rarely present in the state. Brewington conducts most of his business in Mexico, Central America, and South America, and at the present time he is working in Mexico. The fact that Brewington maintains a minimal contact with Arizona does not subject him to being compelled to appear at a pretrial deposition. See *Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc.*, 45 F.R.D. 515, 518 (S.D.N.Y. 1968) (holding that "No policy considerations compel the conclusion that a corporation with only minimal contacts in this district should be compelled to appear for a pretrial deposition as a non-party witness in a civil case which does not in any way relate to this district."). Further, Plaintiffs cannot evade the Rule even if they proposed a telephonic or teleconference deposition. See *Gipson, supra*.

2. *The subpoena is Magedson's latest attempt at intimidating Brewington and subjects him to undue burden.*

Under Rule 45(c)(3)(A)(iv), a subpoena must be quashed if it subjects a person to undue burden. "Non-party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue." *Simmons v. Morgan Stanley Smith Barney, LLC*, 2013 WL 310330, at *1 (S.D. Cal. Jan. 25, 2013), (quoting *Whitlow v. Martin*, 263 F.R.D. 507, 512 (C.D. Ill. 2009)). Brewington is a non-party. He is working on a time-sensitive project in a different country. Brewington's work requires that he be available to respond very quickly to critical volatile situations. For example, one of Brewington's latest cases was

rescuing 34-year-old Amanda Parmar, who is pregnant, and her 8-year-old son, from a violent assailant.  See Pinal Central article from February 28, 2017 attached as **Exhibit K**. This woman and her son were in danger, and when the Pinal County Sheriff's Office, the FBI, ICE, and the U.S. Marshalls office were unable to respond quickly, Brewington was able to work with local authorities in Mexico to rescue this woman and her son.  Brewington has no immediate or set plans to return to Arizona or the United States.  Requiring Brewington to travel over 200 miles to the offices of Jaburg & Wilk in Phoenix will be extremely disruptive to his professional work and personal life. The Rules of Federal Procedure do not require a non-party to respond to a subpoena for a pre-trial deposition in these circumstances.

As illustrated above, Magedson and his associates have been harassing Brewington for the past ten years.  At this point Brewington is more afraid for his safety in Phoenix than he is in the land of drug cartels.  That says something important about Plaintiffs, their history, and their motives.  Magedson's associates have sent death threats to Brewington. They have threatened Brewington's past clients with harm unless Brewington agrees not to share information about Plaintiffs with anyone.  In fact, just within the past few weeks, Meade threatened to harm one of Brewington's past clients unless Brewington agreed *not* to testify in this case.

Brewington moved to Mexico in part to distance himself from Magedson and his band of criminal associates. Magedson, Meade, and Jaburg & Wilk, are attempting to intimidate Brewington to stop communicating with anyone, especially law enforcement, about their illegal activities.  To protect his personal

safety, Brewington has tried to distance himself from these toxic individuals.  Now that he is not talking, Magedson wants to depose him.  Stated differently, Plaintiffs harass Brewington if he does talk about them, and harass him if he does not talk about them.  There is no winning with these people; they will never be satisfied, and they will try to force Brewington into litigation as long as they are able to do so.  This is improper and unreasonable; the Court needs to step in and protect Brewington from this abuse of the judicial process.

Plaintiffs have demonstrated that they use their deposition time to pursue irrelevant topics, attempt to intimidate Brewington, insult him, improperly delve into his personal life and medical history, and ask questions designed to determine just how much information Brewington has discovered about Magedson's questionable business operations (which the Florida Court of Appeals called "appalling."). *Giordano v. Romeo*, 76 So. 3d 1100, 1102 (2011).  There is nothing more that Plaintiffs can ask Brewington that they have not already asked him about in the past ten years of litigation. If there is any marginally relevant information that Brewington has to offer, the probative value of that information is not worth the undue burden imposed on Brewington and the injurious consequences of compliance.

**B.    If this Court is not inclined to follow Rule 45(c), Brewington alternatively requests a Protective Order issued limiting the circumstances of Mr. Brewington's deposition.**

Rule 45(c) in no way envisions a non-party traveling to a different country for a deposition, and Plaintiffs carry the burden of proof to establish a substantial need for Brewington's testimony.  Fed. R. Civ. P. 45(c)(3)(C). However, if this

Court is inclined to find that he is not outside the subpoena power of this Court, Fed. R. Civ. P. 45(c)(3)(C) grants this Court authority to order such specific alternative conditions. The Court may modify the subpoena only if Plaintiffs meet their burden of showing a substantial need for Brewington's testimony or material that cannot otherwise be met without undue hardship. *Id*. If this Court is not inclined to quash the Subpoena for Deposition Testimony, Brewington respectfully requests that this Court issue a Protective Order with the following limitations:

- That Brewington be deposed telephonically;

- That the deposition is limited to no more than four hours;

- That the subject matter discussed with Brewington at the deposition be limited to only those matters involving these Iowa proceedings, and specifically exclude any testimony about Brewington's family or their locations, his work, his financial affairs, his medical history, or any other personal or proprietary information; and

- That Brewington be compensated at a rate no less than $200.00/hour for his time, including any preparation and/or travel time. Perhaps Plaintiffs will be disinclined to continue their pattern of harassment if it starts costing them money.

