**<u>EXHIBIT A</u>**



**Jaburg**
**& Wilk, p.c.**
ATTORNEYS AT LAW

3200 N. Central Ave., Suite 2000
Phoenix, AZ 85012

Adam S. Kunz
Admitted in Arizona and Utah

ask@jaburgwilk.com
Direct Line 602.248.1014
Main Fax 602/248-0522

**R E C E I V E D**

JUN 1 8 2009

**GUST ROSENFELD**

June 16, 2009

Dean C. Robertson, Esq.
Gust Rosenfeld, P.L.C.
201 East Washington, Suite 800
Phoenix, Arizona 85004-2327

Tamara H. Howard, RPR
Griffin & Associates Court Reporters
3030 North Central Avenue, Suite 1102
Phoenix, Arizona 85012

      *Re:*   *Xcentric Ventures, LLC v. Brewington, et al.*
           Deposition of Eric J. Skelling:
           Page and Line Designations of "CONFIDENTIAL" Material in the Transcript

Dear Mr. Robertson and Ms. Howard:

      Pursuant to the Court's instructions and Protective Order, Section 5, Plaintiffs Xcentric Ventures and Ed Magedson hereby designate material from the deposition of Eric J. Skelling as "CONFIDENTIAL" by indicating the following page and line numbers:

| PAGE(S) | LINE(S) | | PAGE(S) | LINE(S) |
|---------|---------|---|---------|---------|
| 7 | 13, 14 | | 59 | 7-8 |
| 14 | 18, 20 | | 60 | 4, 16 |
| 15 | 21-25 | | 77 | 21 |
| 16 | 1-5 | | 78 | 5, 16, 24 |
| 17 | 17-22 | | 80 | 22-24 |
| 38 | 17, 24 | | 99 | 24 |
| 40-41 | 21-5 | | 100 | 5-6 |
| 42 | 5-7 | | 101 | 1, 12, 15, 20 |
| 43-44 | 23-8 | | 102 | 2, 10-11, 13, 17, 20, 23, 25 |
| 44 | 22 | | 103 | 2, 4, 6, 10 |
| 45 | 20 | | 122 | 10-16 |
| 46 | 1 | | 123 | 6 |
| 58 | 19-24 | | 130 | 17-19 |

**ROUTING**



D. Robertson, Esq.
T. Howard, RPR
June 16, 2009
Page 2

Please remember the restrictions of the Protective Order.   None of the material designated confidential shall be filed with the Court or be shown to any person except those people engaged in the litigation pursuant to Paragraphs 7 and 10 of the Protective Order.  Along those lines, please remember that the parties and attorneys have obligations if confidential material is called for in a subpoena.

Sincerely,

**JABURG & WILK, P.C.**

Adam S. Kunz

ASK:lsm

10297-30/ASK/LSM/729629_v1



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

XCENTRIC VENTURES, LLC, an Arizona          )
limited liability company; ED               )
MAGEDSON, an individual,                     )
                                             )
                    Plaintiffs,             )
                                             )
          vs.                                )  CV 2008-008275
                                             )
JOHN F. BREWINGTON and JANE DOE             )
BREWINGTON, husband and wife; and JFB       )
ACQUISITIONS, LLC, an Arizona limited       )
liability company,                           )
                                             )
                    Defendants.             )
                                             )

C O N F I D E N T I A L

DEPOSITION OF ERIC J. SKELLING

Phoenix, Arizona
April 6, 2009
11:12 a.m.

REPORTED BY:
TAMARA H. HOWARD, RPR
Certified Reporter
Certificate No. 50156

PREPARED FOR:
MR. CHRISTOPHER B. INGLE
Attorney at Law

(COPY)



GRIFFIN
&
ASSOCIATES
court reporters

3030 North Central Avenue
Suite 1102
Phoenix, Arizona 85012

T 602.264.2230
  888.529.9990
F 602.264.2245

www.griffinreporters.com

1                          I N D E X

2  WITNESS                                        Page

3  ERIC J. SKELLING

4          Examination by Mr. Ingle                4

5          Examination by Ms. Speth               116

6          Further Examination by Mr. Ingle       121

7

8

9

10                     E X H I B I T S

11 Deposition
   Exhibits:       Description              Marked
12
           (No exhibits marked for identification.)
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              DEPOSITION OF ERIC J. SKELLING was taken on

 2   April 6, 2009, commencing at 11:12 a.m. at the law offices

 3   of Gust Rosenfeld, P.L.C., 201 East Washington, Suite 800,

 4   Phoenix, Arizona, before TAMARA H. HOWARD, a Certified

 5   Reporter in the State of Arizona.

 6

 7   COUNSEL APPEARING:

 8
                  Gust Rosenfeld, P.L.C.
 9                By:  Mr. Christopher B. Ingle
                  201 East Washington
10                Suite 800
                  Phoenix, Arizona   85004
11
                  Jaburg & Wilk, P.C.
12                By:  Ms. Maria C. Speth
                  3200 North Central Avenue
13                Suite 2000
                  Phoenix, Arizona   85012
14
     ALSO PRESENT:
15
                  Mr. John F. Brewington
16                Mr. Ed Magedson, Telephonically

17

18

19

20

21

22

23

24

25
```

1                    ERIC J. SKELLING,

2    a witness herein, having been first duly sworn by the

3    Certified Reporter to speak the truth and nothing but the

4    truth, was examined and testified as follows:

5

6                    MR. INGLE:  Let the record reflect that

7    Mr. Edward Magedson is attending the deposition

8    telephonically.  He is on counsel's speakerphone with it

9    muted so that he cannot speak.

10

11                    EXAMINATION

12   BY MR. INGLE:

13       Q.    Eric Skelling; right?

14       A.    Yes.

15       Q.    Have you ever been deposed before?  Have you ever

16   done a deposition like this?

17       A.    No.

18       Q.    Let me go over a couple of ground rules real

19   quick.

20                    The oath that you took just a second ago is

21   the same oath that you take at trial.  Do you understand

22   that?

23       A.    Yes.

24       Q.    As you can see, our court reporter is taking down

25   everything we say in real time.  She can only record what

1    one of us is saying at any one time.  So I'm going to ask

2    you some questions.  Please let me finish my question and

3    then I will wait for your entire response, that way I

4    won't cut you off as you are talking.

5        A.    Okay.

6        Q.    And for the same reason, taking down verbally

7    what we say, we can't do any uh-huhs or huh-uhs or

8    shoulder shrugs.

9              MS. SPETH:  When he's talking, you cannot be

10   talking.  Otherwise, she can't take it down.

11       Q.    BY MR. INGLE:  Can we agree to operate under

12   those rules?

13       A.    Right.

14       Q.    I'm going to ask you some questions.  If you are

15   unsure of what I'm asking, please ask me to rephrase or to

16   clarify my question, and I will ask it in a different way

17   or I will break it apart.

18              If I ask you a question and you don't ask me

19   for clarification, I'm going to assume that you understood

20   my question and you answered it honestly.  Does that sound

21   good to you?

22       A.    Yes.

23       Q.    This isn't a marathon.  This isn't an endurance

24   contest.  If you want a break, just let me know.  You may

25   take a break for a glass of water or make a phone call or

1  whatever you want.

2      A.    Okay.

3      Q.    I'm going to ask you some questions which

4  Ms. Speth may object to.  We don't have a judge here today

5  to rule on the objections.  So for today, she will lodge

6  her objection.  And unless she tells you not to answer the

7  question, go ahead and answer anyway.  We will have the

8  judge rule on the objections later if we need to.  Okay?

9      A.    Yes.

10      Q.    Before we begin, does Ms. Speth represent you as

11  your attorney?

12      A.    No.

13      Q.    Have you taken any drugs or alcohol that would

14  impair your ability to testify truthfully here today?

15      A.    No.

16      Q.    Do you have any mental health diagnosis that

17  would affect your ability to testify truthfully here

18  today?

19      A.    No.

20      Q.    Are you taking any medications earlier today?

21      A.    No.

22            MS. SPETH:  You mean, that would interfere

23  with his ability to testify.  You are not asking about his

24  personal life; right?

25            MR. INGLE:  No.  I don't mean to get into

```
 1   his personal life.

 2              MS. SPETH:  You mean, that would interfere

 3   with his ability to testify.

 4              MR. INGLE:  If he takes a daily medication,

 5   I want to make sure he took it this morning.

 6              MS. SPETH:  Fair question.

 7        A.   BY THE WITNESS:  No.

 8        Q.   BY MR. INGLE:  Let me get your full name, please.

 9        A.   Eric John Skelling.

10        Q.   Eric with a C?

11        A.   Yes.

12        Q.   Your address, please?

13        A.   ███████████████████████████████████

14   ██████████

15        Q.   Can you spell the street name?

16        A.   McDowell, M-C- --

17        Q.   Oh, McDowell.

18        A.   Yes.

19        Q.   Do you have a phone number?

20        A.   Not at this time, I don't.  My phone is on the

21   blink.

22        Q.   Do you have an e-mail address or anything?

23        A.   No.

24        Q.   So the best way to contact you if necessary is by

25   mail?
```

1    A.   Until I get a new phone, yeah, which will happen

2 next week.

3    Q.   Is there a number where you get messages or

4 anything?

5    A.   No.

6    Q.   Can you tell me what the highest level of

7 education is you completed?

8    A.   12th grade.

9    Q.   Where at?

10   A.   Tupper Lake High School.

11   Q.   Where is that?

12   A.   Tupper Lake.

13   Q.   What state?

14   A.   New York.

15   Q.   And when did you graduate?

16   A.   I'm not sure.  I forgot.  It was a while ago.

17 '87, I think.

18   Q.   You never went to a community college?

19   A.   No.

20   Q.   Or any technical school or anything?

21   A.   No.

22   Q.   Are you currently employed?

23   A.   No.

24   Q.   What was the last job you did hold?

25   A.   It was like six years ago.  I was working for R&S

```
 1    Construction.  And I had a bad car accident, and I haven't

 2    worked since.

 3         Q.    What was the name of the construction company?

 4         A.    R&S.

 5         Q.    Are they here in Arizona?

 6         A.    Yes.

 7         Q.    In Phoenix?

 8         A.    Mesa.

 9         Q.    What did you do for them?

10         A.    Framed houses.

11         Q.    How long did you work for them?

12         A.    About five years.

13         Q.    Who was your supervisor, do you remember?

14         A.    Randy Nicholas.

15         Q.    Do you know the address or any contact

16    information for the company?

17         A.    No, I don't.  Not anymore.  It has been so long.

18    I don't even know if they exist anymore.  I think they

19    went under.

20         Q.    You got in a car accident and then stopped

21    working there?

22         A.    Yeah.  I broke my neck and they told me I could

23    never walk again and stuff.  It was pretty bad.

24         Q.    Did you resign, then, or were you terminated?

25                MS. SPETH:  Objection; legal conclusion.
```

1     Q.   BY MR. INGLE:  Did you quit or did they ask you

2 to leave your job?

3     A.   They wanted me back, but I couldn't work.

4     Q.   So you told them "I can't come back"?

5     A.   Right.

6     Q.   What was the last job you had before that?

7     A.   I worked at the Greyhound Park track in Apache

8 Junction.

9     Q.   What did you do there?

10     A.   I cooked there.

11     Q.   How long did you work there?

12     A.   Two, three years.

13     Q.   Let me get some dates here.

14         Do you happen to recall what were the dates

15 that you worked at --

16     A.   I have trouble remembering from the accident,

17 from that point back.  Do you understand what I mean?  My

18 whole head was ripped off.  And my brain was like hanging

19 out, so I don't remember stuff from -- back from -- the

20 accident, from that point back.  Some things I do

21 remember.  Some things I don't remember.  Dates, like even

22 when I graduated from high school, that's fuzzy in my head

23 today.  I don't remember that.

24     Q.   Do you have like a memory problem?  Was it

25 diagnosed?

1      A.      Just from stuff of the past, you know what I

2   mean?  From the accident and back.  But since the

3   accident, I know everything.

4      Q.      Have you seen a doctor about your memory

5   problems?

6      A.      Yeah, there's no problem.  He said stuff will

7   come back to me from the past.

8      Q.      What was the doctor's name?

9      A.      God, I wouldn't know that.  I would have to look

10   at -- do you know what I mean?

11      Q.      Can you tell me where you saw the doctor?

12      A.      In Scottsdale.

13      Q.      At a hospital or a doctor's office?

14      A.      It was a hospital.  I went to a doctor's office,

15   too.

16      Q.      Do you remember which hospital it was?

17      A.      Scottsdale Memorial, I think it was.

18      Q.      Scottsdale Memorial Hospital?

19      A.      I'm pretty sure.  I'm not --

20              MS. SPETH:  Do you know where you spent the

21   time after the accident?  You were in for a while after

22   the accident.  Do you know where that was?

23      A.      BY THE WITNESS:  It was at that same hospital.

24   The baseball field is right across from it.

25      Q.      BY MR. INGLE:  And you don't remember the

DEPOSITION OF ERIC DUTRA-SUNNICLIFF - 03/31/17

1  doctor's name; is that right?

2      A.    No, but I got paperwork at the house.  I mean, I

3  can look his name up.

4      Q.    Would you mind giving that to Ms. Speth?

5                MR. INGLE:  And can you disclose it or do

6  you want me to subpoena it directly from him?

7                MS. SPETH:  I'm going to object on

8  relevance.  I mean, you are going to ask for his medical

9  records now?

10               MR. INGLE:  That affect his memory, yes.

11               MS. SPETH:  He said it affects his memory

12 from before the accident.

13               And the accident was how many years ago?

14               THE WITNESS:  Oh, geez, seven.

15               MS. SPETH:  I'm going to object on

16 relevance.  I mean, you can make the request if you want,

17 but I can't imagine that you are allowed to go into a

18 witness's, who is a nonparty, medical records and start

19 delving around.  It seems highly confidential and he

20 hasn't waived any rights of his medical privilege.  That's

21 my position.

22               MR. INGLE:  I understand what he said is

23 that his doctor told him it would affect his memory from

24 before the accident, but I would like to actually get that

25 from the doctor himself.

GRIFFIN AND ASSOCIATES - (602) 264-2230

```
1              MS. SPETH:  I understand your position.  I

2    am telling you mine.  That's all.

3        Q.   BY MR. INGLE:  I'm going to need to get those

4    medical records.  So can I send the subpoena to the

5    address that you gave me earlier in this deposition?

6        A.   Sure, if you want.

7        Q.   Do you recall the dates that you worked for R&S

8    Construction, or is that part of what you forgot because

9    of the accident?

10       A.   Let me see.  The accident was -- it was from

11   like --

12       Q.   Your best guess is fine.  I just need a ballpark.

13       A.   -- '95 to like '99.  No, it was 2000 and -- it

14   was probably like from '95 to 2001 is when I got in the

15   accident.

16       Q.   When you worked at the Greyhound Park, was that

17   immediately before you worked for R&S Construction?

18       A.   Yeah, that was before.

19       Q.   Was there a gap in between those two jobs?

20       A.   No.

21       Q.   So from about 2001 all the way back to '95, you

22   worked for R&S Construction, and then from '95 back to

23   about '92, you probably worked at the Greyhound Park; is

24   that right?

25       A.   '93.
```

GRIFFIN AND ASSOCIATES - (602) 264-2230

```
 1        Q.    Can you tell me any other jobs you have had

 2   besides those two?

 3        A.    Yeah.  I mean, I have traveled back and forth

 4   from here to New York and I worked for Evergreen

 5   Construction.

 6        Q.    What did you do for Evergreen?

 7        A.    I was a framer for them.  I built different

 8   houses and all different kinds of stuff.

 9        Q.    And Evergreen Construction is in New York?

10        A.    Yes.

11        Q.    What city?

12        A.    Tupper Lake.

13              They are no longer there.  The reason why I

14   know this is because my friend owned the company.

