**<u>EXHIBIT C</u>**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

XCENTRIC VENTURES, LLC, an          )
Arizona corporation, d/b/a          ) Case No: 2:07-cv-00954-NVW
"RIPOFFREPORT.COM"; ED              )
MAGEDSON, an individual,            )
              Plaintiffs,           )
          vs.                       )
WILLIAM "BILL" STANLEY, an          ) PORTIONS OF THIS
individual; WILLIAM "BILL"          ) TRANSCRIPT ARE FOR
STANLEY d/b/a DEFAMATION            ) ATTORNEYS' EYES ONLY
ACTION.COM; et al.,                 )
              Defendants.           )
ROBERT RUSSO, an individual;        )
QED MEDIA GROUP, L.L.C., a          )
Maine limited liability            )
corporation,                        )
        Counterclaimants,           )
          vs.                       )
ED MAGEDSON, an individual,         )
        Counterdefendant.           )

**VOLUME I**
**DEPOSITION OF JOHN F. BREWINGTON**

Phoenix, Arizona
July 31, 2007

Prepared for:  Michael Kent Dana, Esq.          COPY
Reported by:   Stacey Palmer, RPR/CSR
               Certified Court Reporter, No. 50045

# PALMER
■ ■ ■ ■ ■ ■ *REPORTING SERVICES, INC.*

*2108 E. Evans Drive*
*Phoenix, AZ 85022*
*(602) 867-DEPO*

2

1                     A P P E A R A N C E S

2   For Plaintiffs:             Jaburg & Wilk
                                BY:  Maria Crimi Speth, Esq.
3                               3200 N. Central Avenue
                                Suite 2000
4                               Phoenix, Arizona   85012

5

    For Defendants              Snell & Wilmer
6   Russo, QED Media            BY:  Michael Kent Dana, Esq.
    Group, LLC and              400 E. Van Buren
7   Internet Defamation         Phoenix, Arizona   85004
    League:

8

9   Also Present:              Laura Rogal, Jaburg & Wilk

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

<u>I N D E X</u>

<u>Witness</u>                                          <u>Page</u>

   JOHN F. BREWINGTON

    Examination by Ms. Speth                    4

<u>I N D E X   O F   E X H I B I T S</u>

| <u>Exhibit</u> | <u>Description</u> | <u>Page</u> |
|---|---|---|
| 1 | Subpoena | 57 |
| 2 | Letter to Maria Crimi Speth from John Brewington | 57 |
| 3 | Email correspondence | 80 |
| 4 | One page of handwritten notes | 123 |
| 5 | Letter to Maria Crimi Speth from John Brewington, with attachments | 161 |
| 6 | JFBA post, dated 3/6/07 | 168 |
| 7 | Three pages from JFB's Web site | 177 |
| 8 | One page from JFB Acquisitions Web site | 180 |
| 9 | Excerpt from Salt Lake City Weekly | 181 |

4

THE DEPOSITION OF JOHN F. BREWINGTON

was taken on July 31, 2007, commencing at 2:05 p.m.,

at Jaburg & Wilk, 3200 N. Central Avenue, Suite 2000,

Phoenix, Arizona, before Stacey Palmer, a Certified

Court Reporter in the State of Arizona.


JOHN F. BREWINGTON,

a witness herein, having been first duly sworn by the

Notary Public, was examined and testified as follows:


EXAMINATION

BY MS. SPETH:

Q.    Mr. Brewington, as you know, my name is

Maria Speth, and I represent the Plaintiffs Xcentric

Ventures and Ed Magedson in a case that has been

brought against William Stanley, Rob Russo, and the

related entities.  I'm going to be asking you some

questions today.

Have you ever had your deposition taken

before?

A.    Yes.

Q.    So you are somewhat familiar with the

process.  I'll keep my introductory comments short.

But I do want to make sure we're on the same page as

far as some of the basic rules so we get a good clean

5

1   transcript.

2          A.    Sure.

3          Q.    I'm going to be asking you questions.

4   You're going to be answering.  In everyday conversation

5   it's very common for you to sort of anticipate what my

6   question is going to be and really start to respond to

7   it before I'm done with it.  It's perfectly normal in

8   everyday conversation.  But in order to get a good

9   clean transcript, we have to be very careful not to do

10  that.  Likewise, I will be very careful to wait until

11  your response is finished before I start my new

12  question.

13          The one exception I may make to that rule,

14  if I feel like you're not answering my question,

15  because I do have a limited amount of time, and I have

16  a transcript here, if I feel like you are going on and

17  on and on and I don't feel like you have answered my

18  question, I may interrupt you and stop you.  Other than

19  that, I'll let you finish.

20          A.    Okay.

21          Q.    If at any time you don't understand my

22  question, please let me know, and I'll be more than

23  happy to rephrase it in some way or restate it,

24  whatever you need so we're clear.  If you do respond to

25  the question, that would be an indication that you

6

1    understood the question.  Is that fair?

2         A.    Sure.

3         Q.    And, finally, all of your responses should

4    be verbal.  Nonverbal responses just don't make it very

5    well on the record.  So if I ask you a question, if you

6    would simply shake your head "No," I would probably ask

7    you to please verbally respond.  Is that fair?

8         A.    Yes.

9         Q.    Now, Stacey Palmer has sworn you in.  You

10   understand that you are under oath as you would be in a

11   court of law?

12        A.    Yes.

13        Q.    You understand that you are subject to

14   penalty of perjury if you do not tell the truth?

15        A.    Yes.

16        Q.    You mentioned that you have been involved

17   in other depositions.  When was the last time you were

18   a deponent in a case?

19        A.    A defendant?

20        Q.    A deponent.

21        A.    A year and a half ago, perhaps.

22        Q.    In what matter?

23        A.    I worked with a law firm.  I was the

24   investigator involved in a case, and it was necessary

25   to get my version of the events in that case.

7

1      Q.     I take it it's not unusual for you to be

2  hired by law firms?

3      A.     It's very unusual.

4      Q.     Is it?

5      A.     Yes.

6      Q.     But you have had some law firm clients?

7      A.     As a private investigator?

8      Q.     Right.

9      A.     No.

10      Q.     So you haven't been hired by law firms to

11  do investigating work?

12      A.     No.

13      Q.     So when you said you worked with a law

14  firm, what did you mean by that?

15      A.     Employed by a law firm.

16      Q.     You were an actual employee?

17      A.     Yes.

18      Q.     What was your title at the law firm?

19      A.     Legal assistant/investigator.

20      Q.     What law firm was that?

21      A.     Bethune & Associates.

22      Q.     And Mr. Bethune's first name?

23      A.     Gary.

24      Q.     And where are they located?

25      A.     North Phoenix, on 7th Street.  I don't

1    recall the exact address.   It's Bethune & Associates.

2         Q.    And what was the date you started there

3    and what was the date that you discontinued employment

4    there?

5         A.    October 2000 -- I think it was 2003, and

6    that employment ended March of 2007.

7         Q.    During the time that you were working for

8    Bethune & Associates, was that your full-time position?

9         A.    Yes.

10        Q.    Were you doing any private investigating

11   work other than as an employee for them?

12        A.    No.

13        Q.    Why did you leave in March of 2007?

14        A.    Some consumer advocates had targeted

15   Mr. Bethune in an attempt to harm me.  As opposed to

16   allowing that to happen, I decided to separate myself

17   from the ones that could be harmed by these folks.

18        Q.    Why did they want to target you?  You said

19   they targeted Mr. Bethune because of you?

20        A.    Uh-huh.

21        Q.    What was their beef with you, if you know?

22        A.    I can surmise from the posts that's on

23   your client's Ripoff Report that I have tied in several

24   consumer advocates together as being associates, and

25   they didn't like that very much.

9

1          Q.    So during the time that you were working

2     for Mr. Bethune -- I know I asked you if you were doing

3     private investigating work other than for Mr. Bethune

4     and you said no.

5                 But, in fact, you were, were you not,

6     doing things at least on the Internet where you were

7     checking people out and posting things on the Internet?

8          MR. DANA:   Object to the form.

9          A.    I'm not a party to this suit.  I don't

10    know why I would be asked personal questions.

11         Q.    BY MS. SPETH:  Are you refusing to answer?

12         A.    I am.

13         Q.    I'm going to see if Judge Wake is

14    available to confer with him about this if you are

15    going to take the position that you are not going to

16    answer questions because you aren't a party to the

17    suit.  Let's take a quick break.

18                (Discussion off the record.)

19         Q.    BY MS. SPETH:  While we're waiting to find

20    out this issue about whether you have to answer

21    questions that you consider personal, let me ask you:

22    Do you recall getting a subpoena for this deposition?

23         A.    I do.

24         Q.    And that subpoena had certain documents

25    requested on the last page under Exhibit A.  Do you

10

1    recall that?

2         A.    I do.

3         Q.    Did you bring it with you?

4         A.    I sent that to you certified mail, and it

5    was received by your office.

6         Q.    When you say you sent that to me, what are

7    you referring to?

8         A.    Some of the exhibits that you requested.

9         Q.    My question to you was:  Did you bring the

10   actual subpoena with you?

11        A.    Oh, yes, I did.

12        Q.    Okay.  And what did you send me certified

13   mail?

14        A.    I sent you some notes that were on a

15   yellow pad regarding my interviews of neighbors of

16   Edward Magedson.

17        Q.    Was it attached to your letter to me, one

18   page of notes?

19        A.    Yes.

20        Q.    Anything else that you sent me by

21   certified mail?

22        A.    No.

23        Q.    So let me make sure --

24        A.    Other than the letter.

25        Q.    Let's make sure you and I are on the same

1    page.  Actually, it's not dated.  I did receive a

2    letter from you that said -- it was regarding the

3    subpoena.  It says, "I have asked my attorney to

4    address this subpoena and the impending deposition and

5    he has asked permission to be excused" -- that's the

6    letter that you are talking about being sent by

7    certified mail?

8        A.    Yes.

9        Q.    That's the only correspondence that you

10    sent to me with respect to the subpoena?

11        A.    I sent you an email.  But in terms of

12    United States mail, certified mail, that letter and

13    that one exhibit are the only things I sent you.

14        Q.    And what you sent me by email was a police

15    report, correct?

16        A.    Correct.

17        Q.    We're on the same page.

18        (Discussion off the record.)

19        Q.    BY MS. SPETH:  While we were off the

20    record, Mr. Brewington clarified a little bit his

21    position why he thinks certain things are personal.

22    And for now I think we may be able to get past this

23    issue.  Let me try the question again.

24        If I understand correctly, while you were

25    working for Mr. Bethune on the side, not under the

12

1    scope of employment with him, you were engaging in some

2    Internet-related activities where you linked together

3    activities in some way -- you found links between

4    certain consumer advocates; is that correct?

5         A.    Yes.

6         Q.    And who were those consumer advocates?   I

7    understand one of them is Ed Magedson.

8         A.    Yes.   The other one is Robert Paisola and

9    the other one is Bud Hibbs.

10        Q.    And this led to you deciding to leave

11   Mr. Bethune's office sort of to protect him from --

12        A.    Mr. Bethune was listed in a post on the

13   Ripoff Report.  Having observed the way that report

14   works, if they can't find anything scurrilous about the

15   individual, they go out and try to harm the ones that

16   are closest to the individual.

17             Mr. Bethune, I like and respect him a

18   great deal and has never done anything to deserve that

19   sort of attention.

20        Q.    So you chose to leave his employment to

21   protect him?

22        A.    That's correct.

23        Q.    And of the three gentlemen that you just

24   mentioned, which one were you concerned might in some

25   way harm Mr. Bethune's reputation?

13

1   A.  Bud Hibbs.

2   Q.  All right.  Let's look back -- let me go

3 back.

4       So before October 2003 what did you do for

5 a living?

6   A.  I owned a collection agency.

7   Q.  For how long was that?

8   A.  Maybe a year and a half.

9   Q.  Was that here in Arizona, or was that

10 someplace else?

11   A.  It was here.  I was licensed by the State

12 Banking Commission.

13   Q.  And before that?

14   A.  I was the vice president for Hutchison,

15 Perry & Associates, another collection agency.

16   Q.  For how long?

17   A.  Three years, I think.

18   Q.  Was that here in the Valley?

19   A.  Yes.

20   Q.  When did you move to Phoenix or the

21 Phoenix area?

22   A.  I think 2000.  March, maybe, 2000.

23   Q.  Did we cover all of the positions that you

24 held in Phoenix, or not yet?

25   A.  Yes.

14

1       Q.    And since March 2007, your career has been

2   as a private investigator in your own private practice;

3   is that correct?

4       A.    Yes.

5       Q.    Have you held any other jobs or positions

6   since March 2007?

7       A.    I have been a broker for Power Nissan.

8       Q.    Where did you come from in March 2000?

9       A.    I came from Oregon.

10       Q.    For how long did you live in Oregon?

11       A.    Approximately a year.

12       Q.    And before that?

13       A.    New Orleans.

14       Q.    And for how long were you in New Orleans?

15       A.    Oh, gosh, a couple years.  I worked for

16   Milligan & Michaels.  They transferred me from one

17   place to another.

18       Q.    What's Milligan & Michaels?

19       A.    It's a commercial collection agency.

20       Q.    Altogether, how long have you been in a

21   business that involved collection work or investigative

22   work?

23       A.    20 years.

24       Q.    And before New Orleans, where did you

25   live?

1          A.     I believe I worked at a law firm, Ed Burke

2    & Associates.  Don't ask the date.  I don't remember.

3          Q.     I'm trying to figure out where.  What

4    state?

5          A.     Texas.

6          Q.     For how long were you in Texas?

7          A.     Well, intermittently -- I guess the total

8    would be 10 years.

9          Q.     I'm going to go back the other way.  When

10   did you graduate from high school?

11         A.     I got a GED.

12         Q.     So when did you finish high school?  When

13   did you stop going to high school as a student?

14         A.     1975.

15         Q.     What state was that?

16         A.     Indiana.

17         Q.     And then you went back for your GED when?

18         A.     Maybe '79.

19         Q.     Have you had any college since then?

20         A.     Yes.  I'm a full-time student now.

21         Q.     At what college?

22         A.     Mesa Community College.

23         Q.     Have you earned any degrees yet?

24         A.     No.

25         Q.     What is your major?

16

1        A.      There is no major.

2        Q.      Even for a full-time student?

3        A.      Yes.  It's Internet-related courses.  I

4   need to know as much about it as I possibly can.  I

5   can't rely on everyone else to educate me.

6        Q.      When you say Internet-related courses, you

7   don't mean you take your courses on the Internet.  You

8   take your courses about the Internet?

9        A.      Yes.

10       Q.      How do you define "full time"?

11       A.      Nine hours.

12       Q.      Nine credit hours?

13       A.      Yes.

14       Q.      Have you ever been convicted of a felony?

15       A.      Yes.

16       Q.      In what year?

17       A.      22 years ago.

18       Q.      Is that the only felony conviction you've

19   had?

20       A.      Yes.

21       Q.      What state was that?

22       A.      Texas.

23       Q.      Let's look at the subpoena that I sent you

24   and the exhibit to the subpoena.  I want to go through

25   the topics in there and talk about what documents might

1    exist that were responsive to the subpoena.

2            The first request was for "All documents

3    relating to or regarding William Stanley."

4            You produced for me a couple of notes that

5    had nothing to do with William Stanley, and you

6    produced a police report that had nothing to do with

7    William Stanley.

8            Therefore, am I correct in assuming that

9    you produced to me no documents relating to William

10   Stanley?

11       A.    The police report has his name on there.

12       Q.    Other than the police report that Ed

13   Magedson filed with the Mesa Police, have you produced

14   to me any documents about William Stanley?

15       A.    No.

16       Q.    Why not?

17       A.    I interpreted from the Arizona Revised

18   Statutes that since he's a client of mine that it would

19   take a court order, which I'm happy to comply with, to

20   produce those documents for you.

21       Q.    And which Arizona statute are you

22   referring to?  Would it be the one that you mentioned

23   in your letter to me?

24       A.    Yes.

25       Q.    A.R.S. 32-2455?

18

1      A.      Yes.

2      Q.      And do you have a copy of that statute

3  with you?

4      A.      I don't.

5      Q.      Do you interpret that statute as

6  prohibiting you from telling me what items exist?

7      A.      Oh, no.  I interpret it in terms of --

8  if a court orders me to do so, then I must comply with

9  that.  I feel it's a responsibility to not just

10  arbitrarily --

11          My interpretation of the statute is I

12  don't have a permissive purpose to release that

13  information, unless Mr. Stanley gives it to me in

14  writing or a court tells me to do so.  Either way, I'm

15  happy to do it.

