135

1        A.    I think my -- I think what I was really

2  trying to understand from Mr. Dana was revolving around

3  if Mr. Magedson had personally been served so that he

4  could be deposed in any of these particular cases.

5        Q.    Would I be correct in saying that you

6  wanted to be the hero to finally personally serve

7  Mr. Magedson?

8        A.    No.  Actually, it would be correct that

9  you understand that I want my life back.  And this has

10  been nothing but a negative, negative thing for me.

11        Q.    That you chose.

12        A.    I chose it for myself.

13        Q.    But we were talking earlier about why, why

14  would you spend hundreds of hours?  Is it because you

15  saw the challenge that nobody was able to certainly

16  serve Ed and you wanted to be the one to do that?

17        A.    Mr. Magedson issued that challenge to me

18  vicariously.  I'm not a process server.  I know where

19  he lives.  No one has been told but the Mesa Police and

20  the FBI.

21        Q.    Who else did you interview, other than

22  plaintiffs' counsel and neighbors?

23        A.    Some of the people that have been on the

24  Ripoff Report, too numerous to name.  I want to

25  understand what they're going through emotionally --

PALMER REPORTING SERVICES, INC.

136

1      Q.    I'm going to stop you.  I understand you

2    may have interviewed people who are subjects of

3    reports.  I want to take them out of my question.

4            Who else have you interviewed, other than

5    those who are the subject of reports, about Ed

6    Magedson?

7      A.    Rob Russo.

8      Q.    Who else?

9      A.    Bill Stanley.

10     Q.    Who else?

11     A.    I attempted to interview Steve Miller, but

12   he wouldn't return the call.

13     Q.    How about Chris McFarland?

14     A.    No.

15     Q.    Anyone else?

16     A.    If you consider having a dialogue with the

17   Mesa Police Department --

18     Q.    We'll talk about that in a little bit.

19            Friends and family of Ed Magedson?  Anyone

20   else?

21     A.    Never.  I have been very proactive in

22   asking that Gary Magedson not be brought into any of

23   this.  He's an innocent party.

24     Q.    What about a woman named Georgie, who is a

25   real estate agent?  Did you speak with her?

137

1      A.      I did, yes.

2      Q.      Tell me about that.

3      A.      Phil Reinhardt indicated that that

4  property was being sold, and that you were representing

5  the sale, and that I can probably get information from

6  Georgie on where Mr. Magedson lived.

7      Q.      That I was representing the sale?

8      A.      I can only tell you -- I think Georgie

9  told me you were the contact person, although she did

10  say she did talk to Mr. Magedson upon occasion.  But

11  she definitely left me with the impression you were

12  handling that transaction for him.

13      Q.      What did you say to Georgie?

14      A.      I don't know specifically.  I identified

15  myself as a private investigator, and it probably went

16  along the same lines as everyone else, I would like to

17  know his physical location.

18      Q.      Did you tell her why you were looking for

19  him?

20      A.      I don't remember if I did or not.

21  Probably.

22      Q.      Well, basically if Georgie talks about

23  what you said to her, you would have no reason to

24  dispute what she says because you don't remember the

25  conversation?

1      A.      Eyewitness testimony is traditionally very

2  unreasonable.   There's been a lot of time that's past

3  since there's been an interview.   What she remembers

4  about that interview is probably faulty.

5      Q.      What do you remember about the interview?

6      A.      I went to her office.   I presented her

7  with a business card.   I showed her my credentials as a

8  private investigator and discussed the sale of the home

9  and how much it was, and that she met him at someplace

10  in Mesa; that he would never tell her exactly where he

11  lived or anything.

12      Q.      Did you pretend to be a buyer?

13      A.      Of course not.

14      Q.      And you don't remember any of the things

15  that you told her about Ed Magedson?

16      A.      No.   They weren't scurrilous.   She knew

17  who he was.   She knew something was odd.

18              I'll always talk about the Ripoff Report,

19  and I'll always talk and pepper my language with

20  "alleged" a great deal because he hasn't been convicted

21  of anything.

22      Q.      So it's your testimony as you sit here

23  today that the things you said to Georgie when you met

24  her in her office were not scurrilous about Ed Magedson

25  or the Ripoff Report?

1    A.    To my memory.

2    Q.    Did you ever tell me about your

3 conversation with Mike Dana?

4    A.    I think I told you I had talked to him

5 regarding High Site.

6    Q.    What about it?

7    A.    You know, I don't know if I even asked him

8 general questions about the suit or what direction it

9 was going.  I think I was more interested in terms of

10 was there personal service on Mr. Magedson.  I don't

11 remember specifically.  It was several months ago from

12 our first conversation.

13    Q.    What was the purpose of you calling him?

14 To gather information or to give him information?

15    A.    I'm happy to give information to whoever

16 wants it.  I've never asked for a penny.

17    Q.    My question was:  What was the purpose of

18 you calling him, to gather information or to give him

19 information?

20    A.    I think it was to gather information.

21    Q.    And so you asked him a bunch of questions?

22    A.    I don't remember if I did or not.

23    Q.    Did he answer them?  Do you remember if he

24 ever said, "I'm sorry, I can't speak with you, I can't

25 answer those questions"?

140

1      A.    I don't know.  If he would have operated

2    outside the boundaries of what I felt his client

3    privilege was, I would have taken notice of that.

4      Q.    You are trying to figure out why I'm

5    asking the questions; don't do that.

6             Did he refuse to answer any of your

7    questions?

8      A.    I don't think so.

9      Q.    How many different plaintiffs' counsel do

10    you think you contacted all together?

11      A.    Maybe seven, six.

12      Q.    Now, you called these people to gather

13    information.  Did you take notes of these

14    conversations?

15      A.    No.

16      Q.    Did you document them in any way?

17      A.    No.

18      Q.    Did you make a list of who you did call

19    and you didn't call?

20      A.    No.

21      Q.    How do you know if you called somebody?

22      A.    Oh, there's not that many lawsuits out

23    there.  It's really pretty clear who's involved in it.

24      Q.    If somebody gave you an interesting piece

25    of information that you wanted to follow up on,

141

1   wouldn't you take a note so you could go follow up on

2   it?

3        A.    I may have scribbled something down like

4   that, but I don't think I really necessarily walked

5   away with anything that I found all that interesting.

6             My scope is to try to understand the

7   legalities of what's going on out there.  This is an

8   extremely interesting -- these are interesting cases

9   and interesting issues, and I want to know -- I want to

10  be educated as to what's going on.  And, more

11  importantly, I would certainly like to know had they

12  been able to interview Mr. Magedson personally.

13       Q.    Why do you want to know that?

14       A.    Because from the Internet banter, it seems

15  pretty clear that no one has been able to -- and he's

16  even told me that.

17       Q.    "He" being Mr. Dana?

18       A.    No.  Mr. Magedson has indicated he can't

19  get served or that the service is always improper.  And

20  he seemed to be very focused on the idea that no one

21  can depose him.

22       Q.    Let me ask you something:  If you had a

23  deposition transcript of Mr. Magedson, what would you

24  do?

25       A.    Well, I think it's kind of out there, so I

1    don't really have an interest in that.

2          Q.    What do you mean?

3          A.    I think Miller in the deposition has, you

4    know, put whatever information out there that he feels

5    is important to the public.

6          Q.    I'm talking about a deposition transcript

7    now.

8          A.    I wouldn't do anything with it.

9          Q.    Would you read it?

10         A.    Yeah.

11         Q.    Might you post about it on the Internet?

12         A.    No.

13         Q.    I might have asked you this before, but

14   when did Mr. Stanley hire you?

15         A.    I think that occurred on March 4th.

16         Q.    2007?

17         A.    Yes.

18         Q.    What did you bring with you today?

19         A.    I wrote down some notes as I remember the

20   first contact and when Mr. Paisola became involved in

21   it, my first contact with Mr. Stanley.  I brought the

22   police report with me.  I brought the death threats

23   with me, your subpoenas.  And, of course, this is a

24   folder of the emails that Mr. Magedson and his staff

25   had sent back and forth to me and the reports about me

PALMER REPORTING SERVICES, INC.

143

1    on his Web site.

2         Q.    I would like to take a photocopy of that

3    folder.

4         A.    Sure.

5         Q.    Let me go back to the sticky notes on the

6    inside of that folder.  Why did you write those dates

7    down?

8         A.    Because I knew you would ask me when I

9    first made contact with Mr. Stanley.

10        Q.    Why did you have to have them in writing?

11        A.    Why would I remember a specific date that

12   I made contact with Mr. Stanley?  I can be subjective

13   and say I think it's mid-March, but I want to know.

14        Q.    And the three dates on there is contact

15   with Mr. Stanley --

16        A.    One is the first contact with Mr. Stanley,

17   which I've got it listed here as February 14th; that's

18   me sending him an email.

19             The second contact with Mr. Stanley -- I

20   shouldn't say the second contact.  Mr. Stanley hired me

21   -- or in an email that you'll get -- on March 4th,

22   2007, asking me to investigate the death threat

23   letters.

24        Q.    And there's three dates there.

25        A.    The same date.  No, March 4th, March 4th,

PALMER REPORTING SERVICES, INC.

1    March 14th.

2           Q.    There's three events there?

3           A.    One is Paisola.

4           Q.    And you wrote those dates down so you can

5    remember them?

6           A.    Yes.

7           Q.    Where did you get the information from?

8           A.    From the emails that went back and forth.

9    If I understand the judge correctly, it's probably

10   permissible for me to give those to you.

11          (Discussion off the record.)

12          Q.    BY MS. SPETH:  When the judge called back,

13   we were in the middle of something.  I forgot.

14                You mentioned that you had gotten an

15   anonymous phone call, you sent a trace on the phone

16   call, and it was from a pay phone on Thunderbird.

17   Thunderbird and what?

18          A.    I don't know if it's Thunderbird and --

19   it says it's an apartment.  I think it has an apartment

20   number on it, but it says very clearly it's a pay

21   phone.

22          Q.    Do you know where on Thunderbird it is?

23          A.    No, I have no clue.

24          Q.    When you say "it says," what are you

25   referring to?

1     A.     I pulled an Accurent (phonetic) report,

2  because the individual did not identify himself, and I

3  wanted to know who it was coming from.  I actually

4  didn't want to know, but I felt I should know.

5     Q.     And that, again, is another one of those

6  documents that was responsive to the subpoena that you

7  didn't produce, correct?

8     A.     No.  That happened two days ago.  It

9  happened this weekend.

10     Q.     Will you produce that paper?

11     A.     Of course.

12     Q.     And this anonymous phone caller said, "I

13  know where Ed is," or something like that?

14     A.     Yeah.  The anonymous phone caller said,

15  "Edward Magedson is located at (testimony was deleted)

16  and I saved the recording on my cell phone.  You can

17  have that.

18     Q.     You've just told us where you think that

19  Ed is living or where the caller told you Ed is living.

20  We have a court order that this is to be kept --

21     A.     That's fine.

22     Q.     -- to be kept attorneys' eyes only.

23            I'd ask that at least that certain things

24  would be -- I'd ask that this not be attorneys' eyes

25  only in the sense I would want to ask Ed if that is, in

146

1   fact, his address because I don't know.

2          MR. DANA:  I have no objection.

3          Q.    BY MS. SPETH:  Do you have any problem

4   with me asking Ed if it's his address?

5          A.    No.

6                Do you want a copy of the recording?

7          Q.    I do.

8          A.    No problem.

9          Q.    Other than that phone call, had you gotten

10  any other information that indicated what Ed's current

11  address is?

12         A.    No.

13         Q.    Have you been trying to determine what

14  Ed's current address is?

15         A.    No, not really.  Once the death threats

16  came out, I felt that there was at least some sort of a

17  chance that people would do him harm, so I don't really

18  feel -- that's information that no one needs to have.

19         Q.    The police report that you produced to

20  me -- let's mark this as an exhibit -- you produced to

21  me and Mr. Dana a police report; is that correct?

22         A.    Yes.

23         Q.    When did you receive this police report?

24  We are not marking it as an exhibit.

25                Let me make sure I make a good record.

147

1    It's a police report taken by the Mesa Police

2    Department regarding a threat against Ed Magedson.

3              Here we go, I think my question is

4    answered.  It says, "Released to John Brewington

5    5/14/07.

6         A.    Correct.

7         Q.    How did you get that?

8         A.    I went into the Mesa Police Department and

9    requested it.

10        Q.    And they gave you a copy?

11        A.    Yes.

12        Q.    Did they charge you for the copy?

13        A.    Yes.

14        Q.    You also had some conversations with the

15   Mesa Police, did you not?

16        A.    I did.

17        Q.    Tell me what you told the Mesa Police.

18        A.    That I had been asked to represent

19   Mr. Stanley with regards to finding out who authored

20   the death threat letters.

21        Q.    Who did you say this to?

22        A.    Detective Gamina, and that I asked him

23   some specific questions about the content of the

24   letters.  I asked him if he was aware of any derogatory

25   actions between Mr. Magedson and the Mesa Police

1    Department, and he indicated he was not; that he's only

2    been on the force for one year.

3              I asked him that because I wanted to make

4    sure that Mesa didn't sweep this under the rug.   I

5    wanted somebody to do an investigation.

6              I then forwarded the death threat letters

7    to the mayor's office and asked them to make sure that

8    this thing is investigated.

9              I asked the detective -- I think I asked

10   him, even though it's in the report, whether or not he

11   listened to tapes that had been supplied to him and if

12   those tapes had anything to do with death threats, and

13   he said no.  And he indicated to me that Mr. Magedson

14   was intent on making me a person of interest in regards

15   to either authoring or distributing these death

16   threats.

17        Q.    Did you author these death threats?

18        A.    Of course not.

19        Q.    Did you deliver them?

20        A.    Of course not.

21        Q.    Did you have any involvement in writing

22   them?

23        A.    Of course not.

24        Q.    Had you ever seen them before you got them

25   from, I believe, Sarah Fenske?

149

1       A.      I got them from a media source.  I never

2   saw them prior to that, and I expressed outrage to

3   everyone.

4       Q.      The media source, wasn't that Sarah

5   Fenske?

6       A.      I'm not answering that.

7       Q.      Why not?

8       A.      For the same reasons as everything else.

9       Q.      The judge already said it's attorneys'

10  eyes only.

11      A.      It was Sarah Fenske.

12      Q.      I knew that already.  I knew you got them

13  from Sarah Fenske.

14              So what did the police officer say to you?

15      A.      He said there was no way for him to ask --

16  let me step back.  He had indicated that, based upon

17  the information that they had, that there was really no

18  way for them to figure out who authored these death

19  threat letters.  He had indicated to me that

20  Mr. Magedson had referred the matter over to the FBI,

21  and he hadn't been contacted by the FBI at that point.

22      Q.      Did he tell you that he thought that --

23              (Interruption.)

24      Q.      Did he tell you that he thought that

25  Mr. Magedson authored the letters himself?

PALMER REPORTING SERVICES, INC.

150

1      A.      No.   I don't believe he indicated that at

2  all.

3      Q.      Did you have a conversation with the

4  detective -- any of the detectives at Mesa something

5  about a lie detector test?

6      A.      I've only had one conversation with a

7  detective, that was Gamina, and I don't know if I

8  expressed my willingness to do a lie detector, but I'm

9  certainly willing to do it.

10     Q.      My question is:  Did you discuss anything

11  with him about a lie detector test?

12     A.      I don't know.

13     Q.      Have you ever attempted to contact Dave

14  Bedore?

15     A.      Dave Bedore.  I have not made it -- I sent

16  an email to an individual -- yes, I have made attempts

17  to contact David Bedore.

18     Q.      What attempts have you made?

19     A.      I went to a couple of addresses that I

20  felt he may have been living at in the Chandler area,

21  and he wasn't there.  I sent an email to a gentleman by

22  the name of David Bedore, and that wasn't the correct

23  David Bedore, and that's it.

24     Q.      Did you ever contact anybody by the name

25  of Nicole Bedore?

1    A.    I think I might have.  I think I might

2  have left a message.

3    Q.    What did the phone message say?

4    A.    I don't know.

5    Q.    Is it possible that you said you were a

6  private investigator without saying what your name was?

7    A.    Unlikely.

8    Q.    But it's possible?

9    A.    It's possible there's other P.I.'s out

10  there doing weird stuff, but I certainly identify

11  myself.  I probably left a phone number for her.

12    Q.    Is it your testimony that you never have

13  spoken with David or Nicole Bedore?

14    A.    Yes.

15    Q.    Have you ever spoken with anybody in

16  Tupperlake about Ed Magedson?

17    A.    Jack Delahaney.

18    Q.    Anybody else?

19    A.    No.  I was running it through my head.

20  No.

21    Q.    Have you ever told anybody that you

22  interviewed that Ed Magedson is gay?

23    A.    Mr. Delahaney indicated to me that Ed

24  Magedson was gay.

25    Q.    My question is:  Did you tell anyone that?

1    A.    Yes.

2    Q.    Who did you tell?

3    A.    Oh, Mr. Stanley and Mr. Russo, several

4 other people.

5    Q.    What other people?

6    A.    Ron Jarvis.  I don't know.

7    Q.    How did you have occasion to speak with

8 Ron Jarvis?

9    A.    He called me at the request of Bill

10 Stanley.

11    Q.    Bill Stanley requested that Mr. Jarvis

12 call you?

