1    at it more in terms of probably KMS was trying to get

2    business of some sort or maybe -- I don't know.

3        Q.    Are there any companies out there that you know

4    of that are able to remove Rip-off Report posts?

5        A.    No.

6        Q.    Are there any that are able to remove them from

7    Google search results?

8        A.    No.

9        Q.    You know that Rob Russo advertises -- claims in

10   his advertisements to be able to do that, don't you?

11               MR. DANA:  Objection.

12               THE WITNESS:  I don't know that actually.  I

13   have been struck by the idea that Rob Russo hasn't, from

14   what I have seen, hasn't done a lot of advertising on

15   Google.  We did discuss that particular matter.  He tried

16   to -- not tried.  He made it clear that his verbiage was

17   meant to be he could remove it from the front pages of

18   Google, and he pointed out to me that, "I think your

19   dissatisfaction with him is the fact that he has made

20   claims he can remove it from search engines."

21       Q.    BY MS. SPETH:  Okay.

22       A.    He has never indicated that to me.

23       Q.    Have you Googled your name?

24       A.    Yes.

25       Q.    Does Rip-off Report come up in the front page

1  with your name?

2       A.   Yes.

3       Q.   Have you asked Rob Russo to fix that?

4       A.   Yes.

5       Q.   Has he?

6       A.   Yes.

7       Q.   So currently if I Google your name, it won't come

8  up on the first page of Google?

9       A.   It will, I think.  I haven't done a vanity search

10  for quite a while.

11      Q.   I thought you said you hired him or asked him to

12  remove your name from the front page?

13      A.   What I did was I indicated to Mr. Russo I had a

14  keen interest in finding a company or companies that had

15  the ability to remove those items from the front pages.  I

16  am a bit of a neophyte with regard to the search engine

17  optimization stuff.  It is a learning process.

18      Q.   Okay.

19      A.   Mr. Russo and Stanley had certainly opened my

20  eyes up a lot about it.

21      Q.   Okay.

22      A.   So Mr. Russo, I had indicated to him before I

23  ever recommend anyone to a search engine optimization

24  place like Rob Russo, they are going to have to show me

25  they can do what they say they can do.

1    Q.    Okay.

2    A.    Mr. Russo started a campaign. I didn't hire him.

3    I needed proof, to see exactly what it is he said he can

4    do.

5    Q.    Okay.

6    A.    They showed me some examples, actually. I don't

7    remember who it was. He showed me some examples where

8    they were able to take the Rip-off Report posts and move

9    them back several pages. In fact, were able to do that

10   for me as well.

11   Q.    Okay.

12   A.    Once that was done, it came back to the front

13   pages because I believe it is probably something you have

14   to maintain.

15   Q.    So what you are saying with respect to your

16   posting on Rip-off Report is that at one time it was on

17   the front pages and then Russo showed you how he could

18   move it off the front pages and did do that but now it is

19   back?

20   A.    Yes.

21   Q.    I understand now.

22         Now you said that they showed you some

23   examples?

24   A.    Yes.

25   Q.    What examples did they show you of successful SCO

1    optimization where Rip-off Report came off the front page?

2        A.    Well, just names of various clients that they

3    had, and if you were to ask me who, I will tell you I

4    don't know because I don't remember.  This was at least

5    six months ago.

6        Q.    You don't -- sorry.

7        A.    In the initiating conversations that I would have

8    had with Bill Stanley and Russo in the February, March

9    time frame, I would have asked them -- I was interviewing

10   Reputation Defender, Mike Vertex's organization, as well

11   to establish whether -- what it was they were doing.  This

12   was all new to me.  What is it they could do.

13       Q.    Okay.

14       A.    What was their agenda, what were they trying to

15   achieve.

16       Q.    Let's go back to the examples.

17             You are telling me you don't remember any of

18   the names of people that Russo gave you as an example?

19       A.    No.

20       Q.    Not a one?

21       A.    No.  He didn't open up his client base to me.

22   Would have given me one or two.  I don't remember their

23   particular names.

24       Q.    You said that Russo told you some things that

25   opened your eyes about SCO Optimization, search engine

1  optimization.

2          In what ways did he open your eyes?  What

3  did he tell you?

4      A.   Again as a business owner, I suppose, I would

5  always be interested in how does one even get your

6  business on the front page of Google.  Many business

7  owners would like to have that idea.  I certainly had no

8  idea.

9      Q.   Okay.

10     A.   Wanted to know.

11          I think the beginning conversation I had

12  with Stanley was that he was showing me how it worked,

13  showing me about links and various other things.

14     Q.   Teach me.  I want to know how it works.

15     A.   I don't consider myself -- in fact, I consider

16  myself extremely behind all of this.  I have, through my

17  own experimentation, which is purely what it is, been able

18  to get my own Web site on the front page of Yahoo as a

19  result of reading and studying on how to get it done.

20     Q.   Okay.

21     A.   Their particular, I guess what they were trying

22  to show, is the links could include -- it looks like in

23  their search engine optimization techniques, included

24  going into social Web sites and/or blogs to create key

25  words in there that would go back to or strengthen your

1    particular name.

2        Q.    Okay.

3        A.    I think what they were trying to do is get these

4    blogs or Web sites that were particularly strong, but I

5    don't know -- haven't gone in and looked at these blogs or

6    forums to see what sort of strength they had.

7        Q.    When you talk about "they" the last couple of

8    times, we have been talking -- you said they showed you

9    some examples of how it works, they showed you that links

10   can work, who is the "they"?

11       A.    Both Stanley and Russo.

12       Q.    Did you ever tell Dixon Woodard that Ed Magedson

13   had ten federal warrants?

14       A.    No.

15       Q.    Did you make reference to ten federal warrants

16   with respect to Ed Magedson?

17       A.    No.

18       Q.    Let's talk about this warrant thing.  Every time

19   I have asked you you told me you never said that because

20   it isn't true.

21       A.    Right.

22       Q.    How would you explain the fact that numerous

23   neighbors, who you have interviewed, have told me that you

24   said that Ed had warrants out or there were federal

25   indictments pending?

1          A.     I would explain it in terms of the information

2     that I got back from Jack Delahaney very clearly said that

3     there were civil RICO claims on file, yet when Steve

4     Bedore was up there interviewing people, he seemed to

5     think or he seemed to take great literary license that the

6     FBI was investigating.   Certainly something I never told

7     him.

8          Q.     Okay.

9          A.     I would suppose that -- and I have seen that on

10    the Internet too, someone because they see the word RICO

11    presumes there is some sort of criminal indictment going

12    on, that when someone hears the word RICO, they presume

13    criminal.

14         Q.     What you are saying you may have said to one or

15    more neighbors that there are RICO cases pending against

16    Ed?

17         A.     I think I have been clear that civil is the way I

18    would have phrased them.

19         Q.     You think --

20         A.     I have been careful about making sure there is no

21    reference to any criminality going on.

22         Q.     Have you made reference to RICO claims?

23         A.     Sure.

24         Q.     So you have told Ed's neighbors there are pending

25    RICO cases or claims?

1    A.   I don't know, but that would be within the realm

2  of possibility.  I don't know specifically.

3    Q.   Do you ever remember having a conversation with

4  the mail carrier that works in the Mesa neighborhood that

5  Ed owns a house on Ambrosia?

6    A.   Never spoken to him.

7    Q.   Never spoken to the mailman?

8    A.   Never.

9    Q.   Did you ever try to speak with the mailman and he

10  wouldn't talk to you?

11    A.   No.

12          MS. SPETH:  We need to take a short break

13  because I need to organize this.

14          Let's take a five-minute break.

15          (Recess taken.)

16          (Deposition Exhibit No. 10 was marked for

17  identification.)

18    Q.   BY MS. SPETH:  I asked you earlier who you had

19  contacted since the last time you were deposed here on

20  July 31st.  You did not list any of Ed's neighbors or any

21  of the neighbors around any of the addresses.

22          Is it your testimony you have not contacted

23  any of those neighbors since July 31st, 2007?

24    A.   Yes.

25    Q.   Let's take a look at what we marked as Exhibit

1    10.

2         A.    Okay.

3         Q.    And do you recognize that blog?

4         A.    Yes, it's been brought to my attention.

5         Q.    Well, it is actually something you posted on,

6    isn't it?

7         A.    No.

8         Q.    It is your position you have never posted on the

9    blog that is Exhibit 10?

10        A.    Yes.

11        Q.    What blog do you think this is?

12        A.    It appears to be the blog from CNET that Declan

13   McCullagh posted on.

14        Q.    Who is Declan McCullagh?

15        A.    The reporter for CNET.

16        Q.    Okay.

17        A.    I have never posted on this.

18        Q.    Go to the last page, page 6, JFBA Junior Member.

19              Is it your testimony under oath that that is

20   not you?

21        A.    Is this a part of the CNET?

22        Q.    You are the one who said this was CNET.  I am not

23   sure --

24        A.    Well, this is not me.

25        Q.    "This" meaning the sixth page of Exhibit 10 where

1    the person signed in as a Junior Member named JFBA?

2         A.   Correct, it is not me.  I never posted that.

3         Q.   You never posted the words that we see on page 6

4    of Exhibit 10?

5         A.   That is correct.

6         Q.   Any idea who JFBA is?

7         A.   I would be JFBA Acquisitions, but --

8         Q.   But this is not you?

9         A.   No.

10        Q.   So would you agree with me that sometimes people

11   post and pretend to be someone they are not?

12        A.   Yes.

13        Q.   Does the IP address that is at the bottom of

14   Exhibit 10, page 6, look familiar to you at all?

15        A.   No.

16        Q.   Did you ever give anyone information that that IP

17   address was my law firm's IP address?

18        A.   I don't know what your IP address is, although

19   that came from Sean Richards.

20        Q.   Richardson?

21        A.   Yes.

22        Q.   What came from Sean Richardson?

23        A.   I had gotten information from him at one point in

24   time, a post about me on the Rip-off Report, I think, had

25   been generated from one of your offices, and he came up

1    with an IP address.  But certainly I don't even know what

2    mine is.  I can look it up.

3                    MR. DANA:  You don't have that memorized?

4                    THE WITNESS:  I don't know have it

5    memorized.

6        Q.    BY MS. SPETH:  Do you find Sean Richardson to be

7    a credible person?

8        A.    I don't know what his agenda is.  I just don't

9    know.

10        Q.    Do you think it is possible that Mr. Richardson

11    posted this using your initials?

12        A.    I think it is possible.  I have seen Bill Stanley

13    use things that I have said other places in posts.

14        Q.    Is this something that you said someplace else,

15    what is in --

16        A.    No.  I don't have any -- the report traces to the

17    law offices of Jaburg & Wilk.  Those are Sean Richardson's

18    words.

19        Q.    Well --

20        A.    This is absolutely his information.

21        Q.    It starts off by saying, I found it interesting

22    that after I took the story, The Real Rip-off Report to

23    the Phoenix New Times, I soon became a post on the Rip-off

24    Report as a con man.

25        A.    Yes.

1    Q.    Isn't that something you have indicated to

2  people, that after you took this -- first of all --

3    A.    Yes.

4    Q.    -- let me back up.

5          You did in fact take The Real Rip-off Report

6  story to the Phoenix New Times, didn't you?

7    A.    Yes.

8    Q.    You are the one who initiated Sarah Fenske to

9  write that story?

10    A.    Yes.

11    Q.    And so the person who wrote this, I found it

12  interesting that after I took the story, The Real Rip-off

13  Report to the Phoenix New Times, I soon became a post on

14  the Rip-off Report as a con man, would you agree with me

15  was pretending to be you?

16    A.    No.    Those words were taken from a text I had

17  written in Emazines or something.  The rest of it,

18  somebody took that first paragraph, if you will, from

19  another source and added it to this and posted it on CNET.

20    Q.    You are the author of the first paragraph of the

21  posting on page 6?

22    A.    Correct.

23    Q.    Are you the author of the part that says fake

24  Rip-off Reports?

25    A.    No.

1    Q.    Are you the author of the part that says, "Here

2  is an example of either Maria Speth - Ed Magedson or one

3  of their surrogates using a fake name"?

4    A.    No, I believe that to be Sean Richardson.

5    Q.    The reason you believe that is because that is

6  information he has given you?

7    A.    Yes.

8              MS. SPETH:   Mark this.

9              (Deposition Exhibit No. 11 was marked for

10 identification.)

11   Q.    BY MS. SPETH:   I am showing you what has been

12 marked as Exhibit 11.   This is the document I was saying

13 during the break I am not sure whether we covered in your

14 last deposition.   It is not marked as an exhibit

15 previously.

16             Did you write at least the first page of --

17 actually, on Exhibit 11 where it starts with Worldwide

18 Investigation Services AZ PI License 1551859?

19   A.    Yes.

20   Q.    First of all, that is a reference to your

21 license, is it not?

22   A.    Yes.

23   Q.    Did you write the words that come on the first

24 page of Exhibit 11 after that title?

25   A.    Yes.

1    Q.    When you start off by saying, "For the record, I

2  am a liar," what do you mean by that?

3    A.    I find that periodically in trying to get to the

4  truth of the matter that sometimes I can't always tell the

5  truth to get to the truth.   The police do it too.

6    Q.    You are saying as an investigator sometimes you

7  have to either make up a story or a ruse in order to get

8  information?

9    A.    A ruse, yes.

10    Q.    On the second paragraph it says, "If you have

11  come upon this page it may be because you have been

12  directed to my Web site from one of the Three Horsemen of

13  the Apocalypse."

14              Who are the Three Horsemen of the

15  Apocalypse?

16    A.    Bud Hibbs, Ed Magedson and Robert Paisola.

17    Q.    When did you post this originally?

18    A.    I don't know.   Maybe January, perhaps, after the

19  original posting of my Rip-off Report.

20    Q.    Why do you refer to Mr. Magedson as one of the

21  Three Horsemen of the Apocalypse?

22    A.    Well, my investigation of the three concluded

23  that they certainly had some commonalities in terms of a

24  business relationship.

25    Q.    Okay.

1    A.    Certainly I have spoken to Mr. Hibbs, who

2  acknowledges a relationship, Paisola certainly does, and,

3  of course, I got the e-mail that brought Mr. Paisola to my

4  attention from the Rip-off Report.

5    Q.    Okay.

6    A.    In terms of the Three Horsemen of the Apocalypse,

7  it seems there has been a public outcry that these people

8  are using the Internet for money making schemes.

9    Q.    What does that have to do with the Apocalypse?

10   A.    Well, the Three Horsemen of the Apocalypse is

11 just a literary term.

12   Q.    What does it mean to you?

13   A.    It means there are three people out there who are

14 creating a great deal of discord.

15   Q.    Look at page -- what is listed as page 5 of 12 at

16 top.

17   A.    Okay.

18   Q.    Do you see the posting that starts with paladinpi

19 as supposedly who posted it?

20   A.    Yes.

21   Q.    Did you post that?

22   A.    Yes.

23   Q.    This is Junior Member?

24   A.    Uh-huh.

25   Q.    Yes?

1      A.    Yes.

2      Q.    Remember how we looked at the previous exhibit,

3  Exhibit 10, and you said you didn't post anything on

4  there?

5      A.    Correct.

6      Q.    What is this -- what is Exhibit 11?   What blog is

7  Exhibit 11?

8      A.    This is scam.com.

9      Q.    All right.   Are you sure Exhibit 10 was not

10 scam.com?

11     A.    I am sure I didn't post the -- I am telling you I

12 did not post this report on CNET and I am telling you that

13 those words are absolutely Sean Richardson's words.

14     Q.    But do you agree with me that Exhibit 10 may be

15 scam.com as well?   Just look at the --

16     A.    Yes, I agree it very well could be.

17     Q.    Okay.   Back to Exhibit 11.   The second paragraph

18 of the post that is by paladinpi, it says Ed lives at 2033

19 West McDowell Boulevard in Apache Junction.

20              See that?

21     A.    Yes.

22     Q.    What was your purpose for posting Ed's address on

23 scam.com?

24     A.    So he could be served personally and be addressed

25 in deposition.

1      Q.    It says, "Ed is the trustee of -- something is

2   cut off -- but the Martin Magedson Trust.

3                  See that?

4      A.    Yes.

5      Q.    What was the purpose of providing that

6   information to whoever was reading this?

7      A.    So that they could understand where the assets

8   are.

9      Q.    Says, "In September he borrowed $417,000 from a

10   bank on a refinance."

11                  What was your purpose of posting that?

12     A.    So they could understand where the assets are.

13     Q.    Who is the "they"?

14     A.    Plaintiffs.

15     Q.    So you posted this information to help any

16   plaintiffs to find Ed and find his assets?

17     A.    Correct.

18     Q.    At the time you posted this, what was your goal?

19   I mean, why was it you thought it was important that

20   people know where to serve Ed and where his assets were

21   back then in 2006?

22     A.    I believe that I had received, it was either a

23   telephone call or e-mail, that made it very clear that he

24   was avoiding process, that they couldn't get to him, and I

25   had seen some judgments that were overturned, I suppose,

1    because they could never get personal service on him.

2    Q.    Okay.

3    A.    I also saw that they weren't really able to get

4    depositions, which in my opinion was probably -- useful

5    information would come out.

6    Q.    Isn't it true that what sort of the genesis of

7    this entire obsession that you have with Ed Magedson was

8    Mr. Magedson's refusal to give you the information

9    regarding who authored certain reports on Rip-off Report?

10    A.    I've never asked for that.

11    Q.    Really?

12          Do you recall the whole traveling salesman

13    case matter?

14    A.    Yes.

15    Q.    Didn't you ask Mr. Magedson to give you the

16    authors of those postings?

17    A.    What postings?

18    Q.    The ones that regarded the supposed kidnapping or

19    ransom of some girl.

20    A.    I didn't.  Like I told you last time, her

21    information was in the post, her phone number, e-mail

22    address, her name.

23    Q.    For what purpose did you contact Mr. Magedson

24    originally back in 2006?

