1          When was there a report on the Rip-off
2    Report that tied you with the people that you just
3    mentioned?
4        A.    With Steve Miller I believe it was the first
5    Rip-off Report that came out in January.
6        Q.    January of '07?
7        A.    Yes.
8        Q.    Steve Miller.  You think there is something on
9    Rip-off Report that ties you to Steve Miller as of January
10   of '07?
11       A.    Yes.
12       Q.    What about this Alec DeFry guy, when was there a
13   report like that?
14       A.    I believe that is a report I saw about Rob Russo.
15   I am tied in with Russo, Stanley, myself is listed in
16   there, and our connections to all of these people that I
17   don't know.
18       Q.    My question was when.
19       A.    When was it posted on Rip-off?
20       Q.    Right.
21       A.    No idea.
22       Q.    It is interesting because you are telling me the
23   reason you contacted all of these plaintiffs' attorneys
24   and tell them the truth that has to be told is because you
25   have been tied on the Rip-off Report to people like Alec

1  DeFry.

2            If I am remembering your testimony correctly

3  from last time, you have been contacting plaintiffs'

4  attorneys for many months, perhaps more than a year, and

5  the report that you are referring to didn't come out until

6  very recently.

7            Am I incorrect?

8       A.   No.

9       Q.   So in fact, the reason you were contacting

10  plaintiffs' attorneys before the posting that tied you to

11  these people wasn't because that was the truth you wanted

12  to tell them?

13      A.   No.  It seemed clear to me the truth wasn't being

14  told.

15      Q.   What truth was it you were trying to convey to

16  them?

17      A.   As we had discussed in the last deposition, the

18  bizarre e-mail I had received from presumably the staff of

19  the Rip-off Report had tied Robert Paisola to them

20  vicariously.

21      Q.   Okay.

22      A.   And there were some odd and perverse behaviors in

23  that that made me suspicious.  When I started digging into

24  things, it just -- things seemed very odd, didn't seem to

25  match up.

1   Q.   Okay.

2   A.   As I started getting into the federal lawsuits, I

3   saw more and more what was going on.

4   Q.   Okay.

5   A.   It seemed that the plaintiffs' counsels weren't

6   necessarily understanding, I guess, the big picture.

7   Q.   And you felt it was important that you could give

8   them the information they needed to put the big picture

9   together?

10   A.   Sure.

11   Q.   I am going to name cases, then I will ask you

12   whether you have ever had conversations with the

13   plaintiffs' attorneys for those particular cases.

14                    GW Equity?

15   A.   Yes.

16   Q.   EASI or Energy Automation Systems?

17   A.   I don't know.

18   Q.   Okay.  I will come back to that when I get a

19   list.

20   A.   Okay.

21   Q.   Let's go back to your conversation with Dixon

22   Woodard.

23                    Did you tell Dixon Woodard that you had

24   walked around Ed Magedson's neighborhood in order to get

25   information on who might be threatening Ed Magedson?

1     A.    I believe I indicated to him that I interviewed

2  the neighbors to find out who was making threats against

3  him.

4     Q.    Did you tell him that you were the one that had

5  taken pictures of Ed Magedson's house and posted them on

6  the Internet?

7     A.    The one on McDowell, yes.

8     Q.    Did you in fact do that?

9     A.    Yes.

10    Q.    Not only did you tell Mr. Dixon Woodard you did

11 that, you in fact did do that?

12    A.    Yes.

13    Q.    Did you tell Mr. Woodard that you represented a

14 coalition of people who were wrongly accused on the

15 Rip-off Report?

16    A.    No.

17    Q.    Did you use the word "coalition" at all during

18 that conversation?

19    A.    I may have, actually.

20    Q.    With reference to people who were sort of

21 combined in some way against Rip-off Report?

22    A.    No, actually what I told him was, the day after I

23 had been up in the neighborhood, Travis Hatch told me

24 someone else had been up in that neighborhood making

25 questions and had represented themselves as law

1    enforcement, and they indicated that they were

2    representing a coalition of plaintiffs.

3         Q.    You didn't tell him that you did?

4         A.    Absolutely not.

5         Q.    Do you know of a coalition of people who were

6    adverse to Rip-off Report?

7         A.    I don't.

8         Q.    You don't think the Internet Defamation League is

9    a coalition of people adverse to Rip-off Report?

10        A.    You know, I don't really know all that much about

11   the Internet Defamation League or the Defamation Action

12   League.  I think they would try to project the image they

13   are doing two different things, but since I am not a

14   member of the organization and I don't know anyone that is

15   a member of the organization -- the only thing that Bill

16   Stanley has indicated that the Internet Defamation League

17   does is protest, because I have asked him specifically,

18   "What is it that organization does?"

19        Q.    Okay.

20        A.    He says protests.

21        Q.    It is your testimony that you are not a member of

22   the Defamation Action League?

23        A.    Absolutely.

24        Q.    It is your testimony you are not a member of the

25   Internet Defamation League?

1    A.    It is.

2    Q.    Look at my caption here for a second.

3          Did you ever sign up to become a member?

4    A.    No.  I was sent an invitation, but I ignored it.

5    Q.    What do you mean you were sent an invitation?

6  Like spam?

7    A.    No.  You had asked for e-mails.  I had never

8  heard of the Internet Defamation League, never heard of it

9  before you mentioned it.  When I was providing you with

10  e-mails for your subpoena, I saw an e-mail that had come

11  from Bill Stanley inviting me to join the Internet

12  Defamation League.  It was an e-mail I ignored previously,

13  didn't pay any attention to it.

14    Q.    Do you know how he got your e-mail address to

15  invite you?

16    A.    Bill Stanley and I had been communicating at that

17  point in time.

18    Q.    Who is KMS Investigations?

19    A.    It appears to be a private investigation -- I

20  shouldn't say that.  KMS Investigations officially is a

21  California private investigative firm held by a

22  gentleman -- his name may be Pearson.  I don't know for

23  sure.  I don't remember.

24    Q.    The e-mail that you got from Mr. Stanley, what

25  was the e-mail address it came from?

1     A.    I believe it came from the -- it may have come

2  from the Defamation Action League.

3     Q.    Back to KMS.

4            MS. SPETH:   Read back his answer to the KMS

5  question.

6            (Record read.)

7     Q.    BY MS. SPETH:   What is your opinion of KMS

8  Investigations?

9     A.    Based on my interaction with them is that they

10 are discredible, (sic) not truthful, they are in violation

11 of multiple state statutes, that they have become offended

12 by the post about them at various reporting sites,

13 including the Rip-off Report.

14    Q.    Okay.

15    A.    It appears as if they have taken great umbrage

16 about things that have been said about them in the Rip-off

17 Report.

18            My dialog with a gentleman by the name of

19 Bill Taylor caused me some concern because Mr. Taylor when

20 I contacted him to find out exactly what they were

21 doing -- I contacted them because I had been accused again

22 of masquerading as a federal agent or law enforcement or

23 something, and certainly on the Rip-off Report that

24 exists.

25    Q.    Okay.

1      A.    If the Secret Service -- I'm sorry.   If the FBI

2  is indicating that somebody else was up there doing that,

3  then there is somebody else up there doing it and I want

4  to know who it is.

5      Q.    Okay.

6      A.    My conclusion could possibly be that KMS, based

7  upon the things they were doing, may very well be the one

8  doing it, because part of my conversation with Bill Taylor

9  in trying to establish who his client was he says his

10  client was out of DeerField Beach, Florida.

11      Q.    Okay.

12      A.    That I believe to be the domicile of Steve

13  Miller.

14      Q.    Okay.

15      A.    So as I started digging into KMS more, I seen the

16  postings of the reporter for the Rip-off Report.   A

17  gentleman by the name of Kevin Signs purports to be the

18  private investigator for that particular firm.

19      Q.    Okay.

20      A.    But in fact he is not.   But KMS is a private

21  investigative firm.   You can't access it via the Internet.

22            And they've taken to projecting an image --

23  they certainly are a corporation out of Delaware, and they

24  projected the image they have an office in Alabama.

25      Q.    Have you ever confirmed whether KMS in fact was

1  hired at any time by Federated Financial?

2     A.    No.

3     Q.    You said earlier that they've done some things

4  that violate statutes?

5     A.    Yes.

6     Q.    As investigators, what is it they've done that is

7  in your opinion either illegal or unethical?

8     A.    The states' regulations for private investigators

9  are generally twofold.  Foremost, they want to protect the

10 consumer, the client, from getting a defective product --

11    Q.    Okay.

12    A.    -- if you will.  A private investigator will

13 request a retainer and the client should expect to receive

14 something back from that retainer.  Unfortunately, some

15 private investigators, like other people, will get the

16 retainer and not get the product back.

17               That seemed to be the crux of some of the

18 complaints for KMS.

19    Q.    Complaints by whom?

20    A.    Consumers.

21    Q.    On Rip-off Report?

22    A.    Yes.

23    Q.    About KMS?

24    A.    Yes.

25    Q.    Keep going.

1      A.    They were advertising in several states.   The

2  Arizona Revised Statutes that govern the private

3  investigation field, it is very clear any advertisings you

4  have to have your private investigator's number on those

5  advertisings.   That is to provide the consumer with a

6  place to redress any issues.   There is a $2,000 bond on

7  file that the state requests in the event that consumers

8  do not get what they expected to get.

9      Q.    So the things that you know about KMS and that

10  you consider to be either illegal or unethical, are those

11  just things that were posted about them on Rip-off Report

12  or do you have any independent knowledge of anything that

13  KMS has done?

14      A.    They are also listed on another Web site.   I

15  think it is U.S. Web.   And in fact, that is where I got --

16  U.S. Web was actually where I got KMS's information.

17      Q.    Okay.

18      A.    It had been pointed out to me by someone, I don't

19  remember who it was, but KMS was on U.S. Web, which

20  appears to be a search engine optimization company that

21  claims to be able to remove Rip-off Report posts.   And the

22  language in the U.S. Web post is that they were trying to

23  gather people together for a class action lawsuit.

24      Q.    Okay.

25      A.    Which I found to be discredulous. (sic)   I looked

1  at it more in terms of probably KMS was trying to get

2  business of some sort or maybe -- I don't know.

3      Q.    Are there any companies out there that you know

4  of that are able to remove Rip-off Report posts?

5      A.    No.

6      Q.    Are there any that are able to remove them from

7  Google search results?

8      A.    No.

9      Q.    You know that Rob Russo advertises -- claims in

10  his advertisements to be able to do that, don't you?

11              MR. DANA:  Objection.

12              THE WITNESS:  I don't know that actually.  I

13  have been struck by the idea that Rob Russo hasn't, from

14  what I have seen, hasn't done a lot of advertising on

15  Google.  We did discuss that particular matter.  He tried

16  to -- not tried.  He made it clear that his verbiage was

17  meant to be he could remove it from the front pages of

18  Google, and he pointed out to me that, "I think your

19  dissatisfaction with him is the fact that he has made

20  claims he can remove it from search engines."

21      Q.    BY MS. SPETH:  Okay.

22      A.    He has never indicated that to me.

23      Q.    Have you Googled your name?

24      A.    Yes.

25      Q.    Does Rip-off Report come up in the front page

1    with your name?

2         A.    Yes.

3         Q.    Have you asked Rob Russo to fix that?

4         A.    Yes.

5         Q.    Has he?

6         A.    Yes.

7         Q.    So currently if I Google your name, it won't come

8    up on the first page of Google?

9         A.    It will, I think.  I haven't done a vanity search

10   for quite a while.

11        Q.    I thought you said you hired him or asked him to

12   remove your name from the front page?

13        A.    What I did was I indicated to Mr. Russo I had a

14   keen interest in finding a company or companies that had

15   the ability to remove those items from the front pages.  I

16   am a bit of a neophyte with regard to the search engine

17   optimization stuff.  It is a learning process.

18        Q.    Okay.

19        A.    Mr. Russo and Stanley had certainly opened my

20   eyes up a lot about it.

21        Q.    Okay.

22        A.    So Mr. Russo, I had indicated to him before I

23   ever recommend anyone to a search engine optimization

24   place like Rob Russo, they are going to have to show me

25   they can do what they say they can do.

1    Q.    Okay.

2    A.    Mr. Russo started a campaign.  I didn't hire him.

3  I needed proof, to see exactly what it is he said he can

4  do.

5    Q.    Okay.

6    A.    They showed me some examples, actually.  I don't

7  remember who it was.  He showed me some examples where

8  they were able to take the Rip-off Report posts and move

9  them back several pages.  In fact, were able to do that

10  for me as well.

11    Q.    Okay.

12    A.    Once that was done, it came back to the front

13  pages because I believe it is probably something you have

14  to maintain.

15    Q.    So what you are saying with respect to your

16  posting on Rip-off Report is that at one time it was on

17  the front pages and then Russo showed you how he could

18  move it off the front pages and did do that but now it is

19  back?

20    A.    Yes.

21    Q.    I understand now.

22          Now you said that they showed you some

23  examples?

24    A.    Yes.

25    Q.    What examples did they show you of successful SCO

1    optimization where Rip-off Report came off the front page?

2         A.    Well, just names of various clients that they

3    had, and if you were to ask me who, I will tell you I

4    don't know because I don't remember.  This was at least

5    six months ago.

6         Q.    You don't -- sorry.

7         A.    In the initiating conversations that I would have

8    had with Bill Stanley and Russo in the February, March

9    time frame, I would have asked them -- I was interviewing

10   Reputation Defender, Mike Vertex's organization, as well

11   to establish whether -- what it was they were doing.  This

12   was all new to me.  What is it they could do.

13        Q.    Okay.

14        A.    What was their agenda, what were they trying to

15   achieve.

16        Q.    Let's go back to the examples.

17              You are telling me you don't remember any of

18   the names of people that Russo gave you as an example?

19        A.    No.

20        Q.    Not a one?

21        A.    No.  He didn't open up his client base to me.

22   Would have given me one or two.  I don't remember their

23   particular names.

24        Q.    You said that Russo told you some things that

25   opened your eyes about SCO Optimization, search engine

1   optimization.

2              In what ways did he open your eyes?   What

3   did he tell you?

4       A.     Again as a business owner, I suppose, I would

5   always be interested in how does one even get your

6   business on the front page of Google.   Many business

7   owners would like to have that idea.   I certainly had no

8   idea.

9       Q.     Okay.

10      A.     Wanted to know.

11             I think the beginning conversation I had

12   with Stanley was that he was showing me how it worked,

13   showing me about links and various other things.

14      Q.     Teach me.   I want to know how it works.

15      A.     I don't consider myself -- in fact, I consider

16   myself extremely behind all of this.   I have, through my

17   own experimentation, which is purely what it is, been able

18   to get my own Web site on the front page of Yahoo as a

19   result of reading and studying on how to get it done.

20      Q.     Okay.

21      A.     Their particular, I guess what they were trying

22   to show, is the links could include -- it looks like in

23   their search engine optimization techniques, included

24   going into social Web sites and/or blogs to create key

25   words in there that would go back to or strengthen your

1  particular name.

2      Q.   Okay.

3      A.   I think what they were trying to do is get these

4  blogs or Web sites that were particularly strong, but I

5  don't know -- haven't gone in and looked at these blogs or

6  forums to see what sort of strength they had.

7      Q.   When you talk about "they" the last couple of

8  times, we have been talking -- you said they showed you

9  some examples of how it works, they showed you that links

10 can work, who is the "they"?

11     A.   Both Stanley and Russo.

12     Q.   Did you ever tell Dixon Woodard that Ed Magedson

13 had ten federal warrants?

14     A.   No.

15     Q.   Did you make reference to ten federal warrants

16 with respect to Ed Magedson?

17     A.   No.

18     Q.   Let's talk about this warrant thing.  Every time

19 I have asked you you told me you never said that because

20 it isn't true.

21     A.   Right.

22     Q.   How would you explain the fact that numerous

23 neighbors, who you have interviewed, have told me that you

24 said that Ed had warrants out or there were federal

25 indictments pending?

1      A.    I would explain it in terms of the information

2    that I got back from Jack Delahaney very clearly said that

3    there were civil RICO claims on file, yet when Steve

4    Bedore was up there interviewing people, he seemed to

5    think or he seemed to take great literary license that the

6    FBI was investigating.   Certainly something I never told

7    him.

8      Q.    Okay.

9      A.    I would suppose that -- and I have seen that on

10    the Internet too, someone because they see the word RICO

11    presumes there is some sort of criminal indictment going

12    on, that when someone hears the word RICO, they presume

13    criminal.

14      Q.    What you are saying you may have said to one or

15    more neighbors that there are RICO cases pending against

16    Ed?

17      A.    I think I have been clear that civil is the way I

18    would have phrased them.

19      Q.    You think --

20      A.    I have been careful about making sure there is no

21    reference to any criminality going on.

22      Q.    Have you made reference to RICO claims?

23      A.    Sure.

24      Q.    So you have told Ed's neighbors there are pending

25    RICO cases or claims?

1      A.   I don't know, but that would be within the realm

2  of possibility.   I don't know specifically.

3      Q.   Do you ever remember having a conversation with

4  the mail carrier that works in the Mesa neighborhood that

5  Ed owns a house on Ambrosia?

6      A.   Never spoken to him.

7      Q.   Never spoken to the mailman?

8      A.   Never.

9      Q.   Did you ever try to speak with the mailman and he

10 wouldn't talk to you?

11     A.   No.

12          MS. SPETH:   We need to take a short break

13 because I need to organize this.

14               Let's take a five-minute break.

15          (Recess taken.)

16          (Deposition Exhibit No. 10 was marked for

17 identification.)

18     Q.   BY MS. SPETH:   I asked you earlier who you had

19 contacted since the last time you were deposed here on

20 July 31st.   You did not list any of Ed's neighbors or any

21 of the neighbors around any of the addresses.

