1      A.    This is in February.   Perhaps it was his getting

2  some Corporate Advocacy client on board.

3      Q.    When you said "helpful in your goals," what were

4  his goals?

5      A.    Getting the Corporate Advocacy Program clients on

6  board.

7      Q.    That is what you were referring to when you said

8  "your goals"?

9      A.    Yes.

10     Q.    There is an e-mail dated March 5th, 2007.   I am

11  skipping a lot.   It is from yourself to Mr. Stanley.

12  March 5th, 2007.

13              Let's see here.

14     A.    Okay, it's 91.

15     Q.    No, it is 15.

16              Wait.   You may have the right one.   I'm

17  sorry.

18     A.    What is the --

19     Q.    You may have the right one.   It is actually 14.

20  It is 14 at the bottom.

21     A.    Okay.

22     Q.    See if this helps you.

23              Do you have it?

24     A.    Say that again.

25     Q.    Here is how much of a stack I have in front of

1    me.

2              Do you have it, 14 at the bottom?

3    A.    No, I have 91 at the bottom.

4    Q.    Find one that has 14 at the bottom.  Let's see if

5    I can figure out if --

6              Right there.  I think it is earlier than you

7    are looking at.

8    A.    Well, there is a couple of e-mails dated that

9    date.

10   Q.    I see that.

11   A.    What date?

12   Q.    It is after -- it is dated March 5th.

13   A.    March 7th, and that is 85.

14   Q.    Forget that, though.

15   A.    What is the context of the e-mail that --

16   Q.    Look at the bottom for 14.

17             MR. DANA:  Is it 14?  What about that?  It

18   is Bates labeled 14?

19             MS. SPETH:  Yes.

20   Q.    BY MS. SPETH:  It says in that e-mail, "You may

21   recall from the letter that is posted on the Internet

22   whereby Ed Magedson alleges you are making death threats."

23             Do you see that?

24   A.    Yes.

25   Q.    After it was alleged that Mr. Stanley was making

1  death threats, you gave Mr. Stanley two addresses for

2  Mr. Magedson, did you not?

3      A.   Yes.

4      Q.   You gave him a McDowell address and an Ambrosia

5  address?

6      A.   Correct.

7      Q.   What was your purpose in giving that information

8  to him?

9      A.   I was giving him an update on the investigation

10 in terms of who it was that I needed to have a dialog with

11 or what I had done again.

12     Q.   Okay.

13     A.   The Arizona -- the state requires that -- not

14 requires, but the state would ask that I update him as I

15 see fit.

16     Q.   So after you knew there was a possibility he had

17 threatened Ed Magedson's life, you gave him information

18 about where Ed Magedson's addresses were, correct?

19     A.   Well, yes, I did.

20     Q.   Okay.

21     A.   Presumably he had those addresses when he sent

22 those letters or delivered them, or whatever.

23     Q.   Why did you write to Mayor Hawker of the City of

24 Mesa about Ed Magedson?

25     A.   The detective for the City of Mesa indicated he

1   couldn't pursue the investigation any further because he

2   wasn't getting cooperation from Mr. Magedson and it was

3   alleged that the FBI had taken over the case.

4       Q.   Okay.

5       A.   I wanted to make sure, because other people were

6   threatened in those letters, that there was at least some

7   sort of protection for them, that the police could still

8   investigate and find out who authored those letters.

9       Q.   I asked you why you wrote to the mayor.

10              You wrote to the mayor to give people

11  protection?

12      A.   He doesn't, he orders the police to get involved.

13      Q.   You were trying to convince the police to get

14  involved?

15      A.   Absolutely.

16      Q.   Did you ask Detective Gumina to get involved?

17      A.   Yes.

18      Q.   Really?

19              What did you say to him about getting

20  involved?

21      A.   I asked him if he was going to be able to reopen

22  the case, and he said no, that Mr. Magedson told him the

23  FBI was involved and he was going to be telling -- or I

24  guess the detective had asked who the FBI agent was, and

25  that Mr. Magedson said they will contact you.

1    Q.    All right.

2    A.    Officer Gumina said there wasn't much he was

3 going to be able to do without the complainant

4 cooperating.