**C.    This Motion was delayed because of lead counsel's unexpected illness and subsequent hospitalization.**

Counsel undersigned apologizes to the Court for the late filing of this Motion to Quash.  However, Mr. Ingle, lead counsel on this case, took a number of measures which gave the other parties sufficient notice to minimize any

inconvenience due to a late filing. Mr. Ingle spoke with Ms. Speth on March 2, 2017, and informed her that a Motion to Quash would be forthcoming. Unfortunately, on March 4 Mr. Ingle became extremely ill with pneumonia.  Mr. Ingle was hospitalized three times over the course of several weeks, and had to be transported to the hospital for treatment once by ambulance.  It has only been the past few days in which Mr. Ingle has been able to return to addressing matters in his cases. See Declaration of Christopher B. Ingle, **Exhibit L**. Ms. Speth was once again informed on March 24 by Mr. Ingle that this Motion would be forthcoming. There were additional delays caused by procuring exhibits from Brewington's former counsel, and formatting those exhibits for upload to the Court.

> **D.     Plaintiffs have not demonstrated any need for Brewington's testimony.**

Plaintiffs claim they need to depose Brewington because Smith allegedly testified that he made Xcentric's financial records available to Brewington, who allegedly posted them on his company's website.  That does not meet the standard for discovery.  Even if Smith made financial records available to Brewington, there is no evidence that Brewington actually accessed those records.  And even if he had, Plaintiffs' claim is against Smith.  It does not matter whether Brewington received the records because Smith's conduct remains unchanged, and it is only Smith's conduct that is at issue here.  There are no claims against Brewington. And the information that Brewington allegedly posted online is merely that he discovered Magedson was having him followed by private investigators.  There is no evidence that Brewington obtained that information from the alleged financial records.  Indeed, Brewington, a professional investigator, would be very capable of

discovering when people are attempting to follow him.  This is his exact area of expertise.  Surveillance and counter-surveillance are his stock in trade.  Of course he would notice if someone was following him.  That does not mean he had access to Plaintiffs' financial information.

Plaintiffs have not established that Brewington actually has any relevant information at all.  And, it is important to note, Plaintiffs are once again creating the factual situation that purports to justify their discovery.  They harassed Brewington by hiring people to follow him around, and now they seek discovery to ask Brewington how he discovered that he was being followed.  It is a circular argument; they created the very situation they now claim to want to ask questions about.  And, as has happened in every other case over the past ten years, this will turn out to be a situation where Brewington did nothing wrong and has no relevant evidence to offer.  The only result of the deposition would be that Brewington would be forced to stop working, travel hundreds of miles to Ms. Speth's office, answer a bunch of irrelevant questions about his personal life, endure various threats and insults, and spend thousands of dollars in attorneys' fees.  That has been the result of every other case; there is no reason to believe this one will be any different.  The madness must stop somewhere. This Court should stop it here.

## III.   CONCLUSION.

Pursuant to Rule 45(c)(3)(A)(ii), this Court cannot order Brewington to attend a deposition located over 100 miles from the Court's jurisdiction and the location of deposition. Further, compliance with the subpoena would subject Mr. Brewington to undue burden, which is impermissible under Rule 45(c)(3)(A)(iv).

As explained above, Magedson's desire to depose Brewington for the fifth time[1] is nothing more than a continued pattern of harassment and thinly-veiled threats. Magedson's harassment of Brewington began ten years ago, and it needs to end today. There is no further information that Plaintiffs can gain from Brewington. Despite Plaintiffs' argument that they "must" depose Brewington, that has not proven true in the past depositions where Plaintiffs claimed that they must depose certain people, and Brewington is certain it is the same here.  For his part, Brewington does not believe that he has any relevant information about this case at all.  He specifically avoids issues involving Plaintiffs, specifically to prevent situations like this, and wants nothing to do with Plaintiffs or their latest lawsuit.

For all the foregoing reasons, Brewington respectfully requests that this Court quash the subpoena to Mr. Brewington issued on February 13, 2017, and issue a Protective Order excusing him from deposition on March 31, 2017, until this Court rules on this Motion to Quash.

RESPECTFULLY SUBMITTED this 30th day of March, 2017.


**INGLE LAW FIRM**


By:/s/ *Michelle Mozdzen*
Michelle Mozdzen
Christopher B. Ingle
*Attorneys for non-party*
*John Brewington*

---

[1]    This consists of the two deposition transcripts from the *Stanley* case, and two separate depositions in the *Xcentric v. Brewington* case.  This deposition, if it goes forward, would be the fifth time Brewington would be deposed by these same Plaintiffs.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2017, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Maria Crimi Speth<br>Jaburg & Wilk, P.C.<br>3200 North Central Avenue, Suite 2000<br>Phoenix, Arizona 85012<br>Email: mcs@jaburgwilk.com<br>*Attorneys for Plaintiffs* | |

Dated: March 30, 2017

By: */s/ Michelle Mozdzen*