15        Q.    Who is your friend?

16        A.    Mark Dewyea.

17        Q.    What is it?

18        A.    ████████████████████████

19        Q.    How do you spell the last name?

20        A.    ████████████

21        Q.    What did he tell you about the company?

22        A.    What did he tell me about the company?

23        Q.    Did he tell you it went out of business?

24        A.    Yes.

25        Q.    Did he say why?
```

1    A.    No.  He didn't tell me why.

2    Q.    Did he tell you when it went out of business?

3    A.    No.

4    Q.    So besides Evergreen, the Greyhound Park and R&S,

5    can you tell me any other jobs you have had?

6    A.    No.  Well, I mean, I washed dishes when I was --

7    I worked in a restaurant.

8    Q.    Okay.

9    A.    And Wright Way Construction.  That was another

10   company I worked for.  That is W-R-I-G-H-T.

11   Q.    Okay.

12   A.    And that was really it.

13   Q.    Those were both in Tupper Lake?

14   A.    Yeah.  I worked side jobs.

15   Q.    I think we have got enough.  I just kind of

16   wanted to get a general idea what kind of work you did and

17   what your history was.

18          Let me ask you:  In the time since your

19   accident, you said you haven't worked since then?

20   A.    No.

21   Q.    ████████████████████████████████████

22   A.    ██████████████████████████████████████████

23   ██████████████████████████████████████████

24   Q.    ████████████████████████████

25   A.    ██████████████████████████

Confidential

1   Q.   █████████████████████

2   A.   ████

3   Q.   █████████████████

4   A.   ████████████████████████████████████

5   ████████████████████████████

6       Q.   I know you have given me your current address.

7   When did you start living there?

8       A.   When?  Well, I was living there for a while and

9   then I got thrown off the property, because I was kind of

10  like out of control, drinking a lot.  I had a drinking

11  problem.  I still do have a drinking problem.

12      Q.   What kind of drinking problem do you have?

13      A.   You know, I have a few beers and stuff, and kind

14  of -- stuff wasn't going too good out there.  I had a lot

15  of junk out there on the property and they got mad and

16  threw me off the property?

17      Q.   Have you ever been diagnosed with alcoholism?

18      A.   No.

19      Q.   Have you ever been admitted to an alcohol

20  treatment facility?

21      A.   No.  Wait.  I got a DUI.  I had to go to classes,

22  but, no.

23      Q.   We will get to that in a minute.

24           I'm not sure if I ever got the answer.  When

25  did you start living at your current address?

1     A.   I went to jail for a year.  So I wasn't on the

2  property for a year.  So just recently I got back out

3  there.  It's probably been not even five months.  And I

4  really don't stay up there that much.  I got a girlfriend

5  that I stay with every once in a while.

6     Q.   So it's your permanent address, though; right?

7     A.   Right.

8     Q.   So if we need to find you --

9     A.   I will be up there, yeah.  It got me here and

10  that's where you subpoenaed me, so, yeah.

11     Q.   Now I'm going to have to send out another

12  subpoena apparently.  So I know where to send it.

13          So you have been there for about five

14  months.  And before that where were you living?

15     A.   Before that I was living with a friend.

16     Q.   And what is the name of your friend?

17     A.   ████████████████████

18     Q.   ███████████████████

19     A.   ██████████

20     Q.   ████████████

21     A.   ████████████████████████████████████

22     Q.   ████████████████████

23     A.   I'm not too exactly sure.  She lives off --

24          MS. SPETH:  I'm going to ask that this

25  deposition be marked confidential in light of the history

GRIFFIN AND ASSOCIATES - (602) 264-2230

1  with this particular defendant in this case, publicizing

2  things on the Internet in order to harass people, going to

3  people's houses, quote, investigating people for

4  harassment purposes.

5           I think it's very important that we make

6  clear that this is a nonparty witness.  You are asking

7  some very personal information, where he lived, who his

8  friends are, who he hangs out with.

9           THE WITNESS:  People have already called my

10 parents' house and harassed them.

11          MS. SPETH:  He's harassed extensively

12 already.  So I'm going to ask that this deposition be

13 marked confidential so it cannot be used outside of this

14 litigation.

15          MR. INGLE:  I don't see that asking somebody

16 where they live and what their jobs are --

17          MS. SPETH:  You want to know who he lived

18 with and what their addresses are, who his friends are.

19 And again, there's a history of harassment.  This case is

20 about harassment.  And so now you want the details of a

21 nonparty who's been harassed by this particular defendant

22 before, and now you want him to tell you who his friends

23 are and who has taken care of him and where they live.

24          First of all, I don't think he has to answer

25 the question, but if he does, I think it should be marked

Case 2:17-cv-01686-DLH Document 51 Filed 03/31/17 Page 23 of 136

1   confidential.  I don't want your client to abuse this the

2   way he has abused this information in the past.

3                   MR. INGLE:  Well, I'm not prepared to

4   discuss whether we will mark this confidential at this

5   time.

6                   MS. SPETH:  I'm marking it confidential

7   pursuant to your protective order.  I have the right to do

8   that pursuant to the protective order.  I'm designating it

9   confidential.

10                  If you don't consider it confidential, then

11  you will have to move to lift the designation.

12                  MR. INGLE:  We are.

13                  MS. SPETH:  You are what?

14                  MR. INGLE:  Moving to lift the designation.

15                  MS. SPETH:  Keep that in mind as you answer

16  questions.  He's telling you they want to use this outside

17  of this lawsuit.

18                  THE WITNESS:  No.

19                  MR. INGLE:  Hey --

20                  MS. SPETH:  Why else would you lift the

21  designation?

22                  THE WITNESS:  That's the reason why I don't

23  want to give people's names, because you are going to

24  harass them just like I have been harassed, you know.

25                  MR. INGLE:  Take five here.

1          Are you making an objection?

2          MS. SPETH:  I'm telling you that if you are

3     telling the witness that you are going to move the con- --

4     lift -- you are going to make a motion to lift the

5     confidential designation, what that means is that you

6     object to it being used only in this lawsuit, which means

7     you want to use it outside of this lawsuit.  And I think

8     the witness needs to understand that before he starts

9     giving your client information that he may use to harass

10    him more.

11          MR. INGLE:  Ms. Speth, I am going to invoke

12    Rule 32(b)3.  All objections can be to form.

13          MS. SPETH:  No.  I'm moving for a protective

14    order on this issue.

15          So I can tell the witness he doesn't have to

16    answer the question until the court decides the issue.

17    Q.    BY MR. INGLE:  Is Ms. Speth your attorney?

18    A.    No.

19          MS. SPETH:  We already went through that.

20          THE WITNESS:  No, but I don't want these

21    people harassed.  There's no reason why I should be giving

22    you these names if I know you are going to harass them,

23    you know.  I have already had --

24          MR. INGLE:  I have no intention of -- my

25    client has no interest in harassing anybody.  I'm asking

 1    you questions due to the facts of this lawsuit.

 2                    THE WITNESS:  You are asking me questions --

 3    he has written down all of the names.  I know these people

 4    are going to be harassed.  And I don't want these people

 5    harassed.

 6                    MS. SPETH:  Mr. Ingle, if you are not going

 7    to --

 8                    THE WITNESS:  If I need to get an attorney,

 9    I will.

10                    MR. INGLE:  Let's go off the record for a

11    minute.

12                    MS. SPETH:  I would prefer that we not go

13    off the record.

14                    MR. INGLE:  It's my deposition.  I go off.

15                    MS. SPETH:  And I'm objecting to it being

16    off the record.

17                    MR. INGLE:  If he wants an attorney, I'm

18    going to tell him go find one.

19                    MS. SPETH:  Mr. Ingle, if you don't have any

20    reason to use this outside of the lawsuit, why would you

21    say you would be moving to lift the confidential

22    designation?  Can you explain that to me?

23                    MR. INGLE:  Yes.  He has engaged in a

24    pattern of behavior across multiple lawsuits designed to

25    prevent and obstruct discovery, and I'm not going to have

1   it here.

2                   MS. SPETH:  No.  Try answering the question

3   I asked.

4                   If you are not going to use it outside of

5   the lawsuit, why would you move to lift the confidential

6   designation?

7                   MR. INGLE:  My lift will be set forth in my

8   motion.

9                   There's no reason to have this discussion

10  now.  We are here for the deposition.

11                  MS. SPETH:  Again, the witness will do as he

12  pleases.

13                  THE WITNESS:  Do I have to answer my

14  friends' names who have been harassed?

15     Q.   BY MR. INGLE:  I'm not going to harass any of

16  your friends.

17     A.   I know, you may not.  Somebody else may.

18     Q.   There's some allegations in this lawsuit, and I

19  just need to understand the facts that support them.  So

20  I'm only asking you about the things that have been said

21  about you by the plaintiff, by Mr. Magedson.  I want to

22  find out the truth.

23     A.   Why don't you ask me those questions?  Don't ask

24  about where all my friends are and where my family is

25  living.  What?  Are you going to harass all of them now,

1    too?

2              You think everybody that has something to do

3    with Ed or the names that come up with this or names that

4    I have, that is harassment.

5              You can ask questions about me, ask

6    questions about Ed.  You don't have to ask about my family

7    and my good friends.

8              So what?  He looks them up and then he goes

9    and harasses them.  It may not be him, but it will be his

10   friends that are in there now.

11   Q.    But part of this lawsuit concerns you and where

12   you were and where you lived.

13   A.    Right.  So ask those questions.

14             MS. SPETH:  What part of this lawsuit

15   concerns Mr. Skelling?

16             MR. INGLE:  Well, we are going to discuss it

17   here today.

18             MS. SPETH:  Okay.  Well, I don't think that

19   that was an accurate statement, but let's go back and do

20   questions and answers and see how we do.

21   Q.    BY MR. INGLE:  We got your current address where

22   you have lived for five months.  And then you lived with a

23   friend of yours before that?

24   A.    Right.

25   Q.    And you don't really remember -- we have got the

DEPOSITION OF ERIC DRAILLING

1  friend's name; right?

2      A.    Yeah.   Yeah.   I wish I didn't give it, because I

3  didn't want to give it.

4      Q.    How long did you stay there?

5      A.    Nine months.

6      Q.    So you stayed there from the point you got out of

7  jail?

8      A.    Yes.

9      Q.    So you got out of jail, went to this lady's

10  house, stayed there for nine months, and now you have your

11  current address where you have stayed for five months?

12      A.    Correct.

13      Q.    Do you know the address of the place where you

14  stayed for nine months?

15      A.    No.

16      Q.    Do you know about where it is?

17      A.    Yes, I'm aware of where it is, but what does that

18  have to do --

19              MS. SPETH:   I'm going to object on

20  relevance.   And if necessary, I will move for a protective

21  order on this issue.

22              MR. INGLE:   Understood.

23              All objections are to be to form.

24              MS. SPETH:   No.   Actually, if I'm moving

25  for protective order, the witness does not have to answer

1   the question.

2                  MR. INGLE:  Are you instructing him not to

3   answer?

4                  MS. SPETH:  I'm not instructing the witness

5   anything.  I am telling you, I'm moving for a protective

6   order on this issue.

7                  The address of his friends could not be

8   further from relevance in this case, and I will move for

9   protective order.

10                 MR. INGLE:  Ms. Speth, I'm going to tell you

11  one more time, all objections will be to form.

12                 MS. SPETH:  You know what?  You don't tell

13  me what to do.  You need to read your rules.  If I --

14                 MR. INGLE:  We are going to stop this and

15  get a judge to rule.

16                 MS. SPETH:  Let's do that.  Let's get a

17  judge on the phone.  I think that's a fabulous idea.

18                 MR. INGLE:  Please stop.

19                 (Recess taken at 11:34 a.m. until 12:08

20                 p.m.)

21                 MR. INGLE:  Back on the record.

22                 Let the record reflect that I'm going to

23  refrain from asking any more questions about

24  Mr. Skelling's address until we hear from the judge.

25                 MS. SPETH:  And I appreciate that.

1      MR. INGLE:  For now, the deposition will

2  continue on other topics, and Ms. Speth has agreed to

3  limit her objections to form, or we need to discuss this

4  with the judge.

5      MS. SPETH:  Until we hear from the judge,

6  yes.

7      Q.   BY MR. INGLE:  Mr. Skelling, have you ever been a

8  party to a lawsuit?

9      A.   Yes.  For my car accident.

10     Q.   What was the name of the lawsuit?

11     A.   It was -- I was suing people that -- the lady

12  that was driving the car.

13     Q.   Do you remember --

14     A.   Urbower was the last name.

15     Q.   Bower?

16     A.   Urbower.

17     Q.   E-R-B-O-W-E-R?

18     A.   U-R.

19     Q.   U-R?

20     A.   Yes.

21     Q.   And that was a civil lawsuit; right?

22     A.   Yes.

23     Q.   And you were the victim in that lawsuit?

24     A.   Yes.

25     Q.   So you were also the plaintiff, then?

DEPOSITION OF ERIC RENDERING JOB

```
 1        A.    Yes.

 2        Q.    And that lawsuit has been resolved; correct?

 3        A.    Correct.

 4        Q.    Have you ever been involved in any other

 5   lawsuits?

 6        A.    No.

 7        Q.    Ever been involved in any criminal actions?

 8        A.    Yes.

 9        Q.    Can you tell me about some of those?

10        A.    I went to jail for theft of means.

11        Q.    What is theft of means?

12        A.    Apparently, it's not a theft.  It's like -- I

13   don't know.  Theft of means, it means -- theft of means is

14   transportation.  It's like -- it's not a theft.  It is

15   something lower.  And I went to jail for a year.

16        Q.    When was that?

17        A.    That was -- that date, I don't remember.

18        Q.    You can do years.

19        A.    Years, I would say 2006.

20        Q.    Was that Pinal County?

21        A.    Pinal County, yes.

22        Q.    Was it a felony?

23        A.    I don't think so.

24        Q.    Were you convicted or did you plead?

25        A.    I was convicted.
```

Case 2:17-cv-01686-DLR Document 51 Filed 03/31/17 Page 32 of 136

1    Q.    And you served one year in jail; is that correct?

2    A.    Yeah.  It was nine, ten months.

3    Q.    What jail was that at?

4    A.    I did time at Pinal County, and then I did the

5    other part in Tucson.

6    Q.    Do you know where in Tucson?

7    A.    Tucson Correctional Facility.

8    Q.    Have you ever been involved in any other criminal

9    actions?

10   A.    Yeah, I got driving on a suspended.

11   Q.    Do you remember when you got your last one?

12   A.    Yeah, it was probably first of the year.

13   Q.    Here in Arizona?

14   A.    Yes.

15   Q.    Do you remember which county?

16   A.    Maricopa.

17   Q.    How many of those driving on suspended license

18   violations have you had?

19   A.    Three in all.

20   Q.    All here in Arizona?

21   A.    Yes.

22   Q.    Have you been involved in any other criminal

23   actions?

24   A.    I got busted for a marijuana pipe once in New

25   York.

GRIFFIN AND ASSOCIATES - (602) 264-2230

```
 1        Q.    Do you remember what year and how old you were?

 2        A.    No.

 3        Q.    20's?  30's?

 4        A.    No.  I have been on probation in New York for

 5   numerous things.  I'm trying to think of what it was it's

 6   been so long ago.

 7        Q.    When were you placed on probation?

 8        A.    I was 16 years old.

 9        Q.    Are you still on probation?

10        A.    No.

11        Q.    When did you get off probation?

12        A.    I think it was like 17 or 18.  It was a one-year

13   probation.

14        Q.    How old are you now?

15        A.    I'm 36.

16        Q.    So 20 years ago you got caught with a marijuana

17   pipe and you got probation for two years?

18        A.    One year about.

19        Q.    One year.

20              Have you been involved in any other criminal

21   actions?

22        A.    No.

23        Q.    And besides your car accident and this lawsuit

24   here today, you have never been involved in any other

25   civil lawsuits?
```

1       A.    No, never.

2       Q.    Did you review any documents --

3       A.    Oh, yes.  It was like in '95.  I was going into a

4    McDonald's bathroom and that door jumped back and it

5    pinned my hand and it broke my hand.  And they paid for my

6    doctor bills.  And I think I got like $1,000 out of it.

7    My doctors' bills were paid for and everything.

8       Q.    Where was that?

9       A.    That was at -- in Apache Junction.  And it was

10   the McDonald's that burned down.  I'm not sure.  It is

11   right across from the Greyhound track while I was working

12   there.

13      Q.    So is this back in the '90s sometime?

14      A.    Yeah, '90s sometime.

15      Q.    Do you remember, was it like '90 --

16            MS. SPETH:  He said '95.

17      Q.    BY MR. INGLE:   '95?

18      A.    '95, that sounds about right.

19      Q.    So it was a civil lawsuit that you were, again,

20   the plaintiff, I assume?

21      A.    Yes.

22      Q.    And you settled that case; is that right?

23      A.    Yes.

24      Q.    So besides the car accident and the McDonald's

25   suit and this lawsuit that we are here for today, have you

```
 1   been involved in any other civil lawsuits?

 2       A.   No.

 3       Q.   Did you review any documents to prepare for your

 4   deposition today?

 5       A.   No.

 6       Q.   Did you speak with anybody to prepare for your

 7   deposition today?

 8       A.   No.

 9       Q.   Talk to any friends, family, witnesses in this

10   case?

11       A.   No.  I just got a ride from one of my friends.

12   She dropped me off and asked me what it was for, and I

13   said, "For a deposition."

14       Q.   The friend who dropped you off, are they involved

15   in this lawsuit in any way?

16       A.   No.

17       Q.   Have you ever been sent to discipline for any

18   action taken in a court proceeding?

19       A.   No.

20       Q.   I'm going to let you know that this document I'm

21   looking at is the complaint that was filed in this

22   lawsuit.  I want to ask you if you have knowledge of a

23   couple of things that are in this complaint.