16      Q.      And you did not consider the

17  validly-issued subpoena from the United States District

18  Court to be a court order to do so?

19      A.      No, I didn't.

20      Q.      And you do understand that this subpoena

21  to you was issued by the United States District Court?

22      A.      I do.

23      Q.      Now, my question was:  Do you interpret

24  the statute as prohibiting you from telling me what

25  exists, as opposed to actually producing it?

19

1          A.     No.  I'll tell you what exists.

2          Q.     Tell me what exists with respect to

3    William Stanley's documents that are in your

4    possession.

5          A.     There are no documents.  They're emails.

6          Q.     Let me just make real clear that an email

7    is considered a document.  So when I say "document,"

8    I'm definitely including emails.

9          A.     When I look at your subpoena, it appears

10   that you have separated correspondence and documents

11   from emails.

12              In 4 you say, "All documents related to

13   Ed Magedson."  But you didn't say emails where before

14   you mentioned emails.

15         Q.     Number 1 says, "All documents related to

16   or regarding William Stanley, including but not limited

17   to emails."

18         A.     You don't say that in 4 or 5.  I have

19   emails from other sources that had you asked for those

20   regarding Ed Magedson, then certainly I would have felt

21   compelled to provide them.

22         Q.     We are talking about Number 1 right now.

23              In general, you didn't understand when I

24   said, "All documents including emails," you didn't

25   understand --

20

```
 1        A.    I knew you wanted emails regarding
 2   Mr. Stanley.
 3        Q.    But later on when I said "All documents,"
 4   again because I didn't say specifically "including
 5   emails," you didn't think I meant emails?
 6        A.    For Mr. Stanley I knew you wanted emails
 7   and documents; only emails exist.  They have been
 8   separated on a disk for you that should a judge decide
 9   that's something that you ought to have.
10        Q.    Let's go back to Exhibit A.  All documents
11   including emails relating to William Stanley.
12              Tell me what documents exist that are in
13   your possession and control.
14        A.    The first document would have been
15   approximately February 14th of 2007.  It was a request
16   by me on one of his Web sites; I don't know which one.
17   It was specifically asking him to communicate with me
18   regarding certain Internet activities he was involved
19   in.
20        Q.    What would be the second?  We'll list them
21   first and then we'll talk about them.
22        A.    It would have been his responding to the
23   email providing me with a phone number to communicate
24   with him.
25        Q.    And next?
```

1    A.    I don't have a clue.  There are several

2    emails, but most of the conversations would have taken

3    place in instant chat, which I don't save copies of.

4    I don't think there's a format for Yahoo to save copies

5    of them.

6    Q.    So you and Mr. Stanley would instant

7    message one another?

8    A.    Yes.  That's his preferred method.

9    Q.    Other than instant message, I take it

10   there were also some emails between you and

11   Mr. Stanley?

12   A.    Oh, yes.

13   Q.    Anything else that we haven't discussed

14   that might be a document in either electronic form or

15   hard copy form regarding Mr. Stanley that's in your

16   possession other than emails?

17   A.    Yes.  I forwarded to him -- I received

18   from a media source an email that was sent to them from

19   Edward Magedson, the attachments were death threat

20   letters.  I forwarded that to Mr. Stanley asking if he

21   had any involvement in the death threat letters.  His

22   response was negative.  He found it -- his response was

23   he found it completely ridiculous to be involved in

24   something like that.

25   Q.    Why are you willing to tell me about the

22

1    content of that?   I thought this was part of all the

2    supposed investigation that you didn't have to divulge.

3           A.    He hired me regarding the authorship of

4    the death threat letters.  Since I don't represent him

5    for anything else, I can probably discuss it with you.

6           Q.    You were just discussing your

7    communications with him about the death threat letters?

8           A.    Uh-huh.

9           Q.    You don't have a problem telling me about

10   that?

11          A.    No, I don't.

12          Q.    But yet you didn't produce the documents.

13          A.    You have them.  They're public records.

14          Q.    The emails between yourself and

15   Mr. Stanley?

16          A.    I stand corrected.  No, those emails will

17   show he's asked me to represent him on these death

18   threat letters.  My acquiescence for doing so is for

19   the sum of $1.  That would actually be the first client

20   I charged money for.  I haven't received it.  Haven't

21   billed it either.

22          Q.    What other documents exist, other than

23   emails between yourself and Mr. Stanley, the

24   information that you received from a media source that

25   you forwarded to Mr. Stanley, instant messaging which

23

1    you said probably don't exist anymore, you probably

2    didn't keep them, and then the original request that

3    you made and his response?  What other documents exist

4    that might be responsive to Exhibit 1?

5         A.    Mr. Stanley has, on occasion, asked me to

6    pull public records on particular individuals.  I don't

7    know what the relationship of those parties are.

8         Q.    And so those public records that you

9    pulled would be in your file?

10        A.    They would be in the email, yes.  Not a

11   document, in the email.

12        Q.    And I'm going to reiterate that when I

13   talk about "document," I'm including emails as a

14   document.

15        A.    Understood.

16        Q.    Any other documents that might exist

17   regarding Mr. Stanley that might be responsive to

18   Exhibit A of my subpoena?

19        A.    No.  Conversations.

20        Q.    That wouldn't be a document.

21        A.    I understand that.

22        Q.    Have you ever done any investigation as to

23   the whereabouts of Mr. Stanley?

24        A.    No.

25        Q.    Do you have any notes regarding

24

1    Mr. Stanley, any written notes?

2           A.    No.

3                 For the record, I don't even know that's

4    who it is.  He says his name is Bill Stanley.  I don't

5    have any proof that's who it is.

6           Q.    Have you ever had any correspondence with

7    anybody in writing, written pen and paper

8    correspondence to or from you regarding Mr. Stanley?

9           A.    No.

10          Q.    So have we now identified the entire set

11   of documents that exist with respect to Mr. Stanley

12   that are in your control?

13          A.    I believe so.

14          Q.    And of these documents, do you contend

15   that all of them are somehow protected by A.R.S.

16   32-2455?

17          A.    No.  I believe that those documents -- my

18   interpretation of that Arizona Revised Statute is that

19   my representation of Mr. Stanley should be sacrosanct

20   until it's determined that it's not.

21          Q.    I understand that.  I'm asking you if any

22   of these documents fall outside of that investigative

23   relationship.

24          A.    Well, I would presume that they would,

25   yes.  Again, he's asked me to do a public records

25

1  search on particular individuals.  So what he does with

2  them, I don't have a clue.  I don't know what the

3  relationship with them is.

4      Q.    Maybe you misunderstood my question.

5          Do any of the documents that are in your

6  possession fall outside of what you contend of

7  A.R.S. --

8      A.    I can't answer it.  If I'm ordered to

9  produce the documents, the emails, I'm happy to do so.

10     Q.    You were subpoenaed to do so, and you have

11  withheld all documents in your possession, with the

12  exception of one page of notes and one police report.

13  I'm trying to get to the bottom of your position as to

14  withholding those records.

15         Of the documents that you just told me

16  existed related to Mr. Stanley, do you contend that all

17  of them are covered by A.R.S. 32-2455?

18     A.    I've already answered that question.  I'm

19  not a lawyer.  I have interpreted A.R.S. 32-2455 to

20  mean that since he's a client of mine, I am not just

21  authorized to hand out anything unless a court order --

22  if I've misinterpreted a subpoena for being a court

23  order, then I guess that would be my attorney's fault,

24  who has chosen not to represent me because of his fear

25  of being on the Ripoff Report.

26

1       Q.     Let me ask you this:  When you refer to

2   Mr. Stanley as a client, that's because he has agreed

3   to pay you $1, correct?

4       A.     Correct.

5       Q.     Whose idea was it that he pay you $1?

6       A.     Me.

7       Q.     Why?

8       A.     In the event you sue me, I have a one

9   million dollar bond that protects me.  I can tell my

10   bond company that they're going to have to represent me

11   in that suit since there's a payment that's been made.

12       Q.     The February 14, 2007 request that you

13   made to Mr. Stanley asking him to communicate with you,

14   was that a document that is part of your investigative

15   file of him as a client?

16       A.     It's in an email, only an email from me

17   sending and his replying.

18       Q.     I understand that.  Let me back up.

19              I have in front of me A.R.S. 32-2455.  It

20   says that, "No licensee" -- and you are a licensee

21   under the private investigator statute?

22       A.     Correct.

23       Q.     -- "may divulge or release to anyone other

24   than his client the contents of an investigative file

25   acquired in the course of licensed investigative

1    activity."

2         A.    Uh-huh.

3         Q.    Yes?

4         A.    Yes.

5         Q.    When you wrote to Mr. Stanley on

6    February 14, 2007, at that point would that inquiry

7    have been part of the contents of your investigative

8    file that you acquired in the course of licensed

9    investigative activity?

10        A.    No.  He wasn't a client at that point.

11        Q.    And yet you haven't produced that?

12        A.    That's correct.

13        Q.    Were there emails between you and

14   Mr. Stanley before he became a client?

15        A.    Clearly.

16        Q.    Emails that you have not produced to me;

17   is that correct?

18        A.    That's right.

19        Q.    Let's look at Item 2 of Exhibit A.  The

20   request is for "All documents related to or regarding

21   Robert Russo, including but not limited to emails and

22   other correspondence to or from Russo, checks received

23   from Russo, and bank records reflecting wire transfers

24   from or to Russo."

25               Have you produced any documents responsive

1   to Item Number 2?

2         A.    No.

3         Q.    Let me go back to Item Number 1, the wire

4   transfer.  Mr. Stanley never actually paid you the $1?

5         A.    Correct.

6         Q.    Have you ever received a check from

7   Mr. Stanley for reimbursement or anything?

8         A.    Nothing.

9         Q.    Have you ever received a wire transfer

10  from Mr. Stanley?

11        A.    No.

12        Q.    Now, back to Number 2 with respect to

13  Mr. Russo.  Do you have any documents in your

14  possession regarding Mr. Russo?

15        A.    Emails, yes.

16        Q.    And have you produced those emails?

17        A.    I have not.

18        Q.    Why not?

19        A.    I consider it to be proprietary

20  information that would disclose trade secrets of

21  Mr. Russo's.

22        Q.    Have you signed a confidentiality

23  agreement with Mr. Russo?

24        A.    I have not.

25        Q.    When Mr. Russo provided these emails to

29

1   you, did he ask you to keep them confidential?

2        A.     In conversations with him, he has made it

3   clear that the information that he has is proprietary

4   and trade secrets.  The emails do not contain that.

5        Q.     Do you understand the definition of a

6   "trade secret"?

7        A.     I don't.

8        Q.     When you withheld those emails from me,

9   despite the fact they were subpoenaed, you did so based

10  solely upon Mr. Russo's request --

11       A.     He didn't request me to withhold them.  I

12  simply did that because he and I have a business

13  relationship.  And if they're trade secrets to him,

14  they're trade secrets to me.

15              If the judge instructs me to turn them

16  over, I'm happy to.  I don't feel, however, that I'm

17  doing anyone any service by arbitrarily, based upon

18  getting a subpoena, turning things over that I think

19  may be proprietary or I think may be in violation of

20  the Arizona Revised Statutes.  If I'm directed by an

21  authority, I'm happy to bring them in since I've

22  already separated them.

23       Q.     If you don't know the definition of a

24  trade secret, how did you decide these are somehow a

25  trade secret?

30

1      A.     Well, Mr. Russo had indicated they're

2  trade secrets.  So I would guess that in watching

3  everything over the Internet, he doesn't necessarily

4  want everyone on the planet to understand what it is

5  that he does for a living and how he gets it done.

6      Q.     Mr. Russo, did he use the words "trade

7  secret" with you?

8      A.     He did.

9      Q.     And this is all verbal, though?

10      A.     Yes.

11      Q.     Nothing in writing?

12      A.     Correct.

13      Q.     I'm going to ask you again to wait until

14  my question is finished.  Again, I know you know where

15  I am going, but it will make it much easier for the

16  court reporter.

17             So these emails, they have to do with how

18  Mr. Russo does what he does for a living, the ones that

19  you have that you haven't produced?

20      A.     You know, I don't know.  I would have to

21  review them.  I don't really pay a whole lot of

22  attention to them.  I'm not trying to be unresponsive.

23  I can't give an accurate answer.

24      Q.     That's fair enough.

25             You haven't reviewed those emails

31

1    recently?

2          A.     Oh, no.

3          Q.     Did you review them when you got the

4    subpoena?

5          A.     Yes -- not fully.  I simply went into the

6    Internet and transferred them to a file.

7          Q.     Did you review them to determine whether

8    each one of them contained --

9          A.     Of course not.

10         Q.     Let me finish.

11                Did you review them to determine whether

12   each one of them contained what you considered to be

13   trade secrets?

14         A.     I did not.

15         Q.     But you did determine that you are not

16   going to turn any of them over until a court orders you

17   to do so?

18         A.     Correct.

19         Q.     You said you have a business relationship

20   with Mr. Russo.  What is that business relationship?

21         A.     I send people who have been maligned on

22   the Internet by various Web sites.

23         Q.     To Mr. Russo?

24         A.     Correct.

25         Q.     Does he pay you?

32

```
 1          A.     He does.
 2          Q.     In what way are you compensated?  What's
 3   the payment scheme?
 4          A.     I get 50 percent of what the contractual
 5   amount is.
 6          Q.     And how many people have you referred him,
 7   approximately?
 8          A.     Four.
 9          Q.     And the services that Mr. Russo provides,
10   in general -- and I'm not asking you to disclose what
11   you say you consider are trade secrets -- but, in
12   general, the services are Web site and search engine
13   optimization; is that correct?
14          A.     Yes.
15          Q.     Of the four people that you have sent to
16   Mr. Russo that you received 50 percent, what was the
17   total amount?  In other words, what was it 50 percent
18   of?
19          A.     Are you asking me how much did Mr. Russo
20   receive from them?
21          Q.     How much did he charge, of which he paid
22   you half?
23          A.     It was never the same.  An example would
24   be $5,500, another example would be, I think, $1,000 or
25   $500 -- yeah, $500.
```

33

1      Q.    He charged 500, so you got 250?

2      A.    Correct.

3      Q.    And there were four all together.  Do you

4  remember the other two?

5      A.    Two of them -- you asked what Russo

6  received.  So two of them would be $500, I think, one

7  would be $5,000, and then another one would be $5,500.

8      Q.    I just want to make sure we're saying the

9  same thing.  If he received a total, for instance, of

10  $5,000, he then paid you $2,500?

11      A.    Correct.

12      Q.    So in each of these, this was the total

13  which then got split?

14      A.    Yes.

15      Q.    Was this for a certain period of time, or

16  is this a lump sum forever?

17      A.    So long as they're clients of QED Media.

18      Q.    For instance, if a client paid him $5,500,

19  would the services go on in perpetuity, or would they

20  have to pay again?

21      A.    It's a monthly fee.

22      Q.    So it's $5,500 per month or $500 per

23  month?

24      A.    Yes.

25      Q.    Who are these four clients that you sent

34

1    to him?

2          A.    Well, the one client would be Ad Kids.

3    Another would be the Harmon Agency.  Another would be

4    Video Professor.  And another would be Direct Buy.

5          Q.    Do you know how these guys found you?

6          A.    I found them.

7          Q.    How did you find them?

8          A.    I spend a lot of time on the Internet

9    trying to ascertain if there's particular attention

10   paid to one or more of these individuals by any number

11   of self-described consumer advocates.

12         Q.    So, for instance, you might get on Rip-Off

13   Report's Web site and find somebody that has a lot of

14   Rip-Off reports against them and then contact them?

15         A.    For instance, I would get on infomercial

16   scams or easy background checks Web site.  Not all of

17   these people are on the Ripoff Report's Web site.

18         Q.    Do you know which ones are of the four

19   that you just mentioned?

20         A.    I believe Best Buy, maybe Video Professor.

21         Q.    You said Direct Buy the first time, and

22   now you said Best Buy.  Which one?

23         A.    Direct Buy.  I stand corrected.

24         Q.    So Direct Buy may be on Ripoff Report?

25         A.    Yes.

35

1    Q.    Why is there so much difference between

2  someone paying $5,500 and $500?

3    A.    I don't know how QED decides how he does

4  his pricing.  I don't have a clue.

5    Q.    I think I asked you earlier, doesn't that

6  mean that either Mr. Russo has sent wire transfers to

7  you or checks?

8    A.    No wire transfers or checks.

9    Q.    How are you paid?

10   A.    Direct deposit.

11   Q.    Oh, I see.

12         Let's look at Item Number 3.  Let me

13  orient you.  Item Number 3 of Exhibit A of my subpoena

14  says, "All documents related to or regarding QED Media

15  Group, defendmyname.com, defamationaction.com, Internet

16  Defamation League, or Defamation Action League."

17         Do you have any documents responsive to

18  that category?