13    A.    Yes.

14    Q.    And Mr. Jarvis did call you?

15    A.    Yes.

16    Q.    What did he tell you?

17    A.    Well, the crux of what I understood the

18 conversation to be is that Mr. Jarvis was being looked

19 at, I think -- it was very clear that Defamation Action

20 and Mr. Stanley was trying to shut down the Ripoff

21 Report, I think by Mr. Stanley's own admissions.  And

22 Mr. Jarvis was, perhaps, providing an alternate source

23 for hosting.

24         And Mr. Jarvis was told, I believe, by

25 Mr. Stanley that Mr. Magedson -- things he hasn't been

153

1    convicted of, and Mr. Stanley wanted me to confirm

2    those particular issues.

3              My statement to Mr. Jarvis is,

4    Mr. Magedson hasn't been convicted of anything; that he

5    should probably go to the federal records and decide

6    for himself exactly what's going on out there.

7              I expressed to him -- I think he mentioned

8    Steve Miller.  I expressed to him -- no, he had

9    indicated that you were a partner of Mr. Magedson.

10        Q.    Who did?

11        A.    Mr. Jarvis.

12        Q.    He said I was a partner of --

13        A.    He said Mr. Stanley had indicated that you

14   were a partner of Mr. Magedson.

15             My statement to him was, you know what, I

16   wish you wouldn't say that.  I don't know that it's

17   true.  And even if it were, she's his attorney, and she

18   has an absolute obligation to represent him.  I think I

19   expressed to him my dissatisfaction with the posting of

20   your personal information on the Internet.

21        Q.    Expressed that to Mr. Stanley or

22   Mr. Jarvis?

23        A.    Yes.  And Mr. Stanley, too.

24        Q.    How did Mr. Magedson's sexual preference

25   come up in your conversation with Mr. Jarvis?

PALMER REPORTING SERVICES, INC.

1          A.     You know, the question has arisen many

2     times on why people do what they do.  It's 2007, so

3     Mr. Magedson can choose to do whatever he likes.  But I

4     like to look at a profile of an individual as to try to

5     ascertain why they do what they do and who are they

6     connected to as a result of what they do.

7               So my conversation with Mr. Jarvis would

8     have been, you know, Mr. Magedson has been accused of

9     many things.  He's innocent until proven guilty.

10    Unfortunately, we aren't allowed that through the

11    Ripoff Report.  But Magedson has been accused of many

12    things.  He has allegedly this, and he has allegedly

13    that, and there's no proof.

14         Q.     So one of the many things you mentioned?

15         A.     Oh, yes.

16         Q.     Let's talk about your meeting with the

17    FBI.  Was that Travis Hatch?

18         A.     It was.

19         Q.     Have you spoken with anybody else at the

20    FBI about Mr. Magedson, Mr. Stanley, or the Ripoff

21    Report?

22         A.     I did not.

23         Q.     For how long did you meet with Mr. Hatch?

24         A.     Three or four hours.

25         Q.     What was your understanding as to why

155

1  Mr. Hatch was interviewing you?

2       A.    He didn't answer.  I walked away with some

3  assumptions, but they're only assumptions.

4       Q.    Did he indicate to you that he was

5  interviewing you as a result of the report made to the

6  FBI by Ed Magedson?

7       A.    No.  He made it clear to me that the --

8  are you talking about the death threats?

9       Q.    No.

10            Did Mr. Hatch tell you that he was

11  interviewing you in connection with a report that

12  Mr. Magedson had made to the FBI?

13       A.    No.

14       Q.    He did not tell you that?

15       A.    No.

16       Q.    You said you came away with an impression.

17  What impression did you come away with?

18       A.    He was keenly interested in Steve Miller.

19  He was keenly interested in who was identifying

20  themselves as law enforcement.  He's the one that

21  indicated that somebody had gone up there the day after

22  I had been in there and identified themselves as law

23  enforcement and didn't have credentials and made a

24  hasty exit.

25       Q.    I guess I'm confused why the FBI doesn't

156

```
1    tell you why they called you.
2              Did he call you first?
3         A.   No.  He shows up --
4         Q.   In a phone conversation --
5         A.   He didn't.
6         Q.   He said, "I'm Travis Hatch with the FBI,
7    and I want to meet with you"?
8         A.   Yes.
9         Q.   Did he say what it was regarding?
10        A.   I thought it was for the death threats
11   because the FBI is mentioned in the police complaint;
12   that's the only time I was aware the FBI was involved
13   in anything.
14        Q.   Before Mr. Hatch got to your place in
15   person, did you know or assume it had something to do
16   with Mr. Magedson or the Ripoff Report?
17        A.   I assumed.
18        Q.   He didn't even say it had anything to do
19   with the Ripoff Report?
20        A.   Yes.
21        Q.   So when he came to you in person, you knew
22   it was about the Ripoff Report because that's what he
23   was asking you about, the Ripoff Report and the death
24   threats?
25        A.   No.  He made it clear to me that the FBI
```

157

1    doesn't get involved in death threats on citizens,

2    that's a local police issue.  If it were officials,

3    then the BFI might get involved in it.

4            But I was very incredulous with him

5    saying, "You are telling me the FBI doesn't care about

6    death threats, and you are telling me they are not

7    investigating this."  And I think that it was very

8    clear to me that that's not what he was looking for.

9        Q.    Yet at the same time he didn't tell you

10   what he was looking for?

11       A.    Not at all.  The questioning he was asking

12   is in regards to me ever identifying myself as law

13   enforcement.  And, of course, I have not; that will

14   come out.  And that's when he told me somebody was up

15   there the next day doing that very thing.

16           Of course I found other people that were

17   doing that, as well, and turned that information over

18   to Travis Hatch.  But his questions were regarding

19   whether or not there was a relationship between Stanley

20   and Russo.  He asked me several times about Steve

21   Miller.  He asked me if I suspected Steve Miller.  My

22   response was, "Suspect him of what?  I don't know him.

23   I never talked to the man.  I don't know him."

24       Q.    Ultimately did you get the impression that

25   Mr. Hatch was investigating Stanley and Russo or -- I

1  realize he didn't tell you, but what was your

2  impression?

3       A.    I was under the impression that he was

4  trying to -- I got the impression he was investigating

5  Steve Miller.

6       Q.    Okay.  Fair enough.

7             Do you know who wrote the death threats?

8       A.    No.  I think I know, but I do not know.

9       Q.    And what do you think you know, or what is

10 your opinion on who wrote the death threats?

11      A.    I think Ed Magedson wrote the letters.

12      Q.    What do you base that opinion on?

13      A.    There are some anomalies that are in these

14 letters that I find very striking; information that --

15 heck, I've been out to the neighborhood, and I didn't

16 even know the information.  Of course I don't have a

17 need to know, but it's not that big of a deal.

18             But there's some things in here that

19 there's no way, in my opinion, that Steve Miller --

20 that Robert Russo, who lives in Maine, and Bill

21 Stanley, who lives in Austria, would have this

22 information.  I didn't have it.

23      Q.    Like what?

24      A.    Well, the grocery store and the bank.

25             Now, frankly later after these particular

1   death threats came out, I found a posting from Steve

2   Miller from checks from Bank of America that he put on

3   the Internet showing where, I guess, corporate advocacy

4   clients had paid him from a Bank of America account.

5   I don't find this information interesting, but I didn't

6   know it, and I'm the closest party here, so I thought.

7        Q.    What do you mean you're the closest party

8   here?

9        A.    Somebody delivered the letters.  If Russo

10  is in Maine and Stanley is in Austria and Miller is in

11  Florida, if these letters were hand-delivered, somebody

12  here had to hand-deliver the letters.

13            Now, having a keen interest in who that

14  would be, because I presume it's the same person that's

15  identified themself as law enforcement, I've been

16  digging around and provided that information to the

17  FBI, as well.  But there's just things in here --

18       Q.    Do you get the impression that Ed is a

19  paranoid person?

20       A.    Oh, yes.

21       Q.    Does it strike you as odd that Ed would

22  put in a letter that then would be distributed to other

23  people where he banks or where he shops?

24       A.    The FBI agent said to me that sometimes

25  people do things to make it look like others do it.

160

1          When I first received these letters, I

2    expressed outrage from Sarah when I got them and sent

3    them immediately to Stanley, "Did you do this?"  And

4    his reply was, "Of course not."

5          And, you know, as we started talking about

6    this, he made me aware of some things that I didn't

7    know, that there's a client list here.  I didn't know

8    that these were particular clients of Stanley, but

9    Mr. Stanley had produced for me -- he had indicated to

10   me that he had had a conversation with Mr. Magedson

11   about getting Mr. Magedson and your information,

12   negative information off the Internet through Complaint

13   Remover, which I found kind of unusual.

14         I remember talking to him saying, "These

15   clients that are on here, these aren't people that are

16   associated with you."  And he said, "Well, actually

17   they are associated with us."

18         And there had been a running dialogue

19   between Mr. Magedson and I guess Stanley -- I don't

20   know for sure -- about finding some sort of way to

21   either suppress the SEO stuff or removing it, which you

22   can see clearly from his death threats that's what

23   they're trying to do; that's the image they're trying

24   to project certainly.  Those guys would be fools to put

25   that in their letter, but, hey man, whatever.

161

1          They indicated that Mr. Magedson wanted

2    these particular clients turned over to him for the

3    corporate advocacy program, and he would pay them a 50

4    percent commission on everything that he received from

5    them through the corporate advocacy program.

6          Q.   Let's talk in specifics then.   On

7    exhibit -- it's not an exhibit yet.

8          (Discussion off the record.)

9          (Exhibit 5 was marked.)

10         Q.   Look at the second page first because we

11   were looking at -- look at the third page, and that is

12   the -- that's one of the death threat letters, and it

13   has a list -- the fourth paragraph lists some people

14   like Helen Goldnadel, IPA.

15         A.   Uh-huh.

16         Q.   Are those the people that you were talking

17   about that Stanley said were his clients?

18         A.   Yes.

19         Q.   Did he specifically say they were his

20   clients?

21         A.   No, I don't know that he specifically said

22   his clients or not since -- I was talking to him.   I

23   was asking him about this.   I don't know what the

24   context was, except you don't know who these people

25   are.   These aren't your clients.

162

 1    Q.    And he said, Actually, I do.  Actually,

 2 they are?

 3    A.    Yes.

 4    Q.    Let's look at the first page.  What was

 5 the purpose of you sending me this email?

 6    A.    What email?

 7    Q.    The first page of Exhibit 5.

 8    A.    Sorry.  I wanted you to know that I was

 9 representing Stanley.  But, more importantly, when I

10 called the sheriff's department -- I'm sorry, the Mesa

11 Police Department and asked them if a police report

12 existed, and they told me no.

13    Q.    So what was the purpose of you sending

14 this letter to me?

15    A.    I wanted you to provide me with a police

16 report.

17    Q.    If they told you a police report didn't

18 exist, how were they going to provide you with one?

19    A.    Your email to me said that you know that a

20 complaint had been filed.

21    Q.    This email on March 4th was your first

22 email to me.  I don't know what you are talking about,

23 my email to you.

24    A.    Your subsequent email.

25    Q.    I'm not talking about that.

1        As of March 4th, what made you think I had

2    a police report if the Mesa Police Department told you

3    it didn't exist?

4        A.    You're his counsel.   The email -- I stand

5    corrected.   Mr. Magedson had indicated that he had

6    gotten the federal and local authorities involved.

7        Q.    In what email?

8        A.    In the death threats he says he's under

9    attack and he's gotten the federal and local

10   authorities involved.

11       Q.    Mr. Magedson told you in the --

12       A.    In the email I received.

13            What I received from Sarah Fenske was the

14   email that Mr. Magedson had sent to her.   The death

15   threat letters were attachments.   The email indicated

16   that he had gotten the federal and the local law

17   enforcement involved in it; that implies to me there's

18   a report somewhere.

19       Q.    Did Sarah Fenske send you the email that

20   he sent to her?

21       A.    I think it was forwarded directly from

22   him, yes.

23       Q.    To you?

24       A.    Yes.

25       Q.    So you have that in your file somewhere?

164

1      A.     Yes.

2      Q.     Did that email seem to indicate to you

3  that it was intended to Sarah Fenske?  Was that your

4  understanding?

5      A.     I think her name was on it.

6      Q.     Other than in an email address?

7      A.     I believe it was just an email address.

8  Her name was on the email address, and the email was

9  speaking to media groups, in general.

10     Q.     It was your understanding this was an

11  email that was addressed to multiple media groups?

12     A.     Yes.

13     Q.     Where did you get that understanding?

14     A.     From Sarah Fenske.

15     Q.     She told you that.  She told you other

16  media got this?

17     A.     I asked her twice, "Was this sent to other

18  media groups?"  And she said -- I'll have to paraphrase

19  -- I'm certain of it.  She thinks it went out in the

20  bcc.  Where she got that information, I don't know.

21  The email was clearly speaking in terms of multiple

22  parties.  It wasn't addressing Sarah Fenske as a

23  person.  I don't know definitively that it did go to

24  multiple parties.

25     Q.     But you have the email, so we can wait and

1    look and see from the email.

2         A.    Yes.

3         Q.    We'll leave it at that.

4               And it was that email that said he had

5    gotten law enforcement involved?

6         A.    His email indicated that he's under a

7    terroristic attack, and they've involved the federal

8    and local law enforcement.

9         Q.    And, again, that was an email that he sent

10   to Sarah Fenske that she forwarded to you?

11        A.    Yes.

12        Q.    Do you know where Mr. Stanley lives?

13        A.    Austria.

14        Q.    How do you know?

15        A.    And that's a guess.

16              When I originally was made aware of his

17   presence -- I was made aware of his presence through

18   the Defamation Action League, and I think I went into

19   WhoIs and tried to establish that.

20              His claim is he was successfully taking

21   Ripoff Report down.  He was making claims that I had

22   not seen or witnessed myself, so I was very curious

23   about what it was that he was talking about.

24              When I pulled up the WhoIs report for the

25   Defamation Action League, I think I established that

1    address is Austria.  But other than that, he could live

2    anywhere.

3              Q.    What has he told you about where he lives?

4              A.    He says it's in Austria.  He has a

5    girlfriend, and she has children, and they vacation in

6    Italy or they vacation wherever.

7              Q.    Has he ever told you anything about his

8    background?

9              A.    You know, I received a picture from him

10   once, it was him holding an alligator, and it was

11   clearly -- I think I asked him if he lived in Louisiana

12   at one point, and he acknowledged that he did.  And he

13   had indicated that he was from Texas.  And I asked him

14   how it is that he knew so much about the Internet, how

15   did he get to this point in time, and his statement was

16   his father was involved in some kind of business, that

17   he watched him operate.  He didn't disclose what the

18   business was.

19             He didn't disclose what businesses he's

20   involved in or has been involved in.  And that's why

21   I'm a little bit speculative.  I think I did search on

22   the Internet to try to figure out who this guy is.  Is

23   it really Bill Stanley?  I don't know.  Could be

24   anybody.

25             Q.    Did he mention the name of his girlfriend?

1      A.    No.

2      Q.    Did he say how long it had been since he

3 was in Texas?

4      A.    No.

5      Q.    And did he say what his father's name was?

6      A.    No.

7      Q.    Did you ever do any background searches on

8 him that led you to Spam House --

9      A.    Yes, I saw his name come up in Spam House.

10      Q.    Did you ask him about that?

11      A.    I don't know that I specifically asked him

12 about that.  I think I asked him -- I think I knew from

13 that what he had been doing or had been accused of.  I

14 don't know that the guy has ever lied to me.  He

15 certainly isn't shy about the things that he does.

16      Q.    And you understood from Spam House that he

17 was listed as one of the top worst spammers of all

18 time, right?

19      A.    That's what they said, yes.

20      Q.    Did you understand what Bill Stanley's

21 position was on that, or no?

22      A.    No.

23      Q.    Did he ever mention to you any litigation

24 that he's been involved in?

25      A.    No.

1      Q.    Did he ever mention any disputes that he's

2  had with the government?

3      A.    Not specifically.

4      Q.    Did he tell you whether he had a criminal

5  background?

6      A.    No.

7      Q.    Did he ever tell you whether he had ever

8  served time in prison?

9      A.    No.

10      Q.    He didn't tell you either way?

11      A.    Huh-uh.

12      Q.    You know, I think I asked you if he ever

13  told you where he's living.

14            Did you ever find any indication of where

15  he's living, other than what Stanley has told you?

16      A.    No.

17      (Exhibit 6 was marked.)

18      Q.    Before I move on with Exhibit 6, let me

19  ask you a question that's not related to Exhibit 6.

20  Did Bill Stanley ever talk to you about his

21  relationship with Rob Russo?

22      A.    Yes.

23      Q.    What has he told you?

24      A.    He's told me that he is an affiliate of

25  essentially QED, if you will, Complaint Remover.   An

1    affiliate that provides clients to QED for SEO help.

2         Q.    I know that you've been in contact with

3    Rob Russo when you said you referred some business to

4    him.

5               Did you learn of Rob Russo through Stanley

6    or the other way around?

7         A.    I learned of Rob Russo from Robert

8    Paisola.

9         Q.    How did you learn of Stanley?

10        A.    I asked him who Rob Russo was.

11              When I first got the death threat letters,

12   I asked him, you know, "What the heck is going on here?

13   Did you do this?  Do you have anything to do with

14   this?"  He said, "No."