25    A.    Regarding that case?

1      Q.    Yes.   But what did you want from him?

2      A.    What happened was the people that are involved

3   in -- I wasn't initiating contact with Mr. Magedson.   In

4   fact, it was his staff that was the originating contact

5   parties.

6            What had happened was, I am -- I volunteer

7   my services a great deal, as I discussed last time, to an

8   organization that looks out for children and families that

9   have been victimized by a group of traveling sales

10  businesses.

11     Q.    Okay.

12     A.    And a woman -- like the authorities and Attorney

13  Generals, there are a group of us out there that include

14  attorneys and Attorney Generals and private investigators,

15  et cetera, that monitor Web sites to see what direction

16  these particular organizations are going in.

17     Q.    Okay.

18     A.    A woman had expressed in one of the posts in

19  Rip-off Report that her son, who was chemically dependent

20  for emotional disturbances, had been abducted by one of

21  these traveling sales crews.

22     Q.    Okay.

23     A.    Unfortunately, the investigations I am asked to

24  participate in for free involved murderers, rapists,

25  abductors, all sorts of scurrilous individuals, and I

1  didn't feel like exposing my family to this sort of

2  scrutiny from these individuals.

3      Q.  Okay.

4      A.  So I posted or attempted to post in that

5  particular post my phone number so she could communicate

6  with us to determine whether or not it was a valid plea

7  for help or whether it was someone from the traveling

8  sales crews that were trying to get information on us

9  loosely.

10     Q.  Okay.

11     A.  The monitors for the Rip-off Report communicated

12 with me asking me what it was that I thought I was doing

13 by going around the system.

14     Q.  Okay.

15     A.  What ensued from there was their claims I had

16 told them that I was a police officer, and in that same

17 e-mail chain I pointed out to them clearly I never

18 represented myself as a police officer.  The FBI asked me

19 the same question.

20     Q.  Okay.

21     A.  I think they agreed I wasn't representing myself

22 as a police officer.

23     Q.  Okay.

24     A.  That the ensuing exchange became a little bit

25 paranoid, because I was typing from two different

1  computers.   One was my web-based e-mail, the other was

2  Outlook.

3       Q.   Okay.

4       A.   Unfortunately when I would download the e-mails

5  to Outlook, it wouldn't be back on the server.   They

6  seemed to think I was omitting portions of the e-mail when

7  I wasn't.

8       Q.   Okay.

9       A.   Simply wasn't transferring over from web-based to

10  Outlook.

11       Q.   Okay.

12       A.   In the e-mails you can see clearly that they are

13  suggesting that I am asking for information when I am not.

14  They posted it.   It was there.   I didn't need to get any

15  information.   It was all right there.

16       Q.   It is your position that Rip-off Report contacted

17  you first?

18       A.   Yes.

19       Q.   Is that what you said?

20       A.   Yes.

21       Q.   In what form?

22       A.   E-mail.

23       Q.   What did that e-mail look like?

24       A.   I am not sure I understand your question.   I

25  mean, I provided it to you in -- when I was here, the

1   entire sets of e-mails.

2       Q.   The very first thing that happened was you posted

3   something on Rip-off Report, correct?

4       A.   Attempted to, yes.

5       Q.   You are attempting to post something that

6   basically said to this magazine -- to this lady who posted

7   about the magazine company, contact me, right?

8       A.   Yes.

9       Q.   And did you call Mr. Magedson or did you just

10  post?

11      A.   I don't think I called him, I don't think.

12      Q.   It is your position under oath, your testimony

13  under oath, that you never asked him for the contact

14  information of the lady who did this posting?

15      A.   I am telling you, I am like 99 percent sure,

16  because why would I?  He posted it in her post.

17      Q.   Why didn't you just call her?

18      A.   I did.

19      Q.   She wouldn't talk to you?

20      A.   She did talk to me.

21      Q.   And then why did you have to post something

22  saying she should contact you?

23      A.   Because I posted it first that she should contact

24  us.  They didn't put it in.  I wanted to make sure that

25  this was not the magazine companies that were trying to

1  lure us out, when it was clear that there wasn't going to

2  be any participation or they weren't going to put my phone

3  number in there that these -- I have a phone if you dial

4  it, it will come up with the real number whether you are

5  trying to spoof it or not.  I wanted to know who this

6  really was.

7      Q.   Okay.

8      A.   I went ahead and communicated with her,

9  eventually.

10     Q.   Okay.

11     A.   I forwarded her information to the organization

12  that tracks these people.

13               MS. SPETH:  Mark this.

14               (Deposition Exhibit No. 12 was marked for

15  identification.)

16     Q.   BY MS. SPETH:  Let's look at the exhibit that we

17  marked as Exhibit 12.

18     A.   Okay.

19     Q.   Let's go backwards.  I think we have to start

20  from the back and work up if we are going to look at them

21  in chronological order.

22               There is an e-mail from Ed Magedson to

23  yourself, is that correct, on the third page?

24     A.   I don't know if it is from him or not.

25               Some of these e-mails were saying they were

1  from the staff and Ed was out of town and when he gets

2  back in town, to discuss it with him.

3      Q.    This particular e-mail doesn't say that, does it?

4  Simply says --

5      A.    No.

6      Q.    Okay.  It says it is from editor@ripoffreport,

7  correct?

8      A.    Yes.

9      Q.    It says, "Who do you think you are trying to go

10  around our rules?  You don't even say who you are.

11  Police?  Lawyer?  Consumer?"

12      A.    Yes.

13      Q.    "What is it you will do with your investigation?"

14          Is this the first written communication that

15  you ever got from anyone at Rip-off Report or is there

16  something before this?

17      A.    This is it.

18      Q.    What was this a response to?

19      A.    This was a response for me trying to post my

20  phone number to the post of this woman so that she could

21  contact us.

22      Q.    Where is that posting?  Have you produced that

23  posting to me?

24      A.    I think it is in the documents.  When I showed

25  up, you had requested them, and I think that it is in

1    there.

2         Q.    Okay.

3         A.    I mean, it is her name, her e-mail, her phone

4    number.

5         Q.    And is the second page of the e-mail that is June

6    7th, 2006 at 6:05 a.m., is that a response to that e-mail

7    that we just read?

8         A.    Which one are you asking me --

9         Q.    On June 7th, 2006, at 1:33 in the morning

10   editor@ripoffreport e-mailed you the e-mail I just read on

11   the record, correct?  "Who do you think you are trying to

12   go around our rules."

13        A.    Yes.

14        Q.    The e-mail that is June 7th, 2006, at 6:05 a.m.,

15   is that the response?

16        A.    Yes.

17        Q.    What did you mean when you said you wanted to

18   provide my contact information when Fidelity threatened

19   you?

20        A.    In my communications with Mr. Magedson over the

21   Fidelity issue, he had asked me specifically if he could

22   give my contact information out.

23        Q.    So you have had conversations with him?

24        A.    Yes.

25        Q.    Okay.

1    A.    But this -- that was several months previous to

2    this.

3    Q.    What do you mean "that was several months

4    previous to this"?

5    A.    The Fidelity Financial, that conversation with

6    him was several months previous to any of this going on.

7    Q.    Do you mean Federated Financial?

8    A.    Yes.

9    Q.    In the e-mail you said Fidelity.

10              Do you think you were referring to Fidelity?

11   A.    Indeed I was.

12   Q.    So I thought I was talking about the first time

13   you and Ed ever had contact with each other.

14              Apparently there is an earlier history than

15   this --

16   A.    Yes.  You had addressed that in our last

17   deposition.

18   Q.    I told you I didn't remember.

19              This e-mail exchange we have here that

20   indicates it was printed out on 7-25-07, would you agree

21   with me that is what you produced to me in response to my

22   request for e-mail -- you have it there.

23   A.    I think there was a great deal more that I gave

24   you.

25   Q.    No, but you produced to me the e-mail exchange;

1   isn't that correct?

2       A.    I did.

3       Q.    Do you think you did that in the documents you

4   produced that day at the deposition or the ones you

5   produced afterwards?

6       A.    I think -- I think afterward you had asked for

7   what I had in my hand.  I gave it to you.

8       Q.    Right.

9       A.    I might --

10      Q.    You gave me a stack that you had with you that

11  day and then later on you gave me a big box of documents.

12      A.    Right.

13      Q.    Where do you think this e-mail exchange of

14  Exhibit 12 was?  In which of those two things do you think

15  that was?

16      A.    Pretty positively they were in the information I

17  gave you after the deposition.

18      Q.    That same day?

19      A.    Yes.

20      Q.    Do you know if this Exhibit 12 is a complete --

21  let me say this.  Do you see how it says page 1 of 3, 2 of

22  3 and page 3 of 3?

23      A.    Uh-huh.

24      Q.    Yes?

25      A.    Yes.

1    Q.    Would you agree with me this is exactly the way

2  you printed this out for me?

3    A.    In the subpoena you mean?

4    Q.    No, in what you produced to me.

5    A.    I would be surprised, frankly, because I thought

6  in that packet I gave you it would have included the

7  post -- included everything.  My thoughts on this, there

8  should be nine pages worth of e-mails on that.

9    Q.    Okay.

10    A.    Might have been the one I provided to the FBI.  I

11  don't know.  I would have thought I would have given you

12  everything, including the woman's post.

13    Q.    All right.

14    A.    I don't know I am answering definitively, but I

15  thought in the information I gave you all of that was in

16  there.

17    Q.    Let me ask you this question.  On Exhibit 12 do

18  you know if there is any e-mail between the 1:33 a.m.

19  e-mail and the 6:05 e-mail back?

20    A.    There was a lot of e-mails.  I don't know if

21  there is anything in between or not.

22    Q.    Okay.

23    A.    This thing went on ridiculously long.

24    Q.    "This thing" meaning your e-mails back and forth

25  with Ed?

1    A.    Yes.

2    Q.    Okay.

3    A.    There is quite a bit missing from this.

4              MS. SPETH:   Mark this.

5              (Deposition Exhibit No. 13 was marked for

6    identification.)

7    Q.    BY MS. SPETH:   Look at what we have marked as

8    Exhibit 13.   This is an e-mail that the second e-mail

9    matches the e-mail in Exhibit 12, in other words, the June

10   7th, 2006 e-mail, 1:33 a.m., where Mr. Magedson or

11   somebody from his address asks you, who do you think you

12   are trying to go around our rules.

13             See that?

14   A.    Yes.

15   Q.    In response at 5:19 a.m. on June 7th, 2006, you

16   say, we are all of those and more.

17             See that?

18   A.    Yes.

19   Q.    If you produced, and I am not asking you to say

20   you did right now, but if you produced Exhibit 12 to me

21   just like it was, page 1 of 1, 2 of 3 -- I'm sorry.

22             If in fact you produced to me Exhibit 12,

23   page 1 of 3, page 2 of 3, page 3 of 3, in this exact order

24   the way you did, you left out your response to that

25   e-mail, didn't you?

1      A.    Well, I don't think -- if I provided this to you,

2  there are many things left out.

3      Q.    Okay.  And one of the things you left out was

4  your response to Ed's e-mail of June 7th, 2006 at 1:33

5  a.m.?

6      A.    Frankly -- this?  You say Ed's response.

7      Q.    I am talking about your response to Ed.

8                    Let's go back to Exhibit 13.

9      A.    Okay.

10      Q.    At June 7th, 2006, at 1:33 in the morning,

11  Mr. Magedson says, who do you think you are trying to go

12  around our rules.  You don't even say who you are.

13  Police?  Lawyer?  Consumer?  What is it you will do with

14  your investigation?

15                    And you respond, we are all of those and

16  more.  What we will do is get the kid and return him to

17  his mother.  The information gathered goes to the

18  authorities of many different jurisdictions.

19                    Was that your response?

20      A.    Yes.

21      Q.    Is that an accurate printing of your response?

22      A.    Yes.

23      Q.    So when Mr. Magedson says, you don't even say who

24  you are, police, lawyer, consumer, you responded, we are

25  all of those and more, correct?

1     A.    Uh-huh.

2     Q.    Yes?

3     A.    Yes.

4     Q.    Then when you produced that e-mail string to me,

5  you left out your response, didn't you?

6     A.    Not on purpose.  I thought you had everything.

7     Q.    But you printed something for me that you printed

8  on July 25th, 2007, just a week before your deposition,

9  and when you printed that --

10    A.    A week before my deposition?

11    Q.    A week -- week before your first deposition,

12  correct.

13    A.    Well, I think I printed everything for you after

14  the deposition.

15    Q.    Except the things you handed me that day.

16    A.    Yes, I suppose.

17    Q.    Okay.

18    A.    I don't know.

19    Q.    Let me simply ask you this.  What did you mean

20  when you said "we are all of those and more"?

21    A.    As I described it to Travis Hatch, there are

22  private investigators, attorneys, Attorney Generals,

23  police departments, many organizations involved in trying

24  to get these children back to prosecute the -- in fact,

25  there is legislation in Wisconsin involved right now.

1   There is many organizations involved in participating in

2   trying to do something about this.

3        Q.    Okay.

4        A.    Part of the confusion on this was you have

5   indicated this is Ed that is writing back, so I have been

6   pretty confused over it because we had spoken before.   In

7   those conversations he would ask, "Who are you?   What is

8   it you do?"

9        Q.    Okay.

10        A.    And that would have been an opportunity certainly

11   for me to say that I am a federal law officer.   That never

12   happened.   He had been on my Web site.

13        Q.    How --

14        A.    What he said to me, "You look older than I

15   thought you would be."   My picture was on it.

16        Q.    Okay.

17        A.    I am scratching my head and saying, "I am talking

18   to Ed Magedson and he is acting like he doesn't know

19   anything."   Some of the e-mails are from the staff, and

20   the staff clearly says, Ed is out of town."   Who wrote the

21   e-mails?

22        Q.    Didn't you have a conversation with Ed Magedson

23   on the telephone before the June 7th, 2006 e-mails where

24   you represented yourself to be a federal officer?

25        A.    No.

1      Q.    Did you represent yourself to be a police

2  officer?

3      A.    No.

4      Q.    Did you --

5      A.    He records everything.

6      Q.    Did you represent yourself to be law enforcement?

7      A.    No.

8      Q.    Did you represent yourself to be the authorities?

9      A.    No.

10     Q.    And I take it your position is you have never

11 done that with any of the neighbors you have spoken to

12 either?

13     A.    That is absolutely correct.

14            As I mentioned last time, Travis Hatch was

15 up there and he brought back my business card that had

16 been given to the neighbors that says clearly that I am a

17 private investigator, has my private investigator's number

18 on there.  Has nothing whatever in there that even

19 intimates I am law enforcement.

20     Q.    Is it your position -- is it your testimony under

21 oath that you never told anyone who you were

22 investigating -- I'm sorry -- who you spoke to in your

23 investigation of Ed that you were part of law enforcement

24 authority?

25     A.    Absolutely not.  I have not represented that.

1       Q.      Let's go back to Exhibit 11.

2       A.      Okay.

3       Q.      On page 7 of 12 there is a 2-17-07 post

4  by paladinpi.

5               Is that you?

6       A.      Yes.

7       Q.      In that post, the fifth paragraph, you said,

8  suddenly out of the west rides Bill Stanley of

9  Defamationaction who is also a poster here?

10      A.      Uh-huh?

11      Q.      Yes?

12      A.      Yes.

13      Q.      And you said within an hour Mr. Stanley had the

14  blog removed.  And I know it is cut off.

15      A.      Yes.

16      Q.      You hesitated why?

17      A.      You were saying blog, but I was reading Web site.

18  But yes, you are correct.

19      Q.      You wrote blog, didn't you?

20      A.      Yes.  We were referring to Robert Paisola's blog.

21      Q.      Well, I want to read the previous paragraph

22  before you decide that you were referring to Robert

23  Paisola's blog.

24      A.      That is the only blog he took down.  That was my

25  initiation into what it was he did.

1    Q.    The previous paragraph says, oddly enough, a blog

2  was created about me with untruths and inconsistencies in

3  it and I suddenly showed up on the Rip-off Report as a con

4  man.

5    A.    Yes.

6    Q.    That is a reference to Rip-off Report, isn't it?

7    A.    Yes.

8    Q.    Back to the next paragraph, you say, today I have

9  discovered that somehow the Rip-off Report Web site has

10 been taken down.

11         You are referring clearly to Rip-off Report

12 there?

13   A.    Yes.

14   Q.    You don't think that your previous sentence was a

15 reference to Rip-off Report as well?

16   A.    Clearly it wasn't.

17   Q.    When you say that is a 900 pound gorilla, what is

18 that a reference to?

19   A.    A reference from Bill Stanley in his -- I think

20 it is a term that is used by Web sites that determine the

21 linking strength of particular Web sites.  If it has a lot

22 of links to it, it is a 900 pound gorilla.

23   Q.    The posting on page 8 of 12, the 3-01-07 posting,

24 is that yours as well?

25   A.    Yes.

1      Q.    The third paragraph says, if the Defamation

2   Actions of the world -- if the Defamation Actions of the

3   world put the Rip-off Reports of the world out of

4   business, they too go out of business?

5      A.    Yes.

6      Q.    Did you write that?

7      A.    Yes.

8      Q.    It seems to me that it is not the goal to take

9   down Rip-off Reports, it is to excise -- it is an exercise

10  to get him to comply with the very policy he has in

11  effect?

12     A.    Yes.

13     Q.    To remove bogus -- I don't know where it goes

14  from there.

15     A.    I don't know.

16     Q.    That didn't print very well, did it?

17            The gist was Bill Stanley's group and Rob

18  Russo's group doesn't really want to put Rip-off Report

19  out of business because if they did they put would

20  themselves out of business?

21     A.    Yes.

22     Q.    What they really want to do is what?

23     A.    Well --

24     Q.    What were you referring to here?

25     A.    My thoughts on this is that they were trying to

1  get the Rip-off Report to comply with the terms and

2  conditions that the Internet service providers had in

3  effect.