22               Is it your testimony you have not contacted

23 any of those neighbors since July 31st, 2007?

24     A.   Yes.

25     Q.   Let's take a look at what we marked as Exhibit

1    10.

2         A.    Okay.

3         Q.    And do you recognize that blog?

4         A.    Yes, it's been brought to my attention.

5         Q.    Well, it is actually something you posted on,

6    isn't it?

7         A.    No.

8         Q.    It is your position you have never posted on the

9    blog that is Exhibit 10?

10        A.    Yes.

11        Q.    What blog do you think this is?

12        A.    It appears to be the blog from CNET that Declan

13   McCullagh posted on.

14        Q.    Who is Declan McCullagh?

15        A.    The reporter for CNET.

16        Q.    Okay.

17        A.    I have never posted on this.

18        Q.    Go to the last page, page 6, JFBA Junior Member.

19               Is it your testimony under oath that that is

20   not you?

21        A.    Is this a part of the CNET?

22        Q.    You are the one who said this was CNET.  I am not

23   sure --

24        A.    Well, this is not me.

25        Q.    "This" meaning the sixth page of Exhibit 10 where

1    the person signed in as a Junior Member named JFBA?

2         A.    Correct, it is not me.  I never posted that.

3         Q.    You never posted the words that we see on page 6

4    of Exhibit 10?

5         A.    That is correct.

6         Q.    Any idea who JFBA is?

7         A.    I would be JFBA Acquisitions, but --

8         Q.    But this is not you?

9         A.    No.

10        Q.    So would you agree with me that sometimes people

11   post and pretend to be someone they are not?

12        A.    Yes.

13        Q.    Does the IP address that is at the bottom of

14   Exhibit 10, page 6, look familiar to you at all?

15        A.    No.

16        Q.    Did you ever give anyone information that that IP

17   address was my law firm's IP address?

18        A.    I don't know what your IP address is, although

19   that came from Sean Richards.

20        Q.    Richardson?

21        A.    Yes.

22        Q.    What came from Sean Richardson?

23        A.    I had gotten information from him at one point in

24   time, a post about me on the Rip-off Report, I think, had

25   been generated from one of your offices, and he came up

242

1  with an IP address.  But certainly I don't even know what
2  mine is.  I can look it up.
3             MR. DANA:  You don't have that memorized?
4             THE WITNESS:  I don't know have it
5  memorized.
6      Q.    BY MS. SPETH:  Do you find Sean Richardson to be
7  a credible person?
8      A.    I don't know what his agenda is.  I just don't
9  know.
10     Q.    Do you think it is possible that Mr. Richardson
11  posted this using your initials?
12     A.    I think it is possible.  I have seen Bill Stanley
13  use things that I have said other places in posts.
14     Q.    Is this something that you said someplace else,
15  what is in --
16     A.    No.  I don't have any -- the report traces to the
17  law offices of Jaburg & Wilk.  Those are Sean Richardson's
18  words.
19     Q.    Well --
20     A.    This is absolutely his information.
21     Q.    It starts off by saying, I found it interesting
22  that after I took the story, The Real Rip-off Report to
23  the Phoenix New Times, I soon became a post on the Rip-off
24  Report as a con man.
25     A.    Yes.

1     Q.    Isn't that something you have indicated to

2  people, that after you took this -- first of all --

3     A.    Yes.

4     Q.    -- let me back up.

5           You did in fact take The Real Rip-off Report

6  story to the Phoenix New Times, didn't you?

7     A.    Yes.

8     Q.    You are the one who initiated Sarah Fenske to

9  write that story?

10    A.    Yes.

11    Q.    And so the person who wrote this, I found it

12 interesting that after I took the story, The Real Rip-off

13 Report to the Phoenix New Times, I soon became a post on

14 the Rip-off Report as a con man, would you agree with me

15 was pretending to be you?

16    A.    No.  Those words were taken from a text I had

17 written in Emazines or something.  The rest of it,

18 somebody took that first paragraph, if you will, from

19 another source and added it to this and posted it on CNET.

20    Q.    You are the author of the first paragraph of the

21 posting on page 6?

22    A.    Correct.

23    Q.    Are you the author of the part that says fake

24 Rip-off Reports?

25    A.    No.

1      Q.    Are you the author of the part that says, "Here
2  is an example of either Maria Speth - Ed Magedson or one
3  of their surrogates using a fake name"?

4      A.    No, I believe that to be Sean Richardson.

5      Q.    The reason you believe that is because that is
6  information he has given you?

7      A.    Yes.

8            MS. SPETH:   Mark this.

9            (Deposition Exhibit No. 11 was marked for
10  identification.)

11      Q.    BY MS. SPETH:   I am showing you what has been
12  marked as Exhibit 11.   This is the document I was saying
13  during the break I am not sure whether we covered in your
14  last deposition.   It is not marked as an exhibit
15  previously.

16            Did you write at least the first page of --
17  actually, on Exhibit 11 where it starts with Worldwide
18  Investigation Services AZ PI License 1551859?

19      A.    Yes.

20      Q.    First of all, that is a reference to your
21  license, is it not?

22      A.    Yes.

23      Q.    Did you write the words that come on the first
24  page of Exhibit 11 after that title?

25      A.    Yes.

1    Q.    When you start off by saying, "For the record, I
2   am a liar," what do you mean by that?

3    A.    I find that periodically in trying to get to the
4   truth of the matter that sometimes I can't always tell the
5   truth to get to the truth.  The police do it too.

6    Q.    You are saying as an investigator sometimes you
7   have to either make up a story or a ruse in order to get
8   information?

9    A.    A ruse, yes.

10    Q.    On the second paragraph it says, "If you have
11   come upon this page it may be because you have been
12   directed to my Web site from one of the Three Horsemen of
13   the Apocalypse."

14                Who are the Three Horsemen of the
15   Apocalypse?

16    A.    Bud Hibbs, Ed Magedson and Robert Paisola.

17    Q.    When did you post this originally?

18    A.    I don't know.  Maybe January, perhaps, after the
19   original posting of my Rip-off Report.

20    Q.    Why do you refer to Mr. Magedson as one of the
21   Three Horsemen of the Apocalypse?

22    A.    Well, my investigation of the three concluded
23   that they certainly had some commonalities in terms of a
24   business relationship.

25    Q.    Okay.

1      A.    Certainly I have spoken to Mr. Hibbs, who

2  acknowledges a relationship, Paisola certainly does, and,

3  of course, I got the e-mail that brought Mr. Paisola to my

4  attention from the Rip-off Report.

5      Q.    Okay.

6      A.    In terms of the Three Horsemen of the Apocalypse,

7  it seems there has been a public outcry that these people

8  are using the Internet for money making schemes.

9      Q.    What does that have to do with the Apocalypse?

10     A.    Well, the Three Horsemen of the Apocalypse is

11  just a literary term.

12     Q.    What does it mean to you?

13     A.    It means there are three people out there who are

14  creating a great deal of discord.

15     Q.    Look at page -- what is listed as page 5 of 12 at

16  top.

17     A.    Okay.

18     Q.    Do you see the posting that starts with paladinpi

19  as supposedly who posted it?

20     A.    Yes.

21     Q.    Did you post that?

22     A.    Yes.

23     Q.    This is Junior Member?

24     A.    Uh-huh.

25     Q.    Yes?

1     A.    Yes.

2     Q.    Remember how we looked at the previous exhibit,

3   Exhibit 10, and you said you didn't post anything on

4   there?

5     A.    Correct.

6     Q.    What is this -- what is Exhibit 11?   What blog is

7   Exhibit 11?

8     A.    This is scam.com.

9     Q.    All right.   Are you sure Exhibit 10 was not

10  scam.com?

11    A.    I am sure I didn't post the -- I am telling you I

12  did not post this report on CNET and I am telling you that

13  those words are absolutely Sean Richardson's words.

14    Q.    But do you agree with me that Exhibit 10 may be

15  scam.com as well?   Just look at the --

16    A.    Yes, I agree it very well could be.

17    Q.    Okay.   Back to Exhibit 11.   The second paragraph

18  of the post that is by paladinpi, it says Ed lives at 2033

19  West McDowell Boulevard in Apache Junction.

20              See that?

21    A.    Yes.

22    Q.    What was your purpose for posting Ed's address on

23  scam.com?

24    A.    So he could be served personally and be addressed

25  in deposition.

1     Q.   It says, "Ed is the trustee of -- something is

2  cut off -- but the Martin Magedson Trust.

3                   See that?

4     A.   Yes.

5     Q.   What was the purpose of providing that

6  information to whoever was reading this?

7     A.   So that they could understand where the assets

8  are.

9     Q.   Says, "In September he borrowed $417,000 from a

10  bank on a refinance."

11              What was your purpose of posting that?

12     A.   So they could understand where the assets are.

13     Q.   Who is the "they"?

14     A.   Plaintiffs.

15     Q.   So you posted this information to help any

16  plaintiffs to find Ed and find his assets?

17     A.   Correct.

18     Q.   At the time you posted this, what was your goal?

19  I mean, why was it you thought it was important that

20  people know where to serve Ed and where his assets were

21  back then in 2006?

22     A.   I believe that I had received, it was either a

23  telephone call or e-mail, that made it very clear that he

24  was avoiding process, that they couldn't get to him, and I

25  had seen some judgments that were overturned, I suppose,

1  because they could never get personal service on him.

2     Q.    Okay.

3     A.    I also saw that they weren't really able to get

4  depositions, which in my opinion was probably -- useful

5  information would come out.

6     Q.    Isn't it true that what sort of the genesis of

7  this entire obsession that you have with Ed Magedson was

8  Mr. Magedson's refusal to give you the information

9  regarding who authored certain reports on Rip-off Report?

10    A.    I've never asked for that.

11    Q.    Really?

12          Do you recall the whole traveling salesman

13  case matter?

14    A.    Yes.

15    Q.    Didn't you ask Mr. Magedson to give you the

16  authors of those postings?

17    A.    What postings?

18    Q.    The ones that regarded the supposed kidnapping or

19  ransom of some girl.

20    A.    I didn't.  Like I told you last time, her

21  information was in the post, her phone number, e-mail

22  address, her name.

23    Q.    For what purpose did you contact Mr. Magedson

24  originally back in 2006?

25    A.    Regarding that case?

1       Q.      Yes.   But what did you want from him?

2       A.      What happened was the people that are involved

3    in -- I wasn't initiating contact with Mr. Magedson.   In

4    fact, it was his staff that was the originating contact

5    parties.

6               What had happened was, I am -- I volunteer

7    my services a great deal, as I discussed last time, to an

8    organization that looks out for children and families that

9    have been victimized by a group of traveling sales

10   businesses.

11      Q.      Okay.

12      A.      And a woman -- like the authorities and Attorney

13   Generals, there are a group of us out there that include

14   attorneys and Attorney Generals and private investigators,

15   et cetera, that monitor Web sites to see what direction

16   these particular organizations are going in.

17      Q.      Okay.

18      A.      A woman had expressed in one of the posts in

19   Rip-off Report that her son, who was chemically dependent

20   for emotional disturbances, had been abducted by one of

21   these traveling sales crews.

22      Q.      Okay.

23      A.      Unfortunately, the investigations I am asked to

24   participate in for free involved murderers, rapists,

25   abductors, all sorts of scurrilous individuals, and I

1  didn't feel like exposing my family to this sort of

2  scrutiny from these individuals.

3      Q.   Okay.

4      A.   So I posted or attempted to post in that

5  particular post my phone number so she could communicate

6  with us to determine whether or not it was a valid plea

7  for help or whether it was someone from the traveling

8  sales crews that were trying to get information on us

9  loosely.

10      Q.   Okay.

11      A.   The monitors for the Rip-off Report communicated

12  with me asking me what it was that I thought I was doing

13  by going around the system.

14      Q.   Okay.

15      A.   What ensued from there was their claims I had

16  told them that I was a police officer, and in that same

17  e-mail chain I pointed out to them clearly I never

18  represented myself as a police officer.  The FBI asked me

19  the same question.

20      Q.   Okay.

21      A.   I think they agreed I wasn't representing myself

22  as a police officer.

23      Q.   Okay.

24      A.   That the ensuing exchange became a little bit

25  paranoid, because I was typing from two different

1    computers.  One was my web-based e-mail, the other was

2    Outlook.

3        Q.    Okay.

4        A.    Unfortunately when I would download the e-mails

5    to Outlook, it wouldn't be back on the server.  They

6    seemed to think I was omitting portions of the e-mail when

7    I wasn't.

8        Q.    Okay.

9        A.    Simply wasn't transferring over from web-based to

10   Outlook.

11       Q.    Okay.

12       A.    In the e-mails you can see clearly that they are

13   suggesting that I am asking for information when I am not.

14   They posted it.  It was there.  I didn't need to get any

15   information.  It was all right there.

16       Q.    It is your position that Rip-off Report contacted

17   you first?

18       A.    Yes.

19       Q.    Is that what you said?

20       A.    Yes.

21       Q.    In what form?

22       A.    E-mail.

23       Q.    What did that e-mail look like?

24       A.    I am not sure I understand your question.  I

25   mean, I provided it to you in -- when I was here, the

1    entire sets of e-mails.

2        Q.    The very first thing that happened was you posted

3    something on Rip-off Report, correct?

4        A.    Attempted to, yes.

5        Q.    You are attempting to post something that

6    basically said to this magazine -- to this lady who posted

7    about the magazine company, contact me, right?

8        A.    Yes.

9        Q.    And did you call Mr. Magedson or did you just

10   post?

11       A.    I don't think I called him, I don't think.

12       Q.    It is your position under oath, your testimony

13   under oath, that you never asked him for the contact

14   information of the lady who did this posting?

15       A.    I am telling you, I am like 99 percent sure,

16   because why would I?  He posted it in her post.

17       Q.    Why didn't you just call her?

18       A.    I did.

19       Q.    She wouldn't talk to you?

20       A.    She did talk to me.

21       Q.    And then why did you have to post something

22   saying she should contact you?

23       A.    Because I posted it first that she should contact

24   us.  They didn't put it in.  I wanted to make sure that

25   this was not the magazine companies that were trying to

254

1  lure us out, when it was clear that there wasn't going to

2  be any participation or they weren't going to put my phone

3  number in there that these -- I have a phone if you dial

4  it, it will come up with the real number whether you are

5  trying to spoof it or not.  I wanted to know who this

6  really was.

7      Q.    Okay.

8      A.    I went ahead and communicated with her,

9  eventually.

10     Q.    Okay.

11     A.    I forwarded her information to the organization

12  that tracks these people.

13                  MS. SPETH:  Mark this.

14                  (Deposition Exhibit No. 12 was marked for

15  identification.)

16     Q.    BY MS. SPETH:  Let's look at the exhibit that we

17  marked as Exhibit 12.

18     A.    Okay.

19     Q.    Let's go backwards.  I think we have to start

20  from the back and work up if we are going to look at them

21  in chronological order.

22                  There is an e-mail from Ed Magedson to

23  yourself, is that correct, on the third page?

24     A.    I don't know if it is from him or not.

25                  Some of these e-mails were saying they were

```
 1   from the staff and Ed was out of town and when he gets
 2   back in town, to discuss it with him.
 3        Q.   This particular e-mail doesn't say that, does it?
 4   Simply says --
 5        A.   No.
 6        Q.   Okay.  It says it is from editor@ripoffreport,
 7   correct?
 8        A.   Yes.
 9        Q.   It says, "Who do you think you are trying to go
10   around our rules?  You don't even say who you are.
11   Police?  Lawyer?  Consumer?"
12        A.   Yes.
13        Q.   "What is it you will do with your investigation?"
14             Is this the first written communication that
15   you ever got from anyone at Rip-off Report or is there
16   something before this?
17        A.   This is it.
18        Q.   What was this a response to?
19        A.   This was a response for me trying to post my
20   phone number to the post of this woman so that she could
21   contact us.
22        Q.   Where is that posting?  Have you produced that
23   posting to me?
24        A.   I think it is in the documents.  When I showed
25   up, you had requested them, and I think that it is in
```

1     there.

2          Q.     Okay.

3          A.     I mean, it is her name, her e-mail, her phone

4     number.

5          Q.     And is the second page of the e-mail that is June

6     7th, 2006 at 6:05 a.m., is that a response to that e-mail

7     that we just read?

8          A.     Which one are you asking me --

9          Q.     On June 7th, 2006, at 1:33 in the morning

10    editor@ripoffreport e-mailed you the e-mail I just read on

11    the record, correct?  "Who do you think you are trying to

12    go around our rules."

13         A.     Yes.

14         Q.     The e-mail that is June 7th, 2006, at 6:05 a.m.,

15    is that the response?

16         A.     Yes.

17         Q.     What did you mean when you said you wanted to

18    provide my contact information when Fidelity threatened

19    you?

20         A.     In my communications with Mr. Magedson over the

21    Fidelity issue, he had asked me specifically if he could

22    give my contact information out.

23         Q.     So you have had conversations with him?

24         A.     Yes.

25         Q.     Okay.

1      A.    But this -- that was several months previous to

2  this.

3      Q.    What do you mean "that was several months

4  previous to this"?

5      A.    The Fidelity Financial, that conversation with

6  him was several months previous to any of this going on.

7      Q.    Do you mean Federated Financial?

8      A.    Yes.

9      Q.    In the e-mail you said Fidelity.

10            Do you think you were referring to Fidelity?

11      A.    Indeed I was.

12      Q.    So I thought I was talking about the first time

13  you and Ed ever had contact with each other.

14            Apparently there is an earlier history than

15  this --

16      A.    Yes.  You had addressed that in our last

17  deposition.

18      Q.    I told you I didn't remember.

19            This e-mail exchange we have here that

20  indicates it was printed out on 7-25-07, would you agree

21  with me that is what you produced to me in response to my

22  request for e-mail -- you have it there.