5    Q.    Did you believe him?

6    A.    Makes perfect sense.  Yes.

7    Q.    Then why did you go to the mayor and ask the

8 mayor to get involved?

9    A.    Because I wanted the other individuals protected

10 as well.  Certainly they said they received the letters.

11 It says employees were threatened in the letters.  And I

12 believe they deserved to have some sort of protection.

13    Q.    Why didn't you tell Detective Gumina that?

14    A.    I did.  He still can't do anything without the

15 complainant's assistance.

16    Q.    What did you think the mayor could do that

17 Detective Gumina wouldn't do?

18    A.    Order the police to investigate it.

19           (Deposition Exhibit No. 19 was marked for

20 identification.)

21    Q.    BY MS. SPETH:  Take a look at what we have marked

22 as Exhibit 19.

23           Do you recognize that?

24    A.    I recognize the content of this, but I don't know

25 that it is anything I have paid attention to or seen

1  before.

2     Q.    The contents you recognize is the stuff about

3  you, correct?

4     A.    About me?

5     Q.    Second page.  I guess you weren't talking about

6  the content about you.  You sound surprised.

7              Let's go back to page 1.  Let me ask a

8  different question.

9              What is it about the content on page 1 that

10  you recognize?

11    A.    That it would probably be something from QED

12  Media Group, LLC.

13    Q.    And why is that?  Because it says at the top QED

14  Media, LLC?

15    A.    Yes.

16    Q.    On the left-hand side it also says

17  johnbrewington, doesn't it?

18    A.    Yes.

19    Q.    John F. Brewington PI underneath that?

20    A.    Yes.

21    Q.    Also has QED Portland, Maine offices at the

22  bottom and some Dallas, Texas offices?

23    A.    Yes.

24    Q.    If you turn the page to the next page, it also

25  says QED Media Group at the top, does it not?

1      A.    It does.

2      Q.    It has a posting for John Brewington, Licensed

3  Private Investigators, right?

4      A.    Yes.

5      Q.    Do you know why that content is on QED Media's

6  Web site?

7      A.    Yes.  Mr. Russo was using it to enhance search

8  engine optimization by using key words to I guess push

9  down Rip-off Report posts.

10     Q.    About you?

11     A.    Yes.

12     Q.    By putting information about you on his Web site

13  it was going to help remove Rip-off Reports on search

14  engines?

15     A.    He has never told me he could remove Rip-off

16  Reports.  He made it very clear by going out and posting

17  and using the same key words that other Web sites have

18  used, he is able to push the derogatory information off

19  the front pages.  Never indicated to me he can remove

20  Rip-off Reports.

21     Q.    All right.

22     A.    In fact, on the same page he has listed Video

23  Professor and the Harmon Agency, Kelly Harmon, and it

24  appears to me he is trying to use those names as key words

25  as well.

1        Q.    The content here about John is an expert on and

2    then all the bullet points, where does that come from?

3        A.    Comes from a -- it comes from a public relations

4    firm.

5        Q.    And what is the name of that public relations

6    firm?

7        A.    I don't know.  It is from Salt Lake City.  It

8    would be difficult to figure it out.  They certainly

9    didn't want to post it themselves.

10       Q.    You had a public relations firm create content

11   about you?

12       A.    Yes.

13       Q.    You don't remember their name?

14       A.    No.

15       Q.    Did you pay them?

16       A.    Yes, credit card.

17       Q.    How long ago was this?

18       A.    After the Paisola story, I think, so that was --

19   when was that?  I don't know.  June, April.

20       Q.    Of 2007?

21       A.    Yes.

22       Q.    This year you hired them and you don't remember

23   their name?

24       A.    Yes.  They were a referral.

25       Q.    Were they a referral from Rob Russo?

1       A.    From Steven Dark, the reporter who did the story

2    on Paisola.

3       Q.    Did you provide them with the information so they

4    can do this press release?

5       A.    Yes.

6       Q.    Did you tell them you were an expert on all of

7    these fields that have the bullet points on?

8       A.    Yes.

9       Q.    What makes you an expert on criminalistics and

10   criminology?