24       A.   Okay.

25       Q.   Reading at Paragraph 13, it says, "In March 2006,
```

1    Brewington anonymously posted on ROR," which means Rip Off

2    Report, "physical threats against an individual named

3    Christopher MacFarland."

4              Do you have any knowledge of that?

5        A.   Nothing.

6        Q.   Do you know anything about a public controversy

7    between the Rip Off Report and Federated Financial, a

8    Florida corporation?

9        A.   No.

10       Q.   Paragraph 15, it says, "In June of 2006,

11   Brewington first made contact with Xcentric seeking

12   information about a posting."

13             Do you have any knowledge of that?

14       A.   No.

15       Q.   Paragraph 16, "In or around June 2006, Brewington

16   e-mailed Magedson seeking information about the posting in

17   question."

18             Do you have any knowledge of that event?

19       A.   No.

20       Q.   Like I said, I'm going to go through some of this

21   stuff to find out what you know and what you don't know.

22   So I'm sorry if some of these seem irrelevant.

23       A.   Yeah, I don't know.

24       Q.   Down on Paragraph 17, it reads, "When Magedson

25   and Brewington spoke by telephone in 2006, Brewington led

GRIFFIN AND ASSOCIATES - (602) 264-2230

1  Magedson to believe he was a federal law enforcement

2  officer."

3          Do you have any knowledge that

4  Mr. Brewington represented to Mr. Magedson that he was a

5  federal law enforcement officer?

6     A.   No.

7     Q.   Brewington and Magedson exchanged some e-mails

8  about who Mr. Brewington is and who he works for.

9          Do you have any knowledge of any e-mail

10  exchange between Mr. Brewington and Mr. Magedson?

11    A.   No.

12    Q.   I'm now looking at Paragraph 46.  It reads,

13  "Brewington publicly announced that he had been, quote,

14  hired, end quote, by Stanley to perform an investigation

15  into the origin of death threat letters to Magedson."

16          Are you aware of that event?

17    A.   No.

18    Q.   Do you have any knowledge of that event?

19    A.   No, not at all.

20    Q.   Paragraph 61 reads, "Brewington provided Stanley

21  with the names and contact information for Xcentric's

22  customers, which Stanley used to harass Xcentric's

23  customers."

24          Do you have any knowledge of Mr. Brewington

25  doing any of that?

1       A.    No.

2       Q.    Are you aware of any financial arrangement

3   between Stanley and Mr. Brewington?

4       A.    No.

5       Q.    Any sort of exchange of money in exchange for

6   private investigation services?

7       A.    No.

8       Q.    Do you have any knowledge of how much money

9   Mr. Brewington has received from Mr. Stanley?

10      A.    No.

11      Q.    Do you have any knowledge of Mr. Brewington

12  assisting Mr. Stanley in any way?

13      A.    No, I don't.

14      Q.    Paragraph 75 reads, "Brewington provides

15  referrals or leads to Russo and QED Media Group, L.L.C.,

16  for services that purport to remove Rip Off Reports and

17  has been compensated for those referrals."

18            Do you have any knowledge of that event?

19      A.    No.

20      Q.    Paragraph 76 reads, "Neither Stanley, Russo, or

21  Brewington ever removed a Rip Off Report or caused a Rip

22  Off Report to be removed."

23            Do you have any knowledge of that?

24      A.    No.

25      Q.    I think I asked you this.  I just want to make

1   sure.

2                Do you have any knowledge of Brewington

3   referring any customers to Stanley and Russo?

4        A.   No.

5        Q.   Do you have any knowledge of Brewington receiving

6   a referral fee from QED Media Group?

7        A.   No.

8        Q.   Did you know that Mr. Brewington had a website?

9        A.   No.

10       Q.   So you wouldn't know what was on that website

11  either?

12       A.   No.

13       Q.   Paragraph 82 says, "Brewington was aware that

14  Stanley was going to engage in tortuous conduct."

15               Do you have any knowledge of that?

16       A.   No.

17       Q.   Paragraph 83, "Brewington was aware that Russo

18  was going to engage in tortuous conduct."

19               Do you have any knowledge of that?

20       A.   No.

21       Q.   All right.  We are on Paragraph 83.  We will get

22  through it fast.

23       A.   That's fine.

24       Q.   I just need to find out what of this you know and

25  what you can testify to.

DEPOSITION OF ERIC DAVIS BICKING HARDAGE

 1              MS. SPETH:  You have a copy of his

 2   declaration; right?

 3              MR. INGLE:  Yeah.  I don't have it in front

 4   of me.

 5              MS. SPETH:  Just to make it easier, that's

 6   everything he knows, but whatever.

 7              MR. INGLE:  We will get there.

 8              I'm sure he will come up in about five

 9   minutes.

10      Q.   BY MR. INGLE:  84, "Brewington provided

11   substantial assistance and encouragement to Stanley and

12   Russo with the intent of promoting the tortuous conduct

13   for Stanley and Russo."

14              Do you have any knowledge of that?

15      A.   No.

16      Q.   So actually, the visit to your house that's

17   alleged to have happened, I'm going to ask you a bundle of

18   questions about that.  I'm going to skip it right now and

19   ask you about some other things that are in this

20   complaint, because we are going to spend a lot more time

21   talking about this, and then we will come back to it.

22              Paragraph 100, "In his attempts to get

23   people to talk to him about Magedson, Brewington would

24   tell neighbors and other persons that they were Federal

25   indictment complaints and that the authorities wanted to

1    get in touch with Magedson."

2                    Has Mr. Brewington ever made such a

3    representation to you?

4         A.    Yes.

5         Q.    Do you know of his -- do you have any knowledge

6    of Mr. Brewington making representations like that to

7    anyone else?

8         A.    No.

9         Q.    What did Mr. Brewington say to you?

10        A.    He said he was a private investigator.  And I

11   could have sworn he said the Apache Junction Police

12   Department.  He showed me his badge and told me that

13   Magedson was wanted for extortion and the FBI was looking

14   for him.

15        Q.    Did he tell you there was a federal indictment in

16   place against Mr. Magedson?

17        A.    No.

18        Q.    Do you know whether Mr. Magedson is, in fact, the

19   subject of criminal charges?

20        A.    No, I don't know.

21        Q.    Mr. Brewington told you that the authorities

22   wanted to get in touch with Mr. Magedson; is that correct?

23   Or did he say that --

24        A.    That he -- that the FBI was looking for him for

25   extortion and that -- can you ask the question again?  Did

```
 1   Mr. Brewington say what?

 2       Q.    Did he say that federal authorities wanted to

 3   talk to him or that there was a warrant out for

 4   Mr. Magedson's arrest or --

 5       A.    The FBI was looking for him for extortion.

 6       Q.    He said that they were looking for him.  Are

 7   those the exact words he used, do you remember?

 8       A.    Yeah, that the FBI was looking for him for

 9   extortion.

10       Q.    Do you know whether that's true?

11       A.    No, I don't know.  No.

12       Q.    You don't know or --

13       A.    No, I don't know if that's true or not.

14       Q.    Now, the visit that occurred -- supposedly

15   occurred at your house.  Where was it?  Where were you

16   living when Mr. Brewington came to visit you?

17       A.    ███████████████████████

18             MS. SPETH:  Wait for the question so the

19   court reporter can take it all down.

20             You might want to do the question again,

21   because he stepped all over the question.

22       Q.    BY MR. INGLE:  Where were you living when

23   Mr. Brewington came to visit you at your house?

24       A.    ████████████████████████████████████

25       Q.    Is that a house or is it like a trailer?
```

1    A.    I was staying in an RV at the time.  I had an RV

2  out there.

3    Q.    Is there an actual house on the property?

4    A.    No.

5    Q.    So is this just a plot of land with your RV on

6  it?

7    A.    Yes.

8           MS. SPETH:  What timeframe are you talking

9  about?  Do you want to know if there is a house there

10  currently or was there at the time?

11           MR. INGLE:  We will do both.

12    Q.    Was there a house there at the time?

13    A.    Yes.

14    Q.    And there's no longer a house there?

15    A.    No.

16    Q.    All my questions are going to be phrased in the

17  time when Mr. Brewington visited you at your house.  If I

18  want to specify the present time, I will specify my

19  question.

20           At the time Mr. Brewington came to visit

21  you, you were living in the RV; correct?

22    A.    Yes.

23    Q.    Whose RV is it?

24    A.    Mine.

25    Q.    You own it?

```
 1        A.    Yes.

 2        Q.    When did you get it?

 3        A.    It was in about 2003.

 4        Q.    Who did you purchase it from?

 5        A.    I don't exactly remember his name.  He was an

 6   older guy.

 7        Q.    How did you find it?

 8        A.    I seen it for sale.

 9        Q.    You just drove by one day?

10        A.    Drove by and seen it for sale.

11        Q.    How much did you pay for it?

12        A.    Seven grand.

13        Q.    Do you still own it today?

14        A.    Yes.

15        Q.    Do you still live there today?

16        A.    Yes.

17        Q.    Does it move?  Is it operational?

18        A.    Yes.

19        Q.    The land that it was on, who owns the land?

20        A.    Ed Magedson.

21        Q.    ████████████████████████████████████

22        A.    ████████████████████████████████████

23   ██████████████████████████████████████████████████

24   ███████████████████████

25        Q.    ███████████████████████████████████
```

Confidential

1 ███████████████████████████

2    A.   ████████████████████████

3    Q.   ██████████████████████████████████████

4 ████████████

5    A.   ██████████████████████████████

6    Q.   You asked them verbally?

7    A.   Well, they are friends of my family and stuff,

8 and my mom, you know, they talked, my mom and Ed.

9    Q.   My next question kind of goes to your address,

10 and hear me out on this one.

11          MS. SPETH:   It's almost 11:30 so we can call

12 the judge if we need to.

13    Q.   BY MR. INGLE:   Where were you living before you

14 lived in that trailer on Mr. Magedson's land?

15          MS. SPETH:   That's also asked and answered.

16 We went over that earlier.

17          MR. INGLE:   I still don't know the answer.

18 I don't think it's a problem.

19    A.   BY THE WITNESS:   I was staying with another one

20 of my friends because I was recovering from the accident.

21 It took me a long time to recover from the accident.  So I

22 was staying at a friend's house.  Which you can call the

23 judge, because I don't want to say his name.

24    Q.   BY MR. INGLE:   I was about to ask you that, so we

25 will --

GRIFFIN AND ASSOCIATES - (602) 264-2230

1          MS. SPETH:  Well, it's good timing, because
2    it is 11:30.
3          MR. INGLE:  Let's take a quick break.
4          (Recess taken.)
5     Q.   ████████████████████████████████████
6    ████████████████████████████████████████████
7    ████████████

8     A.   I didn't pay any rent.
9     Q.   You were allowed to stay there for free?
10    A.   I pay utilities every once in a while.
11         MS. SPETH:  I'm sorry?
12    A.   BY THE WITNESS:  I pay utilities every once in a
13   while.
14    Q.   BY MR. INGLE:  Who are the utility bills going
15   to?
16    A.   Who are they going to?
17    Q.   Are they going to you?
18         MS. SPETH:  You are not asking about
19   currently?  You are asking --
20         MR. INGLE:  No, back then when he was there.
21    A.   BY THE WITNESS:  No, he just gave me a bill for
22   the electric or something.  It had his name on there.
23    Q.   BY MR. INGLE:  So do the bills go to Ed and then
24   he gave them to you or --
25    A.   I'm not sure who they went to, but I got them

1   from Ed.

2        Q.    You got them from Ed?

3        A.    Yeah.  And he would say, give me 40 or 50 bucks

4   for the electric.

5        Q.    So if I understand you correctly, he never

6   actually handed you bills.  He would just come by and say,

7   "Hey, the electric bills came in.  Can you give me 50

8   bucks for it"?

9        A.    No, he wouldn't come by.  He would have another

10  one of my friends come by or somebody like that.  He would

11  never come by himself.  I never really see him that much.

12       Q.    What kind of bills would people come by and ask

13  money for?

14       A.    Electric and cable.

15       Q.    Electric and cable?

16       A.    Yeah.

17       Q.    Anything else?

18       A.    No.

19       Q.    Did you pay those every month?

20       A.    No.

21       Q.    Who paid them on the months you didn't, do you

22  know?

23       A.    ███████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25       Q.    ████████████████████████████████



Confidential

1    A.    ▬▬▬▬▬▬▬▬

2          MS. SPETH: ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

3    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

4    ▬▬▬▬▬

5    A.    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

6    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

7    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

8    ▬▬▬▬▬▬▬▬▬

9    Q.    BY MR. INGLE:  Where did they live?

10    A.    In the back.  They had a little apartment in the

11   back.

12    Q.    In the back of the house?

13    A.    Yeah.  He didn't charge them rent.  They just

14   paid the electric, that's all they had to do.  When they

15   were there, I didn't have to pay the electric anymore.

16    Q.    Do you have any understanding as to why

17   Mr. Magedson let you live on his property for free?

18    A.    He's friends of the family.  I was in a bad car

19   accident, and my parents asked him if I could stay there

20   for a while.  And he said that I could stay as long as I

21   want.

22    Q.    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

23   the other person were allowed to live there rent free?

24          MS. SPETH:  Objection; form.

25          Go ahead.

GRIFFIN AND ASSOCIATES - (602) 264-2230

1    A.    BY THE WITNESS:  I think that they landscaped

2    some of his houses and stuff.

3    Q.    BY MR. INGLE:  So they did landscaping for Ed and

4    he would let them live rent free in the apartment?

5                  MS. SPETH:  Form.

6    A.    BY THE WITNESS:  Yeah, that's when I got --

7    Q.    BY MR. INGLE:  On the day that Mr. Brewington

8    allegedly came to your house and talked to you -- well,

9    the RV and talked to you, were -- is it Brett and Connie?

10   A.    Yeah, they weren't around.

11   Q.    How do you know that?

12   A.    Because they didn't move in then.  Back when I

13   got out of jail -- it was right before I went to jail,

14   they moved in.  And then while I was in jail the whole

15   time, my RV stayed up there, because my RV wasn't there at

16   the time.  It was at another friend's house, because we

17   were remodeling their house, and I brought my RV over

18   there.

19                  Then when I went to jail, I called up Ed and

20   ████████████████████████████████████████████████████████

21   there for two weeks before -- or a month before I went to

22   jail.  And then when I was in jail they were paying the

23   utilities.  And then when I got out, they were paying the

24   utilities.  That's what I was telling you about the

25   utilities.

Confidential

1      Q.    ███████████████████████████████

2   live -- no, they can't live there anymore because there's

3   no house there.

4      A.    Right.

5      Q.    Do you know where they are?

6      A.    No, I haven't seen them.

7      Q.    And at the time that Mr. Brewington allegedly

8   visited you at your trailer, they didn't live there yet?

9      A.    No.

10     Q.    How long was it between that visit and when they

11  moved in?

12     A.    Probably like three months afterwards.

13     Q.    Did anyone live in that house or in the RV with

14  you when Mr. Brewington allegedly came to your house?

15     A.    My dog.

16     Q.    Your dog.  Anyone else?

17     A.    No.

18     Q.    Did you have any friends staying over at that

19  time?

20     A.    No.

21     Q.    Just you.  You were the only person that was

22  there?

23     A.    Yes.

24     Q.    How long had you lived there at the time that

25  Mr. Brewington came to your house?  How long?  How many

1   months or years had you been living there?

2       A.    Three.

3       Q.    Three months?

4       A.    No.  Three years, three-and-a-half years about.

5   Yeah, about three years.

6       Q.    Three years?

7       A.    Yeah.

8       Q.    And you never placed any of the utilities in your

9   name; right?

10      A.    No.  As a matter of fact, the house was for sale,

11  and he had the AC running and stuff, and things running

12  inside.  So he didn't really ask me for much.

13                  I would give him 40, 50 bucks.  He knew I

14  did not have much money, because my parents send me $100 a

15  week, so I lived off $400 a month.

16      Q.    Was your address registered with the post office

17  when you lived there?

18      A.    Not all the time.

19      Q.    But you got your mail there; correct?

20      A.    Yes.

21      Q.    Throughout your stay in that trailer, did you

22  ever have roommates?

23      A.    Yes.  Just recently.

24      Q.    Well, actually, how about just in the time when

25  you lived in that RV on Mr. Magedson's land before you

1  went to prison, did you have any roommates during that

2  time?

3      A.    No.   A lot of people would come and go, because

4  we would have parties and everything.   So then I moved my

5  RV to my friend's house, who was remodeling their house.

6  So, no, because then I ended up going to jail and then I

7  moved back up there.

8      Q.    You said you did have some people that would come

9  by and throw a party; is that right?

10     A.    People would come by and drink and stuff.

11     Q.    You had friends that came by, but you didn't have

12 anybody that would come over and live with you; correct?

13     A.    No.   Just recently I had a girl staying up there

14 and stuff.

15     Q.    Just recently, like after you got out of prison;

16 right?

17     A.    Right.

18     Q.    I understand that there's allegations that

19 Mr. Brewington visited you while you lived in this

20 trailer.

21            Can you tell me about that visit?

22     A.    What would you like to know?

23     Q.    When was it?

24     A.    It was like December.

25     Q.    Of 2006?   2007?   2008?

1    A.    2006.

2    Q.    December '06.

3          Do you remember what day of the week it was?

4    What day was it?  The 13th or 15th?

5    A.    I'm not too exactly sure.  I think it was a

6    Tuesday the first time I seen them.

7    Q.    Around about when?

8    A.    Evening.  It started to get dark out.

9    Q.    So around sunset?

10   A.    Yeah, it was getting dark.

11   Q.    Around 5:00 and 6:00 o'clock?

12   A.    7:00, 7:30.  It was starting to get dark out.

13   Q.    What had you been doing that day?

14   A.    How am I supposed to know that?

15         MS. SPETH:  What were you doing on

16   December 15, 2006?

17   Q.    BY MR. INGLE:  Feel free to say "I do not

18   recall."

19   A.    I was doing nothing.

20   Q.    Just hanging out at your house?

21   A.    Yeah.

22   Q.    Was anyone there with you?

23   A.    My dog.

24   Q.    Anyone else?

25   A.    No.

1    Q.    And Mr. Brewington comes by around 6:30, 7:00,

2    something like that?

3    A.    Yes.

4    Q.    How did he announce his presence?

5    A.    He said, "Hi, I'm John Brewington.  I'm a private

6    investigator."  And I thought he said Apache Junction

7    Police Department.  Showed me his badge.  And then he

8    started asking questions about Ed.

9    Q.    Did he knock on the door?  Ring the door bell?

10   Catch you in the yard?

11   A.    Knocked on the door.

12   Q.    Are you sure that he identified himself as a

13   police officer?  Are you positive?

14   A.    No.  He showed me a badge, an investigator badge.

15   I thought he said Apache Junction Police Department.

16   Q.    I keep hearing you say, "I think he said," "He

17   might have said."

18              Are you sure or do you not remember?

19   A.    I think he did, yeah.

20   Q.    Let me remind you you are under oath.

21   A.    I know that.

22   Q.    And under penalty of perjury, he told you, "I'm a

23   police officer"?

24   A.    He showed me his badge and said, "I work for the

25   Apache Junction Police Department."  He said, "I'm a

1  private investigator for Apache Junction Police

2  Department."

3      Q.    When he introduced himself, did he say, "I'm a

4  private investigator" or "I'm a police officer"?

5      A.    "My name is John Brewington.  I'm a private

6  investigator.  I work for the police department."  I don't

7  know if he said Apache.  And then he showed me his badge.

8  And then I said, "What can I help you with?"  And he was

9  asking about Ed.

10     Q.    What kind of badge was it?

11     A.    He just showed it to me.

12     Q.    Something shiny?

13     A.    Yeah.

14     Q.    Didn't see what the words were on it?

15     A.    No.

16     Q.    Did you see where he kept the badge?  Did he pull

17  it out of his pocket?

18     A.    Pocket.

19     Q.    The inside jacket pocket?  It was on the inside

20  of his jacket; right?

21     A.    Yes.

22     Q.    Hooked to his pocket?

23     A.    I saw a badge.

24     Q.    Kind of like this kind of thing?

25     A.    You know, I might be mistaken.  He just flashed a

Case 2:17-cv-01686-DLR Document 51-1 Filed 03/31/17 Page 56 of 136

1  badge.   Pulled out his wallet and showed it to me like

2  this.

3      Q.    Was it in his wallet or his back pocket wallet?

4      A.    No, his jacket.

5      Q.    From somewhere in his jacket he pulled out a

6  badge?

7      A.    Like that.  And it has been a while, so I'm

8  trying to get this -- it was two, three years ago.

9      Q.    Fair enough.  To the best of your recollection

10 just tell me what happened.  And if you don't remember,

11 just say, "I don't remember" or give me your best idea.

12 Like, "I think he had it in his jacket."

13     A.    I don't remember where he pulled it out.  He

14 pulled it out.

15     Q.    You are sure he pulled out a badge, but you don't

16 know where he pulled it from?

17     A.    Right.  Yeah.  I don't know where.

18     Q.    So you didn't see it for --

19     A.    It could have been an investigator badge.  Who

20 knows.  I don't know if private investigators have to have

21 badges or what.

22     Q.    Was it in a stand-alone badge case where all it

23 had in there was a badge or was there other stuff in

24 there?

25     A.    Just the badge.

1    Q.    You did not see other identification?

2    A.    I don't remember exactly.

3    Q.    So he said, "I'm an investigator."  Showed you

4    his badge.

5                How long did you see the badge for?

6    A.    Just a second.  He flashed it.

7    Q.    Long enough to recognize it was a badge, not long

8    enough to see where it was from; is that correct?

9    A.    Correct.

10   Q.    And what happened next?

11   A.    Then he asked me where Ed was.

12   Q.    What did you say?

13   A.    I said, "I don't know."  He said, "Well, he's

14   wanted by the FBI" and the law or something "for

15   extortion."

16   Q.    He said, "He's wanted by the FBI for extortion."

17   And what did you say?

18   A.    I said, "I don't believe that."

19   Q.    You said, "I don't believe that."  What happened

20   next?

21   A.    He got all mad, because I wouldn't tell him where

22   Ed was at.  I didn't know where he was at.  I didn't even

23   know where he was living.  And he took off.  Walked up the

24   road.  Got in his vehicle and took off.

25                And a couple nights later, he came back on a

1    Harley.  And then he said the same thing over again.  "I'm

2    looking for Ed."  Tells me I'm going to get in trouble if

3    I don't tell him where Ed is at.

4                   And then he left again.  And then later on

5    that night came back again and pounded on the door.  Woke

6    me up.  The dog was barking.  And then he started yelling

7    all kinds of crap again, and then he left again.  Didn't

8    see him again until -- the next night there were two

9    bullet shots.  I don't know if it was him or what, but two

10   bullet shots went off.  And I haven't seen or heard from

11   anybody else again.  I haven't had no problems with

12   anybody.

13                   Until I got out of jail and he showed up

14   there.  He said he was a private investigator and I just

15   hung up the phone.  That's it.

16      Q.   Let me get into -- let me break that apart a

17   little bit.

18                   You said he showed up, identified himself,

19   showed you his badge, and began asking you about Ed.  And

20   you said you didn't know where he was.  And then you said

21   Mr. Brewington got mad.

22                   How do you know he got mad?  Did he say

23   anything?  Did he turn red and start to shake?

24      A.   He got upset when I told him I didn't know where

25   Ed was.  He said I would be in trouble, too.  He told me I

1  would be arrested, too.

2     Q.   No.  I mean, what did he say to you that made you

3  think you were going to get in trouble?

4     A.   I don't even remember.

5     Q.   Okay.  That's fine.

6            So then Mr. Brewington left after that; is

7  that fair?

8     A.   Yes.

9     Q.   He was driving a vehicle?

10     A.   Yeah, looked like a Suburban or pickup truck.  It

11  was out by the road.

12     Q.   What color was it?

13     A.   It was dark.

14     Q.   Could you tell what color it was?

15     A.   No, I couldn't.

16     Q.   Something dark?

17     A.   Yes.

18     Q.   Do you remember what kind of vehicle it was?

19            MS. SPETH:  Objection; form.  He said it was

20  dark.  I don't think he meant the car.  I think he meant

21  the night.

22     Q.   BY MR. INGLE:  Let me clarify.  When you said it

23  was dark, did you mean the car was a dark color?

24     A.   No, it was dark out.

25     Q.   So you couldn't tell what color the car was?