19   A.    None.

20   Q.    Your relationship with Mr. Russo, isn't

21  that through QED Media Group?  That's where I

22  understand he does his search engine optimization.

23   A.    It's through QED.

24   Q.    So any documents between you and Mr. Russo

25  may be QED Media documents, if you know?

36

1   A.  Repeat the question.

2   Q.  It's my understanding -- and I can be

3 incorrect -- that Mr. Russo provides his search engine

4 optimization documents through QED Media Group, which

5 is his company.

6     So might there be documents between you

7 and QED Media in connection with that service?

8   A.  My interpretation of your question on 3,

9 again, was documents separate from emails.  Yes, there

10 would be documents -- if emails are documents --

11 documents with regard to only QED Media.

12     I never received emails, documents, or

13 anything else, well, from the Internet Defamation

14 League, Defamation Action League, defendmyname.com, or

15 defamationaction.com.

16   Q.  Let me ask you this:  Did you go to your

17 email outbox or inbox, or both, and run a search for

18 defendmyname.com to see if there are any emails related

19 to them?

20   A.  When you say "defendmyname.com,"

21 Mr. Stanley's email is defamationaction@yahoo.com.  So

22 defendmyname -- I can -- when I did a search, I

23 pulled -- I'm not sure how I did the search.

24     Every email that I thought came from -- I

25 believe I typed in QED.  I'm not sure.  I even went

1  into my Web-based email and pulled what I felt were the

2  emails, too.  Nothing was transferred them -- I

3  transferred them to disk, into files for easy access.

4  So if it exists, I didn't pay attention to it.

5                 I have never received anything from

6  Internet Defamation League.  I only became aware of

7  them through your associate.

8                 Defamation Action League, I became aware

9  of them through postings on the Internet and from

10  Mr. Stanley having a dialogue with me about them, but I

11  never received anything from them.  I don't belong to

12  those organizations, and I don't know who's a member.

13        Q.    Do you know who controls Defamation Action

14  League?

15        A.    I think Mr. Stanley claims he has.  And I

16  believe, if memory serves me, I went into WhoIs to find

17  who controlled that domain.  I would be speculating if

18  I remember he is with WhoIs, with an Austrian address.

19        Q.    The Defamation League, do you know who

20  controls that?

21        A.    I have no idea.

22        Q.    My fourth request in the subpoena is "All

23  documents related to Ed Magedson."

24                 Did you produce to me any documents about

25  Ed Magedson?

38

1        A.     Only what you have.

2        Q.     The police report and one page of

3   handwritten notes?

4        A.     Correct.

5        Q.     Is it your testimony as you sit here today

6   under oath that those are the only documents that you

7   have in your possession?

8        A.     It is.

9        Q.     Is it your testimony that those are the

10  only documents that you have about Ed Magedson that

11  you've ever had?

12       A.     No, that is not all my testimony.

13       Q.     Again, when we are talking about

14  documents, do you understand that I am talking about

15  electronic documents, as well?

16       A.     Sure.

17       Q.     So you don't have any in your possession

18  and control today, but you did at one time.  Do I

19  understand that correctly?

20       A.     With that said, I have the email exchange

21  between he and I or his staff some months ago, and that

22  would be it.

23       Q.     Is that it, really?

24       A.     That's absolutely it.  I have a Department

25  of Defense grade scrubber that I make sure I do every

1   day.  It sweeps my hard drive three times a day for

2   security purposes.

3            I customarily will shred any documents

4   that I don't necessarily want to fall into the wrong

5   people's hands.

6            The statutes for the Arizona Revised

7   Statutes for P.I. says if law enforcement requests me

8   to do a report, I'm obligated to give them one.  But it

9   doesn't say I have to do one in writing.  I make sure

10  there's not any notes I am taking.

11           Q.   So every single day you shred anything --

12  you scrub anything on your system --

13           A.   No.  I don't go in there -- I simply do a

14  scrub for anything that's deleted.

15           I did not pick out Magedson.  I don't pick

16  out anything in particular.  I simply will go in there

17  and tell my system to scrub anything that's been

18  deleted.  It will go in there indiscriminately and

19  rewrite over the hard drive.

20           Q.   I understand.  It does not scrub things

21  that you did not delete, correct?

22           A.   Oh, of course not.

23           Q.   So are you saying that you hand --

24  manually deleted everything about Ed Magedson?

25           A.   No.  I still have the emails.  But any

40

1    document --

2         Q.    Let's separate the electronic from the

3    hard so I understand.  Let's talk about electronic for

4    a minute.

5              Are you saying that you hit the delete

6    button with respect to documents on your system

7    regarding Ed Magedson and that you've done that in the

8    past?

9         A.    No.

10        Q.    But yet there are documents, electronic

11   documents that are not in your control today that were

12   at one time?

13        A.    Yes.

14        Q.    And so then how did they come off of your

15   system?

16        A.    It doesn't mean they were ever on my

17   system.  You can log into certain Web sites or data

18   bases and secure information and never bound it to your

19   computer; it's always on another server or Web site.

20   I don't necessarily feel inclined to pull that

21   information into my computer.

22        Q.    So, obviously, when you do an

23   Internet-based search, you may or may not save what you

24   find.  I get that.

25              So a lot of your work, I'm sure -- just

PALMER REPORTING SERVICES, INC.

41

1  like a lot of my work -- involves doing Internet

2  searches and checking things out on the Internet,

3  right?

4        A.     Yes.

5        Q.     And I understand that just because you

6  accessed a Web site, whether it was a public record or

7  not, doesn't mean you have a copy of it.  I get that.

8               When you have done research on Ed

9  Magedson, have you ever in some way downloaded snag it

10  -- I know that's not the right term -- done a snag it

11  on it or in any way captured the information that you

12  have found?

13        A.     Yes.

14        Q.     And what would be your normal method of

15  capturing information when you are doing Internet

16  research if you choose to capture it?

17        A.     Maybe printing it.  Sometimes it may only

18  be a cut and paste.

19        Q.     Cut and paste it into a Word document?

20        A.     A Word document or onto a Web site of some

21  sort.

22        Q.     Do you keep some Web sites for archiving

23  information?

24        A.     No, I don't.

25        Q.     What do you mean when you say paste it

42

1    onto a Web site of some sort?

2         A.    There are Web sites that are in control of

3    other information that I will certainly take public

4    information --

5         Q.    So sometimes you grab information about

6    Ed Magedson and cut and paste it onto somebody else's

7    Web site?

8         A.    Correct.

9         Q.    What Web site might that be that you paste

10   it onto?

11        A.    Scams.com.  And certainly in the comments

12   section of the story of the real Ripoff Report.

13        Q.    And we'll talk about those later.

14              Now, you've done that to post to the

15   public.  Is there some kind of archive Web site that's

16   not available to the public?

17        A.    None exist that I know of.

18        Q.    So now I'm back to my original question.

19   You are doing research about Ed Magedson on the

20   Internet -- and certainly you've done that, right?

21        A.    Yes.

22        Q.    And you've decided there's a particular

23   piece of information that you want to save.  One

24   possibility is you print it.  We'll talk about hard

25   copies in a second.  One possibility is that you paste

43

1    it and put it on another Web site.

2              Do you ever download it in a way that you

3    can save it in your system?

4         A.    Yes.

5         Q.    And between then and now, what has

6    happened to that information?

7         A.    Well, much of the investigation that would

8    have been done would have been done on a separate

9    computer.  I have a newer computer, and that

10   information is not on there.  I simply don't have it.

11   It would be on another computer.  And I would have to

12   go to storage and make everything available to the FBI

13   or whoever else would want it.

14        Q.    What do you mean you made it available to

15   the FBI?

16        A.    I made all my computers available to the

17   FBI and any of the information on them.

18        Q.    I want to know what you --

19        A.    I told the agent if he wants my computers,

20   he's welcome to them.

21        Q.    Including the one in storage?

22        A.    Of course.

23        Q.    When I requested in Exhibit A to the

24   subpoena those documents, you knew they were on the

25   computer in storage?

44

1    A.    No, I don't know that.

          What I told you was anything on the other

3    computer I don't know, and I doubt seriously that

4    anything is going to be on there.

5          If I had anything in my possession

6    regarding documents, which I will refer to as printed

7    material at this point in time, I can almost assure you

8    I would have shredded it several months ago.

9    Q.    I'm not talking about printed material.

10   Let's start over.

11         Sometimes when you're on the Internet and

12   you're doing research about Mr. Magedson, you see

13   something of interest to you, whether it's on a public

14   data Web site, you may capture it, you may cut and

15   paste it, or download it in some way that you can keep

16   it for future reference.    Correct?

17   A.    Yes.

18   Q.    What I want to know is, what happened to

19   those items between then and now that you are telling

20   me they are no longer in your possession?

21   A.    You know, Counselor, when you say in my

22   possession, if they're on the computer, I don't know, I

23   don't access them.  If I want to know something about

24   Edward Magedson, I don't refer to documents that may or

25   may not be there.

45

1        I have no knowledge of any documents that

2  you're talking about.  If I need anything, I can go

3  right to the Internet and pull it off in the form of an

4  Accurent (phonetic) or any of the other service

5  providers.  Information becomes archaic quickly.  If I

6  downloaded something six months ago, it may not be

7  accurate today.

8        Q.    Let me try it again.  I understand that

9  often you don't capture what you find, but you said

10  sometimes you download it in some manner so that you

11  have it for future reference.  And I want to know where

12  that information is that you downloaded in the past

13  about Mr. Magedson.

14        A.    The only information that I know of is if

15  I ever printed anything up for my own records on

16  Mr. Magedson, I probably shredded them a long time ago,

17  nothing recently.

18        Q.    So is it your testimony now that you have

19  never downloaded or cut and pasted a document

20  electronically about Mr. Magedson?

21        A.    Well, yes, of course I have.

22        Q.    What happened to those documents?

23        A.    I don't know.  They may still exist.

24        Q.    On your computer in storage?

25        A.    On a computer.  They may not exist either.

PALMER REPORTING SERVICES, INC.

46

1    I don't know.

2         Q.    Might they exist on the computer that you

3    use today every day?

4         A.    I doubt it.

5         Q.    Did you do a search?

6         A.    For documents on Magedson?

7         Q.    Yes.

8         A.    Yes.   That's why I came up with the pdf

9    file for the police report.   I inadvertently left it

10   out, so I sent it to you.

11        Q.    So when you did that search, the only

12   thing that came up on your whole system was a pdf of

13   the police report?

14        A.    Yes.

15        Q.    When you did that search, did you search

16   your Word file, your Word documents?

17        A.    Yes.   I had the computer for just a few

18   months.

19        Q.    That wasn't my question.

20             My question is:  Did you search the Word

21   documents?   And you said yes, and none came up.

22        A.    Yes, I believe.   The pdf file is very

23   obvious.   Everything else on there -- frankly, some of

24   it -- I would go from memory because there is no recent

25   events of me looking into Magedson at all that I would

47

1   have cause or reason to download anything on this new

2   computer.

3            So I can say to you with a great deal of

4   clarity that I am 99 percent certain that I have never

5   downloaded any documents on my new computer, other than

6   what we've discussed.  If it's there, it's an accident.

7   And I would not have shred it, especially in these

8   events, either cyber scrubbing or through sending it

9   through a scrubber.  I would have saved it at some

10  point so I can hand that over.

11           Q.    On this new computer do you keep a folder,

12  a separate folder in your documents for either Ripoff

13  Report or Ed Magedson?

14           A.    No.  In this particular case, I went in

15  and separated emails from Russo and emails from

16  Stanley.

17           Q.    I wasn't talking about the emails because

18  I know we talked already about that.

19           Did you do a search for Magedson's name in

20  your emails?

21           A.    I don't know if I did or not.  My

22  clarification on this, again, is that you wanted to

23  see -- you wanted to see documents which I did not

24  presume to be emails.

25           Q.    So you may not have done a search for

PALMER REPORTING SERVICES, INC.

48

1    emails?

2          A.     I may not.

3          Q.     So I asked you if you had a folder on your

4    computer under documents for either Magedson or Ripoff

5    Report and you said no.

6          A.     That's correct.

7          Q.     Do you have a folder in your email records

8    for Magedson --

9          A.     Almost never.

10         Q.     So your Outlook is all mixed in together?

11         A.     Yes.

12         Q.     So back to your old computer.

13                When did you switch from your old computer

14   to your new computer?

15         A.     Three, four months ago.

16         Q.     Why did you switch?

17         A.     Because the new one is portable.  It's a

18   laptop.

19         Q.     Did you take the data off the old one and

20   move it to the new one?

21         A.     No.

22         Q.     No?

23         A.     No.

24         Q.     Did you take any of the data off of the

25   old one and put it on the new one?

49

1       A.    No.

2       Q.    And the old one went into storage?

3       A.    Yes.

4       Q.    Where is storage?

5       A.    I have a storage facility in Mesa,

6  Baseline and -- I don't know the cross street.  I have

7  several computers.  But the one in particular that I've

8  been using is in that storage facility.

9       Q.    So the computer that you are using right

10  now --

11       A.    The laptop.

12       Q.    Is that your only computer that you are

13  currently using?

14       A.    Yes.

15       Q.    And previous to that there's a computer

16  that you say is now in the Mesa storage facility?

17       A.    Yes.

18       Q.    At that time was that the only computer

19  that you were using?

20       A.    Yes.

21       Q.    When you say you have several computers,

22  what are the other ones you are thinking of?

23       A.    I think there's five, four computers in

24  our house.  So my significant other has one, my son has

25  one, I have one, there's one in the garage.  So we've

1    got a lot of them.

2              But in terms of our dialogue, there would

3    have only been two computers that I would have used.

4         Q.    The one in the Mesa storage and the one

5    you currently use?

6         A.    Correct.

7         Q.    How come you told the FBI that they could

8    look at the one in the Mesa storage?

9         A.    They can look at any of them.

10        Q.    Why did you tell them that?

11        A.    Because there are things going on that are

12   completely inappropriate, and I think it's in the best

13   interest for the Justice Department to get involved and

14   sort it out.

15        Q.    And your computer might contain

16   information about those things?

17        A.    Well, sometimes you have to eliminate a

18   suspect so that you can get on to the others.

19             The FBI visited me four weeks ago and

20   asked a great many questions.  I didn't get the

21   impression that I was really a suspect or a person of

22   interest.  But if it helps them get to the bottom

23   line --

24             For example, if Mr. Stanley -- remember, I

25   don't represent him to exonerate him.  I represent him

eNavigation

1    to find out who authored those letters.  If he did it,

2    I'll turn him in to the FBI.

3             Q.    Why did you tell the FBI --

4             My question before was:  Why did you tell

5    the FBI that, that your computers would be available to

6    them?

7             MS. SPETH:  Can you read back my question and

8    his answer?

9             (Record read beginning on page 50, line 7.)

10            Q.    BY MS. SPETH:  When I asked you why you

11   told the FBI your computers are available and when you

12   say things are inappropriate, you are referring to

13   activities of my client, are you not?

14            A.    Not necessarily.

15            Q.    What were you referring to?

16            A.    There are death threats made against him.

17   Allegedly whoever authored those death threats needs to

18   be addressed.  These are issues for the courts to

19   decide.  They're not issues to be reduced to violence.

20   Now, whoever does it needs to be addressed.

21            Q.    I understand that.  And I don't want to

22   talk about philosophy right now.  I'm trying to figure

23   out where documents are.

24            And my question to you is:  Why did you

25   offer your computers to the FBI?  And your answer was

52

1  because they might contain information about these

2  events.

3      MR. DANA:   Objection.

4      Q.   BY MS. SPETH:   Is that correct, or is that

5  not correct?

6      MR. DANA:   Misstates his testimony.

7      MS. SPETH:   I'm going to ask her again to read

8  back my question and your answer, and tell me why you

9  answered this way.

10     (Record read beginning on page 50, line 7.)

11     Q.   BY MS. SPETH:   Can you tell me what you

12  meant by that answer?

13     A.   As I've already answered, I investigated

14  the authorship of death threat letters.   In spite of

15  the FBI saying they're not involved in that particular

16  investigation, if I can be helpful to them, I can

17  certainly provide that information.

18     Q.   In what way was making your computers

19  available to the FBI helpful to the FBI in this

20  investigation?

21     A.   If they're asking me questions -- and they

22  have gone to my mailboxes.   I presume they want to

23  eliminate me as a suspect in any of the other events

24  out there.

25         If providing them any and all information

1   to help them understand that I don't know Steve Miller

2   and I don't know any of the other parties and what

3   they're doing, if that helps them get on to the next

4   course of action, I'm happy to do that.