15              "If you want me to represent you, I want

16   to talk to some people.  Who do I need to talk to?"

17   He indicated Rob Russo.

18              At that point I kept hearing "Rob, Rob,

19   Rob" from Paisola and from Stanley, so I really wasn't

20   sure who he was until several weeks later.

21        Q.    I take it, then, at that point in time you

22   weren't doing business with Russo?

23        A.    Oh, no.

24        Q.    Back in March 2007, you did not have a

25   relationship with Russo yet?

1        A.      Correct.

2        Q.      But when you asked Stanley about the death

3   threat letters, he somehow told you to talk to Russo,

4   but not about the death threat letters, but about

5   Stanley --

6        A.      No, about the death threat letters.

7        Q.      Why did he want you to talk to Russo about

8   the death threat letters?

9        A.      I think I was quizzing him on who could

10  have possibly drafted, you know, these letters, who is

11  it that's involved in all of this that could have

12  drafted these letters.  And his only reply, if I

13  remember correctly, you know -- I'm not even sure how

14  he brought it up.  You can talk to Rob Russo or Rob

15  about it.  But that's when I called Russo actually to

16  interview him about this letter.

17       Q.      Was Stanley inferring that maybe Rob Russo

18  wrote the letters?

19       A.      No, not at all.

20       Q.      What was he saying that Russo might know

21  about?

22       A.      I don't know.  I wanted to know everyone

23  that he's involved with, who could have done this.

24  Clearly there's a business relationship between him and

25  Stanley.  They seemed to do the same things in terms of

1   SEO optimization.  The email points very clearly -- in

2   Mr. Magedson's email he claims Mr. Russo and

3   Mr. Stanley are one in the same.

4          Q.    What email?

5          A.    From Sarah Fenske that Ed Magedson

6   allegedly sent to her.

7                So I mean his name is in the email, that's

8   really where it would have come up, and I didn't

9   understand the connection at that time.

10         Q.    But did Stanley tell you they were

11  business partners?

12         A.    No.

13         Q.    Did Stanley tell you they had worked

14  together?

15         A.    I don't know if he did.

16               I came away understanding that Mr. Stanley

17  had an affiliate -- he had Complaint Remover, and he

18  did search engine optimization and clearly he worked

19  with Rob Russo in getting that done.

20         Q.    What, if anything, did Rob Russo tell you

21  about Bill Stanley?

22         A.    You know, the only conversation I remember

23  about Rob Russo talking about Bill Stanley was that he

24  wanted him -- because Mr. Russo and I were talking

25  about me taking on an affiliate, very recent.  And

```
 1    Mr. Russo indicated that he was unhappy with the idea

 2    that Bill Stanley was operating as a sole

 3    proprietorship and wanted him to become an LLC or

 4    corporation, the same requirements he wanted of me.

 5         Q.    Did he tell you anything else about Bill

 6    Stanley?

 7         A.    No.

 8         Q.    So then Russo did confirm to you that

 9    Stanley was one of his affiliates?

10         MR. DANA:   Objection to the form.

11         Q.    BY MS. SPETH:   Why would he care --

12         A.    I don't know.   I think maybe he did.

13         Q.    All right, now let's look at Exhibit 6.

14         A.    Prior to doing any business with Russo, I

15    looked in the Secretary of State's office to try to

16    establish if Mr. Russo had negative public information

17    out there.   The only thing I saw was that he was the

18    only member of QED Media, which was an LLC.   I didn't

19    see Stanley's name anywhere.

20         Q.    Look at Exhibit 6.   That's you posting

21    that?

22         A.    It is.

23         Q.    And you posted this on scam.com?

24         A.    Yes.

25         Q.    And your first opening statement said,
```

173

1    "Oliver I will answer that for Mr. Stanley."

2              Why were you speaking on behalf of

3    Mr. Stanley?

4         A.    Stanley, I don't agree with everything

5    that he does.  My intent is to get out there and find

6    out what's going on.

7              You had mentioned Mr. Magedson is a bit

8    paranoid, but the tail often wags the dog with him.  I

9    will often do things because I know he's going to

10   react, I know he is, and that reaction is going to give

11   me an indication of what's going on.

12             Stanley is not an investigator.  I want to

13   know what's going on.  So I'll go out there and post

14   red herrings, if you will, because I know some people

15   are going to respond to it.

16        Q.    Did Mr. Stanley ask you to write the post

17   that is Exhibit 6?

18        A.    Oh, no.

19        Q.    You say in the second paragraph,

20   "Mr. Russo who is not Mr. Stanley, in spite of the

21   claims in the email, lives thousands of miles away."

22             How do you know that, that he lives

23   thousands of miles away?

24        A.    Because the Web site, Defamation Action,

25   is listed to an address in Austria.

1    Q.    No, no.   This says Mr. Russo lives

2    thousands of miles away.

3    A.    He lives in Maine.

4    Q.    How do you know that?

5    A.    The Secretary of State in Maine has QED

6    listed as an LLC.

7    Q.    Does that mean Mr. Russo lives there?

8    A.    No.   The fact that he has a 207 area code

9    doesn't mean that either.

10   Q.    In fact, Mr. Stanley has a 207 area code?

11   A.    He does.

12   Q.    And yet you believe Mr. Stanley does not

13   live in Maine?

14   A.    I don't think I ever said that.   I think I

15   said I don't know who Mr. Stanley is.   He could live

16   anywhere.   I only said WhoIs said he is in Austria, and

17   he has said that, and that doesn't make it so.

18   Q.    You say, "I assure you the personal

19   information in the letter was not known to

20   Mr. Stanley."   This is the fourth paragraph.

21   Did Mr. Stanley ask you to say that?

22   A.    No.

23   Q.    How do you know that the personal

24   information in the letter was not known to Mr. Stanley?

25   A.    I asked him about the contents of this

entire letter.  I've asked him, "Did you know what

grocery store he went to?"  I mean I asked him about

everything in here.  I wanted to get clear in my mind,

did this guy do this?

Q.    And you are assuring whoever is reading

this posting that Mr. Stanley did not know this

information.  And you are telling me that your sole

basis for assuring everybody of that is that

Mr. Stanley told you he didn't know this information?

A.    And from my observations.  I mean -- let

me clarify that.  Yes, Mr. Stanley told me he didn't

know this information.  I can only take his word that's

the case.

Q.    Why would you take his word?

A.    Because the rest of it seems very logical

to me, too.  It seems unlikely, number one, even if he

lives in Maine, he's not going to drive down here and

hand-deliver a letter.  He wouldn't know about Fry's --

Q.    You are mixing up Stanley and Russo.

MR. DANA:  Objection to the form.

A.    I understand.  It doesn't matter if it's

Stanley or Russo, if they both live in Maine.

Obviously Austria is a bigger issue.

Somebody did it.  Perhaps an agent could

have done so.  But the information in the text in these

176

1    letters, it's just inconceivable to me they would have

2    known about Fry's over on Brown and Higley.   They

3    wouldn't have known about this.

4         Q.    It's inconceivable to you because you

5    believe Stanley lives far away, right?

6         A.    Yes.

7         Q.    It is possible -- you say you don't know

8    where Stanley lives?

9         A.    That's true.

10        Q.    It's possible that Stanley lives right

11   here in Mesa?

12        A.    That's true, logistically possible.

13        Q.    You say in this posting, "I have given

14   Mr. Stanley a preliminary report.   If he wishes to

15   share it with the world he may."

16              Was there a written preliminary report?

17        A.    Most of it was verbal, and I believe --

18   some may be in the email.   I wouldn't have deleted

19   that.   It's part of it.   Let me step back.

20              Most of our communications have been via

21   instant message, most of them.   So if nothing appears

22   on an email about that, it was either verbal or through

23   instant message.

24        Q.    Are you going to produce that email,

25   whatever preliminary support you gave to --

177

1          A.    Yes.  If it exists in the emails, I'll

2    give it to you.

3          Q.    You have to wait until I'm done.  I'm

4    sorry.

5                What is Stanley's screen name or user

6    name?

7          A.    In Yahoo?

8          Q.    For whatever instant messenger he uses.

9          A.    I think it's Defamation Action.

10         (Exhibit 7 was marked.)

11         Q.    Is this a page or two from your Web site

12    -- actually three?

13         A.    Yes, I believe it may be.

14         Q.    And JFB Acquisitions is your company,

15    correct?

16         A.    Yes.

17         Q.    One of the pages on your Web site is a

18    page that's called Defamation Action League.  Is that

19    correct?

20         A.    Yes.

21         Q.    And that's Stanley's association; is that

22    correct?

23         A.    Yes.

24         Q.    Why do you have a page on your Web site

25    called Defamation Action League?

1      A.    Because Mr. Stanley and Defamation Action

2  League did a pretty good job for me in terms of getting

3  Robert Paisola to remove a blog site he had out there.

4      Q.    In fact, he did that by illegal means, did

5  he not?

6      A.    I don't know.  I've given the information

7  to the FBI.

8      Q.    To Travis?

9      A.    Sure.

10         I think I've been pretty public about what

11  he claims he did.  I don't know if he did that or not.

12     Q.    In fact, there's a news story where he

13  claimed to you he was able to put a spider in and grab

14  email addresses --

15     A.    That information came from me.

16     Q.    Let me finish.

17         There's a news story where you reported to

18  the reporter that Stanley told you that he actually

19  sent spiders into somebody's computer to grab the email

20  addresses of their clients?

21     A.    Correct.

22     Q.    And do you understand that to be an

23  illegal thing to do, to hack into somebody's computer

24  and steal information?

25     A.    I don't know

179

1        Q.    You don't know if that's illegal or not?

2        A.    I'm not an attorney.  I'm not law

3 enforcement.

4        Q.    He did tell you he did that?

5        A.    Yes, he did say that.

6        THE WITNESS:  Why are you looking at me?

7        MS. ROGAL:  You are the only person to look at.

8        THE WITNESS:  It's pleasant.

9        Q.    BY MS. SPETH:  Let's look at the second

10 page of the Defamation Action League page of your Web

11 site.  And you say in that paragraph, "Some weeks ago

12 John I took my findings to The Phoenix New Times and

13 Sarah Fenske did a great job on a story that appeared

14 on the front page."

15        You are referring to yourself, you brought

16 the story to Sarah Fenske?

17        A.    Correct.

18        Q.    Did you know Sarah?

19        A.    No.

20        Q.    She was just a person you contacted at the

21 New Times?

22        A.    Yes.

23        Q.    And you said that within a half hour --

24 you say, "Suddenly out of the west rides Bill Stanley

25 of Defamation Action League.  Within a half hour

1    Mr. Stanley had the blog removed."

2              What blog were you talking about?

3         A.    Robert Paisola had hijacked my name,

4    johnbrewington.org, .net, and everything, and built a

5    Web site that suggested that I was a former private

6    investigator under investigation by the Secret Service,

7    all sorts of stuff.

8         Q.    And that is what Mr. Stanley had taken

9    down?

10        A.    Yes.

11        Q.    Did he actually have it taken down,

12   removed completely or removed from the search engines?

13        A.    Mr. Paisola removed it from -- I guess he

14   took it down from his domain.

15        Q.    And he did that as a result of

16   Mr. Stanley's actions?

17        A.    That's my impression.

18        (Exhibit 8 was marked.)

19        Q.    Is Exhibit 8 a page from your Web site?

20        A.    Yes.

21        Q.    Is that Bill Stanley's ad in the middle of

22   that page for complaintremover.com, or is that Rob

23   Russo's?

24        A.    I think it's Bill Stanley's.

25        Q.    How is it that Bill Stanley's ad ended up

181

1    on your Web site?

2         A.    I asked him for the banner to it so I can

3    refer people to him.

4         Q.    Why did you want to refer people to him?

5         A.    Because I find that there is an

6    irresponsible posting of information on the Internet,

7    some of it is true and some of it is not true.  And I

8    feel that those who have been improperly maligned

9    should have some sort of recourse about getting that

10   information in a less obvious position.

11        (Exhibit 9 was marked.)

12        Q.    Salt Lake City Weekly is apparently the

13   publication, correct?

14        A.    Yes.

15        Q.    And you've got to kind of go all the way

16   to page 6.  And on page 6 there's some references to an

17   interview with you --

18        A.    Uh-huh.

19        Q.    -- as a critic of Paisola's, correct?

20              It says, "But of all of Paisola's critics,

21   Brewington, who's on a self-appointed crusade to drag

22   him into the light, is by far" --

23        A.    May I look over your shoulder?

24        Q.    On the top.  It's bold.

25        A.    Yes.

1      Q.      And you talk a little bit --

2              Let me ask you this:  Read quickly to

3   yourself through this page and tell me if it's an

4   accurate description of what you told the journalist

5   who interviewed you about this.

6              (Pause in the proceedings.)

7      A.      Just the third paragraph alone is not an

8   accurate depiction.  The journalist interviewed

9   Mr. Stanley, so some of the information would have come

10  from him.  I never told him this dollar figure.  I

11  don't have a clue, for the most part, how they choose

12  to do anything.

13     Q.      So you really mean the fourth paragraph?

14     A.      Yes, the fourth paragraph.  That would

15  have been information probably that came from

16  Mr. Stanley himself.

17     Q.      So the part, "Based in Austria, Stanley

18  runs a site that promises to combat defamation on the

19  Web" --

20     A.      I think that came from Mr. Stanley

21  himself.

22     Q.      Right, because you wouldn't have known

23  what the fees were for the search optimizations that he

24  does.

25     A.      No.

183

1      Q.    How about the next paragraph, "Stanley

2   told Brewington he could persuade Paisola to remove the

3   blog in half an hour.  'While we were on the phone, he

4   sent spiders into Paisola's Web site,' Brewington said.

5   'He extracted addresses in there and sent to 400 email

6   contacts an email discussing the fact that Paisola was

7   a convicted child porn possessor'"

8      A.    That's what Mr. Stanley told me.

9      Q.    So that is an accurate quote from him?

10     A.    Yes.

11     MS. SPETH:  I am not done with this deposition,

12  but Mr. Dana has expressed that he needs to leave.  And

13  I realize this is an inconvenience to you, but I will

14  want to reconvene the deposition.

15          But if it makes you feel any better, it

16  would have been reconvened anyway because you didn't

17  produce documents in response to my subpoena.  And once

18  I got those documents, I would have had an opportunity

19  to ask you about them anyway.  So either way you were

20  going to be called back anyhow.

21          THE WITNESS:  Do you want them in a CD?

22          MS. SPETH:  I don't care how you produce them to

23  me.

24          And we can talk about dates and times for

25  the further deposition.  We don't need to do that on

PALMER REPORTING SERVICES, INC.

184

1    the record, but we'll call this Volume 1.

2              (Discussion off the record.)

3              (Adjourned at 6:10 p.m.)

4

5

6                    _____
                              JOHN F. BREWINGTON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

185

1    STATE OF ARIZONA      )
                           )   ss.
2    COUNTY OF MARICOPA    )

3              BE IT KNOWN that the foregoing deposition

4    was taken by me pursuant to stipulation of counsel;

5    that I was then and there a Certified Court Reporter in

6    the State of Arizona; that the witness before

7    testifying was duly sworn by me to testify to the whole

8    truth; that the questions propounded by counsel and the

9    answers of the witness thereto were taken down by me in

10   shorthand and thereafter transcribed; that the

11   foregoing pages are a full, true and accurate

12   transcript of all proceedings and testimony had and

13   adduced upon the taking of said deposition, all to the

14   best of my skill and ability.

15             I FURTHER CERTIFY that I am in no way

16   related to any of the parties hereto nor am I in any

17   way interested in the outcome hereof.

18             DATED at Phoenix, Arizona, this 28th day

19   of August, 2007.

20

21                         _____
                                  STACEY PALMER
22                         Certified Court Reporter

23

24

25

PALMER REPORTING SERVICES, INC.

**Exhibits**



EXHIBIT
*Brewington 1*
7-31-07

✎AO88 (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

DISTRICT OF _____ ARIZONA _____

XCENTRIC VENTURES, LLC

V.

WILLIAM "BILL" STANLEY, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  2:07-cv-00954-NVW

TO:   JOHN F. BREWINGTON, 14435 N. 7th Street, Suite 201,
Phoenix, AZ 85022

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☑   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A attached hereto.

| PLACE   Jaburg & Wilk, P.C., 3200 North Central Avenue, Suite 2000, Phoenix, Arizona, 85012 | DATE AND TIME   7/31/2007 2:00 pm |
|---|---|

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

  Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)   *Maria C. Speth*   Attorney for Plaintiff | DATE   7-11-07 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Maria Crilli Speth
3200 N. Central Ave. Suite 2000
Phoenix, AZ 85012        602-248-1000

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO 88  (Rev.  12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
    (1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
    (2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
    (B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, copying, testing, or sampling.  Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
    (3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
        (i) fails to allow reasonable time for compliance;
        (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
        (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
        (iv) subjects a person to undue burden.
    (B) If a subpoena
        (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
        (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
        (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
    (1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
    (B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
    (C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
    (D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost.  On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost.  If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C).  The court may specify conditions for the discovery.
    (2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
    (B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it.  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved.  A receiving party may promptly present the information to the court under seal for a determination of the claim.  If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it.  The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.  Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued.  An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

# EXHIBIT A

1.  All documents related to or regarding William Stanley, including but not
    limited to emails and other correspondence to or from Stanley, checks
    received from Stanley, and bank records reflecting wire transfers from or to
    Stanley.