4      Q.    How were they trying to get that to happen?

5      A.    According to Bill Stanley, his protest group went

6  after, communicated, or whatever it is he does with the

7  Internet service providers.

8      Q.    I think we may have talked about this, but it is

9  brief enough I will cover it quickly.

10          On page 9 of 12 there is a post by

11  DefamationAction, which I am going to assume was Bill

12  Stanley, and he says, I have hired a private investigator,

13  John F. Brewington, to investigate this matter as no

14  police report seems to have been filed in connection with

15  this very serious crime.

16          Do you believe that is Bill Stanley that

17  wrote that?

18      A.    Yes.

19      Q.    Did Mr. Stanley in fact hire you?

20      A.    Yes.

21      Q.    And on page 11 of 12, the posting that is 3-6-07,

22  do you see that?

23      A.    Hang on.

24      Q.    It starts on 10, goes over to 11.

25      A.    Yes.

1      Q.    The last sentence says, I have given Mr. Stanley

2  a preliminary report.  If he wishes to share it with the

3  world, he may.

4                    Did you write that?

5      A.    Yes.

6      Q.    You wrote that under JFBA Junior Member, didn't

7  you?

8      A.    I did.

9      Q.    Isn't that the same user name you said wasn't

10  yours?

11     A.    The user name I said was indeed mine.  We were

12  talking about a post on CNET, because that is what it

13  looks like.

14     Q.    Okay.

15     A.    This -- when you were asking me about this post,

16  it appears as if this came from CNET, when indeed the back

17  pages comes from scam.com.

18     Q.    Okay.

19     A.    If you are asking me, did I post this on

20  scam.com, the answer is yes.  Did I post it on CNET?  The

21  answer is no.

22     Q.    I asked you if you posed it and you said you did

23  not.

24                    Now you admit that you posted it?

25     A.    I admit it because this is all CNET on it.  Never

1  been to CNET, never posted anything on there.

2     Q.   You said --

3     A.   It says it right on there.

4     Q.   Okay.  You are saying you thought you didn't post

5  that because you thought it was CNET?

6     A.   Correct.

7     Q.   But you did post on scam.com?

8     A.   Yes.

9     Q.   You posted on scam.com under JFBA?

10    A.   Yes.

11    Q.   You in fact posted on scam.com that I, Maria

12 Speth, of Jaburg & Wilk posted things on Rip-off Report

13 about you?

14    A.   What I posted was exactly what Sean Richardson

15 sent to me, exactly.

16    Q.   So you republished what Mr. Richardson gave to

17 you, correct?

18    A.   There is something wrong with this.

19    Q.   It is a lie, that is what is --

20    A.   Indeed it is, but there are some things missing.

21 I have received this information.  It is correct.

22    Q.   So you were passing along what Richardson told

23 you?

24    A.   Yes.

25    Q.   You felt that that lie should be posted all over

1    the Internet?

2         A.    Scam.com isn't all over the Internet.

3         Q.    You felt that that lie should be posted on

4    scam.com which would be available to anyone who has

5    Internet access?

6         A.    Is it a lie?

7         Q.    You just told me it was a lie.  Do you think it

8    is not?

9         A.    I don't know if it is or not.

10        Q.    Do you believe that my law firm posted something

11   about you on Rip-off Report?

12                 MR. DANA:  Objection; misleading.

13        Q.    BY MS. SPETH:  I am --

14        A.    I think that there is a direct conduit from this

15   law firm to Edward Magedson.  To what degree I don't know.

16        Q.    Do you believe that my law firm posted something

17   on Rip-off Report about you?

18        A.    I don't know.

19        Q.    But yet you posted that information on scam.com

20   not knowing whether it was true or false?

21                 MR. DANA:  Objection; misleading.

22                 THE WITNESS:  I presume that Sean Richardson

23   had done his homework and had come up with viable

24   information.

25        Q.    BY MS. SPETH:  Okay.

1    A.   It says clearly this is what I received.

2    Q.   How did you receive this information from

3 Mr. Richardson?

4    A.   I think he sent it to me either through e-mail or

5 through instant message.   I am not sure.

6    Q.   Do you know when he sent it to you?

7    A.   I don't.

8    Q.   Does it help to indicate that according to

9 Exhibit 10 you posted it on the 11th of July?

10    A.   Probably close to that.

11    Q.   So sometime obviously before July 11th, 2007

12 Mr. Richardson sent you everything from fake Rip-off

13 Reports exclamation point through the end of the IP

14 address that we see in Exhibit 10?

15    A.   Yes.

16    Q.   You posted that on scam.com?

17    A.   Yes.

18    Q.   What, if anything, did you do with respect to

19 Mr. Richardson to confirm that that information was

20 accurate?

21    A.   I asked him where he got it from.

22    Q.   What did he say?

23    A.   He said that an Indian hacker had gotten into

24 your Web site and pulled the information out.

25    Q.   An Indian hacker?

1      A.   Hacker from India.

2      Q.   Oh, okay.  Sorry.  I had this vision of -- never

3   mind.

4                 So somebody from India --

5      A.   Yes.

6      Q.   -- got into our Web site, and did what?

7      A.   Pulled out the information.

8      Q.   What information?

9      A.   That the post -- what I was led to believe is

10   that he had gone into the Rip-off Report, had somehow

11   established what IP address that that post had originated

12   from and had ascertained that that particular IP address,

13   if memory serves me, comes from your Scottsdale office.

14      Q.   He told you this or he wrote this to you?

15      A.   I think I called him and asked him, "Where are

16   you getting this from?"

17      Q.   Okay.

18      A.   Those are things he told me.

19      Q.   Do you think you had that conversation with him

20   before or after you posted this on scam.com?

21      A.   I am sure I had it with him before.

22      Q.   Did you believe him?

23      A.   Our last deposition you had indicated that

24   Mr. Magedson was paranoid.  This is a paranoid business.

25   You don't know who is in your computer, you don't know who

```
 1   is doing what, don't know what people are up to.
 2              My thoughts have been that there are people
 3   in the wire that are probably doing things.
 4        Q.   Okay.
 5        A.   I have already expressed to you I believe there
 6   is a conduit from somebody in this office that is
 7   funneling information back to Mr. Magedson.
 8        Q.   Okay.
 9        A.   The answer is --
10        Q.   Do you remember the question anymore?
11        A.   Yes.
12              I have reason to suspect that somebody in
13   this office may very well be posting information.  I don't
14   know.
15        Q.   And the reason you have to suspect that is what
16   Mr. Richardson told you?
17        A.   No, not exactly, because I received an e-mail
18   after our deposition from an alleged private investigator
19   that I have never received anything even similar to that
20   that seemed to have information about maybe that
21   deposition.
22              Where did that come from?  I don't know.
23        Q.   Did you produce that e-mail?
24        A.   I sent it to you.
25        Q.   Okay.
```

1       A.    Sent it to Mike, the FBI.

2       Q.    So I don't think you ever answered the question.

3             Did you believe the information that Sean

4    Richardson provided to you that you posted on scam.com on

5    or about July 11th, 2007?

6       A.    Yes.

7       Q.    You believed it?

8       A.    Yes.

9       Q.    You said something about conduit from my office

10   to Mr. Magedson.

11            What are you talking about?

12      A.    I think there is a strong possibility that

13   someone in your employ, someone in the organization, is

14   providing intelligence and/or other information to

15   Mr. Magedson.

16      Q.    He is our client.

17      A.    Okay.

18      Q.    I would hope we provide him information.

19            What am I missing?  You think there is

20   something wrong with a law firm providing --

21      A.    I actually don't think there is anything wrong

22   with it.  What you asked me, do I believe that the

23   information on there is accurate.  My thoughts are, I

24   believe there is somebody that is in here doing things

25   other than that as well.

1    Q.    Bottom line, you are saying you believe that

2  someone in the Jaburg & Wilk office is posting things on

3  Rip-off Report about you?

4    A.    I believe there is a possibility of that.

5    Q.    All right.  What other conduits of information

6  are you referring to, or is that all you were referring

7  to?

8    A.    I have some suspicions about that e-mail that I

9  received that I forwarded to you and to the courts and to

10  Mike, to the FBI.

11    Q.    What suspicions?

12    A.    If I recall correctly, the idea behind -- let me

13  go back and try to focus on this.

14          The wording on the e-mail from this

15  gentleman was suggesting that I turn evidence against

16  Russo and Stanley and that I perhaps join the Corporate

17  Advocacy Program and Ed is a benevolent man and would

18  forgive me and hire me, and those sort of things.

19    Q.    Okay.

20    A.    And my thought process as I was thinking -- and

21  he had mentioned the fact that I was hiding my criminal

22  conviction from 22 years ago, when it is public record.

23          So since no one has ever approached me with

24  that, ever approached me with that, I thought to myself,

25  clearly something from the deposition has gone out when I

1    thought I understood the judge to say that he wanted that

2    deposition to be kept between the two attorneys.

3        Q.    So what you are saying, you believe we provided

4    information to Mr. Magedson that we weren't supposed to

5    provide according to some court order?

6        A.    Correct.

7        Q.    Other than that, what do you mean when you say

8    there is some sort of conduit between this office and Mr.

9    Magedson?

10       A.    That is all I mean.

11       Q.    That is all you meant?

12       A.    Yes.

13       Q.    We had a copy of a police report in your file.

14             Do you know when you obtained that police

15   report from the Mesa Police Department?

16       A.    I don't.  I think it is stamped on the front.

17       Q.    Okay.

18       A.    May, perhaps.

19       Q.    It is stamped that it was released to you on May

20   14th, 2007.

21       A.    Yes.

22       Q.    What did you need to do in order to get this

23   police report?  Did you have to fill out some sort of

24   form?

25       A.    Yes.

1    Q.    Who did you submit that form to?

2    A.    The clerk at the police department.

3    Q.    Did you have a conversation with Detective

4    Gumina?

5    A.    Yes.

6    Q.    Tell me about that conversation.

7    A.    Detective Gumina indicated that because he wasn't

8    able to ascertain yet who the author of the death threat

9    letters were, Mr. Magedson tried to implicate me in the

10   death threats, that he records everything, that I need to

11   be careful.

12   Q.    Okay.

13   A.    I asked him if he was aware of any issues between

14   the City of Mesa.  Wanted to ascertain if he was going to

15   be tainted in what he was doing.  And Ed Magedson and

16   Detective Gumina indicated he only had been on the force

17   one year and he had no knowledge of any adverse history

18   between the city, the police department or him.

19   Q.    Okay.

20   A.    He had indicated, I believe, that he had received

21   some tapes to go along with the police report that alleged

22   Russo and Stanley had threatened Mr. Magedson, but there

23   was no substance on those tapes that would definitively --

24   they said there were no death threats on there.

25   Q.    Sergeant Gumina told you that there were no death

1   threats on the tapes?

2       A.   I believe so.

3       Q.   He said there were no death threats on the tapes

4   from Stanley to Magedson?

5       A.   I don't know that that was defined.

6       Q.   What do you think he was talking about?  What

7   tapes do you think he was talking about?

8       A.   The police report says that Mr. Magedson turned

9   over three tapes.  That is the only tapes I have reference

10  to.

11      Q.   The officer's conclusion was there was no death

12  threats on there?

13      A.   Yes.  I think it says so in the police report as

14  well.

15      Q.   Did Officer Gumina tell you that -- I'm sorry.

16  Did you tell Officer Gumina that Ed Magedson threatened

17  you?

18      A.   Threatened me?

19      Q.   Yes.

20      A.   I don't think so.

21      Q.   Have you ever told anyone that Ed Magedson

22  threatened you?

23      A.   I don't think so.

24      Q.   Has Ed Magedson ever threatened you?

25      A.   No.

1      Q.    Do you feel threatened by him?

2      A.    No.

3      Q.    You said that pretty emphatically.

4      A.    I don't think he is going to reach over the table

5   and beat me up.

6                  Is that what you mean?

7      Q.    I don't know what I mean.

8                  Did you tell anybody you feel threatened by

9   him?

10     A.    No.

11     Q.    Did you tell -- withdrawn.

12                 MS. SPETH:  Mark this.

13                 (Deposition Exhibit No. 14 was marked for

14   identification.)

15     Q.    BY MS. SPETH:  Take a look at Exhibit 14.

16     A.    Okay.

17     Q.    Is that a printout from your Web site?

18     A.    Yes.

19     Q.    On the front page of your Web site, at least on

20   the front page of what is Exhibit 14, on the left-hand

21   column there are some links.

22     A.    They are pages.

23     Q.    One of the pages says Internet Defamation.

24                 See that?

25     A.    Yes.

1    Q.   Do you know what that page goes to?

2    A.   Probably goes to a page on my Web site.

3    Q.   A page about what?

4    A.   I think it is probably a portion of the letter

5    that I had posted that I am now a subject or a post on the

6    Rip-off Report.  You probably have it, but I don't know

7    specifically.

8              I made some changes to the Web site.

9    Q.   Do you think it goes to a page or reference to

10   Bill Stanley?

11   A.   I think at one point in time there was probably a

12   banner for Defamation Action League.

13   Q.   And Defamation Action League being Bill Stanley's

14   organization, correct?

15   A.   I presume so.

16   Q.   You had a banner on your Web site regarding Bill

17   Stanley's organization?

18   A.   Yes.

19   Q.   Why was that?

20   A.   Mr. Stanley did me a favor by getting Robert

21   Paisola to remove that blog.  I had high hopes that

22   Mr. Stanley's intentions out there were to create a way of

23   helping victims alleviate their situation.

24   Q.   Okay.

25   A.   This was my -- certainly didn't ask me to.  This

1  was my way of saying thank you.

2      Q.    The way he did you that favor, according to

3  Mr. Stanley himself, was by hacking into Mr. Paisola's

4  system and getting e-mail addresses, correct?

5      A.    That is what you indicated last time.  You asked

6  me if I knew that hacking was illegal, and since I am not

7  an attorney, I have to answer no.  But the hacking, when I

8  looked it up afterward, indicates that it is the

9  unauthorized entry into a secured database.

10     Q.    Okay.

11     A.    What Mr. Stanley has said he did, and whether he

12 did it or not, I don't know, he said he got into the Web

13 site and he pulled out the e-mail information, e-mails

14 that were in Paisola's server, and sent them out.

15     Q.    400 of them, correct?

16     A.    That is what Stanley says.

17     Q.    Right.

18             He told you that he got into Paisola's Web

19 site, extracted 400 e-mail addresses, and sent out 400

20 e-mails?

21     A.    That is what he said.

22     Q.    You have some question in your mind whether that

23 is legal?

24     A.    Well, again, the definition says a secured Web

25 site.

1          Has Mr. Paisola filed a complaint with the

2   police?  I don't know.

3      Q.   I didn't ask you if he filed a complaint, I asked

4   you if you have some doubt in your mind --

5      A.   I don't know if he has committed a crime or not.

6      Q.   You just know that it was helpful to you?

7      A.   Well, I know that I told him later on I am not

8   willing to break the law or sell my soul to have something

9   like that done.  If it means putting the information back

10  up, that is what has to happen.

11     Q.   Did information ever go back up?

12     A.   It didn't.

13          MS. SPETH:  Mark this.

14          (Deposition Exhibit No. 15 was marked for

15  identification.)

16     Q.   BY MS. SPETH:  So on your Web site, let's look at

17  Exhibit 15, and on your Web site if you click on

18  Defamation Action League, or at least at one time if you

19  clicked on Defamation Action League, you would get what we

20  see in Exhibit 15.

21          Do you agree with me?

22     A.   Yes.

23     Q.   And let's --

24     A.   If you click on Defamation Action League, it

25  might have been a link to his Web site.  I think what you

1  just asked me is -- did you ask me if you click on

2  Defamation Action League does it go to a link on my Web

3  site?

4      Q.   No.   If I click on Defamation Action League on

5  your Web site, or at least at one time if I clicked on it

6  as of July of 2007, isn't it true that what I would see is

7  what you would see on Exhibit 15?

8           Do you see what I am saying?

9      A.   I see what you are saying.

10          If you clicked on Internet Defamation, a

11  page on my Web site, this is what would come up.

12     Q.   Okay.

13     A.   If you clicked on the banner Defamation Action

14  League, I believe it is probably HTML code, there would be

15  a link to his Web site.

16     Q.   If you clicked on Internet Defamation, what would

17  come up would be what we see on page 2 of Exhibit 15,

18  correct?

19     A.   Yes.

20     Q.   And is that something that you wrote?

21     A.   Yes.

22     Q.   In the second paragraph of exhibit -- page 2 of

23  Exhibit 15, there is a reference to your conversations or

24  your -- you taking your findings to Sarah Fenske at the

25  New Times, correct?

1    A.    Yes.

2    Q.    And where was this letter that is exhibit -- that

3  is page 2 of Exhibit 15 posted other than your Web site,

4  if anywhere?

5    A.    If anyplace, it is only posted on an article that

6  I wrote for Emazines.

7    Q.    Was this the full content of the article or were

8  there other stuff?

9    A.    I believe this is it.

10   Q.    What was your purpose of posting this on

11  Emazines?

12   A.    It was an attempt -- I had noticed that that had

13  a relatively strong link and that I was experimenting to

14  determine whether or not by posting on that if it would

15  come up in a strong position on the front page of Google.

16   Q.    Okay.

17   A.    And it did.

18             (Discussion off the record.)

19             MR. DANA:  Can we take a short lunch break

20  soon?

21             MS. SPETH:  Yes.

22             (Recess taken.)

23             THE REPORTER:  There is a little overlapping

24  of the speakers going on.

25             MS. SPETH:  We both improved over last time.

1    You should see what we did to poor Stacey.  You talk about

2    talking over each other, oh, my goodness.

3              We really do need to be more careful or we

4    are not going to get a clear record.

5       Q.    BY MS. SPETH:   Did you ever receive any

6    information from the Mesa Police Department regarding Ed

7    Magedson's address?

8       A.    No.

9       Q.    I have the deposition on July 31st, 2007.

10             You told me that you got Ed's address from

11   an anonymous caller?