23      A.    I think there was a great deal more that I gave

24  you.

25      Q.    No, but you produced to me the e-mail exchange;

1    isn't that correct?

2        A.    I did.

3        Q.    Do you think you did that in the documents you

4    produced that day at the deposition or the ones you

5    produced afterwards?

6        A.    I think -- I think afterward you had asked for

7    what I had in my hand.  I gave it to you.

8        Q.    Right.

9        A.    I might --

10       Q.    You gave me a stack that you had with you that

11   day and then later on you gave me a big box of documents.

12       A.    Right.

13       Q.    Where do you think this e-mail exchange of

14   Exhibit 12 was?  In which of those two things do you think

15   that was?

16       A.    Pretty positively they were in the information I

17   gave you after the deposition.

18       Q.    That same day?

19       A.    Yes.

20       Q.    Do you know if this Exhibit 12 is a complete --

21   let me say this.  Do you see how it says page 1 of 3, 2 of

22   3 and page 3 of 3?

23       A.    Uh-huh.

24       Q.    Yes?

25       A.    Yes.

1    Q.    Would you agree with me this is exactly the way
2    you printed this out for me?
3    A.    In the subpoena you mean?
4    Q.    No, in what you produced to me.
5    A.    I would be surprised, frankly, because I thought
6    in that packet I gave you it would have included the
7    post -- included everything.  My thoughts on this, there
8    should be nine pages worth of e-mails on that.
9    Q.    Okay.
10   A.    Might have been the one I provided to the FBI.  I
11   don't know.  I would have thought I would have given you
12   everything, including the woman's post.
13   Q.    All right.
14   A.    I don't know I am answering definitively, but I
15   thought in the information I gave you all of that was in
16   there.
17   Q.    Let me ask you this question.  On Exhibit 12 do
18   you know if there is any e-mail between the 1:33 a.m.
19   e-mail and the 6:05 e-mail back?
20   A.    There was a lot of e-mails.  I don't know if
21   there is anything in between or not.
22   Q.    Okay.
23   A.    This thing went on ridiculously long.
24   Q.    "This thing" meaning your e-mails back and forth
25   with Ed?

1      A.    Yes.

2      Q.    Okay.

3      A.    There is quite a bit missing from this.

4            MS. SPETH:   Mark this.

5            (Deposition Exhibit No. 13 was marked for

6      identification.)

7      Q.    BY MS. SPETH:   Look at what we have marked as

8      Exhibit 13.   This is an e-mail that the second e-mail

9      matches the e-mail in Exhibit 12, in other words, the June

10     7th, 2006 e-mail, 1:33 a.m., where Mr. Magedson or

11     somebody from his address asks you, who do you think you

12     are trying to go around our rules.

13            See that?

14     A.    Yes.

15     Q.    In response at 5:19 a.m. on June 7th, 2006, you

16     say, we are all of those and more.

17            See that?

18     A.    Yes.

19     Q.    If you produced, and I am not asking you to say

20     you did right now, but if you produced Exhibit 12 to me

21     just like it was, page 1 of 1, 2 of 3 -- I'm sorry.

22            If in fact you produced to me Exhibit 12,

23     page 1 of 3, page 2 of 3, page 3 of 3, in this exact order

24     the way you did, you left out your response to that

25     e-mail, didn't you?

1      A.    Well, I don't think -- if I provided this to you,

2  there are many things left out.

3      Q.    Okay.  And one of the things you left out was

4  your response to Ed's e-mail of June 7th, 2006 at 1:33

5  a.m.?

6      A.    Frankly -- this?  You say Ed's response.

7      Q.    I am talking about your response to Ed.

8            Let's go back to Exhibit 13.

9      A.    Okay.

10     Q.    At June 7th, 2006, at 1:33 in the morning,

11  Mr. Magedson says, who do you think you are trying to go

12  around our rules.  You don't even say who you are.

13  Police?  Lawyer?  Consumer?  What is it you will do with

14  your investigation?

15            And you respond, we are all of those and

16  more.  What we will do is get the kid and return him to

17  his mother.  The information gathered goes to the

18  authorities of many different jurisdictions.

19            Was that your response?

20     A.    Yes.

21     Q.    Is that an accurate printing of your response?

22     A.    Yes.

23     Q.    So when Mr. Magedson says, you don't even say who

24  you are, police, lawyer, consumer, you responded, we are

25  all of those and more, correct?

1      A.    Uh-huh.

2      Q.    Yes?

3      A.    Yes.

4      Q.    Then when you produced that e-mail string to me,

5  you left out your response, didn't you?

6      A.    Not on purpose.  I thought you had everything.

7      Q.    But you printed something for me that you printed

8  on July 25th, 2007, just a week before your deposition,

9  and when you printed that --

10     A.    A week before my deposition?

11     Q.    A week -- week before your first deposition,

12  correct.

13     A.    Well, I think I printed everything for you after

14  the deposition.

15     Q.    Except the things you handed me that day.

16     A.    Yes, I suppose.

17     Q.    Okay.

18     A.    I don't know.

19     Q.    Let me simply ask you this.  What did you mean

20  when you said "we are all of those and more"?

21     A.    As I described it to Travis Hatch, there are

22  private investigators, attorneys, Attorney Generals,

23  police departments, many organizations involved in trying

24  to get these children back to prosecute the -- in fact,

25  there is legislation in Wisconsin involved right now.

1  There is many organizations involved in participating in

2  trying to do something about this.

3       Q.   Okay.

4       A.   Part of the confusion on this was you have

5  indicated this is Ed that is writing back, so I have been

6  pretty confused over it because we had spoken before.   In

7  those conversations he would ask, "Who are you?   What is

8  it you do?"

9       Q.   Okay.

10      A.   And that would have been an opportunity certainly

11 for me to say that I am a federal law officer.   That never

12 happened.   He had been on my Web site.

13      Q.   How --

14      A.   What he said to me, "You look older than I

15 thought you would be."   My picture was on it.

16      Q.   Okay.

17      A.   I am scratching my head and saying, "I am talking

18 to Ed Magedson and he is acting like he doesn't know

19 anything."   Some of the e-mails are from the staff, and

20 the staff clearly says, Ed is out of town."   Who wrote the

21 e-mails?

22      Q.   Didn't you have a conversation with Ed Magedson

23 on the telephone before the June 7th, 2006 e-mails where

24 you represented yourself to be a federal officer?

25      A.   No.

1    Q.    Did you represent yourself to be a police
2  officer?
3    A.    No.
4    Q.    Did you --
5    A.    He records everything.
6    Q.    Did you represent yourself to be law enforcement?
7    A.    No.
8    Q.    Did you represent yourself to be the authorities?
9    A.    No.
10   Q.    And I take it your position is you have never
11 done that with any of the neighbors you have spoken to
12 either?
13   A.    That is absolutely correct.
14         As I mentioned last time, Travis Hatch was
15 up there and he brought back my business card that had
16 been given to the neighbors that says clearly that I am a
17 private investigator, has my private investigator's number
18 on there.  Has nothing whatever in there that even
19 intimates I am law enforcement.
20   Q.    Is it your position -- is it your testimony under
21 oath that you never told anyone who you were
22 investigating -- I'm sorry -- who you spoke to in your
23 investigation of Ed that you were part of law enforcement
24 authority?
25   A.    Absolutely not.  I have not represented that.

1        Q.    Let's go back to Exhibit 11.

2        A.    Okay.

3        Q.    On page 7 of 12 there is a 2-17-07 post

4    by paladinpi.

5                    Is that you?

6        A.    Yes.

7        Q.    In that post, the fifth paragraph, you said,

8    suddenly out of the west rides Bill Stanley of

9    Defamationaction who is also a poster here?

10       A.    Uh-huh?

11       Q.    Yes?

12       A.    Yes.

13       Q.    And you said within an hour Mr. Stanley had the

14   blog removed.  And I know it is cut off.

15       A.    Yes.

16       Q.    You hesitated why?

17       A.    You were saying blog, but I was reading Web site.

18   But yes, you are correct.

19       Q.    You wrote blog, didn't you?

20       A.    Yes.  We were referring to Robert Paisola's blog.

21       Q.    Well, I want to read the previous paragraph

22   before you decide that you were referring to Robert

23   Paisola's blog.

24       A.    That is the only blog he took down.  That was my

25   initiation into what it was he did.

1      Q.      The previous paragraph says, oddly enough, a blog

2  was created about me with untruths and inconsistencies in

3  it and I suddenly showed up on the Rip-off Report as a con

4  man.

5      A.      Yes.

6      Q.      That is a reference to Rip-off Report, isn't it?

7      A.      Yes.

8      Q.      Back to the next paragraph, you say, today I have

9  discovered that somehow the Rip-off Report Web site has

10  been taken down.

11              You are referring clearly to Rip-off Report

12  there?

13      A.      Yes.

14      Q.      You don't think that your previous sentence was a

15  reference to Rip-off Report as well?

16      A.      Clearly it wasn't.

17      Q.      When you say that is a 900 pound gorilla, what is

18  that a reference to?

19      A.      A reference from Bill Stanley in his -- I think

20  it is a term that is used by Web sites that determine the

21  linking strength of particular Web sites.  If it has a lot

22  of links to it, it is a 900 pound gorilla.

23      Q.      The posting on page 8 of 12, the 3-01-07 posting,

24  is that yours as well?

25      A.      Yes.

1    Q.    The third paragraph says, if the Defamation

2    Actions of the world -- if the Defamation Actions of the

3    world put the Rip-off Reports of the world out of

4    business, they too go out of business?

5    A.    Yes.

6    Q.    Did you write that?

7    A.    Yes.

8    Q.    It seems to me that it is not the goal to take

9    down Rip-off Reports, it is to excise -- it is an exercise

10   to get him to comply with the very policy he has in

11   effect?

12   A.    Yes.

13   Q.    To remove bogus -- I don't know where it goes

14   from there.

15   A.    I don't know.

16   Q.    That didn't print very well, did it?

17          The gist was Bill Stanley's group and Rob

18   Russo's group doesn't really want to put Rip-off Report

19   out of business because if they did they put would

20   themselves out of business?

21   A.    Yes.

22   Q.    What they really want to do is what?

23   A.    Well --

24   Q.    What were you referring to here?

25   A.    My thoughts on this is that they were trying to

1   get the Rip-off Report to comply with the terms and

2   conditions that the Internet service providers had in

3   effect.

4        Q.    How were they trying to get that to happen?

5        A.    According to Bill Stanley, his protest group went

6   after, communicated, or whatever it is he does with the

7   Internet service providers.

8        Q.    I think we may have talked about this, but it is

9   brief enough I will cover it quickly.

10              On page 9 of 12 there is a post by

11  DefamationAction, which I am going to assume was Bill

12  Stanley, and he says, I have hired a private investigator,

13  John F. Brewington, to investigate this matter as no

14  police report seems to have been filed in connection with

15  this very serious crime.

16              Do you believe that is Bill Stanley that

17  wrote that?

18       A.    Yes.

19       Q.    Did Mr. Stanley in fact hire you?

20       A.    Yes.

21       Q.    And on page 11 of 12, the posting that is 3-6-07,

22  do you see that?

23       A.    Hang on.

24       Q.    It starts on 10, goes over to 11.

25       A.    Yes.

1    Q.    The last sentence says, I have given Mr. Stanley

2    a preliminary report.   If he wishes to share it with the

3    world, he may.

4              Did you write that?

5    A.    Yes.

6    Q.    You wrote that under JFBA Junior Member, didn't

7    you?

8    A.    I did.

9    Q.    Isn't that the same user name you said wasn't

10   yours?

11   A.    The user name I said was indeed mine.   We were

12   talking about a post on CNET, because that is what it

13   looks like.

14   Q.    Okay.

15   A.    This -- when you were asking me about this post,

16   it appears as if this came from CNET, when indeed the back

17   pages comes from scam.com.

18   Q.    Okay.

19   A.    If you are asking me, did I post this on

20   scam.com, the answer is yes.   Did I post it on CNET?   The

21   answer is no.

22   Q.    I asked you if you posed it and you said you did

23   not.

24              Now you admit that you posted it?

25   A.    I admit it because this is all CNET on it.   Never

1    been to CNET, never posted anything on there.

2        Q.    You said --

3        A.    It says it right on there.

4        Q.    Okay.  You are saying you thought you didn't post

5    that because you thought it was CNET?

6        A.    Correct.

7        Q.    But you did post on scam.com?

8        A.    Yes.

9        Q.    You posted on scam.com under JFBA?

10       A.    Yes.

11       Q.    You in fact posted on scam.com that I, Maria

12   Speth, of Jaburg & Wilk posted things on Rip-off Report

13   about you?

14       A.    What I posted was exactly what Sean Richardson

15   sent to me, exactly.

16       Q.    So you republished what Mr. Richardson gave to

17   you, correct?

18       A.    There is something wrong with this.

19       Q.    It is a lie, that is what is --

20       A.    Indeed it is, but there are some things missing.

21   I have received this information.  It is correct.

22       Q.    So you were passing along what Richardson told

23   you?

24       A.    Yes.

25       Q.    You felt that that lie should be posted all over

1   the Internet?

2        A.    Scam.com isn't all over the Internet.

3        Q.    You felt that that lie should be posted on

4   scam.com which would be available to anyone who has

5   Internet access?

6        A.    Is it a lie?

7        Q.    You just told me it was a lie.  Do you think it

8   is not?

9        A.    I don't know if it is or not.

10       Q.    Do you believe that my law firm posted something

11  about you on Rip-off Report?

12            MR. DANA:  Objection; misleading.

13       Q.    BY MS. SPETH:  I am --

14       A.    I think that there is a direct conduit from this

15  law firm to Edward Magedson.  To what degree I don't know.

16       Q.    Do you believe that my law firm posted something

17  on Rip-off Report about you?

18       A.    I don't know.

19       Q.    But yet you posted that information on scam.com

20  not knowing whether it was true or false?

21            MR. DANA:  Objection; misleading.

22            THE WITNESS:  I presume that Sean Richardson

23  had done his homework and had come up with viable

24  information.

25       Q.    BY MS. SPETH:  Okay.

1     A.    It says clearly this is what I received.

2     Q.    How did you receive this information from

3  Mr. Richardson?

4     A.    I think he sent it to me either through e-mail or

5  through instant message.  I am not sure.

6     Q.    Do you know when he sent it to you?

7     A.    I don't.

8     Q.    Does it help to indicate that according to

9  Exhibit 10 you posted it on the 11th of July?

10    A.    Probably close to that.

11    Q.    So sometime obviously before July 11th, 2007

12 Mr. Richardson sent you everything from fake Rip-off

13 Reports exclamation point through the end of the IP

14 address that we see in Exhibit 10?

15    A.    Yes.

16    Q.    You posted that on scam.com?

17    A.    Yes.

18    Q.    What, if anything, did you do with respect to

19 Mr. Richardson to confirm that that information was

20 accurate?

21    A.    I asked him where he got it from.

22    Q.    What did he say?

23    A.    He said that an Indian hacker had gotten into

24 your Web site and pulled the information out.

25    Q.    An Indian hacker?

1       A.    Hacker from India.

2       Q.    Oh, okay.  Sorry.  I had this vision of -- never

3  mind.

4                   So somebody from India --

5       A.    Yes.

6       Q.    -- got into our Web site, and did what?

7       A.    Pulled out the information.

8       Q.    What information?

9       A.    That the post -- what I was led to believe is

10  that he had gone into the Rip-off Report, had somehow

11  established what IP address that that post had originated

12  from and had ascertained that that particular IP address,

13  if memory serves me, comes from your Scottsdale office.

14      Q.    He told you this or he wrote this to you?

15      A.    I think I called him and asked him, "Where are

16  you getting this from?"

17      Q.    Okay.

18      A.    Those are things he told me.

19      Q.    Do you think you had that conversation with him

20  before or after you posted this on scam.com?

21      A.    I am sure I had it with him before.

22      Q.    Did you believe him?

23      A.    Our last deposition you had indicated that

24  Mr. Magedson was paranoid.  This is a paranoid business.

25  You don't know who is in your computer, you don't know who

1    is doing what, don't know what people are up to.

2                My thoughts have been that there are people

3    in the wire that are probably doing things.

4        Q.    Okay.

5        A.    I have already expressed to you I believe there

6    is a conduit from somebody in this office that is

7    funneling information back to Mr. Magedson.

8        Q.    Okay.

9        A.    The answer is --

10       Q.    Do you remember the question anymore?

11       A.    Yes.

12                I have reason to suspect that somebody in

13   this office may very well be posting information.  I don't

14   know.

15       Q.    And the reason you have to suspect that is what

16   Mr. Richardson told you?

17       A.    No, not exactly, because I received an e-mail

18   after our deposition from an alleged private investigator

19   that I have never received anything even similar to that

20   that seemed to have information about maybe that

21   deposition.

22                Where did that come from?  I don't know.

23       Q.    Did you produce that e-mail?

24       A.    I sent it to you.

25       Q.    Okay.

1      A.      Sent it to Mike, the FBI.

2      Q.      So I don't think you ever answered the question.

3              Did you believe the information that Sean

4    Richardson provided to you that you posted on scam.com on

5    or about July 11th, 2007?

6      A.      Yes.

7      Q.      You believed it?

8      A.      Yes.

9      Q.      You said something about conduit from my office

10   to Mr. Magedson.

11             What are you talking about?

12     A.      I think there is a strong possibility that

13   someone in your employ, someone in the organization, is

14   providing intelligence and/or other information to

15   Mr. Magedson.

16     Q.      He is our client.

17     A.      Okay.

18     Q.      I would hope we provide him information.

19             What am I missing?  You think there is

20   something wrong with a law firm providing --

21     A.      I actually don't think there is anything wrong

22   with it.  What you asked me, do I believe that the

23   information on there is accurate.  My thoughts are, I

24   believe there is somebody that is in here doing things

25   other than that as well.