11      A.    I don't know actually that I am.   That was an

12   invention by allexperts.com.   They are the ones that put

13   it in.

14      Q.    Okay.

15      A.    They do the same thing.   Search engine

16   optimization, they are the ones that built it.

17      Q.    So they posted things about you that you really

18   couldn't support as being true and you didn't have a

19   problem with that?

20      A.    I don't know if it is true or untrue.

21      Q.    Somebody is billing you as an expert on

22   criminalistics and criminology?

23      A.    Uh-huh.

24      Q.    I want to know what your credentials are to be

25   called an expert on that.   And you are saying maybe you

1    are not an expert on that?

2        A.    Yes.

3        Q.    Did you ever ask these guys to not post this

4    stuff?

5        A.    Yes.

6        Q.    In fact, you paid them to create this stuff,

7    right?

8        A.    Yes.

9        Q.    Did they run it by you before they posted it?

10       A.    Yes.

11       Q.    And you approved it?

12       A.    Yes.

13       Q.    How about an expert on litigation support, what

14   litigation support have you provided?

15       A.    I have worked for a law firm for quite a period

16   of time.

17       Q.    What work have you done in the worker's

18   compensation insurance field?

19       A.    Clients have asked me to investigate their

20   employees that are currently on worker's compensation.

21       Q.    Have you done that?

22       A.    Yes.

23       Q.    For a fee?

24       A.    Yes.

25       Q.    Also says John has been used as a source for

1   several journalists and is arguably the definitive source

2   for Internet defamation cases.

3                  Did you write that?

4        A.   No.

5        Q.   Who wrote that?

6        A.   It would have been the public relations people.

7        Q.   When it says "several journalists," who would

8   those several journalists be?

9        A.   Regarding what?

10       Q.   I don't know.

11       A.   Robert Anglin of The Arizona Republic.

12       Q.   Okay.

13       A.   Steven Dark, Sarah Fenske.

14       Q.   Okay.  How many state chamber events have you

15   spoken at?

16       A.   State chamber events.  I belong to two chamber of

17   commerces and have had a couple of meetings and in fact

18   another one.  As a matter of fact, three.  I belong to

19   two, I have been with three and have had dialog or during

20   meetings have had -- they always want a speaker, so a

21   couple of times.

22       Q.   Have you been an actual speaker at a chamber

23   event?

24       A.   No.

25       Q.   Have you been a speaker at a Rotary Club event?

1    A.    Yes.

2    Q.    How many times?

3    A.    Once.

4    Q.    Have you been a speaker at local high schools?

5    A.    Yes.

6    Q.    How many times?

7    A.    Once.

8    Q.    Which one?

9    A.    Corona Del Sol.

10   Q.    Is that in Arizona?

11   A.    Chandler.

12   Q.    What was the topic?

13   A.    The topic was -- it was Job Day or a Career Day.

14   They were trying to ascertain what it was -- the

15   potentials or the qualifications for becoming a private

16   investigator.

17   Q.    Who provided the content to Mr. Russo in order to

18   put it on the Web site?

19   A.    I did.

20         MS. SPETH:  Mark that.

21         (Deposition Exhibit No. 20 was marked for

22   identification.)

23   Q.    BY MS. SPETH:  Do you recognize Exhibit 20?

24   A.    No, not really.

25   Q.    Is that a different Web site than what we looked

1    at in 19, do you know?

2        A.    I don't know.

3        Q.    Do you know anything about squarespace.com?

4        A.    I have seen it with regards to Robert Paisola.

5    There was a public relations woman.  I can't remember her

6    name.  She used a blog site or a Web site.  It was

7    squarespace also.

8              My presumption is that it is a blog site, I

9    guess.

10       Q.    Do you know how it came to be that you had a link

11   on squarespace on the QED Media page?

12       A.    No, I don't have any idea.

13       Q.    Okay.  When was the last time you spoke with Mike

14   Dana?

15       A.    I talked with him at lunch briefly.

16       Q.    Did you talk about Ed Magedson?

17       A.    No.

18       Q.    When was the last time you had a conversation

19   with Mike Dana about Ed Magedson?