```
 1        A.    No.

 2        Q.    Thank you for clarifying that.

 3               What was Mr. Brewington wearing?

 4        A.    He was wearing a leather jacket.

 5               MS. SPETH:  There was more than one time.

 6   Form.

 7        Q.    BY MR. INGLE:  On the very first visit, I'm

 8   asking what --

 9        A.    I don't remember.

10        Q.    Was he wearing a police uniform?

11        A.    No, I know that.  No, he wasn't.  I don't

12   remember what he was wearing, but it wasn't a police

13   uniform.

14        Q.    Presumably he was wearing some sort of street

15   clothes, casual attire?

16        A.    I don't remember.

17        Q.    But you know he wasn't wearing a law enforcement

18   officer uniform; correct?

19        A.    No.

20        Q.    Is that correct?

21        A.    Correct.

22        Q.    His badge wasn't displayed; right?  It wasn't

23   out -- it wasn't visible.  He had to pull it out from a

24   pocket; is that correct?

25        A.    Yes.
```

1      Q.    Was he wearing a gun or utility belt?

2      A.    I don't know.

3      Q.    Did he have a gun strapped to the side of his leg

4    or --

5      A.    No, I did not see it.

6      Q.    Did he have like a police officer utility belt

7    with like a radio, baton, flashlight, anything like that?

8      A.    No, I did not see it.

9      Q.    I know you don't remember exactly what he was

10   wearing, but was it like jeans, T-shirt, and a jacket,

11   that kind of thing?

12     A.    I don't know.  I already told you, I don't

13   remember.

14     Q.    I was just curious.

15     A.    No, I don't remember.  I don't remember what he

16   was wearing.  I told you that.

17     Q.    To the best of your recollection, what did you do

18   after Mr. Brewington left?

19     A.    I was watching TV before he got there.  I went

20   back to watching TV.

21     Q.    Did you call anybody?

22     A.    I couldn't call anybody.  I didn't have a phone.

23     Q.    Did you talk to anybody in person?

24     A.    No.

25     Q.    Do you have a computer there?

1    A.   No.

2    Q.   Did you later tell anybody about that visit?

3    A.   Yeah.

4    Q.   Who did you tell?

5    A.   I told my next door neighbor kid.  That's who I

6    told.  And I told Ed.  I went and used my friend's phone

7    and called him up.

8    Q.   When you said you told a neighbor and then you

9    said kid, is that their name or the neighbor's kid?

10   A.   The neighbor's kid came over after that and I

11   told him.

12   Q.   So you didn't tell the neighbors.  You told their

13   child?

14   A.   Right.

15   Q.   The neighbors, what are their names, the

16   neighbors whose kid it was?

17              THE WITNESS:  Do I have to say that?

18              MS. SPETH:  I will mark it confidential.

19   A.   ████████████████████

20   Q.   ████████████████████████████████

21   A.   ████████████████████████████

22   ████████████████████████████

23   Q.   ████████████████

24   A.   ████████████████████████

25   Q.   So this isn't like a little kid.  This is like an

GRIFFIN AND ASSOCIATES - (602) 264-2230

1    18-year-old?

2        A.   Yeah.  He's the youngest out of the family.  He's

3    probably -- he was probably like 15 back then.

4        Q.   You said you told Ed.  How did you tell Ed?

5        A.   I used my friend's phone.

6        Q.   What friend?

7        A.   ██████████████████████████

8        Q.   ██████████████████

9        A.   We used to work together.

10       Q.   Over at?

11       A.   I met him when I was working for R&S.

12       Q.   And he also worked at R&S?

13       A.   Yes.

14       Q.   When did you use his phone to speak with Ed?

15       A.   I think it was like the next day.

16       Q.   How did you get to your friend's house?

17       A.   He came out to see me.

18       Q.   And he brought his phone with him?

19       A.   Yes.

20       Q.   And you said, "Hey, can I borrow your phone?"

21       A.   Yeah.  He's the one that took care of me when I

22   was hurt.

23            But now, if he's going to be writing this --

24   it don't matter, because he can't take nothing out of this

25   room; right?

1        Q.    All of the information about where you live, who

2    you lived with, what their names are, that information

3    will never leave.

4        A.    ██████████████████████

5                    MS. SPETH:  Since we agreed that what the

6    judge said won't leave this room, Mr. Brewington will

7    leave those notes behind, those portions of the notes

8    where we wrote down names of the people?

9                    MR. INGLE:  Off the record.

10                   (Discussion had off the record.)

11                   MR. INGLE:  Back on the record.

12       Q.    How did you know which phone number to call to

13   get in touch with Ed?  Do you know Ed's phone number?

14       A.    Of course, yeah, I know his phone number.

15       Q.    Are you keeping it a secret?

16       A.    ████████████████

17       Q.    You have got that memorized.  Has he had that

18   number for a long time?

19       A.    Uh-huh.

20       Q.    Years?

21       A.    Yeah, a while.

22       Q.    So it's the same number you call to get in touch

23   with him?

24       A.    Yes.

25       Q.    What did you tell him when you called him?

1    A.   I just told him somebody stopped by.  I didn't

2    even say whose name it was.  I just said, "Somebody

3    stopped by and said they were looking for you."

4    Q.   What did Mr. Magedson say?

5    A.   He said, "Really."  And I said, "Yeah."  And he

6    said, "What did the guy look like?"  And I told him.  And

7    he said, "Oh, no."

8    Q.   Did he know who he was?

9    A.   Yeah, after I told him what he looked like.

10    Q.   What did he say?

11    A.   He said, "You are in trouble now.  You better

12    move out, because he's going to be looking for me."

13    Q.   When you described Mr. Brewington to Ed, did Ed

14    say, "Oh, I know who that is" or anything like that?

15    A.   He said, "Oh, my God.  Man, what's he doing out

16    there?"

17    Q.   Did he give you any names?

18    A.   He said, "It must be Brewington."  That's the

19    first time I ever heard his name.

20    Q.   He said, "Oh, it must be Brewington.  You should

21    move out, so he doesn't come around asking questions"?

22    A.   He said, "He's probably going to cause you

23    problems. You can't tell him anything about me."  I said,

24    "I don't even know much about where you are at."  I don't,

25    because to this day, I have been to his house, but I still

1  don't realize where exactly it is, you know what I mean,

2  because I'm not familiar.

3      Q.    There's a great many people in the same boat.

4            Did you and Mr. Magedson discuss anything

5  else in that phone call?

6      A.    No.  I don't remember.  We may have went over a

7  few things.  And he said, "Oh, it must be Brewington."

8      Q.   Did he tell you you should move out?

9            MS. SPETH:  Asked and answered.

10            Go ahead.

11      A.    BY THE WITNESS:  Did he say I should move out?

12  Yeah.  He said, "You are going to have all kinds of

13  problems up there.  You have problems with me, you should

14  move out."

15      Q.    BY MR. INGLE:  Let me clarify.

16            Did he tell you you have to move out or --

17      A.    No, he didn't say I have to.

18      Q.    But he said, "It might be a good idea for you to

19  move out"?

20      A.    Yeah.

21      Q.    Did you speak with Ed again before you saw

22  Mr. Brewington again?

23      A.    No.

24      Q.    When is the next time you saw Mr. Brewington?

25      A.    It was not -- like two nights later he came.

```
1    Pulled up on a motorcycle.  I couldn't tell you what kind
2    it was.  And he said I was going to be in a lot of trouble
3    if I didn't tell him where Ed was at.  And I told him I
4    didn't know where he was.  And he got huffy and puffy and
5    left again.
6                    He came back later on that evening, probably
7    about 11:30, 12:00 -- I'm sleeping -- banging on the door.
8    My dog is barking.  And he asked me again, he said, "I
9    will shoot your dog," this and that.  And he goes and
10   leaves and walks back out and takes off.
11                   And then it was like two nights later the
12   gunshots went off, two or three gunshots went off.  And
13   the next door neighbors heard it, because I went over
14   asking.  And they said, "Yeah, we heard it."  And that was
15   it.
16       Q.    So when he came back, about what time was it?
17       A.    I just told you.
18       Q.    You said that he came back twice.  The first
19   time --
20       A.    It was like about 4:30, 5:00.  And then he came
21   back later on that night and it was like about 11:30 or
22   12:00.
23       Q.    Let's call the 4:30, the second visit, the second
24   time he's at your house.  And the 11:30 visit we will call
25   that the third visit.
```

```
 1              The second visit you said he arrived on a
 2   motorcycle?
 3       A.   Yes.
 4       Q.   How do you know that?  How did you get outside to
 5   see what he was driving?
 6       A.   I heard it.
 7       Q.   Did you ever go outside and look at the
 8   motorcycle?
 9       A.   I'm sorry?
10       Q.   Did you ever see it yourself?
11       A.   No.  Well, we talked about motorcycles for a
12   minute.  And then he started asking about Ed, and I told
13   him, "I don't know where Ed is at."  And then he left.
14              And then he came back about 11:30 or 12:00
15   and was banging on my door telling me I was going to be in
16   all kinds of trouble if I didn't tell him where Ed was at.
17   Threatening to shoot my dog.  I told him to leave the
18   property now.  And he left and took off.  Two nights
19   later, gunshots went off.
20       Q.   On the second visit, what was Mr. Brewington
21   wearing?
22       A.   He was wearing a black leather jacket.
23       Q.   Do you remember what else he was wearing?
24       A.   He had a scarf around his neck.
25       Q.   What color was the scarf?
```

DEPOSITION OF ED SCHILLING

1    A.    Red.

2    Q.    So a black leather jacket, a red scarf.  Do you

3  remember anything else about what he was wearing?

4    A.    No.

5    Q.    Did he knock on the door?  Ring the door bell?

6  See you out front?  How did he get in touch with you?

7    A.    I heard the motorcycle pull up the first time.

8  So I went outside and explained to him I didn't know where

9  Ed was.  And he got huffy and puffy and left, and told me

10  I was going to be in trouble.

11          And then he came back that night.  He's

12  banging on the door.  My dog started barking.  Threatening

13  to shoot my dog.  And he said I would be in trouble if I

14  didn't tell him stuff.

15          And then I told him to get off the property.

16  He went out and jumped on his bike.  He was yelling at

17  something, mumbling other stuff.  I couldn't even catch

18  what he was saying.  Got on his motorcycle and drove off.

19    Q.    At the time of the second occasion, was there

20  anyone else at your house?

21    A.    No, there is rarely anybody out there.  Or ever,

22  no.  No.

23    Q.    I wanted to know if anybody else was there.  I

24  have to ask --

25    A.    No.

1     Q.    -- to see if there was anybody else who may have

2  seen or heard any of that.

3              Was there anybody else around to see or hear

4  any of that, do you know?

5     A.    It was probably two nights afterwards when the

6  gunshots went off.

7     Q.    I will ask you about that in a second.

8              Now, you said Mr. Brewington again inquired

9  as to where Ed was.

10             Do you remember exactly what he said?

11    A.    He said I'm going to be in big trouble.  He asked

12 if I knew where Ed was.  If I don't tell him where Ed is,

13 I'm going to be in trouble.  I said, "I don't know."  I

14 said, "I don't know when he's coming or going," when he

15 comes up there, you know.

16    Q.    Did he tell you you are going to be arrested for

17 impeding a federal investigation --

18    A.    Yeah.

19    Q.    You are going to have to let me --

20    A.    Second time.

21    Q.    I want to finish my question so she can take it

22 down and get your answer.

23             Did he say you are going to be indicted for

24 hindering an investigation or did he say you are going to

25 be in tons of trouble?

Case 2:17-cv-01686-DJH   Document 51   Filed 03/31/17   Page 71 of 136

1    A.    He said I was going to be arrested.   I would be

2  in trouble if I didn't tell him where Ed was at.

3    Q.    Did he tell you what you were going to be

4  arrested for?

5    A.    No.

6    Q.    Who was going to arrest you?

7    A.    No.

8    Q.    Tell you what you supposedly had done wrong?

9    A.    No.

10    Q.    He said you were going to be arrested?

11    A.    Yes.

12           And then he came back the second time and

13  told me I'm going to have big problems.   All kinds of

14  stuff.   He's going to shoot my dog.   I told him to get the

15  hell out of here.   He left the property.   He's mumbling

16  something.   Jumped on his motorcycle and took off.   I

17  don't know.

18           Do you have a question about that part?   I

19  have already said it five times what happened.

20    Q.    Actually, I do have a couple follow-up questions.

21           During the second visit, he said, "Where is

22  Ed?"   You said, "I don't know."   He said, "You are going

23  to get in trouble if you don't tell me."

24    A.    That's when he left the second time.   He came

25  back a third time.