5        Q.   Is it your testimony now under oath that

6   the reason you offered your computers to the FBI wasn't

7   because you thought there was information on them about

8   Mr. Magedson?

9        A.   Oh, absolutely not.

10       Q.   So you do believe there's information on

11  your computers about Mr. Magedson?

12       A.   I don't know that.  I did not offer the

13  computers to the FBI agent with the intent of providing

14  them information about Mr. Magedson.

15       Q.   All right.  Now, when we were talking

16  earlier about documents that might be responsive to

17  Item 4 of Exhibit A, I want to separate electronic from

18  hard copies.

19            So if you were surfing the Internet and

20  you found some information that was interesting to you

21  about Ed Magedson or about Ripoff Report, you might

22  print it out; true?

23       A.   No.

24       Q.   Didn't you tell me earlier that sometimes

25  you print it out?

54

1       A.     Past tense.   I don't do that now.   There's

2   no reason for me to have those documents.

3       Q.     So sometimes back then you would print

4   them out?

5       A.     Yes.

6       Q.     And between then and now they no longer

7   exist, correct?

8       A.     Correct.

9       Q.     Because you shredded them, correct?

10      A.     The ones that I would know about, yes.

11      Q.     What do you mean "the ones that I would

12  know about"?

13      A.     If anything else exists, I'm not aware of

14  it.   I wouldn't purposely hide something somewhere

15  else.   If it's there, it's by accident, I overlooked

16  it.   But I did not refer to documents on a daily basis

17  about Ed Magedson.   If they exist, they're by accident.

18      Q.     What did you do when you received the

19  subpoena from me in connection with this deposition?

20  What did you do to determine whether there were any

21  responsive documents to Item 4 -- actually, let's lump

22  them together, Items 4 and 5.   4 is Ed Magedson and 5

23  is Xcentric Ventures.

24             For the purpose of this, I will ask you:

25  What did you do to search for such documents?

55

1          A.     Opened my file cabinets and pulled out the

2     file that said "Magedson," and there was one document

3     in there, which is the death threat letters in there,

4     which I received from a media source.

5               When I went into my computer, I don't

6     remember if I did a Word document search -- probably

7     not because I haven't really done a whole lot of

8     looking around about what Mr. Magedson is up to.  I

9     have been really involved in Robert Paisola.

10          Q.     You haven't done a lot in the last several

11    months since you got your new computer?

12          A.     Yes.

13          Q.     So the only thing you did is open the file

14    cabinet and look in your file, the cabinet file?

15          A.     And a cursory look in my computer.  The

16    pdf file appears on my front page.  I don't know if

17    there's anything else there.

18          Q.     Now I'm limiting it to hard copies of

19    documents.  Other than the file cabinet, did you look

20    anyplace else?

21          A.     There would be no other place.

22          Q.     Because you shred documents like that,

23    correct?

24          A.     Yes.

25          Q.     What is your regular practice and

1    procedure for shredding documents?

2          A.     There is no regular practice.  If it's

3    around and I -- if it's archaic, if it's information --

4    I shred bills that I receive and pay.  If it's

5    information that I feel could be harmful to other

6    individuals and they don't -- it doesn't need to be --

7    the public doesn't need to get it by going through my

8    trash or any other method, then I will destroy those

9    documents.

10         Q.     When is the last time you shredded

11   documents related to Ed Magedson or Xcentric Ventures?

12         A.     I have no idea.  Nothing recently because

13   I haven't had any documents.

14         Q.     Is it your position that you haven't

15   worked on anything with regard to Ed Magedson in

16   several months?

17         A.     It's my position that I haven't downloaded

18   or printed any documents about him in a period of time.

19         Q.     And the one page of notes that you sent

20   me, where did you find those?

21         A.     One of the yellow folders that I have that

22   I indiscriminately write notes on.

23         Q.     So that was actually on a manila folder?

24         A.     No.  A yellow legal pad.

25         Q.     And what was the folder marked?

57

```
 1        A.    Well, the folder is marked "Magedson."
 2        Q.    And the only document in that folder was
 3   the notes?
 4        A.    No, it wasn't in the notes.  The notes
 5   were in a yellow folder like that.  I have several that
 6   I write things on.  There's only one page that I
 7   remembered ever writing anything about Magedson in any
 8   recent history.
 9        Q.    I think you are saying "folder" when you
10   mean "legal pad."
11        A.    Yes.  In the manila folder marked
12   "Magedson" the only thing in there were the death
13   threat letters.
14        Q.    And the reason I mentioned that, you
15   pointed to my legal pad when you said "folder."
16              You had a legal pad you found the one page
17   of notes?
18        A.    Yes, I knew they existed.  I didn't know
19   anything else exists.  I don't know.
20        (Exhibits 1 and 2 were marked.)
21        Q.    BY MS. SPETH:  Is Exhibit 2 a letter that
22   you sent to me?
23        A.    Yes.
24        Q.    And since it's undated, let's see if we
25   get an approximate time frame.  It would have been
```

58

1    shortly after you received the subpoena in this case?

2         A.    Yes.

3         Q.    You mention in here your attorney, but

4    then you say you're not represented, so I want to make

5    sure I completely understand.

6               You are not represented today by counsel

7    in this matter, correct?

8         A.    Yes.

9         Q.    But you spoke to an attorney about the

10   possibility of being represented, if I understand your

11   letter correctly.

12        A.    Yes.

13        Q.    Who was that attorney?

14        A.    Mitch Cohen.

15        Q.    K-o-h --

16        A.    C-o-h-e-n.

17        Q.    Why did I think "K."

18              And you say here, he asked permission to

19   be excused from that duty because of his fear he will

20   be maligned on my client's Web site or other public

21   venue.

22        A.    Yes.

23        Q.    Can you describe that conversation to me

24   more fully?

25        A.    I have an acquaintance with a criminal

1   lawyer by the name of Mark Weingart.  He specializes in

2   DUI defense and criminal defense.

3                 And when the subpoena -- I should say when

4   the FBI showed up on my doorstep, I went to Mark and

5   asked his advice with regards to some of the questions

6   that the FBI was asking.

7                 When the subpoena came, I asked Mark to

8   represent me both with the subpoena and with an

9   appearance here today.  He referred me to one of his

10  associates, Mitch Cohen.

11                I met with Mr. Cohen, described to him

12  what was going on.  And his comment was, "Unless I'm

13  forced to by Mr. Weingart, I have to decline

14  representing you on this because I've got one crazy

15  wife now, I don't want to start appearing on Web sites

16  all over the place."

17      Q.    Have you sought any other legal

18  representation in connection with this matter?

19      A.    I have not.

20      Q.    In the numbered Paragraph 1 in this letter

21  -- withdrawn.

22                The final sentence of Paragraph 1 of this

23  letter, the numbered Paragraph 1 says, "My information

24  has been provided to the FBI and you might consider

25  requesting that information through The Freedom of

60

1   Information Act."

2           I take it, then, you meant some

3   documentary evidence, otherwise I couldn't get it

4   through The Freedom of Information Act.

5       A.      Correct.

6       Q.      What documentary evidence did you provide

7   to the FBI?

8       A.      One of the items was secured from a

9   neighbor of Edward Magedson.  The document was a flier.

10  The top letters were red.  It said, "Warning."  It had

11  three pictures of John Unger at the bottom.  The text

12  of the flier said -- I'll paraphrase it.  It says to be

13  careful of this man.  He gives prescription medications

14  to men and molests them while they're in a state of

15  repose.  Do not allow him to come up behind you; that

16  he is a sexual predator.

17          And those documents were disseminated to

18  the neighbors and were thrown out into the street up at

19  the address that the trust owns on McDowell Street in

20  Pinal County.  I gave the original to the FBI.

21      Q.      Who was this neighbor?

22      A.      I'm not going to disclose that.

23          You know, every one of the neighbors have

24  expressed an expressed fear of Mr. Magedson.

25  Mr. Magedson showed a clear disregard for harming

1    people with the Internet.

2              You know, I'm not going to disclose it.

3    If a judge orders me to do it, then I'm forced to do

4    so.  But all of these people -- every one of his

5    neighbors at every address has expressed extreme fear.

6         Q.    This particular neighbor that gave you the

7    flier, this is a neighbor up on the McDowell property?

8         A.    Correct.

9         Q.    And you don't think Ed knows who his

10   neighbors are?

11        A.    He has several neighbors.  I don't feel I

12   want to be the responsible one for throwing these

13   people under the Ripoff Report's gust.

14        Q.    I think I'm a little confused.  These

15   fliers and these warnings, who are they supposed to be

16   careful of?  John Unger?  Or be careful of Ed?

17        A.    Well, the flier was clearly meant to be

18   careful of Mr. John Unger.  It was alleged Mr. Magedson

19   distributed those fires.

20        Q.    Alleged by whom?

21        A.    The neighbors.

22        Q.    Was it John Unger who gave you this?

23        A.    No.

24        Q.    Was it John Unger's parents?

25        A.    No.

62

1     Q.    And you gave this to the FBI?

2     A.    I did.

3     Q.    Did you tell the FBI who gave it to you?

4     A.    I don't know that I did.

5     Q.    When you gave it to the FBI, did you give

6  the FBI the only copy that you have?

7     A.    Yes.

8     Q.    You did not keep a copy?

9     A.    I did not.

10     Q.    You said earlier that there were several

11  copies of it on the ground or something like that.  Did

12  I understand that correctly?

13     A.    Well, I was told that there were several

14  copies that not only went to the neighbors, but were

15  also thrown into the street.

16     Q.    Did you ever have more than one?

17     A.    No, never.

18     Q.    Did you ever have an electronic version of

19  it?

20     A.    No.

21     Q.    The one that you have, where did you find

22  it when you gave it to the FBI?

23     A.    I had a hard copy of it.

24     Q.    Where were you keeping it?

25     A.    I made a separate folder for the FBI.

63

1      Q.     Before you made the folder for the FBI,

2    where was it?  You didn't have an FBI folder all your

3    life.

4      A.     No.   I had it, I think, for approximately

5    one week, and it was sitting on my desk.   I believe I

6    had it for maybe a week before the FBI showed up.

7      Q.     The neighbor gave it to you a week

8    earlier?

9      A.     I believe so.

10     Q.     I thought you told me that you haven't

11   been investigating --

12     A.     I was investigating the death threats.

13   The death threats -- it's alleged that the neighbors

14   received these death threats.   I was up there

15   investigating whether the --

16     Q.     And the death threats, in fact, are

17   addressed to Mr. Magedson, are they not?

18     A.     Well, yeah, I guess they are.

19     Q.     If I asked you for documents about

20   Mr. Magedson, did you believe I didn't mean the death

21   threats and things related to the death threats?

22     A.     Those fliers would have been, from my

23   understanding of it, would have been created a few

24   years ago.   How can they possibly be related to the

25   death threats?

64

1        Q.    They were related -- no.  My question was

2   my subpoena asked you for all records related to

3   Mr. Magedson.

4        A.    Okay.

5        Q.    Did you have this flier in your possession

6   when you received my subpoena?

7        A.    Absolutely not.

8        Q.    Because you had given it to the FBI?

9        A.    Yes.

10        Q.    And you said you only had it in your

11   possession for about a week before you gave it to the

12   FBI?

13        A.    Yes.

14        Q.    When did you meet with the FBI?

15        A.    I received a phone call from him -- I'm

16   going to be a bit vague.  I would have to go back to my

17   -- I received a cell phone call from him maybe one

18   month ago, four to five weeks ago, asking if he could

19   have an appointment with me.  And my phone call back to

20   him was yes, absolutely.

21              I met with him on a Friday again four,

22   five weeks ago, and he showed up alone and without a

23   warrant on Friday, and we discussed a great many

24   things.

25              I made a folder for him because it had

65

1   been alleged the only FBI involvement that I have been

2   aware of in any of these circumstance was in the police

3   report it alleges Mr. Magedson had elected to get the

4   FBI involved, so I presume that's what his phone call

5   was for.

6        Q.    But we're a little off track.   I'm trying

7   to figure out the documents.   Is this the only document

8   that you gave to the FBI?

9        A.    I provided him with the death threats and

10  the police report.

11       Q.    So the things you gave to the FBI you told

12  me to get through The Freedom of Information Act was

13  the police report from the Mesa Police?

14       A.    Yes.

15       Q.    The death threat letters, the two death

16  threat letters?

17       A.    Yes.

18       Q.    And also this flier that you've just

19  mentioned?

20       A.    Yes.

21       Q.    That's everything?

22       A.    Yes.

23       Q.    Now, I want to go back to this issue of

24  neighbors.   I've got to know who you spoke with.

25            I take it you interviewed lots of

66

1   neighbors; true?

2          A.    Yes.

3          Q.    At two different locations, correct?

4          A.    I interviewed neighbors at two different

5   locations.

6          Q.    You didn't keep any notes of these

7   interviews?

8          A.    I did not.

9          Q.    You kept it all in your head?

10         A.    Yes.

11         Q.    And you would be able -- I'm not asking

12   yet if you are willing to -- but you would be able to

13   tell me the names of these neighbors?

14         A.    Yes.

15         Q.    Where they lived?

16         A.    Yes.

17         Q.    And what they said to you about Ed

18   Magedson?

19         A.    Yes.

20         Q.    Let me start with this, which you probably

21   will answer, how about what you said to them about Ed

22   Magedson.  What did you tell Ed's neighbors?

23                You knocked on their door, correct?

24         A.    Yes.

25         Q.    What did you say to them?

1    A.    I was looking for his location so he could

2    be served summons and complaints.

3    Q.    Who?

4    A.    There are plenty of attorneys out there

5    that would love to get him personally served and

6    brought into depositions.  I've spoken to all the

7    plaintiffs.

8    Q.    So your position is that you told these

9    neighbors that you were trying to serve him with

10   process --

11   A.    I said we were looking for a location for

12   Mr. Magedson so he could have his day in court.  Never

13   at any time did I ever represent myself as a process

14   server.

15         And, in fact, when the FBI showed up, they

16   had made it clear that the neighbors knew exactly what

17   I was doing, and they had my business card on them.

18   Q.    How many different neighbors are we

19   talking about?

20   A.    A minimum of three.

21   Q.    I don't want to know a minimum.  I want to

22   know how many.

23   A.    Which time?

24   Q.    All of the neighbors that you have ever

25   interviewed about Ed Magedson.

1          A.     One, two, three, four, five.

2          Q.     And I'm going to narrow this down for you.

3     One of them was Eric Skelling?

4          A.     No.

5          Q.     Then you really interviewed six?

6          A.     I never interviewed Skelling.

7          Q.     You never interviewed Eric Skelling?

8          A.     No.

9          Q.     Do you know who he is?

10         A.     There's a document on file in Pinal County

11    where Edward Magedson filed a forcible detainer against

12    him, so it was clear Eric Skelling had known things

13    about Mr. Magedson.  So I went up to that location, but

14    I haven't been able to find him -- actually, I did find

15    him later, but the first time I never was able to.

16         The neighbors gave me some information

17    about Mr. Skelling on that first episode that kind of

18    gave me a bit of a profile about what they thought he

19    was and then who he was.  And that was really kind of

20    the last attention I paid to him until the second visit

21    when I decided it would be important to go up and

22    interview the neighbors again to find out if they

23    received the death threat letters.

24         What I noticed when I went up there, there

25    were bullet holes in Mr. Magedson's mailbox.  In the

1  death threat letters it suggests that "Did you hear the

2  gunfire last night?"  So I kind of wondered about it.

3  There's bullet holes in this guy's mailbox.  What's

4  going on?

5          So interviewing the neighbors, they

6  disclosed to me that Eric Skelling had indicated to

7  them that he was Mr. Magedson's significant other and

8  that he had been molested since he was a small boy in

9  Tupperlake, New York; that they felt Mr. Skelling was

10  currently incarcerated somewhere.

11          I figured out that Mr. Skelling was, in

12  fact, sitting in the Pinal County jail.  I believe at

13  that point he had already been convicted of a B and E

14  and resisting arrest.  I went to the Pinal County jail

15  to interview him, and he wouldn't talk to me.

16          Q.    It is your testimony under oath today that

17  you never had a conversation with Eric Skelling?

18          A.    That's absolutely right.

19          Q.    Do you drive a Harley-Davidson?

20          A.    I do.

21          Q.    How do you think Mr. Skelling might know

22  that?

23          A.    It's on the Internet.  It's on the Ripoff

24  Report.

25          Q.    So if Mr. Skelling testifies under oath

70

1    that you interviewed him, you're going to say that's

2    false?

3         A.    Absolutely.

4         Q.    Let's go back to the neighbors who you did

5    interview.