2.  All documents related to or regarding Robert Russo, including but not
    limited to emails and other correspondence to or from Russo, checks
    received from Russo, and bank records reflecting wire transfers from or to
    Russo.

3.  All documents related to or regarding QED Media Group,
    defendmyname.com, defamationaction.com, Internet Defamation League,
    or Defamation Action League.

4.  All documents related to Ed Magedson.

5.  All documents related to Xcentric Ventures, LLC.



**JFB ACQUISITIONS**
World Wide Investigations

**John F Brewington**
Private Investigator

4939 W. Ray Rd
Ste. 4-115
Chandler, AZ 85226
(602) 490-0676
AZ PI License 1551859
jfb@jfbainc.com
http://www.jfbainc.com



Jaburg & Wilk, P.C.
3200 N Central Ave
Ste 2000
Phoenix, AZ 85012
ATT: Maria Crimi Speth

      Re: Subpoena 2:07-cv-00954-NVW

Counselor,

I have asked my attorney to address this subpoena and the impending deposition and he as asked permission to be excused from that duty because of his fear he will be maligned on your client's website or other public venue. Therefore I will go it alone, for the moment.

Your client and his associates have made very clear threats to malign and embarrass me with what is clearly disinformation. There are posts on the Rip Off Report that are meant to fulfill that promise. The pattern and practice of Mr. Magedson to discredit what he perceives to be his dissenters are well documented and it is clear that any personal information about me provided to you will be misused.

1.  You have been advised previously that that I represent Mr. Stanley as to the origination of death letters claimed to have been received by your client. As such under ARS 32-2455 I do not feel I am compelled to provide you what you ask for without court order. You would find the results disappointing. My information has been provided to the FBI and you might consider requesting that information through The Freedom of Information Act.

2.  I do not represent Mr. Russo but do have a business relationship that is unrelated to this case and your client. As such any communications would violate trade secrets and there is a likelihood that those secrets would be disseminated to the public by your client with intent to harm both parties.

3.  While the request is vague, I have never been in possession of documents regarding QED Media, defendendmyname.com, defamationaction.com, Internet Defamation League, or Defamation Action League. Their sites are readily available to the public and I am limited to the same information. I am not an

officer or member of these organizations and have no need to know what their business is.

4. This too is a vague question. I have no documents relating to Ed Magedson other than what can be retrieved via the internet. Original copies of certain items have been given to the FBI. You might request those items through The Freedom of Information Act. For security purposes I commonly do not take notes nor am I required to though do include hand written notes taken from interviews with neighbors to establish whether they received death threat letters targeting Mr. Magedson. I have given my verbal report to the FBI.

5. I do not have documents regarding Xcentric Ventures. All items are available via the internet and for security purposes it is ill advised for me to retain hard copies of anything.

Sincerely,

John F. Brewington PI
Managing Member
JFB Acquisitions, LLC

EXHIBIT

Brewington 3

7-31-07

**From:** Chris McFarland [mailto:rmcfarland@federatedfinancial.org]
**Sent:** Wednesday, March 22, 2006 11:52 AM
**To:** EDitor@ripoffreport.com
**Subject:** FW: you are "on notice" counselor, as per florida law.

ed here is your copy of what i sent to your lawyer.

"have a nice day".

**From:** Chris McFarland
**Sent:** Wednesday, March 22, 2006 1:49 PM
**To:** Maria Crimi Speth (mcs@jaburgwilk.com)
**Cc:** 'Chris Whitelock'; Steve Miller
**Subject:** you are "on notice" counselor, as per florida law.

ps. You know, I had decided not to write the Arizona Bar.  Why bother?  I know lawyers and judges take care of their own.  Well I guess I may as well get it all off my chest after all, eh? Maybe whomever reads my complaint will see what I've seen after all.

here is the deal, counselor.  this is removed from his website pronto, or I sue him this time, right here in federal court in florida.  to quote your inbred, miscreant client:  "No Joke". don't involve my wife, or her family, madam.  as you know, i view you as mr. magedson's co-

conspirator.  certainly, no less. i intend to sue you both on RICO theories right here in florida.
please be guided accordingly.

chris mcfarland

http://www.ripoffreport.com/reports/ripoff38900.htm

## Rebuttal Consumer Comment
Submitted: **3/1/2006 3:43:54 PM** Modified: **3/19/2006 12:00:26 AM**

# Sooner or later thugs come up against someone who has no fear and is ready to act as a Paladin with extreme prejudice.

**My personal experience is that force needs to be met with force. Is this the guy you are talking about?**

**Christopher R. McFarland**

**8069 SEVERN DR APT D**
**Boca Raton, FL 33433-8532**
**COUNTY: PALM BEACH**

**Wife**
**MCFARLAND, KIMBERLY A aka Kimberly Amey aka Kimberly Davies aka Kimberly Continenza**

**Seems to be a Buick man but has a 2004 Tahoe plate number XO7XBE VIN 1GBEC13271R**
**and 2005 PT Cruiser Touring edition I32HCR VIN 3C4F458BX5T**

**Is this the guy?**

**Sooner or later thugs come up against someone who has no fear and is ready to act as a Paladin with extreme prejudice.**

**You will hear no more from me on this subject.**

**John - Chandler, Arizona**
**U.S.A.**

7/31/2007

SARAH HENDERSON

PHIL REINHARDT

ADMIN

FLORENCE

ERIC SHOOT MAILBOX

MOTT TOWING

MATT MOTT

480-326-1343

BULLIT HOLES

MAILBOX       ERIC SKELLING

GOLD CANYON

O KING RANCH RD       MOUNTAIN BROOK

3RD LEFT

480-982-2341

800-3523794

**EXHIBIT**
Brewington 4
7-31-07

**From:**        John F. Brewington [jfb@jfbainc.com]
**Sent:**        Sunday, March 04, 2007 10:07 AM
**To:**          Maria Crimi Speth
**Subject:**     Ed Magedson

**Attachments:**    Magedson Death Threat.tif


Magedson Death
Threat.tif (153...

                Maria Crimi Speth Esq.
Jaburg & Wilk, P.C.
3200 N. Central Avenue
Suite 2000
Phoenix, AZ 85012

        RE: Edward Magedson

Mrs. Speth,

The attached letter has been received by William Stanley who today has asked for my
representation in terms of finding who has authored the disturbing contents.  I have
agreed to take the case.  Mr. Stanley has expressed two concerns.  First and foremost that
while the two parties have fundamental differences of opinion in business affairs, Mr.
Stanley does not condone physical violence to achieve any goal.  Second the letter has
been drafted to make it appear that Mr. Stanley or a contemporary or agent has authored
it.  Mr. Stanley has made it very clear to me that he did not nor does he know from whom
this originated.

As of yet I am unable to find a law enforcement agency that has received a report of this
threat on Mr. Magedson's life.  I was hoping with your cooperation that you could provide
me with a report so that I can assist in tracking down the perpetrator.  It would save me
a lot of time interviewing neighbors and associates that allegedly received the threat.

Should you have further question or comments please communicate them to me.

Thanking you in advance,




John F. Brewington
Private Investigator
AZPI 1551859
US (602) 490-0676
UK (011) 44-020-8123-8096

EXHIBIT
Brewington 5
7-31-07

Dear Mr ED Magedson.            Received on 2-5-07 Mesa Hom
                                     on 2-13-07 Pinal county Home & neighbors
You should have never called me a liar. This letter is being sent to hour
you in the name of more than 500 businesess. No matter where you go,
we will cause you a probem. Your life is in danger untill you comply
with our demands. This is your last warning.

Your neighbors already know about your criminal dealings and how
you are making many people loose their business. You will soon be
beaten to a pulp and pounced into the ground six feet under with a
baseball bat and sleg hammer. You will soon be sorry not just
from what I am capable of doing to you, but what other members will
do as soon as they know exactly where you are. Its just a matter of
time until I get to you.

Here is what you can do to save your life. But you must act
imidiatly. Make what ever deal it takes, you must comply.

You have the previous list of companies that you need to remove from
Rip-off Report. We know you hold the power. We know you have that
list.

You were provided an additional list several hours ago. It's too late
for anything that was discussed today. No more deal. No more playing
Mr Nice Guy. Now you must delete any of our members from your data
base who have reports listed on any serch engine.

IF not, BVA will drop you with in 24 hours. We will make thier life
misrable like we have with Prolexic and gigenet. They don't like you
either. We now know who your host is and the IP address to your
servers.

Those you do business with will be in danger and will be continusily
be harassed till they stop doing business with you. We are contacting
your advertisers.

We will continue to spam you making it imposable for you to read your
mail.

Use the list you recieved in the past. I am told you know about that
list and I know that you have gven a copy to the Mesa police.

You must add to the list, anyone that sent you an email in the last
year, asking you to remove the Reports on thier company.

You must remove reports on search engines from companies that already
had a lawsuit with you in the past and those presently. We do not
care if you prevailed in the case or they settled with you. You
must delete all those reports as well.
Once you have reomoved those reports we will leave those who host you
alone along with anyone else doing business with you. If not,
consider this your final warning.

Any theats from the past are not like theses threats. We will find
you kill your dog and remove parts of your body one by one util your
site is completely shut down. That is a threat you can take to your
bank of America.


O YEAH - I HAVE A MESSAGE FOR YOU: HAVE A GREAT DAY ED

Received 2-13-07 Pmal Home



We warned you ed magedson. Did you hear the gun shots last night? Because of you innocent people will die. Your tenants, family members and those that work with you. Think we're joking? I told you that your site will be down and it is. That is all we want and we will not hurt anyone.

If ripoff report moves again to new hosting facilities you will not like what we will do next. Your home will burn. Those around you will burn. Do not expect any help from the police.

As soon as you are up again ED. God help you. We will know exactly when you are up and where you are located. You will have 6 hours from that time to delete the the following listings on search engines.

Helene Goldnadel, IPA, Tax Club, Boyajian Law, Chad Everett, Prosper Learning, Energy Automation Systems, Jim Rivas, 4x Made Easy, Warrantee Activation headquarters along with any company suing you in Florida or has sued you in the past.

Once you have completed with our first list we demand you remove we will give you another list on Saturday and every Saturday from this day forward and you will have 6 hours to do the same from the time we give you that list on each and every Saturday. If the Links work after the 6 there will be a man hunt for you.

We know where you shop. We know where you bank. Greenfield and Broadway, Greenfield and Main. Are we getting closer ED? What about Basha's at Higley and Brown?

We know the police will not bother with you but if you do go to the police you will suffer the consequences along with everyone around you. You've met your match ed. There will be no hiding. You should have played ball when I offered you the chance. You have no idea who you are playing with.

03-06-2007, 01:51 AM

## JFBA 
Junior Member

Join Date:
Posts: 14

**Re: Ed Magedson Served Personally**

Oliver I will answer that for Mr. Stanley. If you look at the email sent from Mr. Magedson also att this post, he clearly has attached the letters. You will see from the hand written notes that these were allegedly hand delivered. Since Mr. Stanley does not reside in the continental US, making th delivery himself could be problematic and unlikely since he has taken it upon himself to discover write and deliver the letters.

Mr. Russo who is not Mr. Stanley, in spite of the claims in the email, lives thousands of miles awa is unlikely that he wrote and hand delivered the note.

The letter threatens to burn down Mr. Magedson house but also that of his neighbors. Perhaps we the opinion that those neighbors deserve to know about this threat if they don't already. The ema asserts that employees and contractors are in danger. They too deserve to know.

There has been no indication anywhere that Mr. Stanley has ever threatened Mr. Magedson with except in the letter. The letter was clearly crafted to appear that Mr. Stanley may have been the but I assure you, the personal information in the letter was not known to Mr. Stanley.

What do you think is another alternative? Who else could have authored and delivered this letter

I have assured Mr. Stanley that it is my practice to take criminal matters to law enforcement and not be an exception. He seems excited at the idea that the police will get involved. If he was the or knew who did, he has made a very bad judgment error.

Lots of inuendo and blatent statement errors have been made about Mr. Stanley and his busines know if those statement errors are purposeful or just sloppy work, but either way it can be harmf is why I think the two parties have a disagreement. Remember "Innocent until proven guilty".

I have given Mr. Stanley a preliminary report. If he wishes to share it with the world he may.

*Last edited by JFBA : 03-06-2007 at 02:18 AM.*



EXHIBIT
Brewington-6
7-31-07

| HOME PAGE | TERMS AND CONDITIONS | COMMUNITY SERVICE |
|---|---|---|

| DEFAMATION ACTION LEAGUE |
|---|

# *JFB ACQUISITIONS*

*PRIVATE INVESTIGATIONS*

## Defamation Action League



It has become an unfortunate tread in our society that cyber lynchings occur with some regularity. The freedom of speech has turned into a person's right to say anything about anyone. Doesn't seem to matter the facts do not support the claims. Several months ago I became disturbed at the trend and decided to investigate on my own what sites like RIPOFFREPORT are up to. Part of my investigation was to look at some of the associates knowing full well that exposing myself would result in their posting whatever they wanted about me. Lies become truth and truth become lies. It should be noted that there are no consumer complaints out there about me anywhere. Better Business Bureau, Attorneys General, Superior Court Etc.

Some weeks ago John I took my findings to The Phoenix New Times and Sarah Fenske did a great job on a story that appeared on the front page. Oddly enough a Blog was created about John Brewington and JFB Acquisitions with untruths and consistencies that suddenly showed up on The RIPOFFREPORT. It doesn't really address anything other than a claim that I have moved around a lot and that I have a relationship with Steve Miller, a Magedson antagonist. I don't know him and haven't been hired by him or anyone else yet the timing is wonderful. Suddenly out of the west rides Bill Stanley of Defamation Action League (defamationaction@yahoo.com). Within ½ hour Mr. Stanley had the Blog removed. Today I have discovered that somehow the RIPOFFREPORT website has been taken down. That's a 900lb gorilla.

It is unfortunate that this has occurred because there has to be social value for consumers to able to access a database that will allow them to make informed decisions about companies. The information in the RIPOFFREPORT has been tainted by the accusations of extortion in Federal court through the filings of RICO suits. It is alleged that Mr. Magedson's advocacy program has investigated a select few of the posts to champion their cause because he claims they are good people, good companies and he says so in the post that still have the negative information. What doesn't say is that he has been paid for the program. He does say that he has investigated each company. Very odd because when I looked into just 3 I find an unusual amount of Federal suits where these advocacy clients are defendants. How was this missed by Mr. Magedson's investigation? Was there an investigation?

This is very troubling. The public deserves to know what the truth is whether it is bad or good. It seems clear that the information on RIPOFFREPORT is tainted. What do we believe? Innocent until proven guilty means nothing. It seems everyone has to prove they are not guilty. I think it would be great fun for someone to build a website solely for the purpose of letting people that complained about the companies that Magedson now champions, complain again. Presumably the people that had grievances before would have them now and would want to vent them through unedited posts. These posts would then get search engine optimization tools to make the rankings high in Google and Yahoo. Right there with RIPOFFREPORT. Would that then negate the posts that Magedson posted? Would those that choose to pay him for the advocacy now decide not to especially in light of the fact his service is vulnerable to take down. Let's remember just 3 of the 30 I checked out have significant public record. Does the public deserve to know? Here's my personal experience. Bill Stanley of DEMAMATION ACTION LEAGUE did a good job for me. He did not cause me any harm. On the other hand I am listed on RIPOFFREPORT as a con-man in spite of the fact I have never taken a dime for these investigations and have no consumer complaints. I am curious how this will affect the suits in Federal court right now and any settlement negotiations that are going on. Cyber Lynchings and the Fear Merchants coming soon.

The first of a 3 part story is out. It is only by coincidence that the subjects of this investigation are self described "consumer advocates". It is unfortunate that there are some real victims that need attention brought to their issues but after these series of stories you will wonder who the real victims are. Sarah Fenske did a great job on the article for The Phoenix New Times.



Copyright 2007. JFB Acquisitions. All rights reserved.



GoDaddy.com is the world's #1 ICANN-accredited domain name registrar!

JFB ACQUISITIONS

WORLDWIDE INVESTIGATIONS OFFICES ACQUISITIONS JFB

## Associations



Traveling Sales Crews

Dedicated Memorial

Complaint Remover

**Exchange Links**
**Planning Wedding**
Offering a wide variety of articles and resources relating to weddings and wedding planning including software for windows. More than 20,000 software titles are available for free download.

**Download Freeware And Shareware Software At SofeDB.com**
Large archive of freeware, shareware, and trial software for windows. More than 20,000 software titles are available for free download.

**Clocks & Other Treasures**
Our clocks would grace any wall, desktop, or mantle. Our huge selection of discount priced clocks are articulately crafted and uniquely designed. Our decorative clocks include antique wall clocks, desktop clocks, kitchen clocks, wall clocks and more.

**International Private Investigators Search Engine Directory** - The web's largest Private Investigation Directory. More than 32,000 listings in over 160 countries. Free listings for Private Investigators, Protection Agents & Industry related Professionals.

**Resources - Link Exchange**

**#1 Free Link Exchange Directory On The Web - Link Market**
Have you ever tried to exchange links, swap links, or trade links? Was it hard? Use link market instead - It is easy to use, free and very smart. It will save you hours of work.