12      A.    Yes.

13      Q.    And that you traced the call to a pay phone on or

14   near Thunderbird.

15             Is that correct?

16      A.    Yes.

17      Q.    What process did you use to trace the call?

18      A.    Accurant.

19      Q.    What is Accurant?

20      A.    A subsidiary of Lexus Nexus.

21      Q.    How does it work?  Do you have to be a

22   subscriber?

23      A.    Yes.

24      Q.    You are a subscriber?

25      A.    Yes.

1      Q.    For how long have you been a subscriber?

2      A.    A year, perhaps.

3      Q.    And does Accurant work on a particular phone or

4  every phone or -- in other words, is every line you use

5  covered by Accurant?

6      A.    What you have to understand about Lexus Nexus,

7  all of the competitors, they will tell you up front the

8  information could be flawed.

9      Q.    Okay.

10     A.    I understand that when I go in there.

11           No, it doesn't operate on every phone.  The

12  information that comes up -- you know, people spoof phone

13  numbers.

14     Q.    Let me go back to my question.  Maybe you

15  answered my question in the middle of everything else you

16  felt like saying.

17           My question was, you have a cell phone and a

18  home phone and a work phone, or no?

19     A.    I have Skype and a cell phone.

20     Q.    Skype is what?

21     A.    Telephony for lack of a better term.

22     Q.    That is what you use for your business?

23     A.    Yes.

24     Q.    Then you have a cell phone?

25     A.    Yes.

1      Q.    Do you use Accurant to trace calls that come into

2  your cell phone?

3      A.    I did in that case.

4      Q.    If it is a subscription service, doesn't it work

5  in every case?

6      A.    I can plug in any phone number I want.

7  Information doesn't come back on every phone number.  You

8  have to understand where they get the information from and

9  how it works.

10     Q.    I am not talking about the incoming phone

11 numbers.  What I am trying to figure out is, are you using

12 Accurant to trace all calls that come into your cell phone

13 number?

14     A.    No.

15     Q.    What do you have to do to differentiate between

16 calls that are traced and the ones that aren't?

17     A.    I have to plug the phone number into Accurant

18 system.

19     Q.    What you are saying, your cell phone records who

20 called you?

21     A.    Yes.

22     Q.    Then you take that number, you plug it into

23 Accurant?

24     A.    Yes.

25     Q.    I see.

1              If they call on Skype, do you still have a

2    record of who called you?

3      A.    If it is a blocked number, no.

4      Q.    All right.  So let's talk about the call you gave

5    that gave you Ed's address, the one you volunteered to us

6    during your last deposition, that address.

7      A.    Okay.

8      Q.    That call came in on your cell phone?

9      A.    Yes.

10     Q.    What phone number was that?

11     A.    602 438-6033

12     Q.    And who is the carrier you have that cell phone

13   with?

14     A.    Nextel, but it is now Sprint.

15     Q.    At the time it was Nextel?

16     A.    I don't know.

17     Q.    That --

18     A.    It goes back and forth.  Sprint is the one that

19   bills me.

20     Q.    Okay.  About what time of day did that call come

21   in?

22     A.    11:00 in the morning.

23     Q.    It was shortly before your deposition, correct?

24     A.    A few days before.

25     Q.    It wasn't a blocked call?

1     A.    No.

2     Q.    What was the phone number?

3     A.    I don't know.  I didn't erase it, but they don't

4  stay on my cell phone.  Over a period of time they are

5  going to get deleted.  I have a Blackberry.  I think I

6  have it set up for every 15 days all my e-mails will wind

7  up getting deleted so it doesn't clog up the server.

8     Q.    In order to run an Accurant report didn't you

9  write the number down somewhere?

10    A.    No.  I looked at my cell phone, I plugged it into

11 Accurant and it came up.

12    Q.    When you say you "plugged it in," you mean you

13 typed it?

14    A.    Yes.

15    Q.    The Accurant report that you did you did it --

16 did you keep a copy of it?

17    A.    No.

18    Q.    Why is it that when we had your deposition you

19 said you had a copy and you would provide it?

20    A.    Because at that point in time I would have had at

21 least the phone number, and I can always go back into

22 Accurant and pull it up.

23    Q.    You are saying that you were going to recreate it

24 for me?

25    A.    Recreate it.

1    Q.    What changed?

2    A.    I don't have it now.  As a matter of fact, when

3 you requested it in your -- in the paperwork I got, I went

4 to my cell phone to see if the number was still there, and

5 it wasn't.

6    Q.    Okay.

7    A.    My bills I get from Sprint do not have phone

8 numbers going in and out.  I contacted Sprint and asked

9 them if there were ways for me to go ahead and pull a

10 billing statement from July, supposing that number would

11 be in there.

12    Q.    Okay.

13    A.    What they force you to do is, for security

14 purposes, you have to go in and register.  I went in and

15 tried to register, and it came back saying they couldn't

16 register me.  I called Sprint and asked them what is the

17 problem.  I needed to be registered so I can retrieve that

18 phone number and go ahead and trace it for you again.

19    Q.    Okay.

20    A.    They said they would send me an e-mail walking me

21 through the steps of registering so I can get all my phone

22 numbers that come in and out.

23    Q.    Okay.

24    A.    It became too much of a nuisance.  Never received

25 the e-mail.  Never provided me with access to my own

1   billing statement with the phone numbers.

2       Q.   You told me in your deposition in July that you

3   saved the trace on your cell phone.

4       A.   I saved the number.  I didn't erase it.

5       Q.   I asked you what was the trace -- I asked you how

6   did you learn where Ed lives, and you said, I got an

7   anonymous phone call.  I sent the trace on the phone call

8   to the FBI.

9             Tell me about that part.

10      A.   Well, I believe I sent that by e-mail to Travis

11  Hatch.

12      Q.   You believe?

13      A.   Yes.

14      Q.   And --

15      A.   That is --

16      Q.   -- that means you have an e-mail somewhere?

17      A.   No.

18      Q.   Why not?

19      A.   Anything that has to do with Travis Hatch I would

20  get rid of immediately.

21      Q.   So you destroyed evidence?

22      A.   I destroyed that.

23      Q.   Evidence you knew I asked for?

24      A.   Counselor, I can always go back and get it.

25  There is no reason for me -- in my particular mind I

1   didn't think I was destroying it, I thought I still had it

2   on my cell phone.

3        Q.    Okay.

4        A.    And I guess if I had to hammer Sprint longer,

5   they would probably still give me access to my billing

6   statements.

7        Q.    You sent the trace on the phone call to the FBI.

8              What does that mean, the trace on the phone

9   call?

10       A.    It means I went into Accurant, pulled up the

11  information the phone number had listed for.

12       Q.    Okay.

13       A.    I think I sent an e-mail to Travis Hatch letting

14  him know that somebody had provided me with Mr. Magedson's

15  address and that was the phone number.

16       Q.    You sent him the Accurant report?

17       A.    I don't think I did.

18       Q.    Then what did you mean when you said I sent the

19  trace --

20       A.    The information, just the information.

21  Thunderbird -- the information that showed up on the

22  report.

23       Q.    After you sent that to Travis, you deleted your

24  e-mail out of your send box?

25       A.    Yes.

1    Q.    How long between when you sent it to Travis and

2    when you deleted it?

3    A.    Frankly, I don't know, because I indiscriminately

4    will go in and just clean house.  I never purposely

5    deleted too many things.  I have another e-mail address

6    actually that automatically destroys itself.

7    Q.    Okay.

8    A.    It is more room so I can send bigger files.

9    Q.    How often does it destroy the contents?

10   A.    As soon as I send it.

11   Q.    I said what was the trace on the phone call, you

12   said it is a pay phone on Thunderbird.  I saved the trace

13   on my cell phone.  It was pretty simple.

14            What did you mean I saved the trace on my

15   cell phone?

16   A.    It is on my cell phone, meaning I didn't delete

17   it.  It was on my cell phone.

18   Q.    Nobody calls it a trace when you have a number on

19   your cell phone.

20   A.    I have already explained to you, I went into

21   Accurant and pulled it up.  I can't take an Accurant

22   report and save it on my cell phone.

23   Q.    But that is what you told me you did, isn't it?

24   A.    I don't know.  If you say I did I did.

25   Q.    Okay.

1     A.   It was misworded.

2     Q.   Okay.

3     A.   If you subpoena Sprint, I am sure they will pull

4  up the cell phone records, and if I am forceful enough

5  with them, I am sure they will finally get it set up so I

6  can get the phone numbers that have come in and out.   I

7  don't care if you have it.

8     Q.   You would care if I had it if in fact you weren't

9  telling the truth to begin with.

10    A.   That would be true, but it would be disappointing

11 for me to get it from Travis Hatch.

12    Q.   Unless it doesn't exist?

13    A.   That is true.

14    Q.   What did the Accurant report say about where the

15 number came from?

16             It said Thunderbird, but what else?

17    A.   It said it was a pay phone at an apartment.   It

18 listed apartment number something.   I don't recall.   I

19 found it contradictory it was a pay phone and an apartment

20 number.

21    Q.   Okay.

22    A.   Since I deal with it all the time, I understand

23 they warn you the information on Accurant is only as good

24 as the people that plug in the information.

25    Q.   What does that mean?

1    A.    It means Lexus Nexus and Accurant and the other

2    organizations compile their information from various

3    sources, headers and credit bureaus, public record, all

4    sorts of information.

5    Q.    Okay.

6    A.    Essentially what it means that whoever is

7    inputting the data on their particular end, the

8    information is only as good as what they put in.

9    Q.    Okay.

10   A.    They will tell you off the top it could be

11   flawed.

12         We all know people spoof numbers too.

13   Q.    You said that a couple of times.  You think this

14   number was spoofed?

15   A.    I don't know if it was spoofed or not.

16   Q.    Where on Thunderbird was this apartment?

17   A.    Counselor, this is my promise to you.  I don't

18   know where on Thunderbird, but if you want, I will go back

19   into Sprint and again be pretty forceful about getting

20   access to all of my phone numbers and pull it up so you

21   can have it.  I don't care if you have it or not.

22   Q.    See, the problem is at the last deposition we had

23   this conversation.  I made it very clear to you that I

24   wanted that and then you destroyed it --

25   A.    You waited 60 days to --

1    Q.    I asked for it at the last deposition.  When I
2    didn't get it --
3    A.    Do you feel like waiting 60 days for that request
4    is --
5    Q.    I asked for it at your last deposition.  You
6    didn't provide it.
7    A.    No.
8    Q.    You are saying you think it is reasonable to
9    destroy something you knew I asked for?
10   A.    I don't know I did destroy that.
11   Q.    I don't have a lot of sympathy about the fact you
12   can't find it when you knew I was looking for it.
13         I asked you at your deposition on July 31st,
14   will you produce that paper, that Accurant report.  Your
15   answer was of course.
16   A.    Yes.
17   Q.    I then asked you what -- I'm sorry.  Let me back
18   up a second.  Let me ask you, what did the caller say who
19   supposedly gave you this information about Ed's address?
20   A.    Are you asking?
21   Q.    What did they say?
22   A.    The recording was, Ed Magedson lives at -- I am
23   not going to repeat the address.  Clearly you don't want
24   it in the record.
25   Q.    It's already in the record.

1          Go ahead.

2     A.    You had it removed, didn't you?

3     Q.    Doesn't matter to me.

4     A.    Ed Magedson lives at 1116 North Sabrina, Mesa,

5 Arizona.   I think he repeated the address again, and he

6 will be moving to the address over on Ambrosia.

7     Q.    You didn't actually have a conversation with this

8 person?

9     A.    Right.

10    Q.    It was a voice mail?

11    A.    Yes.

12    Q.    You also told me at your deposition you saved the

13 recording on your cell phone.

14          I take it you have erased that too?

15    A.    I think I indicated to you they don't stay on my

16 cell phone.   Everything goes away after 15 days.

17    Q.    You did nothing to --

18    A.    Sorry.

19    Q.    Following your deposition on July 31st, you did

20 nothing to preserve that recording?

21    A.    I did not.

22    Q.    At that time at your deposition in July I

23 asked -- I'm sorry.   You asked me if I wanted a copy of

24 that recording, and I responded I do, and you said no

25 problem.

1            But you didn't follow up, did you?

2      A.   I did.  When I received your formal notice, I

3  went back into my cell phone to see if that particular

4  recording was there, and it was not, so I called Sprint.

5      Q.   Following the deposition you did nothing to

6  preserve that recording?

7      A.   Did nothing to preserve it.

8      Q.   You knew you were under subpoena to provide

9  information, correct, under legal subpoena?

10     A.   I knew that I had provided you everything asked

11  for in the subpoena.  I received that voice mail after the

12  subpoena.

13            Am I obligated to keep providing things to

14  you?

15     Q.   You knew that as of the date of July 31st, 2007,

16  you provided everything I asked for in the subpoena?

17     A.   Say that again.

18            MS. SPETH:  Read back his answer.

19            (Record read.)

20     Q.   BY MS. SPETH:  What you just said there isn't

21  true, is it?

22     A.   I am not sure I am following.

23     Q.   Sure.

24     A.   When was your subpoena issued to me?  It is a

25  rhetorical question.

1              When I came in here, you were upset I hadn't
2     provided everything to you.   I provided everything to you,
3     but your subpoena came -- I got this recording two days
4     before I walked in here.
5          Q.   So --
6          A.   It wasn't erased on purpose.   I don't care if you
7     have it.   I don't think it's going to be much trouble for
8     you to get the phone number and trace it exactly where it
9     comes up in Accurant.
10         Q.   Okay.
11         A.   In my particular point of view, I am not hiding
12    it.   It is nobody that I knew.
13              So if you are alluding to that I
14    purposefully destroyed something so you can't have it, you
15    are incorrect.
16         Q.   Just now I was asking you about the fact you just
17    stated on the record you knew you provided everything to
18    me in the subpoena, when in fact you know you didn't
19    provide me everything.
20              Am I wrong?
21         A.   Apparently not.
22         Q.   Okay.   Following your deposition on July 31st,
23    didn't you go back to the neighborhood where you knew Ed
24    to own a home and speak to some more neighbors?
25         A.   I did not.

1      Q.    Do you have a dog?

2      A.    I have two dogs.

3      Q.    Did you take either one of them for a walk in

4    Ed's neighborhood?

5      A.    Of course not.

6      Q.    Do you ever remember any incident where any of

7    the neighbors in Ed's neighborhood told you to leave or

8    they would call the police?

9      A.    No.

10     Q.    Did Ed ever tell you that people haven't been

11   able to serve him with process or that any time he has

12   been served it has been improper?

13     A.    Yes.

14     Q.    When did he tell you that?

15     A.    Well, I believe our first communications was when

16   he elaborated on his criminal past that I didn't care

17   about.

18     Q.    What did he say about his criminal past?

19     A.    I think he mentioned a marijuana bust and he

20   mentioned the bad check thing.  I didn't care.

21     Q.    And if you didn't care, why did you just bring it

22   up now when I didn't ask you about it?

23     A.    You asked me what the content of the conversation

24   was.

25     Q.    I asked you if he said he wasn't served or

1   properly served.

2       A.    Well --

3       Q.    You volunteered to talk about his criminal past.

4   But you don't really care about his criminal past?

5       A.    I don't.

6       Q.    But you felt compelled to make sure you mentioned

7   that, right?

8       A.    Compelled?  No.

9       Q.    You volunteer what you want me to hear; isn't

10  that true?

11      A.    I don't think it is a big secret, I don't think I

12  am bringing anything out in the open that doesn't exist.

13      Q.    No, but you want to make sure you remind me,

14  right?

15      A.    No.

16      Q.    Let's go back to getting about Ed telling you

17  something about he hadn't been served or properly served.

18            What do you remember about that

19  conversation?

20      A.    I don't remember a whole lot about it --

21      Q.    All right.

22      A.    -- if anything.

23      Q.    You said it was one of the very first

24  conversations you guys ever had?

25      A.    Yes.

1       Q.    Do you remember like what brought that up?

2       A.    Yes.

3       Q.    What?

4       A.    I had posted something about -- is it Federated?

5  And he called me and asked if it was okay he posted it in

6  a particular area.

7       Q.    What did you post about Federated?

8       A.    Essentially public records that existed on

9  Mr. McFarland.

10      Q.    How did he know you posted it?  Do you know?

11      A.    I am registered with Rip-off Report.  I noticed

12  on that particular day that Federated was coming up

13  extremely -- more frequently than other posts, which drew

14  my attention to it.

15      Q.    Okay.

16      A.    I looked at it, started studying it.  I pulled up

17  a public record on Mr. McFarland and sent the post in.

18  Mr. Magedson called me from the phone number that I had

19  registered with Rip-off Report.

20      Q.    Okay.

21      A.    Asked me specifically if he could post it and

22  post it in a particular area.  That was one of the first

23  conversations, I think.

24      Q.    Is that the post where you talked about a

25  Paladin -- I can't remember the words.

1    A.    Yes.

2    Q.    It is your testimony that Mr. Magedson asked you

3    if he could post that before he posted it?

4    A.    I don't know when he posted it.  He asked me very

5    specifically if he could post it and in a particular area.

6    I don't know where.

7    Q.    All right.  So it wasn't about whether to post

8    it, it was about where to post it, maybe?

9    A.    Perhaps.

10   Q.    Do you remember having a conversation with Ron

11   Jarvis?

12   A.    Yes.

13   Q.    Did you tell Ron Jarvis that -- let me ask you it

14   this way.  What did you tell Mr. Jarvis about

15   Mr. Magedson?

16   A.    That I have every reason to believe that

17   Mr. Magedson probably has been discriminated against for

18   several things in his life, that Mr. Jarvis was trying to

19   ascertain from me if the information Bill Stanley had told

20   him was correct about that he was committing extortion.