1    Q.    Bottom line, you are saying you believe that

2  someone in the Jaburg & Wilk office is posting things on

3  Rip-off Report about you?

4    A.    I believe there is a possibility of that.

5    Q.    All right.  What other conduits of information

6  are you referring to, or is that all you were referring

7  to?

8    A.    I have some suspicions about that e-mail that I

9  received that I forwarded to you and to the courts and to

10  Mike, to the FBI.

11    Q.    What suspicions?

12    A.    If I recall correctly, the idea behind -- let me

13  go back and try to focus on this.

14        The wording on the e-mail from this

15  gentleman was suggesting that I turn evidence against

16  Russo and Stanley and that I perhaps join the Corporate

17  Advocacy Program and Ed is a benevolent man and would

18  forgive me and hire me, and those sort of things.

19    Q.    Okay.

20    A.    And my thought process as I was thinking -- and

21  he had mentioned the fact that I was hiding my criminal

22  conviction from 22 years ago, when it is public record.

23        So since no one has ever approached me with

24  that, ever approached me with that, I thought to myself,

25  clearly something from the deposition has gone out when I

1    thought I understood the judge to say that he wanted that

2    deposition to be kept between the two attorneys.

3        Q.    So what you are saying, you believe we provided

4    information to Mr. Magedson that we weren't supposed to

5    provide according to some court order?

6        A.    Correct.

7        Q.    Other than that, what do you mean when you say

8    there is some sort of conduit between this office and Mr.

9    Magedson?

10       A.    That is all I mean.

11       Q.    That is all you meant?

12       A.    Yes.

13       Q.    We had a copy of a police report in your file.

14             Do you know when you obtained that police

15   report from the Mesa Police Department?

16       A.    I don't.  I think it is stamped on the front.

17       Q.    Okay.

18       A.    May, perhaps.

19       Q.    It is stamped that it was released to you on May

20   14th, 2007.

21       A.    Yes.

22       Q.    What did you need to do in order to get this

23   police report?  Did you have to fill out some sort of

24   form?

25       A.    Yes.

1    Q.    Who did you submit that form to?

2    A.    The clerk at the police department.

3    Q.    Did you have a conversation with Detective

4    Gumina?

5    A.    Yes.

6    Q.    Tell me about that conversation.

7    A.    Detective Gumina indicated that because he wasn't

8    able to ascertain yet who the author of the death threat

9    letters were, Mr. Magedson tried to implicate me in the

10   death threats, that he records everything, that I need to

11   be careful.

12   Q.    Okay.

13   A.    I asked him if he was aware of any issues between

14   the City of Mesa.  Wanted to ascertain if he was going to

15   be tainted in what he was doing.  And Ed Magedson and

16   Detective Gumina indicated he only had been on the force

17   one year and he had no knowledge of any adverse history

18   between the city, the police department or him.

19   Q.    Okay.

20   A.    He had indicated, I believe, that he had received

21   some tapes to go along with the police report that alleged

22   Russo and Stanley had threatened Mr. Magedson, but there

23   was no substance on those tapes that would definitively --

24   they said there were no death threats on there.

25   Q.    Sergeant Gumina told you that there were no death

1  threats on the tapes?

2      A.   I believe so.

3      Q.   He said there were no death threats on the tapes

4  from Stanley to Magedson?

5      A.   I don't know that that was defined.

6      Q.   What do you think he was talking about?  What

7  tapes do you think he was talking about?

8      A.   The police report says that Mr. Magedson turned

9  over three tapes.  That is the only tapes I have reference

10 to.

11     Q.   The officer's conclusion was there was no death

12 threats on there?

13     A.   Yes.  I think it says so in the police report as

14 well.

15     Q.   Did Officer Gumina tell you that -- I'm sorry.

16 Did you tell Officer Gumina that Ed Magedson threatened

17 you?

18     A.   Threatened me?

19     Q.   Yes.

20     A.   I don't think so.

21     Q.   Have you ever told anyone that Ed Magedson

22 threatened you?

23     A.   I don't think so.

24     Q.   Has Ed Magedson ever threatened you?

25     A.   No.

1    Q.    Do you feel threatened by him?

2    A.    No.

3    Q.    You said that pretty emphatically.

4    A.    I don't think he is going to reach over the table

5    and beat me up.

6               Is that what you mean?

7    Q.    I don't know what I mean.

8               Did you tell anybody you feel threatened by

9    him?

10   A.    No.

11   Q.    Did you tell -- withdrawn.

12              MS. SPETH:  Mark this.

13              (Deposition Exhibit No. 14 was marked for

14   identification.)

15   Q.    BY MS. SPETH:  Take a look at Exhibit 14.

16   A.    Okay.

17   Q.    Is that a printout from your Web site?

18   A.    Yes.

19   Q.    On the front page of your Web site, at least on

20   the front page of what is Exhibit 14, on the left-hand

21   column there are some links.

22   A.    They are pages.

23   Q.    One of the pages says Internet Defamation.

24              See that?

25   A.    Yes.

1   Q.   Do you know what that page goes to?

2   A.   Probably goes to a page on my Web site.

3   Q.   A page about what?

4   A.   I think it is probably a portion of the letter

5   that I had posted that I am now a subject or a post on the

6   Rip-off Report.  You probably have it, but I don't know

7   specifically.

8           I made some changes to the Web site.

9   Q.   Do you think it goes to a page or reference to

10  Bill Stanley?

11  A.   I think at one point in time there was probably a

12  banner for Defamation Action League.

13  Q.   And Defamation Action League being Bill Stanley's

14  organization, correct?

15  A.   I presume so.

16  Q.   You had a banner on your Web site regarding Bill

17  Stanley's organization?

18  A.   Yes.

19  Q.   Why was that?

20  A.   Mr. Stanley did me a favor by getting Robert

21  Paisola to remove that blog.  I had high hopes that

22  Mr. Stanley's intentions out there were to create a way of

23  helping victims alleviate their situation.

24  Q.   Okay.

25  A.   This was my -- certainly didn't ask me to.  This

1    was my way of saying thank you.

2        Q.    The way he did you that favor, according to

3    Mr. Stanley himself, was by hacking into Mr. Paisola's

4    system and getting e-mail addresses, correct?

5        A.    That is what you indicated last time.  You asked

6    me if I knew that hacking was illegal, and since I am not

7    an attorney, I have to answer no.  But the hacking, when I

8    looked it up afterward, indicates that it is the

9    unauthorized entry into a secured database.

10       Q.    Okay.

11       A.    What Mr. Stanley has said he did, and whether he

12   did it or not, I don't know, he said he got into the Web

13   site and he pulled out the e-mail information, e-mails

14   that were in Paisola's server, and sent them out.

15       Q.    400 of them, correct?

16       A.    That is what Stanley says.

17       Q.    Right.

18             He told you that he got into Paisola's Web

19   site, extracted 400 e-mail addresses, and sent out 400

20   e-mails?

21       A.    That is what he said.

22       Q.    You have some question in your mind whether that

23   is legal?

24       A.    Well, again, the definition says a secured Web

25   site.

1            Has Mr. Paisola filed a complaint with the

2    police?  I don't know.

3        Q.   I didn't ask you if he filed a complaint, I asked

4    you if you have some doubt in your mind --

5        A.   I don't know if he has committed a crime or not.

6        Q.   You just know that it was helpful to you?

7        A.   Well, I know that I told him later on I am not

8    willing to break the law or sell my soul to have something

9    like that done.  If it means putting the information back

10   up, that is what has to happen.

11       Q.   Did information ever go back up?

12       A.   It didn't.

13            MS. SPETH:  Mark this.

14            (Deposition Exhibit No. 15 was marked for

15   identification.)

16       Q.   BY MS. SPETH:  So on your Web site, let's look at

17   Exhibit 15, and on your Web site if you click on

18   Defamation Action League, or at least at one time if you

19   clicked on Defamation Action League, you would get what we

20   see in Exhibit 15.

21            Do you agree with me?

22       A.   Yes.

23       Q.   And let's --

24       A.   If you click on Defamation Action League, it

25   might have been a link to his Web site.  I think what you

1   just asked me is -- did you ask me if you click on

2   Defamation Action League does it go to a link on my Web

3   site?

4       Q.   No.   If I click on Defamation Action League on

5   your Web site, or at least at one time if I clicked on it

6   as of July of 2007, isn't it true that what I would see is

7   what you would see on Exhibit 15?

8            Do you see what I am saying?

9       A.   I see what you are saying.

10           If you clicked on Internet Defamation, a

11  page on my Web site, this is what would come up.

12      Q.   Okay.

13      A.   If you clicked on the banner Defamation Action

14  League, I believe it is probably HTML code, there would be

15  a link to his Web site.

16      Q.   If you clicked on Internet Defamation, what would

17  come up would be what we see on page 2 of Exhibit 15,

18  correct?

19      A.   Yes.

20      Q.   And is that something that you wrote?

21      A.   Yes.

22      Q.   In the second paragraph of exhibit -- page 2 of

23  Exhibit 15, there is a reference to your conversations or

24  your -- you taking your findings to Sarah Fenske at the

25  New Times, correct?

1    A.    Yes.

2    Q.    And where was this letter that is exhibit -- that

3  is page 2 of Exhibit 15 posted other than your Web site,

4  if anywhere?

5    A.    If anyplace, it is only posted on an article that

6  I wrote for Emazines.

7    Q.    Was this the full content of the article or were

8  there other stuff?

9    A.    I believe this is it.

10   Q.    What was your purpose of posting this on

11  Emazines?

12   A.    It was an attempt -- I had noticed that that had

13  a relatively strong link and that I was experimenting to

14  determine whether or not by posting on that if it would

15  come up in a strong position on the front page of Google.

16   Q.    Okay.

17   A.    And it did.

18            (Discussion off the record.)

19            MR. DANA:  Can we take a short lunch break

20  soon?

21            MS. SPETH:  Yes.

22            (Recess taken.)

23            THE REPORTER:  There is a little overlapping

24  of the speakers going on.

25            MS. SPETH:  We both improved over last time.

1   You should see what we did to poor Stacey.  You talk about

2   talking over each other, oh, my goodness.

3                We really do need to be more careful or we

4   are not going to get a clear record.

5        Q.   BY MS. SPETH:  Did you ever receive any

6   information from the Mesa Police Department regarding Ed

7   Magedson's address?

8        A.   No.

9        Q.   I have the deposition on July 31st, 2007.

10               You told me that you got Ed's address from

11   an anonymous caller?

12        A.   Yes.

13        Q.   And that you traced the call to a pay phone on or

14   near Thunderbird.

15               Is that correct?

16        A.   Yes.

17        Q.   What process did you use to trace the call?

18        A.   Accurant.

19        Q.   What is Accurant?

20        A.   A subsidiary of Lexus Nexus.

21        Q.   How does it work?  Do you have to be a

22   subscriber?

23        A.   Yes.

24        Q.   You are a subscriber?

25        A.   Yes.

1    Q.    For how long have you been a subscriber?

2    A.    A year, perhaps.

3    Q.    And does Accurant work on a particular phone or

4    every phone or -- in other words, is every line you use

5    covered by Accurant?

6    A.    What you have to understand about Lexus Nexus,

7    all of the competitors, they will tell you up front the

8    information could be flawed.

9    Q.    Okay.

10   A.    I understand that when I go in there.

11            No, it doesn't operate on every phone.  The

12   information that comes up -- you know, people spoof phone

13   numbers.

14   Q.    Let me go back to my question.  Maybe you

15   answered my question in the middle of everything else you

16   felt like saying.

17            My question was, you have a cell phone and a

18   home phone and a work phone, or no?

19   A.    I have Skype and a cell phone.

20   Q.    Skype is what?

21   A.    Telephony for lack of a better term.

22   Q.    That is what you use for your business?

23   A.    Yes.

24   Q.    Then you have a cell phone?

25   A.    Yes.

1      Q.     Do you use Accurant to trace calls that come into

2   your cell phone?

3      A.     I did in that case.

4      Q.     If it is a subscription service, doesn't it work

5   in every case?

6      A.     I can plug in any phone number I want.

7   Information doesn't come back on every phone number.  You

8   have to understand where they get the information from and

9   how it works.

10     Q.     I am not talking about the incoming phone

11  numbers.  What I am trying to figure out is, are you using

12  Accurant to trace all calls that come into your cell phone

13  number?

14     A.     No.

15     Q.     What do you have to do to differentiate between

16  calls that are traced and the ones that aren't?

17     A.     I have to plug the phone number into Accurant

18  system.

19     Q.     What you are saying, your cell phone records who

20  called you?

21     A.     Yes.

22     Q.     Then you take that number, you plug it into

23  Accurant?

24     A.     Yes.

25     Q.     I see.

1           If they call on Skype, do you still have a
2    record of who called you?
3       A.   If it is a blocked number, no.
4       Q.   All right.  So let's talk about the call you gave
5    that gave you Ed's address, the one you volunteered to us
6    during your last deposition, that address.
7       A.   Okay.
8       Q.   That call came in on your cell phone?
9       A.   Yes.
10      Q.   What phone number was that?
11      A.   602 438-6033
12      Q.   And who is the carrier you have that cell phone
13   with?
14      A.   Nextel, but it is now Sprint.
15      Q.   At the time it was Nextel?
16      A.   I don't know.
17      Q.   That --
18      A.   It goes back and forth.  Sprint is the one that
19   bills me.
20      Q.   Okay.  About what time of day did that call come
21   in?
22      A.   11:00 in the morning.
23      Q.   It was shortly before your deposition, correct?
24      A.   A few days before.
25      Q.   It wasn't a blocked call?

1    A.    No.

2    Q.    What was the phone number?

3    A.    I don't know.  I didn't erase it, but they don't

4    stay on my cell phone.  Over a period of time they are

5    going to get deleted.  I have a Blackberry.  I think I

6    have it set up for every 15 days all my e-mails will wind

7    up getting deleted so it doesn't clog up the server.

8    Q.    In order to run an Accurant report didn't you

9    write the number down somewhere?

10   A.    No.  I looked at my cell phone, I plugged it into

11   Accurant and it came up.

12   Q.    When you say you "plugged it in," you mean you

13   typed it?

14   A.    Yes.

15   Q.    The Accurant report that you did you did it --

16   did you keep a copy of it?

17   A.    No.

18   Q.    Why is it that when we had your deposition you

19   said you had a copy and you would provide it?

20   A.    Because at that point in time I would have had at

21   least the phone number, and I can always go back into

22   Accurant and pull it up.

23   Q.    You are saying that you were going to recreate it

24   for me?

25   A.    Recreate it.

1    Q.    What changed?

2    A.    I don't have it now.  As a matter of fact, when

3    you requested it in your -- in the paperwork I got, I went

4    to my cell phone to see if the number was still there, and

5    it wasn't.

6    Q.    Okay.

7    A.    My bills I get from Sprint do not have phone

8    numbers going in and out.  I contacted Sprint and asked

9    them if there were ways for me to go ahead and pull a

10   billing statement from July, supposing that number would

11   be in there.

12   Q.    Okay.

13   A.    What they force you to do is, for security

14   purposes, you have to go in and register.  I went in and

15   tried to register, and it came back saying they couldn't

16   register me.  I called Sprint and asked them what is the

17   problem.  I needed to be registered so I can retrieve that

18   phone number and go ahead and trace it for you again.

19   Q.    Okay.

20   A.    They said they would send me an e-mail walking me

21   through the steps of registering so I can get all my phone

22   numbers that come in and out.

23   Q.    Okay.

24   A.    It became too much of a nuisance.  Never received

25   the e-mail.  Never provided me with access to my own

1  billing statement with the phone numbers.

2      Q.   You told me in your deposition in July that you

3  saved the trace on your cell phone.

4      A.   I saved the number.  I didn't erase it.

5      Q.   I asked you what was the trace -- I asked you how

6  did you learn where Ed lives, and you said, I got an

7  anonymous phone call.  I sent the trace on the phone call

8  to the FBI.

9           Tell me about that part.

10     A.   Well, I believe I sent that by e-mail to Travis

11 Hatch.

12     Q.   You believe?

13     A.   Yes.

14     Q.   And --

15     A.   That is --

16     Q.   -- that means you have an e-mail somewhere?

17     A.   No.

18     Q.   Why not?

19     A.   Anything that has to do with Travis Hatch I would

20 get rid of immediately.

21     Q.   So you destroyed evidence?

22     A.   I destroyed that.

23     Q.   Evidence you knew I asked for?

24     A.   Counselor, I can always go back and get it.

25 There is no reason for me -- in my particular mind I

1    didn't think I was destroying it, I thought I still had it

2    on my cell phone.

3        Q.    Okay.

4        A.    And I guess if I had to hammer Sprint longer,

5    they would probably still give me access to my billing

6    statements.

7        Q.    You sent the trace on the phone call to the FBI.

8              What does that mean, the trace on the phone

9    call?

10       A.    It means I went into Accurant, pulled up the

11   information the phone number had listed for.

12       Q.    Okay.

13       A.    I think I sent an e-mail to Travis Hatch letting

14   him know that somebody had provided me with Mr. Magedson's

15   address and that was the phone number.

16       Q.    You sent him the Accurant report?

17       A.    I don't think I did.

18       Q.    Then what did you mean when you said I sent the

19   trace --

20       A.    The information, just the information.

21   Thunderbird -- the information that showed up on the

22   report.

23       Q.    After you sent that to Travis, you deleted your

24   e-mail out of your send box?