20              He can't testify.

21       A.    You know, my guess is right about the time of the

22   deposition.  Maybe right after.

23       Q.    The July 31st deposition?

24       A.    Yes.

25       Q.    What was that conversation about?

1     A.    The length of time you were spending going

2  through all of these issues.

3     Q.    Did you call him or did he call you?

4     A.    I called him.  In fact, we had a kind of

5  conversation that was completely away from that, just

6  about his life, my life, whatever.

7     Q.    Okay.

8     A.    I don't remember who called whom.  I might have

9  called him.  I don't know.

10    Q.    Has he given you any advice in this case, any

11  legal advice?

12    A.    No.

13    Q.    Have you and Mr. Dana ever talked about the

14  relationship between Rob Russo and Bill Stanley?

15    A.    I think maybe.

16    Q.    What was that discussion about?

17    A.    I think I told him that from the appearances it

18  looks like you are thinking that I know way more than I

19  know about these two guys and I have no information that

20  leads me to believe that the two of them are partners.

21    Q.    What did he tell you?

22    A.    He is pretty noncommittal about those things.  He

23  doesn't really express one thing or another.

24    Q.    The two threat letters you said you were hired by

25  Stanley to investigate, how did you receive those letters

1   from Mr. Stanley?

2       A.    I received them from Sarah Fenske.

3       Q.    You didn't receive them from Mr. Stanley?

4       A.    No.

5       Q.    Okay.  How did Mr. Stanley receive them, if you

6   know?

7       A.    I sent them to him.

8               (Deposition Exhibit No. 21 was marked for

9   identification.)

10      Q.    BY MS. SPETH:  What I just showed you is Exhibit

11  21.  That is a letter that you wrote to me, correct?

12      A.    Yes.

13      Q.    You say in the beginning of that letter, "The

14  attached letter has been received by William Stanley, who

15  today has asked for my representation."

16              Do you see that?

17      A.    Yes.

18      Q.    So you sent it to Mr. Stanley and then you sent

19  me a letter saying it has been received by Mr. Stanley?

20      A.    Yes.

21      Q.    You didn't say, "I sent it to Mr. Stanley"?

22      A.    No.

23      Q.    Who is Fly?

24      A.    I'm sorry?

25      Q.    Who is Fly?

1    A.    F-l-y?

2    Q.    F-l-y.

3    A.    No idea.

4    Q.    Have you ever seen a posting on scam.com that was

5    under the JFBA name that wasn't from you, in other words,

6    have you ever seen a situation on scam.com where somebody

7    else used that user name?

8    A.    I don't think so.

9              MS. SPETH:  Mark this.

10             (Deposition Exhibit No. 22 was marked for

11   identification.)

12

13                   EXAMINATION

14

15   Q.    BY MR. DANA:  I am going to ask you a quick

16   question.

17             Earlier you -- let's see here.  You were

18   asked about when Mr. Magedson had called you about a

19   posting that you made?

20   A.    Yes.

21   Q.    Did you call Mr. Magedson before that?

22   A.    No.

23   Q.    So his call to you was unsolicited?

24   A.    Yes.

25   Q.    And he had asked you if he could post it in a

1   particular area.

2            Was that an area within his Web site?

3       A.   I am not sure what the context of it was, I

4   really don't know, but it was specifically he was asking

5   for permission to post it someplace.

6       Q.   Okay.

7       A.   I don't remember specifically what his verbiage

8   was.

9       Q.   What was your post about?

10      A.   It was about -- I pulled up some public record on

11  -- well, it was about your former client, Steve Miller,

12  who had --

13      Q.   Federated Financial?

14      A.   Yes.   Who had posted some public information

15  about Maria Speth and her family that I took offense to.

16  I had noticed it was coming up quite frequently in the

17  Rip-off Report, so I started looking at it and pulled up

18  some public record and posted that on the Rip-off Report.

19      Q.   Do you remember about what time this occurred?

20      A.   Are you saying --

21      Q.   The date.

22      A.   I don't.

23      Q.   What year?

24      A.   Well, I would guess the end of '06.

25      Q.   And did you give him permission to post it in the

1  particular area he was requesting?