```
 1              MS. SPETH:  Let him finish his question.
 2       Q.   BY MR. INGLE:  Did you guys talk about anything
 3   else before he left on the second visit?
 4       A.   (No oral response.)
 5       Q.   No?
 6       A.   No.
 7       Q.   And then he comes back the third time.  And
 8   that's on the same day, it's just later on that night; is
 9   that correct?
10       A.   Yes.
11       Q.   You said it's around 11:30 p.m.?
12       A.   Yes.
13       Q.   Did Mr. Brewington knock on your door again or
14   did you hear the motorcycle and come out?
15              MS. SPETH:  Asked and answered.
16       A.   BY THE WITNESS:  Yes.
17       Q.   BY MR. INGLE:  Which one?
18       A.   He pounded on my door.
19       Q.   He pounded on the door.  Were you asleep?
20              MS. SPETH:  Asked and answered.
21       A.   BY THE WITNESS:  Yes.
22       Q.   BY MR. INGLE:  So you go over to the door.  You
23   open it.  You see Mr. Brewington.
24              Was he wearing the same clothes that he was
25   wearing earlier that day?
```

1     A.    Yes.

2     Q.    Did you see a badge?

3     A.    No.

4     Q.    Did he show you a badge on either the second or

5 third visit?

6     A.    No.  He pulled out his thing and showed me a gun.

7 He said I'm going to be in a lot of trouble.  And I told

8 him I did not know where Ed was at.  That was the third

9 time.  I told him to, "Get the hell off the property."  He

10 was going to shoot my dog.  I told him to, "Get the hell

11 off the property."  He left.  Went off mumbling something.

12 Jumped on his bike and drove off.

13     Q.    Did he tell you he was an investigator during

14 either the second or third visits?

15     A.    No.

16     Q.    Did he tell you he was a police officer either

17 the second or third visit?

18     A.    No.

19     Q.    Did he tell you he was any sort of law

20 enforcement official?

21     A.    No.

22     Q.    You say he moved this thing and you saw a gun.

23 When you say "thing," you meant, he pulled his jacket to

24 one side to show you a gun?

25     A.    Yes.

Case 2:17-cv-01686-DLH-C Document 51  Filed 03/31/17, Page 74 of 136

1      Q.    Was it the left side of the jacket or the right

2  side?

3      A.    (Indicating.)

4      Q.    So that would be his left hand pulling out the

5  left side of his jacket.

6             And the gun was attached to his hip?  His

7  thigh?  His shoulder holster?

8      A.    It looked like it was on a shoulder holster.  I

9  couldn't tell what kind of gun it was.  He showed me the

10  gun.  He told me I was going to have a lot of problems.

11      Q.    What color was the gun?

12      A.    Black.

13      Q.    Was it a nickel-plated gun?

14      A.    (No oral response.)

15      Q.    What part of the gun could you see?

16      A.    Not much of it.  I vaguely remember.

17      Q.    What part could you see?

18      A.    I seen the handle part.

19      Q.    So the grip?

20      A.    Yeah.

21      Q.    Did you see a magazine?

22      A.    I don't remember.

23      Q.    Ammunition?

24      A.    I don't remember.

25      Q.    Do you remember if it was an automatic weapon or

1    revolver?

2        A.    I don't know.

3        Q.    A handgun, though; right?

4        A.    Yes.

5        Q.    What did he say to you on that third visit at

6    11:30 at night?

7        A.    Do you want to hear it?

8        Q.    Precise words.

9        A.    He banged on the door.  He said he wanted to know

10   where Ed was at.  Where he lived.  I told him, "I don't

11   know where Ed is.  I don't know when he's going to be back

12   around here."

13               And then my dog kept barking.  He said, "I

14   will shut that dog up.  I will kill that dog."  He said,

15   "You are in a lot of trouble."  I told him he had to leave

16   the property and go.  And he walked off mumbling stuff and

17   jumped on his motorcycle and drove off.

18       Q.    And you were outside and watched him leave?

19       A.    Yeah.  The door was shut because of the dog when

20   he started walking up, because he was afraid of him.

21       Q.    Do you have some sort of screen door that you can

22   see through?

23       A.    No.

24       Q.    I'm just curious, if he shows up at 11:30 at

25   night and you guys are talking in your doorway, where is

Case 2:17-cv-01686-DLH Document 51 Filed 03/31/17 Page 76 of 136

1  the light that allows you to see what's happening?

2      A.    There's sensor lights.

3      Q.    Motion sensitive?

4      A.    Yeah.

5      Q.    So when somebody walks in front of your house,

6  the lights come on?

7      A.    Yeah, when it's dark out they come on.

8      Q.    How many of those floodlights are on your RV?

9      A.    There's one, two, three -- let me see.  There's

10  one, two, three, four, five, six sensor lights that

11  were -- when somebody walks by, they turn on and there are

12  three of them that are on all the time until the morning.

13      Q.    So you have six motion sensor lights and three

14  always-on-at-night lights?

15      A.    Right.

16      Q.    How many lights were on when Mr. Brewington

17  visited you on the third occasion?

18      A.    I don't remember.  I don't remember that.

19      Q.    Were some of the lights on?

20      A.    Yeah, there were some on.  I don't remember

21  exactly how many.

22      Q.    How many of those floodlights face the front of

23  your trailer where Mr. Brewington would have been?

24      A.    Two.  I don't remember if they were on.

25      Q.    But the lights that enabled you to see

1    Mr. Brewington was coming from some of these floodlights;

2    is that correct?

3        A.    He wasn't that far away from me.  I knew exactly

4    who he was.  He was banging on my door when I opened it.

5        Q.    Did you have lights on inside your trailer?

6        A.    Yeah.

7        Q.    You said you were asleep.  I thought it might be

8    dark.

9        A.    No.  I have sensor lights that turn on.  If you

10   walk by them, they turn on.  And I don't remember.

11       Q.    Let's talk about the gunshots.

12              Actually, I'm sorry.  After the second and

13   third visits, did you talk to Ed Magedson again?

14       A.    The following day -- or was it two days

15   afterwards?

16       Q.    One or two days later you spoke to Ed.  By phone

17   again?

18       A.    No.

19       Q.    In person?

20       A.    Yes.

21       Q.    Where?

22       A.    He drove out to the property.  It was like three

23   days afterwards, or four days afterwards, after the

24   gunshots went off.  That was the last -- no, I didn't talk

25   to him the next day.  I didn't talk to him after -- I

1   talked to him after the gunshots, which was two days

2   afterwards, and then the following day he drove up there.

3      Q.   So you didn't talk to Mr. Magedson between the

4   second and third visits and the gunshots?

5      A.   Correct.

6      Q.   Let's talk about the gunshots.

7          How many days after Mr. Brewington's third

8   visit to your house do the gunshots occur?

9      A.   Two days.

10      Q.   As I recall, those gunshots occurred sometime in

11   the night?

12      A.   Yes.  And the neighbors next door heard it, too.

13      Q.   So one or two days later these gunshots go off.

14          Did you see who fired the gunshots?

15      A.   No.  I don't know.

16      Q.   How do you know they were gunshots?

17      A.   How do I know?  Because it was boom, boom.

18   Because my next door neighbor, he said, "What's going on?"

19   And I said, "Somebody drove by and shot bullets at the

20   house."  And they said, "Yeah, somebody drove by and

21   shot."  And we both agreed that is what it was.

22      Q.   So because you heard the loud sound, you agreed

23   it had to be a gunshot?

24      A.   Well, it was.

25      Q.   Was there anything else that told you it was a

1   gunshot besides hearing it?

2       A.    It was a gunshot.  I got a tire blown off my RV.

3   I don't know if they shot at the house or they shot at --

4   when I went out there the next day, there was a hole in

5   the RV.  It could have ricocheted.  I don't know.  I

6   changed the tire.  I still have the tire in the back of my

7   RV.

8       Q.    Was there anything else that told you it was a

9   gunshot besides hearing it?

10      A.    Yeah, my tire was shot out on my RV.

11      Q.    Is that it?

12      A.    That, and I showed him on his house when he came

13  where one of bullets hit the house.  It was right in

14  front.  You could see where it hit.  That's how I know.

15      Q.    So you heard it and then the next day you noticed

16  a hole in the RV and you thought, "Hey, that had to be a

17  gunshot"?

18      A.    No, I didn't think it.  It must have been

19  ricocheted and went through my tire.  It was a gunshot.

20      Q.    Was there anything else that told you it was a

21  gunshot?

22      A.    I mean, I just told you.  There was a bullet --

23            MS. SPETH:  He means anything other than

24  what you already told him.

25      A.    BY THE WITNESS:  No.  I'm sorry.

1      Q.    BY MR. INGLE:  Are you aware of whether there

2    were any witnesses to these gunshots?

3      A.    Just the sound of that.  And my next door

4    neighbors heard them, too.

5      Q.    Is that the Carpenters?

6      A.    Hathaways.

7      Q.    So you spoke with the Hathaways about hearing the

8    gunshots?

9      A.    They heard it, too.  We ran out -- I ran outside

10   and checked the road and the vehicle was already gone.

11   And they said, "Who was that that just came by shooting?"

12   And I said, "I don't know."

13     Q.    So you heard a vehicle as well?

14     A.    Yeah.  I heard the vehicle drive by and then I

15   heard, boom, boom, and they heard it, too.  And I went up

16   to the road, I met them up there at the road.  And they

17   said, "Boy, somebody's shooting bullets."  And I said,

18   "Yeah, I think they were shooting at his house."  I didn't

19   see the tire or anything, though, the bullet hole, but it

20   was gunshots.

21     Q.    I know you can't tell me what kind of vehicle it

22   was just simply by hearing it, but could you describe, was

23   it a motorcycle, kind of a loud engine, or was it a car,

24   or maybe one of those big trucks?

25     A.    It sounded like -- I don't remember.

1    Q.    You just know it was a vehicle of some sort?

2    A.    Yes.

3    Q.    You could not say if it was a motorcycle?

4    A.    No.

5    Q.    Did you find any shell casings?

6    A.    No.

7    Q.    Did you call the police?

8    A.    No.  I didn't have a phone.  But I think my next

9    door neighbors did.  And I -- they never came by that

10   night.  They never came to my premises, but I think they

11   went over to their house and they talked to him.  I'm

12   not --

13       Q.    When you talked to the Hathaways, did you talk to

14   them that same night that the gunshots happened --

15   A.    Yes.

16   Q.    -- or the next day?

17   A.    It was that same night.

18   Q.    So you heard the gunshots and you went outside

19   and didn't see anybody; is that correct?

20   A.    Right.

21   Q.    ██████████████████████████████

22   A.    Yes.

23   Q.    Did they say whether they saw anybody?

24   A.    No.  They said they just heard a vehicle drive by

25   really fast and heard two gunshots.

1    Q.    Did you think at the time that you should call
2  the police and report it?
3    A.    I would have called the police, but they already
4  called them and I didn't have a phone.
5    Q.    ████████████████████████████████████████████
6    A.    They said they were going to.
7    Q.    That they were going to?
8    A.    Yes.
9    Q.    Do you know if they ever did?
10   A.    I don't know.
11   Q.    The way your house is situated, are you along a
12  road or are you at the end of a road?
13   A.    I'm kind of in the middle of the road.
14   Q.    So the road extends past your place in either
15  direction?
16   A.    ████████████████████████████████
17   Q.    Are there multiple ways out of the neighborhood
18  where you live or --
19   A.    Yeah.
20   Q.    So if somebody drove in, they wouldn't
21  necessarily have to drive back by your house to get out?
22   A.    No.
23   Q.    Did you see any vehicles in the neighborhood
24  ███████████████████████████████████████
25   A.    No.

GRIFFIN AND ASSOCIATES - (602) 264-2230

1       Q.      Have you ever worked with guns on a firing range

2   or cleaning them or making them or anything?

3       A.      Yes.  I have hunted deer.  Yes, I have had guns.

4       Q.      But none of your jobs have involved guns; is that

5   correct?

6       A.      No.

7       Q.      Do you have any professional training on

8   firearms?

9       A.      No.

10       Q.      Does your experience with firearms come from

11   hunting and stuff like that?

12       A.      Yeah.

13       Q.      How can you distinguish between gunshots and

14   other loud bangs, fireworks?

15               MS. SPETH:  Form.

16       A.      BY THE WITNESS:  I don't know.

17       Q.      BY MR. INGLE:  You said you spoke to Ed, what, a

18   day or two later; is that correct?

19       A.      Yeah, it was like two days afterwards.  A day

20   afterwards.  It was so long ago, I don't remember.

21       Q.      A day or two?

22       A.      (No oral response.)

23       Q.      Is that a yes?

24       A.      Yes.

25       Q.      Everything has to be verbal.

Case 2:17-cv-01686-DJH   Document 151   Filed 03/31/17   Page 84 of 136

1          So how did you get in touch with Ed?  Did he

2  happen to just stop by the house?

3      A.   Yes.

4      Q.   He just happened to be coming by?

5      A.   Yes.

6      Q.   What did you say to him when you saw him?

7      A.   I told him what happened.

8      Q.   I mean, what did you tell him?

9      A.   I told him what I just told you.  And then he

10  hurried up and took off the property and said, "I'm out of

11  here."

12      Q.   Did you tell him anything else beyond what you

13  told me?

14      A.   No.

15      Q.   What did he tell you?

16      A.   He said, "I'm out of here."  He said, "This guy

17  has been bothering me and causing me all kinds of

18  problems."

19      Q.   Did he drive away?

20      A.   Yeah.

21      Q.   What kind of car was he driving?

22      A.   ████████████████████

23      Q.   █████████████

24      A.   ██████████

25          MS. SPETH:  I would ask that that be marked

1    confidential.

2       Q.    BY MR. INGLE:    At some point you went to jail for

3    theft of means; correct?

4       A.    Yes.

5       Q.    And I understand there's an allegation that

6    Mr. Brewington visited you while you were in jail?

7       A.    Yes.

8       Q.    Which jail was this at?

9       A.    Pinal County.

10      Q.    How long had you been in jail at the time this

11   visit occurred?

12      A.    Oh, a month probably.

13      Q.    Had you had any other visitors?

14      A.    Yeah.

15      Q.    Were they all friends and family?

16      A.    Yeah.

17      Q.    The day that Mr. Brewington visited you in jail,

18   how did you learn you had a visitor?

19      A.    Because COs, the people that watch prisoners.

20      Q.    The wardens?

21      A.    No.

22      Q.    The guards?

23      A.    The correction officers told me I had a visitor.

24      Q.    Did they tell you who it was?

25      A.    No.

Case 2:17-cv-01686-DJH Document 51-1 Filed 03/31/17, Page 86 of 136

1    Q.    So you knew you had a visitor, but you did not

2 know who it was, so you proceeded to the visitation area?

3    A.    Correct.

4    Q.    You got to the visitation area.  What did you do

5 next?

6    A.    I looked -- I picked up the phone and I looked at

7 him.  He picked his face up.  He had a cap on.  His

8 glasses were hanging.  He took his hat off and said, "I'm

9 a private investigator."  I looked at him, turned around

10 and hung the phone up and told the correction officer to

11 take me back.  And that was it.

12   Q.    Did you say anything to Mr. Brewington?

13   A.    No.

14   Q.    Did you recognize him from before?

15   A.    Yes.

16   Q.    Did you speak with Ed Magedson about that visit?

17   A.    I wrote him a letter.

18   Q.    Do you have a copy of that letter?

19   A.    No, I don't.  I wrote it to him.

20   Q.    While you were in jail?

21   A.    Yes.

22   Q.    What did you say in your letter?

23   A.    I just told him about what happened, the same

24 thing that I just told you.  I walked in there.  I seen

25 him.  He picked his head up.  And I hung up the phone and

1    I left.

2         Q.   And that's what you put in your letter to

3    Mr. Magedson?

4         A.   He was pissed off that I wouldn't talk to him.

5         Q.   I'm sorry?

6         A.   He was kind of pissed off I wouldn't talk to him.

7         Q.   How do you know?

8         A.   I hear him when I was putting the phone up.   I

9    heard him say some shit.   And I left.

10        Q.   Do you recall what he said?   Did you hear it?

11   Could you make it out?

12        A.   I don't remember.

13        Q.   Did Mr. Magedson communicate to you about that

14   visit?   Did he respond to you in any way?

15        A.   Yeah.   He called my mother.   And my mother called

16   me and told me to call him.   And I called my mother.   So I

17   called up Ed two or three weeks afterwards, two weeks

18   afterwards, I don't remember, and I talked to him.

19        Q.   But you called him from jail?

20        A.   Yes.

21        Q.   And you talked about Mr. Brewington's visit to

22   you in jail?

23        A.   Yes.

24        Q.   Did Mr. Magedson tell you to do anything about

25   that or give you any advice about how to proceed?

Case 2:17-cv-01686-DLR Document 51 Filed 03/31/17 Page 88 of 136

1    A.    No.  As a matter of fact, I think I contacted

2    you, because you had the letter.

3              MS. SPETH:  For the record, the witness is

4    indicating, when he says "you," he's indicating towards me

5    and not Mr. Ingle.

6    A.    BY THE WITNESS:  He had a lawyer and said she

7    would meet me.

8    Q.    BY MR. INGLE:  I don't need to know anything --

9              MS. SPETH:  We don't represent him.  That's

10   fine.  We sent a lawyer down to go get a statement.

11             MR. INGLE:  So there's no attorney/client

12   privilege there?

13             MS. SPETH:  Correct.

14   Q.    BY MR. INGLE:  What did you tell the attorney

15   that came to speak with you?  The same thing we covered

16   here today?

17   A.    I don't remember.  The same thing we covered

18   already.

19   Q.    Did you discuss any other information other than

20   what we have discussed here?

21   A.    No.

22   Q.    Let me ask you some questions about how you met

23   Ed Magedson.

24             Can you tell me when you first met him?

25   A.    It was back in the '80s.  He moved to the town

1  that I'm from and helped out underprivileged families and

2  stuff.  There's a place there.  And he was remodeling --

3  Ed remodeled apartments and buildings and stuff for the

4  State and for the people who lived there.

5      Q.    So he was buying property and fixing it up for

6  government housing; is that correct?

7      A.    No.  Just for rentals and, you know, people that

8  were low budget income and stuff.  Stuff like that.

9      Q.    So he was --

10     A.    I don't know exactly if that's what he was doing.

11 Apartments, do you know what I mean?

12     Q.    He was setting up some low-rent apartments?

13     A.    Right.

14     Q.    And he met you?

15     A.    Right.  Well, I met him -- somebody stole his car

16 and he had to borrow my bike.  So he took my bike and he

17 gave it back to me the next day.

18     Q.    How did he know to borrow your bike?

19     A.    He did not know me.

20     Q.    You were just a stranger to him and he said, "Can

21 I borrow your bike?"

22     A.    Yeah.  Somebody stole his car.  In the town where

23 I'm from, it's not that bad.  You know what I mean?  Plus,

24 he owned American House, and I have known him a little bit

25 from the area.

1    Q.    What did you call it?

2    A.    He owned American House in the teen center.

3    Q.    And you knew him from the teen house?

4    A.    Just see him, you know.  I knew he owned it and

5    stuff and that I would get my bike back.