6              Is it possible that one of them was Eric

7    Skelling and you got confused about who he was?

8         A.    When I went to the Pinal County jail, they

9    brought Mr. Skelling into a holding cell.  I've never

10   seen the man before.

11        Q.    You're sure that you never interviewed him

12   before that day?

13        A.    Positive.

14        MS. SPETH:  I need the names of those neighbors,

15   and I need to go to the judge on those issues if you

16   won't give them to me.

17              You have no objection?

18        MR. DANA:  I have no objection.

19        (Break taken.)

20        Q.    BY MS. SPETH:  This flier that you gave to

21   the FBI, you told the FBI that it had been told to you

22   that Ed created this flier?

23        A.    Yes.

24        Q.    Do you have any idea -- first of all, do

25   you know the person who told you that?  I know you know

1  who they were because you interviewed them.

2      A.   No.

3      Q.   Do you have any reason to believe that

4  they weren't telling you the truth?

5      A.   Well, fundamentally I would give people

6  the benefit of the doubt, but there's every reason in

7  the world, if someone has a vengeance against another

8  party, they'll make things up, they'll lie, whatever.

9  Is it possible that they lied?  Absolutely.  Is it

10  possible they're wrong?  Absolutely.

11      Q.   So you really had no way of knowing

12  whether this information that Ed created this flier was

13  accurate or not accurate; is that correct?

14      A.   That's correct.

15      Q.   But you provided it to the FBI, correct?

16      A.   Yes.

17      Q.   In Paragraph 2 of your letter, which is

18  Exhibit 2, you said that you don't represent Mr. Russo,

19  but you do have a business relationship and it is

20  unrelated to this case and my client.

21           We talked about this business relationship

22  earlier, correct?

23      A.   Yes.

24      Q.   And I guess what I'm confused about is:

25  If Mr. Russo provides search engine optimization

1    services and those services are, in part, to help

2    people whose reputations have been harmed by being

3    posted on Ripoff Report, wouldn't that relate to my

4    client?

5           MR. DANA:  Objection to the form.

6                If I make an objection, you can ignore me.

7           A.    Yeah, but I don't -- I think I told you

8    those particular clients aren't all on the Ripoff

9    Report.  I can see your point, but I don't know if I

10   focus on the Rip-off Report.  I focus on people that I

11   feel have been maligned without due process.

12          Q.    BY MS. SPETH:  Do you keep a calendar,

13   like a daily calendar?

14          A.    No.

15          Q.    Not a handwritten version or electronic

16   version?

17          A.    Huh-uh.

18          Q.    Is that a no?  Because you said "huh-uh."

19   No?

20          A.    I beg your pardon.  Sorry.  No.

21          Q.    Sometimes you post things on the Internet,

22   correct?

23          A.    Yes.

24          Q.    And sometimes you've posted things about

25   Ed Magedson, correct?

1        A.      Yes.

2        Q.      And sometimes you've posted things about

3   Ripoff Report?

4        A.      Yes.

5        Q.      Can you tell me all of the user names that

6   you have used to post things about Mr. Magedson or

7   Ripoff Report?

8        A.      JFBA.  I'm trying to think of the names

9   that I have done this on, and I don't know that I

10  remember what they are.  If you have them, I'll

11  certainly tell you "yes" or "no."

12              But I have spent a good deal of time using

13  my own name in this matter.  I spent a good deal of

14  time using my own name and no other.  I answered the

15  same question to the FBI, but they asked me

16  specifically, and I gave them that answer.

17       Q.      So sometimes you use the name John

18  Brewington?

19       A.      Yes.

20       Q.      And sometimes it's JFBA?

21       A.      Yes.

22       Q.      And you can't think of any others right

23  now?

24       A.      I have pseudonyms.

25       Q.      I want to ask you what the pseudonyms are

74

1    that you can remember.

2         A.    Perhaps Paladin P.I.

3         Q.    Any others?

4         A.    I don't know others.

5         Q.    Have you ever testified as an expert

6    witness in a case?

7         A.    No.

8         Q.    You offer that service, though?

9         A.    I guess if somebody wants me to, but I

10   don't know that I'm qualified for something like that.

11        Q.    What associations are you a member of?

12        A.    The Arizona Association of Licensed

13   Private Investigators, National Association of

14   Investigative Specialists, the International

15   Association of Commercial Collectors, the American

16   Legion, Patriot Guard Riders.

17        Q.    Chandler Chamber of Commerce?

18        A.    Yes.  And Phoenix Chamber of Commerce.

19        Q.    And your private investigator's number is

20   1551859?

21        A.    That's the agency -- my agency number,

22   yes.

23        Q.    Do you currently live at Siesta Drive in

24   Phoenix?

25        A.    I don't.

75

1     Q.    Have you ever?

2     A.    Yes.

3     Q.    Do you currently live at Dean Street in

4  Chandler?

5     A.    I do.

6     Q.    And at one time you lived in Houston,

7  Texas, correct?

8     A.    Yes.

9     Q.    And the dates that I have -- and you can

10 tell me if they're accurate or not -- from April '93 to

11 August of '03, does that sound right for Texas?

12    A.    No, absolutely not.

13    Q.    What are the dates?  You probably told me

14 earlier.

15    A.    The last time I was in Texas would have

16 been '99, perhaps, or even earlier.

17    Q.    Are you a member of the private

18 investigators union?

19    A.    No.  I didn't know a union existed.

20    Q.    Do you know a gentleman named Thomas

21 Tanner?

22    A.    No.

23    Q.    What about Jan Coughlin?

24    A.    I don't think I know that person either.

25    Q.    How about Allen Hoffer, H-o-f-f-e-r?

1        A.      I don't think I know that name either.

2        Q.      Are you familiar with a Web site called

3   goodbusinessbureau.com?

4        A.      I've seen it.

5        Q.      Have you ever posted on it?

6        A.      I don't believe so.

7        Q.      Are you one of the operators of that Web

8   site?

9        A.      No.

10        Q.      Do you know who is?

11        A.      I can only surmise.  I've never looked

12   into it, but it appears it's Steve Miller.

13        Q.      And you might have told me this:  Are you

14   a member of the Arizona Association of Licensed Private

15   Investigators?

16        A.      I am.

17        Q.      When was the first time you ever heard of

18   the Ripoff Report?

19        A.      I volunteer my services and have for quite

20   a period of time to nonprofit organizations that -- in

21   that particular case would have been traveling sales

22   crews, a man by the name of Phil Alan Becker runs it.

23   He lost a daughter as a result of a van rollover crash.

24   And he maintains a Web site -- he tracks the activities

25   of the magazine salespeople.

1    Periodically he'll come to me with great

2  frequency and ask me for information on either a

3  company or some of the individuals that have been

4  convicted of murder, rape, kidnappings, many different

5  things.  And I'll go in and find that information for

6  him and give it to him so he can distribute it to the

7  Attorney Generals, district attorneys, police, whatever

8  his needs are.  I've assisted some of the Attorney

9  Generals in some of this information.

10    In doing background searches on some of

11  these organizations, they are listed heavily in the

12  Ripoff Report.  And so it alerted me that, just like

13  the FBI, Attorney Generals or whatever, there's an

14  indicator that something may be wrong, and it gives me

15  an idea that I need to go further because it's

16  certainly not prima facie evidence, but it does tell me

17  something odd is going on and I need to dig a little

18  bit further and find out what the truth is about these

19  organizations.  That is when I first became aware of

20  the Ripoff Report.

21    Q.    So you first had used Ripoff Report as a

22  resource?

23    A.    Absolutely.

24    Q.    About what time frame was that?

25    A.    A year and a half maybe.

1       Q.      That's all?

2       A.      Yeah.

3       Q.      So sometime in 2005?

4       A.      I think so.  It hasn't been long.

5       Q.      And it's your testimony that before you

6  had never heard of Ripoff Report?

7       A.      Never.

8       Q.      Never posted on Ripoff Report?

9       A.      Of course.

10      Q.      Before that, before 2005.

11      A.      Counselor, I don't know the exact date,

12  but I have posted on Ripoff Report, yes.

13      Q.      I'm not talking about the last couple of

14  years.  If you never heard of it, you couldn't post on

15  it.

16      A.      No.

17      Q.      That's not right?

18      A.      Prior to the last couple years, I was not

19  aware of the Ripoff Report and did not post anything on

20  the Ripoff Report.

21      Q.      What are some of the things that you do

22  remember posting on the Ripoff Report?

23      A.      There's an investigation of a gentleman by

24  the name of Jeffrey McCune that is currently under 148

25  count indictment of 148 counts of fraud, and I provided

1    assistance to the Orange County District Attorneys for

2    that.

3            Q.    And you posted that on the Ripoff Report?

4            A.    Oh, yes.  And, in fact, I filed a

5    complaint with the Attorney General's office.

6                  I got involved in a case regarding Rescom,

7    R-e-s-c-o-m, and I believe the police are involved in

8    it right now, as well, and Integrity Sales and the

9    proprietor of that is actually wanted by the courts.

10   I received an email from Ed Magedson updating me on

11   that report.

12           Q.    What do you mean?

13           A.    It said, "Editor Ripoff Report," somebody

14   had -- a consumer had gone in and filed a follow-up

15   post, if you will.

16           Q.    If anybody files an update to a report,

17   you get a message from Ripoff Report saying so, right?

18           A.    I presume.

19           Q.    Well, you've gotten them before, haven't

20   you?

21           A.    Yes.

22           Q.    Rescom, you posted something about that,

23   something about Jeffrey McCune.  Anything else?

24           A.    I don't know.

25           Q.    Do you remember posting anything about

PALMER REPORTING SERVICES, INC.

80

1  Steve Miller or Federated Financial?

2      A.    No -- well, I stand corrected.  Yes, I

3  have.

4      Q.    Do you remember what you posted?

5      A.    Public information, I believe.

6  (Exhibit 3 was marked.)

7      Q.    I'm showing you what's been marked as

8  Exhibit 3.  Let's start with the second page, which is

9  the posting.  Is that something that you posted?

10      A.    Yes.

11      Q.    And you posted it under the name -- it

12  just says, "John, Chandler, Arizona."  Sorry.

13          Let's read through that.  The title is

14  "Sooner or later thugs come up against someone who has

15  no fear and is ready to act as a Paladin with extreme

16  prejudice."  Do you see that?

17      A.    I do.

18      Q.    Who wrote that title?

19      A.    That may be me.  Probably me.

20      Q.    Do you recall when you would post

21  something on Ripoff Report that the first step in the

22  process is to, in fact, write the title of the report?

23      A.    I don't recall if that's the case, but

24  probably it is.

25      Q.    It says, "My personal experience is that

1   force needs to be met with force.  Is this the guy you

2   are talking about?"  And then you list something about

3   Christopher R. McFarland.  Do you see that?

4          A.    Yes.

5          Q.    You weren't talking about any personal

6   experience with Christopher McFarland?

7          A.    Of course not.  I don't know him.

8          Q.    Just in general?

9          A.    Yes.

10          Q.    And you posted some information about

11   Mr. McFarland, about his wife, about the cars that he

12   drove.

13                And then you said, "Sooner or later thugs

14   come up against someone who has no fear and is ready to

15   act as a Paladin with extreme prejudice."

16                What does that mean?

17          A.    What does what part mean?

18          Q.    "Thugs come up against someone who has no

19   fear and is ready to act as a Paladin with extreme

20   prejudice."

21          A.    There are many different meanings in it.

22   I'll break it down for you.

23                From the multiple Internet postings about

24   these two gentlemen, it appears there was a pattern of

25   practice from Mr. McFarland using threats and

82

1    intimidation against some parties.  I was absolutely

2    offended at the idea that they posted your personal

3    information on the Internet --

4         Q.    My personal information?

5         A.    My three cents you went in there and

6    explained --

7         Q.    You were worried about me?

8         A.    Counselor, you know, I know you're an

9    attorney, and you have an obligation to represent your

10   client.  I don't think attorneys should be held out to

11   public ridicule because they represent somebody that

12   has a scurrilous past, whether he's innocent until

13   proven guilty also.  I find it offensive no matter who

14   does it.

15        Q.    And you were, in fact, working for a law

16   firm at the time?

17        A.    Absolutely.

18        Q.    And I know it wasn't part of your duties

19   at the time --

20        A.    That's right on.  Had a wonderful

21   relationship with many attorneys.

22              The paladin thing -- let's break that down

23   so you understand.  Some people, unfortunately, equate

24   the character Paladin with a 1950s and '60s television

25   program.

1          But if you go back further, a paladin was

2     actually one of the Knights Templar who took on a cause

3     of justice; that when other people were being

4     victimized or held hostage, or whatever, somebody

5     stepped forward and did something about it.

6          My whole -- this is about fear.  McFarland

7     or whoever goes out and posts that information about

8     people, they want you to be afraid.  And my feelings

9     are, how do you like it?  How does that feel to have

10    somebody do something like that?

11          Q.    Now, I will tell you that Mr. Magedson

12    ended up redacting a great -- if you look at this

13    posting today, it's greatly redacted because it was

14    interpreted as a threat against Mr. McFarland.

15          Did you mean it as a threat against

16    Mr. McFarland --

17          A.    Absolutely not.

18          Q.    Let me finish.  Poor Stacey is trying to

19    keep up with me and you, and we both talk fast.

20          You did not mean it as a threat against

21    Mr. McFarland?

22          A.    No.

23          Q.    Was it somewhat of a warning?  I don't

24    mean a warning in a bad way.  Be careful because sooner

25    or later someone else might take matters into their own

84

1    hands?

2         A.    I hope not.

3         Q.    Who was the someone who had no fear that

4    might act as a paladin?

5         A.    Me.

6         Q.    You were talking about yourself?

7         A.    Yes.

8         Q.    When you say "with extreme prejudice,"

9    what did you mean by that?

10        A.    Exactly what I said.  Nowhere was anything

11   ever implied for physical harm or even extortion.

12        Q.    Did Ed Magedson ask you to make this post,

13   which is on 3/1/2006 that is part of Exhibit 3?

14        A.    Of course not.

15        Q.    Did he know you were going to make it?

16        A.    No.

17        Q.    Were you aware that Mr. McFarland then

18   accused Mr. Magedson of having made that post under

19   somebody else's name?

20        A.    Yes.

21        Q.    Did you step in and clear that up?

22        A.    No.  Your law firm called and asked if I

23   was giving them permission to release that information,

24   and I said no.

25        Q.    When did you first start investigating

1  Ed Magedson or Ripoff Report?

2         A.     When I received an email from he and/or

3  his staff that suggested Robert Paisola was giving him

4  an affirmative posting on a blog site.  The responses

5  from he and/or his staff gave me reason to suspect that

6  this was not a professional organization.  There was

7  something wrong.  Why are you sending me a reference

8  when I didn't ask for one and why is the reference

9  lying?

10        Q.     And you are being a little abstract.

11               I know, because you told me earlier, that

12  Paisola is one of the guys you were investigating.

13        A.     Yes.

14        Q.     So Paisola mentioned Ripoff Report --

15        A.     Ripoff Report sent me an email -- I

16  believe you have them, but if you don't -- but they

17  were specifically -- let's step back.  Let me get this

18  in the right order.

19               In investigating for the traveling sales

20  crews, a young lady posted, Penny, I believe, posted an

21  item that her son has been abducted by this group, that

22  he was mentally challenged, I think --

23        Q.     "This group" meaning?

24        A.     The magazine salespeople.  And that she

25  was desperately searching for a way to get her son

1    back.

2              Uncharacteristically, she had her name,

3    her address, her phone number, her email address in

4    that post.  Because we deal with murderers and rapists

5    and all sorts of bad sorts, I wanted to communicate to

6    her to let her know that we can probably help you

7    because we follow these people, we keep track of what

8    they're doing.

9              Q.    Who is the "we"?

10             A.    Traveling sales crews and various and

11   sundry other people.  Again, there's Attorney Generals

12   and police and multiple organizations that are involved

13   in this.

14             I tried to communicate to this young lady

15   by giving her my phone number because I didn't know who

16   she was.  As far as I know, it was uncharacteristic

17   that all of her information would be posted in the

18   Ripoff Report.

19             MS. SPETH:  I'm sorry, I know you are in the

20   middle of an answer, but I have to take a quick break.

21             (Break taken.)

22             Q.    BY MS. SPETH:  You were telling me how

23   this person posted on Ripoff Report.  She had all of

24   her contact information and then you contacted her.

25             A.    Tried to by giving her my phone number,

1  because my phone number will trap who it really is.  We

2  didn't know who this person really is.  They're an ugly

3  bunch, so I wanted to make sure, for security purposes,

4  indeed that's who it was.

5              I did communicate with her, and we would

6  have gladly gotten her son and returned him to her had

7  she participated in the process.