**Unique Picture Frames**
Our picture frames would make a lovely addition to your home decor. Our unique picture frames include classic and photo frames for wedding, school photos, baby, teen, and family. We have a wide selection of discount picture frames to choose from.

**Web Directory Links**
Human edited web directory with a large category structure for quality and friendly sites. Free, reciprocal and paid submission listings are offered. Webdirectorylinks is also search-engine friendly.

CHANDLER
CHAMBER OF COMMERCE
**MEMBER**

JFB Acquisitions, LLC
4939 W. Ray Rd
Ste. 4-115
Chandler, AZ 85226
(602)-490-0676
AZ DPS 1551959
jfb@jfbsinc.com



Web Hosting powered by Network Solutions®

EXHIBIT
Brewington - 8
7-31-07

EXHIBIT

Brewington 9
7-31-07





**news** • **arts & entertainment** • **classifieds** • **cinema listings** • **event listing**
**dining listings** • **best of utah** • **coupons** • **personals** • **savage love** • **CW Blog** •

## EDITORIAL

enter keywords here          search

Feature • May 24, 2007

# Conman.com

**If cybersquatter Robert Paisola is the future of the internet, then we're all in big trouble.**

*by Stephen Dark*

### "WELCOME TO THE WONDERFUL WORLD OF ROBERT PAISOLA."

The greeting was scrawled in red on a board in a conference room of a Salt Lake City office complex and storage unit site. Paisola, wearing an ever-ready smile, sat at a large round table, waiting.

Actually, the world of felon and alleged Internet cyberpirate Robert Paisola can be downright creepy. It seems the Internet—more so than



patriotism—has become the last refuge of scoundrels.



I promised the manager of the building where Paisola and I met not to reveal the property's name and address. She didn't want to be associated with 39-year-old Paisola in print, especially after learning he claimed it as one of his offices. Nor did a self-described friend of his at the complex, who held up his hands at the mention of Paisola and walked away. One of Paisola's relatives even begged via e-mail that his family not be brought into any story.

Paisola, however, wanted to talk—at least for our first and last interview. "I want front page," he chanted.

So, for two and a half hours, we battled over the truth about Paisola, founder and Chief Executive Officer of a mysterious Utah company, Western Capital Group.

While Western Capital Financial, Inc. is a state-registered corporation, whether or not the company actually has offices or employees beyond Paisola and the Lehi condo he rents from a relative is debatable at best. Paisola's court-documented criminal past, which includes convictions for insurance fraud, child pornography possession and false loan applications, is not.

Paisola considers the past behind him. "I simply draw a line and move forward," he said. "That's the way I am able to create what I create, the abundance in my life. I do so by being able to simply say, 'That was then, and I've paid my price to society for the things I have done.'"

But, if such abundance exists, critics argue, it may come in part from Paisola soliciting fees on the Internet from people being pursued by debt collectors. He professes to be an expert on debt collection on his Website MyCollector.com, but doesn't reveal that law enforcement agents shut down his first collection agency, and he went to jail for submitting a false loan application.

Which perfectly illustrates the true wonder of Paisola's world: It's built on an electronic version of the street-corner hustle, Three Card Monte. Apparently with plenty of time on his hands, Paisola endlessly shuffles and multiplies Web pages so you never know where the truth is hiding—or if it's present at all.

Take Robert Paisola's Western Capitol Foundation. Its Web page says it promotes "criminal offender reform." MSNBC even featured him as a prisoners' rights advocate in a news segment in February. Yet Paisola can't cite a single prison he's visited as an advocate or an ex-con he's helped.

His publicist says he "is quickly becoming one of America's eminent citizens, motivational speakers and success-training leaders." But he would not provide a couple of clients to testify to the virtues of his programs.

Add to all this relentless puffery his pressuring of companies large and small with innuendo-strewn blogs and Websites and the overwhelming impression is of a man hiding his past from prying eyes with endless digital sleights of hand—even as he claws at your wallet.

Consider this a cautionary tale: Robert Paisola would like nothing better than to pull you into one of many scams, burrow under your skin and stay there.

## BANNED TO JIFFY LUBE

Once I'd examined Paisola's rap sheet and his conservatively estimated 15 Websites, one fact became startlingly

clear: With so much personal information available on the Internet, it's inevitable that the Paisolas of this world—with just a few minutes of research—can lob grenades packed with misleading information and innuendo at whomever they choose with little or no consequence to themselves.

But, if that was the impression I'd gained from studying Paisola before our interview, he had a different message to sell me. He was inspiring others through motivational speaking to learn from his example of building a future after leaving prison.

"I want to be very clear up front: I stand 100 percent accountable for everything that has happened in my past," Paisola boomed upon my arrival. His criminal experiences "made me what I am today." They've shown, he says, he can create change by inspiring others with his example. "[I don't] just sit back and go … I'm a complete victim, I'll never be able to overcome this, I'm forever banned to [working at] *Jiffy Lube*."

Paisola's concern with an ex-convict's future being restricted to wiping dipsticks aside, I might have given him more of the benefit of the doubt about his supposed achievements, if, 10 minutes into the interview, he hadn't whipped out a document bearing my name, my wife's name, our old home phone number, my home address, and the previous countries I've lived in.

He said he'd been informed I was asking questions about him. Throwing that document in my face was his response. I told him how uncomfortable his blatant attempt at intimidation made me.

"Tell me how it feels," Paisola demanded. "Describe it."

He later deemed the personal invasion an object lesson in what it takes to be an investigative reporter in the era of the Internet and online information sources like LexisNexis. If journalism in the 1970s was about thorough editing, today, "Mrs. Jones who learns how to blog isn't going to have checks and balances," he said. "She's mad at the milkman because he's not delivering the milk. That's where we are going."

The Internet future Paisola posited, and indeed represents, is already a reality. Under Section 230 of the federal Communications Decency Act, the owner of a Website is not liable for what third parties write on it. So the Internet's a free-for-all, one never-ending bathroom stall wall where you can scrawl whatever you want about someone you don't like—and it will never go away.

But for Paisola, the Internet's not just about instantaneous publication, regardless of veracity. Like a contemporary version of James Thurber's eternal dreamer Walter Mitty—armed with a digital pen—Paisola has built a labyrinth of Websites and blogs detailing subsidiaries of his businesses and at least 10 supposed careers that speak volumes about his desire to reinvent himself.

The reinvention extends to his criminal past. When it comes to his child-porn-possession conviction, Paisola chooses to rewrite history, even as the consequences of that very crime pursue him into court.

The threat he poses, I discovered, is not only to livelihoods and reputations. He can also steal a person's innocence. Whether you're a teenage girl in a small Texas town being questioned by local police because, unknowingly, you have a registered sex offender from Utah called Robert Paisola on your list of MySpace friends, or a journalist who thought his professional neutrality was a shield that could not be breached, no one, it seems, is immune.

The only thing he said that I felt I didn't need to confirm during 150 minutes filled with obfuscation and evasion was, "I guarantee you one thing: When you leave here, you will never, ever, ever forget this interview as long as you live."

## LAWN-MOWER MAN

"Do you feel a presence when you're around me?" Paisola asked. "Do you feel a magnetism?"

What I felt was a hammering headache from being constantly shouted at as I tried to extract his story. But in order to understand Paisola's dark Wizard of Oz persona, you need to see the criminal roots from which it sprang.

Paisola was born in 1967, a date worth noting since he's been known on his MySpace pages to lop five years off his age. He was raised a Mormon in Newark, Ohio. His father was an elementary school principal; his mother, a real-estate agent. Money was important to Paisola, even at age 13. While his school friends were getting $5 allowances, the budding entrepreneur had his eye on $50 bills. So he set up Paisola's Lawn Care. "I cut neighbors' lawns for $5 and $10 apiece," Paisola recalled, who ranks one-time junk-bond king Michael Milken and business mogul Donald Trump as personal heroes.

He studied business administration, he says, at Brigham Young University. While he disagrees with a BYU records office administrator about how many years he was there—she said four, he said two—either way, both say he dropped out. With a group of friends, he set up a Provo company called Credit Control in 1990. "[We] said there's all these apartment complexes in town … [so we] specialized in collecting the rent of students that don't pay."

Times were so good for awhile that the firm's principals' Porsches lined the entry to Credit Control headquarters, Paisola boasted. But in February 1996, according to press reports at that time, Utah County Attorney's Office investigators shut the firm down. Paisola faced 22 state charges of theft by deception and one of racketeering, and one count of insurance fraud. He pleaded guilty to the fraud charge in August.

In January 1997, Paisola pleaded guilty to a federal charge of submitting a false loan application and was sentenced in June 1997 to 30 months in prison with 60 months supervised release. The state dropped its charges in exchange for the federal plea. He was ordered to pay more than $132,000 in restitution.

Paisola served his time at Lompoc Correctional Facility in California. While there, he also pleaded guilty in 1998 to the possession of three or more images of child porn found on his computer. His 18-month sentence ran concurrently with the time he was already serving.

Come May 1999, he was out of jail, on parole and back in Utah. The child porn conviction earned him a place on the Utah State Sex Offenders Registry. It lists his home address in Utah County and two Lexus vehicles. The Website also features Paisola's sex offender registry's ID photo.

He asked if I noticed anything unusual about the picture.

"You were smiling," I said. "Why on earth would you smile?"

"To be completely clear it's OK," he said. "If everybody lived in their past, Bill Clinton would probably have a difficult time being paid anything to speak to anybody."

## MR. INVESTIGATIVE

Despite the fate of Credit Control and a long list of small-claims court judgments, Paisola nevertheless returned to handling others' debts when he left jail, opening a collection agency called Western Capital. Three years later, he was back in court on charges of violating his parole by making two false loan applications.

At Paisola's sentencing hearing in July 2002, U.S. District Court Judge David Winder said, "This man didn't gain any understanding from his conviction on the prior crimes, and he gets out, and there is just page after page fraudulently dealing with other people here. … In order to keep him from committing crimes, he has got to be incarcerated."

Along with a 16-month sentence, Winder ordered 18 months of supervised release that included participation in mental-health treatment, no control over others' assets or funds and no access to computers. The Internet ban included "any Internet service provider, bulletin board system or other public or private computer network."

But according to material on his own Websites, Paisola was soon breaking parole by promoting Western Capital via the Internet.

Paisola said he recently quit retail debt collection to focus on "helping people." Through blogs and Websites, he began assailing companies—whether debt collectors, real-estate agents, or mortgage lenders—he claimed were abusing consumers. He launched so-called "investigations" using his credentials as a self-proclaimed senior journalist at "CNNlegal" and also as a member of the University of Missouri-based Investigative Reporters and Editors [IRE] organization. His critics argue that his promotion of ties to organizations like IRE add weight to his spurious claims of wrongdoing and inspire fear in those he pursues. Paisola evaded several requests to produce either printed or electronic articles he'd been paid for. He did, however, produce his IRE membership card.

I inquired with IRE president Brent Houston about Paisola's membership. Following a review of his credentials and a request for any additional material, Houston said Paisola's $60-per-year membership was terminated. "We rely a great deal on the integrity of people who apply to be journalists," Houston said.

Paisola continues to hold himself out as an IRE member, despite being told of the nonprofit's decision to revoke it. "As an accredited reporter with IRE, we provide raw stories to some of the nations leading publications," he insisted by e-mail. "Many of the stories we do are investigative in nature." Paisola explained that CNNlegal.com, for which he claimed to work as a senior journalist, is "a conduit for these raw stories."

Click on CNNlegal.com on Paisola's site and, until recently, you were taken to CNN's home page, giving the impression he worked for the 24-hour news network. "CNN is a trademark of Turner Communications and that is why the site goes to CNN.com," he said.

Asked for comment, CNN spokeswoman Megan Mahoney said, "We're looking into this matter further and will take action as we deem fit," she said.

By purchasing sound-alike domain names like CNNlegal.com, Paisola often leeches off the reputations of brand-name outfits to give himself gravitas. In a lengthy letter of complaint about Paisola to the Utah Attorney General's Office sent December 2006, a debt collector turned private investigator named John Brewington explained, "Mr. Paisola steals whatever appeals to him. He takes names like Trump, CNN, Sundance, IPO, Carnival Cruises and changes them to make his own. There is no mistaking his intent." That intent, Brewington said, is to get companies to pay him in exchange for the domain names. "If the owners of the material make their dissatisfaction known, Mr. Paisola posts their names on his Website in a suggestion that they did something wrong."

An AG spokesman said the office was not pursuing any action against Paisola at that time.

## ATTACK OF THE SPIDERS

Among Paisola-related sites listed on Google are several dedicated to attacking his character and claims. One is by a

feisty, 78-year-old debt-collection critic, Oklahoma-based Billie Bauer, who recently took to calling Paisola "the thief in chief." But of all Paisola's critics, Brewington, who's on a self-appointed crusade to drag him into the light, is by far the most ardent in his pursuit. Not that Paisola takes such attacks lightly.

One of the stories Paisola claims to have done through **CNNlegal.com is his expose of Brewington for** "[defaming] my family." Paisola claimed to have forced **Brewington to remove negative Websites he put up about him.**

Brewington said it was the other way around. He's been investigating Paisola from his home base of Phoenix for almost a year. Last November, Brewington said, Paisola put up a blog on his own site claiming the PI was a cyberterrorist under U.S. Secret Service investigation. Paisola also published Brewington's home address.

A Phoenix journalist told Brewington about a onetime spammer-turned-Internet-vigilante called William Stanley. Based in Austria, Stanley runs a site that promises to combat defamation on the Web. For fees ranging from $2,000 to $10,000 or more per month, Stanley's company uses optimization search engines to force down negative material to the second or third page of Google. Most searchers only encounter their clients' sanctioned copy.

Stanley told Brewington he could persuade Paisola to remove the blog in half an hour. "While we were on the phone, he sent [computer] spiders into Paisola's Website," Brewington said. "He extracted addresses in there and sent to 400 e-mail contacts an e-mail discussing the fact [Paisola] was a convicted child-porn [possessor]."

Paisola tried to negotiate with Brewington. "He was on my phone eight times that day. Finally I picked up. 'Take it down or get crushed,' I told him." The blog came down.

Along with his letter to the Utah AG, Brewington included a package of Western Capital Website material and two recent lawsuits for cybersquatting filed against Paisola. He claimed Paisola was "a danger to the worldwide community."

Brewington makes no bones about his mission to expose Paisola. "Paisola's a predator," he said. For Brewington, it's his duty to protect the weak. "I hate bullies," he said.

Even though Brewington severely doubted Paisola's abilities as an investigator, that doesn't reduce the threat Paisola poses on the Internet, he said.

"Isn't he committing murder as well, [by] assassinating a business, a character?" he said.

## DIGITAL DRIVE-BYS

One business reputation Paisola's attacked is that of Scottsdale, Ariz.-based mortgage lender, William Spain, who owns a company called Provident Partners.

"[Paisola's second] ex-wife worked for us," Spain said. "We terminated her for not doing her job. As soon as we did, he started hassling us."

Paisola said he became involved with Spain because "a close friend"—his ex-wife's current partner, another onetime Spain employee—was owed $2,000. Spain denied this.

The "hassling" took the form of a Website entitled "Provident Partners—the facts." (Paisola put up a similar site

promising the "facts" about *Salt Lake City Weekly* in late April and also bought the domain names SLWeekly.net, SLWeekly.org and SLWeekly.info. At press time, these domains redirected browsers to *City Weekly*'s official site, SLWeekly.com, but were still under Paisola's control.)

"He's trying to be a disturbance in the business," Spain said. "He intimidates, interferes in daily business practices, prints all kinds of things that are not true."

All Paisola could come up with on his Website regarding Spain's alleged wrongdoings was to catch Spain lying about having legal representation. Spain said he'd become so exasperated by the constant harassment, he'd told Paisola to speak to a lawyer whom a Provident employee had recommended, without actually having hired him.

Finally, Spain decided the best remedy was to simply ignore Paisola. Any client inquiring about the Website was issued a statement, Spain said, that it was from a "disgruntled ex-employee's boyfriend, a felon, not a nice guy."

Spain employs 45 people. But Paisola's ambitions are not limited to needling small businesses. A lawsuit filed against Paisola in Utah by American Express spin-off Ameriprise Financial for alleged cyberpiracy and another by Illinois-based small business consultant International Profits Associations [IPA], claiming Paisola made "extortionist demands for 'hush money'" provide ample evidence of his willingness to take on sizeable corporate opponents.

Paisola agreed: "I have no problem taking on some of the biggest corporations in the world,"

Ameriprise, in a September 2006 complaint filed in U.S. district court of Utah, alleged Paisola had registered AmeripriseUniversity.com, which he'd linked to an Ameriprise-owned Webpage. He then tried to sell Ameriprise the domain name for "at least $3,000." When Ameriprise counsel asked Paisola why the company should purchase the infringing domain name, he said, according to court documents, "that he is 'narcissistic,' and is only concerned that 'the check clears.'"

In January 2007, Ameriprise obtained a default judgment against Paisola in U.S. District Court for $10,000, plus attorneys' fees of $17,000. Asked for comment, all Paisola would say is "bring it on."

IPA's management, through a spokesman, said they enjoy "an amicable relationship with Robert Paisola." This seems odd, given the torture he put the company through, including, according to court documents, "a campaign of false, misleading and defamatory Internet postings ... and not-so-veiled threats against IPA's officers and employees." Paisola's alleged demands for payment started at $56,000 but wound up at $10 million and climbing.