21   Q.    Okay.

22   A.    I pointed Mr. Jarvis to Pacer and told him it is

23   really not up to me.  It has been alleged in Pacer

24   documents or something he needs to look at and ascertain

25   for himself what the reality is.

1    Q.    You told him what he would find in Pacer, there

2    was a $10 million judgment against Rip-off Report?

3    A.    I don't believe I told him that at all.

4    Q.    What were you directing him to in Pacer?

5    A.    There are several -- well, federal lawsuits.

6    Q.    You didn't tell Mr. Jarvis that Rip-off Report

7    had a $10 million judgement against it?

8    A.    I don't think so.

9    Q.    If Mr. Jarvis testifies that way, that is just --

10   he is just wrong?

11   A.    He is probably wrong.  I presumed he was

12   recording.

13   Q.    Did you talk to Mr. Jarvis about anyone who you

14   called a victim of Rip-off Report?

15   A.    I don't know.

16   Q.    Did you tell Mr. Jarvis that there were federal

17   indictments against Mr. Magedson?

18   A.    No.

19   Q.    Okay.  Did you discuss Helen Golendal with Mr.

20   Jarvis?

21   A.    I don't know.  I don't think so.  I don't know

22   her.  Never spoken to her.

23   Q.    Did you tell Mr. Jarvis that Ed is Jewish, gay

24   and has an ability to make people angry?

25   A.    Yes.

1    Q.    Why did you tell him that?

2    A.    Because that is part of why I believe

3  Mr. Magedson has been discriminated against in his life.

4    Q.    And that is what you told Mr. Jarvis?

5    A.    I believe so.

6    Q.    In what way has Mr. Magedson been discriminated

7  against in his life?

8    A.    He has indicated that the City of Tupper Lake has

9  discriminated against him because he has long hair and is

10  Jewish.

11    Q.    Okay.

12    A.    It is not unusual to believe that even in 2007

13  that there are people in the world that don't accept

14  people being gay or Jewish or long hair, whatever else it

15  is.  I can believe 20, 30 years ago somebody has probably

16  tried to make this man a victim.

17    Q.    So you think that is the context in which you

18  made those statements to Mr. Jarvis, the context being

19  that this is why he is discriminated against, as opposed

20  to you just saying these are the three things I know about

21  Mr. Magedson?

22    A.    No.  The context of the conversation is that

23  anybody that -- a lot of people that get involved in the

24  Rip-off Report and try to analyze why Ed Magedson does

25  what he does.

1     Q.    Okay.

2     A.    The analogy that I am able to come up with, he

3   feels discriminated against, and I think he probably has

4   been discriminated against and he does what he does

5   because of that discrimination.

6     Q.    Is it your testimony that you don't tell people

7   that Ed Magedson is gay in order to make him look bad?

8     A.    It is not, and in fact, the audiotape that went

9   to the FBI with -- that came from Jack Delahaney, says

10  clearly that he is openly gay.  So I don't think that -- I

11  don't find that scurrilous.

12    Q.    Okay.

13    A.    I don't find that to be bad.  I haven't heard

14  anyone say anything bad.  However, that is the one thing I

15  asked Bill Stanley to remove from one of his postings.  He

16  had posted that David Bedore was Ed Magedson's gay lover.

17    Q.    Okay.

18    A.    I asked him to remove it.

19    Q.    Why did you --

20    A.    Because I don't know that David Bedore is.  It is

21  nothing I ever told him.

22    Q.    Okay.

23    A.    He came up with it.  And I don't think it is --

24  wether he is Jewish -- in fact, I went into scam.com and

25  asked they remove the Jewish comments.  I think they did.

1    Q.   Do you know if Bill Stanley removed what you

2  asked --

3    A.   I don't think he did.

4    Q.   Where was that posting?

5    A.   Some forum somewhere.  He posted it on a forum.

6  I think it is accessible.  I followed up.  I asked him a

7  couple of times to do it.

8    Q.   You didn't tell people that Ed Magedson was gay

9  to try to embarrass him?

10   A.   No.

11   Q.   You just mentioned you don't know that David

12  Bedore is gay.

13        Do you know that Ed Magedson is gay?

14   A.   I can only tell you what the authorities of

15  Tupper Lake have said.

16   Q.   What did they say?  That he is gay?

17   A.   No.  The words were -- let me remember this --

18  that he was -- came from Fire Island.  There was a couple

19  of conversations.  Came from Fire Island.  I specifically

20  asked Jack Delahaney, "Isn't that a community with a good

21  amount of gays?"  He said yes, Magedson was openly out of

22  the closet.

23   Q.   Okay.

24   A.   No big deal, but in our last deposition it also

25  came out that Eric Skelling had made certain accusations.

1   Bill Stanley called Eric Skelling's mother and she

2   confirmed the relationship.

3       Q.    Okay.

4       A.    So I can conclude from many of these particular

5   conversations that that is probably the case, and in 2007

6   who would think ill of somebody like that.

7       Q.    I find it -- I am curious why you feel compelled

8   to tell people that when you are investigating Ed.

9              Isn't your goal when you are doing an

10  investigation to learn things?

11      A.    Yes.

12      Q.    Why does it seem like everybody I've talked to

13  has told me that what you really did was tell them things,

14  that Ed is gay, that Ed has RICO claims against him?

15             How does that further your goals of getting

16  information about Ed?

17      A.    Well, I think they are not telling you all of the

18  conversations.  Like the gentleman that sold the property

19  to him that had the accusation there was mold in it

20  indicated to me he follows up on the Web sites quite

21  frequently and he makes his money by extorting businesses.

22  Those were his words, not mine.

23      Q.    Okay.

24      A.    I think there is a lot of people out there that

25  take a great deal of license with what they think is going

1  on.

2      Q.    Except my question was, why do you tell people

3  stuff about Ed instead of just asking about Ed?

4      A.    They asked me, why does he do what he does?

5  Certainly I think it is a topic of conversation.   I think

6  it is interesting.

7      Q.    Bill Stanley called Eric Skelling's mother, that

8  is what you said, correct?

9      A.    Yes.

10      Q.    How do you know that?

11      A.    He told me.

12      Q.    How did he reach Eric Skelling's mother?

13      A.    Pulled up the phone number.   I didn't.

14      Q.    You didn't give him the phone number?

15      A.    Did not.

16      Q.    Did you ever have Eric Skelling's mother's phone

17  number?

18      A.    No.

19      Q.    Do you know who Eric Skelling's mother is?

20      A.    No.

21      Q.    Did you ask Bill Stanley how he got that number?

22      A.    No.   I would presume it is posted in the phone

23  book somewhere.

24      Q.    Do you even know her name?

25      A.    No.

1    Q.    Did he say whether he talked to Eric Skelling?

2    A.    He didn't say that he did.  I think it would be

3  unlikely that he has spoken to him.

4    Q.    Why?

5    A.    He is in prison.

6    Q.    You had a hard time speaking to him, you tried to

7  see him in jail and you couldn't?

8    A.    Correct.

9    Q.    He wasn't in jail the entire time that you have

10  been investigating Ed, right?

11    A.    That I don't know.  They said he went into jail,

12  I believe, January, or at least the county jail, in

13  January.  Where he was before that I don't have a clue.

14    Q.    Did Bill indicate that he was -- Bill Stanley

15  indicate that he was doing any other investigation about

16  Ed?

17    A.    Well, no.  Bill had called Gary once.  I mean I

18  had asked him not to.  He did and had a long conversation,

19  but didn't really disclose to me what that conversation

20  was.

21    Q.    Just told you that he had it?

22    A.    Yes.

23    Q.    Anyone else that he told you that he called in

24  investigating Ed?

25    A.    No.

1      Q.    Did he tell you why he was doing this, why he was

2  investigating?

3      A.    I don't know that he was investigating Ed.  He

4  simply was probably trying to look for dirt on him.

5      Q.    Did he tell you that or is that what you are

6  assuming?

7      A.    You know what, he is a bit of a paradox.  I mean

8  Bill on one hand will say, you know, gay bashing is wrong,

9  and I agree, on the other hand, he goes out and posts that

10 stupid post.

11     Q.    Okay.

12     A.    I can't really -- I have gone to him and asked

13 him to correct some of his behavior.  He clearly beats to

14 his own drummer.

15     Q.    Do you know when this conversation between Gary

16 Magedson and Bill Stanley occurred?

17     A.    I am going to guess March.

18     Q.    2007?

19     A.    Yes.

20     Q.    Is that about the same time the conversation

21 occurred with Eric Skelling's mother?

22     A.    No, I think the Eric Skelling's mother

23 conversation took place maybe July.

24     Q.    Of 2007?

25     A.    Yes.

1       Q.    Do you think it was after your deposition, your

2    last deposition, or before?

3       A.    I think before.

4       Q.    I want to go through some of the neighbors you

5    have spoken with.  Last time we got bogged down on what is

6    confidential, what is not.

7       A.    Right.

8       Q.    Give me a list of the neighbors of Ed's that you

9    remember speaking with.

10      A.    From the Ambrosia Street, is it Bill Buyer, the

11   gentleman that sold the house to Mr. Magedson; the lady

12   next door, I believe she goes by Patsy; the gentleman on

13   the other side of her, I believe their last name is

14   Johnson.

15      Q.    Okay.

16      A.    On the McDowell address I gave you two names that

17   I spoke to up there, Randy Henderson, and then the other

18   gentleman on the corner.  I can't remember his name.

19      Q.    Okay.

20      A.    Sterling -- I don't remember.

21      Q.    Back on Ambrosia, those are the only three

22   neighbors you spoke with?

23      A.    Yes.

24      Q.    Ever spoke with a real estate agent?

25      A.    Yes.

1  Q.   Who was that?

2  A.   I don't remember her name.  You had mentioned it

3  last time.

4       Yes, I spoke to her.

5  Q.   What did you say to her?

6  A.   I asked where he was.  She told me you were the

7  liaison for the sale, that she had met Mr. Magedson at a

8  shopping center, I think is what she had indicated.

9  Q.   Okay.

10 A.   He was pricing his property too high and she

11 wasn't able to sell it.  She was referred to me from the

12 gentleman on the corner, whose name I don't remember.  No

13 --

14 Q.   I am more interested in what you said to her.

15 What --

16 A.   I don't remember, Counselor.

17 Q.   You don't remember what you told her about Ed

18 Magedson?

19 A.   Correct.

20 Q.   Did you tell her Ed was gay?

21 A.   I don't know.

22 Q.   Did you tell her that Ed had indictments against

23 him?

24 A.   No.

25 Q.   Did you tell her that there were federal RICO

1    cases?

2        A.    I don't know.

3        Q.    How about Steve Johnson, did you tell him that

4    there were -- that there were federal indictments against

5    Ed?

6        A.    Who is Steve Johnson?

7        Q.    You said one of the neighbors was Johnson.

8        A.    Oh, Johnson.

9        Q.    First name Steve.

10       A.    I don't know what I spoke with him about.  It was

11   very brief.

12       Q.    You could have told him that Ed had indictments,

13   federal indictments against him?

14       A.    No.

15       Q.    If Mr. Johnson testifies that is what you told

16   him, that would be false?

17       A.    Exactly.

18       Q.    Any idea why Mr. Johnson would make that up?

19       A.    I think we explored that earlier.  When someone

20   hears RICO, they think criminal.  They don't understand it

21   is also a civil charge.

22       Q.    Did you say to Steve Johnson there were RICO

23   cases or charges against Ed?

24       A.    I don't know.  I am pretty careful about the

25   wording that I used.

1    Q.    Did you say RICO charges or RICO cases?

2    A.    Wouldn't say RICO charges.  I would almost always

3    say civil RICO cases.

4    Q.    So you think what you said to Steve Johnson was

5    that Ed had civil RICO cases against him?

6    A.    I don't know.  I don't remember the conversation

7    with him.

8    Q.    So then you would have no reason to disagree with

9    what he says you say if you don't remember?

10   A.    I would have plenty of reason if it is something

11   I wouldn't normally say.

12   Q.    Okay.  Let me ask you something.  Let's assume

13   that Mr. Johnson says, "What he did say was civil RICO

14   cases, that is what he said," what purpose would you have

15   in telling Ed's neighbor that he has civil RICO cases

16   against him?  What were you trying to accomplish there?

17   A.    Get information on where he is.  The neighbors

18   didn't have very good things to say about Mr. Magedson.

19   It was as much them venting to me as it was to me having

20   any kind of dialog with them.

21   Q.    Why do you provide that information to them?  Why

22   would you tell neighbors of Ed's that he has civil RICO

23   cases against him?

24   A.    One of them -- two of them had mentioned to me

25   that he has a Web site that makes people very angry and he

1  behaves very oddly.  Of course we are going to have

2  dialogue about things like that.

3      Q.    Okay.  So you are saying that the reason that you

4  told Steve Johnson that Ed has -- if you told him that Ed

5  had RICO cases against him, you did it because Steve

6  Johnson said to you that Ed had a Web site and behaved

7  oddly?

8      A.    I don't believe that Mr. Johnson said that, but

9  certainly I would want to have a dialog to prompt whomever

10  had the information on where Mr. Magedson was residing

11  would give that information.

12     Q.    Mr. Johnson is going to sign a declaration and

13  has approved a declaration that says you told him Ed had

14  federal indictments against him.

15             You are telling me that is not what you

16  said?

17     A.    That is correct.

18     Q.    But there is a possibility you said RICO cases

19  and Mr. Johnson may have misunderstood you?

20     A.    Perhaps.

21     Q.    I am trying to figure out why you told

22  Mr. Johnson Ed had either federal indictments against him

23  or at least RICO cases against him.

24             What was your purpose?

25     A.    I wanted to get an address for Mr. Magedson so he

1  could be served.

2      Q.    Would it be fair to say you wanted the neighbors

3  to believe he was wanted by the authorities so they would

4  provide you with information, so they would have a reason

5  to give you the information they knew?

6      A.    No, that is the guy that showed up the next day.

7  I presented every single one of them with a business card

8  identifying who I was.

9      Q.    Okay.

10     A.    There is no mistaking about the fact I'm a

11 private investigator.

12     Q.    I think you misunderstood my question.

13            Isn't it true that you gave this negative

14 information to the neighbors in an effort to make them

15 believe that they should provide you with information

16 because Ed was wanted by the authorities?

17     A.    No.

18     Q.    Did Steve Johnson express to you that he had a

19 great fear of Ed Magedson?

20     A.    I don't know if he did or not.   The other two

21 did.

22     Q.    Patsy and Mr. Buyer?

23     A.    Yes.

24     Q.    So the one I have spoken to that I have the

25 declaration from, he didn't tell you that?

1      A.    I don't know if he did or not.  It was a very

2   short conversation.

3      Q.    But it is your testimony that Patsy told you that

4   she had great fear of Ed's physical -- including physical

5   harm, that she could be physically harmed?

6      A.    No.  I don't think anyone has ever indicated

7   physical harm.

8      Q.    So none of the neighbors you spoke with told you

9   that they feared physical harm as a result from Ed?

10     A.    Correct.

11     Q.    Did Mr. Johnson ask you to not tell Mr. Magedson

12  that he spoke with you?

13     A.    I don't think so.

14     Q.    Did Patsy tell you to not tell Mr. Magedson that

15  she spoke with you?

16     A.    I don't know if she did or not.

17     Q.    We are talking about the Ambrosia address, right?

18     A.    Yes.

19     Q.    If you are standing at the Ambrosia address

20  facing the house, which way is Patsy?

21     A.    On the right.

22     Q.    Directly next door?

23     A.    I think so.

24     Q.    Then you think she has moved since maybe?

25     A.    Maybe.

1    Q.    Not sure?

2    A.    Yes.

3    Q.    All right.  Did Brian --

4    A.    I think it is Buyer.

5    Q.    Could it be Bill Boyd?

6    A.    Yes.

7    Q.    Let's assume it is Bill Boyd.

8    A.    Sure.

9    Q.    Did Bill Boyd tell you he was afraid, that he

10   feared physical harm from Ed Magedson?

11   A.    Not physical harm.

12   Q.    Did he tell you he did not want you to tell

13   Mr. Magedson he spoke with you?

14   A.    Well, I don't know that he expressed that to me

15   or not.

16   Q.    Okay.  Did Patsy say, "Don't tell Ed I spoke with

17   you"?

18   A.    I don't know that she expressed that or not.

19   Q.    Did the people over at the McDowell address say,

20   "Don't tell Ed I spoke with you"?

21   A.    No, they didn't say, "Please don't tell Ed."

22   They just didn't want it to be released.

23   Q.    Didn't want what to be released?

24   A.    The information they were telling me.

25   Q.    Didn't want you to tell anyone?

1       A.    Correct.

2       Q.    Let's get specific here.  Who told you, "Don't

3    tell anybody what I am telling"?  Who was that?

4       A.    Randy Henderson.

5       Q.    He lives where?

6       A.    In a reasonable proximity to the McDowell

7    address.  Next door.

8       Q.    What did he tell you he asked you not to tell

9    anyone?

10      A.    He had expressed a fear that he was going to wind

11   up on the Rip-off Report and he expressed a fear he was

12   going to be sued.

13      Q.    All right.

14      A.    He had a dialog with me regarding the

15   conversations Eric Skelling and Matt Mott had had with

16   them regarding Mr. Magedson, in their opinion, had alleged

17   he had the ability to get people killed.

18      Q.    And that is what he told you not to tell anyone?

19      A.    He had asked me not to disclose any information.

20   I told him that I couldn't make a promise like that in the

21   event I came under deposition.  There was no way I could

22   ever promise him I wouldn't disclose who provided that

23   information.

24      Q.    Okay.

25      A.    Including the flyer.

1    Q.   I am not going to ask the court reporter to read

2    it back.  I will ask you to repeat it because I didn't

3    completely catch it.  I heard something in there about a

4    death threat.

5              What did I miss?

6    A.   The Hendersons had indicated in their

7    conversations with Eric Skelling and Matt Mott they were

8    somehow under the belief that Mr. Magedson had the ability

9    to have people killed.