25       A.    Yes.

1    Q.    How long between when you sent it to Travis and
2    when you deleted it?

3    A.    Frankly, I don't know, because I indiscriminately
4    will go in and just clean house.  I never purposely
5    deleted too many things.  I have another e-mail address
6    actually that automatically destroys itself.

7    Q.    Okay.

8    A.    It is more room so I can send bigger files.

9    Q.    How often does it destroy the contents?

10   A.    As soon as I send it.

11   Q.    I said what was the trace on the phone call, you
12   said it is a pay phone on Thunderbird.  I saved the trace
13   on my cell phone.  It was pretty simple.

14         What did you mean I saved the trace on my
15   cell phone?

16   A.    It is on my cell phone, meaning I didn't delete
17   it.  It was on my cell phone.

18   Q.    Nobody calls it a trace when you have a number on
19   your cell phone.

20   A.    I have already explained to you, I went into
21   Accurant and pulled it up.  I can't take an Accurant
22   report and save it on my cell phone.

23   Q.    But that is what you told me you did, isn't it?

24   A.    I don't know.  If you say I did I did.

25   Q.    Okay.

1      A.    It was misworded.

2      Q.    Okay.

3      A.    If you subpoena Sprint, I am sure they will pull

4   up the cell phone records, and if I am forceful enough

5   with them, I am sure they will finally get it set up so I

6   can get the phone numbers that have come in and out.  I

7   don't care if you have it.

8      Q.    You would care if I had it if in fact you weren't

9   telling the truth to begin with.

10     A.    That would be true, but it would be disappointing

11  for me to get it from Travis Hatch.

12     Q.    Unless it doesn't exist?

13     A.    That is true.

14     Q.    What did the Accurant report say about where the

15  number came from?

16               It said Thunderbird, but what else?

17     A.    It said it was a pay phone at an apartment.  It

18  listed apartment number something.  I don't recall.  I

19  found it contradictory it was a pay phone and an apartment

20  number.

21     Q.    Okay.

22     A.    Since I deal with it all the time, I understand

23  they warn you the information on Accurant is only as good

24  as the people that plug in the information.

25     Q.    What does that mean?

1      A.    It means Lexus Nexus and Accurant and the other

2 organizations compile their information from various

3 sources, headers and credit bureaus, public record, all

4 sorts of information.

5      Q.    Okay.

6      A.    Essentially what it means that whoever is

7 inputting the data on their particular end, the

8 information is only as good as what they put in.

9      Q.    Okay.

10     A.    They will tell you off the top it could be

11 flawed.

12            We all know people spoof numbers too.

13     Q.    You said that a couple of times.  You think this

14 number was spoofed?

15     A.    I don't know if it was spoofed or not.

16     Q.    Where on Thunderbird was this apartment?

17     A.    Counselor, this is my promise to you.  I don't

18 know where on Thunderbird, but if you want, I will go back

19 into Sprint and again be pretty forceful about getting

20 access to all of my phone numbers and pull it up so you

21 can have it.  I don't care if you have it or not.

22     Q.    See, the problem is at the last deposition we had

23 this conversation.  I made it very clear to you that I

24 wanted that and then you destroyed it --

25     A.    You waited 60 days to --

1    Q.    I asked for it at the last deposition.  When I
2  didn't get it --
3    A.    Do you feel like waiting 60 days for that request
4  is --
5    Q.    I asked for it at your last deposition.  You
6  didn't provide it.
7    A.    No.
8    Q.    You are saying you think it is reasonable to
9  destroy something you knew I asked for?
10    A.    I don't know I did destroy that.
11    Q.    I don't have a lot of sympathy about the fact you
12  can't find it when you knew I was looking for it.
13            I asked you at your deposition on July 31st,
14  will you produce that paper, that Accurant report.  Your
15  answer was of course.
16    A.    Yes.
17    Q.    I then asked you what -- I'm sorry.  Let me back
18  up a second.  Let me ask you, what did the caller say who
19  supposedly gave you this information about Ed's address?
20    A.    Are you asking?
21    Q.    What did they say?
22    A.    The recording was, Ed Magedson lives at -- I am
23  not going to repeat the address.  Clearly you don't want
24  it in the record.
25    Q.    It's already in the record.

1              Go ahead.

2      A.    You had it removed, didn't you?

3      Q.    Doesn't matter to me.

4      A.    Ed Magedson lives at 1116 North Sabrina, Mesa,

5  Arizona.  I think he repeated the address again, and he

6  will be moving to the address over on Ambrosia.

7      Q.    You didn't actually have a conversation with this

8  person?

9      A.    Right.

10     Q.    It was a voice mail?

11     A.    Yes.

12     Q.    You also told me at your deposition you saved the

13 recording on your cell phone.

14              I take it you have erased that too?

15     A.    I think I indicated to you they don't stay on my

16 cell phone.  Everything goes away after 15 days.

17     Q.    You did nothing to --

18     A.    Sorry.

19     Q.    Following your deposition on July 31st, you did

20 nothing to preserve that recording?

21     A.    I did not.

22     Q.    At that time at your deposition in July I

23 asked -- I'm sorry.  You asked me if I wanted a copy of

24 that recording, and I responded I do, and you said no

25 problem.

1        But you didn't follow up, did you?

2    A.    I did.  When I received your formal notice, I

3    went back into my cell phone to see if that particular

4    recording was there, and it was not, so I called Sprint.

5    Q.    Following the deposition you did nothing to

6    preserve that recording?

7    A.    Did nothing to preserve it.

8    Q.    You knew you were under subpoena to provide

9    information, correct, under legal subpoena?

10   A.    I knew that I had provided you everything asked

11   for in the subpoena.  I received that voice mail after the

12   subpoena.

13        Am I obligated to keep providing things to

14   you?

15   Q.    You knew that as of the date of July 31st, 2007,

16   you provided everything I asked for in the subpoena?

17   A.    Say that again.

18        MS. SPETH:   Read back his answer.

19        (Record read.)

20   Q.    BY MS. SPETH:  What you just said there isn't

21   true, is it?

22   A.    I am not sure I am following.

23   Q.    Sure.

24   A.    When was your subpoena issued to me?  It is a

25   rhetorical question.

1          When I came in here, you were upset I hadn't

2  provided everything to you.  I provided everything to you,

3  but your subpoena came -- I got this recording two days

4  before I walked in here.

5     Q.   So --

6     A.   It wasn't erased on purpose.  I don't care if you

7  have it.  I don't think it's going to be much trouble for

8  you to get the phone number and trace it exactly where it

9  comes up in Accurant.

10    Q.   Okay.

11    A.   In my particular point of view, I am not hiding

12  it.  It is nobody that I knew.

13          So if you are alluding to that I

14  purposefully destroyed something so you can't have it, you

15  are incorrect.

16    Q.   Just now I was asking you about the fact you just

17  stated on the record you knew you provided everything to

18  me in the subpoena, when in fact you know you didn't

19  provide me everything.

20          Am I wrong?

21    A.   Apparently not.

22    Q.   Okay.  Following your deposition on July 31st,

23  didn't you go back to the neighborhood where you knew Ed

24  to own a home and speak to some more neighbors?

25    A.   I did not.

1    Q.    Do you have a dog?

2    A.    I have two dogs.

3    Q.    Did you take either one of them for a walk in

4    Ed's neighborhood?

5    A.    Of course not.

6    Q.    Do you ever remember any incident where any of

7    the neighbors in Ed's neighborhood told you to leave or

8    they would call the police?

9    A.    No.

10   Q.    Did Ed ever tell you that people haven't been

11   able to serve him with process or that any time he has

12   been served it has been improper?

13   A.    Yes.

14   Q.    When did he tell you that?

15   A.    Well, I believe our first communications was when

16   he elaborated on his criminal past that I didn't care

17   about.

18   Q.    What did he say about his criminal past?

19   A.    I think he mentioned a marijuana bust and he

20   mentioned the bad check thing.  I didn't care.

21   Q.    And if you didn't care, why did you just bring it

22   up now when I didn't ask you about it?

23   A.    You asked me what the content of the conversation

24   was.

25   Q.    I asked you if he said he wasn't served or

1   properly served.

2       A.   Well --

3       Q.   You volunteered to talk about his criminal past.

4   But you don't really care about his criminal past?

5       A.   I don't.

6       Q.   But you felt compelled to make sure you mentioned

7   that, right?

8       A.   Compelled?  No.

9       Q.   You volunteer what you want me to hear; isn't

10  that true?

11      A.   I don't think it is a big secret, I don't think I

12  am bringing anything out in the open that doesn't exist.

13      Q.   No, but you want to make sure you remind me,

14  right?

15      A.   No.

16      Q.   Let's go back to getting about Ed telling you

17  something about he hadn't been served or properly served.

18              What do you remember about that

19  conversation?

20      A.   I don't remember a whole lot about it --

21      Q.   All right.

22      A.   -- if anything.

23      Q.   You said it was one of the very first

24  conversations you guys ever had?

25      A.   Yes.

1    Q.    Do you remember like what brought that up?

2    A.    Yes.

3    Q.    What?

4    A.    I had posted something about -- is it Federated?

5  And he called me and asked if it was okay he posted it in

6  a particular area.

7    Q.    What did you post about Federated?

8    A.    Essentially public records that existed on

9  Mr. McFarland.

10   Q.    How did he know you posted it?  Do you know?

11   A.    I am registered with Rip-off Report.  I noticed

12  on that particular day that Federated was coming up

13  extremely -- more frequently than other posts, which drew

14  my attention to it.

15   Q.    Okay.

16   A.    I looked at it, started studying it.  I pulled up

17  a public record on Mr. McFarland and sent the post in.

18  Mr. Magedson called me from the phone number that I had

19  registered with Rip-off Report.

20   Q.    Okay.

21   A.    Asked me specifically if he could post it and

22  post it in a particular area.  That was one of the first

23  conversations, I think.

24   Q.    Is that the post where you talked about a

25  Paladin -- I can't remember the words.

1      A.    Yes.

2      Q.    It is your testimony that Mr. Magedson asked you

3  if he could post that before he posted it?

4      A.    I don't know when he posted it.  He asked me very

5  specifically if he could post it and in a particular area.

6  I don't know where.

7      Q.    All right.  So it wasn't about whether to post

8  it, it was about where to post it, maybe?

9      A.    Perhaps.

10     Q.    Do you remember having a conversation with Ron

11  Jarvis?

12     A.    Yes.

13     Q.    Did you tell Ron Jarvis that -- let me ask you it

14  this way.  What did you tell Mr. Jarvis about

15  Mr. Magedson?

16     A.    That I have every reason to believe that

17  Mr. Magedson probably has been discriminated against for

18  several things in his life, that Mr. Jarvis was trying to

19  ascertain from me if the information Bill Stanley had told

20  him was correct about that he was committing extortion.

21     Q.    Okay.

22     A.    I pointed Mr. Jarvis to Pacer and told him it is

23  really not up to me.  It has been alleged in Pacer

24  documents or something he needs to look at and ascertain

25  for himself what the reality is.

1    Q.    You told him what he would find in Pacer, there

2    was a $10 million judgment against Rip-off Report?

3    A.    I don't believe I told him that at all.

4    Q.    What were you directing him to in Pacer?

5    A.    There are several -- well, federal lawsuits.

6    Q.    You didn't tell Mr. Jarvis that Rip-off Report

7    had a $10 million judgement against it?

8    A.    I don't think so.

9    Q.    If Mr. Jarvis testifies that way, that is just --

10   he is just wrong?

11   A.    He is probably wrong.  I presumed he was

12   recording.

13   Q.    Did you talk to Mr. Jarvis about anyone who you

14   called a victim of Rip-off Report?

15   A.    I don't know.

16   Q.    Did you tell Mr. Jarvis that there were federal

17   indictments against Mr. Magedson?

18   A.    No.

19   Q.    Okay.  Did you discuss Helen Golendal with Mr.

20   Jarvis?

21   A.    I don't know.  I don't think so.  I don't know

22   her.  Never spoken to her.

23   Q.    Did you tell Mr. Jarvis that Ed is Jewish, gay

24   and has an ability to make people angry?

25   A.    Yes.

1     Q.    Why did you tell him that?

2     A.    Because that is part of why I believe

3  Mr. Magedson has been discriminated against in his life.

4     Q.    And that is what you told Mr. Jarvis?

5     A.    I believe so.

6     Q.    In what way has Mr. Magedson been discriminated

7  against in his life?

8     A.    He has indicated that the City of Tupper Lake has

9  discriminated against him because he has long hair and is

10 Jewish.

11    Q.    Okay.

12    A.    It is not unusual to believe that even in 2007

13 that there are people in the world that don't accept

14 people being gay or Jewish or long hair, whatever else it

15 is.  I can believe 20, 30 years ago somebody has probably

16 tried to make this man a victim.

17    Q.    So you think that is the context in which you

18 made those statements to Mr. Jarvis, the context being

19 that this is why he is discriminated against, as opposed

20 to you just saying these are the three things I know about

21 Mr. Magedson?

22    A.    No.  The context of the conversation is that

23 anybody that -- a lot of people that get involved in the

24 Rip-off Report and try to analyze why Ed Magedson does

25 what he does.

1       Q.    Okay.

2       A.    The analogy that I am able to come up with, he

3   feels discriminated against, and I think he probably has

4   been discriminated against and he does what he does

5   because of that discrimination.

6       Q.    Is it your testimony that you don't tell people

7   that Ed Magedson is gay in order to make him look bad?

8       A.    It is not, and in fact, the audiotape that went

9   to the FBI with -- that came from Jack Delahaney, says

10  clearly that he is openly gay.  So I don't think that -- I

11  don't find that scurrilous.

12      Q.    Okay.

13      A.    I don't find that to be bad.  I haven't heard

14  anyone say anything bad.  However, that is the one thing I

15  asked Bill Stanley to remove from one of his postings.  He

16  had posted that David Bedore was Ed Magedson's gay lover.

17      Q.    Okay.

18      A.    I asked him to remove it.

19      Q.    Why did you --

20      A.    Because I don't know that David Bedore is.  It is

21  nothing I ever told him.

22      Q.    Okay.

23      A.    He came up with it.  And I don't think it is --

24  wether he is Jewish -- in fact, I went into scam.com and

25  asked they remove the Jewish comments.  I think they did.

1   Q.   Do you know if Bill Stanley removed what you
2   asked --

3   A.   I don't think he did.

4   Q.   Where was that posting?

5   A.   Some forum somewhere.  He posted it on a forum.
6   I think it is accessible.  I followed up.  I asked him a
7   couple of times to do it.

8   Q.   You didn't tell people that Ed Magedson was gay
9   to try to embarrass him?

10   A.   No.

11   Q.   You just mentioned you don't know that David
12   Bedore is gay.

13        Do you know that Ed Magedson is gay?

14   A.   I can only tell you what the authorities of
15   Tupper Lake have said.

16   Q.   What did they say?  That he is gay?

17   A.   No.  The words were -- let me remember this --
18   that he was -- came from Fire Island.  There was a couple
19   of conversations.  Came from Fire Island.  I specifically
20   asked Jack Delahaney, "Isn't that a community with a good
21   amount of gays?"  He said yes, Magedson was openly out of
22   the closet.

23   Q.   Okay.

24   A.   No big deal, but in our last deposition it also
25   came out that Eric Skelling had made certain accusations.

1  Bill Stanley called Eric Skelling's mother and she

2  confirmed the relationship.

3      Q.   Okay.

4      A.   So I can conclude from many of these particular

5  conversations that that is probably the case, and in 2007

6  who would think ill of somebody like that.

7      Q.   I find it -- I am curious why you feel compelled

8  to tell people that when you are investigating Ed.

9           Isn't your goal when you are doing an

10  investigation to learn things?

11      A.   Yes.

12      Q.   Why does it seem like everybody I've talked to

13  has told me that what you really did was tell them things,

14  that Ed is gay, that Ed has RICO claims against him?

15           How does that further your goals of getting

16  information about Ed?

17      A.   Well, I think they are not telling you all of the

18  conversations.  Like the gentleman that sold the property

19  to him that had the accusation there was mold in it

20  indicated to me he follows up on the Web sites quite

21  frequently and he makes his money by extorting businesses.

22  Those were his words, not mine.

23      Q.   Okay.

24      A.   I think there is a lot of people out there that

25  take a great deal of license with what they think is going

1   on.

2       Q.    Except my question was, why do you tell people

3   stuff about Ed instead of just asking about Ed?

4       A.    They asked me, why does he do what he does?

5   Certainly I think it is a topic of conversation.  I think

6   it is interesting.

7       Q.    Bill Stanley called Eric Skelling's mother, that

8   is what you said, correct?

9       A.    Yes.

10      Q.    How do you know that?

11      A.    He told me.

12      Q.    How did he reach Eric Skelling's mother?

13      A.    Pulled up the phone number.  I didn't.

14      Q.    You didn't give him the phone number?

15      A.    Did not.

16      Q.    Did you ever have Eric Skelling's mother's phone

17  number?

18      A.    No.

19      Q.    Do you know who Eric Skelling's mother is?

20      A.    No.

21      Q.    Did you ask Bill Stanley how he got that number?

22      A.    No.  I would presume it is posted in the phone

23  book somewhere.

24      Q.    Do you even know her name?

25      A.    No.

1    Q.   Did he say whether he talked to Eric Skelling?

2    A.   He didn't say that he did.  I think it would be

3 unlikely that he has spoken to him.

4    Q.   Why?

5    A.   He is in prison.

6    Q.   You had a hard time speaking to him, you tried to

7 see him in jail and you couldn't?

8    A.   Correct.

9    Q.   He wasn't in jail the entire time that you have

10 been investigating Ed, right?