2      A.    Yes.  I told him to do whatever he felt like he

3  wanted to do.

4              MR. DANA:  No further questions.

5

6                    FURTHER EXAMINATION

7

8      Q.    BY MS. SPETH:  You actually submitted that to be

9  posted, correct?

10     A.    Yes.

11     Q.    All right.  Let me show you what we have marked

12  as Exhibit 22.

13     A.    All right.

14     Q.    Did you write this press release?

15     A.    No.

16     Q.    Did you write any portion of it?

17     A.    I would have provided the litigation support, all

18  of that.  The rest of it was all created by the -- the PR

19  firm.

20     Q.    But you provided them the underlying information,

21  correct?

22     A.    Yes.

23     Q.    In the bold portion of Exhibit 22 it says, two

24  such characters are Robert Paisola, a convicted kiddy porn

25  possessor and con man, and Edward Magedson, founder of the

1   controversial Rip-off Report, who faces various court
2   actions, including RICO and Linhan Act violations.
3                   Do you see that?
4       A.    Yes.
5       Q.    In writing when you were providing this
6   information to your press release company, the public
7   relations firm, you didn't point out that these were
8   civil, did you?
9       A.    I don't know that I did or didn't.
10      Q.    When you got it back from them, you didn't say,
11  "Guys, I am real careful about my wording, you need to say
12  civil RICO"?
13      A.    I didn't say that, no.
14              MS. SPETH:  I have nothing else, except for
15  what Adam needs to get for me.
16              MR. DANA:  Well, I mean, I have to leave in
17  about three minutes and I won't agree to continue this
18  deposition.
19              We have gone beyond seven hours.
20              MS. SPETH:  I understand, and I am not
21  agreeing to end the deposition.  I have about five minutes
22  of questions as soon as I get a copy of what I am looking
23  for.
24              MR. DANA:  You have already gone --
25      Q.    BY MS. SPETH:  We talked about this earlier but I

1    didn't have the list.

2              Have you ever had a conversation with

3    Russell Taber, an attorney in the EASI case, or anyone

4    from his office?

5         A.    I don't know.

6         Q.    Do you know if you provided him with any

7    information, any documents?

8         A.    Probably not.

9         Q.    Have you ever had a conversation with Terrence

10   Woods?

11        A.    The name isn't familiar to me.

12        Q.    Ever had a conversation with Sean Burkin?

13        A.    Yes.

14        Q.    Did you provide him with any documents?

15        A.    I don't think so.

16        Q.    Have you ever had a conversation with Gary

17   Edelman?

18        A.    The name isn't familiar to me.

19        Q.    I asked you earlier about Tray Cox.  Did you

20   provide him with any documents?

21        A.    No.

22              MS. SPETH:  I have no further questions.

23

24

25

1           MR. DANA:   Neither do I.

2      (The deposition concluded at 3:20 p.m.)

3

4         (Signature not requested.)

5         ------------------

6         John Brewington

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF ARIZONA          )

 2   COUNTY OF MARICOPA        )

 3              BE IT KNOWN that the foregoing deposition

 4   was taken by me pursuant to stipulation of counsel; that I

 5   was then and there a Certified Reporter in and for the

 6   County of Maricopa, State of Arizona, and by virtue

 7   thereof authorized to administer an oath; that the witness

 8   before testifying was duly sworn by me to testify to the

 9   whole truth; that the questions propounded by counsel and

10   the answers of the witness thereto were taken down by me

11   in shorthand and thereafter transcribed into typewriting

12   under my direction; that the foregoing pages are a full,

13   true and accurate transcript of all proceedings and

14   testimony had and adduced upon the taking of said

15   deposition, all to the best of my skill and ability.

16              A REVIEW OF the transcript was not

17   requested.

18              I FURTHER CERTIFY that I am in no way

19   related to nor employed by any parties hereto nor am I in

20   any way interested in the outcome hereof.

21              DATED at Phoenix, Arizona, this 28th day of

22   October, 2007.

23                        _____

24                              Mark Miller
                               CCR # 50474
25
```