6    Q.    You hadn't spoken to him, but you knew who he

7    was?

8    A.    Yeah.  I didn't know him, but he gave me my bike

9    back and $20.

10   Q.    And you are friends with him still today.

11         Have you been in constant contact with Ed

12   more or less ever since then and now?

13   A.    No.  We always talked a little bit here and there

14   on the phone and stuff.  But what happened is, I was on

15   vacation and I was visiting my aunt in Palm Springs and my

16   uncle.

17         I just came from Seattle, because I had some

18   friends up there.  So I went from Seattle to California

19   and from California to here.  And he bought a house and

20   needed some work done on it, so...

21   Q.    How often do you speak with Ed?

22   A.    Maybe once a week lately.  Otherwise, maybe, I

23   don't know, seems like -- probably twice a week.

24   Otherwise -- the less I talk to him, the better I am,

25   because he drives me crazy.  Do you know what I mean?

1    Q.    When is the last time you saw him?

2    A.    When is the last time I saw him?

3    Q.    Yeah.  Or spoke to him?

4    A.    It was last night.  He wanted to know -- he

5    wanted to remind me that I had to come here today and I

6    had to get a ride.

7    Q.    Did you guys discuss your testimony today?

8    A.    No.

9    Q.    When is the last time before that that you spoke

10   to him?

11   A.    When I lost my phone.

12   Q.    When was that?

13   A.    That was -- I was on a boat and I lost my phone,

14   and that was two weeks -- it was a while until I got to

15   him.  The last time was probably about two weeks.

16   Q.    I know you talked to him last night and he

17   reminded you you had to be here today.

18          Did you guys talk about anything else during

19   that conversation?

20   A.    Well, yeah, I was worried about my dog being home

21   alone.

22   Q.    Anything else?

23   A.    No.  How I was going to get here.  I told him I

24   had a friend to drop me off.  And he said he would come

25   pick me up.

Case 2:17-cv-01686-DLH   Document 51   Filed 03/31/17   Page 92 of 136

1    Q.    The last meeting you had when you lost your

2    phone, did you discuss anything else besides you losing

3    your phone?

4    A.    No, because I used one of my friends' phones and

5    told him I would contact him.

6    Q.    Do you know anything about Mr. Magedson's

7    business ventures?

8    A.    No.  The ones back East?

9    Q.    What ones back East?

10   A.    The apartments he was doing.  Because I used to

11   do a little bit of work for him.

12   Q.    Do you know whether he still has those

13   apartments?

14   A.    No, I don't.

15   Q.    Do you know of any of his online or

16   Internet-based businesses, anything about that?

17   A.    No, I don't know anything about that.

18   Q.    Have you ever heard of Xcentric Ventures?

19   A.    No.  I mean, he told me about Rip Off Report, but

20   I don't even go on computers.

21   Q.    Has he mentioned anything else about that Rip Off

22   Report company that he owns?

23           MS. SPETH:  Form.

24   A.    BY THE WITNESS:  No.

25   Q.    BY MR. INGLE:  He just told you, "Hey, I own

1    this"?

2        A.   Yes.

3        Q.   Do you know what it is?

4        A.   No.

5        Q.   Have you ever been to Rip Off Report dot com?

6        A.   No.  To be honest, the truth, no, I haven't.

7        Q.   I believe you just fine.

8             Do you know any of Mr. Magedson's business

9    associates who he is in business with?

10       A.   No.

11       Q.   Have you ever met any of his business partners?

12       A.   No.

13       Q.   Has he ever told you this person is a business

14   associate of mine?

15       A.   No.

16       Q.   At some point when I was going through my notes I

17   know Mr. Magedson evicted you from the residence; is that

18   true?

19       A.   Yes.

20       Q.   How many times?

21       A.   Just once.  It was my fault.

22       Q.   What was that all about?

23       A.   I had a couple wrecked cars up there and all

24   kinds of stuff.  And he wanted the property cleaned.  So

25   he told me -- give me 30 days to clean it off.  And I

Case 2:17-cv-01686-DLR Document 51 Filed 03/31/17 Page 94 of 136

1    didn't do it, so he evicted me.

2                   MR. INGLE:   Off the record.

3                   (Discussion had off the record.)

4       Q.    BY MR. INGLE:  So you were bringing some wrecked

5    cars over there and he told you to clean it up.  When did

6    that happen?

7       A.    I don't remember.  I'm sure you can look it up.

8       Q.    Can you tell me if it was before or after you

9    went to jail for the theft of means?

10      A.    Yeah, that was before.

11      Q.    So the place you were evicted from, was that the

12   same residence where Mr. Brewington visited you?

13      A.    Yes.

14      Q.    And you have lived there continuously from the

15   time he visited you until Mr. Magedson evicted you?

16      A.    Yes.

17      Q.    And it's because you were bringing wrecked cars

18   up to the property?

19      A.    Yes.

20      Q.    Was there any other reason for your eviction?

21      A.    Probably all the parties, too, and everything.

22      Q.    Have some out-of-control parties out there?

23      A.    Yeah, some good ones.

24      Q.    Were the cops called, is that why the problem, if

25   you know?

1     A.    I don't remember.

2     Q.    So maybe you were having --

3     A.    They have been up there, you know.

4     Q.    So you had some parties there and you had the

5   yard maybe filled with some clutter.  Are those the only

6   reasons you were evicted?

7     A.    Yeah, we got everything cleaned out now.

8     Q.    Let me go back on something real quick.

9           The jail visit, did Mr. Brewington show you

10  his credentials when he visited you in jail?

11    A.    No.

12    Q.    Did he show you a badge or anything?

13    A.    No.

14    Q.    Do you have any warrants out for your arrest

15  right now?

16    A.    No.

17    Q.    Do you have any failure to appear warrants?

18    A.    No.

19    Q.    Did you have some?

20    A.    Oh, yeah.

21    Q.    You have got those taken care of?

22    A.    Yeah.

23    Q.    When?

24    A.    I paid a lot of money and they have all been

25  taken care of.

1    Q.   What did you fail to appear for?

2    A.   I was driving on suspended a couple of times.  I

3  got arrested and I bailed myself out.

4    Q.   The failure to appear, were they all failure to

5  appear for a suspended license?

6    A.   They were all for East Mesa Court.

7    Q.   East Mesa Justice Court perhaps?

8    A.   Yeah.  And I took care of them all.

9    Q.   And all your failure to appear warrants all

10  related to some traffic violation?

11    A.   Correct.

12    Q.   How did you take care of them?

13    A.   My mother.

14    Q.   You borrowed some money and went into court and

15  paid the fine?

16    A.   Yes.

17    Q.   And they knocked out the warrant?

18    A.   No.  I had to go get my warrant -- when they had

19  the warrants on me, I had to go to court and I had to pay

20  $49, and then they reinstated -- told me I had to go to

21  court and pay the fines.

22    Q.   To attend the actual hearing that you missed

23  before?

24    A.   Yes.

25    Q.   And you got those wrapped up, when did you say?

Case 2:17-cv-01686-DLH  Document 51  Filed 03/31/17  Page 97 of 136

1      A.    A couple of months ago.

2      Q.    Do you mean really like --

3      A.    I just got out of jail.  I didn't want to go back

4  to jail.

5      Q.    When did you get out of jail?

6      A.    August, I think.  It was a year and six months.

7  But when I got out, yeah, there were warrants for me when

8  I got out of jail, and I hurried up and took care of them.

9      Q.    Have you ever had warrants out for your arrest

10 for anything else besides failure to appear, do you know?

11     A.    I don't know.

12           MS. SPETH:  Is that an I don't know or --

13     A.    BY THE WITNESS:  I don't know.  I may now.  Who

14 knows.  I don't know.  I know I paid my fines.  I just got

15 pulled over by police not to too long ago and they tested

16 me and said I was clean.

17     Q.    BY MR. INGLE:  I have to ask:  What did the

18 police pull you over for?

19     A.    I was with a girl and she ran a stop sign and

20 they ran me.

21     Q.    Do you know John Younger (phonetic)?

22     A.    Yes.  He was the neighbor down the street.  And I

23 haven't spoken to him in four or five years.  Maybe

24 longer.

25     Q.    He was the neighbor down the street.  Is that

1 down the street from where you lived on Mr. Magedson's

2 lot?

3    A.    Yeah.  That was way down -- four houses down.

4    Q.    So he was a neighbor.  Did you have any personal

5 interaction with him?

6    A.    He was a nice guy.  I didn't have any problems

7 with him.  He's had problems, I think, emotional problems.

8 He's a whack.  Do you know what I mean?

9    Q.    Why do you say that?

10    A.    Because he put his hand on my leg one time.  He

11 was hitting on me.  And I told him to, "Get the hell out

12 of here.  Get away from me.  Don't come back around."  So

13 he has problems.

14    Q.    Apparently.

15    A.    I never talked to him again.

16    Q.    I was going to ask you:  Did you ever talk to him

17 after that incident?

18    A.    No.

19    Q.    Did you know him before that incident?

20    A.    He would come by every once in a while.  Do you

21 know what I mean?  He seemed pretty normal, but when he

22 tried that --

23    Q.    Did he just come over and hang out, have a few

24 beers and watch TV?

25    A.    He was just weird.  Not even that.

GRIFFIN AND ASSOCIATES - (602) 264-2230

1    Q.    I don't need to get into the nitty gritty

2    details, but what happened with his hand on your leg?

3    A.    Well, he put his hand on my leg.

4    Q.    Where were you guys?  What were you doing?

5    A.    He came by my house.  He came by my house and put

6    his hand on my leg.  And I said, "What are you doing?  Get

7    the hell out of here."

8    Q.    Did he?

9    A.    Yeah.  And I have never talked to him again.

10    Q.    There's some allegations in this case that

11    somebody circulated some fliers warning people to stay

12    away from John Younger.

13          Do you have any knowledge of who might have

14    been circulating those fliers?

15          MS. SPETH:  Object to form.

16    A.    BY THE WITNESS:  I have no clue.

17    Q.    BY MR. INGLE:  Have you ever spoken to Ed

18    Magedson about those fliers?

19    A.    No.

20    Q.    Have you ever seen one of those fliers?

21    A.    No.

22    Q.    Did you know that there were allegations that

23    people were circulating these fliers?

24    A.    No.

25    Q.    You haven't heard about that before today?

Case 2:17-cv-01686-DJH   Document 15-1   Filed 03/31/17   Page 100 of 136

1    A.    No.  It's kind of funny.

2    Q.    Do you have a driver's license right now?

3    A.    No, but I can get it now.

4    Q.    So you don't have it, but you are eligible?

5    A.    Right.  As a matter of fact, I'm supposed to go

6    today at 2:00 o'clock to go get it.  I'm supposed to pay a

7    $50 fine for an abandoned vehicle.

8    Q.    When is the last time you operated any sort of

9    motor vehicle?

10            MS. SPETH:  Hold on one second.  Don't

11    answer the question yet.

12            You are asking him if he drove without a

13    license.  And I think it's fair to tell him that he has

14    Fifth Amendment rights under the law.

15            MR. INGLE:  I'm asking him when he drove,

16    not necessarily without a license.

17            MS. SPETH:  We know he doesn't have a

18    license and hasn't had a license.  I think it's only

19    appropriate to let him know he has Fifth Amendment rights

20    of self-incrimination.

21            You don't have to say that you committed a

22    crime if you didn't.

23            THE WITNESS:  No, I have --

24            MS. SPETH:  I'm just saying -- I don't know

25    what the answer is, but I just don't think it's fair to

1  put you in that situation.

2      A.   BY THE WITNESS:  It had to be around -- I drove

3  my tractor yesterday.

4      Q.   BY MR. INGLE:  You don't need a license for that?

5      A.   No.  Probably four or five years ago.  I always

6  get rides from somebody.  I mean, I have a dirt bike.  I

7  still have that, but you don't need a license to drive

8  that, either.

9      Q.   How did you get it?

10     A.   I have had it for years.

11     Q.   Have you had it for more than ten years?

12     A.   Five years, I think.

13     Q.   Mr. Skelling, I understand that at some point the

14  house that was on the property where you used to live --

15  where you still live, it burned down; is that correct?

16     A.   Yes.  It's barren.

17     Q.   Do you know what caused that fire?

18     A.   Yeah.  The investigators and such, they said it

19  was wires in the garage.  They said they think it was roof

20  rats, that there was the biggest roof rats nest that they

21  have ever come by.

22     Q.   You spoke with the fire investigators?

23     A.   Well, yeah, I spoke to them.  I was up there.

24  I'm the one that called the fire department.

25     Q.   You actually saw the fire?

1      A.   Yeah, I was trying to put it out and that's when

2  I ran next door and had them call the fire department.

3      Q.   When did this happen?  A couple years ago?  A

4  couple months ago?

5      A.   It has been a year now.

6      Q.   Did you live on the property at the time of the

7  fire?

8      A.   Yeah, I was the one that called the fire

9  department.  It was only a little fire in the ceiling.

10 They thought they would be able to put it out.  But when

11 they went inside, they cut a hole in the ceiling and it

12 backdrafted, and the whole house went.  And that's all I

13 know about it.

14     Q.   And the fire investigator told you it was caused

15 by some faulty wiring and roof rats?

16     A.   They said the rats probably are the ones eating

17 all the wires and it grounded out.  And they said they

18 found a -- inside this metal thing, they found the rats, a

19 bunch of rats in there, and they grounded it out and

20 that's where they -- I don't know.

21     Q.   Were you in the property that burned down, were

22 you in it?

23     A.   What?

24     Q.   The property that burned down, the house, were

25 you inside of it that day?

Case 2:17-cv-01686-DJH   Document 15-1   Filed 03/31/17   Page 103 of 136

1    A.   No.

2    Q.   Have you ever been inside that house?

3    A.   Yes.

4    Q.   When was the last time before the fire?

5    A.   Six months probably.  Seven months.

6    Q.   Did you give a statement to the fire

7  investigator?

8    A.   Oh, yeah.

9    Q.   Had you been drinking the day of the fire?

10   A.   Yeah.

11   Q.   I mean, drinking alcohol?

12   A.   Yeah.

13   Q.   Do you recall how much you drank that day?

14   A.   No.

15   Q.   Had you used any illegal drugs that day?

16   A.   No.  I don't remember if I did.

17   Q.   I understand you get some money from your

18  parents.  Do you get like an annuity or anything from the

19  settlement from your auto accident?

20   A.   No.

21   Q.   Did you get like a big lump sum or something like

22  that?

23   A.   I got my medical bills paid is the most I got.

24   Q.   ███████████████████████████████████████

25   A.   Yes.

Case 2:17-cv-01686-DJH Document 15-1 Filed 03/31/17 Page 104 of 136

1    Q.   Who is that person?

2    A.   A guy I knew from Tupper Lake.  I don't really

3    know him that good.

4              (Brief interruption.)

5    Q.   ██████████████████████████████████████████

6    ████████████████████████████████████████████████

7    A.   New York.

8    Q.   How did you know him in New York?  What was your

9    relationship?

10   A.   He was my next door neighbor.

11   Q.   Did you guys ever have like a business

12   relationship?

13   A.   No.

14   Q.   Did you ever work together?

15   A.   Yes.

16   Q.   Where did you work at?

17   A.   For that company I gave you earlier.  Evergreen

18   Construction.

19   Q.   Beyond being kind of social acquaintances with

20   David Bedor, do you have any professional involvement with

21   him or business relations or anything?

22   A.   No.

23   Q.   Do you know what kind of work he does?

24   A.   No, I don't.  I know he's a -- he got hurt.  I

25   think he's collecting disability.  I'm not too sure.

1    Q.    ████████████████████████████████████

2    A.    Probably two days ago.  We are friends.

3    Q.    What did you guys talk about?

4    A.    About me hitting him over the head with a hammer.

5    Q.    What?

6    A.    Me hitting him over the head with a hammer.

7    Q.    That's what you guys talked about?

8    A.    Joked about.

9    Q.    Did you talk about anything involving this

10   lawsuit, Mr. Magedson, or his companies?

11   A.    No.

12   Q.    ████████████████████████████████████████

13   just social like you described?

14   A.    Just friends.

15   Q.    ██████████████████████████

16   A.    I haven't talked to her in years.  Yeah.

17   Q.    Did you know her back in New York?

18   A.    Yeah.

19   Q.    Were you friends with her the same way you were

20   ████████████████████

21   A.    Yes.

22   Q.    Did you ever have any business relationships with

23   her?

24   A.    No.

25   Q.    Do you know what kind of business she's in?

1    A.    I think she works at the mental hospital.

2    Q.    ████████████████████████████████████████

3  New York?

4    A.    Yes.

5    Q.    Do you know if they have any --

6    A.    Yeah, they are still in New York.

7    Q.    Do you know if either one of them have any

8  involvement with Mr. Magedson or his companies?

9    A.    No.  I don't know.  I don't think so.

10   Q.    ████████████████████████████████████████

11  ███████████

12   A.    No.

13   Q.    ██████████████████████████████████

14   A.    Yeah.

15   Q.    Who's that?

16         MR. MAGEDSON:  I'm sorry, does he know who?

17         █████████████████████████████

18         MR. MAGEDSON:  You mentioned another name.

19         MR. INGLE:  Ed.

20         █████████████████████████

21         MR. MAGEDSON:  I'm sorry.

22   A.    BY THE WITNESS:  No.

23   Q.    ███████████████████████████████████████████

24   A.    No.

25   Q.    ████████████████████████

1      A.    Yes.

2      Q.    ████████████████████

3      A.    She's from the same town I am from.  That's how I

4      ████████████████████████████████████████

5  married.

6      Q.    ████████████████████████████████████████

7  her maiden name?

8      A.    Right.

9      Q.    Do you know anyone else with the last name of

10  ██████████

11     A.    No.

12     Q.    Does Mr. Magedson ever pay rent on your behalf?

13           MS. SPETH:  Form.

14     A.    BY THE WITNESS:  No.

15     Q.    BY MR. INGLE:  Have any of his companies paid

16  rent on your behalf?

17           MS. SPETH:  Form.

18     A.    BY THE WITNESS:  No.

19     Q.    BY MR. INGLE:  Besides the interactions you have

20  had with Mr. Brewington that we already talked about, have

21  you ever had any other interactions with Mr. Brewington?

22     A.    No.

23     Q.    Do you have a typewriter?

24     A.    No.

25     Q.    Do you have a computer?

1    A.    No.

2    Q.    I think I asked you that.

3              So anytime you want to record something, you

4    write it down on paper; is that right?

5    A.    No.    I always told people I don't write stuff

6    down.

7    Q.    I know when you got out of jail you stayed with a

8    friend for a while.  And I understand the dispute over the

9    identity and the location of the friend, and then you

10   moved back into the RV on Mr. Magedson's property; is that

11   correct?

12   A.    What?

13   Q.    I think that's what you said earlier.  I just

14   wanted to make sure I understood you correctly.

15   A.    Yeah.  Yes.

16   Q.    Can you tell me the day that you moved back into

17   the --

18   A.    No.

19   Q.    -- or the month maybe that you moved back into

20   the property that Mr. Magedson's family trust owns?

21   A.    No.

22   Q.    Can you give me an estimate?  How long have you

23   been there?  A couple of months?  Would you say like five,

24   six, seven months?

25   A.    Yeah.