8              So the monitor or one of the review people

9  from the Ripoff Report took offense to my attempt to

10 communicate with this person, in spite of her personal

11 information being on there.  And I felt they were

12 trying to get information they already published in a

13 public arena.

14      Q.    We are going to come across those emails.

15             And that caused you then to start

16 investigating Ripoff Report?

17      A.    Yes.  The way they were responding to me

18 was weird.  It was unusual.

19             And then finally when they sent me the

20 blog site that Robert Paisola had done for them, and I

21 read so many blatant lies in the bog site, my thoughts

22 were:  Why are you sending a reference when I didn't

23 ask for one?  I had no reason to think you were

24 anything other than what you were.

25             And Mr. Magedson discussed with me in the

88

1  past criminal issues, and I didn't pay attention to

2  them.  Why is this guy lying about you?  So many lies.

3  Why?  It threw up some flags.  Something told me

4  something was wrong.

5      Q.    Who were you investigating first, Paisola

6  or Ripoff Report?

7      A.    Simultaneous.  I was investigating nobody.

8  But the minute I got that email on Paisola, it threw

9  the flags up on both of them, and it started both at

10  the same time.

11     Q.    When you started investigating Ripoff

12  Report --

13          With the exception of the $1 that William

14  Stanley paid you, has anyone paid you anything to

15  investigate anything to do with Ripoff Report?

16     A.    No.

17     Q.    Has anyone asked you to investigate

18  anything to do with Ripoff Report?

19     A.    I think -- I was thinking about this

20  today.  I believe somebody offered me $1,000 to provide

21  them with Edward's physical address recently.  I want

22  to say it was Computer Nerds.  I don't know for sure,

23  but I declined that offer.

24          And there's an attorney in Tucson that

25  indicated that he would like to get the physical

89

1   address, but he didn't offer any money.  And I made it

2   very clear I will not accept money.  I do not want

3   money.  And I've never taken any money for doing any of

4   this.

5          Q.    But you declined the $1,000 why?

6          A.    Because even though I believe that

7   Mr. Magedson authored the death threat letters himself,

8   there's a reasonable chance that somebody else did it.

9   And if somebody else did do it, then it would be

10  irresponsible for me to provide Mr. Magedson's physical

11  address in the event that somebody actually does mean

12  to cause him harm.

13          Prior to those death threat letters, I

14  never had seen anything that suggested anybody wanted

15  to harm him.  Everything changed when those letters

16  were produced.  Even though I know where he lives now,

17  I absolutely won't tell anyone.

18          Q.    How did you learn where he lives now?

19          A.    I got an anonymous phone call.  I sent the

20  trace on the phone call to the FBI, as well as the Mesa

21  Police Department, that I'm aware of where Edward

22  Magedson lives.

23          Q.    What was the trace on the phone call?

24          A.    It's a pay phone on Thunderbird.  I saved

25  the trace on my cell phone.  It was pretty simple.

PALMER REPORTING SERVICES, INC.

90

1          (Discussion off the record.)

2          (The telephonic conference with Judge Wake began

3     at 4:01 p.m.)

4          JUDGE WAKE:  Hello.

5          MS. SPETH  Good morning, Judge -- or good

6     afternoon.

7          JUDGE WAKE:  This is Judge Wake.

8               You have a court reporter there?

9          MS. SPETH:  We do have a court reporter.

10          JUDGE WAKE:  And we're on the record?

11          MS. SPETH:  Yes, sir.

12          JUDGE WAKE:  Would everyone state their

13     appearances?

14          MS. SPETH:  Maria Speth for the plaintiffs.

15          MR. DANA:  Mike Dana for the defendants, Robert

16     Russo and QED Media Group.

17          MS. SPETH:  We also have a nonparty witness

18     whose name is John Brewington.

19          JUDGE WAKE:  Burlington?

20          MS. SPETH:  Brewington, B-r-e-w-i-n-g-t-o-n.

21          JUDGE WAKE:  Is Mr. Brewington represented?

22          MS. SPETH:  He is not.

23          JUDGE WAKE:  Okay.  What is your disagreement?

24          MS. SPETH:  Actually, Mr. Dana and I are in

25     agreement with this.  The witness refuses to answer a

1   series of questions which I believe are relevant and

2   should be answered, and I believe Mr. Dana believes

3   they are relevant and should be answered.

4         MR. DANA:  I can't assume all of the questions

5   she's going to ask.  But the basic subject matter that

6   Ms. Speth was about to go into, I am also interested in

7   asking questions on, as well.

8         MS. SPETH:  And the subject matter, Your Honor,

9   is Mr. Brewington is a private investigator, and he has

10  testified that he was hired by Mr. Stanley, Mr. William

11  Stanley, the defendant in this case, to investigate the

12  death threats that were made against Ed Magedson.

13             Mr. Brewington, in the course of that

14  investigation, interviewed the neighbors of

15  Mr. Magedson, my client.  Mr. Brewington is unwilling

16  to tell me the names of the neighbors that he

17  interviewed.

18        JUDGE WAKE:  All right.  Mr. Brewington, could

19  you tell me what your basis is for believing that you

20  should not have to give that information?

21        MR. BREWINGTON:  Well, Your Honor, I have

22  interpreted an Arizona Revised Statute, perhaps

23  incorrectly, that unless I have a court order regarding

24  a particular case, then I'm not going to give it out.

25  And I, incorrectly, perhaps, misinterpreted a subpoena

1    in terms of that being a court order.

2              I was expecting a judge, like yourself, to

3    come in and rule that you're obligated to turn this

4    information over to them, although I didn't necessarily

5    feel -- I don't know that I feel that the death threat

6    letters are necessarily germane to what the real issues

7    are.

8              For the record, I had a dialogue with an

9    attorney to represent me, and they chose not to do so

10   because of their fear of their becoming under public

11   scrutiny on Ripoff Report's Web site.  I have the same

12   fears.

13        JUDGE WAKE:  Mr. Brewington, do you or either

14   counsel have the citation to the statute?

15        MS. SPETH:  Yes, I have it here.

16              I think Mr. Brewington is answering a

17   different question than Your Honor asked.  We had an

18   earlier dispute about the issue of I subpoenaed a bunch

19   of documents, which he did not produce and didn't

20   produce because of this statute.  I don't think

21   Mr. Brewington was citing this statute on this

22   particular question, which is not a question about

23   documents, but it's a question about investigation.

24              The statute that he's referring to is

25   A.R.S. Section 32-2455.  It provides --

1        JUDGE WAKE:  Wait a minute.  I'm going to pull

2  the statute and read it.

3        (Pause in the proceedings.)

4        JUDGE WAKE:  All right, I've read the statute.

5  I don't see anything here that purports to create an

6  evidentiary privilege that would override the

7  compulsory process.

8            Let me ask both counsel whether they have

9  any different understanding of the law.

10            Ms. Speth?

11        MS. SPETH:  No, Your Honor.  And I think -- I'm

12  sure that my subpoena would have been under the part of

13  the statute that says -- or someplace in here it says

14  as long as it's been ordered by a court, and now I'm

15  not finding it.

16        JUDGE WAKE:  Actually, I don't see that in the

17  statute.

18        MS. SPETH:  Maybe it's a previous or subsequent

19  statute.

20        COURT REPORTER:  I'm having trouble hearing.

21        JUDGE WAKE:  I don't see anything in this that

22  would give the client or the investigator the privilege

23  to give a disclosure of information in the hands of the

24  client that would be otherwise discoverable.

25            The fact the information was obtained

94

1   through a private investigator doesn't have anything to

2   do with creating any privilege against the compulsory

3   process.

4          Mr. Brewington, have you been paid for

5   your services?

6          MR. BREWINGTON:  I have not, Your Honor, no.

7          JUDGE WAKE:  And your client was Mr. Stanley?

8          MR. BREWINGTON:  He was.

9          There was an Internet communication

10  between he and I that I would charge him $1 for this

11  particular service, but I have not received that $1,

12  Your Honor.

13         JUDGE WAKE:  And Mr. Stanley is represented by

14  Mr. Dana; is that correct?

15         MR. DANA:  No, Your Honor.  Mr. Stanley is still

16  pro per.  I don't think he's been served in the case.

17  I represent Mr. Russo only and his affiliated

18  companies.

19         JUDGE WAKE:  All right.

20         MS. SPETH:  Mr. Stanley is the gentleman who

21  claims to be in Austria that we've had a hard time

22  finding.

23         JUDGE WAKE:  Payment of $1 is nominal, at best,

24  so I don't see any issue here of the investigator

25  losing the value of his services.

95

1        Is this the only issue, this answering of

2    questions that relates to this investigation?

3        MS. SPETH:  It was the only issue I was calling

4    you on, Your Honor.  I had subpoenaed five categories

5    of documents, which were all not produced.

6        JUDGE WAKE:  We'll come to that in a minute.

7        First of all, tell me again, Ms. Speth, in

8    as much detail as you can, the subject matters into

9    which you have inquired and not received an answer and

10   to which you intend to inquire.

11       MS. SPETH:  Yes.  The subject matter is I asked

12   Mr. Brewington who he interviewed as part of his

13   investigation of this issue, and he said neighbors of

14   Mr. Magedson, of my client, but he refused to tell me

15   who those neighbors were and does not want to disclose

16   those identities.  And he is claiming that they made

17   certain allegations about my client, and yet I can't

18   find out who they are.

19       JUDGE WAKE:  And tell me the relevance of this.

20       MS. SPETH:  Yes.  These are people who

21   supposedly told Mr. Brewington, you know, things that

22   my client did that he's now told the FBI.  It's all

23   very intertwined with some of the allegations that have

24   been made against Mr. Magedson on the Web sites that

25   have been posted --

PALMER REPORTING SERVICES, INC.

1      MR. BREWINGTON:  They are not part of public

2  information.

3      JUDGE WAKE:  This information is relevant to the

4  counterclaim, right?

5      MS. SPETH:  I think it's relevant.

6      MR. DANA:  I think it's relevant to both.

7          The original purpose, according to

8  Mr. Brewington, for going out there was to investigate

9  this letter, which is -- I wouldn't say at the center

10  of this dispute, but it's certainly a big component of

11  it; that the plaintiff claims was sent by one or more

12  of the defendants; and that many defendants believe the

13  plaintiff created himself.

14          Mr. Brewington went out to investigate the

15  origin of this letter and in doing so spoke with these

16  neighbors.  And in the course of those discussions with

17  the neighbors, there were other things that the

18  neighbors told Mr. Brewington or according to

19  Mr. Brewington that the neighbors said about

20  Mr. Magedson and that's -- and those neighbors are who

21  Mr. Brewington is not willing to identify, according to

22  him, because he doesn't want to put those neighbors at

23  risk of having their names out there on the Ripoff

24  Report.

25      JUDGE WAKE:  Are you seeking this information

1  from Mr. Brewington?

2       MR. DANA:  I am also wanting to know this same

3  information, yes.

4       MR. BREWINGTON:  All of the neighbors have

5  expressed great fear, both physically and from being

6  defamed on the Internet, if their information is

7  disclosed.

8            Certainly I defer to the Court that I

9  don't feel it's responsible for me to just arbitrarily

10  put other people in danger of those two items.

11       JUDGE WAKE:  Mr. Brewington, did these persons

12  express to you that fear specifically?

13       MR. BREWINGTON:  Oh, yes.

14       JUDGE WAKE:  Did they ask that you not divulge

15  the content of what they were telling you to

16  Mr. Magedson?

17       MR. BREWINGTON:  Absolutely.

18       JUDGE WAKE:  I thought this case was about

19  Mr. Magedson hosting complaints and even anonymous

20  complaints by other persons rather than postings for

21  which --

22       MS. SPETH:  This case is about the attacks by

23  Mr. Stanley and Mr. Russo upon Mr. Magedson that

24  included these very death threats we're talking about.

25  There are many things that were alleged against

1    Mr. Stanley and Mr. Russo, but one of the many things

2    is they threatened his life with these letters.   And

3    I'm interested in trying to get to the bottom of where

4    these letters came from.

5           And Mr. Brewington interviewed the

6    neighbors to try to get to the bottom of where these

7    letters came from and doesn't want to tell me that

8    information.

9           JUDGE WAKE:   What about taking Mr. Brewington's

10   statements at face value?   What about the risk or fears

11   of retaliatory publicity?

12         MR. BREWINGTON:   Your Honor, I would like you to

13   know that I am listed on the Ripoff Report in three

14   different categories, one of those categories was

15   impersonating an FBI agent.   I've been accused of many

16   things that are untruthful.

17           I myself have an absolute fear that I am

18   going to be held out for death threats perhaps by being

19   on the Internet, as well.   They posted my personal

20   information, where I live, all of those things.

21           I can assure you the neighbors are

22   terrified of all of those things.   And one of the

23   neighbors, in fact, had indicated to me that

24   Mr. Magedson would like people to think he has the

25   ability to have them killed.

1          MS. SPETH:  Your Honor, one of the neighbors

2     told Mr. Magedson that Mr. Brewington represented

3     himself as a law enforcement official and told the

4     neighbor that Mr. Magedson was wanted by the

5     authorities and that that neighbor had to give him

6     information; and that if he didn't give that

7     information, that they could be subject to a process

8     for interference with an investigation.

9               Mr. Brewington is going to deny that that

10    happened.  And I have no way of testing whether the

11    conversation is as the neighbor said or as

12    Mr. Brewington says if I can't figure out which

13    neighbor he is talking about.

14         MR. BREWINGTON:  Your Honor, when the FBI showed

15    up to interview me, they had my business card which

16    identifies myself very clearly as a private

17    investigator.  The neighbors were all given that.  They

18    were all told what I was doing.  The FBI agent

19    indicated to me that the next day someone showed up

20    identifying themself as law enforcement; and when asked

21    to produce credentials, he was unable to do it.

22         JUDGE WAKE:  All right.  Ms. Speth and Mr. Dana,

23    would you accept a protective order that allows this

24    information to be taken, the deposition to be sealed,

25    and a protective order that restrains all the parties

1   in this case from publicizing in any way either the

2   names of these people or the evidence that they have

3   given, unless there's a prior court allowing it?

4   Specifically what I am thinking about --

5            MR. BREWINGTON:  Your Honor, are you able to

6   take that protective order a bit further and include

7   anything in the deposition from being disseminated in

8   any fashion whatsoever except for evidentiary hearings?

9            JUDGE WAKE:  That's the subject of another

10  protective order.  That motion is pending before me,

11  not yet decided.  I don't want to get to that yet,

12  Mr. Brewington.

13           At this point my question to counsel is

14  whether you are willing to just agree to bring it into

15  this Internet publicity with respect to the information

16  that would come out of this deposition considering

17  third parties.  Because if you are willing to do that,

18  that may be enough to tip the balance to allow the

19  information to be gathered, but to provide protection

20  to these third parties unless the Court authorizes the

21  publicity.

22           And I will say specifically it's difficult

23  for me to see any justification for publicizing in this

24  negative and perhaps frightening way the evidence

25  supplied by third parties in this case that would be

1    indirectly through the testimony of Mr. Brewington.

2              Ms. Speth, are you agreeable to that on

3    behalf of your client?

4          MS. SPETH:  I would like to share the

5    information with my client, as long as my client agrees

6    it won't be put on the Internet.  He knows his

7    neighbors, so it's difficult for me to test the

8    information without asking him.  But I am willing to do

9    that only if he agrees.  If you need it to be in

10   writing it won't be publicized or --

11         JUDGE WAKE:  Or in any other way.

12         MR. BREWINGTON:  Your Honor, there's been ample

13   evidence to suggest that Mr. Magedson doesn't

14   necessarily adhere to the advice of counsel or the

15   courts, and there's no assurances that he is going to

16   comply with the order that you are discussing right

17   now.

18         JUDGE WAKE:  Well, you know, I can't say whether

19   Mr. Magedson has engaged in wrong or not.  I haven't

20   had any matter before me that required me to make that

21   judgment.  I have made a preliminary opinion about some

22   of the conduct of the defendants.  But that in no way

23   suggests that Mr. Magedson is free of misconduct, as

24   well.  That is not before me.

25              And I am trying to address this in a way

1    that will allow discovery to move forward and to

2    protect innocent persons from this kind of intimidation

3    through exposure of private information that both sides

4    in this case accuse the other of engaging in.

5         MR. BREWINGTON:  I would like it on the record

6    that I consider myself one of the victims of the

7    dissemination of information that's false and designed

8    to make me fear for myself and my family.

9         JUDGE WAKE:  Mr. Dana, would you be agreeable to

10   a protective order along those lines?

11        MR. DANA:  Yes.  That narrowly covers the

12   information about the neighbors at this stage also,

13   recognizing that there is a pending motion and hearing

14   coming up on a more general protective order.