"Whereas Paisola recently conducted himself with a feigned appearance of legitimate, business-like professionalism," IPA's counsel wrote in court filings, "within the past week, his behavior has become irrational, profane and bizarre in his own ranting Website posts ..."

IPA and Paisola came to an agreement that involved the issuing of a permanent injunction prohibiting him from "posting, publishing or disseminating any information, statements, recordings or images ... purporting to be, either expressly or implicitly, about IPA." He also had to transfer ownership of any and all domain names related to IPA, including IpaOpinion.com and IpaRipoff.com

Phoenix investigator Brewington questions the effectiveness of legal tools combating Internet bullying. In his letter to the Utah attorney general, Brewington wrote, "Mr. Paisola has no assets and hundreds of thousands in judgments. Why should I spend $20,000 in an attempt to get him to take my information off his Website when there will be another [victim] to replace me in minutes?"

## SYMPATHY FOR THE DEVIL?

"Is it essential to bring up the sex-offender issue and the historical relevance of that as to where I'm at now, past the 2-year mark [of leaving jail], moving forward, bringing change to the world?" Paisola asked.

"It's part of your story," I said.

"But do you get I'm not this creepy little guy, it's not like that?"

"Yes," I said.

I'm not sure why I said "yes." Having spent more than two hours with him, there had been moments, such as his constant mimicking of my body posture, that were oddly amusing in his less-than-subtle attempts to manipulate me.

But for all his attempts at denial or dismissal, for the harping on how his past has made him great, at the disturbing heart of Robert Paisola's story arguably lies a series of horrific images involving children and his incessant efforts to squirm out of the moral sanction his ownership of them imposed on the rest of his life.

"Whenever I think of child porn, I think of a child being sexually molested," Paisola said. "I have never seen anything, and you can talk to any investigator, anything that represented that in any of my cases. Nothing. Not one iota, not one picture that would be considered sexually deviant."

In our interview, Paisola claimed the porn found on his computer in 1996 were images from a nudist group, included among 50,000 pictures a friend gave him on a software program.

Federal court documents reveal, however, that U.S. Customs investigators found images not only of naked prepubescent girls but also of children engaged in explicit sexual acts. Employees of his Internet service provider discovered the porn after learning Paisola had far exceeded his contractual space limits. They told investigators Paisola tried to delete the images. Court documents also show he acknowledged "he was aware that the photographs were there."

All this seems to contradict a statement made in a press release Paisola's publicist e-mailed me that his "unsecured computer" contained "images which were not viewed, used, passed along nor satisfied any concept of personal sexual fulfillment or deviation."

I asked via e-mail if it's appropriate for a man on the brink of 40, with a conviction for a child-sex offense, to have among his 47 "friends" on two MySpace pages—which states "I will tell no lies ..."—nearly two dozen women in their early 20s in various states of undress.

"I have hundreds of friends and supporters and the belief that age is an issue with adult [sic] is uncanny," he wrote back. "The sex-offense conviction was 10 years ago [almost eight years ago, according to court documents] and I have proven that is not who I am."

But for a then-17-year-old girl who graduated in 2006 from Crandall High School in Texas, discovering last summer that the child-porn conviction of a man who was one of her MySpace "friends" was a whole eight years ago could hardly have seemed comforting.

A rural community southeast of Dallas, population 3,000, Crandall is a close-knit town, said the student's high school

coach, Brian Barnett.

Last summer, Phoenix investigator Brewington called Barnett to inform the school of a model student whom Paisola had listed as a MySpace friend. The school investigated Brewington's claim, Barnett said, then called in the girl's father and local police. Shortly after, the girl went with her parents to the police station.

"It was really creepy to go to that guy's MySpace page, see his picture there, then go to the State of Utah sex offender list, read what he was accused and convicted of," Barnett said. "It's almost surreal it could be happening here."

MySpace closed down Paisola's page, Brewington said. But by the end of April 2007, he had two MySpace pages under the name of Moneytrainer. One featured a 17-year-old Utah girl listed among his 'friends.' Although MySpace did not respond to a call for comment, the pages were recently deleted.

## A POWERFUL GUY

However much Paisola downplays his porn conviction, it still follows him around. A Lehi detective arrested Paisola last September after finding discrepancies on his Utah Sex Offender Registry listing. At the end of a mid-April preliminary hearing, 4th District Court Judge Samuel McVey found probable cause against Paisola for two counts of failing to register. His arraignment is set for June 25.

In an e-mail, Paisola explained his arrest was based on the misspelling of his home address on the sex-offender site and his failure to register the second Lexus he'd purchased. What Paisola neglected to mention was that for more than a year, his home address on the state Website was the same as Western Capital's principal offices—a UPS store mailbox in Draper.

At the end of our interview, Paisola called up his Website. He had announced our interview and the forthcoming story. Alongside my name, he'd put my home address. Trembling with rage at yet another attempt at bullying me with my own information, I asked him between clenched teeth to take it off.

"Would you like me to take it off?" he cooed, smiling up at me with his empty eyes. "You know that it is my honor to take it off."

On his lips, the word *honor* seemed obscene. I ached to hit him. Instead, I held out my hand. He stared at it for a moment, then stood up, took it and held my elbow with his other hand. "I'm honored to meet your request, to do that for you," he said.

"You shouldn't have put it there in the first place," I said, jerking my hand out of his grip.

"I didn't know who you were, my friend."

No one, he seemed to be saying, had the right to ask questions about Paisola, and certainly should not expect to walk away from such efforts unscathed. What he wanted me to understand, I realized, was the power he had to cyberstalk me before I'd written one word about him.

"Power?" he said with a half-smile. "I'm a tender, loving, caring, powerful guy. Yes, I am."

He was right about one thing, I thought, as I stepped out of his makeshift lair into the sunlight. This was an interview I wouldn't soon forget.

*Salt Lake City Weekly* and *slweekly.com* ©1996-2007 Copperfield Publishing, Inc.. All rights reser
editorial internship program • invitation to freelance writers • media kit • sponsorship applicati
offices: 248 S. Main Street • Salt Lake City, Utah 84101 • 801-575-7003

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| XCENTRIC VENTURES, L.L.C., an )<br>Arizona corporation, d/b/a )<br>"RIPOFFREPORT.COM, ED MAGEDSON, an )<br>individual, )<br> )<br>     Plaintiffs, )<br>vs. )<br> )<br>WILLIAM "BILL" STANLEY an )<br>individual; et al., )<br> )<br>     Defendants. )<br>------------------------------- )<br>ROBERT RUSSO, an individual; et )<br>al., )<br>     Counterclaimants, )<br>vs. )<br>ED MAGEDSON, an individual, )<br>     Counterdefendant )<br> )  | No. 2:07-cv-<br>    00954-NVW |

DEPOSITION OF JOHN BREWINGTON

Phoenix, Arizona
October 15, 2007

VOLUME 2

Prepared For:  Michael Kent Dana          COPY
      Reported by:   Mark Miller, RMR, No. 50474

**PALMER** ■ ■ ■ ■ ■ ■ ■ *REPORTING SERVICES, INC.*

*2108 E. Evans Drive*
*Phoenix, AZ 85022*
*(602) 867-DEPO*

<u>I N D E X</u>

WITNESS                                                          PAGE

JOHN BREWINGTON

    Examination by Ms. Speth                            190, 382
    Examination by Mr. Dana                                  380

<u>INDEX TO EXHIBITS</u>

| No. | Description | Page |
| --- | --- | --- |
| 10 | CNET blog that Declan McCullagh posted on | 239 |
| 11 | document using the words Worldwide Investigation Services AZ PI License 1551859 | 244 |
| 12 | e-mails | 254 |
| 13 | e-mails | 260 |
| 14 | printout from witness Web site | 280 |
| 15 | Defamation Action League | 283 |
| 16 | Bank of America deposit slip | 326 |
| 17 | Transaction Details | 328 |
| 18 | excerpts from witness production | 330 |
| 19 | document entitled QED Media Group, LLC | 369 |
| 20 | document listing Squarespace.com | 376 |
| 21 | letter dated 3-4- from Brewington to Speth | 379 |
| 22 | press release | 380 |

```
1                    DEPOSITION OF JOHN BREWINGTON,

2    was taken on October 15, 2007, commencing at 10:00 a.m.,

3    at the law offices of Jaburg & Wilk, P.C., 3200 North

4    Central Avenue, Suite 2000, Phoenix, Arizona, before MARK

5    MILLER, Certified Reporter No. 50474 for the State of

6    Arizona.

7

8    APPEARANCES:

9

10   For the Plaintiffs:

11        JABURG & WILK, P.C.

12        By:  Ms. Maria Crimi Speth

13        3200 North Central Avenue, Suite 2000

14        Phoenix, Arizona  85012

15

16   For the Defendants Russo, QED Media Group, LLC and

17   Internet Defamation League:

18        SNELL & WILMER

19        By:  Mr. Michael Kent Dana

20        400 East Van Buren

21        Phoenix, Arizona  85004

22

23        Also present:  Mr. Ed Magedson

24

25
```

```
1                      STATEMENT OF REPORTER

2

3            I am Mark Miller, RMR, Certified Reporter

4   No. 50474, before whom the deposition of JOHN BREWINGTON

5   shall be conducted.  My business address is 2108 East

6   Evans Drive, Phoenix, Arizona.  The date, time, and

7   location of the deposition are:  October 15, 2007, 10:00

8   a.m., 3200 North Central Avenue, Suite 2000, Phoenix,

9   Arizona.  I administered the oath to the deponent.  The

10  following persons are present:  Ms. Maria Crimi Speth; Mr.

11  Michael Kent Dana; Mr. Ed Magedson.

12            I make this statement pursuant to

13  Rule 30(b)(4), Arizona Rules of Civil Procedure, which, as

14  amended, became effective on December 1, 2003.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    JOHN BREWINGTON,

 2   called as a witness herein, having been first duly sworn

 3   by the Certified Reporter to speak the truth and nothing

 4   but the truth, was examined and testified as follows:

 5

 6                      EXAMINATION

 7

 8       Q.    BY MS. SPETH:  Mr. Brewington, this is a

 9   continuation of the deposition that we began on July 31st,

10   2007.  I will do my best to not duplicate anything we did

11   before.  If I go over something again, it is only because

12   I forgot.  I will do my best to move forward and not

13   recover stuff, unless I need to clarify something from

14   before specifically?

15       A.    Okay.

16       Q.    Since the last time that your deposition was

17   taken on July 31st, 2007, have there been any additional

18   persons that you have contacted or had contact or

19   communication with regarding Ed Magedson?

20       A.    Yes.

21       Q.    Can you tell me who they are?

22       A.    I think I was contacted by Raul Manchanda and his

23   counsel and briefly -- you know, I don't know I have

24   spoken to Bill Stanley since that period of time or not.

25   Yes, I have, as a matter of fact.
```

1      Q.    Okay.

2      A.    And Rob Russo.

3      Q.    Anyone else you have talked to about Mr. Magedson

4   since July 31st, 2007?

5      A.    I was interviewed by the Canadian Broadcasting

6   Company, but I don't know if it was about Mr. Magedson.

7   It was about search engine optimization.

8      Q.    Anyone else that you can recall having a

9   conversation with?

10      A.    Not offhand.

11      Q.    Let's go back then to Raul Manchanda and his

12   counsel.

13            Do you remember the name of his counsel?

14      A.    There was Bill Kerr.  I think he has been

15   replaced by someone else.  Both of them have had dialog

16   with me.

17      Q.    And you don't remember the name of the other

18   person?

19      A.    I don't.

20      Q.    Have you actually spoken with Mr. Manchanda or

21   only his attorneys?

22      A.    Both.

23      Q.    Okay.  First of all, who initiated the

24   conversation?

25      A.    Well, Computer Nerds, I think, referred them to

1  me.

2        Q.    Okay.

3        A.    So I believe I received a phone call, but perhaps

4  I contacted them as a result of Computer Nerds.   I don't

5  remember for sure which one it was.

6        Q.    Since the last deposition you have had

7  conversations with Sean Richardson from --

8        A.    Yes.

9        Q.    It is important you wait until I finish my

10 question before you begin your answer so the court

11 reporter can take down both of us.

12       A.    Okay.

13       Q.    As best as you can remember, you got a call from

14 Computer Nerds saying that you should hook up in some way

15 with Mr. Manchanda?

16       A.    Yes.

17       Q.    What exactly -- and Computer Nerds is Sean

18 Richardson?

19       A.    Yes.

20       Q.    What did Mr. Richardson say about Raul Manchanda?

21       A.    He was annoyed at the fact he was listed on the

22 Rip-off Report.

23       Q.    Why did Sean think it was a good idea for you to

24 contact him, if he said?

25       A.    I don't know what his agenda is.

1     Q.    None of us do.

2           When was the last time -- withdrawn.

3           I take it this is not the first time you had

4     conversation with Sean Richardson?

5     A.    It is not.

6     Q.    We will talk about that in a little bit.

7           Mr. Richardson mentioned Mr. Manchanda.

8     Then do you think you called Mr. Manchanda?

9     A.    It is possible.

10    Q.    Okay.  And tell me everything you can recall

11    about your conversation with Raul Manchanda.

12    A.    I think we had a -- a conversation.  He was

13    certainly animated over his posts on the Rip-off Report.

14    Q.    Okay.

15    A.    He postured himself as being a patriot and that

16    the sort of behavior was very disturbing to him and that

17    he pointed out to me -- he knew the name, actually, of the

18    FBI agent, Travis Hatch.

19    Q.    Okay.

20    A.    That is not a name I have ever given anybody

21    except in this deposition.

22           I asked him how it was he came up with this

23    information.  He wouldn't tell me.  It was certainly

24    confusing to me.  I asked him on several occasions where

25    did he get that name.

1    Q.    Okay.

2    A.    And he asked me about David Bedore because he

3    pulled the statutory documents from the Arizona Corporate

4    Commission.

5    Q.    Okay.

6    A.    I think we in general had discussions about some

7    of the cases that were in federal courts.

8    Q.    How many conversations did you have with Mr.

9    Manchanda?

10   A.    One.

11   Q.    How long did that conversation last?

12   A.    45 minutes, maybe.

13   Q.    During that conversation did Mr. Manchanda

14   indicate whether he had had any conversations with Ed

15   Magedson?

16   A.    I don't know if he did or not.

17   Q.    Did he indicate whether he had had any

18   conversations with any attorney for Ed Magedson?

19   A.    I don't know if he did or not.

20   Q.    What did he tell you about who he was and his

21   position?

22   A.    Professionally?

23   Q.    Yes.

24   A.    He was an attorney in New York.

25   Q.    Did he tell you anything about any political ties

1    he might have?

2        A.    No.

3        Q.    Did you --

4        A.    Let me retrack that.

5              A part of my dialog, when he mentioned

6    Travis Hatch, he had also mentioned to me that he had a

7    brother-in-law with the United States Attorney's Office.

8        Q.    Did he say who that brother-in-law was?

9        A.    No.

10       Q.    Was there any discussion between you and Mr.

11   Manchanda about Mr. Manchanda in any way attempting to

12   communicate with Mr. Manchanda or his attorney?

13       A.    I don't know, I don't know if we had that dialog

14   or not.

15       Q.    Then you said you also had a conversation with a

16   Bill Kerr.

17       A.    Yes.

18       Q.    That is an attorney for Mr. Manchanda?

19       A.    Yes.

20       Q.    What precipitated that conversation?

21       A.    It was a conference call.  All of them were on

22   the phone at the same time.

23       Q.    This 45-minute call was with three people, with

24   Mr. Kerr, Mr. Manchanda -- actually four, including

25   yourself?

```
 1      A.   Yes, but I think Mr. Manchanda also had one of

 2  his assistants on there, whose name I don't recall.

 3      Q.   Was it a scheduled conference call?

 4      A.   No.

 5      Q.   Mr. Richardson told you to call him, you called

 6  him, and suddenly there were four people on the phone?

 7      A.   Yes.

 8      Q.   Were they in the same office?

 9      A.   No.  I think Bill Kerr was -- I don't know where

10  he was at, but the area codes would indicate one is in

11  Manhattan, perhaps, and the other in Long Island or in a

12  different burrow, but I can only presume they were in

13  those different locales.

14      Q.   Okay.

15      A.   I don't know if they were sitting together or

16  not.

17      Q.   So you conferenced them in?

18      A.   They did.

19      Q.   Who did?

20      A.   One or the other.  I don't know who did the

21  conferencing.  I certainly didn't.

22      Q.   So you called Mr. Manchanda and then he

23  conferenced some else?

24      A.   Yes.

25      Q.   Then he conferenced in another person?
```

1      A.    I presume.

2      Q.    What do you mean you presume?

3      A.    I don't know how he conducted it.  I don't know

4   if they were all in the same room.  I presume his attorney

5   was in another burrow.

6      Q.    The reason you presume that is because of the

7   area code.

8            How would you know what area code he was

9   calling from?

10     A.    They gave me their phone numbers.

11     Q.    During the conversation?

12     A.    Yes.

13     Q.    Did you call them again after that?

14     A.    Never spoken to Raul Manchanda.  I might have

15   spoken to Bill Kerr.  I have spoken to the other attorney,

16   and again I can't remember his name.  Apparently they've

17   substituted in someone else.  I don't know who that is.