10   Q.   They told you that?

11   A.   Yes.

12   Q.   You are sort of speaking in a passive voice.

13             Are you saying that -- what did this have to

14   do with Skelling and this other person that you mentioned?

15   A.   That neighbors had a dialog with Skelling and

16   Matt Mott who related to the neighbors that Mr. Magedson

17   had told them that he had the ability to have people

18   killed.

19   Q.   I see.

20             Supposedly Magedson told Skelling and Matt

21   Mott that he had the ability to get people killed and then

22   they told Randy Henderson and then Randy Henderson told

23   you?

24   A.   Yes.

25   Q.   Did he tell you not to tell anybody that?

```
 1        A.    His original question was that he really didn't
 2   want to talk to me.  Wasn't even that.  He made it clear
 3   that -- I guess he was asking me not to tell anyone, and I
 4   told him that I can't make that promise.
 5        Q.    Not to tell anyone what?
 6        A.    The things he was going to relate to me.
 7        Q.    That he was your source of the information?
 8        A.    Yes.
 9        Q.    And did Randy Henderson express to you that he
10   believed that -- believed what Eric Skelling and Matt Mott
11   told him, that Ed really said that?
12        A.    About the death threats?
13        Q.    No, about the ability to have someone killed.
14        A.    I don't know that I walked away with an
15   understanding of whether they believed it or not.  They
16   certainly believed other things in the conversation.
17        Q.    What was your understanding of Ed Magedson's
18   relationship with Randy Henderson?
19        A.    According to Mr. Henderson, he showed me a letter
20   that he asserted was received from Mr. Magedson.  The
21   letter was anonymous but it discussed the -- the affairs
22   of his wife, that his wife was having an affair with
23   Mr. Henderson's brother.
24        Q.    Okay.
25        A.    You know, it was gossip essentially that -- and
```

1    it reported to come from another neighbor somewhere.  A

2    voyeuristic letter going to the Hendersons that your wife

3    does this and you people are trash and so on and so forth.

4    They showed me that letter --

5         Q.   Okay.

6         A.   -- believing it came from Mr. Magedson.

7              Then they showed me the flyer we had

8    discussed that had John Unger on it.  And they asserted

9    that Mr. Magedson was disseminating that flyer in the

10   neighborhood, that Mr. Henderson and Mr. Magedson had some

11   sort of an encounter.  I don't know that I understood

12   exactly what it was, what the encounter was or anything

13   else.

14        Q.   I asked you what the relationship was.

15             Basically it was just neighbors or did they

16   have some sort of business relationship?

17        A.   Didn't tell me --

18        Q.   Just neighbors?

19        A.   Yes, neighbors.

20        Q.   I think I asked you this last time.  Did you

21   follow up with John Unger?

22        A.   I have never spoken to the man.

23        Q.   Have you e-mailed with him?

24        A.   No.

25        Q.   Have you instant messaged?

1        A.    No, no communications.

2        Q.    At your last deposition when we were speaking

3   with the judge on the phone, you said to the judge that

4   all the neighbors knew what you were doing, that you

5   didn't misrepresent yourself to the authorities.

6        A.    Yes.

7        Q.    And that they all had your card and that the

8   neighbors were all -- they were all told what -- it says

9   they were all told what I was doing.

10                    What did you tell them about what you were

11   doing?

12        A.    I told them I was trying to find an address so

13   that Ed Magedson could be served a summons and complaint.

14   To go along with that, when Travis Hatch showed up at my

15   house, he produced for me a business card he obtained from

16   the neighbors.  I asked him point-blank, "When you

17   interviewed the neighbors, what did they say"?

18        Q.    Okay.

19        A.    He said, "The neighbors said you were trying to

20   get an address for service for Edward Magedson."

21        Q.    Okay.

22        A.    According to the FBI agent, when he interviewed

23   the neighbors, it is contrary to what you are indicating,

24   that they knew I was there to get an address for personal

25   service.

 1     Q.    But of course you had nothing to serve Mr.

 2    Magedson?

 3     A.    Of course not.

 4     Q.    All right.  Do you believe you violated any of

 5    the rules that you are supposed to abide by as a private

 6    investigator?

 7     A.    No.

 8     Q.    Do you believe that your actions in the way you

 9    dealt with Mr. Magedson have crossed the line in any way

10    from private investigator to somebody who is out to ruin

11    somebody's reputation?

12     A.    I think I am a wounded consumer, and I am

13    outraged.

14     Q.    And your interactions with people while you have

15    been investigating Mr. Magedson have reflected that,

16    haven't they?

17     A.    Yes.

18     Q.    You think it is appropriate for an investigator

19    to personally inject themselves in their investigation the

20    way you have done?

21     A.    I had purposely set myself up purposely to have

22    the slings and arrows be thrown at me.  Whether it is

23    appropriate or not, I don't think it is covered under the

24    Arizona Revised Statutes.

25          (Deposition Exhibit No. 16 was marked for

1   identification.)

2       Q.    BY MS. SPETH:   Showing you what has been marked

3   as Exhibit 16.

4              Let me just tell you that the Bates numbers

5   at the bottom mean these are the documents you produced to

6   me after your deposition which we Bates labeled.

7              Okay?

8       A.    Uh-huh.

9       Q.    This page indicates it is a $3,000, I don't know,

10  maybe deposit into Bank of America.

11             Do I have that correct?

12      A.    Yes.

13      Q.    Did this money come from Robert Russo?

14      A.    Yes.

15      Q.    Or QED Media, perhaps?

16      A.    Yes.

17      Q.    What was it for?

18      A.    It was for referring a client that needed public

19  relations help.

20      Q.    Do you know who that client was?

21      A.    I believe I told you in the last deposition that

22  this particular one was probably Video Professor and a

23  woman that is not on the Rip-off Report.   I can't remember

24  her name.

25      Q.    Okay.

1        A.    A business -- I told you in the deposition.  I

2   don't remember.

3        Q.    Do you think the 3,000 reflects two referrals?

4        A.    Yes.

5        Q.    Why are you so sure about that?

6        A.    Because the one referral would have been $500,

7   the other one would have been 2,500.

8        Q.    Was Video Professor the 500 or 2,500?

9        A.    2,500.

10       Q.    Okay.  Do you know -- it was a percentage, wasn't

11   it?

12       A.    50 percent.

13                  MS. SPETH:  Mark this.

14                  (Deposition Exhibit No. 17 was marked for

15   identification.)

16       Q.    BY MS. SPETH:  Let's take a look at Exhibit 17.

17   That's a $5,500 deposit.

18                  Is that also from either Mr. Russo or his

19   company?

20       A.    Yes.

21       Q.    What does that reflect, or what is that for?

22       A.    Commission from Video Professor and Buy Direct.

23       Q.    B-u-y D-i-r-e-c-t?

24       A.    Yes.

25       Q.    And again, was that 50 percent that you got?

```
 1        A.    Yes.

 2        Q.    Would it be fair for me to say that the way you

 3   get these referrals is you get on to Rip-off Report and

 4   you look and see who has multiple reports against them and

 5   then you call that person and find out if they are

 6   interested in Mr. Russo's services?

 7        A.    Not exactly.

 8        Q.    How do you find these referrals?

 9        A.    I get on to Google, actually, and some of them

10   are in different Web sites, like consumeraffairs, and as I

11   mentioned, one of them isn't even on Rip-off Report at

12   all.  They are over the Internet or in another Web site.

13              Video Professor isn't having a big challenge

14   with Rip-off Report, their challenge is

15   informercialscams.com.  In fact, just sued them in federal

16   court.

17        Q.    I don't understand.  If you are using Google,

18   what do you punch into Google?

19        A.    I will go into informercialscams.com or other

20   places or even the Rip-off Report.

21        Q.    That is what I asked.  You can't start with

22   Google, you wouldn't know what to punch into Google, would

23   you?

24        A.    Indeed.

25        Q.    So you have to start with a Web site that is
```

1    reporting somebody's conduct, right?

2        A.    Yes.

3        Q.    And that is what you do and that is how you get

4    referrals for Mr. Russo?

5        A.    Yes.

6        Q.    That is what I asked.

7                  MS. SPETH:  Mark this.

8                  (Deposition Exhibit No. 18 was marked for

9    identification.)

10       Q.    BY MS. SPETH:  I put in front of you Exhibit 18,

11   which are excerpts from what you produced to me.

12       A.    Okay.

13       Q.    Take a look at page 118 at the bottom, which

14   probably is the first page.

15                  That is an e-mail from yourself to Sarah

16   Fenske; is that correct?

17       A.    Yes.

18       Q.    Dated January 3rd, 2007?

19       A.    Yes.

20       Q.    This is not the first e-mail between you and her,

21   is it?

22       A.    I don't think so.

23       Q.    Do you know why you didn't produce anything

24   earlier?

25       A.    Well, I don't know that I have it.  If you have

1    gone through the chronology of it.  I don't know that I

2    have it.

3         Q.   Okay.

4         A.   You have to keep in mind that my Web-based e-mail

5    deletes to save space on the server.  If I don't pull the

6    e-mails down into Outlook, it will delete them.

7                   I pulled everything that I had everywhere.

8         Q.   Everything that you had that wasn't deleted?

9         A.   Exactly.

10        Q.   This January 3rd, 2007 e-mail refers to an e-mail

11   that you sent to her last night.

12                  Do you know where that e-mail is?

13        A.   I don't have any idea.

14                  Have you done a chronology of these e-mails

15   by date?

16        Q.   I tried to put them in chronological order, yes.

17        A.   Okay.

18        Q.   Can't promise you they are perfect.

19        A.   I don't have a clue.

20        Q.   What was your purpose in sending Sarah Fenske

21   this January 3rd, 2007 e-mail at 10:53 a.m.?

22        A.   I believe I was -- she hadn't done the report

23   yet, so, you know, sometimes she and I will just have

24   conversations as well.  There would be plenty of e-mails

25   from her and I back and forth talking about this

1   particular subject.

2       Q.   Okay.

3       A.   So some of the e-mails will mean nothing

4   whatsoever, except me having dialog with her.  Some of the

5   e-mails would be to assist her in her story.

6       Q.   In general is the purpose of your e-mails with

7   Sarah Fenske to get her to do a story?

8       A.   Yes.

9       Q.   Okay.  Do you have an office location on

10  Thunderbird?

11      A.   No.

12      Q.   Does Sarah Fenske have an office location on

13  Thunderbird?

14      A.   I don't think so.

15           The location you are discussing is when I

16  worked for Gary Bethune.  He is over in that area.

17      Q.   Thunderbird and 7th Street, isn't it?

18      A.   Close to it.

19      Q.   Take a look at page 119.  It is probably the next

20  page.

21      A.   Okay.

22      Q.   Do you see -- let's see.  How can we find the

23  line we are looking at here?

24           In the middle of the page it says "lunch is

25  good."

1    A.    Yes.

2    Q.    You say -- by the way, this is you talking here,

3    right?

4    A.    Yes.

5    Q.    You say, "I am disappointed many times that I

6    seem to have more energy on these issues than even the

7    victims do.  The authorities want me to hand them the case

8    on a silver platter and sometimes they need prompting by

9    getting exposure."

10              What is that a reference to?

11    A.    It is a reference to Jeffrey McCoon, which was a

12    case that I had to get involved in and originally brought

13    in The Arizona Republic because the police and the

14    Attorney General's Office didn't understand what crimes

15    had been committed.

16    Q.    So you are saying you weren't talking about Ed

17    Magedson when you said that?

18    A.    No.  Ms. Fenske had my history in terms of

19    helping out the authorities.

20    Q.    When you were e-mailing Ms. Fenske on the 2nd of

21    January 2007, you were talking about the Ed Magedson and

22    Rip-off Report story, were you not?

23    A.    Yes.

24    Q.    Do you believe that you were giving the

25    impression when you said "the authorities want me to hand

1    them the case on a silver platter," that you were talking

2    about this case?

3        A.    I wasn't talking about Edward Magedson.

4        Q.    I understand --

5        A.    My history with the authorities has been that I

6    literally have to gift-wrap it and hand it to them on

7    everything I have ever been in.

8        Q.    My question to you is, were you trying to get

9    Ms. Fenske to believe that the authorities were interested

10   in Mr. Magedson and that you needed to hand it to them on

11   a silver platter and that the media exposure would help

12   that happen?

13       A.    Quite the contrary.

14       Q.    What authorities have you worked with in the

15   past?

16       A.    Attorney Generals of Arizona and West Virginia,

17   all different places.  I am currently assisting the

18   assistant district attorney in Orange County, California

19   because Jeffrey McCoon has been indicted for 148 counts of

20   fraud.  The Provo -- the Lehi Police Department is

21   involved.  An investigation with Robert Paisola for

22   failure to register as a sex offender.  Among other

23   things.

24       Q.    Okay.

25       A.    The County Attorney's Office of the same

1    jurisdiction, I have been providing information to them as

2    well.  I have shown up for his arraignment.  Various

3    authorities.

4        Q.    Did you ever indicate to Sarah Fenske that the

5    authorities were interested in pursuing some sort of

6    criminal case against Ed Magedson?

7        A.    No.

8        Q.    Did you ever indicate to her that by her posting

9    a story or writing a story about him, that that might

10   prompt that to occur?

11       A.    No.

12       Q.    Take a look at the page 120 at the bottom.

13       A.    Okay.

14       Q.    It is the e-mail from Sarah Fenske dated January

15   2nd, 2007.  She says, "I find this all pretty interesting.

16   I am not familiar with Mr. Magedson, but after reading

17   your report and doing a bit of Nexis-ing, it sounds like

18   you are on to something.

19              What report is she referring to?

20       A.    She apparently has access to Lexus Nexus.

21       Q.    No, no, your report, she is referring to your

22   report.

23       A.    I put together a thumbnail sketch of some of the

24   things that were going on out there.

25       Q.    Where is that?

1      A.   She would have it.

2      Q.   You don't have it anymore?

3      A.   No.

4      Q.   You destroyed it?

5      A.   I probably gave it to her and didn't keep copies

6   of it.

7      Q.   All right.  When was the last time you checked

8   for it?

9      A.   I pulled everything out of my computers when I

10  sent you the -- when I sent you the stuff you had asked

11  for.

12     Q.   Take a look at what has 111 at the bottom.

13          Is that an e-mail you sent to Sarah Fenske

14  on February 1st, 2007?

15     A.   Yes.

16     Q.   Is this after the story was published in the New

17  Times or before?

18     A.   I believe the same day.

19     Q.   So you are making this e-mail, which is page 111

20  of Exhibit 18, this e-mail that you were writing, you were

21  writing it as a response to seeing the published story

22  that Sarah Fenske wrote about Rip-off Report?

23     A.   Yes.

24     Q.   What attorneys complimented her work?

25     A.   The attorneys I worked for, they read the

1   Internet version of it and thought she did well on her

2   work.

3       Q.    The way you interpreted that here was by saying

4   it was well written and that though she didn't

5   vociferously go after Magedson, they walked away thinking

6   he was a slime ball?

7       A.    Yes.

8       Q.    Is that what you considered well written?

9       A.    I am not -- that is their verbiage.

10      Q.    Well --

11      A.    Well written was I didn't really read that she

12  was attacking them so much.

13      Q.    And yet someone reading this story walked away

14  thinking he was a slime ball?

15      A.    Yes.

16      Q.    That is what you considered well written, isn't

17  it?

18      A.    No.  The reason that it goes to journalists, and

19  I have a history for doing something like that, is because

20  they are supposed to be objective.  They write the story

21  in their own words, they are supposed to do the

22  investigation to make sure the facts are right.

23      Q.    Okay.

24      A.    The editors are supposed to get involved and make

25  sure that everything is on the up and up and their legal

1   team is supposed to look at it.

2      Q.    Okay.

3      A.    So anything that I provide to any journalists, I

4   am doing it because I want them to do their own work and

5   come to their own conclusions.

6      Q.    That doesn't answer my question.

7             What you were saying to Sarah in this e-mail

8   that is on page 111 of Exhibit 118 is that it was a well

9   written story and that although she didn't come right out

10  and go after Magedson, the people who read it walked away

11  thinking he was a slime ball?

12     A.    Correct.

13     Q.    Are you saying that the reason it was well

14  written was because people who read it walked away

15  thinking he was a slime ball?

16     A.    No.

17     Q.    You just happened to put those two things in the

18  same sentence?

19     A.    Yes.

20     Q.    Do you believe that Sarah Fenske did a balanced

21  story?

22     A.    You know, I don't have any -- I am not a

23  journalist.  You know, my feeling is is that papers are

24  designed to sell advertising and somehow they slip in

25  stories between the advertising.  Sp however they would

1  choose to do their work, I don't know.

2      Q.    Do you believe that she told both sides of the

3  story, both sides of the Rip-off Report story?

4      A.    Well, you know, in the allotted space she had,

5  she certainly mentioned one of the clients who seemed to

6  be happy with the Corporate Advocacy Program, so I think

7  in the space she had it was balanced.

8      Q.    The story was very long, it was many, many pages

9  long.

10          Do you feel like she had some sort of page

11  limitation?

12      A.    They do.

13      Q.    Do you think she did?

14      A.    Yes.

15      Q.    Do you remember how many pages that story was?

16      A.    Was it eight?

17      Q.    Eight pages in New Times.

18          How much of that story was negative, do you

19  remember, and how much was positive?

20      A.    A great deal was negative.

21      Q.    Did you tell Sarah Fenske that Ed writes the

22  reports on Rip-off Report?

23      A.    I don't know that I told her that or not.  I

24  think it has been alleged that, and I certainly may have

25  indicated that it is alleged, but I don't know that he

1   does.  In fact -- doesn't matter.

2       Q.   I am not asking what you know now, I am asking

3   you what you told Sarah Fenske back in February of 2007.

4       A.   I don't know that I told her he does or not.

5       Q.   Take a look at page 109 of Exhibit 18.

6       A.   Okay.

7       Q.   At 2-1-07, February 1st, 2007, you e-mailed her

8   and said that Magedson has rights as do the people that he

9   writes about.