11    A.   That I don't know.  They said he went into jail,

12 I believe, January, or at least the county jail, in

13 January.  Where he was before that I don't have a clue.

14    Q.   Did Bill indicate that he was -- Bill Stanley

15 indicate that he was doing any other investigation about

16 Ed?

17    A.   Well, no.  Bill had called Gary once.  I mean I

18 had asked him not to.  He did and had a long conversation,

19 but didn't really disclose to me what that conversation

20 was.

21    Q.   Just told you that he had it?

22    A.   Yes.

23    Q.   Anyone else that he told you that he called in

24 investigating Ed?

25    A.   No.

1    Q.    Did he tell you why he was doing this, why he was

2    investigating?

3    A.    I don't know that he was investigating Ed.  He

4    simply was probably trying to look for dirt on him.

5    Q.    Did he tell you that or is that what you are

6    assuming?

7    A.    You know what, he is a bit of a paradox.  I mean

8    Bill on one hand will say, you know, gay bashing is wrong,

9    and I agree, on the other hand, he goes out and posts that

10   stupid post.

11   Q.    Okay.

12   A.    I can't really -- I have gone to him and asked

13   him to correct some of his behavior.  He clearly beats to

14   his own drummer.

15   Q.    Do you know when this conversation between Gary

16   Magedson and Bill Stanley occurred?

17   A.    I am going to guess March.

18   Q.    2007?

19   A.    Yes.

20   Q.    Is that about the same time the conversation

21   occurred with Eric Skelling's mother?

22   A.    No, I think the Eric Skelling's mother

23   conversation took place maybe July.

24   Q.    Of 2007?

25   A.    Yes.

1  Q.   Do you think it was after your deposition, your
2  last deposition, or before?
3  A.   I think before.
4  Q.   I want to go through some of the neighbors you
5  have spoken with.  Last time we got bogged down on what is
6  confidential, what is not.
7  A.   Right.
8  Q.   Give me a list of the neighbors of Ed's that you
9  remember speaking with.
10  A.   From the Ambrosia Street, is it Bill Buyer, the
11  gentleman that sold the house to Mr. Magedson; the lady
12  next door, I believe she goes by Patsy; the gentleman on
13  the other side of her, I believe their last name is
14  Johnson.
15  Q.   Okay.
16  A.   On the McDowell address I gave you two names that
17  I spoke to up there, Randy Henderson, and then the other
18  gentleman on the corner.  I can't remember his name.
19  Q.   Okay.
20  A.   Sterling -- I don't remember.
21  Q.   Back on Ambrosia, those are the only three
22  neighbors you spoke with?
23  A.   Yes.
24  Q.   Ever spoke with a real estate agent?
25  A.   Yes.

1  Q.   Who was that?

2  A.   I don't remember her name.  You had mentioned it

3  last time.

4           Yes, I spoke to her.

5  Q.   What did you say to her?

6  A.   I asked where he was.  She told me you were the

7  liaison for the sale, that she had met Mr. Magedson at a

8  shopping center, I think is what she had indicated.

9  Q.   Okay.

10  A.   He was pricing his property too high and she

11  wasn't able to sell it.  She was referred to me from the

12  gentleman on the corner, whose name I don't remember.  No

13  --

14  Q.   I am more interested in what you said to her.

15  What --

16  A.   I don't remember, Counselor.

17  Q.   You don't remember what you told her about Ed

18  Magedson?

19  A.   Correct.

20  Q.   Did you tell her Ed was gay?

21  A.   I don't know.

22  Q.   Did you tell her that Ed had indictments against

23  him?

24  A.   No.

25  Q.   Did you tell her that there were federal RICO

1    cases?

2        A.    I don't know.

3        Q.    How about Steve Johnson, did you tell him that

4    there were -- that there were federal indictments against

5    Ed?

6        A.    Who is Steve Johnson?

7        Q.    You said one of the neighbors was Johnson.

8        A.    Oh, Johnson.

9        Q.    First name Steve.

10       A.    I don't know what I spoke with him about.  It was

11   very brief.

12       Q.    You could have told him that Ed had indictments,

13   federal indictments against him?

14       A.    No.

15       Q.    If Mr. Johnson testifies that is what you told

16   him, that would be false?

17       A.    Exactly.

18       Q.    Any idea why Mr. Johnson would make that up?

19       A.    I think we explored that earlier.  When someone

20   hears RICO, they think criminal.  They don't understand it

21   is also a civil charge.

22       Q.    Did you say to Steve Johnson there were RICO

23   cases or charges against Ed?

24       A.    I don't know.  I am pretty careful about the

25   wording that I used.

1    Q.    Did you say RICO charges or RICO cases?

2    A.    Wouldn't say RICO charges.   I would almost always

3    say civil RICO cases.

4    Q.    So you think what you said to Steve Johnson was

5    that Ed had civil RICO cases against him?

6    A.    I don't know.   I don't remember the conversation

7    with him.

8    Q.    So then you would have no reason to disagree with

9    what he says you say if you don't remember?

10    A.    I would have plenty of reason if it is something

11    I wouldn't normally say.

12    Q.    Okay.   Let me ask you something.   Let's assume

13    that Mr. Johnson says, "What he did say was civil RICO

14    cases, that is what he said," what purpose would you have

15    in telling Ed's neighbor that he has civil RICO cases

16    against him?   What were you trying to accomplish there?

17    A.    Get information on where he is.   The neighbors

18    didn't have very good things to say about Mr. Magedson.

19    It was as much them venting to me as it was to me having

20    any kind of dialog with them.

21    Q.    Why do you provide that information to them?   Why

22    would you tell neighbors of Ed's that he has civil RICO

23    cases against him?

24    A.    One of them -- two of them had mentioned to me

25    that he has a Web site that makes people very angry and he

1   behaves very oddly.  Of course we are going to have

2   dialogue about things like that.

3       Q.   Okay.  So you are saying that the reason that you

4   told Steve Johnson that Ed has -- if you told him that Ed

5   had RICO cases against him, you did it because Steve

6   Johnson said to you that Ed had a Web site and behaved

7   oddly?

8       A.   I don't believe that Mr. Johnson said that, but

9   certainly I would want to have a dialog to prompt whomever

10  had the information on where Mr. Magedson was residing

11  would give that information.

12      Q.   Mr. Johnson is going to sign a declaration and

13  has approved a declaration that says you told him Ed had

14  federal indictments against him.

15           You are telling me that is not what you

16  said?

17      A.   That is correct.

18      Q.   But there is a possibility you said RICO cases

19  and Mr. Johnson may have misunderstood you?

20      A.   Perhaps.

21      Q.   I am trying to figure out why you told

22  Mr. Johnson Ed had either federal indictments against him

23  or at least RICO cases against him.

24           What was your purpose?

25      A.   I wanted to get an address for Mr. Magedson so he

1    could be served.

2         Q.    Would it be fair to say you wanted the neighbors

3    to believe he was wanted by the authorities so they would

4    provide you with information, so they would have a reason

5    to give you the information they knew?

6         A.    No, that is the guy that showed up the next day.

7    I presented every single one of them with a business card

8    identifying who I was.

9         Q.    Okay.

10        A.    There is no mistaking about the fact I'm a

11   private investigator.

12        Q.    I think you misunderstood my question.

13              Isn't it true that you gave this negative

14   information to the neighbors in an effort to make them

15   believe that they should provide you with information

16   because Ed was wanted by the authorities?

17        A.    No.

18        Q.    Did Steve Johnson express to you that he had a

19   great fear of Ed Magedson?

20        A.    I don't know if he did or not.  The other two

21   did.

22        Q.    Patsy and Mr. Buyer?

23        A.    Yes.

24        Q.    So the one I have spoken to that I have the

25   declaration from, he didn't tell you that?

1    A.    I don't know if he did or not.  It was a very
2 short conversation.
3    Q.    But it is your testimony that Patsy told you that
4 she had great fear of Ed's physical -- including physical
5 harm, that she could be physically harmed?
6    A.    No.  I don't think anyone has ever indicated
7 physical harm.
8    Q.    So none of the neighbors you spoke with told you
9 that they feared physical harm as a result from Ed?
10    A.    Correct.
11    Q.    Did Mr. Johnson ask you to not tell Mr. Magedson
12 that he spoke with you?
13    A.    I don't think so.
14    Q.    Did Patsy tell you to not tell Mr. Magedson that
15 she spoke with you?
16    A.    I don't know if she did or not.
17    Q.    We are talking about the Ambrosia address, right?
18    A.    Yes.
19    Q.    If you are standing at the Ambrosia address
20 facing the house, which way is Patsy?
21    A.    On the right.
22    Q.    Directly next door?
23    A.    I think so.
24    Q.    Then you think she has moved since maybe?
25    A.    Maybe.

1    Q.    Not sure?

2    A.    Yes.

3    Q.    All right.   Did Brian --

4    A.    I think it is Buyer.

5    Q.    Could it be Bill Boyd?

6    A.    Yes.

7    Q.    Let's assume it is Bill Boyd.

8    A.    Sure.

9    Q.    Did Bill Boyd tell you he was afraid, that he

10   feared physical harm from Ed Magedson?

11   A.    Not physical harm.

12   Q.    Did he tell you he did not want you to tell

13   Mr. Magedson he spoke with you?

14   A.    Well, I don't know that he expressed that to me

15   or not.

16   Q.    Okay.   Did Patsy say, "Don't tell Ed I spoke with

17   you"?

18   A.    I don't know that she expressed that or not.

19   Q.    Did the people over at the McDowell address say,

20   "Don't tell Ed I spoke with you"?

21   A.    No, they didn't say, "Please don't tell Ed."

22   They just didn't want it to be released.

23   Q.    Didn't want what to be released?

24   A.    The information they were telling me.

25   Q.    Didn't want you to tell anyone?

1    A.    Correct.

2    Q.    Let's get specific here.  Who told you, "Don't

3    tell anybody what I am telling"?  Who was that?

4    A.    Randy Henderson.

5    Q.    He lives where?

6    A.    In a reasonable proximity to the McDowell

7    address.  Next door.

8    Q.    What did he tell you he asked you not to tell

9    anyone?

10    A.    He had expressed a fear that he was going to wind

11    up on the Rip-off Report and he expressed a fear he was

12    going to be sued.

13    Q.    All right.

14    A.    He had a dialog with me regarding the

15    conversations Eric Skelling and Matt Mott had had with

16    them regarding Mr. Magedson, in their opinion, had alleged

17    he had the ability to get people killed.

18    Q.    And that is what he told you not to tell anyone?

19    A.    He had asked me not to disclose any information.

20    I told him that I couldn't make a promise like that in the

21    event I came under deposition.  There was no way I could

22    ever promise him I wouldn't disclose who provided that

23    information.

24    Q.    Okay.

25    A.    Including the flyer.

1    Q.    I am not going to ask the court reporter to read

2    it back.  I will ask you to repeat it because I didn't

3    completely catch it.  I heard something in there about a

4    death threat.

5              What did I miss?

6    A.    The Hendersons had indicated in their

7    conversations with Eric Skelling and Matt Mott they were

8    somehow under the belief that Mr. Magedson had the ability

9    to have people killed.

10   Q.    They told you that?

11   A.    Yes.

12   Q.    You are sort of speaking in a passive voice.

13             Are you saying that -- what did this have to

14   do with Skelling and this other person that you mentioned?

15   A.    That neighbors had a dialog with Skelling and

16   Matt Mott who related to the neighbors that Mr. Magedson

17   had told them that he had the ability to have people

18   killed.

19   Q.    I see.

20             Supposedly Magedson told Skelling and Matt

21   Mott that he had the ability to get people killed and then

22   they told Randy Henderson and then Randy Henderson told

23   you?

24   A.    Yes.

25   Q.    Did he tell you not to tell anybody that?

1    A.    His original question was that he really didn't

2  want to talk to me.  Wasn't even that.  He made it clear

3  that -- I guess he was asking me not to tell anyone, and I

4  told him that I can't make that promise.

5    Q.    Not to tell anyone what?

6    A.    The things he was going to relate to me.

7    Q.    That he was your source of the information?

8    A.    Yes.

9    Q.    And did Randy Henderson express to you that he

10 believed that -- believed what Eric Skelling and Matt Mott

11 told him, that Ed really said that?

12   A.    About the death threats?

13   Q.    No, about the ability to have someone killed.

14   A.    I don't know that I walked away with an

15 understanding of whether they believed it or not.  They

16 certainly believed other things in the conversation.

17   Q.    What was your understanding of Ed Magedson's

18 relationship with Randy Henderson?

19   A.    According to Mr. Henderson, he showed me a letter

20 that he asserted was received from Mr. Magedson.  The

21 letter was anonymous but it discussed the -- the affairs

22 of his wife, that his wife was having an affair with

23 Mr. Henderson's brother.

24   Q.    Okay.

25   A.    You know, it was gossip essentially that -- and

1    it reported to come from another neighbor somewhere.  A

2    voyeuristic letter going to the Hendersons that your wife

3    does this and you people are trash and so on and so forth.

4    They showed me that letter --

5         Q.    Okay.

6         A.    -- believing it came from Mr. Magedson.

7               Then they showed me the flyer we had

8    discussed that had John Unger on it.  And they asserted

9    that Mr. Magedson was disseminating that flyer in the

10   neighborhood, that Mr. Henderson and Mr. Magedson had some

11   sort of an encounter.  I don't know that I understood

12   exactly what it was, what the encounter was or anything

13   else.

14        Q.    I asked you what the relationship was.

15              Basically it was just neighbors or did they

16   have some sort of business relationship?

17        A.    Didn't tell me --

18        Q.    Just neighbors?

19        A.    Yes, neighbors.

20        Q.    I think I asked you this last time.  Did you

21   follow up with John Unger?

22        A.    I have never spoken to the man.

23        Q.    Have you e-mailed with him?

24        A.    No.

25        Q.    Have you instant messaged?

1      A.    No, no communications.

2      Q.    At your last deposition when we were speaking

3  with the judge on the phone, you said to the judge that

4  all the neighbors knew what you were doing, that you

5  didn't misrepresent yourself to the authorities.

6      A.    Yes.

7      Q.    And that they all had your card and that the

8  neighbors were all -- they were all told what -- it says

9  they were all told what I was doing.

10          What did you tell them about what you were

11  doing?

12     A.    I told them I was trying to find an address so

13  that Ed Magedson could be served a summons and complaint.

14  To go along with that, when Travis Hatch showed up at my

15  house, he produced for me a business card he obtained from

16  the neighbors.  I asked him point-blank, "When you

17  interviewed the neighbors, what did they say"?

18     Q.    Okay.

19     A.    He said, "The neighbors said you were trying to

20  get an address for service for Edward Magedson."

21     Q.    Okay.

22     A.    According to the FBI agent, when he interviewed

23  the neighbors, it is contrary to what you are indicating,

24  that they knew I was there to get an address for personal

25  service.

1      Q.    But of course you had nothing to serve Mr.

2   Magedson?

3      A.    Of course not.

4      Q.    All right.  Do you believe you violated any of

5   the rules that you are supposed to abide by as a private

6   investigator?

7      A.    No.

8      Q.    Do you believe that your actions in the way you

9   dealt with Mr. Magedson have crossed the line in any way

10  from private investigator to somebody who is out to ruin

11  somebody's reputation?

12     A.    I think I am a wounded consumer, and I am

13  outraged.

14     Q.    And your interactions with people while you have

15  been investigating Mr. Magedson have reflected that,

16  haven't they?

17     A.    Yes.

18     Q.    You think it is appropriate for an investigator

19  to personally inject themselves in their investigation the

20  way you have done?

21     A.    I had purposely set myself up purposely to have

22  the slings and arrows be thrown at me.  Whether it is

23  appropriate or not, I don't think it is covered under the

24  Arizona Revised Statutes.

25               (Deposition Exhibit No. 16 was marked for

1    identification.)

2         Q.    BY MS. SPETH:   Showing you what has been marked

3    as Exhibit 16.

4               Let me just tell you that the Bates numbers

5    at the bottom mean these are the documents you produced to

6    me after your deposition which we Bates labeled.

7               Okay?

8    A.    Uh-huh.

9    Q.    This page indicates it is a $3,000, I don't know,

10   maybe deposit into Bank of America.

11              Do I have that correct?

12   A.    Yes.

13   Q.    Did this money come from Robert Russo?

14   A.    Yes.

15   Q.    Or QED Media, perhaps?

16   A.    Yes.

17   Q.    What was it for?

18   A.    It was for referring a client that needed public

19   relations help.

20   Q.    Do you know who that client was?

21   A.    I believe I told you in the last deposition that

22   this particular one was probably Video Professor and a

23   woman that is not on the Rip-off Report.   I can't remember

24   her name.

25   Q.    Okay.

1      A.    A business -- I told you in the deposition.    I

2  don't remember.

3      Q.    Do you think the 3,000 reflects two referrals?

4      A.    Yes.

5      Q.    Why are you so sure about that?

6      A.    Because the one referral would have been $500,

7  the other one would have been 2,500.

8      Q.    Was Video Professor the 500 or 2,500?

9      A.    2,500.

10     Q.    Okay.  Do you know -- it was a percentage, wasn't

11  it?

12     A.    50 percent.

13              MS. SPETH:   Mark this.

14              (Deposition Exhibit No. 17 was marked for

15  identification.)

16     Q.    BY MS. SPETH:   Let's take a look at Exhibit 17.

17  That's a $5,500 deposit.

18              Is that also from either Mr. Russo or his

19  company?

20     A.    Yes.

21     Q.    What does that reflect, or what is that for?

22     A.    Commission from Video Professor and Buy Direct.

23     Q.    B-u-y D-i-r-e-c-t?

24     A.    Yes.

25     Q.    And again, was that 50 percent that you got?

1      A.    Yes.

2      Q.    Would it be fair for me to say that the way you

3  get these referrals is you get on to Rip-off Report and

4  you look and see who has multiple reports against them and

5  then you call that person and find out if they are

6  interested in Mr. Russo's services?