```
 1        Q.    Do you know what season it was when you moved
 2   back into that location?
 3        A.    No.
 4        Q.    It was within the last year; right?
 5        A.    Yes.
 6        Q.    But you can't give any further specification
 7   within that year as to when you might have moved in or how
 8   long you might have lived there?
 9        A.    No.
10        Q.    Do you just not remember, is that why you can't
11   tell me?
12        A.    I don't remember.
13        Q.    So, for example, you do not remember when or even
14   approximately when you moved back into Mr. Magedson's
15   property?
16        A.    Correct.
17        Q.    Do you have any knowledge of Mr. Brewington
18   allegedly lying under oath to a federal judge?
19        A.    No.
20        Q.    Do you know what defamation is, a defamation of
21   character?
22        A.    No.
23        Q.    I'm going to go ahead and describe it.  In
24   layman's terms, it's where you say something false and bad
25   about somebody else.
```

1    A.    I do know what it means.

2    Q.    Have you ever heard Mr. Brewington say something

3    false and/or bad about Mr. Magedson to anyone besides

4    yourself?

5    A.    No.

6    Q.    When you were staying at the property that

7    Mr. Magedson owned, did you have a written lease for you

8    staying there?

9    A.    No.

10   Q.    Kind of a gentlemen's agreement?

11   A.    Yeah, I guess.

12   Q.    Mr. Skelling, have you given a written statement

13   to anyone about this lawsuit?

14   A.    No.

15         MS. SPETH:   Object on form.

16   Q.    BY MR. INGLE:   Have you given a verbal statement

17   to anyone about this lawsuit?

18   A.    No.

19         MS. SPETH:   Form.

20   A.    BY THE WITNESS:   I didn't even know there was a

21   lawsuit.

22   Q.    BY MR. INGLE:   I now need to ask you about a

23   somewhat sensitive subject, and I apologize for delving

24   into your personal life, but I have to ask you about this.

25         When you were a child, did Mr. Magedson ever

1    molest you?

2        A.    No.

3            MS. SPETH:  Let the record reflect that he

4    laughed when he responded no.

5        Q.    BY MR. INGLE:  Do you have any idea why some of

6    Mr. Magedson's neighbors might say that that had happened?

7            MS. SPETH:  Objection; form.

8        A.    BY THE WITNESS:  No.  They could be crazy.  I

9    don't know.

10       Q.    BY MR. INGLE:  In your mind, there's absolutely

11   no reason why these neighbors would say that Mr. Magedson

12   had molested you?

13           MS. SPETH:  Form.

14       A.    BY THE WITNESS:  No.

15       Q.    BY MR. INGLE:  I apologize for asking you about

16   that.

17       A.    I think it's funny.  They are probably crazier

18   than myself.  A lot of people think I'm crazy.

19       Q.    Especially if it was true, it's not something I

20   would ordinarily want to talk to anybody about.

21       A.    No.

22           MR. INGLE:  Let's take a five-minute break

23   so I can make sure I don't have any more questions.

24           (Recess taken.)

25           MR. INGLE:  Back on the record now.

Case 2:17-cv-01686-DJH  Document 5-1  Filed 03/31/17  Page 112 of 136

1              Ms. Speth and I are going to enter a

2    stipulation on the record that we are going to continue

3    this deposition until such time as we receive a

4    clarification on the Court's order regarding whether I'm

5    entitled to ask Mr. Skelling about his former addresses

6    and who he lived with.

7              If the judge says I can ask about those

8    things, we are going to continue this deposition at a

9    later date.  If the judge says that information is not

10   discoverable, we will be done after my next few questions.

11             MS. SPETH:  And I agree with the way you

12   stated that.  We are on the same page.

13        Q.   BY MR. INGLE:  Mr. Skelling, I have just six more

14   topics I want to address with you.

15             Have you ever been interviewed by the

16   Department of Public Safety regarding any of the parties

17   involved in this lawsuit, Mr. Magedson, Mr. Brewington,

18   Xcentric Ventures, anybody else related to this?

19        A.   Somebody named Officer Deets.

20        Q.   D-E-E-T-S?

21        A.   I can't remember who it was, but there was some

22   guy.

23        Q.   What did you talk to him about?

24        A.   He just asked me a couple of questions.  I don't

25   even remember what he asked me.  That was like a year ago.

1    Q.    Did he call you on the phone or contact you in

2  person?

3    A.    Contacted me on the phone.

4    Q.    How did he get in touch with you by phone?  I

5  thought you did not have a phone.

6    A.    I was at my friend's house at that time.  And

7  he was trying to get ahold of me.  I think it was from

8  your law firm.  I think it was DES or something like

9  that.

10         MS. SPETH:  Once again, the witness is

11  pointing to me and not Mr. Ingle.

12    Q.    BY MR. INGLE:  Do you remember the basic gist of

13  what you spoke to that person about?

14    A.    No.

15    Q.    When you said DES, that deals with welfare.

16    A.    I'm not sure what it was.  It was Officer Deets.

17  I'm not sure who he is or what.

18    Q.    You don't recall at all what you spoke about?

19    A.    No, I don't know.

20    Q.    Do you know if it had to do with this case at

21  all?

22    A.    No, I don't remember.  I know it had something to

23  do with Ed and him.

24         MS. SPETH:  "Him" being a reference to him

25  and Mr. Brewington; right?