15             And I guess with respect to the

16   information being given to Mr. Magedson, it sounds like

17   from Mr. Brewington that that itself is the concern.

18   But, you know, then, again, I am also wanting to know

19   this information.

20             So if there's a narrow protective order

21   and then with respect to whether it can be provided to

22   Mr. Magedson or not, that's not my issue.  But I would

23   be willing to stipulate to a protective order on that

24   information only if we can get the information from

25   Mr. Brewington.

1        JUDGE WAKE:  Well, what I'm also hearing from

2   Mr. Brewington is the concern that one, if not both of

3   the parties are at risk of engaging in misconduct in

4   trying to cover their tracks.  And so he's worried

5   merely having the information could result in things

6   detrimental happening to these witnesses with an

7   inability to trace it back.

8        MR. BREWINGTON:  Absolutely.

9        MS. SPETH:  There's not a speck of evidence that

10  my client has threatened anyone.  My client's business

11  is to host a Web site that hosts information.  The

12  suggestion to this Court that there's some physical

13  concern is absolutely outrageous, based on nothing.

14        And Mr. Brewington is the one that has

15  publicized an enormous amount of information about my

16  client's personal whereabouts and has done a lot of

17  things to my client.  So it's really offensive to me

18  that he's concerned out of fear of my client.

19        He has been tracking my client and talking

20  to people about my client and making representations

21  about my client.  If he was afraid, he wouldn't be

22  doing all of these things.

23        JUDGE WAKE:  I'm trying to fashion a way of

24  going forward that protects these third party

25  witnesses.

104

1          MR. BREWINGTON:   Your Honor, I think another

2    addendum to this would be that I know the whereabouts

3    of Edward Magedson, and it will probably come out in

4    this testimony.   I have made great pains to make sure

5    that nobody else gets this information and wouldn't

6    like it disseminated via any other public vehicle

7    either because it's only been recently that I've been

8    made aware of the death threats.   Prior to that, I

9    didn't know anything existed and had no reason to think

10   that anyone was out to get him.

11         JUDGE WAKE:   How many depositions do you have

12   set between now and the time I have the hearing set for

13   the motion for protective order?

14         MS. SPETH:   None, except the remainder of this

15   one.

16         JUDGE WAKE:   What's the detriment of continuing

17   this deposition?

18         MS. SPETH:   Your Honor, obviously I do not want

19   to do that.   I'm trying to gather information for the

20   case.   I need to get William Stanley served.   I'm

21   trying to determine where he is.   I'm thinking

22   Mr. Brewington might have some information about that.

23   That is one of the reasons I called him as my first

24   witness because he's been hired by Mr. Stanley.   I

25   would not like to put this deposition off.

PALMER REPORTING SERVICES, INC.

1          Now, this particular issue, if you ask me

2    to not disclose it to my client until there's further

3    briefing, I'm willing to do that.  But my problem is

4    ultimately I can't test the information without asking

5    for Mr. Magedson's help because, again, these are his

6    neighbors.  But for a short period of time, the next

7    couple of weeks, I can keep it from him.

8         JUDGE WAKE:  That's what I was thinking.  Allow

9    this for counsels' eyes only, subject to resolution

10   only with the other motion, what will be ordered with

11   respect to people's privacy.

12          Mr. Dana, can you live with that for a

13   couple weeks?

14        MR. DANA:  Yes.  That makes sense, Your Honor.

15        JUDGE WAKE:  Here's what I'm going to do.

16   Having considered what's in effect were motions to

17   compel answers to deposition questions and motions for

18   protective order from the witness, it is ordered --

19   well, not before I order this --

20          Counsel, is there any difficulty with

21   having this deposition prepared for counsels' eyes only

22   for this period of time?

23        MS. SPETH:  There may be, Your Honor.  I don't

24   know what's going to come out in it.

25        JUDGE WAKE:  Well, then I will define it

106

1   broadly.  It is ordered that portions of the deposition

2   of Mr. Brewington shall be for counsels' eyes only, not

3   to be divulged to any other persons, including their

4   clients, with respect to the following subject matters:

5   Investigation by Mr. Brewington done on behalf of

6   Mr. Stanley, including, without limitation, the

7   comments and identity of commenters identified by

8   Mr. Brewington.

9          Mr. Brewington, what other subject

10  matters?  Is there anything not encompassed within that

11  that you feel you have a need for protection within a

12  period of a couple weeks?

13         MR. BREWINGTON:  No, Your Honor.  My biggest

14  concern is the people that have expressed -- I am a big

15  boy and can protect myself against everything except

16  malicious gossip on the Internet.

17         JUDGE WAKE:  I think I covered that.

18         Now, as this deposition proceeds, if you

19  have other disputes, I urge you to work them out.  And

20  I can tell you right now what I'm likely to do if you

21  need to call me again.  I am likely to grant a

22  temporary protection for keeping information from the

23  parties and restricting them to counsel until we can

24  work out the broad protective order.  So even if you

25  have a disagreement in a more general sense, you may be

107

1    able to work it out by temporary agreement any further

2    disputes.

3                I'm in a criminal trial, and, therefore,

4    I'm largely unavailable -- I'm unavailable between 9:00

5    and 4:30, and even lunch times are very hectic when

6    we're in trial.

7                So I'll let you proceed with your

8    deposition.  I hope you'll be able to work things out,

9    if you can.  And basically the structure will be to

10   maximize the information given and minimize anything

11   that is disclosed beyond counsel until we can address

12   this in a broader way in connection with the other

13   motion for protective orders.

14       MS. SPETH:  I think I probably know the answer

15   to this, but I want to make sure I clarify.  If he

16   gives me the name of a neighbor and I contact that

17   neighbor and that neighbor refuses to talk to me, I

18   take it I have to wait until August 22nd before I can

19   issue a subpoena to that neighbor if I want to find out

20   under oath --

21       JUDGE WAKE:  If you did that, you are divulging

22   that to your client.  The answer is yes, you absolutely

23   cannot do that.

24       MS. SPETH:  We'll talk about that on August 22nd

25   because I need to test if that is an accurate

PALMER REPORTING SERVICES, INC.

108

1    characterization of the testimony.

2         JUDGE WAKE:   Thank you.

3         (The telephonic conference with Judge Wake ended

4    at 4:27 p.m.)

5         MS. SPETH:   Can you read back what

6    Mr. Brewington said about ample evidence?

7         (Record read beginning on page 101, line 12.)

8         MS. SPETH:   We're back on the record right now.

9         Q.    BY MS. SPETH:   Can you tell me what the

10   ample evidence is that Mr. Magedson does not adhere to

11   the advice of his counsel?

12        A.    I had an interview with Jack Delahaney, a

13   district attorney in Tupperlake, New York.   There is an

14   extreme amount of postings about Mr. Delahaney, who

15   used to be the counsel to Mr. Magedson at one point in

16   time.   My interview with Mr. Delahaney brought out some

17   subject matter in terms of Mr. Magedson perhaps using a

18   civil rights lawsuit in Tupperlake, New York.   And

19   there's been an extreme amount of postings on the

20   Internet about the city fathers, the police,

21   Mr. Delahaney, and some other matters.

22        Q.    Slow down, please.

23        When you said he didn't follow advice of

24   counsel, you meant Mr. Delahaney?

25        A.    Yes.   Not you, by any means.

109

1    Q.    In what way did Mr. Magedson not follow

2  the advice of Mr. Delahaney?

3    A.    My understanding on this was that he had

4  been admonished for posting items on the Internet.  I

5  think I saw Mr. Magedson had admitted to posting

6  certain items about the City of Tupperlake.

7    Q.    So in what way did he not follow or heed

8  the advice of counsel was my question?

9    A.    I'm fairly certain that Mr. Delahaney

10  indicated to me he was admonished for doing something

11  like that.

12    Q.    He was admonished by Mr. Delahaney?

13    A.    Yes.

14    Q.    Mr. Delahaney told you about his advice to

15  his client.  Is that your testimony?

16    A.    Mr. Delahaney told me many things, as a

17  matter of fact.

18    Q.    But specifically my question is:

19  Mr. Delahaney told you about the advice he gave his

20  client?

21    A.    I don't recall exactly.

22    Q.    And you also said that he doesn't -- that

23  Mr. Magedson doesn't necessarily -- I can't remember

24  the exact words, but basically listen to what the Court

25  said.  What ample evidence is there of that?

1     A.     Again, there's ample postings about the

2  City of Mesa, Tupperlake -- there were several items

3  that he's involved in, court cases that he's lost and

4  that he continues to -- I should say there continues to

5  be an excessive amount of postings about these

6  particular entities that seems suspicious.  And, of

7  course, I've always had my suspicions that Mr. Magedson

8  is posting either through a surrogate or himself,

9  perhaps Mr. Bedore or others.  So maybe a poor choice

10  of words was "ample evidence," in my mind.

11     Q.     So you're saying there's not ample

12  evidence that Mr. Magedson does not follow court

13  orders?

14     A.     Correct.

15     Q.     Now, let's go back to the neighbors.  I'm

16  not sure what to do first.

17            Which neighbors did you interview?

18     A.     I'm not going to be able to get their

19  names specifically, but I can provide them.  You

20  actually have that information on there.

21            Randy Henderson is the neighbor that

22  provided the flier to me that was alleged to have been

23  created by Mr. Magedson.  On that flier the topic, of

24  course, was John Unger.

25     Q.     Let me back up for a second.

1      You said I actually have that information

2  on there.  What did you mean?

3      A.    Here.

4      Q.    On the notes.

5      You said you are not sure if you can

6  provide me all the names --

7      A.    I don't know at the moment if I can

8  because I don't have their names.

9      Patsy is an elderly woman who lived on the

10 right side of Mr. Magedson over on the Ambrosia

11 address.  I believe her first name is Patsy.

12     Q.    When you say "right side," you mean facing

13 the house?

14     A.    Yes.

15     On the left-hand side I believe the

16 gentleman's name is Bill Byer, who purchased the home

17 from Mr. Magedson.

18     And on the -- when you are facing the

19 house, the house next to Patsy, I believe their name is

20 Johnson.  I don't know for sure.

21     I interviewed all three of them, gave them

22 my business card, which clearly says I'm a private

23 investigator.  And it was very clear that I needed a

24 physical address for him.

25     Q.    Let me back up for a second.

112

1          If you don't have all the names today, you

2     could provide them?

3          A.     Yes.

4          Q.     What would you do to get them?

5          A.     I would go online and pull up the people

6     that live at those particular addresses.   I don't have

7     them in documents.

8          Q.     So let's first talk about the Ambrosia

9     property.   And you've mentioned that if you are facing

10    the house, on the right side is a woman named Patsy?

11         A.     Used to be there.   She's moved.

12         Q.     And you don't know her last name?

13         A.     No.   Again, I can pull it up, but I don't

14    remember.

15         Q.     And the left side is a Bill Byer?

16         A.     I believe that's his name.

17         Q.     And then two houses over on the right is

18    Johnson?

19         A.     Yes, I think so.

20         Q.     Is that a man or woman?

21         A.     Husband and wife.

22         Q.     Do you remember their first names?

23         A.     I don't.

24              If I recall, I went into the assessor's

25    office and pulled up the ownership so it would be easy

```
 1    for me to say, yep, that's who it was.  And each of

 2    them, again, was given business cards.

 3             Q.    Did you interview anybody else at the

 4    Ambrosia property?

 5             A.    No.

 6             Q.    Let's start with Patsy.  For instance,

 7    when you knocked on Patsy's door and she answered the

 8    door, in what way did you introduce yourself?

 9             A.    She knew who I was.  I called her first

10    and asked her if it was okay if I come by and have a

11    talk with her.  And in my dialogue -- on the telephone

12    I asked her if she knew Edward Magedson, if Edward

13    Magedson lived next door.  She said yes, he lived next

14    door, described him to me.  And she told me that the

15    person that would have a lot of information about him

16    is Bill Byer, the gentleman that sold the home to him.

17             Q.    How did you introduce yourself to her when

18    you called her?

19             A.    As a private investigator.

20             Q.    Did you use your real name?

21             A.    Of course.

22             Q.    And then you asked her if you could come

23    see her?

24             A.    Yes.

25             Q.    How come you needed to come see her?
```

114

1       A.    I wanted to talk to the neighbor, the man

2  that had sold the house to Mr. Magedson, and I wanted

3  to talk to the other neighbor, as well.

4       Q.    Why did you go to see Patsy then?

5       A.    She was waiting outside for me when I

6  pulled up. The things she had to say were certainly

7  important. She provided me information that was, you

8  know, her opinion, but wasn't necessarily important to

9  anything.

10       Q.    So between the conversation you had on the

11  phone and when you went to see her in person, tell me

12  everything that you told Patsy about Ed Magedson. Not

13  what she told you, what you told her.

14       A.    To paraphrase it, Mr. Magedson was the

15  owner of a Web site that allowed the posting of

16  information about anyone. She made it clear she was

17  aware of it. And there were -- I told her there were

18  several cases in court, and that no one has seemed to

19  be able to get personal service on Mr. Magedson. I was

20  interested in finding a physical location so I could

21  provide that information to the plaintiffs.

22       Q.    So you led her to believe that the reason

23  you were interviewing her was related to service of

24  process on Ed Magedson?

25       A.    I don't know I led her to believe that at

115

1   all.   I stated to her very clearly what I just told

2   you.   It wasn't my intent to make her think I was a

3   process server; that's a separate item from a private

4   investigator.   I didn't have papers with me.   I didn't

5   flash them in front of her.   No one was told I had

6   papers to serve.   They were told there were plaintiffs'

7   counsel out there that had not been able to get

8   Mr. Magedson served with a summons and complaint.

9          Q.     Did you tell her that you were

10  investigating death threats against Mr. Magedson?

11         A.     The death threats didn't exist at that

12  point.

13         Q.     So you started investigating Mr. Magedson

14  before Mr. Stanley hired you?

15         A.     Of course.

16         Q.     And yet you produced none of those

17  documents to me.   And you didn't produce them based

18  upon a statute; is that correct?

19         A.     Yes.

20         Q.     You had no grounds to withhold any of

21  those documents, did you?

22         A.     I don't know that.   When do those

23  documents become part of the investigation for

24  Mr. Stanley?

25         Q.     So what did Miss Patsy tell you?

116

1  A. She had indicated --

2  Q. Let me stop you.  Did you tell Patsy that

3 Mr. Magedson was wanted by the FBI?

4  A. Of course not.  He's not.

5  Q. Did you tell him he's a criminal on the

6 run?

7  A. Of course not.  He's not.

8  Q. What did she tell you?

9  A. She said he was an extremely paranoid

10 type; that he was having some issues with the

11 homeowners association; that he and the neighbors were

12 having a bit of a row because he wanted motion detector

13 lights put up around his house.  If anybody approached

14 it, the lights would come on.

15  She claims he had some shrubbery put up in

16 front of the house so I think -- I took it from her so

17 no one can peer in or watch him or anything like that.

18  And that he had, upon occasion, offered to

19 take her to a supermarket for lunch, and that she was

20 uncomfortable -- uncomfortable with him.  And she made

21 him aware she knew about the Web site, but she wasn't

22 computer literate, so she didn't know all of that.

23  She indicated he was going by a different

24 name.  She claims he asked her to identify him as Dave.

25  Q. Anything else for Patsy?

1          A.     Nothing stands out.

2          Q.     How about Bill Byer, what did he tell you?

3          A.     Bill said he knew where Mr. Magedson

4    lived; that he didn't want to disclose where that was

5    because he had fear that he would wind up on the Ripoff

6    Report; that he was on the Ripoff Report a great deal.

7    And his comments were that he -- he said he understood

8    that Mr. Magedson made his money by going on the

9    Internet and maligning people, and he had a fear that

10   was going to happen to him.

11                He discussed a lawsuit that Mr. Magedson

12   had against him when they purchased -- I think you were

13   the plaintiff's counsel -- that when Mr. Magedson

14   purchased the property, it was alleged that there was a

15   mold condition inside the house, and that

16   Mr. Magedson -- they expressed discontent with the idea

17   that Mr. Magedson really didn't have any kind of

18   dialogue to resolve it.  He called them in an angry

19   tone using profanities.  And the next thing he knows,

20   he was sued, and they had to settle out of court.  He

21   was very concerned if he told me anything he would get

22   sued again.

23         Q.     What did you tell him about Mr. Magedson?

24         A.     Same thing.  Everybody has my business

25   card to tell them that I'm law enforcement.  Anything

118

1   else is ridiculous.  And I'll remind you, the FBI said

2   somebody was out there the next day posing as law

3   enforcement.

4        Q.   What else did Mr. Byer say to you about

5   Mr. Magedson, if anything?

6        A.   I think that's about it.

7        Q.   Why did you think you needed to protect

8   Patsy or Bill Byer when they didn't really say

9   anything -- withdrawn.