18     Q.    Do you have any notes of this conversation?

19     A.    No.

20     Q.    Were there any documents that were exchanged

21   between yourself and Mr. Manchanda or his agents or his

22   attorneys?

23     A.    Yes.

24     Q.    E-mails?

25     A.    Yes, an e-mail.

1    Q.    Just one e-mail?

2    A.    I think, but it could have been more.

3    Q.    Any other documents exchanged?

4    A.    No.

5    Q.    Did you provide him with any background or

6  information about Mr. Magedson in writing?

7    A.    In the e-mail, yes.

8    Q.    Did the e-mail have attachments?

9    A.    Yes.

10    Q.    So this is an e-mail that you sent to Mr.

11  Manchanda?

12    A.    No, to his attorney.

13    Q.    What did you tell Mr. Manchanda about

14  Mr. Magedson?

15    A.    I provided him with an 11-page document that had

16  been produced by a private investigator in New York, and

17  that private investigation included an audio disk that was

18  an interview with the assistant district attorney, Jack

19  Delahaney.  And we discussed the contents of those

20  documents that I had received after your request for

21  subpoena --

22    Q.    Okay.

23    A.    -- and the contents of that audiotape.

24    Q.    Who was the private investigator in New York?

25    A.    Steve Brebre.

1     Q.     Spell that for me.

2     A.     I will try, but I don't know that I am going to

3  get it right.   I think it is B-r-e-b-r-e, I think.

4     Q.     Okay.

5     A.     I am slaughtering it I am sure.

6     Q.     What is your understanding about Mr. Brebre's

7  connection to Mr. Magedson?

8     A.     I don't know that he has a connection with him.

9     Q.     Do you know why he produced an 11-page document

10  about Mr. Magedson?

11     A.     I asked him to do an investigation.

12     Q.     You hired him?

13     A.     I don't know about hired him.   That was my

14  intent.   He certainly hasn't sent me a bill, and I tried

15  to communicate that to him.

16     Q.     You tried to communicate what to him?

17     A.     To follow up with me.   I had some questions about

18  the documents he produced and some of the things that he

19  said when he was up there in Tupper Lake.   They were

20  concerning to me.

21     Q.     He has not sent you a bill?

22     A.     He has not.

23     Q.     How did you find this gentleman?

24     A.     I belong to several forums, several professional

25  groups.   I had put out an inquiry, which is common for

1    forums if you need a subcontractor.  And I needed a

2    subcontractor in Tupper Lake and Mr. Brebre responded.

3         Q.    And as a result of the work that he did for you,

4    he provided some sort of report?

5         A.    Yes.

6         Q.    And you provided that report to Mr. Manchanda or

7    his attorney?

8         A.    Yes.

9         Q.    Who else did you provide that report to?

10        A.    FBI.

11        Q.    To Travis?

12        A.    Yes.

13        Q.    Who else did you provide that report to?

14        A.    I think I might have sent it to Mike.

15        Q.    Mike Dana?

16        A.    Yes.

17        Q.    The attorney for Mr. Russo?

18        A.    Yes.

19        Q.    You didn't send me a copy, did you?

20        A.    I didn't.

21        Q.    Anybody else you provided that report to?

22        A.    No.

23        Q.    Have you posted it on the Internet anywhere?

24        A.    No.

25        Q.    What was the contents of that report?

1      A.    Lots of different things, but some of the

2  paperwork included judgments that hadn't been paid,

3  allegedly hadn't been paid by Mr. Magedson when he left

4  Tupper Lake.  There was an e-mail from a person that

5  wanted to make the recipients of the e-mail believe they

6  were Chinese.  It was going to Alcion, one of the

7  plaintiffs, I should say, that sued in St. Kitts.  The

8  e-mail essentially was threatening the plaintiffs that if

9  they didn't give Mr. Magedson $10,000 and the defendants

10  $10,000, that terrible things were going to happen to

11  them.

12      Q.    Who is the e-mail from?

13      A.    It was from a Chinese person.  The name is -- I

14  don't have a clue.  No idea.

15            But again this was supplied to me by --

16  essentially given by Jack Delahaney because Alcion sent it

17  to him.  Alcion was asking Mr. Delahaney had he ever

18  received any e-mails similar to this.

19      Q.    Okay.

20      A.    Basically the contents of the e-mail was

21  threatening the plaintiffs if they didn't pay monies to

22  both Mr. Magedson -- $10,000 for his legal fees and

23  $10,000 to the defendants, that terrible things were going

24  to happen.

25      Q.    Okay.

1      A.     They mentioned the Hebrew term, which was the

2  Hebrew term -- I don't remember, but the English

3  equivalent is the Mossad Special Forces.

4      Q.     Okay.

5      A.     I found it odd.

6             But the other contents were some

7  transactions, I suppose, looks like financial transactions

8  in terms of real estate transactions.  The audiotape of

9  Mr. Delahaney included conversations where he asserts Mr.

10 Magedson was committing welfare fraud.  He asserts Mr.

11 Magedson was arrested for improper contact with minors.

12     Q.     Okay.

13     A.     He expressed his discomfort with Mr. Magedson's

14 contact with minors.  He discussed Mr. Magedson's

15 purchasing of hotels or apartment complexes in the area.

16     Q.     Okay.

17     A.     Apparently he and the city fathers had some

18 disputes over HUD lines, and they agreed to disagree.  And

19 according to Mr. Delahaney, if I remember this correctly,

20 he had indicated that -- I think basically ran them out of

21 town because of some of the disturbing things they

22 perceived were going on.

23     Q.     Mr. Delahaney said in this audiotape that he ran

24 Mr. Magedson out of town?

25     A.     I think he said he was ran out of town.  He

1   didn't say he did it.  I believe he said he was ran out of

2   town.

3       Q.    What was your understanding of who was on this

4   audiotape?  Mr. Delahaney, was somebody interviewing him?

5       A.    Steve Brebre was interviewing him.

6       Q.    This was the audiotape of Mr. Brebre's interview

7   with Mr. Delahaney?

8       A.    Yes.

9       Q.    And what information did you provide to Mr.

10  Brebre for him to get the foundation that he needed to do

11  his investigation?

12      A.    Indicated to him that there were federal lawsuits

13  in place, there were some connections in Tupper Lake and I

14  wanted to know what the relationship of those connections

15  were.

16      Q.    Did you provide him anything in writing, Mr.

17  Brebre?

18      A.    No.

19      Q.    You just verbally gave him instruction?

20      A.    Yes.

21      Q.    How did he know to contact Mr. Delahaney?

22      A.    I don't know.  That might have been something I

23  gave him, but I don't know that I did.

24      Q.    You told me since the last time your deposition

25  was taken in July you had at least one conversation with

1    Bill Stanley.

2              Do you know if it was one conversation or

3    more?

4         A.   I want to say one, but it could have been two.   I

5    would doubt it was more than that.

6         Q.   And what is your understanding as to where

7    Mr. Stanley is currently?

8         A.   I have no understanding if he is out of Austria.

9    I don't know where he is at.   I would presume Austria.

10        Q.   Why do you presume Austria?   -

11        A.   That is where his domains are registered and that

12   is where he's told me he's at.

13        Q.   He didn't tell you that recently, did he?

14        A.   No.   I haven't had a dialogue with him about his

15   whereabouts.

16        Q.   So the last two conversations you had with him he

17   didn't indicate where he was?

18        A.   No.

19        Q.   Did you call him or did he call you?

20        A.   You are saying conversations.   They were instant

21   messages through his Yahoo.

22        Q.   So have you had any verbal conversations with

23   Mr. Stanley since the last deposition?

24        A.   I don't think so.   Haven't talked to him in a

25   couple months.

1     Q.    I take it you don't keep any sort of copy of

2   those instant messages?

3     A.    No.

4     Q.    Tell me what you remember about the contents.

5     A.    I had expressed my frustration with him, I had

6   expressed my consternation over some postings he put on

7   the Internet and had suggested he remove those and had

8   suggested he remove the Web sites he had built for Jaburg

9   & Wilk.

10    Q.    What did he say?

11    A.    I think he indicated he would remove or would be

12  amenable to removing the other postings that were about

13  Mr. Magedson.  I think he was pretty firm he wasn't going

14  to take down the Web site for Jaburg & Wilk.  He didn't

15  give an explanation as to why, he just seemed firm he

16  wasn't going to do it.

17    Q.    In the instant messages between yourself and

18  Mr. Stanley, was there any discussion of the fact that

19  there was a court order ordering him to take down Web

20  sites?

21    A.    I don't know if he mentioned it or not.

22  Certainly I think I was probably aware of it, but my

23  desire for him to take them down is purely -- it is

24  desultory to what it is that he would portray him.  If he

25  doesn't want defamation, he shouldn't defame.

1      Q.    Did you and Mr. Stanley have any conversations

2  about his relationship with Mr. Russo since July?

3      A.    No.

4      Q.    Have you and Mr. Stanley ever had any

5  conversations about his relationship with Mr. Russo?

6      A.    Yes.  He said they had never met.

7      Q.    Okay.

8      A.    He had indicated that his relationship was that

9  he was an affiliate for search engine optimization.  I

10 asked him, I guess, on a couple of occasions if they were

11 partners, because it didn't come up.  And I don't know

12 that I ever received an affirmative or negative answer

13 from him.  Certainly Russo has denied it, but I don't know

14 that Stanley has.

15     Q.    All right.  You also said you have spoken to

16 Mr. Russo since the July 31st, 2007 deposition that you

17 took in this case.

18     A.    Yes.

19     Q.    Have those been verbal communications or in

20 writing?

21     A.    Verbal.

22     Q.    How many about Mr. Magedson?  Let's start there.

23     A.    Vicariously it is all about Mr. Magedson.

24     Q.    Let's --

25     A.    I would venture to say two.

1    Q.    So two total conversations?

2    A.    Perhaps.

3    Q.    You called him or did he call you?

4    A.    I believe I called him.

5    Q.    Did you call him after the deposition to let him

6    know how it went?

7    A.    I called him on the deposition to tell him that

8    there was -- I didn't feel inclined to discuss what took

9    place in there because there was an order from the judge

10   to protect the witnesses, I suppose.

11   Q.    Okay.

12   A.    And so I was pretty clear to as many people as I

13   could that I wasn't going to discuss what took place in

14   there.

15   Q.    Have you ever had a conversation with Mr. Russo

16   about his relationship with Mr. Stanley?

17   A.    Yes.

18   Q.    On how many occasions?

19   A.    Several.  I probed on several occasions.

20   Q.    And how has he described the relationship with

21   Mr. Stanley?

22   A.    Frustrating.  He has voiced great consternation

23   over the fact that Bill Stanley has positioned himself to

24   be immune, perhaps, from prosecution or civil litigation

25   by virtue of his residency outside the United States and

1  that Mr. Russo is here in the United States taking the

2  full brunt of the lawsuits.

3       Q.   Okay.

4       A.   He has expressed frustration that he cannot get

5  Bill Stanley to behave outside of the behavior that he has

6  already exhibited.

7       Q.   Okay.

8       A.   He has expressed that Bill Stanley's relationship

9  with him is only that of an affiliate.

10      Q.   Has he explained to you why he doesn't cut

11  Mr. Stanley off as an affiliate?

12      A.   No.  He went further to say he has mandated that

13  any of his affiliates have to incorporate.  I don't know

14  the reason why he would insist on something like that.  I

15  don't know.

16      Q.   All right.  Within the last several months,

17  Mr. Russo has indicated to you that Mr. Stanley still is

18  in Austria?

19      A.   Well, I don't know Russo has ever indicated that

20  to me.

21      Q.   Well, when you said he expressed great concern or

22  frustration over the fact that Mr. Stanley says he is

23  immune because of his residency, were any of those

24  conversations recently?

25      A.   No.

1     Q.    Has Mr. Russo told you recently that Mr. Stanley

2  is in Texas?

3     A.    No.

4     Q.    Have you had any knowledge from anywhere that

5  Mr. Stanley is in Texas?

6     A.    I know that is where he is from, but I don't know

7  that he resides there.  My belief is he resides in

8  Austria.  That is what he tells me consistently.

9     Q.    You haven't done any investigation of your own

10  about whether he is actually in Texas?

11     A.    No.

12     Q.    I asked you earlier what conversations you have

13  had since July 31st about Mr. Magedson and you mentioned

14  the Canadian Broadcasting what?

15     A.    Canadian Broadcasting Company.

16     Q.    Company.

17           Was that a verbal conversation or was that

18  an e-mail?

19     A.    A verbal.

20     Q.    Did you call them or did they call you?

21     A.    They called me.

22     Q.    What reporter did you speak to?

23     A.    I don't remember.

24     Q.    A woman or a man?

25     A.    A man.

1       Q.      I take it they were doing some sort of story?

2       A.      Yes, but not about Magedson.   They were doing a

3    story about Search Engine Optimization.

4       Q.      Did Mr. Magedson's name come up?

5       A.      Yes.

6       Q.      In what context?

7       A.      Before interviewing me they went on the Internet

8    and pulled up information about me that had been posted on

9    the Rip-off Report, and they concluded there seemed to be

10   great energy between the two parties, myself and

11   Mr. Magedson.

12      Q.      They told you that?

13      A.      Yes.

14      Q.      What did you say about that?

15      A.      I said yes, there certainly is great energy.   My

16   focus on it was that the search engine optimization as a

17   whole or the science of it has become disturbing to me and

18   that in terms of the Rip-off Report or in terms of me,

19   that I had every reason to believe that the reports that

20   were on there was as a result of Mr. Magedson posting by

21   proxy through another party.

22      Q.      Okay.

23      A.      I think that is what we discussed.

24      Q.      I guess if they were talking about search engine

25   optimization, do you know why it is they were contacting

1    you about Mr. Magedson?

2        A.    People get referred to me as a result of those

3    posts that are on the Rip-off Report and other places.    I

4    will get called by people.

5        Q.    I understand, but I am trying to figure out how

6    in this conversation they tied in the search engine

7    optimization with the conversation about Mr. Magedson, or

8    did you bring up Mr. Magedson?

9        A.    They brought it up.

10       Q.    How did they tie that into what the story was

11   about?

12       A.    I don't know.

13       Q.    What did you tell them about Mr. Magedson?

14       A.    I don't know specifically what we discussed about

15   him.

16            They were very clear it wasn't a topic of

17   conversation for them, they were only interested in the

18   search engine optimization.

19       Q.    Did you tell them that Mr. Magedson has

20   indictments against him by the FBI?

21       A.    I don't think he does, so of course not.

22       Q.    Did you tell them that Mr. Magedson is gay?

23       A.    No.

24       Q.    Did you tell them Mr. Magedson has a $10 million

25   judgment against him?

1      A.    No.

2      Q.    Do you know if they ran some sort of written

3  story or if they did some sort of show?

4      A.    I don't believe anything has come out.

5      Q.    Okay.  Let's talk about -- I will come back to

6  that.

7            Have you ever spoken with anyone who is

8  related to Ed Magedson, like family member?

9      A.    No.

10     Q.    Have you ever tried to contact anyone that is

11 related to Ed Magedson?

12     A.    A family member?

13     Q.    Yes.

14     A.    No.

15     Q.    Do you know who his family members are?

16     A.    I know Gary Magedson is a brother.

17     Q.    And you have never tried to contact Gary

18 Magedson?

19     A.    No.

20     Q.    How do you know that Gary Magedson is a brother?

21     A.    He is listed on the statutory documents in the

22 trust.

23     Q.    Why didn't you try to contact him?

24     A.    I don't feel that he is a party to anything that

25 is going on.

```
 1        Q.    Do you recall having a conversation with a

 2   gentleman named Dixon Woodard?

 3        A.    Yes.

 4        Q.    What do you recall about that conversation?

 5        A.    There has been a couple.

 6                    Want to go back to the beginning?

 7        Q.    Sure.  How many times have you spoken with him?

 8        A.    I want to guess three.

 9        Q.    And --

10        A.    Maybe four.

11        Q.    The first time you ever spoke with him, did you

12   call him or did he call you?

13        A.    He called me.

14        Q.    Did he say why he was calling?

15        A.    Yes.

16        Q.    What did he say?

17        A.    His first question was, was my name James

18   Willingham, did I go by that name?  I said no.

19        Q.    Okay.

20        A.    Asked if I knew who it was.  I said no.  This was

21   January, a pretty important time.  That is when I got my

22   first post on the Rip-off Report.

23        Q.    Okay.

24        A.    I asked him why was he inquiring about something

25   like that.  He had indicated there was a gentleman up in
```

1   Texas who was masquerading as me and that he was doing

2   depositions of people that he didn't have the authority to

3   do.

4      Q.   Okay.

5      A.   My conversation with him was that if there was

6   someone up there masquerading as me or someone pretending

7   to be a private investigator, he needed to report that to

8   the state that regulates private investigators and

9   security guards.

10     Q.   Okay.

11     A.   At that same time -- I will stick with the Dixon

12   Woodard conversation.

13     Q.   Did you and Mr. Dixon in that first conversation

14   talk about Ed Magedson?

15     A.   No.

16     Q.   At some point in time did you later contact

17   Mr. Dixon?

18     A.   Yes.

19     Q.   Was the next time you and him spoke, was it at

20   your initiation?