10           Do you see that?

11      A.   Yes.

12      Q.   You told her that he writes about people, right?

13      A.   Yes.

14      Q.   Did you mean on Rip-off Report?

15      A.   Yes.

16      Q.   Take a look at page 108 of Exhibit 18.  And they

17  are not in the order of the Bates numbers.  They are in

18  sort of chronological order.

19           Do you see page 108?

20      A.   Yes.

21      Q.   You wrote to Sarah on February 5th, 2007, and you

22  said, what if Magedson created the posts, then sold a

23  service that buried his own posts.

24           Do you see that?

25      A.   Yes.

1    Q.    What were you talking about?

2    A.    At this point, February 5th, I don't know if I

3  had communicated with Bill Stanley at that point or not,

4  but I think I had.

5          I think Sarah Fenske had -- Bill Stanley had

6  communicated with her and he was jumping up and down about

7  taking the Rip-off Report down.  In my mind I think I was

8  wondering, what if somebody, Mr. Magedson, was going out

9  there and creating items and then selling a service to get

10 the items removed.

11   Q.    You are saying before you really did a whole lot

12 of investigation, your initial thought was possibly it was

13 Mr. Magedson that was behind the Complaintremover type

14 service?

15   A.    No, I don't think I thought that at all.  It was

16 me kind of bouncing around some ideas that -- you know, I

17 found both sides to really -- the people that post and

18 Mr. Magedson and the Russos and the Stanleys really not

19 doing things that serve the public well, I guess, and I

20 was trying to figure out really what the heck was going

21 on, what was going on.

22   Q.    You were suggesting to Sarah that maybe Magedson

23 sold the service, right, to --

24   A.    I wasn't suggesting that to her.  I was

25 hypothesizing that what if.  I don't think that is a

1    declarative statement.

2         Q.    What if Magedson created the posts, then sold the

3    service that buried his own post.  You were just

4    hypothesizing --

5         A.    Yes.

6         Q.    -- to a reporter who was writing the story?

7         A.    She had written the story already.

8         Q.    Fair enough.

9                 To a reporter that had written a story?

10        A.    Yes.

11        Q.    Let's take a look at what is page 106 at the

12   bottom of the page on Exhibit 18, middle paragraph.

13        A.    Uh-huh.

14        Q.    You said, I had a funny thought.  What if a guy

15   started a Web site that only took posts about the 30 that

16   are now on Magedson's program.  Presumably the same people

17   that complained before would complain again and with

18   search engine optimization tools the posts could be the

19   first people see in Google, thus negating the Rip-off

20   Report's positive entries.

21                 What are you talking about there?

22        A.    Again I was running a scenario in my mind, what

23   if somebody created a Web site and focused only upon the

24   members of the Corporate Advocacy Program and allowed the

25   same disgruntled people that had posted on the Rip-off

1    Report an opportunity to continue posting if they had any

2    grievances.

3         Q.    Except you weren't running the scenario in your

4    mind, you were running the scenario for Sarah Fenske, a

5    reporter, correct?

6         A.    Indeed so.

7         Q.    Take a look at page 79 of Exhibit 18.

8         A.    Which one?

9         Q.    79 at the bottom.

10        A.    Okay.

11        Q.    This is an e-mail from yourself to

12   defamationAction@yahoo.com dated February 15th, 2007.

13        A.    Yes.

14        Q.    Defamation Action being Bill Stanley?

15        A.    Yes.

16        Q.    It starts off by saying, "Good to speak to you

17   last night."

18              Do you see that?

19        A.    Yes.

20        Q.    You spoke with Bill Stanley on February 14th,

21   2007, Valentine's Day?

22        A.    Yes.

23        Q.    And what do you remember about that conversation?

24        A.    You know, I don't know specifically that I

25   remember, but probably he -- at that particular point in

1    time he was really, really involved in going after the

2    Internet service providers of the Rip-off Report.

3        Q.    Okay.

4        A.    My interest in Bill Stanley at that point in time

5    was to try to figure out the science, what is it you are

6    doing, how are you doing it, why are you doing it.

7        Q.    And in this e-mail you in fact ask him, do you

8    not, to see what he can do about Paisola?

9        A.    About what?

10        Q.    Robert Paisola.

11        A.    Yes.

12        Q.    You mentioned to him that the Salt Lake City

13    Weekly will be doing a story, right?

14        A.    Yes.

15        Q.    And you say you want to get his service, correct?

16        A.    Yes.

17        Q.    Bill Stanley's service, right?

18        A.    Yes.

19        Q.    And this is where you ask him to do something

20    about Paisola's conduct, correct?

21        A.    Yes.

22        Q.    And this is what prompted Bill Stanley to then

23    obtain e-mail addresses from Paisola's computer and e-mail

24    those people?

25        A.    Yes.

1    Q.   He did it at your request?

2    A.   No, he didn't.

3    Q.   Okay.

4    A.   I had no idea.  That is why I am talking to him.

5    How is -- what are you doing?  How is it you are doing

6    this?

7              I think you will find in further e-mails

8    that I tell him I am not interested in breaking the law or

9    selling my soul to get something like that done.

10   Q.   Who is David Weiner?

11   A.   Where do you see that?

12   Q.   Next page, 77.

13   A.   David Weiner is a salesperson for

14   reputationdefender.

15   Q.   Would that be Bill Stanley or Robert Russo?

16   A.   I think reputationdefender is Mike Vertex, isn't

17   it?

18   Q.   I don't know.

19   A.   I think it is Mike Vertex.  I know he doesn't

20   have any relationship with Russo or Stanley.

21   Q.   How do you know that?

22   A.   It sure would have come up in the conversations.

23   I spoke to Mr. Vertex, he is an esteemed counsel, he is

24   all over the Internet, on what his goal is.

25   Q.   What do you mean he is an esteemed counsel?

1    A.    The things that have been written about him, he

2  is an attorney.  My conversations with him -- apparently

3  one that is fairly good, respected.  My conversation with

4  him was I walked away thinking that this is a guy that is

5  trying to make some positive changes to the world.

6    Q.    Okay.  What does he mean when he says, "I want to

7  update you on the status of the destroys you requested"?

8    A.    The reputationdefender specializes in going out

9  and finding scurrilous material out on the Internet.

10    Q.    Okay.

11    A.    What they then do is go out and notify you of the

12  items that are posted out there.  Their modus operandi

13  then is to send a nice letter to the particular Web site

14  and suggesting that, you know, it probably would be a nice

15  thing for you to take it down.

16            He was updating me on some of the stuff that

17  was written out there on the Internet.

18    Q.    It says in the second paragraph, "We have

19  succeeded in one destroy for you."

20            What is he talking about?

21    A.    He sent a letter to a particular blog, and they

22  took it down.

23    Q.    Next paragraph says, "We also do not attempt to

24  destroy with Rip-off Report for the reasons you and I have

25  both outlined."

```
 1                    What are those reasons?

 2      A.    Mr. Magedson won't cooperate with him.

 3      Q.    Take a look at what is page 75 at the bottom of

 4  Exhibit 18.   There is an e-mail from yourself to Bill

 5  Stanley.

 6      A.    Uh-huh.

 7      Q.    Dated February 15th, 2007.

 8                    Do you see that?

 9      A.    Yes.

10      Q.    You are mentioning that a Web site entitled

11  johnbrewington.net is still up?

12      A.    Yes.

13      Q.    What do you mean when you say at the end of that

14  e-mail, "The good news is that collection agencies have

15  deep pockets"?

16      A.    Mr. Magedson -- Mr. Stanley was asking questions

17  about Bud Hibbs, who has a propensity for going after

18  collection agencies.   If Mr. Stanley was going to sell his

19  services out there, certainly collection agencies are able

20  to afford it.

21      Q.    Take a look at what is page 71 at the bottom in

22  Exhibit 18.

23                    Can you tell me what that is?   I don't

24  understand what that --

25      A.    It is public record pulled from probably the
```

1    Secretary of State's Office.

2        Q.    About whom?

3        A.    It looks like Gigenet or Coloquest.

4        Q.    From yourself to Bill -- this is an e-mail from

5    yourself to Bill Stanley?

6        A.    Yes.

7        Q.    February 15th, 2007?

8        A.    Yes.

9        Q.    Subject Rip-off Report?

10               MR. DANA:  I need to ask a quick question.

11               MS. SPETH:  Sure.

12               MR. DANA:  These don't seem to be in order

13   and --

14               MS. SPETH:  They are not.

15               You have not been paying attention.

16               MR. DANA:  Where does 71 start?

17               THE WITNESS:  It is after 75 and 76.

18               MS. SPETH:  They are not in order because

19   they are in chronological order.  They were Bates stamped

20   as they came in and then they were moved around in

21   chronological order.

22               MR. DANA:  Okay.  Give me a date.

23               MS. SPETH:  February 15th, 2007.

24               I think you might be too far into the stack.

25               MR. DANA:  Let me look.

```
 1                    MS. SPETH:  It looks like this, if that

 2   helps, Mike.

 3                    MR. DANA:  Okay.

 4                    71?

 5                    MS. SPETH:  71.

 6                    MR. DANA:  Then it goes to 59.

 7                    MS. SPETH:  Tell me what page you are on,

 8   and I will tell you --

 9                    MR. DANA:  Here is 69.

10                    MS. SPETH:  You are in the wrong area.

11                    MR. DANA:  But the date you gave me is the

12   same.

13                    MS. SPETH:  Give me one page you are on that

14   you can see.

15                    MR. DANA:  59.

16                    MS. SPETH:  Let's see where we are at.

17                    MR. DANA:  It is February 15th at 5:04 p.m.

18                    MS. SPETH:  Go back about ten pages before

19   that.  Maybe not quite ten.

20                    MR. DANA:  Here it is.

21                    Go ahead.

22      Q.   BY MS. SPETH:  All right.  February 15th, 2007,

23   you sent an e-mail to Bill Stanley, correct?

24      A.   Yes.

25      Q.   In that e-mail you sent some public record,
```

1    correct?

2        A.    Yes.

3        Q.    Subject is Rip-off Report, correct?

4        A.    Yes.

5        Q.    Top line says "Gigenet aka Coloquest, more to

6    come"?

7        A.    Yes.

8        Q.    And what is that a public record of?

9        A.    I think UCC-1 holdings.

10       Q.    Of who?

11       A.    Gigenet.

12       Q.    Why were you sending Bill Stanley UCC-1 public

13   records regarding Gigenet?

14       A.    He asked for them.

15       Q.    Do you know why he asked for them?

16       A.    No idea.

17       Q.    You just provided him with a bunch of information

18   at his request without knowing why he wanted it?

19       A.    Public record.  He could have accessed it

20   himself.

21       Q.    But he didn't, he asked you to do it?

22       A.    That is easier for me.

23       Q.    And you did it?

24       A.    Yes.

25       Q.    Why is it easier for you?

1      A.    I know how to maneuver in the system.

2      Q.    The subject was Rip-off Report, correct?

3      A.    In the e-mail, yes.

4      Q.    You put that in your subject box?

5      A.    Yes.

6      Q.    You knew that you were sending this to Bill

7  Stanley, something to do with Rip-off Report?

8      A.    I did.

9      Q.    Did you understand that Gigenet was Rip-off

10 Report's service provider?

11     A.    No.

12     Q.    You didn't understand that?

13     A.    There has been so many postings.  I have no idea

14 who any of the players are.

15     Q.    It is your testimony under oath that you sent

16 public records regarding Gigenet to Bill Stanley and you

17 didn't know that you were doing that because that was the

18 service provider of Rip-off Report?

19     A.    Correct.

20     Q.    You didn't know you were doing that so that

21 Stanley could harass --

22     A.    I had no idea.  At this point in time he had

23 already taken down Rip-off Report.

24     Q.    He just called you and asks you to do record

25 searches and you just do them?

1    A.    Yes.

2    Q.    He pays you for those?

3    A.    No.

4    Q.    You do it why?

5    A.    Sorry?

6    Q.    Why do you do it?

7    A.    Why not?

8    Q.    To date has Bill Stanley paid you any money -- he

9    didn't even pay you the dollar he was supposed to pay you,

10   right?

11   A.    Yes.

12   Q.    Has he paid you any money at all?

13   A.    None.

14   Q.    Let's take a look at page 69 of Exhibit 18.

15   A.    Okay.

16   Q.    Do you know why you were sending these records

17   that start off with Dell Financial Services to Bill

18   Stanley?

19   A.    I have no idea.

20           Isn't it part of the other -- isn't it part

21   of the other e-mail?

22   Q.    I don't know.

23   A.    I don't know either.

24   Q.    Take a look at the e-mail that is at the bottom

25   of that page from Bill Stanley to you.  It says, "It is

1    dead.   Later I will have him kill the dns."

2                    Do you know what that means?

3       A.   He is referring to the blog Mr. Paisola had put

4    up and hijacked my domain name, put up a blog.   And

5    Mr. Stanley had convinced him that taking it down was the

6    right thing to do.

7                    The dns, I am not sure what that means.

8       Q.   Is it possible that Mr. Stanley helped you with

9    your Paisola situation in exchange for you helping him

10   with his Rip-off Report situation?

11      A.   We had no agreement like that.

12      Q.   But did you have discussions like that?

13      A.   Me helping him so that he could help me with

14   Rip-off Report?

15      Q.   No, the other way around, him helping you with

16   your problem with johnbrewington.net, in exchange you

17   helping him with Rip-off Report?

18      A.   No.

19      Q.   No conversations like that?

20      A.   No.

21      Q.   No e-mails like that?

22      A.   No.

23      Q.   No instant messages like that?

24      A.   No.

25      Q.   Who is Jeff Gong?

1    A.    I have no idea.

2    Q.    Take a look at -- let's see.  Now I can't find

3  it.

4    A.    It is on page 059.

5    Q.    Thank you.

6          It is an e-mail from yourself to Bill

7  Stanley -- I will look at that later.  "Where is Jeff Gong

8  and what company is he affiliated with"?

9    A.    Yes.

10   Q.    What is that a reference to?

11   A.    He is sending me an e-mail below that.  Says,

12 "Hi.  These ones I am done with mostly.  I just need Jeff

13 Gong."

14   Q.    Okay.

15   A.    I am saying to him, I don't know who it is, what

16 company he is affiliated with.  I have no idea who the man

17 is.

18   Q.    So you didn't just get one public record for him,

19 you got a whole bunch of them?

20   A.    Yes.

21   Q.    Do you remember how many?

22   A.    No.

23          When you say a "whole bunch," I am sure it

24 is under a dozen.  Probably five.

25   Q.    Were they all Internet service providers?

1        A.    I don't know who they were.

2        Q.    You know, it is not in your stack for some

3   reason, but there is an e-mail dated February 15th, 2007,

4   from yourself to Bill Stanley, and it says -- subject is

5   Rip-off Report.   It says, got him!  He lives less than a

6   mile from me.   What do you need?

7              Do you know if that is still a reference to

8   Jeff Gong?

9        A.    Probably.

10       Q.    Do you have a recollection of finding out Mr.

11  Gong lives close to you?

12       A.    I don't have that recollection.

13       Q.    I will show you this.   It is not part of Exhibit

14  18 because it got ripped out.

15             Tell me if that refreshes your recollection

16  of whether that is a reference to Jeff Gong or not.

17       A.    I would presume it means Jeff Gong.   It says

18  here, these ones I am done with mostly.   Do you have the

19  e-mail?  Got him.   He lives less than a mile from me.

20             I am guessing it is Jeff Gong.

21       Q.    All right.   Do you live in Glendale?

22       A.    Do I?

23       Q.    Yes.

24       A.    No.

25       Q.    How did you find the records that you provided as

1    Exhibit 18?   And I realize Exhibit 18 is not a complete

2    copy of what you provided me.

3              How did you locate those records?   What

4    searches did you perform?

5    A.   Either Pacer or the Secretary of State's Office

6    or even the Recorder's Office.

7    Q.   I didn't mean the public records, I meant the

8    whole set of documents you produced to me.

9              How did you find them in your computer or

10   filing system?

11   A.   Went through sents, went through deletes,

12   everything I had, put in Rip-off Report, put in Ed

13   Magedson, everything I could possibly pull up.

14   Q.   Did you run a search for the name Russo?

15   A.   I think I did.

16   Q.   Run a search for the name Stanley?

17   A.   I think I did.

18   Q.   Did you check any paper documents or did you only

19   check computer documents?

20   A.   I don't have any paper documents.   I have a very

21   thin folder, but there is no documents in there.

22   Q.   So you don't keep file cabinets of documents?

23   A.   No.

24   Q.   Take a look at what is marked JFB 27 in Exhibit

25   18.

1    A.   Okay.

2    Q.   This is an e-mail from yourself to Bill Stanley,

3 correct?

4    A.   Uh-huh.

5    Q.   February 16, 2007?

6    A.   Yes.

7    Q.   You say, one of the companies that admitted to

8 being a paid client of Magedson was Chandler Hill

9 Partners.

10              Why were you providing that information to

11 Bill Stanley?

12    A.   I think Bill Stanley was looking at that point in

13 time to offer services to all the corporate -- the CAP

14 clients to do search engine optimization for them to clean

15 Rip-off Report for free.

16    Q.   Is it your testimony that you didn't know that

17 Bill Stanley was going to use the information you were

18 providing to him to harass those people?

19    A.   That is absolutely my testimony.  I don't know

20 that he did.

21    Q.   Okay.  Is it your testimony that if you had known

22 that Bill Stanley was going to harass the people that were

23 customers of Rip-off Report, you wouldn't have provided

24 this information to him?

25    A.   Yes.

1        Q.     Next page, page 26, you also provided Bill

2    Stanley with a bunch of information about cases that

3    Rip-off Report had against it, correct?

4        A.     Say that again.

5        Q.     Page 26 you are writing to Bill Stanley, you

6    said, "There are 17 cases in federal court."