7      A.    Not exactly.

8      Q.    How do you find these referrals?

9      A.    I get on to Google, actually, and some of them

10  are in different Web sites, like consumeraffairs, and as I

11  mentioned, one of them isn't even on Rip-off Report at

12  all.  They are over the Internet or in another Web site.

13           Video Professor isn't having a big challenge

14  with Rip-off Report, their challenge is

15  informercialscams.com.  In fact, just sued them in federal

16  court.

17      Q.    I don't understand.  If you are using Google,

18  what do you punch into Google?

19      A.    I will go into informercialscams.com or other

20  places or even the Rip-off Report.

21      Q.    That is what I asked.  You can't start with

22  Google, you wouldn't know what to punch into Google, would

23  you?

24      A.    Indeed.

25      Q.    So you have to start with a Web site that is

1  reporting somebody's conduct, right?

2      A.    Yes.

3      Q.    And that is what you do and that is how you get

4  referrals for Mr. Russo?

5      A.    Yes.

6      Q.    That is what I asked.

7            MS. SPETH:  Mark this.

8            (Deposition Exhibit No. 18 was marked for

9  identification.)

10     Q.    BY MS. SPETH:  I put in front of you Exhibit 18,

11 which are excerpts from what you produced to me.

12     A.    Okay.

13     Q.    Take a look at page 118 at the bottom, which

14 probably is the first page.

15           That is an e-mail from yourself to Sarah

16 Fenske; is that correct?

17     A.    Yes.

18     Q.    Dated January 3rd, 2007?

19     A.    Yes.

20     Q.    This is not the first e-mail between you and her,

21 is it?

22     A.    I don't think so.

23     Q.    Do you know why you didn't produce anything

24 earlier?

25     A.    Well, I don't know that I have it.  If you have

1  gone through the chronology of it.  I don't know that I

2  have it.

3      Q.    Okay.

4      A.    You have to keep in mind that my Web-based e-mail

5  deletes to save space on the server.  If I don't pull the

6  e-mails down into Outlook, it will delete them.

7            I pulled everything that I had everywhere.

8      Q.    Everything that you had that wasn't deleted?

9      A.    Exactly.

10     Q.    This January 3rd, 2007 e-mail refers to an e-mail

11 that you sent to her last night.

12           Do you know where that e-mail is?

13     A.    I don't have any idea.

14           Have you done a chronology of these e-mails

15 by date?

16     Q.    I tried to put them in chronological order, yes.

17     A.    Okay.

18     Q.    Can't promise you they are perfect.

19     A.    I don't have a clue.

20     Q.    What was your purpose in sending Sarah Fenske

21 this January 3rd, 2007 e-mail at 10:53 a.m.?

22     A.    I believe I was -- she hadn't done the report

23 yet, so, you know, sometimes she and I will just have

24 conversations as well.  There would be plenty of e-mails

25 from her and I back and forth talking about this

1  particular subject.

2      Q.   Okay.

3      A.   So some of the e-mails will mean nothing

4  whatsoever, except me having dialog with her.  Some of the

5  e-mails would be to assist her in her story.

6      Q.   In general is the purpose of your e-mails with

7  Sarah Fenske to get her to do a story?

8      A.   Yes.

9      Q.   Okay.  Do you have an office location on

10  Thunderbird?

11      A.   No.

12      Q.   Does Sarah Fenske have an office location on

13  Thunderbird?

14      A.   I don't think so.

15           The location you are discussing is when I

16  worked for Gary Bethune.  He is over in that area.

17      Q.   Thunderbird and 7th Street, isn't it?

18      A.   Close to it.

19      Q.   Take a look at page 119.  It is probably the next

20  page.

21      A.   Okay.

22      Q.   Do you see -- let's see.  How can we find the

23  line we are looking at here?

24           In the middle of the page it says "lunch is

25  good."

1    A.    Yes.

2    Q.    You say -- by the way, this is you talking here,

3  right?

4    A.    Yes.

5    Q.    You say, "I am disappointed many times that I

6  seem to have more energy on these issues than even the

7  victims do.  The authorities want me to hand them the case

8  on a silver platter and sometimes they need prompting by

9  getting exposure."

10                What is that a reference to?

11   A.    It is a reference to Jeffrey McCoon, which was a

12  case that I had to get involved in and originally brought

13  in The Arizona Republic because the police and the

14  Attorney General's Office didn't understand what crimes

15  had been committed.

16   Q.    So you are saying you weren't talking about Ed

17  Magedson when you said that?

18   A.    No.  Ms. Fenske had my history in terms of

19  helping out the authorities.

20   Q.    When you were e-mailing Ms. Fenske on the 2nd of

21  January 2007, you were talking about the Ed Magedson and

22  Rip-off Report story, were you not?

23   A.    Yes.

24   Q.    Do you believe that you were giving the

25  impression when you said "the authorities want me to hand

1    them the case on a silver platter," that you were talking

2    about this case?

3        A.    I wasn't talking about Edward Magedson.

4        Q.    I understand --

5        A.    My history with the authorities has been that I

6    literally have to gift-wrap it and hand it to them on

7    everything I have ever been in.

8        Q.    My question to you is, were you trying to get

9    Ms. Fenske to believe that the authorities were interested

10   in Mr. Magedson and that you needed to hand it to them on

11   a silver platter and that the media exposure would help

12   that happen?

13       A.    Quite the contrary.

14       Q.    What authorities have you worked with in the

15   past?

16       A.    Attorney Generals of Arizona and West Virginia,

17   all different places.  I am currently assisting the

18   assistant district attorney in Orange County, California

19   because Jeffrey McCoon has been indicted for 148 counts of

20   fraud.  The Provo -- the Lehi Police Department is

21   involved.  An investigation with Robert Paisola for

22   failure to register as a sex offender.  Among other

23   things.

24       Q.    Okay.

25       A.    The County Attorney's Office of the same

335

1    jurisdiction, I have been providing information to them as

2    well.  I have shown up for his arraignment.  Various

3    authorities.

4        Q.   Did you ever indicate to Sarah Fenske that the

5    authorities were interested in pursuing some sort of

6    criminal case against Ed Magedson?

7        A.   No.

8        Q.   Did you ever indicate to her that by her posting

9    a story or writing a story about him, that that might

10   prompt that to occur?

11       A.   No.

12       Q.   Take a look at the page 120 at the bottom.

13       A.   Okay.

14       Q.   It is the e-mail from Sarah Fenske dated January

15   2nd, 2007.  She says, "I find this all pretty interesting.

16   I am not familiar with Mr. Magedson, but after reading

17   your report and doing a bit of Nexis-ing, it sounds like

18   you are on to something.

19               What report is she referring to?

20       A.   She apparently has access to Lexus Nexus.

21       Q.   No, no, your report, she is referring to your

22   report.

23       A.   I put together a thumbnail sketch of some of the

24   things that were going on out there.

25       Q.   Where is that?

1    A.    She would have it.

2    Q.    You don't have it anymore?

3    A.    No.

4    Q.    You destroyed it?

5    A.    I probably gave it to her and didn't keep copies

6    of it.

7    Q.    All right.  When was the last time you checked

8    for it?

9    A.    I pulled everything out of my computers when I

10   sent you the -- when I sent you the stuff you had asked

11   for.

12   Q.    Take a look at what has 111 at the bottom.

13          Is that an e-mail you sent to Sarah Fenske

14   on February 1st, 2007?

15   A.    Yes.

16   Q.    Is this after the story was published in the New

17   Times or before?

18   A.    I believe the same day.

19   Q.    So you are making this e-mail, which is page 111

20   of Exhibit 18, this e-mail that you were writing, you were

21   writing it as a response to seeing the published story

22   that Sarah Fenske wrote about Rip-off Report?

23   A.    Yes.

24   Q.    What attorneys complimented her work?

25   A.    The attorneys I worked for, they read the

1   Internet version of it and thought she did well on her

2   work.

3        Q.    The way you interpreted that here was by saying

4   it was well written and that though she didn't

5   vociferously go after Magedson, they walked away thinking

6   he was a slime ball?

7        A.    Yes.

8        Q.    Is that what you considered well written?

9        A.    I am not -- that is their verbiage.

10       Q.    Well --

11       A.    Well written was I didn't really read that she

12   was attacking them so much.

13       Q.    And yet someone reading this story walked away

14   thinking he was a slime ball?

15       A.    Yes.

16       Q.    That is what you considered well written, isn't

17   it?

18       A.    No.  The reason that it goes to journalists, and

19   I have a history for doing something like that, is because

20   they are supposed to be objective.  They write the story

21   in their own words, they are supposed to do the

22   investigation to make sure the facts are right.

23       Q.    Okay.

24       A.    The editors are supposed to get involved and make

25   sure that everything is on the up and up and their legal

1    team is supposed to look at it.

2        Q.    Okay.

3        A.    So anything that I provide to any journalists, I

4    am doing it because I want them to do their own work and

5    come to their own conclusions.

6        Q.    That doesn't answer my question.

7              What you were saying to Sarah in this e-mail

8    that is on page 111 of Exhibit 118 is that it was a well

9    written story and that although she didn't come right out

10   and go after Magedson, the people who read it walked away

11   thinking he was a slime ball?

12       A.    Correct.

13       Q.    Are you saying that the reason it was well

14   written was because people who read it walked away

15   thinking he was a slime ball?

16       A.    No.

17       Q.    You just happened to put those two things in the

18   same sentence?

19       A.    Yes.

20       Q.    Do you believe that Sarah Fenske did a balanced

21   story?

22       A.    You know, I don't have any -- I am not a

23   journalist.  You know, my feeling is is that papers are

24   designed to sell advertising and somehow they slip in

25   stories between the advertising.  Sp however they would

1 choose to do their work, I don't know.

2     Q.   Do you believe that she told both sides of the

3 story, both sides of the Rip-off Report story?

4     A.   Well, you know, in the allotted space she had,

5 she certainly mentioned one of the clients who seemed to

6 be happy with the Corporate Advocacy Program, so I think

7 in the space she had it was balanced.

8     Q.   The story was very long, it was many, many pages

9 long.

10           Do you feel like she had some sort of page

11 limitation?

12     A.   They do.

13     Q.   Do you think she did?

14     A.   Yes.

15     Q.   Do you remember how many pages that story was?

16     A.   Was it eight?

17     Q.   Eight pages in New Times.

18           How much of that story was negative, do you

19 remember, and how much was positive?

20     A.   A great deal was negative.

21     Q.   Did you tell Sarah Fenske that Ed writes the

22 reports on Rip-off Report?

23     A.   I don't know that I told her that or not.  I

24 think it has been alleged that, and I certainly may have

25 indicated that it is alleged, but I don't know that he

1  does.   In fact -- doesn't matter.

2       Q.    I am not asking what you know now, I am asking

3  you what you told Sarah Fenske back in February of 2007.

4       A.    I don't know that I told her he does or not.

5       Q.    Take a look at page 109 of Exhibit 18.

6       A.    Okay.

7       Q.    At 2-1-07, February 1st, 2007, you e-mailed her

8  and said that Magedson has rights as do the people that he

9  writes about.

10            Do you see that?

11      A.    Yes.

12      Q.    You told her that he writes about people, right?

13      A.    Yes.

14      Q.    Did you mean on Rip-off Report?

15      A.    Yes.

16      Q.    Take a look at page 108 of Exhibit 18.   And they

17 are not in the order of the Bates numbers.   They are in

18 sort of chronological order.

19            Do you see page 108?

20      A.    Yes.

21      Q.    You wrote to Sarah on February 5th, 2007, and you

22 said, what if Magedson created the posts, then sold a

23 service that buried his own posts.

24            Do you see that?

25      A.    Yes.

1    Q.    What were you talking about?

2    A.    At this point, February 5th, I don't know if I

3 had communicated with Bill Stanley at that point or not,

4 but I think I had.

5         I think Sarah Fenske had -- Bill Stanley had

6 communicated with her and he was jumping up and down about

7 taking the Rip-off Report down.  In my mind I think I was

8 wondering, what if somebody, Mr. Magedson, was going out

9 there and creating items and then selling a service to get

10 the items removed.

11   Q.    You are saying before you really did a whole lot

12 of investigation, your initial thought was possibly it was

13 Mr. Magedson that was behind the Complaintremover type

14 service?

15   A.    No, I don't think I thought that at all.  It was

16 me kind of bouncing around some ideas that -- you know, I

17 found both sides to really -- the people that post and

18 Mr. Magedson and the Russos and the Stanleys really not

19 doing things that serve the public well, I guess, and I

20 was trying to figure out really what the heck was going

21 on, what was going on.

22   Q.    You were suggesting to Sarah that maybe Magedson

23 sold the service, right, to --

24   A.    I wasn't suggesting that to her.  I was

25 hypothesizing that what if.  I don't think that is a

1    declarative statement.

2       Q.    What if Magedson created the posts, then sold the

3    service that buried his own post.   You were just

4    hypothesizing --

5       A.    Yes.

6       Q.    -- to a reporter who was writing the story?

7       A.    She had written the story already.

8       Q.    Fair enough.

9             To a reporter that had written a story?

10      A.    Yes.

11      Q.    Let's take a look at what is page 106 at the

12   bottom of the page on Exhibit 18, middle paragraph.

13      A.    Uh-huh.

14      Q.    You said, I had a funny thought.   What if a guy

15   started a Web site that only took posts about the 30 that

16   are now on Magedson's program.   Presumably the same people

17   that complained before would complain again and with

18   search engine optimization tools the posts could be the

19   first people see in Google, thus negating the Rip-off

20   Report's positive entries.

21            What are you talking about there?

22      A.    Again I was running a scenario in my mind, what

23   if somebody created a Web site and focused only upon the

24   members of the Corporate Advocacy Program and allowed the

25   same disgruntled people that had posted on the Rip-off

1   Report an opportunity to continue posting if they had any

2   grievances.

3        Q.    Except you weren't running the scenario in your

4   mind, you were running the scenario for Sarah Fenske, a

5   reporter, correct?

6        A.    Indeed so.

7        Q.    Take a look at page 79 of Exhibit 18.

8        A.    Which one?

9        Q.    79 at the bottom.

10       A.    Okay.

11       Q.    This is an e-mail from yourself to

12   defamationAction@yahoo.com dated February 15th, 2007.

13       A.    Yes.

14       Q.    Defamation Action being Bill Stanley?

15       A.    Yes.

16       Q.    It starts off by saying, "Good to speak to you

17   last night."

18                    Do you see that?

19       A.    Yes.

20       Q.    You spoke with Bill Stanley on February 14th,

21   2007, Valentine's Day?

22       A.    Yes.

23       Q.    And what do you remember about that conversation?

24       A.    You know, I don't know specifically that I

25   remember, but probably he -- at that particular point in

1    time he was really, really involved in going after the

2    Internet service providers of the Rip-off Report.

3         Q.    Okay.

4         A.    My interest in Bill Stanley at that point in time

5    was to try to figure out the science, what is it you are

6    doing, how are you doing it, why are you doing it.

7         Q.    And in this e-mail you in fact ask him, do you

8    not, to see what he can do about Paisola?

9         A.    About what?

10        Q.    Robert Paisola.

11        A.    Yes.

12        Q.    You mentioned to him that the Salt Lake City

13   Weekly will be doing a story, right?

14        A.    Yes.

15        Q.    And you say you want to get his service, correct?

16        A.    Yes.

17        Q.    Bill Stanley's service, right?

18        A.    Yes.

19        Q.    And this is where you ask him to do something

20   about Paisola's conduct, correct?

21        A.    Yes.

22        Q.    And this is what prompted Bill Stanley to then

23   obtain e-mail addresses from Paisola's computer and e-mail

24   those people?

25        A.    Yes.

1    Q.    He did it at your request?

2    A.    No, he didn't.

3    Q.    Okay.

4    A.    I had no idea.  That is why I am talking to him.

5 How is -- what are you doing?  How is it you are doing

6 this?

7               I think you will find in further e-mails

8 that I tell him I am not interested in breaking the law or

9 selling my soul to get something like that done.

10    Q.    Who is David Weiner?

11    A.    Where do you see that?

12    Q.    Next page, 77.

13    A.    David Weiner is a salesperson for

14 reputationdefender.

15    Q.    Would that be Bill Stanley or Robert Russo?

16    A.    I think reputationdefender is Mike Vertex, isn't

17 it?

18    Q.    I don't know.

19    A.    I think it is Mike Vertex.  I know he doesn't

20 have any relationship with Russo or Stanley.

21    Q.    How do you know that?

22    A.    It sure would have come up in the conversations.

23 I spoke to Mr. Vertex, he is an esteemed counsel, he is

24 all over the Internet, on what his goal is.

25    Q.    What do you mean he is an esteemed counsel?

1     A.    The things that have been written about him, he

2  is an attorney.  My conversations with him -- apparently

3  one that is fairly good, respected.  My conversation with

4  him was I walked away thinking that this is a guy that is

5  trying to make some positive changes to the world.

6     Q.    Okay.  What does he mean when he says, "I want to

7  update you on the status of the destroys you requested"?

8     A.    The reputationdefender specializes in going out

9  and finding scurrilous material out on the Internet.

10     Q.    Okay.

11     A.    What they then do is go out and notify you of the

12  items that are posted out there.  Their modus operandi

13  then is to send a nice letter to the particular Web site

14  and suggesting that, you know, it probably would be a nice

15  thing for you to take it down.

16            He was updating me on some of the stuff that

17  was written out there on the Internet.

18     Q.    It says in the second paragraph, "We have

19  succeeded in one destroy for you."

20            What is he talking about?

21     A.    He sent a letter to a particular blog, and they

22  took it down.