```
 1                    THE WITNESS:  Yes.

 2       Q.    BY MR. INGLE:  Was it a short phone call, a

 3  couple of minutes?

 4       A.    I met him in person.

 5       Q.    So he called you on the phone?

 6       A.    Yeah.  And he asked me to meet him in person.

 7       Q.    Where did you meet at?

 8       A.    Circle K.

 9       Q.    One by your house maybe?

10       A.    No.  It was the one off like Country Club and the

11  freeway, somewhere in there.

12       Q.    The 60?

13       A.    Yes.

14       Q.    Was it the state government, do you remember?

15  Was it a state person or a county person?

16       A.    I don't remember.

17       Q.    Some government person called you, you met with

18  that person --

19                    Was it a man or a woman?

20       A.    Man.  Colored guy.

21       Q.    -- over at Circle K on Country Club and the 60;

22  right?

23       A.    Yes.

24       Q.    How long did you speak with this gentleman for?

25       A.    Three minutes.
```

GRIFFIN AND ASSOCIATES - (602) 264-2230

1       Q.   But it had something to do with Mr. Magedson and

2   Mr. Brewington?

3       A.   Yes.  I don't remember what it was about.

4       Q.   Did that person take notes?

5       A.   I don't remember.

6       Q.   Were they wearing a uniform?

7       A.   Yes.  He showed me a badge.

8       Q.   Like a law enforcement badge?

9       A.   Yes.

10      Q.   Was he wearing a law enforcement uniform?

11      A.   A white shirt.

12      Q.   Did he have anything that said police or federal

13  agent or anything on it?

14      A.   No.  I don't remember.

15      Q.   Mr. Skelling, I have asked you before if you had

16  any warrants, and I just want to ask one more time.

17              Are you sure that you do not have a current

18  warrant for your arrest in New York?

19              MS. SPETH:  Asked and answered.

20      A.   BY THE WITNESS:  Yes, I'm sure.

21      Q.   BY MR. INGLE:  You are sure you do not have a

22  warrant?

23      A.   I'm pretty sure I don't.

24      Q.   Mr. Skelling, I have already asked about your

25  criminal history, and we talked about driving on suspended

1  licenses and failure to appear.

2          Let me ask you:  Have you ever been arrested

3  for burglary?

4      A.   Yes, I'm pretty sure I have been.  I think they

5  dropped it down, though, to -- I got probation after.

6      Q.   Where and when was that?

7      A.   That's vague, because I was really young then.

8          MS. SPETH:  Were you a minor?  Were you

9  under 18?

10          THE WITNESS:  Yeah.

11          MS. SPETH:  I don't think you can ask about

12  that, if I understand correctly.

13          MR. INGLE:  I'm not going to ask about

14  anything having to do with when he was a minor.

15          THE WITNESS:  I think I was 16.

16          MS. SPETH:  Yeah, I believe juvenile records

17  are sealed, privileged, et cetera.

18      Q.   BY MR. INGLE:  I am not going to ask you about

19  anything about when you were a minor.

20      A.   I was a minor then.

21      Q.   I understand at some point in your past you were

22  also accused of selling marijuana.

23          Was that also when you were a minor?

24      A.   I was never arrested for selling marijuana.

25      Q.   So regardless whether it was a minor or an adult

1    thing, you have never been accused of selling or

2    distributing marijuana?

3        A.    No, not that I know.

4        Q.    Mr. Skelling, I can't help but notice as we go

5    through some of the documents that relate to you there's

6    some issue to substance abuse in your past.

7             Have you ever had a drug dependency?

8             MS. SPETH:  Form.

9        A.    BY THE WITNESS:  I had a DUI.  I had to go to

10   classes, you know.  Back in -- I was a minor then, too.

11   You can't ask me that.

12       Q.    BY MR. INGLE:  Have you ever used

13   methamphetamines?

14       A.    Yes.

15       Q.    When is the last time you have used

16   methamphetamines?

17       A.    Probably seven, nine months ago maybe.  Maybe

18   even longer than that.

19       Q.    And when was the last time before that?

20            MS. SPETH:  I'm going to once again remind

21   this witness, that I know he's not represented by counsel,

22   but he has a right to refuse to answer questions on the

23   grounds of self-incrimination.

24            THE WITNESS:  It don't matter to me.

25       Q.    BY MR. INGLE:  I will represent to you that I'm

Case 2:17-cv-01686-DJH   Document 5-1   Filed 03/31/17   Page 118 of 136

1  not going to turn you into the authorities.

2      A.   It doesn't matter what they get me for, I don't

3  do it.  It don't matter.

4      Q.   Did you ever go into a treatment program or

5  anything for methamphetamines?

6      A.   No.

7      Q.   Have you ever used any illegal drugs besides

8  methamphetamines?

9      A.   No.

10     Q.   Have you ever used marijuana since becoming an

11 adult?

12     A.   Yes.

13     Q.   Do you remember when the last time you used it

14 was?  Was it years ago?

15     A.   I don't remember.

16     Q.   I have already asked you about this, but I'm

17 going to ask you about two more points, and they are

18 really the important points I need to know.

19          When Mr. Brewington came over to your

20 house the very first time, did he say that Mr. Magedson

21 was wanted for questioning by authorities or did he say

22 he was wanted for arrest or did he say something

23 different?

24     A.   "The FBI is looking for him for extortion" and he

25 was in a lot of trouble.

1      Q.    Okay.  Thank you.

2            Also, I need to know, then, when the date

3  was when that exchange occurred.  I know you said it was

4  December of 2006, midway.

5            Was it before Christmas?

6      A.    I don't remember.

7      Q.    Was it before New Year's?

8      A.    It was two years ago.  I don't remember exactly.

9  Do you know what I mean?

10     Q.    I'm not trying to get an exact date here.

11     A.    I don't remember.

12     Q.    You don't remember whether it was before or after

13  Christmas?

14     A.    I don't remember.

15     Q.    What about Thanksgiving?

16     A.    I don't remember.

17     Q.    Is there any sort of event in your mind that

18  occurred right around the time when Mr. Brewington

19  visited you at your house, something we can get a date

20  from?

21     A.    No, I don't think so.  I wish I remembered.

22     Q.    I was just kind of throwing my hands up.  If you

23  don't remember, you don't remember.

24            MR. INGLE:  That's all the questions I have

25  for you, Mr. Skelling.  Thanks for showing up today and

1    being patient enough to answer them for me.

2             MS. SPETH:  Before we run out, I think I

3    have a couple clarifications and follow-ups.

4

5                      EXAMINATION

6    BY MS. SPETH:

7      Q.    Early on Mr. Ingle asked you about the conviction

8    for theft of means.  He asked if you were convicted or you

9    pled.  And I think you said you were convicted.

10             Was there an actual trial where a jury found

11   you guilty or was there a plea bargain?

12     A.    Plea bargain.

13     Q.    There were some questions about whether

14   Mr. Brewington actually said he was a police officer when

15   he came to your house or if he said he was working for the

16   police.

17             I think you said he did identify himself as

18   a private investigator; correct?

19     A.    Correct.

20     Q.    Do you think he did that on the first visit?

21     A.    Yes.  On the first visit he did.

22     Q.    Was there anything that he said or did or either

23   in his actions --

24     A.    He could have had a badge, investigator badge.

25   I'm not too sure.

1    Q.    You kind of answered the question I was going to

2  ask.

3              Was there anything about his actions or

4  mannerisms or what he said that made you think he worked

5  for the police?

6    A.    No.

7    Q.    The fact that he had a badge, did that lead you

8  to believe that he was working for the police, or not

9  necessarily?

10              MR. INGLE:    Form.

11    A.    BY THE WITNESS:    Yeah, he said, "The FBI is

12  looking for him.    I'm an investigator."    And he showed me

13  a badge.

14    Q.    BY MS. SPETH:    And that's another question I had.

15              Did he say he was a private investigator or

16  did he say he was an investigator?

17    A.    An investigator.

18    Q.    Mr. Ingle asked you some questions about the

19  lighting when Mr. Brewington came to visit you on the

20  second or third time.

21              Did you have any difficulty seeing

22  Mr. Brewington?

23    A.    No.

24    Q.    Did you know for sure it was the same person who

25  had come to see you the first time that -- you said each

1    time it was Mr. Brewington.

2              Do you have any doubt it was the same person

3    each time?

4        A.    No.

5        Q.    Now, you also said that when the shots were fired

6    that night that there were bullets shot at the house.

7              Where was the bullet?  Was it on the house

8    or your RV?

9              MR. INGLE:   Form.

10       A.    BY THE WITNESS:   It was the house and it looked

11   like it maybe ricocheted off and hit the tire of the RV.

12       Q.    BY MS. SPETH:   I know the tire.   But the house

13   part, you meant the house and not the RV?

14       A.    Right.

15       Q.    What part of the house was hit?

16       A.    It was right in front in the block wall.   That's

17   the only one that I saw.

18       Q.    Now, the one that hit the tire or whatever hit

19   the tire, you said the tire was actually flat?

20       A.    Right.

21       Q.    You said you still have that tire?

22       A.    Yes.

23       Q.    Have you ever checked inside of it for the

24   bullet?

25       A.    No.

1    Q.    Where do you keep that tire?

2    A.    It's in the back of my RV still.

3    Q.    Don't get rid of or move or do anything with

4    that tire.  We will be requesting that it be produced.

5    Okay?

6    A.    Okay.

7    Q.    Now, you said earlier that Ed owned Rip Off

8    Report.

9              Did he talk about legally who owns it?  Do

10   you know who legally owns Rip Off Report?

11   A.    No.

12   Q.    Mr. Ingle asked you if you ever gave a statement

13   regarding this lawsuit.  I want to word that differently.

14             Do you ever remember signing either a

15   declaration or affidavit regarding Mr. Brewington?

16   A.    What do you mean by that?

17   Q.    Do you ever remember either reading or signing

18   your statement about what Mr. Brewington did about what we

19   talked about today?

20   A.    No.  I mean, I don't know what's going on about

21   the lawsuit.

22   Q.    I'm not asking about the lawsuit.  I'm just

23   asking whether you have ever -- let me do it this way.

24             You indicated that somebody from my office

25   went to see you while you were in prison?

1      A.    Yes.

2      Q.    Do you remember who that was?

3      A.    No.

4      Q.    Did he give you something to sign after you told

5  him what happened?  Did he write it up and ask you to sign

6  it?

7      A.    Yes.

8      Q.    What you said in that statement, was it accurate?

9      A.    Yes.

10           MS. SPETH:  I think that's all I have.  Let

11  me check real quick.  If we can take a very short break, I

12  want to see if my client has anything else.

13           MR. INGLE:  Sure.

14           (Recess taken.)

15      Q.    BY MS. SPETH:  My only other question is:  Do

16  you know anything about threatening letters being

17  received at the property on McDowell in Apache Junction?

18      A.    Yeah.  I don't know who it was.  Do you know what

19  I mean?

20      Q.    What do you know?  What do you remember?

21      A.    There were a couple letters which I understood to

22  kill Ed and all kinds of -- kill Ed and they were going to

23  shoot him.

24      Q.    Have you actually seen any of those letters?

25      A.    Yes.

1    Q.    Which ones do you remember?

2    A.    One where if he didn't take stuff off his web

3  site, he was going to get killed.

4    Q.    What were the circumstances under which you saw

5  that letter?

6    A.    How did I see them?

7    Q.    Yes.

8    A.    It was in the mailbox.

9    Q.    Did you actually find the letter?

10   A.    Yes.  It was in the mailbox.

11   Q.    The one that was left in the mailbox, was Ed

12  there that day?

13   A.    No.

14   Q.    Do you have any reason to believe that Ed put

15  that letter there?

16   A.    No.

17   Q.    Do you know who put it there?

18   A.    No.

19   Q.    And you gave it to Ed?

20   A.    Yes.

21   Q.    Did Ed seem surprised?

22         MR. INGLE:  Form.

23   A.    BY THE WITNESS:  Yes.

24         MS. SPETH:  I have no further questions.

25         MR. INGLE:  Just a few follow-up.

```
 1                    FURTHER EXAMINATION
 2   BY MR. INGLE:
 3       Q.   I'm sorry.  What?
 4       A.   Well, Dixie and Larry, the other next door
 5   neighbors on the other side, they were there when the
 6   gunshots went down and they had a lot of written letters
 7   and stuff, too, that was sent to their house, too.  So I
 8   don't --
 9       Q.   What are their names?
10       A.   ████████████
11       Q.   ██████
12       A.   ████████████████████████
13       Q.   ███████████████████████
14   ████████
15       A.   ████████████
16       Q.   ████████████████
17            You were just asked whether Mr. Brewington
18   specified whether he was a private investigator or simply
19   an investigator when he came to your house.
20            Can you tell me for absolute certainty under
21   penalty of perjury that he did not say private
22   investigator?
23       A.   No, I can't say that, because he said, "The FBI
24   is looking for Ed for extortion.  I'm a private
25   investigator."  Yes, I'm pretty sure that's what he said.
```

Confidential

Confidential

1    Private investigator.

2        Q.    When you heard the gunshots outside your house,

3    did you ask around the neighborhood to see if anybody seen

4    anything?

5        A.    No.    The next door neighbors heard it.    And the

6    ████████████████████████████████████████████████

7    heard it, too.    I'm not positive.    I don't remember

8    talking to them about it, but I'm sure they heard it, too.

9        Q.    Did you do any sort of investigation to figure

10   out if they were gunshots and who it was?

11       A.    I should have called the police.    I think the

12   Hathaways did next door.    No, I didn't do my own

13   investigation except for that one thing I seen in the wall

14   and changing my tire on my RV.    And I don't think it was

15   more towards me.    I think it was just a ricochet.

16       Q.    You said you still have that tire; right?

17       A.    Yeah, I do.

18       Q.    I would also like to take a look at it just

19   because maybe the bullet is inside and maybe we can match

20   it to a gun.

21       A.    There you go.

22       Q.    So can you give that tire or make it available to

23   Ms. Speth?

24       A.    Yeah, I can.

25       Q.    Do you know if anybody owns the Rip Off Report

1    with Ed?

2        A.    No, I don't know nothing about it.

3        Q.    The attorney who came to see you in jail, you

4    said you signed a document while he was there?

5        A.    Yes.

6        Q.    Did he have that document with him already?

7        A.    I'm sorry?

8        Q.    Did he have that document with him already?

9        A.    Yes.

10            MS. SPETH:  The first time he came to see

11   you he had the document.

12       A.    BY THE WITNESS:  He only came to see me once.

13       Q.    BY MR. INGLE:  Was it already prepared, all you

14   had to do was sign your name to it?

15       A.    I wrote the statement and everything and then

16   they typed it up.

17       Q.    So you wrote out a statement, and somebody wrote

18   what you said, and then you signed the typed copy?

19       A.    The same thing I wrote is on that paper.

20       Q.    Did they write it in front of you or type it up

21   in front of you?

22       A.    I'm pretty sure the man -- I don't know -- I'm

23   not sure.

24            MS. SPETH:  If you don't know, say you don't

25   know.

```
1        A.    BY THE WITNESS:  I don't know.

2              MS. SPETH:  You are probably better off

3   asking my office what happened.

4        A.    BY THE WITNESS:  Yeah, because I don't know.

5        Q.    BY MR. INGLE:  I understand.  I would be

6   surprised if they allowed somebody to carry in either a

7   computer and printer or a typewriter in the jail with

8   them.

9              Did the person you were speaking to have a

10  computer or typewriter with them?

11       A.    I don't know.

12       Q.    Were they typing it out while you wrote it out?

13       A.    I don't remember.

14       Q.    You don't really remember, do you?

15       A.    (No oral response.)

16       Q.    Is that a no?

17       A.    No, I don't remember.

18       Q.    I haven't heard of these threatening letters

19  before Ms. Speth asked about them.  Let me ask you a few

20  questions about those.

21             They were threatening letters; correct?

22       A.    There was just that one I seen.

23       Q.    Just one?

24       A.    Yeah, that was the only one I seen.

25       Q.    So you saw one letter?
```

1    A.   One.  Just one.

2    Q.   And you found it in your mailbox?

3    A.   Yeah.  It was in the mailbox.  It was on a piece

4  of paper and he said, "Ed Magedson, if you don't get

5  things off your Rip Off Report, we are going to kill you."

6    Q.   Was it signed?

7    A.   No.

8    Q.   It wasn't in an envelope?

9    A.   No.  Just on a piece of paper.

10    Q.   Could you tell, was it delivered with the rest of

11  the mail or was it placed there after you picked up your

12  mail that day?

13    A.   It was after I picked up my mail.

14    Q.   When do you pick up your mail?  Do you know when

15  your mail is delivered?

16    A.   It's different.  Anytime between 10:00 and 4:00

17  in the afternoon.  But when I pick up my mail, it's 5:00

18  o'clock.

19    Q.   Do you remember when you found this letter?  Was

20  it at night?

21    A.   It's when I went to pick up the mail at 5:00 or

22  6:00 o'clock.

23    Q.   Was there any other mail in the mailbox with it?

24    A.   Yeah, but I don't remember what it was.

25    Q.   Was this note on top of it all?

```
 1      A.   I don't remember.

 2      Q.   Was it typed?  Was it handwritten?  Do you know

 3  anything about it?

 4      A.   No.  It was handwritten.

 5           But again, there was a snake in front of the

 6  mailbox before and a tarantula.

 7      Q.   When you are in the desert, you are used to

 8  looking around?

 9      A.   Yeah.

10           MS. SPETH:  Was your answer you don't know

11  if it was handwritten or --

12           THE WITNESS:  It was handwritten.

13      Q.   BY MR. INGLE:  Was it folded in half?

14      A.   Yes, it was folded in half.

15      Q.   Did it have Mr. Magedson's name written on it?

16      A.   Yeah, it had Magedson on it.

17      Q.   Did you read the letter?

18      A.   Yeah.  It said, "Ed, if you don't take off" -- I

19  don't remember exactly what it said, but "we are going to

20  kill you."

21      Q.   Was there anything else in the letter besides

22  that?

23      A.   I don't remember.

24      Q.   What did you do with the letter?

25      A.   I gave it to Ed about a week later when he showed
```

1    up.  I said, "Here, this was in your mailbox."

2        Q.    Had you previously told him you had received that

3    letter?

4        A.    No.  I didn't say anything.

5        Q.    So he just happened by the property one day and

6    you said, "Hey, while you are here, I have this letter

7    somebody left for you"?

8        A.    Yeah, or -- yeah.

9        Q.    It contained a death threat, and you didn't think

10   you should tell him before he just happened to show up at

11   his house?

12       A.    I had no way to contact him.  And I wasn't

13   staying up there at that time when the death threat came

14   out.  I was staying down at my other friend's house.  And

15   I would go up there and get my mail, and that was in

16   there.  I stayed like a week down there.

17       Q.    I thought you had a phone number that Ed had for

18   years and years.  Why didn't you just call that and tell

19   him, "Hey, I got a death threat for you"?

20       A.    I didn't think that it was real.

21       Q.    And that's the only letter that you have personal

22   knowledge of; is that correct?

23       A.    Correct.

24       Q.    And I believe you said you don't know who put

25   that letter in the mailbox?

```
 1        A.    No, I don't know.

 2        Q.    Was the letter signed?

 3        A.    No.

 4        Q.    Was it written on like white lined paper like I

 5   have here or like computer stock paper?

 6        A.    Yeah, there wasn't no lines on it or nothing.

 7        Q.    Just a plain white sheet of

 8   eight-and-a-half-by-eleven paper?

 9        A.    Yeah.  In fact, it was like a vanilla.

10        Q.    Kind of off white?

11        A.    Yeah.

12        Q.    You said there were some neighbors that also said

13   something about getting letters.

14        A.    Yeah, Dixie and Larry next door mentioned

15   something about letters and a couple of other things.

16   They were getting something in their mailbox and they were

17   telling me about it.  I don't know what happened to it, if

18   they gave it to him or what, but they told me about it one

19   time.

20        Q.    Do you remember when you discussed that with

21   Dixie and --

22        A.    It was probably four years ago.  I'm not too

23   sure.  And I'm not too sure, you know, because I sold the

24   house a year ago and I was in jail for a year, and it was

25   probably -- it's probably about three-and-a-half years
```

1   ago.  I'm not too sure.

2       Q.    That's fine.  Nobody expects you to remember the

3   exact date that you had this conversation with your

4   neighbor several years ago.

5             Did they discuss anything else in that

6   conversation or did they just say, "Hey, we got these

7   letters for Ed"?

8       A.    That was it.

9       Q.    Did they say if they were going to try to get in

10  contact with Ed to give him the letters or if they had

11  spoken to him about it?

12      A.    I don't know if they gave it to him or not.

13      Q.    So as far as you know, they could still have

14  those letters in their possession?

15      A.    Yes.

16      Q.    I would like to get those letters.

17  ███████████████████████████████████████████████

18  ███████████

19      A.    █████████████████████████████████████████████

20  not too sure.  I could ask the people that bought the

21  house where they live and I could give you that

22  information and I could give it to Maria.

23      Q.    That would be great if you would do that.

24      A.    Yeah, I will do that.  Plus I will make sure she

25  gets the tire.

```
1                    MR. INGLE:  I have no further questions.

2                    MS. SPETH:  I have no further questions.

3                    MR. INGLE:  You are done, Mr. Skelling.

4                    Mr. Skelling, you have the right to review

5    your deposition transcript to make sure everything was

6    recorded correctly.

7                    If you want, I can mail you a copy, you can

8    read it and you can mark any changes you need to make.

9                    MS. SPETH:  I can provide you a copy as

10   well.

11                   THE WITNESS:  Can one of you guys do that?

12                   MS. SPETH:  If you want to read it, I will

13   take care of it.

14                   Do you want to read and sign it?

15                   THE WITNESS:  Yes.

16                   MS. SPETH:  I will take care of it.

17                   (Deposition concluded at 2:51 p.m.)

18

19

20

21                       _____
                              ERIC J. SKELLING
22

23

24

25
```

```
 1   STATE OF ARIZONA     )
                          ) ss.
 2   COUNTY OF MARICOPA   )

 3        I HEREBY CERTIFY that the foregoing deposition was

 4   taken by me pursuant to Notice; that I was then and there

 5   a Certified Reporter for the State of Arizona and, by

 6   virtue thereof, authorized to administer an oath; that the

 7   witness before testifying was duly sworn by me to testify

 8   to the whole truth and nothing but the truth; that the

 9   questions propounded by counsel and the answers of the

10   witness thereto were taken down by me in shorthand and

11   thereafter transcribed through computer-aided

12   transcription under my direction, and that the foregoing

13   typewritten pages contain a full, true, and accurate

14   transcript of all proceedings had upon the taking of said

15   deposition, all done to the best of my skill and ability.

16        I FURTHER CERTIFY that I am in no way

17   related to nor employed by any of the parties hereto, nor

18   am I in any way interested in the outcome hereof.

19             DATED at Phoenix, Arizona, this 11th day of

20   May, 2009.

21

22                            _____
                              TAMARA H. HOWARD
                              Certified Reporter
23                            Certificate No. 50156

24

25
```