10            What did they say to you that you are

11  worried about retaliation for?

12       A.   Mr. Byer made it very clear he was afraid

13  of being on the Ripoff Report.  His words, he was going

14  to be retaliated against for talking to me.  And

15  certainly he was concerned he was going to be sued by

16  you again.

17       Q.   By me?  He told you he was concerned that

18  he would be sued by me again?

19       A.   Yes.

20       Q.   And he told you he was sued by me before?

21       A.   He was sued by Ed.  He said Maria Crimi

22  Speth was his legal counsel, and I think so.

23       Q.   Did you check that out?  Did you look on

24  the Internet?

25       A.   No.  Why?  It's not important.

1    Q.    Did you think that maybe the credibility

2  of Mr. Byer might have been important?

3    A.    Well, sure.   What information did I get

4  from Mr. Byer that's important?   You seem to think

5  there is something.   I don't know that there is.

6    Q.    So you're saying that you really didn't

7  care about his credibility because he didn't tell you

8  anything important?

9    A.    It's not for me to judge what comes out of

10  his mouth; it's for the court to decide.

11    Q.    Why were you interviewing these people?

12    A.    Because I wanted to know where Edward

13  Magedson was.

14    Q.    For what purpose?

15    A.    Mr. Magedson put on his Web site right on

16  the front page he invites anyone to investigate him.

17    Q.    For what purpose did you spend your

18  precious time when no one was paying you?   What was

19  your purpose?

20    A.    I saw in some of the postings out there

21  that the one time Mr. Magedson was deposed some

22  information came out that probably he didn't want out.

23         My feeling is that if Mr. Magedson is

24  deposed on a personal level again, the public is going

25  to become aware of some of the truths that exist that

120

1    have not been told.

2         Q.    That's very vague.

3              Tell me what your purpose was in talking

4    to these neighbors and trying to find Ed Magedson.

5    What were you trying to do?

6         A.    I would have gotten a physical address and

7    communicated to all of plaintiffs' counsels where he

8    was.

9         Q.    You would have gotten a physical address

10   and what?

11        A.    Provided it to plaintiffs' counsels so

12   they were able to get him served.

13             I, in fact, communicated with one and

14   delivered to them a process server's name so they can

15   facilitate that.

16        Q.    Which one did you communicate with?

17        A.    I don't recall, frankly.  I gave them the

18   name of Frontier Process and gave them the address on

19   Ambrosia.  Mr. Magedson had already moved at this

20   point.

21        Q.    How did you find this plaintiff's counsel?

22        A.    It's on PACER.

23        Q.    So you watch PACER for Ed's information,

24   don't you?

25        A.    Not so much.  There's a lot of people that

1  email me and keep me apprised as to what's going on.

2      Q.   How many hours do you think you've spent

3  all together investigating Ed Magedson?

4      A.   Hundreds.

5      Q.   Hundreds of hours.  And nobody has paid

6  you?

7      A.   Yes, absolutely.

8      Q.   You're obsessed?

9      A.   Someone accused me of being obsessed, yes.

10     Q.   And I'm not really understanding why.

11  What did Ed Magedson do to get you obsessed about him?

12     A.   I think there are some things that exist,

13  but, you know, it's been -- I've been accused about

14  being obsessed about Robert Paisola, and he's certainly

15  in the courts right now for failure to register as a

16  sex offender.

17          Yes, when I see there's a cause, I get

18  involved in the cause.  And the real Ripoff Report,

19  that story, it's important that someone investigate it

20  and then there's other eyes like an editor and other

21  eyes like a legal team.

22          I want to know what's under the layers of

23  Mr. Magedson and the Ripoff Report.  There's something

24  there.  I want to know what it is, and it's only going

25  to come from him.

122

1          Q.     All right.   Let's go back to the

2     neighbors.

3                 The Johnsons, husband and wife, I take it

4     you told them the same thing that you told me?

5          A.     Same thing what?

6          Q.     That you were investigating trying to find

7     a physical address?

8          A.     Yes.

9          Q.     What did they tell you?

10         A.     I don't know that the Johnsons said

11    anything.   They were given a business card.

12         Q.     Which one of these three neighbors told

13    you that the next day -- maybe it was the FBI --

14    somebody else came back --

15         A.     Yes.

16         Q.     Did you visit any of these neighbors on

17    your bike?

18         A.     Yes.

19         Q.     All of them?

20         A.     I was out there -- I think the first time

21    I went out there -- the only time I went out there was

22    on my bike, yes.

23         Q.     You interviewed all three of these people

24    the same day?

25         A.     Yes.

123

1         Q.    Can you give me an approximate day or at

2    least a month?

3         A.    I don't know.

4         Q.    Can you give me a year?

5         A.    2007.

6         Q.    You also went out to the property in Pinal

7    County on McDowell Road, correct?

8         A.    Yes.

9         Q.    And tell me -- first list for me and then

10   tell me who you -- let's start with the list of who you

11   spoke to out there.

12             Randy Henderson is one?

13        A.    Will you provide me with that document --

14        (Exhibit 4 was marked.)

15        MS. SPETH:  I will say on the record, let's

16   really slow down.  I know it's getting late and we want

17   to get done, but we want to be observant of the court

18   reporter's ability to get a clear record.

19        THE WITNESS:  I apologize.  I don't do this

20   every day.

21        MS. SPETH:  I do, and I'm still not able to slow

22   down.

23        Q.    BY MS. SPETH:  Does Exhibit 4 help you?

24        A.    Yes, it does.

25        Q.    Who did you interview at the property in

124

1    Pinal County?

2         A.    The first time I only interviewed Phil

3    Reinhardt.

4         Q.    Who else did you interview?

5         A.    No one else.

6         Q.    All together?

7         A.    All together.

8         Q.    What happened to Randy Henderson?

9         A.    That was the second time.

10        Q.    I said all together.

11        A.    That was one visit.

12              Altogether the second time, I would have

13   interviewed Phil Reinhardt again and Randy Henderson.

14        Q.    Who else did you interview every time that

15   you went out there?

16        A.    That's it.

17        Q.    Total?

18        A.    Yes.

19        Q.    Did you ever knock on any of the doors at

20   the actual addresses that you believed that Ed Magedson

21   lived at?

22        A.    No.  It has a "No Trespassing" notice.

23        Q.    So you never knocked on the door?

24        A.    No.

25        Q.    Did you notice any other buildings other

PALMER REPORTING SERVICES, INC.

125

1    than the main house?

2         A.    I think there's a motor home out there,

3    and there might be something in the back, like a shed

4    perhaps.

5         Q.    Did you knock on the motor home door?

6         A.    No.  It says "No Trespassing."

7         Q.    I understand.

8               There's some names on here, as long as we

9    have it in front of us.  I see Phil Reinhardt, Sarah

10   Henderson -- who is that?

11        A.    The wife of Randy Henderson.  Randy is the

12   individual that provided the information.

13        Q.    We'll come back to that.

14              Do you see any other names on here?  Who

15   is Eric?

16        A.    Eric Skelling.

17        Q.    What about him?  Why is he on here on

18   Exhibit 4?

19        A.    The interview -- the second time when I

20   had gone up there to establish whether or not any of

21   the neighbors had actually received the death threat

22   letters -- neither Mr. Reinhardt nor the Hendersons,

23   they were very clear they hadn't received death threat

24   letters.

25              They had indicated to me there was a

126

1    relationship between Eric Skelling -- in fact, I asked

2    them specifically about the bullet holes in the

3    mailbox --

4         Q.    I want to know who "them" is before you

5    continue.

6         A.    Randy Henderson.  I asked him about the

7    bullet holes that appeared in Mr. Magedson's mailbox.

8    Where did they come from?  They indicated to me that

9    Eric Skelling put those bullet holes in that mailbox.

10        Q.    Did they say they saw him do that?

11        A.    I don't remember whether they saw it or

12   not.

13        Q.    You don't remember if they saw it happen

14   or heard it happen?

15        A.    I don't.  They told me why it happened.

16        Q.    What did they say?

17        A.    Because Mr. Magedson evicted him from the

18   property.

19        Q.    Now, I take it Mr. Henderson, you told him

20   that you were looking for Mr. Magedson's physical

21   address?

22        A.    No.

23        Q.    This was different?

24        A.    Yes.  I told Mr. Henderson there had been

25   death threats, I showed them to him, and it had been

PALMER REPORTING SERVICES, INC.

127

1   alleged that the neighbors had received death threat

2   copies.  They looked at the copies and said, no, they

3   hadn't received them.

4        Q.   Did you ever ask the neighbors on Ambrosia

5   if they received them?

6        A.   I called Patsy and asked her if she had

7   received any letters, and she said no.

8        Q.   What about the other two?

9        A.   I haven't.  My previous conversation with

10  them, they were obviously very nervous about giving any

11  information out.  So, no, I did not interview anyone

12  other than Patsy.

13             But it says right on the death threats

14  that it was the Pinal County neighbors that received

15  the death threats.  It's handwritten on there.

16       Q.   Let's go back to the information with

17  Randy Henderson.  He is the one that gave you the

18  flier; yes?

19       A.   Yes.

20       Q.   And the flier, what did he say when he

21  gave you the flier?

22       A.   He had other documents in his possession

23  that he alleged came from Mr. Magedson, as well, that

24  was making character assassinations about he and his

25  wife.  I asked him if -- how does he know they came

128

1    from Edward Magedson.  And he didn't really have a

2    clear and concise answer where those documents came

3    from.  I did not take possession of any of those

4    documents.

5             The only thing I took possession of is

6    that flier about John Unger.  And I'm not really sure

7    how -- they made it clear that they felt that

8    Mr. Magedson was the individual that had created those;

9    that it had caused so much turmoil for Mr. Unger that

10   he was forced to move out of his house.

11        Q.    Did they tell you whether Mr. Unger told

12   them that?

13        A.    No, I don't think that's where it came

14   from.  I think this was a personal experience that they

15   had.  They made it pretty clear that Mr. Unger had some

16   psychological problems, and that seems to be accurate.

17   And I didn't feel taking him down that path again was

18   going to be beneficial to him, so I never interviewed

19   Mr. Unger.

20        Q.    Have you ever had a conversation or any

21   conversation with Mr. Unger?

22        A.    Never.

23        Q.    I guess if I'm a neighbor and I got this

24   flier that's at my house that says --

25             Let me clarify for the record.  Do you

129

1    understand that John Unger was also a neighbor by the

2    Pinal County property at one time?

3        A.    Yes, I do.

4        Q.    If I'm a neighbor and I'm the Hendersons

5    and I see this flier, look out for John Unger, he's a

6    predator, and I come to the conclusion that Ed created

7    the flier, where would they have gotten that from?  Did

8    they give you any indication how they came to that

9    conclusion?

10       A.    No.  It was clear they had some history

11   with Mr. Magedson in the past.  All of them had

12   expressed a dissatisfaction with him being a neighbor.

13   In general terms, there was a fight over a public light

14   being put on a corner.

15             And, again, they had received letters

16   allegedly from a third party down the street that

17   besmirched the character of Mr. Henderson's wife.

18   Where they got the information from, I don't have any

19   idea.

20       Q.    Did the Hendersons give you any indication

21   that perhaps Eric Skelling created that flier?

22       A.    You know, I don't know that they purposely

23   did.  I think their thought process -- this is

24   supposition -- I think their thought process is Matt

25   Mott and Eric Skelling do a great deal for Mr. Magedson

130

1    that he doesn't want to put his hands on; that's what I

2    took from the interview.

3         MS. SPETH:  Can you read his answer back?

4         (Answer read.)

5         Q.    BY MS. SPETH:  Who is Matt Mott?

6         A.    According to the neighbors, Mr. Mott was

7    frequenting the house where Mr. Magedson lived.  And

8    Mr. Mott had told the neighbors that Mr. Magedson had

9    been teaching him slip and fall scams in grocery stores

10   and going into, I think, homes, renting homes or

11   apartments and gutting them of their appliances and

12   that sort of thing.

13        Q.    Did they say who the source of that

14   information was?

15        A.    Matt Mott.

16        Q.    Not through John Unger?

17        A.    No.  It's clear they had been speaking

18   with Mr. Unger, and they know where he is.  But

19   Mr. Unger, in my understanding, has some issues that he

20   shouldn't be involved in any of this.

21        Q.    Did you try to contact this Matt Mott?

22        A.    I tried to find him.  In fact, one of the

23   numbers that you'll find on there is for the sheriff's

24   department out there.  I wanted to go out and pull any

25   police reports that would have existed on John Unger to

PALMER REPORTING SERVICES, INC.

131

1    ascertain if he had ever really been accused of

2    molesting men, drugging them, any of those sorts of

3    things.

4            Q.    It says, "Matt Mott, (480)326-1343."

5            A.    That's a phone number -- the Hendersons

6    provided that to me.  It goes to Mott's Towing, I

7    think.

8            Q.    Did you try it?

9            A.    It's a blind recorder.  I left a message.

10   No return calls.

11           Q.    Let's go through this little exhibit here,

12   Exhibit 4.

13                 Sarah Henderson you mentioned.  Phil

14   Reinhardt you mentioned.

15                 Admin.  Admin Florence?

16           A.    Yes.  That's where the Pinal County jail

17   is at.

18           Q.    And you did, in fact, go visit

19   Mr. Skelling in jail, but you were not able to speak

20   with him?

21           A.    They brought him to a holding cell.  I

22   identified myself to him.  I'd never seen the man

23   before.  And he quickly exited and didn't want to talk

24   to me and left.

25           Q.    Do you have any idea why?

1      A.      According to the neighbors, they related

2  to me that Mr. Skelling was under the distinct

3  impression that Mr. Magedson had the ability to kill

4  people.  So, you know, nothing that comes out of

5  Mr. Skelling's mouth about any of these things I don't

6  suppose is going to help him, especially when he's

7  sitting in jail.  If he participated in distributing

8  fliers, if he participated in anything else that's

9  illegal, why would he want to help me.

10      Q.      When you were interviewing the neighbors

11  in Pinal County on McDowell, did you ask any of them if

12  they heard gunshots around the time that the letter was

13  delivered?

14      A.      Yes.  I showed them the letter, and I

15  said, "Did you hear the gunshots last night?"  They

16  indicated they hear gunshots a lot.

17      Q.      The little reference to "Eric shoot

18  mailbox," that's what one of them told you.  Was that

19  Ron Howard?

20      A.      No.  Randy Henderson.

21      Q.      And then the "bullet holes," that's your

22  reference?

23      A.      Yes.  I was making notes.

24          When I passed the mailbox, I saw holes in

25  it, and my thoughts went back to his death threat

133

1   letter where it suggested, "Did you hear the gunshots

2   last night?"

3        Q.    Were all these notes on Exhibit 4 taken

4   the same day?

5        A.    Yes.

6        Q.    And then the reference down here to "Gold

7   Canyon."

8        A.    That's the Pinal County Sheriff's

9   Department location, the nearest one to them.

10       Q.    King Ranch Road?

11       A.    Yes, it's off of King Ranch Road.

12       Q.    And then it says, "Mountain Brook."  Is

13  that part of the same thing?

14       A.    Yes, I believe so.

15       Q.    And then the phone number is the sheriff's

16  department?

17       A.    Yes.

18       Q.    Did you talk to anybody else at the Pinal

19  County property?

20       A.    No.

21       Q.    Is there any other conversations that you

22  had at the Pinal County property with neighbors that we

23  haven't discussed that might be relevant to the subject

24  matters that we've been talking about, the death

25  threats or, you know, any postings on the Internet

134

1    about Ed Magedson?

2         A.    They made me aware that Mr. Magedson ran

3    the Ripoff Report, and they were uncomfortable with

4    what their perception of what the Ripoff Report was and

5    what it did.  I don't know how they expressed it.  The

6    same way everyone does, they had a fear they were going

7    to appear on there.

8              Mr. Henderson was particularly afraid that

9    his wife would be maligned in a disrespectful fashion.

10        Q.    We've already talked about the neighbors

11   that you interviewed.

12             Who else have you interviewed with respect

13   to Ed Magedson?  Not limiting it now to neighbors.

14        A.    Every plaintiffs' counsel, probably.

15        Q.    Mr. Dana?

16        A.    Oh, yes.

17        Q.    When did you have that conversation?

18        A.    I believe the first conversation was when

19   he was representing High Site (phonetic).

20        THE WITNESS:  Didn't you represent High Site?

21        MR. DANA:  Yes.

22        A.    I believe that was the first one.  I mean,

23   I believe every plaintiffs' counsel.

24        Q.    BY MS. SPETH:  Tell me about your

25   conversation with Mr. Dana.