21     A.   Yes.

22     Q.   Why did you call him?

23     A.   I had read an article from the Dallas Morning

24   News, I think, that had mentioned Dixon Woodard with

25   regards to the GW Equity suit.

1     Q.   Okay.

2     A.   It was an interesting article.  I started

3 thinking that, "I wonder if Mr. Woodard was the one that

4 had posted the information on the Rip-off Report about

5 me," because it made no sense.

6     Q.   Okay.

7     A.   There were a lot of things that didn't make any

8 sense.  Someone had indicated I was masquerading as law

9 enforcement or FBI or something.

10    Q.   Okay.

11    A.   I had sent that information to the Fort Worth

12 Police Department suggesting they get involved in an

13 investigation on that.

14    Q.   Okay.

15    A.   I wasn't sure of what Mr. Woodard's connection

16 with everything was.

17            When I had my second dialog with him, I was

18 essentially trying to establish if he was the one that was

19 making the postings about me on there.

20    Q.   Did you --

21    A.   I --

22    Q.   Sorry.

23    A.   Go ahead.

24    Q.   Did you record that conversation?

25    A.   No.

1    Q.    Do you know if Mr. Woodard did?

2    A.    I presume he did.

3    Q.    All right.  Was there another conversation with

4    Mr. Woodard?

5    A.    Yes.

6    Q.    Was that at your initiation or his?

7    A.    I don't know.  He has called me several times.

8    Q.    You guys have had numerous conversations?

9    A.    I think three or four.

10   Q.    I will not ask you to try to keep them straight,

11   which topics were covered in which conversation.  I will

12   basically lump them together.

13   A.    Okay.

14   Q.    During those conversations did you ever tell

15   Dixon Woodard that you had a million dollar insurance

16   policy?

17   A.    I think I might have.

18   Q.    Why did you tell him that?

19   A.    He was certainly alluding to the idea that

20   perhaps I was going to get sued or I was committing torts,

21   or whatever, so I certainly was expressing to him if I

22   violated the law, then the authorities need to investigate

23   me, if I have committed some torts, then certainly I need

24   to answer in court for those.

25   Q.    Did you tell Mr. Woodard that you would leave Ed

1   Magedson alone or stop investigating him or harassing him

2   if he removed the reports about you from Rip-off Report?

3        A.    I have never used the word harassment.  It is

4   your word.

5        Q.    Okay.

6        A.    Yes, we had that particular dialog.

7        Q.    Tell me how you remember it.

8        A.    Well, Mr. Woodard seemed keenly interested in

9   making the whole thing go away.

10       Q.    Okay.

11       A.    I have never approached anyone about getting --

12   about complaining about the Rip-off Report or having an

13   Embassary represent me in any way to get those removed.

14       Q.    Okay.

15       A.    He for some reason wanted to be the intermediary

16   between the two parties.  He certainly in my opinion is

17   prone to hyperbole in terms of being your bodyguard and

18   chauffeur when you go to Dallas and him being an

19   undercover operative for the Attorney General's Office and

20   former FBI agent and having a Doctor of Jurisprudence.

21       Q.    You are saying he told you all these things?

22       A.    Yes.

23       Q.    You think he lied to you about things?

24       A.    I would try to give people the benefit of the

25   doubt, but I have an instinct about humans that they are

1    probably prevaricating, and I suspect that he was in many

2    of these instances.

3         Q.   Did you tell Dixon Woodard that you contacted him

4    because you saw his name on scams.com?

5         A.   I saw the Dallas Morning News report on

6    scams.com.

7         Q.   Did you ask him about his relationship with Ed

8    Magedson?

9         A.   Yes.

10        Q.   Did you tell him that you contacted Tray Cox or

11   John Cox the Third?

12        A.   Yes.

13        Q.   Did you in fact have a conversation with Tray

14   Cox?

15        A.   Yes, a very brief one.

16        Q.   How did that conversation go?

17        A.   I was asking Mr. Cox about the veracity of Mr.

18   Woodard's commentary, and Mr. Cox confirmed my suspicions

19   he is probably not to be believed.

20        Q.   You think Mr. Cox -- withdrawn.

21             Is that the only thing you spoke with Mr.

22   Cox about was Mr. Dixon Woodard's veracity?

23        A.   I think we discussed the idea that David Bedore

24   was a statutory agent in the Arizona Corporate

25   Commission's Web site and I asked him if he was involved

1   in the lawsuit.  I don't know if I received an affirmative

2   response from him or not.

3        Q.   You informed him that David Bedore was a stat

4   agent.  You said we discussed it.

5                  Is that something you told him?

6        A.   Probably.

7        Q.   You were inquiring of him why he wasn't --

8   whether he had named Mr. Bedore as a defendant in the

9   case?

10       A.   Yes.

11       Q.   Were you suggesting he should have?

12       A.   I don't think that I have the legal expertise to

13  suggest to a state counsel how they run their case.

14       Q.   You do that, don't you?  Don't you call counsel

15  who are adverse to Mr. Magedson and give them advice,

16  hints, ideas on what they can do in their case?

17       A.   What I do is I call them and provide them with

18  information that has been pulled out of the investigation.

19  They communicate with each other, certainly.

20       Q.   And the information that you provide them is

21  information you think they should know in order to

22  effectively litigate against Mr. Magedson?

23       A.   Yes.

24       Q.   Why do you feel that is a role you need to take?

25       A.   I don't think the truth has been told and I think

1  the truth needs to be told.

2      Q.   Did you tell Mr. Woodard that you had worked with

3  almost every Attorney General in the United States?

4      A.   I worked with several.  I don't know that I told

5  him every one, but several.

6      Q.   You told him that you had worked with several

7  AG's in the U.S.?

8      A.   Let's go back and decide what work with is.

9                I have provided intelligence and information

10  to several Attorney Generals' offices.

11      Q.   But you told Mr. Woodard you had worked with

12  almost every A.G. in the U.S.?

13      A.   I don't know if that is the words I used or not.

14  My meaning was having provided them information.  I have

15  never worked with or for the Attorney General's Office.

16      Q.   So if you told Mr. Woodard that you had worked

17  with every Attorney General, then that wasn't accurate?

18      A.   It is accurate to me.  Certainly when the

19  Attorney Generals are asking me for information, I provide

20  it to them.  Then I am certainly -- my intent is not to

21  make him think that I have worked for the Attorney

22  Generals' offices.

23      Q.   I never said worked for and I didn't say you said

24  worked for.  I said worked with.

25                Did you tell him you worked with almost

1  every A.G. in the United States?

2      A.   I don't know.   I told him I worked with Attorney

3  Generals in the United States.

4      Q.   A couple of minutes ago you said it is important

5  that plaintiffs' attorneys or people who are adverse to Ed

6  in cases, that the truth be told.

7              What truth is it you think should be told?

8      A.   I find it unusual that a person like myself, who

9  has never had consumer complaints against him, suddenly

10  winds up on the Rip-off Report, when -- actually I left

11  several trails with Paisola.   I wanted to see where those

12  trails would wind up leading.

13      Q.   Okay.

14      A.   I found it odd the Rip-off Report being about

15  rip-offs that I would wind up on there, tying me to people

16  like Steve Miller and Cortez Anderson and Alec DeFry,

17  people I don't know and have never communicated with.

18      Q.   Okay.

19      A.   It seems odd that anyone other than Mr. Magedson

20  would have a vested interest in me being connected to

21  these people.

22      Q.   Are you done?

23      A.   Sure.

24      Q.   It sounds to me like you are maybe mixing up some

25  chronology here.

1          When was there a report on the Rip-off
2 Report that tied you with the people that you just
3 mentioned?
4     A.    With Steve Miller I believe it was the first
5 Rip-off Report that came out in January.
6     Q.    January of '07?
7     A.    Yes.
8     Q.    Steve Miller.  You think there is something on
9 Rip-off Report that ties you to Steve Miller as of January
10 of '07?
11    A.    Yes.
12    Q.    What about this Alec DeFry guy, when was there a
13 report like that?
14    A.    I believe that is a report I saw about Rob Russo.
15 I am tied in with Russo, Stanley, myself is listed in
16 there, and our connections to all of these people that I
17 don't know.
18    Q.    My question was when.
19    A.    When was it posted on Rip-off?
20    Q.    Right.
21    A.    No idea.
22    Q.    It is interesting because you are telling me the
23 reason you contacted all of these plaintiffs' attorneys
24 and tell them the truth that has to be told is because you
25 have been tied on the Rip-off Report to people like Alec

1    DeFry.

2              If I am remembering your testimony correctly

3    from last time, you have been contacting plaintiffs'

4    attorneys for many months, perhaps more than a year, and

5    the report that you are referring to didn't come out until

6    very recently.

7              Am I incorrect?

8         A.   No.

9         Q.   So in fact, the reason you were contacting

10   plaintiffs' attorneys before the posting that tied you to

11   these people wasn't because that was the truth you wanted

12   to tell them?

13        A.   No.  It seemed clear to me the truth wasn't being

14   told.

15        Q.   What truth was it you were trying to convey to

16   them?

17        A.   As we had discussed in the last deposition, the

18   bizarre e-mail I had received from presumably the staff of

19   the Rip-off Report had tied Robert Paisola to them

20   vicariously.

21        Q.   Okay.

22        A.   And there were some odd and perverse behaviors in

23   that that made me suspicious.  When I started digging into

24   things, it just -- things seemed very odd, didn't seem to

25   match up.

1      Q.    Okay.

2      A.    As I started getting into the federal lawsuits, I

3   saw more and more what was going on.

4      Q.    Okay.

5      A.    It seemed that the plaintiffs' counsels weren't

6   necessarily understanding, I guess, the big picture.

7      Q.    And you felt it was important that you could give

8   them the information they needed to put the big picture

9   together?

10     A.    Sure.

11     Q.    I am going to name cases, then I will ask you

12   whether you have ever had conversations with the

13   plaintiffs' attorneys for those particular cases.

14                GW Equity?

15     A.    Yes.

16     Q.    EASI or Energy Automation Systems?

17     A.    I don't know.

18     Q.    Okay.  I will come back to that when I get a

19   list.

20     A.    Okay.

21     Q.    Let's go back to your conversation with Dixon

22   Woodard.

23                Did you tell Dixon Woodard that you had

24   walked around Ed Magedson's neighborhood in order to get

25   information on who might be threatening Ed Magedson?

1     A.    I believe I indicated to him that I interviewed

2  the neighbors to find out who was making threats against

3  him.

4     Q.    Did you tell him that you were the one that had

5  taken pictures of Ed Magedson's house and posted them on

6  the Internet?

7     A.    The one on McDowell, yes.

8     Q.    Did you in fact do that?

9     A.    Yes.

10    Q.    Not only did you tell Mr. Dixon Woodard you did

11  that, you in fact did do that?

12    A.    Yes.

13    Q.    Did you tell Mr. Woodard that you represented a

14  coalition of people who were wrongly accused on the

15  Rip-off Report?

16    A.    No.

17    Q.    Did you use the word "coalition" at all during

18  that conversation?

19    A.    I may have, actually.

20    Q.    With reference to people who were sort of

21  combined in some way against Rip-off Report?

22    A.    No, actually what I told him was, the day after I

23  had been up in the neighborhood, Travis Hatch told me

24  someone else had been up in that neighborhood making

25  questions and had represented themselves as law

1   enforcement, and they indicated that they were

2   representing a coalition of plaintiffs.

3       Q.   You didn't tell him that you did?

4       A.   Absolutely not.

5       Q.   Do you know of a coalition of people who were

6   adverse to Rip-off Report?

7       A.   I don't.

8       Q.   You don't think the Internet Defamation League is

9   a coalition of people adverse to Rip-off Report?

10      A.   You know, I don't really know all that much about

11  the Internet Defamation League or the Defamation Action

12  League.  I think they would try to project the image they

13  are doing two different things, but since I am not a

14  member of the organization and I don't know anyone that is

15  a member of the organization -- the only thing that Bill

16  Stanley has indicated that the Internet Defamation League

17  does is protest, because I have asked him specifically,

18  "What is it that organization does?"

19      Q.   Okay.

20      A.   He says protests.

21      Q.   It is your testimony that you are not a member of

22  the Defamation Action League?

23      A.   Absolutely.

24      Q.   It is your testimony you are not a member of the

25  Internet Defamation League?

1     A.   It is.

2     Q.   Look at my caption here for a second.

3          Did you ever sign up to become a member?

4     A.   No.  I was sent an invitation, but I ignored it.

5     Q.   What do you mean you were sent an invitation?

6  Like spam?

7     A.   No.  You had asked for e-mails.  I had never

8  heard of the Internet Defamation League, never heard of it

9  before you mentioned it.  When I was providing you with

10 e-mails for your subpoena, I saw an e-mail that had come

11 from Bill Stanley inviting me to join the Internet

12 Defamation League.  It was an e-mail I ignored previously,

13 didn't pay any attention to it.

14    Q.   Do you know how he got your e-mail address to

15 invite you?

16    A.   Bill Stanley and I had been communicating at that

17 point in time.

18    Q.   Who is KMS Investigations?

19    A.   It appears to be a private investigation -- I

20 shouldn't say that.  KMS Investigations officially is a

21 California private investigative firm held by a

22 gentleman -- his name may be Pearson.  I don't know for

23 sure.  I don't remember.

24    Q.   The e-mail that you got from Mr. Stanley, what

25 was the e-mail address it came from?

1      A.    I believe it came from the -- it may have come

2   from the Defamation Action League.

3      Q.    Back to KMS.

4            MS. SPETH:   Read back his answer to the KMS

5   question.

6            (Record read.)

7      Q.    BY MS. SPETH:   What is your opinion of KMS

8   Investigations?

9      A.    Based on my interaction with them is that they

10  are discredible, (sic) not truthful, they are in violation

11  of multiple state statutes, that they have become offended

12  by the post about them at various reporting sites,

13  including the Rip-off Report.

14     Q.    Okay.

15     A.    It appears as if they have taken great umbrage

16  about things that have been said about them in the Rip-off

17  Report.

18           My dialog with a gentleman by the name of

19  Bill Taylor caused me some concern because Mr. Taylor when

20  I contacted him to find out exactly what they were

21  doing -- I contacted them because I had been accused again

22  of masquerading as a federal agent or law enforcement or

23  something, and certainly on the Rip-off Report that

24  exists.

25     Q.    Okay.

1      A.    If the Secret Service -- I'm sorry.  If the FBI

2  is indicating that somebody else was up there doing that,

3  then there is somebody else up there doing it and I want

4  to know who it is.

5      Q.    Okay.

6      A.    My conclusion could possibly be that KMS, based

7  upon the things they were doing, may very well be the one

8  doing it, because part of my conversation with Bill Taylor

9  in trying to establish who his client was he says his

10  client was out of DeerField Beach, Florida.

11      Q.    Okay.

12      A.    That I believe to be the domicile of Steve

13  Miller.

14      Q.    Okay.

15      A.    So as I started digging into KMS more, I seen the

16  postings of the reporter for the Rip-off Report.  A

17  gentleman by the name of Kevin Signs purports to be the

18  private investigator for that particular firm.

19      Q.    Okay.

20      A.    But in fact he is not.  But KMS is a private

21  investigative firm.  You can't access it via the Internet.

22              And they've taken to projecting an image --

23  they certainly are a corporation out of Delaware, and they

24  projected the image they have an office in Alabama.

25      Q.    Have you ever confirmed whether KMS in fact was

1   hired at any time by Federated Financial?

2       A.   No.

3       Q.   You said earlier that they've done some things

4   that violate statutes?

5       A.   Yes.

6       Q.   As investigators, what is it they've done that is

7   in your opinion either illegal or unethical?

8       A.   The states' regulations for private investigators

9   are generally twofold.  Foremost, they want to protect the

10  consumer, the client, from getting a defective product --

11      Q.   Okay.

12      A.   -- if you will.  A private investigator will

13  request a retainer and the client should expect to receive

14  something back from that retainer.  Unfortunately, some

15  private investigators, like other people, will get the

16  retainer and not get the product back.

17               That seemed to be the crux of some of the

18  complaints for KMS.

19      Q.   Complaints by whom?

20      A.   Consumers.

21      Q.   On Rip-off Report?

22      A.   Yes.

23      Q.   About KMS?

24      A.   Yes.

25      Q.   Keep going.

1      A.    They were advertising in several states.  The

2  Arizona Revised Statutes that govern the private

3  investigation field, it is very clear any advertisings you

4  have to have your private investigator's number on those

5  advertisings.  That is to provide the consumer with a

6  place to redress any issues.  There is a $2,000 bond on

7  file that the state requests in the event that consumers

8  do not get what they expected to get.

9      Q.    So the things that you know about KMS and that

10 you consider to be either illegal or unethical, are those

11 just things that were posted about them on Rip-off Report

12 or do you have any independent knowledge of anything that

13 KMS has done?

14     A.    They are also listed on another Web site.  I

15 think it is U.S. Web.  And in fact, that is where I got --

16 U.S. Web was actually where I got KMS's information.

17     Q.    Okay.

18     A.    It had been pointed out to me by someone, I don't

19 remember who it was, but KMS was on U.S. Web, which

20 appears to be a search engine optimization company that

21 claims to be able to remove Rip-off Report posts.  And the

22 language in the U.S. Web post is that they were trying to

23 gather people together for a class action lawsuit.

24     Q.    Okay.

25     A.    Which I found to be discredulous. (sic)  I looked