7               You were talking about cases against Rip-off

8    Report, or no?

9        A.     No.

10       Q.     Talking about what?

11       A.     George S. May.

12       Q.     Why were you providing this information to Bill

13   --

14       A.     For the same reason as the other one.  George S.

15   May at that point in time was a plaintiff in federal court

16   and had suddenly become a Corporate Advocacy Program

17   client.  I found it curious that so many people were out

18   there posting negative things about him --

19       Q.     Okay.

20       A.     -- and that there were so many federal cases

21   against them.  I was just puzzled as to how all of that

22   could suddenly just go away.

23       Q.     You weren't just curious, you were providing

24   information to Bill Stanley about it?

25       A.     He was going to offer everybody in the CAP

1    program an opportunity to become clients.

2        Q.    That is what he told you?

3        A.    Yes.

4        Q.    Do you have an e-mail from him saying that is why

5    he wanted the information?

6        A.    No.   Mr. Stanley is very religious about using

7    Yahoo instant message, and we have talked on the phone.

8        Q.    You obviously sent him e-mails?

9        A.    Yes.

10       Q.    He didn't respond to those e-mails sometimes?

11       A.    Sometimes.

12       Q.    So wherever it was that he requested these public

13   records from you and this information about corporate

14   advocacy members, those were probably instant messages?

15       A.    Or telephone calls.

16       Q.    When you say that George S. May -- you said

17   reports went away?

18       A.    No.

19       Q.    What did you say about George?

20             MS. SPETH:   Read that back.

21             (Record read.)

22       Q.    BY MS. SPETH:   What do you mean by that?

23       A.    By that is that George S. May or through

24   Mr. Magedson's investigation had determined that George S.

25   May was a -- promised to resolve their problems.   And I

1   found that very odd that they are still -- at this point

2   in time, that there was all these federal suits going on

3   and how did he not resolve them when he had promised to do

4   so.

5       Q.   What do you mean -- who promised to do so?

6       A.   George S. May, one of the CAP members.

7       Q.   Right.

8       A.   Didn't he promise to resolve all outstanding

9   issues as a member of that program, yet, at least

10  according to the post that went on Rip-off Report -- so

11  there was still litigants.   In fact, there are people

12  still posting on scam.com about George S. May.

13      Q.   Okay.

14      A.   I was scratching my head, how is it that the

15  Corporate Advocacy Program -- what is it that it is for

16  really.

17      Q.   You weren't scratching your head, you were giving

18  this information to Bill Stanley.   Let's be clear on that.

19           You were providing this information to Bill

20  Stanley why?

21      A.   He wanted to help the Corporate Advocacy Program

22  members by providing services to them for free.

23      Q.   So you were investigating them and wondering why

24  they weren't doing the things they said they were going to

25  do?   That was going to help him provide services to them?

1    A.   No, but certainly in my mind I have often
2 questioned whether or not the people that are on the
3 Rip-off Report don't deserve to be there.

4    Q.   I understand that.

5         And that is what you were providing to Bill
6 Stanley, isn't it?

7    A.   Sure.

8    Q.   You wanted to share with Bill Stanley what you
9 had learned or believed you had learned, which is that
10 people in Corporate Advocate Programs still have lawsuits
11 against them?

12   A.   Yes.

13   Q.   People like George S. May?

14   A.   Yes.

15   Q.   And Primerica?

16   A.   I guess.

17   Q.   You don't remember that one?

18   A.   No.   I don't dispute it.   I pulled up probably
19 five.

20   Q.   You showed Bill Stanley the information that you
21 found, correct?

22   A.   Yes.

23   Q.   You shared it with him?

24   A.   Yes.

25   Q.   You were working with him, correct?

1        A.    I was providing him with information.  He wasn't

2   paying me.

3        Q.    Let's take a look at the e-mail that is dated

4   February 16th, 2007 -- I will get you the Bates number --

5   from yourself to Mr. Stanley.  And it is -- oh, that is

6   not it.

7                    (Discussion off the record.)

8        Q.    BY MS. SPETH:  It is 23 at the bottom, Bates No.

9   23 at the bottom.

10                   Do you have it?

11       A.    Yes.

12       Q.    All right.  You say in that e-mail to Bill

13  Stanley that there are many -- let me read the whole

14  sentence.  I have e-mailed counsel that represents a

15  couple of the federal court RICO plaintiffs and let them

16  know the site is down and there may be some interest in

17  the people that have chosen to join the Corporate Advocacy

18  Program.

19                   What do you mean by that?

20       A.    I am not sure who I was referring to in terms of

21  the plaintiffs' counsel.  Maybe Mike.  I don't know that

22  to be for sure.

23                   The interest from the Corporate Advocacy

24  Program would be for them to join and have the search

25  engine optimization to get them off the front page of

1  Google.

2      Q.    That those people might be interested?

3      A.    Yes.

4      Q.    Why would you need to tell the attorneys -- I

5  don't think that is what you meant here at all.  You

6  better read it more carefully.

7              Why would you be calling plaintiffs'

8  attorneys and say these people might be interested in

9  joining Bill's program?  That doesn't make any sense.

10             Let me read the sentence to you again.

11             You said I have e-mailed counsel that

12 represents a couple of the federal court RICO plaintiffs

13 and let them know the site is down and there may be some

14 interest in the people that have chosen to join the

15 Corporate Advocacy Program.

16             Don't you mean they should find some

17 interest in those people and they should check those

18 people out?

19     A.    I don't know that that is what I meant at all.

20             MR. DANA:  Objection; misleading.

21             THE WITNESS:  I don't know that I meant that

22 at all.  I think I meant Mr. Stanley had been discussing

23 for quite a period of time and Russo in fact about helping

24 for free the Corporate Advocacy clients.

25     Q.    BY MS. SPETH:  What does that have to do with

1    e-mailing counsel that represent the federal RICO

2    plaintiffs?

3        A.   I don't know that it has anything to do with it.

4        Q.   You just stuck it in the same sentence?

5        A.   Yes.

6        Q.   Okay.

7        A.   If we are going to be much longer, we should

8    probably think about a bathroom break or something.

9             MR. DANA:  How much longer do you think you

10   will be?

11            MS. SPETH:  Let's take a break.

12            MR. DANA:  Okay.

13            (Recess taken.)

14       Q.   BY MS. SPETH:  Okay.  Take a look at page 23 at

15   the bottom.

16       A.   Yes.

17       Q.   At the end of that e-mail you wrote to -- I'm

18   sorry, to William Stanley on February 16, you said, was

19   information I gave you yesterday helpful in your goals?

20            What information did you give him yesterday

21   that you are referring to?

22       A.   My guess, and it is a guess, if we were to look

23   at the e-mails regarding public record, it is probably

24   that.  I don't know.

25       Q.   Okay.

1      A.     This is in February.   Perhaps it was his getting

2   some Corporate Advocacy client on board.

3      Q.     When you said "helpful in your goals," what were

4   his goals?

5      A.     Getting the Corporate Advocacy Program clients on

6   board.

7      Q.     That is what you were referring to when you said

8   "your goals"?

9      A.     Yes.

10      Q.     There is an e-mail dated March 5th, 2007.  I am

11   skipping a lot.  It is from yourself to Mr. Stanley.

12   March 5th, 2007.

13              Let's see here.

14      A.     Okay, it's 91.

15      Q.     No, it is 15.

16              Wait.  You may have the right one.  I'm

17   sorry.

18      A.     What is the --

19      Q.     You may have the right one.  It is actually 14.

20   It is 14 at the bottom.

21      A.     Okay.

22      Q.     See if this helps you.

23              Do you have it?

24      A.     Say that again.

25      Q.     Here is how much of a stack I have in front of

1   me.

2                    Do you have it, 14 at the bottom?

3        A.   No, I have 91 at the bottom.

4        Q.   Find one that has 14 at the bottom.  Let's see if

5   I can figure out if --

6                    Right there.  I think it is earlier than you

7   are looking at.

8        A.   Well, there is a couple of e-mails dated that

9   date.

10       Q.   I see that.

11       A.   What date?

12       Q.   It is after -- it is dated March 5th.

13       A.   March 7th, and that is 85.

14       Q.   Forget that, though.

15       A.   What is the context of the e-mail that --

16       Q.   Look at the bottom for 14.

17                    MR. DANA:  Is it 14?  What about that?  It

18  is Bates labeled 14?

19                    MS. SPETH:  Yes.

20       Q.   BY MS. SPETH:  It says in that e-mail, "You may

21  recall from the letter that is posted on the Internet

22  whereby Ed Magedson alleges you are making death threats."

23                    Do you see that?

24       A.   Yes.

25       Q.   After it was alleged that Mr. Stanley was making

1  death threats, you gave Mr. Stanley two addresses for

2  Mr. Magedson, did you not?

3      A.   Yes.

4      Q.   You gave him a McDowell address and an Ambrosia

5  address?

6      A.   Correct.

7      Q.   What was your purpose in giving that information

8  to him?

9      A.   I was giving him an update on the investigation

10 in terms of who it was that I needed to have a dialog with

11 or what I had done again.

12     Q.   Okay.

13     A.   The Arizona -- the state requires that -- not

14 requires, but the state would ask that I update him as I

15 see fit.

16     Q.   So after you knew there was a possibility he had

17 threatened Ed Magedson's life, you gave him information

18 about where Ed Magedson's addresses were, correct?

19     A.   Well, yes, I did.

20     Q.   Okay.

21     A.   Presumably he had those addresses when he sent

22 those letters or delivered them, or whatever.

23     Q.   Why did you write to Mayor Hawker of the City of

24 Mesa about Ed Magedson?

25     A.   The detective for the City of Mesa indicated he

1  couldn't pursue the investigation any further because he

2  wasn't getting cooperation from Mr. Magedson and it was

3  alleged that the FBI had taken over the case.

4      Q.   Okay.

5      A.   I wanted to make sure, because other people were

6  threatened in those letters, that there was at least some

7  sort of protection for them, that the police could still

8  investigate and find out who authored those letters.

9      Q.   I asked you why you wrote to the mayor.

10          You wrote to the mayor to give people

11  protection?

12     A.   He doesn't, he orders the police to get involved.

13     Q.   You were trying to convince the police to get

14  involved?

15     A.   Absolutely.

16     Q.   Did you ask Detective Gumina to get involved?

17     A.   Yes.

18     Q.   Really?

19          What did you say to him about getting

20  involved?

21     A.   I asked him if he was going to be able to reopen

22  the case, and he said no, that Mr. Magedson told him the

23  FBI was involved and he was going to be telling -- or I

24  guess the detective had asked who the FBI agent was, and

25  that Mr. Magedson said they will contact you.

1    Q.   All right.

2    A.   Officer Gumina said there wasn't much he was

3  going to be able to do without the complainant

4  cooperating.

5    Q.   Did you believe him?

6    A.   Makes perfect sense.  Yes.

7    Q.   Then why did you go to the mayor and ask the

8  mayor to get involved?

9    A.   Because I wanted the other individuals protected

10 as well.  Certainly they said they received the letters.

11 It says employees were threatened in the letters.  And I

12 believe they deserved to have some sort of protection.

13   Q.   Why didn't you tell Detective Gumina that?

14   A.   I did.  He still can't do anything without the

15 complainant's assistance.

16   Q.   What did you think the mayor could do that

17 Detective Gumina wouldn't do?

18   A.   Order the police to investigate it.

19          (Deposition Exhibit No. 19 was marked for

20 identification.)

21   Q.   BY MS. SPETH:  Take a look at what we have marked

22 as Exhibit 19.

23          Do you recognize that?

24   A.   I recognize the content of this, but I don't know

25 that it is anything I have paid attention to or seen

1    before.

2        Q.    The contents you recognize is the stuff about

3    you, correct?

4        A.    About me?

5        Q.    Second page.  I guess you weren't talking about

6    the content about you.  You sound surprised.

7              Let's go back to page 1.  Let me ask a

8    different question.

9              What is it about the content on page 1 that

10   you recognize?

11       A.    That it would probably be something from QED

12   Media Group, LLC.

13       Q.    And why is that?  Because it says at the top QED

14   Media, LLC?

15       A.    Yes.

16       Q.    On the left-hand side it also says

17   johnbrewington, doesn't it?

18       A.    Yes.

19       Q.    John F. Brewington PI underneath that?

20       A.    Yes.

21       Q.    Also has QED Portland, Maine offices at the

22   bottom and some Dallas, Texas offices?

23       A.    Yes.

24       Q.    If you turn the page to the next page, it also

25   says QED Media Group at the top, does it not?

1        A.    It does.

2        Q.    It has a posting for John Brewington, Licensed

3   Private Investigators, right?

4        A.    Yes.

5        Q.    Do you know why that content is on QED Media's

6   Web site?

7        A.    Yes.  Mr. Russo was using it to enhance search

8   engine optimization by using key words to I guess push

9   down Rip-off Report posts.

10       Q.    About you?

11       A.    Yes.

12       Q.    By putting information about you on his Web site

13  it was going to help remove Rip-off Reports on search

14  engines?

15       A.    He has never told me he could remove Rip-off

16  Reports.  He made it very clear by going out and posting

17  and using the same key words that other Web sites have

18  used, he is able to push the derogatory information off

19  the front pages.  Never indicated to me he can remove

20  Rip-off Reports.

21       Q.    All right.

22       A.    In fact, on the same page he has listed Video

23  Professor and the Harmon Agency, Kelly Harmon, and it

24  appears to me he is trying to use those names as key words

25  as well.

1     Q.     The content here about John is an expert on and

2  then all the bullet points, where does that come from?

3     A.     Comes from a -- it comes from a public relations

4  firm.

5     Q.     And what is the name of that public relations

6  firm?

7     A.     I don't know.  It is from Salt Lake City.  It

8  would be difficult to figure it out.  They certainly

9  didn't want to post it themselves.

10     Q.     You had a public relations firm create content

11  about you?

12     A.     Yes.

13     Q.     You don't remember their name?

14     A.     No.

15     Q.     Did you pay them?

16     A.     Yes, credit card.

17     Q.     How long ago was this?

18     A.     After the Paisola story, I think, so that was --

19  when was that?  I don't know.  June, April.

20     Q.     Of 2007?

21     A.     Yes.

22     Q.     This year you hired them and you don't remember

23  their name?

24     A.     Yes.  They were a referral.

25     Q.     Were they a referral from Rob Russo?

1      A.    From Steven Dark, the reporter who did the story
2  on Paisola.
3      Q.    Did you provide them with the information so they
4  can do this press release?
5      A.    Yes.
6      Q.    Did you tell them you were an expert on all of
7  these fields that have the bullet points on?
8      A.    Yes.
9      Q.    What makes you an expert on criminalistics and
10 criminology?
11     A.    I don't know actually that I am.  That was an
12 invention by allexperts.com.  They are the ones that put
13 it in.
14     Q.    Okay.
15     A.    They do the same thing.  Search engine
16 optimization, they are the ones that built it.
17     Q.    So they posted things about you that you really
18 couldn't support as being true and you didn't have a
19 problem with that?
20     A.    I don't know if it is true or untrue.
21     Q.    Somebody is billing you as an expert on
22 criminalistics and criminology?
23     A.    Uh-huh.
24     Q.    I want to know what your credentials are to be
25 called an expert on that.  And you are saying maybe you

1  are not an expert on that?

2      A.   Yes.

3      Q.   Did you ever ask these guys to not post this

4  stuff?

5      A.   Yes.

6      Q.   In fact, you paid them to create this stuff,

7  right?

8      A.   Yes.

9      Q.   Did they run it by you before they posted it?

10     A.   Yes.

11     Q.   And you approved it?

12     A.   Yes.

13     Q.   How about an expert on litigation support, what

14 litigation support have you provided?

15     A.   I have worked for a law firm for quite a period

16 of time.

17     Q.   What work have you done in the worker's

18 compensation insurance field?

19     A.   Clients have asked me to investigate their

20 employees that are currently on worker's compensation.

21     Q.   Have you done that?

22     A.   Yes.

23     Q.   For a fee?

24     A.   Yes.

25     Q.   Also says John has been used as a source for

1    several journalists and is arguably the definitive source

2    for Internet defamation cases.

3                    Did you write that?

4        A.    No.

5        Q.    Who wrote that?

6        A.    It would have been the public relations people.

7        Q.    When it says "several journalists," who would

8    those several journalists be?

9        A.    Regarding what?

10       Q.    I don't know.

11       A.    Robert Anglin of The Arizona Republic.

12       Q.    Okay.

13       A.    Steven Dark, Sarah Fenske.

14       Q.    Okay.  How many state chamber events have you

15   spoken at?

16       A.    State chamber events.  I belong to two chamber of

17   commerces and have had a couple of meetings and in fact

18   another one.  As a matter of fact, three.  I belong to

19   two, I have been with three and have had dialog or during

20   meetings have had -- they always want a speaker, so a

21   couple of times.

22       Q.    Have you been an actual speaker at a chamber

23   event?

24       A.    No.

25       Q.    Have you been a speaker at a Rotary Club event?

1       A.    Yes.

2       Q.    How many times?

3       A.    Once.

4       Q.    Have you been a speaker at local high schools?

5       A.    Yes.

6       Q.    How many times?

7       A.    Once.

8       Q.    Which one?

9       A.    Corona Del Sol.

10      Q.    Is that in Arizona?

11      A.    Chandler.

12      Q.    What was the topic?

13      A.    The topic was -- it was Job Day or a Career Day.

14  They were trying to ascertain what it was -- the

15  potentials or the qualifications for becoming a private

16  investigator.

17      Q.    Who provided the content to Mr. Russo in order to

18  put it on the Web site?

19      A.    I did.

20            MS. SPETH:  Mark that.

21            (Deposition Exhibit No. 20 was marked for

22  identification.)

23      Q.    BY MS. SPETH:  Do you recognize Exhibit 20?

24      A.    No, not really.

25      Q.    Is that a different Web site than what we looked