23     Q.    Next paragraph says, "We also do not attempt to

24  destroy with Rip-off Report for the reasons you and I have

25  both outlined."

```
 1              What are those reasons?

 2     A.   Mr. Magedson won't cooperate with him.

 3     Q.   Take a look at what is page 75 at the bottom of

 4  Exhibit 18.   There is an e-mail from yourself to Bill

 5  Stanley.

 6     A.   Uh-huh.

 7     Q.   Dated February 15th, 2007.

 8              Do you see that?

 9     A.   Yes.

10     Q.   You are mentioning that a Web site entitled

11  johnbrewington.net is still up?

12     A.   Yes.

13     Q.   What do you mean when you say at the end of that

14  e-mail, "The good news is that collection agencies have

15  deep pockets"?

16     A.   Mr. Magedson -- Mr. Stanley was asking questions

17  about Bud Hibbs, who has a propensity for going after

18  collection agencies.   If Mr. Stanley was going to sell his

19  services out there, certainly collection agencies are able

20  to afford it.

21     Q.   Take a look at what is page 71 at the bottom in

22  Exhibit 18.

23              Can you tell me what that is?   I don't

24  understand what that --

25     A.   It is public record pulled from probably the
```

```
 1    Secretary of State's Office.

 2        Q.    About whom?

 3        A.    It looks like Gigenet or Coloquest.

 4        Q.    From yourself to Bill -- this is an e-mail from

 5    yourself to Bill Stanley?

 6        A.    Yes.

 7        Q.    February 15th, 2007?

 8        A.    Yes.

 9        Q.    Subject Rip-off Report?

10              MR. DANA:  I need to ask a quick question.

11              MS. SPETH:  Sure.

12              MR. DANA:  These don't seem to be in order

13    and --

14              MS. SPETH:  They are not.

15              You have not been paying attention.

16              MR. DANA:  Where does 71 start?

17              THE WITNESS:  It is after 75 and 76.

18              MS. SPETH:  They are not in order because

19    they are in chronological order.  They were Bates stamped

20    as they came in and then they were moved around in

21    chronological order.

22              MR. DANA:  Okay.  Give me a date.

23              MS. SPETH:  February 15th, 2007.

24              I think you might be too far into the stack.

25              MR. DANA:  Let me look.
```

1              MS. SPETH:  It looks like this, if that

2    helps, Mike.

3              MR. DANA:  Okay.

4              71?

5              MS. SPETH:  71.

6              MR. DANA:  Then it goes to 59.

7              MS. SPETH:  Tell me what page you are on,

8    and I will tell you --

9              MR. DANA:  Here is 69.

10             MS. SPETH:  You are in the wrong area.

11             MR. DANA:  But the date you gave me is the

12   same.

13             MS. SPETH:  Give me one page you are on that

14   you can see.

15             MR. DANA:  59.

16             MS. SPETH:  Let's see where we are at.

17             MR. DANA:  It is February 15th at 5:04 p.m.

18             MS. SPETH:  Go back about ten pages before

19   that.  Maybe not quite ten.

20             MR. DANA:  Here it is.

21             Go ahead.

22      Q.   BY MS. SPETH:  All right.  February 15th, 2007,

23   you sent an e-mail to Bill Stanley, correct?

24      A.   Yes.

25      Q.   In that e-mail you sent some public record,

1    correct?

2        A.    Yes.

3        Q.    Subject is Rip-off Report, correct?

4        A.    Yes.

5        Q.    Top line says "Gigenet aka Coloquest, more to

6    come"?

7        A.    Yes.

8        Q.    And what is that a public record of?

9        A.    I think UCC-1 holdings.

10       Q.    Of who?

11       A.    Gigenet.

12       Q.    Why were you sending Bill Stanley UCC-1 public

13   records regarding Gigenet?

14       A.    He asked for them.

15       Q.    Do you know why he asked for them?

16       A.    No idea.

17       Q.    You just provided him with a bunch of information

18   at his request without knowing why he wanted it?

19       A.    Public record.  He could have accessed it

20   himself.

21       Q.    But he didn't, he asked you to do it?

22       A.    That is easier for me.

23       Q.    And you did it?

24       A.    Yes.

25       Q.    Why is it easier for you?

1     A.    I know how to maneuver in the system.

2     Q.    The subject was Rip-off Report, correct?

3     A.    In the e-mail, yes.

4     Q.    You put that in your subject box?

5     A.    Yes.

6     Q.    You knew that you were sending this to Bill

7  Stanley, something to do with Rip-off Report?

8     A.    I did.

9     Q.    Did you understand that Gigenet was Rip-off

10 Report's service provider?

11    A.    No.

12    Q.    You didn't understand that?

13    A.    There has been so many postings.  I have no idea

14 who any of the players are.

15    Q.    It is your testimony under oath that you sent

16 public records regarding Gigenet to Bill Stanley and you

17 didn't know that you were doing that because that was the

18 service provider of Rip-off Report?

19    A.    Correct.

20    Q.    You didn't know you were doing that so that

21 Stanley could harass --

22    A.    I had no idea.  At this point in time he had

23 already taken down Rip-off Report.

24    Q.    He just called you and asks you to do record

25 searches and you just do them?

```
1        A.    Yes.

2        Q.    He pays you for those?

3        A.    No.

4        Q.    You do it why?

5        A.    Sorry?

6        Q.    Why do you do it?

7        A.    Why not?

8        Q.    To date has Bill Stanley paid you any money -- he

9   didn't even pay you the dollar he was supposed to pay you,

10  right?

11       A.    Yes.

12       Q.    Has he paid you any money at all?

13       A.    None.

14       Q.    Let's take a look at page 69 of Exhibit 18.

15       A.    Okay.

16       Q.    Do you know why you were sending these records

17  that start off with Dell Financial Services to Bill

18  Stanley?

19       A.    I have no idea.

20             Isn't it part of the other -- isn't it part

21  of the other e-mail?

22       Q.    I don't know.

23       A.    I don't know either.

24       Q.    Take a look at the e-mail that is at the bottom

25  of that page from Bill Stanley to you.  It says, "It is
```

1   dead.   Later I will have him kill the dns."

2                 Do you know what that means?

3       A.   He is referring to the blog Mr. Paisola had put

4   up and hijacked my domain name, put up a blog.   And

5   Mr. Stanley had convinced him that taking it down was the

6   right thing to do.

7                 The dns, I am not sure what that means.

8       Q.   Is it possible that Mr. Stanley helped you with

9   your Paisola situation in exchange for you helping him

10  with his Rip-off Report situation?

11      A.   We had no agreement like that.

12      Q.   But did you have discussions like that?

13      A.   Me helping him so that he could help me with

14  Rip-off Report?

15      Q.   No, the other way around, him helping you with

16  your problem with johnbrewington.net, in exchange you

17  helping him with Rip-off Report?

18      A.   No.

19      Q.   No conversations like that?

20      A.   No.

21      Q.   No e-mails like that?

22      A.   No.

23      Q.   No instant messages like that?

24      A.   No.

25      Q.   Who is Jeff Gong?

354

1      A.    I have no idea.

2      Q.    Take a look at -- let's see.  Now I can't find

3  it.

4      A.    It is on page 059.

5      Q.    Thank you.

6            It is an e-mail from yourself to Bill

7  Stanley -- I will look at that later.  "Where is Jeff Gong

8  and what company is he affiliated with"?

9      A.    Yes.

10     Q.    What is that a reference to?

11     A.    He is sending me an e-mail below that.  Says,

12 "Hi.  These ones I am done with mostly.  I just need Jeff

13 Gong."

14     Q.    Okay.

15     A.    I am saying to him, I don't know who it is, what

16 company he is affiliated with.  I have no idea who the man

17 is.

18     Q.    So you didn't just get one public record for him,

19 you got a whole bunch of them?

20     A.    Yes.

21     Q.    Do you remember how many?

22     A.    No.

23            When you say a "whole bunch," I am sure it

24 is under a dozen.  Probably five.

25     Q.    Were they all Internet service providers?

1     A.    I don't know who they were.

2     Q.    You know, it is not in your stack for some

3  reason, but there is an e-mail dated February 15th, 2007,

4  from yourself to Bill Stanley, and it says -- subject is

5  Rip-off Report.  It says, got him!  He lives less than a

6  mile from me.  What do you need?

7          Do you know if that is still a reference to

8  Jeff Gong?

9     A.    Probably.

10    Q.    Do you have a recollection of finding out Mr.

11 Gong lives close to you?

12    A.    I don't have that recollection.

13    Q.    I will show you this.  It is not part of Exhibit

14 18 because it got ripped out.

15          Tell me if that refreshes your recollection

16 of whether that is a reference to Jeff Gong or not.

17    A.    I would presume it means Jeff Gong.  It says

18 here, these ones I am done with mostly.  Do you have the

19 e-mail?  Got him.  He lives less than a mile from me.

20          I am guessing it is Jeff Gong.

21    Q.    All right.  Do you live in Glendale?

22    A.    Do I?

23    Q.    Yes.

24    A.    No.

25    Q.    How did you find the records that you provided as

1  Exhibit 18?  And I realize Exhibit 18 is not a complete

2  copy of what you provided me.

3              How did you locate those records?  What

4  searches did you perform?

5      A.   Either Pacer or the Secretary of State's Office

6  or even the Recorder's Office.

7      Q.   I didn't mean the public records, I meant the

8  whole set of documents you produced to me.

9              How did you find them in your computer or

10  filing system?

11      A.   Went through sents, went through deletes,

12  everything I had, put in Rip-off Report, put in Ed

13  Magedson, everything I could possibly pull up.

14      Q.   Did you run a search for the name Russo?

15      A.   I think I did.

16      Q.   Run a search for the name Stanley?

17      A.   I think I did.

18      Q.   Did you check any paper documents or did you only

19  check computer documents?

20      A.   I don't have any paper documents.  I have a very

21  thin folder, but there is no documents in there.

22      Q.   So you don't keep file cabinets of documents?

23      A.   No.

24      Q.   Take a look at what is marked JFB 27 in Exhibit

25  18.

1    A.    Okay.

2    Q.    This is an e-mail from yourself to Bill Stanley,

3  correct?

4    A.    Uh-huh.

5    Q.    February 16, 2007?

6    A.    Yes.

7    Q.    You say, one of the companies that admitted to

8  being a paid client of Magedson was Chandler Hill

9  Partners.

10         Why were you providing that information to

11 Bill Stanley?

12   A.    I think Bill Stanley was looking at that point in

13 time to offer services to all the corporate -- the CAP

14 clients to do search engine optimization for them to clean

15 Rip-off Report for free.

16   Q.    Is it your testimony that you didn't know that

17 Bill Stanley was going to use the information you were

18 providing to him to harass those people?

19   A.    That is absolutely my testimony.  I don't know

20 that he did.

21   Q.    Okay.  Is it your testimony that if you had known

22 that Bill Stanley was going to harass the people that were

23 customers of Rip-off Report, you wouldn't have provided

24 this information to him?

25   A.    Yes.

1    Q.    Next page, page 26, you also provided Bill

2    Stanley with a bunch of information about cases that

3    Rip-off Report had against it, correct?

4    A.    Say that again.

5    Q.    Page 26 you are writing to Bill Stanley, you

6    said, "There are 17 cases in federal court."

7                You were talking about cases against Rip-off

8    Report, or no?

9    A.    No.

10   Q.    Talking about what?

11   A.    George S. May.

12   Q.    Why were you providing this information to Bill

13   --

14   A.    For the same reason as the other one.  George S.

15   May at that point in time was a plaintiff in federal court

16   and had suddenly become a Corporate Advocacy Program

17   client.  I found it curious that so many people were out

18   there posting negative things about him --

19   Q.    Okay.

20   A.    -- and that there were so many federal cases

21   against them.  I was just puzzled as to how all of that

22   could suddenly just go away.

23   Q.    You weren't just curious, you were providing

24   information to Bill Stanley about it?

25   A.    He was going to offer everybody in the CAP

1   program an opportunity to become clients.

2       Q.    That is what he told you?

3       A.    Yes.

4       Q.    Do you have an e-mail from him saying that is why

5   he wanted the information?

6       A.    No.  Mr. Stanley is very religious about using

7   Yahoo instant message, and we have talked on the phone.

8       Q.    You obviously sent him e-mails?

9       A.    Yes.

10      Q.    He didn't respond to those e-mails sometimes?

11      A.    Sometimes.

12      Q.    So wherever it was that he requested these public

13  records from you and this information about corporate

14  advocacy members, those were probably instant messages?

15      A.    Or telephone calls.

16      Q.    When you say that George S. May -- you said

17  reports went away?

18      A.    No.

19      Q.    What did you say about George?

20            MS. SPETH:  Read that back.

21            (Record read.)

22      Q.    BY MS. SPETH:  What do you mean by that?

23      A.    By that is that George S. May or through

24  Mr. Magedson's investigation had determined that George S.

25  May was a -- promised to resolve their problems.  And I

1    found that very odd that they are still -- at this point

2    in time, that there was all these federal suits going on

3    and how did he not resolve them when he had promised to do

4    so.

5        Q.    What do you mean -- who promised to do so?

6        A.    George S. May, one of the CAP members.

7        Q.    Right.

8        A.    Didn't he promise to resolve all outstanding

9    issues as a member of that program, yet, at least

10   according to the post that went on Rip-off Report -- so

11   there was still litigants.  In fact, there are people

12   still posting on scam.com about George S. May.

13       Q.    Okay.

14       A.    I was scratching my head, how is it that the

15   Corporate Advocacy Program -- what is it that it is for

16   really.

17       Q.    You weren't scratching your head, you were giving

18   this information to Bill Stanley.  Let's be clear on that.

19              You were providing this information to Bill

20   Stanley why?

21       A.    He wanted to help the Corporate Advocacy Program

22   members by providing services to them for free.

23       Q.    So you were investigating them and wondering why

24   they weren't doing the things they said they were going to

25   do?  That was going to help him provide services to them?

361

```
 1        A.    No, but certainly in my mind I have often
 2   questioned whether or not the people that are on the
 3   Rip-off Report don't deserve to be there.
 4        Q.    I understand that.
 5              And that is what you were providing to Bill
 6   Stanley, isn't it?
 7        A.    Sure.
 8        Q.    You wanted to share with Bill Stanley what you
 9   had learned or believed you had learned, which is that
10   people in Corporate Advocate Programs still have lawsuits
11   against them?
12        A.    Yes.
13        Q.    People like George S. May?
14        A.    Yes.
15        Q.    And Primerica?
16        A.    I guess.
17        Q.    You don't remember that one?
18        A.    No.  I don't dispute it.  I pulled up probably
19   five.
20        Q.    You showed Bill Stanley the information that you
21   found, correct?
22        A.    Yes.
23        Q.    You shared it with him?
24        A.    Yes.
25        Q.    You were working with him, correct?
```

1       A.    I was providing him with information.  He wasn't

2    paying me.

3       Q.    Let's take a look at the e-mail that is dated

4    February 16th, 2007 -- I will get you the Bates number --

5    from yourself to Mr. Stanley.  And it is -- oh, that is

6    not it.

7                   (Discussion off the record.)

8       Q.    BY MS. SPETH:  It is 23 at the bottom, Bates No.

9    23 at the bottom.

10                  Do you have it?

11      A.    Yes.

12      Q.    All right.  You say in that e-mail to Bill

13   Stanley that there are many -- let me read the whole

14   sentence.  I have e-mailed counsel that represents a

15   couple of the federal court RICO plaintiffs and let them

16   know the site is down and there may be some interest in

17   the people that have chosen to join the Corporate Advocacy

18   Program.

19                  What do you mean by that?

20      A.    I am not sure who I was referring to in terms of

21   the plaintiffs' counsel.  Maybe Mike.  I don't know that

22   to be for sure.

23                  The interest from the Corporate Advocacy

24   Program would be for them to join and have the search

25   engine optimization to get them off the front page of

1   Google.

2        Q.    That those people might be interested?

3        A.    Yes.

4        Q.    Why would you need to tell the attorneys -- I

5   don't think that is what you meant here at all.  You

6   better read it more carefully.

7              Why would you be calling plaintiffs'

8   attorneys and say these people might be interested in

9   joining Bill's program?  That doesn't make any sense.

10             Let me read the sentence to you again.

11             You said I have e-mailed counsel that

12  represents a couple of the federal court RICO plaintiffs

13  and let them know the site is down and there may be some

14  interest in the people that have chosen to join the

15  Corporate Advocacy Program.

16             Don't you mean they should find some

17  interest in those people and they should check those

18  people out?

19       A.    I don't know that that is what I meant at all.

20             MR. DANA:  Objection; misleading.

21             THE WITNESS:  I don't know that I meant that

22  at all.  I think I meant Mr. Stanley had been discussing

23  for quite a period of time and Russo in fact about helping

24  for free the Corporate Advocacy clients.

25       Q.    BY MS. SPETH:  What does that have to do with

1  e-mailing counsel that represent the federal RICO

2  plaintiffs?

3      A.    I don't know that it has anything to do with it.

4      Q.    You just stuck it in the same sentence?

5      A.    Yes.

6      Q.    Okay.

7      A.    If we are going to be much longer, we should

8  probably think about a bathroom break or something.

9              MR. DANA:  How much longer do you think you

10  will be?

11             MS. SPETH:  Let's take a break.

12             MR. DANA:  Okay.

13             (Recess taken.)

14     Q.    BY MS. SPETH:  Okay.  Take a look at page 23 at

15  the bottom.

16     A.    Yes.

17     Q.    At the end of that e-mail you wrote to -- I'm

18  sorry, to William Stanley on February 16, you said, was

19  information I gave you yesterday helpful in your goals?

20             What information did you give him yesterday

21  that you are referring to?

22     A.    My guess, and it is a guess, if we were to look

23  at the e-mails regarding public record, it is probably

24  that.  I don't know.

25     Q.    Okay.