**<u>EXHIBIT D</u>**

## Page 1

CAUSE NO. 241724

XCENTRIC VENTURES, LLC, ) IN THE DISTRICT COURT
an Arizona limited )
liability company, and )
ED MAGEDSON, an )
individual, )
)
Plaintiffs, )
)
)
VS. ) 146TH JUDICIAL DISTRICT
)
SHAWN RICHESON, )
Non-party Deponent. ) OF BELL COUNTY, TEXAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VIDEOTAPED and ORAL DEPOSITION OF
SHAWN RICHESON
MARCH 29, 2010
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED and ORAL DEPOSITION of
SHAWN RICHESON, produced as a witness at the instance
of the Plaintiffs and duly sworn was taken in the
above-styled and numbered cause on the 29th of March,
2010, from 11:02 a.m. to 2:58 p.m. before Gina Oertli,
RMR, CSR in and for the State of Texas, reported by
method of machine shorthand, at the Shilo Inns Suites
Hotel, Fort Worth Boardroom, 3701 S. WS Young Drive,
Killeen, Texas, pursuant to the Texas Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

## Page 2

1
2          A P P E A R A N C E S
3
      FOR THE PLAINTIFFS, XCENTRIC VENTURES, LLC,
4     and ED MAGEDSON:
         MS. MARIA CRIMI SPETH
5        JABURG WILK
         3200 N. Central Avenue, 30th Floor
6        Phoenix, Arizona 85012
         602.248.1089
7        602.248.0522 - Fax
         mcs@jaburgwilk.com
8
      FOR THE DEFENDANTS, JOHN F. BREWINGTON,
9     JANE DOE BREWINGTON, and JFB
      ACQUISITIONS, LLC:
10
         MR. CHRISTOPHER B. INGLE (telephonically)
11       GUST ROSENFELD, P.L.C.
         201 E. Washington, Suite 800
12       Phoenix, Arizona  85004
         602.257.7422
13       602.254.4878 - Fax
         cingle@gustlaw.com
14
15    FOR THE NON-PARTY DEPONENT, SHAWN RICHESON:
16       MR. SHAWN RICHESON
         Pro Se
17       1906 Twilight Drive
         Killeen, Texas 76543
18       254.690.6373
         866.451.0588 - Fax
19       shawn@clickanerd.com
20
      ALSO PRESENT:  Annette Richeson;
21       Mark Wolfington, Videographer
22
23
24
25

## Page 3

I N D E X

EXAMINATION

                                          PAGE
By Ms. Speth................................  7
By Mr. Ingle................................ 145
By Ms. Speth................................ 178
By Mr. Ingle................................ 182

Signature Waived............................ 183
Reporter's Certificate...................... 184


              EXHIBITS

NUMBER          DESCRIPTION          PAGE

  1       9-14-09 e-mail from         10
          Mr. Richeson to Ms. Speth
  2       9-14-09 e-mail to Ms. Speth  16
          Mr. Richeson to Ms. Speth

  3       9-15-09 e-mail from         17
          Mr. Richeson to Ms. Speth
  4       9-16-09 e-mails between     25
          Mr. Richeson to Ms. Speth

  5       11-21-09 e-mails between    27
          Mr. Richeson & Paladin
  6       Subpoena duces tecum to     36
          Shawn Richeson, witness

  7       12-1-09 e-mail from         40
          Mr. Richeson to Ms. Speth
  8       3-10-10 e-mail from         41
          Mr. Richeson to Ms. Speth

  9       11-30-09 Affidavit of Shawn A.  44
          Richeson
 10       Intervenor's Original Petition  46

## Page 4

          EXHIBITS CONTINUED

NUMBER          DESCRIPTION          PAGE

 11       11-29-09 noted from Mr. Richeson  56
          to Ms. Speth and Mr. Magedson
 12       11-29-09 e-mails from       58
          Mr. Richeson to Ms. Speth

 13       November of '09 e-mails     60
          from Mr. Richeson
 14       3-30-08 e-mails between     61
          Mr. Richeson & Mr. Magedson

 15       5-28-07 e-mails between     66
          Mr. Richeson & Mr. Russo
 16       CNET News article entitled  68
          Killeen Texas Computer Nerds

 17       7-3-07 e-mail from Mr. Richeson  76
          Mr. Magedson & Ms. Speth
 18       7-3-07 e-mails from Mr. Richeson  79
          to Ms. Speth, Jaburg Wilk &
          Annette Richeson
 19       7-3-07 e-mails from Mr. Richeson  80
          to Ms. Speth & Mr. Magedson

 20       7-3-07 e-mails from Mr. Richeson  80
          to Mr. Magedson & Jaburg Wilk
 21       10-26-07 e-mail from        83
          Mr. Richeson to Ms. Speth

 22       4-12-08 e-mails between     84
          Mr. Magedson & Mr. Richeson
 23       Thetopnerd's comments on CNET  86
          posted on 2007 & 2008

 24       11-15-08 e-mail from        91
          Mr. Richeson to Mr. Magedson

Gwendolyn Parker and Associates, Inc.
214-747-8007

Page 5

EXHIBITS CONTINUED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 25 | Posting by Mr. Magedson on Free Press Release | 91 |
| 26 | 12-31-08 e-mail from Mr. Richeson to Mr. Magedson, with Pay Pal attachment | 94 |
| 27 | USA SEO Pros blog postings | 96 |
| 28 | 4-23-09 Affidavit of Shawn Richeson | 100 |
| 29 | 11-25 & 11-24 '09 e-mails between Mr. Richeson, Ms. Speth & Ms. Storey | 106 |
| 30 | 11-25-09 e-mails between Mr. Richeson & Ms. Storey | 108 |
| 31 | 12-3-09 e-mail from Mr. Richeson to Ms. Speth | 109 |
| 32 | 12-11-09 e-mails between Mr. Richeson & Ms. Schlott | 110 |
| 33 | 2-17-10 e-mail from Mr. Richeson, Ms. Speth & Mr. Magedson | 111 |
| 34 | 3-10-10 e-mail from Mr. Richeson to Ms. Speth | 116 |
| 35 | Stop Ed Magedson Ripoff Report Scam Forum | 116 |
| 36 | 3-17-10 e-mail from Mr. Richeson to Mr. Magedson | 118 |
| 37 | Judgment on Jury Verdict Guilty | 120 |
| 38 | Final Judgment and Order for Sanctions | 121 |
| 39 | U.S. Party/Case Index | 127 |

Page 6

EXHIBITS CONTINUED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 40 | Westlaw listing of appellate cases | 134 |
| 41 | 9-16-09 e-mails between Mr. Richeson to Ms. Speth | 146 |
| 42 | Declaration of John F. Brewington | 146 |
| 43 | Article on Phoenix News - The Real Ripoff Report | 146 |
| 44 | 11-21-09 e-mails between Mr. Richeson & Mr. Paladin | 146 |
| 45 | 11-20-09 Ripoff Report article | 146 |
| 46 | 10-7-09 e-mails between Mr. Richeson & Mr. Magedson | 146 |
| 47 | 9-16-09 e-mails from Mr. Richeson to Ms. Speth | 146 |
| 48 | 6-29-07 e-mail from Mr. McCullagh to Mr. Richeson | 146 |
| 49 | Phoenix News - The Real Ripoff Report, dated 12-28-09 | 146 |

Page 7

1   THE VIDEOGRAPHER:  Today is March 29th,
2   2010.  The time is 11:02.  We're on the record.
3   SHAWN RICHESON,
4   having been first duly sworn, testified as follows:
5   DIRECT EXAMINATION
6   BY MS. SPETH:
7   Q.  Can you please state your full name for the
8   record.
9   A.  Shawn, S-h-a-w-n, A, Allen, Richeson.
10   Q.  And, Mr. Richeson, as you know, we're here
11   today to take your deposition in the matter entitled
12   Xcentric versus Brewington.
13       And you're here as a non-party witness.
14   You have been sworn, and under oath, which means that
15   you are sworn to tell the truth as you would be in a
16   court of law.
17       I'm going to be asking you some
18   questions, and you'll be answering them.  If you, at
19   any point, don't understand my question, please let me
20   know.  I'll be happy to rephrase it.
21       Also, please wait until my question is
22   complete, even if it seems like you know where the
23   question is going, before you start your answer.  And
24   I will wait until your answer is complete before I
25   start my next question.

Page 8

1       The only exception to that might be if I
2   feel that you're just not answering the question, I
3   may stop you, only because we do have time limits.
4   A.  Yes, ma'am.
5   Q.  Other than that, I will do my best to let you
6   finish before I start my next question.
7       And if at any time you want to take a
8   break, just let us know, and we'll take a break --
9   A.  Yes, ma'am.
10   Q.  -- okay?  All right.
11   A.  Before you start, though --
12   Q.  Yes.
13   A.  -- we are on the record now, and this is
14   Cause 242272 B.  You have been named as a defendant,
15   and this is the Plaintiff's Original Petition, and I'm
16   giving it to Maria Speth.
17   Q.  Is there a citation that you have that goes
18   with that?  My understanding is -- so this is what
19   you --
20   A.  That is your service today, ma'am.
21   Q.  Yeah.  That's why I was asking, if you are
22   actually serving me, isn't there a citation that goes
23   with it, or no?
24   A.  There could be a citation to go with it, but
25   if you just accept service today, it's -- it's good.

Page 9

1    Q.   Well, I'm not accepting service, but you are
2  serving me. I mean, just for the record, you're
3  serving me with something called Plaintiff's Original
4  Petition. It says, served from Cause Number 241724,
5  and it is a one, two, three, four, five -- six-page
6  document, and I don't see a citation.
7    A.   All right, ma'am.
8    Q.   Let me just mark it that I've gotten it today
9  at 9:0 -- oh, not 9:05 -- 11:05. I'm going on Arizona
10  time.
11    A.   And just one more reminder, Judge Morris had
12  severed out all -- all my claims and discovery
13  requests from -- from your cause of action, and it's
14  all incorporated into that.
15    Q.   Correct.
16    A.   All right.
17    Q.   And today is, what, the twenty -- who knows
18  what today is?
19       MR. INGLE: 29th.
20    A.   29th.
21       MS. SPETH: 29th. Thanks, Chris.
22    Q.   (BY MS. SPETH) All right. With that, we'll
23  get started.
24       MS. SPETH: I'm going -- for marking
25  exhibits, I'll be passing them to you, and then I'll

Page 10

1  ask you to pass them directly to the witness; okay?
2  Or do you want me to mark them?
3       COURT REPORTER: Whatever --
4       MS. SPETH: That would be fine.
5       (Exhibit Number 1 was marked.)
6    Q.   (BY MS. SPETH) Mr. Richeson, I'm showing you
7  what's been marked as Exhibit 1.
8    A.   Uh-huh.
9    Q.   It is -- it states at the top that it is from
10  Shawn - Field Manager; e-mail address,
11  Shawn@ClickaNerd.com. It says it was sent Monday,
12  September 14th, to Maria Crimi Speth, and the subject
13  is simply a link.
14       In the second page, there's some
15  content.
16    A.   Okay.
17    Q.   I'd ask you to take a look at the content of
18  page -- of the second and third page of Exhibit 1.
19  And tell me if that content ever appeared on your
20  website, or on the website known as ClickaNerd.com.
21    A.   Let me take a look here. I've got a
22  three-page exhibit. It looks like I got a URL called
23  ClickaNerd.com/legal/jaburg-wilk.
24       MS. SPETH: We're going to take a short
25  break because somebody is knocking at the door. We'll

Page 11

1  figure out what that's all about.
2       THE VIDEOGRAPHER: Off the record at
3  11:06.
4       (Off the record 11:06 a.m. - 11:07 a.m.)
5       THE VIDEOGRAPHER: We're back on the
6  record at 11:07.
7    A.   In response to your question, this three-page
8  exhibit does appear to be some of the data that I've
9  collected on you and your law firm as it relates to my
10  alleging you guys engaging in racketeering. Yes,
11  ma'am.
12    Q.   (BY MS. SPETH) Okay. So my exact
13  question -- well, you know what -- and I guess I
14  should have asked it a little differently, because I
15  want to make sure that I understand that this is your
16  website.
17       Is ClickaNerd.com a website that you
18  control, operate, own --
19    A.   ClickaNerd.com --
20    Q.   -- operate from?
21    A.   Yeah. ClickaNerd.com is one of the domains
22  that I do manage, yes.
23    Q.   Oh, okay. That's a better way to say it.
24       And -- and so at some point in time, and
25  then whether now or at any point in time, this content

Page 12

1  that we see in Exhibit 1, did that exist on that
2  website?
3    A.   Yes, ma'am.
4    Q.   Okay. Now, let's go back to the first page
5  of Exhibit 1. Do you -- did you send an e-mail to me
6  dated September 14th, 2009, with that link in it, as
7  we see in Exhibit 1?
8    A.   Exhibit 1, that link looks like something
9  that I would have sent to you on September 14th.
10    Q.   Okay. And on the second page of Exhibit 1,
11  it says -- it's talking about the -- there's a
12  reference to a private investigator. It says,
13  "Licensed" -- kind of a little far -- a little below
14  the middle of the page.
15    A.   Yes, ma'am.
16    Q.   "Licensed - Private Investigator
17  John Brewington conducted an interview with previous
18  employees of Ripoff Report and a video was made of
19  that interview."
20    A.   Yes, ma'am.
21    Q.   Question for you: Is -- what -- what led you
22  to believe that the people in that video that you're
23  referring to were former or previous employees of
24  Ripoff Report?
25    A.   When I was looking at the video, I believe

Gwendolyn Parker and Associates, Inc.
214-747-8007

Page 13

1 that those two people appear to be credible. One of
2 them, I guess, did prove to be credible, the girl that
3 was in there. And I guess that -- I just guessed they
4 were. I mean, I don't see why they would make some
5 assertions like that unless they were.
6    MS. SPETH: Okay. I -- I'm going to
7 object as non-responsive. And I -- and I actually
8 was, later, going to ask a question about that.
9    Q. (BY MS. SPETH) But my question was not about
10 whether they were credible. My question was
11 whether -- why do you believe that they were
12 employees?
13    A. The way the video was -- said, it just led me
14 to believe that they were employees of you and
15 Mr. Magedson.
16    Q. Okay. Did anybody in that video ever say
17 that he or she was an employee, or a former employee,
18 of Ripoff Report?
19    A. Honestly, I couldn't tell you that, but just
20 based on the -- the way that it sounded, it appeared
21 that you and Mr. Magedson sent them into that car lot
22 to extort them.
23    Q. And there's something in the video that made
24 it appear, what -- sent who into the car lot to extort
25 them? I'm sorry.

Page 14

1    A. The way I understood that video to -- to
2 recite, it looked like those guys went along with
3 Ed Magedson onto the Putt Putt car lot, and then tried
4 to extort them for like $500, if -- if I'm talking
5 about the same video.
6    Q. Yeah. We're talking about the same video,
7 except we don't remember it the same way.
8       Who do you remember was in the video?
9    A. There was -- there was a girl; there was a
10 guy -- actually, a couple of guys; and then the
11 detective, Brewington.
12    Q. Okay. You think there were -- how about, who
13 was speaking? Do you remember who spoke in the video?
14    A. The guy -- the guy that appeared to be a
15 little bit older was the one that did most of the
16 talking. And then -- it looked kind of more like a
17 criminal investigation. It looks like Mr. Brewington
18 was there actually getting information about it.
19    Q. He was interviewing the other two people,
20 correct?
21    A. Right. Yeah.
22    Q. He was asking questions and they were
23 answering, correct?
24    A. Yes, ma'am.
25    Q. Now, in Exhibit 1, it says, "To view the

Page 15

1 video, click here."
2    A. Uh-huh.
3    Q. At that point in time, I -- I recall that I
4 was able to actually click there and see the video.
5       Is that your recollection, that as of
6 September 14th, 2009, if someone were to follow that
7 link and -- on Exhibit 1, and click there, it actually
8 would have brought them to the video?
9    A. Yes, ma'am.
10    Q. Did you at one time have it actually pasted
11 on your own website, ClickaNerd.com?
12    A. I believe I had it under this URL, if I'm not
13 mistaken.
14    Q. Okay. Clickanerd.com/legal --
15 /legal/jaburg-wilk, correct?
16    A. Yes, ma'am.
17    Q. And how did it -- how did you -- in what
18 format did you actually load it onto your website?
19 When I say "your website," I mean the URL we just
20 said.
21    A. It was either in Windows Media format or
22 Real Media. I'm not sure.
23    Q. And where did you get that video from?
24    A. I believe it was first put on either UTube or
25 one of those other public blogs, and before you know

Page 16

1 it, it kind of propagated around the internet. So I
2 don't really remember the exact location, but I do
3 remember it was pretty published on the web.
4    Q. Right. And as of September 14th, 2009 -- no.
5 Wait. Let me ask it a little differently: When
6 did you -- where did you first obtain the video?
7    A. The exact date, I couldn't tell you for sure,
8 but this time frame seems to be correct.
9    Q. Okay. And where did you first obtain the
10 video from?
11    A. I'm going to guess at UTube. I don't know.
12 There was quite a few links out there that had that
13 video on it.
14    Q. Okay. There was as of September 14th, 2009?
15    A. I think so.
16       (Exhibit Number 2 was marked.)
17    Q. (BY MS. SPETH) Okay. I'm showing you what's
18 been marked as Exhibit 2. It's got a Bates label
19 Xcen 1120 at the bottom.
20    A. Okay.
21    Q. That's actually the same document that we
22 just saw, except this one has a header at the top.
23    A. Okay.
24    Q. And so taking a look at that header, it says
25 "Received from 690Nerd." Does 690Nerd mean anything

Page 17

1  to you?
2      A.  690Nerd is a telephone number, yeah.
3      Q.  Okay.  And it says, by ocean.bcentralhost.com.
4  Is bcentralhost.com a service that you use, as an
5  internet service provider, or an e-mail host that you
6  use?
7      A.  Bcentralhost, that does look -- yes.  Yes,
8  ma'am.  As a matter of fact, I think Jaburg and Wilk
9  is hosted there too.
10     Q.  Okay.  I'm trying to remember where I'm
11 putting everything.  There we are.
12         Let's take a look at the next exhibit
13 here.  I'm going to mark as Exhibit 3 a document
14 that's got a Bates label 1122.  Let me put the number
15 on it first.
16         (Exhibit Number 3 was marked.)
17     A.  I've got a two-page exhibit marked as
18 Exhibit 3.
19     Q.  (BY MS. SPETH)  Yes.
20     A.  And it appears to be written out to a
21 Nikki A. Wilk.
22     Q.  And, actually, it's not just Xcen 1122; it's
23 also Xcen 1123.  Because as you point out, it is a
24 two-page exhibit.
25     A.  Okay.

Page 18

1      Q.  If you'll skip the header for the moment and
2  move down to the part that says, from Shawn - Field
3  Manager, to Maria Crimi Speth, and then there's a
4  carbon copy and there's a subject.
5      A.  Okay.
6      Q.  Then on the next page, there's some content.
7  If you'll take a minute to look at Page 2 and the
8  content, and tell us whether you ever sent the e-mail
9  that is reflected in Exhibit 3, keeping in mind that
10 added to the e-mail is a header that wouldn't have
11 been there, at least not in that format, when you sent
12 it.
13     A.  Okay.  If you'd give me just a second --
14     Q.  Sure.
15     A.  -- to read this, I'll tell you.  "Dear Maria
16 Crimi Speth - Attorney at Law..."
17         Yes.  This is the letter I used to bait
18 you into Texas.  Yes, it is.
19     Q.  Okay.  And you sent that to me on
20 September 15th, 2009?
21     A.  Yes, ma'am.  And for the record, I never for
22 a moment believed that they were actors.  I believe
23 John Brewington's story.  I just knew that you weren't
24 much of a strategist and you'd end up in Texas.
25         MS. SPETH:  Objection, non-responsive.

Page 19

1      Q.  (BY MS. SPETH)  In the -- oh, I think it's
2  the third or fourth paragraph of the second page of
3  Exhibit 3, it says, "The people on this video could
4  all be actors..."  And you just told me that you do
5  believe that.
6          But I want to look at the next part.  It
7  says, "for all I know" -- "for all I know, and the
8  author of the video, John Brewington, could be using
9  me for some hidden agenda as well."
10         Can you tell me what you meant by that?
11     A.  Like I said, I've been studying your every
12 move since 2004.  And based on my assumptions of your
13 propensity to file frivolous suits against the parties
14 out there, I used it as a tool to bait you into Texas
15 so I can get you served with my process.
16         MS. SPETH:  Objection, non-responsive.
17     Q.  (BY MS. SPETH)  My question was, what did you
18 mean when you said "the author of the video, John
19 Brewington, could be using me for some hidden agenda
20 as well"?
21     A.  Precisely what I just said.
22     Q.  What -- okay.  Then I'm going to have to ask
23 you to try again, because I don't see how that's
24 responsive to my question.
25         I'm trying to figure out what you meant

Page 20

1  when you said "John Brewington could be using me" --
2  the "me" in this sentence is Shawn Richeson, isn't it?
3      A.  Yes.
4      Q.  -- "for some hidden agenda as well."
5          What did you mean by that?
6      A.  I knew that you go around filing frivolous
7  suits.  I knew that John Brewington had you guys on
8  the rope.  So did this video.  I knew that if I baited
9  you into thinking I had some sort of dirt on
10 Mr. Brewington, you would try to get my deposition.  I
11 knew that if I jerked you off for several months,
12 you'd file in Bell County, and you did.
13     Q.  Okay.
14     A.  That was the point.
15     Q.  I understand, and you've told me three or
16 four times that that was the point of this whole
17 e-mail --
18     A.  Uh-huh.
19     Q.  -- but that's not my question, Mr. Richeson.
20 What I'm really asking you is, in this e-mail, you
21 indicate that John Brewington could be using you for
22 some hidden agenda.  What hidden agenda did you think
23 that John Brewington might be using you for?
24     A.  I didn't.  The contents of the e-mail were
25 fabricated as a point of drawing you into Texas.  I

Page 21

1  never believed John Brewington was using it as any
2  hidden agenda. I believe John Brewington caught you
3  guys red-handed.
4       Q.  Do you believe that this sentence reflects or
5  indicates that John Brewington provided the video to
6  you?
7       A.  Not at all.
8       Q.  It says it in a couple of paragraphs down,
9  currently you have over 261,000 customers in the USA
10 and Canada. Is that a true statement?
11      A.  Technically, yes.
12      Q.  What do you mean "technically"?
13      A.  I don't know if they're all customers. Just
14 because you called us and made a call record doesn't
15 mean you're necessarily a customer, but I have 261,000
16 e-mail addresses, if that's where this is headed.
17      Q.  A little further down it says, "I would like
18 to work out a deal with you and Ed Magedson and see if
19 we can come up with some mutually agreeable
20 contract as to what I should do with this video."
21           What -- what do you mean by that?
22      A.  Once again, making the assumption that you do
23 file frivolous suits, I knew that you would be drawn
24 into this. You would file a motion trying to get me
25 deposed out in Arizona. You would get pissed off when

Page 22

1  I finally didn't respond to any of your deposition
2  notices. And you would end up in Texas. It was a
3  long-term thought on my part.
4       Q.  Yeah. And -- and, Mr. Richeson, you want to
5  tell me how you've orchestrated this entire thing, and
6  it's non-responsive because I'm not asking about why
7  you sent the e-mail.
8            I'm asking about what you said in the
9  e-mail in this specific statement when you said --
10      A.  No. I understand precisely what you're
11 saying. What I'm telling you is I made it up so you'd
12 chase me into Texas. I believe John Brewington. I
13 believe the people that are in the videos. And I
14 believe you and Magedson are going to end up getting
15 indicted. That's what I believe.
16      MS. SPETH: Objection, non-responsive.
17      Q.  (BY MS. SPETH) My question is, did you want
18 to work out a deal with Mr. Magedson?
19      A.  Not at all.
20      Q.  Did you -- okay. Now, a little further down
21 it says, "Absence your comments and response as to the
22 truthfulness of the people in this video...I will
23 accept the comments and claims as facts and proceed
24 with my agenda."
25           As of September 15th, 2009, what was

Page 23

1  your agenda with respect to the video?
2       A.  Getting you into Texas.
3       Q.  Okay. Did you have an agenda to disseminate
4  the video?
5       A.  Yes.
6       Q.  And you were going to do that regardless of
7  how I responded to this e-mail; is that correct?
8       A.  I already made my decision at that point that
9  it was truthful.
10      Q.  Okay. It says, "I am sending a carbon
11 copy" -- let me back up.
12           You said, "I believed John Brewington."
13           At this point, as of September 15th,
14 2009, did John Brewington tell you that the video was
15 truthful?
16      A.  I can't remember all of our conversations,
17 but, yes.
18      Q.  You said, "I'm sending" this -- "a carbon
19 copy of this e-mail to my attorneys."
20           Who were your attorneys as of
21 September 15th, 2009?
22      A.  Dan Corbin and Jerry Scarbrough.
23      Q.  In what way are they -- what was a little
24 confusing to me is then you wanted to say that I'm
25 pro se and I'll be pro se. So in what way were they

Page 24

1  your attorneys then?
2       A.  Both of them I host websites for. And when I
3  speak with attorneys and they've already been proven
4  to doctor e-mails and things, such as you do, I cover
5  my ass by sending copies to my attorneys. So that, if
6  necessary, I can call them in to contradict anything
7  that you may put into evidence that I consider
8  perjurious.
9       Q.  Okay. What -- what e-mail do you contend I
10 doctored?
11      A.  Well, right now, so far, everything is legit,
12 but I've heard in other cases -- like I said, I've
13 been tracking you for about four years, and I've got
14 your number. I know what you do.
15      Q.  Okay. My --
16      MS. SPETH: Objection, non-responsive.
17      Q.  (BY MS. SPETH) My question is, what e-mails
18 do you think I've doctored? And if you can't tell me
19 right now, I understand. There's a, you know --
20      A.  Honestly, those things can be discovered in
21 the cause of action that you've been served with. But
22 I think you and Mr. Magedson, when you file your
23 causes of action and get caught, the evidence-doctoring
24 that both of you do is well doctored -- well
25 documented; let's just put it that way.

Page 25

1    Q.  All right.  Let's look at the next document.
2    I'm going to mark as Exhibit 4 an e-mail that has a
3    Bates label Xcen 1125 through 1127.
4            (Exhibit Number 4 was marked.)
5    Q.  (BY MS. SPETH)  Sorry about having to toss
6    those across the table.
7    A.  No problem.
8    Q.  And what did I just say?  That was 4, right?
9        MS. SPETH:  Chris, are you there?  Were
10   you able to find that one?
11       MR. INGLE:  Yeah.  I've -- I've got it
12   in front of me.
13       MS. SPETH:  Okay.
14   A.  I've got Exhibit Number 4 that is a
15   three-page exhibit that looks to be an e-mail.
16   Q.  (BY MS. SPETH)  And, again, you know, for the
17   record, the beginning of the exhibit is simply a
18   header that was cut and pasted into the e-mail to show
19   source --
20   A.  Okay.
21   Q.  -- so I'm not asking about the beginning.
22   I'm asking you specifically about from the part that
23   says from Shawn Richeson -- I'm sorry.
24   From Shawn - Field Manager --
25   A.  Uh-huh.

Page 26

1    Q.  -- sent Wednesday, September 16th.  And from
2    there on, is that an e-mail that you sent to me on
3    September 16th, 2009?
4    A.  It looks like September 16th, 2009.
5        "Dear Maria,
6        "Thank you for your response.  I felt it
7    prudent to check the facts before disseminating to
8    other parties.  You and I and my attorneys are the
9    only ones that know about this link location.  It will
10   not be discovered by search engines.  I will rely upon
11   your word that these facts are false."
12       Yeah.
13   Q.  And so you did send that?
14   A.  Yes, ma'am.
15   Q.  And I take it from you -- I won't -- I won't
16   try to assume.  Was this -- were the statements that
17   you made in this e-mail false, particularly the part
18   where you said that you believed me and, therefore,
19   you would not be disseminating it?
20   A.  Yes, ma'am.
21   Q.  So the very last part of this particular
22   e-mail where you said, "I intend to archive it" was
23   simply a false statement?
24   A.  I'm not sure.  Where did you see "I tend to
25   archive it"?

Page 27

1    Q.  Sure.  You said, "If you have made a copy, I
2    see no purpose in my retention.  If you want the link
3    left in place for your purposes, please let me know,
4    else I intend to archive it."
5    A.  Oh.  Yes, ma'am.
6    Q.  That was a false statement?
7    A.  Yes.
8            (Exhibit Number 5 was marked.)
9    Q.  (BY MS. SPETH)  Let's take a look at
10   Exhibit 4 -- oh, 5.  Excuse me.  Exhibit 5 is
11   Xcentric -- or Xcen 1129 through 1132.
12   A.  These are all going in the --
13   Q.  Yeah.  Put them upside down in a pile and
14   they'll go back to the court reporter.  She'll keep
15   them with the official record.  Thank you.
16   A.  Okay.
17   Q.  All right.  Exhibit 5 is an e-mail
18   from Shawn - Field Manager, sent Saturday,
19   November 21st, 2009, to Paladin --
20   Paladin@paladinPI.com.
21       If you will take a couple of minutes to
22   take a look at the content of that particular e-mail
23   and tell me whether or not that's an e-mail that you
24   actually sent and if it's an accurate e-mail -- I
25   mean, an accurate copy of the e-mail you actually

Page 28

1    sent.
2    A.  Let's see, this is dated November 21st, 2009,
3    at 10:39 a.m.
4    Q.  Yes.
5    A.  Let's see, 5 -- Exhibit 5 is a three-page
6    exhibit.
7    Q.  Yes.
8    A.  And it looks to be carbon copied to Maria
9    Crimi Speth, ed@RipoffReport.com,
10   david.osbourne@fbi.gov, legal@dancorbin.com,
11   lgreenwood@sanantoniotexas.rr.com, and
12   jws@jerryscarbrough.org.
13   Q.  And let me just stop you one second.  It's
14   actually a four-page.  I think you said it was three.
15   A.  Oh, I'm sorry.  One is stuck together.  Yes,
16   it is.  Yeah.  Yes, it is, ma'am.
17   Q.  And did you actually author the e-mail that
18   is dated November 21st, 2009, and is this an accurate
19   copy?
20   A.  This does look like something I would say.
21   Yeah, I would say this is accurate.
22   Q.  Okay.  And you sent this to John Brewington,
23   correct?
24   A.  It looks like --
25   Q.  And then copied the other people that you

1  mentioned?
2      A.  Yeah.  It looks like I wrote it to John
3  Brewington, and then carbon copied to all you guys,
4  yeah.
5      Q.  Right.  Okay.  Your very first sentence says,
6  "This whole private investigator issue (Scott from
7  Killeen) is starting to come into focus."
8          Who is "Scott from Killeen"?
9      A.  Honestly, I'm not sure, but it seems like
10  there was a local private investigator that was
11  contacted by you guys, so I'm not -- I'm not really
12  sure who that is.
13      Q.  How -- what did -- did you have any contact
14  with a private investigator named Scott?
15      A.  No.
16      Q.  Did someone that you know?
17      A.  Oh, I take that back.  I had received a call
18  from the Killeen Police Department from a guy named
19  Detective Jack St. John who had mentioned a guy named
20  Scott.  Yes.  Yes, I did receive a call, but I got --
21      Q.  But -- I'm sorry.  I'm sorry.
22      A.  I got the call from a detective and -- but I
23  did initiate an outbound call to a Scott -- I think it
24  was Scott.
25      Q.  Let me see if I understand this correctly.

1  So some -- one of the detectives called you, indicated
2  that this Scott, who was a private investigator, was
3  poking around, and you contacted Scott?
4      A.  Yes, ma'am.
5      Q.  In this video, I mean -- sorry.  In this
6  e-mail to Mr. Brewington, sort of in the middle of the
7  e-mail, you say, "The fact of the matter is, I've
8  already disseminated your video to thousands of people
9  on my own accord and without your authorization,
10  believing the content in the aforesaid video to be
11  truthful and accurate."
12          Did I read that correctly?
13      A.  That's -- yes, ma'am.
14      Q.  And is that a true statement?  Did you, in
15  fact, disseminate the video that we've been talking
16  about to thousands of people?
17      A.  Yes, ma'am.
18      Q.  And in what format did you do that?  I don't
19  mean what format with the video.  The e-mails --
20      A.  It would be similar to the way I did it to
21  you.  I would have sent them a link and let them click
22  on it and do it for their own.
23          We had quite a few businesses that were
24  affected by your operation here.  And as a matter of
25  fact, in an attempt to drum up testimony for the jury

1  trial, I thought it prudent to make sure that I target
2  the local ones so I can find out who would be willing
3  to testify against you and Mr. Magedson.
4      Q.  Do you have some sort of database that you
5  keep, that you consider a database, as people who are
6  interested in things regarding Mr. Magedson or Ripoff
7  Report?
8      A.  And you, yes.
9      Q.  And -- and, you know, Mr. Richeson, you've
10  repeatedly said my operation and referred to me
11  personally.  What -- what leads you to believe that I
12  somehow operate or own or are involved in Ripoff
13  Report?
14      A.  There's a couple of things that make me
15  wonder:  One, upon the information and belief, I
16  believe you're on a signature card at a bank account
17  that receives deposits for Ripoff Report.  That's --
18  that's probably at the top of my list.
19          And then, secondly, your actions don't
20  mimic a standard attorney/corporate client
21  relationship.  They look more like a partner and an
22  owner.
23          So based on the things that I have
24  discovered in the cause of action, which I'm not
25  prepared to argue or discuss today, because I didn't

1  know we were going to be discussing it, I think -- I
2  think I've built a prima facie case of your ownership
3  or at least significant involvement.
4      Q.  When you say you're not prepared to discuss
5  it, but -- but in every question I've asked you,
6  you've gone out of your way to say that I own a
7  website or to refer to me, and so it seems like you
8  want to discuss it, and that's why -- that's the only
9  reason I'm asking.
10      A.  I do.  I do.  But just not for purposes of
11  John Brewington.  I'm just responding to your subpoena
12  for that cause of action.
13      Q.  Okay.  And I understand that, and that's a
14  different matter.  But when I ask you questions about,
15  you know, the website or Mr. Magedson, you've --
16  you've made it a point to -- to express that you think
17  that I -- that I own it, so that's why I asked.  I
18  want this record to be clear; okay?
19      A.  What I would -- if I would have known that
20  that's the direction that this was going to -- to go
21  today, then I would have brought in the things that
22  make me believe that, but we're -- you know,
23  we've literally -- I mean, literally, we have our car
24  packed and we're ready to head for Florida, so I kind
25  of expected this to be very short.

Page 33

1    Q.  Yeah. I understand. I understand. And I --
2  and I intend to keep it short, so let's -- let's move
3  on.
4         Although, actually, before I move on, I
5  do have to ask you this:  You said upon your
6  information and belief, there's a signature card that
7  receives deposits at a bank that has my name on it.
8    A.  Correct.
9    Q.  Where did you get that information?
10    A.  Just through some research on the internet.
11  I don't know how factual it is, but it appears that
12  you definitely are tied to a bank account for Ripoff
13  Report.
14    Q.  Yes.  In researching the internet --
15    A.  I'm sorry.  Not Ripoff Report.  For Pay Pal.
16  I believe you're tied to a deposit link for Pay Pal.
17    Q.  For a Pay Pal account.  Okay.
18         And what -- what kind of information
19  would be on the -- on the internet that would have a
20  bank signature?
21    A.  Well, the documents that I have stumbled upon
22  doing my research led me to believe that you actually
23  have a bank account with, I believe, it's Bank of
24  America in Phoenix, Arizona, tied to Ripoff Report's
25  deposit link that says, click here for -- click here

Page 34

1  for either make legal deposits or click here for
2  donations, something to that effect.
3    Q.  Oh.  So you're thinking that because Ripoff
4  Report has a link that says if you want to donate to
5  the legal fund --
6    A.  Uh-huh.
7    Q.  -- you're thinking that I'm somehow involved
8  in that?
9    A.  Yes, ma'am.
10    Q.  Okay.  Is there anything that says -- other
11  than a box on Ripoff Report that says if you'd like to
12  help pay our legal expenses, you know, donate to the
13  legal fund, click here, other than that, is there
14  anything else?  I mean, have you actually, you know,
15  seen some sort of banking records?
16    A.  I haven't seen anything that could back that
17  claim up.
18    Q.  Okay.  And has anyone told you that?
19    A.  No, ma'am.
20    Q.  Has John Brewington ever provided you with
21  any -- any records regarding Ripoff Report?
22    A.  Other than the tape and -- it seems like I
23  got something one time.
24    Q.  Maybe something by e-mail?
25    A.  I'm not sure.  But the tape part of it, yeah,

Page 35

1  I think he told me about him posting it on UTube or
2  one -- it's either on UTube or one of those public
3  sites.  I think I did get something like that one
4  time.
5    Q.  Have you ever met John Brewington in person,
6  or just on the phone?
7    A.  No.  Just on the phone.
8    Q.  And there's been some e-mails back and forth?
9    A.  Yes, ma'am.
10    Q.  In noticing up this deposition for today, I
11  did a document request for any records that were
12  responsive to that -- well, instead of me trying to go
13  through it, let me ask you this, did you bring any
14  records with you?
15    A.  None.  I don't have any e-mails that I could
16  print out for you.
17    Q.  Okay.
18    A.  But they're pretty much what you've already
19  handed me, though.  I mean, everything that you've
20  handed me is the same sort of information.
21    Q.  So you -- let me ask it this way, just so we
22  have a clear record:  Do you have any documents that
23  are responsive to the subpoena that you received --
24         You know what?  I should mark this as an
25  exhibit.  Let me do that.

Page 36

1         MS. SPETH:  So what I'm marking as an
2  exhibit -- and, Chris, I -- I don't know if you have
3  it handy.  I don't know that we even had it with my
4  exhibits.
5         But what I'm marking as an exhibit is a
6  subpoena duces tecum to Shawn Richeson, and it is
7  filed, date stamped March 25th, 2010.  And I'm going
8  to make this Exhibit 10 -- no.  I'm sorry.  Exhibit 6.
9  I skipped ahead.
10         (Exhibit Number 6 was marked.)
11    Q.  (BY MS. SPETH)  Oh, you know what, I wrote
12  on there.  Shawn, would you do me a favor; would you
13  stick this sticker over what I wrote?
14    A.  Sure.
15    Q.  Thank you.
16    A.  Exhibit 6 is a one, two, three, four-page --
17  oh, this is just a copy of the subpoena duces tecum.
18  Yeah.
19    Q.  Exactly.
20    A.  Okay.
21    Q.  On the second page it's got a list of three
22  categories of documents to be produced.  I know you
23  told me you didn't bring any of those with you today.
24         Do any of those documents exist in your
25  possession, anything that's responsive to Category 1,

9 (Pages 33 to 36)

Page 37

1    2 or 3 of Exhibit 6?
2        A.   It says, "All written or electronic
3    communications that you had with John Brewington or
4    his agents."
5            I don't have any.
6            "Any documents or information provided
7    to you by John Brewington or his agents."
8            I don't have any.
9            "Any documents or information provided
10   to you by John Brewington or his agents by you."
11           I don't have any.
12           But these things here do appear to be
13   the same documents.  And I'm only reflecting this from
14   memory.
15       Q.   Okay.  And when you say you don't have any,
16   you mean you don't have any with you, or you don't
17   have them at all?
18       A.   I don't keep them.
19       Q.   So how do -- how do e-mails -- how do you not
20   keep e-mails?  Are you actually deleting e-mails?  I
21   mean, do you do it contemporaneously?
22           Let me ask one question at a time.  I
23   apologize.  Do you actually delete the e-mails from
24   your system?
25       A.   No.  Once I respond to them, they

Page 38

1    automatically go to the delete folder, and when I exit
2    out, it cleans them out.
3        Q.   Okay.  So that's the way your system is set
4    up?
5        A.   Yeah.  I've never seen any point in long-term
6    archive.  I work on computers for a living, and I'm
7    finding e-mail boxes crash all the time because of
8    that kind of technical --
9        Q.   Okay.  Let's go back to Exhibit 5.  I kind of
10   got a little bit side-tracked there.
11       A.   Yes, ma'am.  Exhibit 5, four-page exhibit.
12   Got it.
13       Q.   Correct.  Let's look at the second page of
14   Exhibit 5.
15       A.   Okay.
16       Q.   It says in the middle of the -- no,
17   towards -- a little further down, in the middle.  It
18   says, "I figured since you had already posted on
19   UTube, you would not mind me distributing it on my
20   own."
21           The "it" in that sentence is the video,
22   correct?
23       A.   Yes, ma'am.
24       Q.   And what is the web address for UTube?
25       A.   Honestly, I don't know.  I mean, I don't

Page 39

1    know.  It's usually an alpha-numeric web address, but
2    I don't know.
3        Q.   And you wrote here UTube, U-T-u-b-e.  Do you
4    think it's maybe U-T-u-b-e.com?
5        A.   I would guess.
6        Q.   In this -- in this e-mail, which is
7    Exhibit 5, you have a paragraph that starts off by
8    saying, "The other fact is that since September of
9    2004, I've had a few e-mail conversations with Maria
10   Speth and Mr. Magedson over the years and have
11   recorded their conversations..."
12           Do you keep those audio recordings?
13       A.   No.  As a matter of fact, that turns out to
14   be some stuff that I've turned over to the FBI, yes.
15   And that was about right, 2004.
16       Q.   Okay.  And who -- when you say you turned
17   them over to the FBI, who did you turn them over to?
18       A.   Only because I have not had an opportunity to
19   speak with the U.S. attorney, I'm reluctant to discuss
20   any ongoing criminal investigation.
21       Q.   All right.  How many -- how many audiotapes
22   have you made of conversations -- conversations with
23   Mr. Magedson?
24       A.   I'm not really sure.  I remember talking to
25   you and talking to him one time back in 2004, and I

Page 40

1    think I had one in 2005 as well.
2        Q.   That's a little different than what I asked.
3    I asked how many audiotapes there were.  So are you
4    saying that there were two conversations and,
5    therefore, two audiotapes, or no?
6        A.   I don't think I can accurately ask that --
7    or, I mean, answer that.  I don't know.
8        Q.   Because you just don't remember?
9        A.   I don't remember.
10       Q.   Okay.  Is it possible that there are more
11   than ten recordings?
12       A.   I honestly don't know.
13       Q.   Okay.
14       A.   I don't know.
15       Q.   There could be?
16       A.   I -- I don't know.  I -- I can't answer that.
17           (Exhibit Number 7 was marked.)
18       Q.   (BY MS. SPETH)  Let's take a look at
19   Exhibit 7.  And Exhibit 7 is Bates labeled Xcen 1141
20   through 1143.
21       A.   All right.  I have Exhibit 7, which appears
22   to be an e-mail, and it's a three-page exhibit, with
23   the last page being blank.
24       Q.   And this is just going to be real simple.
25   All I want to do is -- all I want here is to ask you

Page 41

1 if you actually sent this e-mail, again, understanding
2 that it wouldn't have had this big, long header in it?
3     A.  "Annette told me last night she wants to go
4 to Canada instead of Arizona for Christmas.  As crazy
5 as that sounds, I will comply.  Not thrilled about
6 below zero weather."
7         Yeah, that all sounds like something to
8 me -- that sounds like me.
9     Q.  Okay.  Let's take a look at the next exhibit
10 then.  I told you that one would be short.
11        (Exhibit Number 8 was marked.)
12     Q.  (BY MS. SPETH)  I'll show you what's been
13 marked as Exhibit 8.
14     A.  Plaintiff's Exhibit -- or I'm sorry.  Your
15 Exhibit 8 --
16     Q.  Yeah.
17        MS. SPETH:  I'm sorry, Chris.  It's Xcen
18 1167 to 68.
19     A.  And it's a two-page exhibit which also
20 appears to be an e-mail.
21     Q.  (BY MS. SPETH)  Yes.  And my question to you
22 is, did you send that e-mail, which is dated
23 March 10th, 2010, to me, to Gary Jaburg, to
24 legal@dancorbin.com?
25     A.  Yeah, that does sound like me.

Page 42

1     Q.  The second to last paragraph says that you
2 "find it remarkably dishonest and clearly actionable
3 by the Arizona State Bar that" -- and it says "you,"
4 and the "you" appears to be me, Maria Speth -- "would
5 manufacture and file doctored e-mail evidence in an
6 attempt to mislead the 146th District."
7        What are you referring to there?
8     A.  I've been on -- let's see -- let me see what
9 date this is.
10        As I recall, in your application for a
11 subpoena duces tecum, which incidentally wasn't served
12 on me till the 13th -- I learned about it through a
13 website query -- there was some attached e-mails, and
14 that e-mail looked like it had been doctored.
15     Q.  Okay.  Have you since determined that it was
16 not doctored?
17     A.  I haven't been able to make any additional
18 determinations.
19     Q.  So it's your testimony that our subpoena to
20 you included an e-mail that looked doctored?
21     A.  The subpoena to me didn't look doctor -- that
22 didn't look doctored, but the -- I had gone down to
23 the Bell County District Clerk and pulled a copy of
24 the yellow file and read through the application, and
25 it looked like it was put together in such a way as to

Page 43

1 create an unreasonable amount of response time for me.
2     Q.  Because you got served so late?
3     A.  Correct.
4     Q.  Okay.
5     A.  As a matter of fact, I learned about it
6 because I was there.  I have another lawsuit pending
7 with another company, and the clerk knows me, and she
8 says, you've got another lawsuit here, and she handed
9 it to me.  And that's the only reason I even knew it
10 exists.
11     Q.  Okay.  And what do you remember about the
12 e-mail that was attached to it that looked doctored to
13 you?
14     A.  It just looked falsified.  And I don't
15 remember the parameters of it, but if I put that in an
16 e-mail to you, I must have felt that at the time.
17     Q.  Okay.  My next exhibit --
18        MS. SPETH:  Chris, for your sake, I
19 don't think it has a Bates label on it.  It's an
20 Affidavit of Shawn A. Richeson.  It is dated
21 November 30th, 2009.
22        And, Chris, I note that I have three of
23 them here.  That could possibly mean that one of them
24 didn't make it into your stack.  So I'm going to give
25 you a minute.  Let me know if you see that.  It's --

Page 44

1 it's a one-page affidavit, and it's got e-mails
2 attached to it.  It's the one that's got the really
3 light, hard-to-read e-mails attached to it.
4        MR. INGLE:  Okay.  Yeah.  Let me look
5 through for just a second.  I think I did see his
6 affidavit in there.  What's the date on it?
7        MS. SPETH:  That date is -- actually,
8 the only thing I see is the notary date.  It says,
9 "Sworn to me on this Monday, the 30th day of November
10 2009."
11        MR. INGLE:  Okay.  I have a different
12 affidavit, so --
13        MS. SPETH:  Yeah.  I've got that one in
14 here, too, but that's -- this is -- there's an April
15 one, but this is the November one.
16        It's something that you produced to me, if
17 that helps at all.  It was attached to your motion for
18 summary judgment.
19        MR. INGLE:  Okay.  Go ahead.
20        MS. SPETH:  Okay.  I'll go ahead and
21 mark it.
22     Q.  (BY MS. SPETH)  I'm marking as Exhibit 9 your
23 affidavit dated November 30th, 2009.
24        (Exhibit Number 9 was marked.)
25     Q.  (BY MS. SPETH)  Is that a true and accurate,

11  (Pages 41 to 44)

Page 45

1   correct copy of an affidavit that you executed?
2       A.  Let me take a moment to read it.  The two
3   exhibits that are attached to it -- actually, I'm
4   sorry.  There's -- there's three exhibits that are
5   attached to a sworn affidavit that I obviously
6   executed on the 30th day of November 2009, whereas I
7   swore that I did not threaten any type of distribution
8   of a videotape.
9           That is mine, yes, it is.
10      Q.  Okay.  And I notice the exhibits are
11  extremely hard to read, and I apologize.  But I will
12  tell you that when I got them, they were extremely
13  hard to read, so we'll kind of do the best we can.
14      A.  Okay.
15      Q.  So one of the things that you say in this
16  affidavit is that Deponent's Exhibit 1, 2, and 3 are
17  the only correspondence that you had with me in the
18  year 2009.  That wasn't correct, was it?
19      A.  Let's see, in 2009... Honestly, I can't say
20  if these are mine, but based on the fact that there's
21  carbon copies on all these attorneys down there, it
22  certainly looks like it would be.
23      Q.  Well, I think your affidavit, in all
24  fairness, says that they're yours.
25      A.  Oh, okay.

Page 46

1       Q.  But they say that they're the only ones that
2   you sent me in 2009.
3       A.  The only ones that I could recollect, yeah.
4       Q.  Okay.  So that was based on your current
5   recollection as of that date?
6       A.  Correct.
7       Q.  And because you don't keep e-mails, you
8   didn't have them all in front of you?
9       A.  Correct.
10      Q.  Okay.  Let's look at the next exhibit then.
11          (Exhibit Number 10 was marked.)
12      Q.  (BY MS. SPETH)  That's Exhibit 10.  And
13  Exhibit 10 is Intervenor's Original Petition, it's
14  called -- it's called.  And it looks like it was filed
15  with the court on March 19th, according to the file
16  stamp.
17      A.  Yes, ma'am.
18          MS. SPETH:  And I'm going to give Chris
19  a minute to catch up, because I'm not sure where it is
20  in his stack.
21          MR. INGLE:  I'm looking at it.
22      Q.  (BY MS. SPETH)  Okay.  One, two, three, four,
23  five -- it looks like this is a six-page document.
24      A.  Okay.
25      Q.  And if you'd look at the third page of

Page 47

1   exhibit -- I'm sorry.  Was that 10 that I gave you?
2       A.  Exhibit Number 10 is my Intervenor's Original
3   Petition.  I'm on Page 3.
4       Q.  Yes.  On Page 3 -- excuse me -- in the fourth
5   paragraph, it says, "Upon information and belief, John
6   Brewington, a detective that resides in Arizona in
7   proximity to Magedson and Speth, has acquired a
8   videotape of this criminal conduct and said tape
9   clearly implicates Magedson and Speth..."
10          Is that the same videotape that you
11  posted on your website that we've been talking about?
12      A.  Yes, ma'am.
13      Q.  Let me -- let me -- just so that we don't
14  have any confusion throughout this deposition, have
15  you ever had possession of more than one videotape
16  where John Brewington is interviewing witnesses about
17  Ripoff Report, or is there only one?
18      A.  This is the only one I have.
19      Q.  It says, "Upon information and belief, Krysta
20  Agerone, an Arizona resident, authenticated the
21  accuracy and truthfulness of this videotape..." Let
22  me stop there because -- there's a second part, but
23  let me just stop there.
24          What information or link did you have
25  that Krysta Agerone did that?

Page 48

1       A.  Like I said, I'd been tracking things in your
2   Arizona case to find out who all would authenticate
3   the truthfulness of this videotape.
4       Q.  Okay.  So what did you track and what did you
5   find that led you to believe that she authenticated
6   it?
7       A.  The website showed a deposition with her on
8   there, and from the best I can tell, her deposition
9   held up and she authenticated it.
10      Q.  What website showed her deposition?
11      A.  Your -- your cause of action in Arizona,
12  there's minute -- minute meetings, and you had a
13  hearing, whereas you asked to extend the -- where you
14  asked to extend the -- your motion for summary
15  judgment, or maybe it was their motion for summary
16  judgment.  You'd asked to extend that pending my
17  deposition and Mrs. -- whatever that lady's name
18  deposition is.
19      Q.  Okay.  So looking at the minute entries in
20  that case, you knew that her deposition was taken?
21      A.  Uh-huh.
22      Q.  Have you seen her deposition or the
23  transcript?
24      A.  No.
25      Q.  So how do you know that she authenticated the

Page 49

1  accuracy of it?
2      A.  I believe I heard -- I forget who it was
3  from -- well, I don't know.  Honestly, I don't
4  remember who originally told me, but the deposition
5  itself was conducted, and the favorableness of her
6  testimony was used to authenticate it, and it had to
7  have come from Brewington somehow.
8      Q.  Okay.  And do you have a recollection of
9  having John Brewington tell you that?
10     A.  John Brewington?  I don't know if it was him
11 or one of the attorneys.  I don't know.
12     Q.  Have you had conversations with Chris Ingle?
13     A.  Chris Ingle, yes.
14     Q.  How many --
15     A.  That's one of the attorneys.  That's the one
16 that's on the phone right now.
17     Q.  That is correct.
18     A.  Yeah.
19     Q.  How many have you had?
20     A.  A couple.
21     Q.  Some people say "a couple" when they mean
22 two.  Some people mean three or four.
23     A.  I'd say two or three, including one that was
24 in Judge Morris' court when he listened in on the
25 hearing.

Page 50

1      Q.  Okay.  So without that one, one-on-one
2  conversations, maybe two perhaps?
3      A.  That sounds right.
4      Q.  All right.  And do you remember the contents
5  of either one of those conversations?
6      A.  Pretty much the -- I would say he pretty much
7  agreed with me.  I -- I had mentioned that the cause
8  of action that you'd filed against Mr. Brewington to
9  be frivolous, and, of course, he took that position as
10 well.  And that, as I recall, I think -- I think they
11 said they pretty much had their case in the bag now.
12 I mean, that was the substance of it.
13     Q.  Okay.  When you say "they said," was there
14 somebody else on the phone other than Chris Ingle?
15     A.  There's another lawyer.  I don't remember his
16 name.
17     Q.  That works with Chris?
18     A.  Yeah, yeah.  In that same law firm, I
19 believe.
20     Q.  And they told you they pretty much have their
21 case "in the bag," or something like that?
22     A.  Uh-huh.
23     Q.  Yes?
24     A.  Yes, ma'am.
25     Q.  Anything else you can remember about that

Page 51

1  conversation?
2      A.  They pretty much agreed with me that you're
3  not a strategist.  We were joking about that.  And
4  they agreed with me that you do have the propensity of
5  filing frivolous lawsuits to drum up attorneys' fees
6  and -- I'm not sure if that's really what you were
7  doing.  I really think it's more of a partnership kind
8  of judgment that you get, or attempt to get, through
9  you and Mr. Magedson working together.  But, yeah,
10 pretty much the same things that we've been saying for
11 years.
12     Q.  Did they agree with you that I'm an owner and
13 a partner in the website?
14     A.  No, I don't think they did.  I think when I
15 bring that up, they may even question whether or not I
16 can prove that.
17     Q.  Okay.  And you think there's been -- was
18 Chris and the other attorney in both conversations, or
19 just one of them?
20     A.  Chris was in one, and it seems like there's a
21 younger guy.  I don't know which one is which, but
22 I've had two different conversations.
23     Q.  And that's what I'm getting at, is, two
24 different conversations with two different attorneys,
25 or two conversations with both attorneys on the phone

Page 52

1  both times?
2      A.  No, no.  One with Mr. -- with Chris.  And is
3  there a Dean?
4      Q.  There is a Dean, that's correct.
5      A.  Okay.  That one.
6      Q.  Do you think -- do you think -- I'm going to
7  give Chris a hard time.  Do you think Dean is the
8  younger one, or do you think Chris is?
9      A.  I thought Chris was the younger one.
10     Q.  Yes.
11     A.  Okay.  I mean...
12     Q.  So back to the information that Krysta Ageron
13 authenticated the accuracy, is it your testimony that
14 that came from either Brewington or one of
15 Brewington's attorneys?
16     A.  It had to have come from John Brewington.  I
17 mean, either that or his attorney.  I don't remember.
18 But I just know for sure that I've heard that the
19 accuracy of the video -- or, I mean, the authenticity
20 of the video has been confirmed by one of the
21 participants in the video.  And I looked it up on the
22 website to see if that was really true, and I seen
23 there was a deposition, so I have no reason to believe
24 otherwise.
25     Q.  So you've had a conversation with either

1  Mr. Brewington or one of his attorneys since
2  Ms. Agerone's deposition?
3      A.  Yes, ma'am.
4      Q.  Now, the second part of the statement that
5  you make in Exhibit 10 that we were just talking
6  about --
7      A.  Okay.
8      Q.  -- says, "and is believed to be assisting the
9  authorities in criminal prosecution of Magedson and
10 Speth."
11         Now, the -- that's still a reference to
12 Krysta Agerone.
13     A.  Correct.
14     Q.  And I understand that that's -- that may be
15 your belief, but is it based on anything that you
16 heard from anyone else?
17     A.  No.  They didn't say anything to me
18 whatsoever about that.  It's just a belief that I have
19 based on other information that I've been unable to
20 corroborate at this point.
21         But -- so the record is clear, an
22 attorney at -- John Brewington's attorneys or
23 John Brewington, neither one, made a comment of that
24 nature to me.
25     Q.  I understood that.  Thank you for clarifying,

1  but I understood that.
2         In the third paragraph of Exhibit 10, it
3  says, "Maria Crimi Speth, utilizing her thug-like
4  tactics, attempted to threaten and intimidate
5  Mr. Richeson into turning over aforesaid videotape and
6  silencing Mr. Richeson under the threat of criminal
7  extortion."
8         Can you explain to me how you believe
9  that I did that?  What did I -- in what way did I
10 attempt to threaten and intimidate you into turning
11 over the videotape?
12     A.  Okay.  For purposes of today's hearing, this
13 cause of action, 241724, has been severed out into a
14 new cause of action.  I was not prepared to disclose
15 everything relating to that.  But in the form of a
16 deposition or interrogatories or whatever, you know,
17 discovery served upon me, I intend to answer that
18 question.  But for today, I don't have the evidence
19 before me to give to you to back that comment up.
20     Q.  And I understand.  And I'm not asking you for
21 documentary evidence, and I understand that that's a
22 separate lawsuit.
23     A.  Right.
24     Q.  And the only reason I'm asking about this
25 particular paragraph is because it relates to the

1  videotape, and the videotape is very much at issue --
2      A.  Right.  Right.
3      Q.  -- in the lawsuit that we're dealing with.
4      A.  Right.  And it is my belief that you and
5  Mr. Magedson are trying to bury this tape.  And it's
6  my belief that you and Mr. Magedson stand to lose
7  money, and more than likely, your freedom, when this
8  tape gets disseminated and the other little pieces of
9  evidence come into the public eye.  It is my belief
10 that the FBI will eventually get some justice for the
11 victims out there.
12         And the pieces of information that I
13 have been able to ascertain since 2004 will completely
14 back up the claim that I made in the Intervenor's
15 Original Petition.  But, like I said, I'm not prepared
16 to argue that today.
17     Q.  Okay.  And here's -- here's one of the things
18 I'm a little confused about:  You say in here that I
19 attempted to threaten you into turning over the
20 videotape to me.  Didn't we already establish that you
21 turned the videotape over to me back in September of
22 2009?
23     A.  True.
24     Q.  In fact, that's the first I learned of it?
25     A.  In order to clarify what my point was in that

1  particular verbiage that I used in the Intervenor's
2  Original Petition, instead of "turn over," it should
3  have been better stated, "to silence me from
4  distribution -- distributing that for the purposes of
5  the damages that it could cause you two."
6      Q.  Okay.  And you actually say that in sort of
7  the next part of the sentence.
8      A.  Okay.
9      Q.  I understand what you're saying there.  Okay.
10         I'm going to mark Exhibit 11, which is
11 an e-mail that I actually don't -- you know what?
12 This looks duplicative.  This is a duplicate.  Okay.
13         (Exhibit Number 11 was marked.)
14     Q.  (BY MS. SPETH)  All right.  Exhibit 11 is
15 a -- it appears to be a posting from New Times --
16 comment to the New Times report called the Real Ripoff
17 Report.
18     A.  Okay.
19     Q.  And there's a comment section -- I'm going to
20 show you -- I'm moving the tab because it covers the
21 date, and we don't want to do that.  Okay.  All right.
22 So there's Exhibit 11.
23     A.  Okay.
24         MS. SPETH:  And at the bottom, Chris,
25 for your -- for your sake in finding it, at the

Page 57

1  bottom, it says, phoenixnewtimes/2007-2-01/news/
2  the-real-rip-off-report.  And it's a comment by Shawn
3  Richeson dated 11-29-2009 at 10:33:24 a.m.
4      A.  Okay.
5          MR. INGLE:  I have it in front of me.
6          MS. SPETH:  Oh, okay.  Great.
7      Q.  (BY MS. SPETH)  So, Mr. Richeson, my question
8  to you, first of all, is, is this a posting that
9  you -- is Exhibit 11 a posting that you actually made
10  as a comment to the Phoenix New Times article called
11  the Real Rip-Off Report?
12      A.  It does appear to be accurate.  I printed out
13  all the ones I made on that blog, and that does look
14  like mine.  So Exhibit 11 does appear to be my comment
15  made.
16      Q.  Okay.  Who is Brenda Heeney?
17      A.  She's an I.R.S. investigator.
18      Q.  And do you know what office she works out of?
19      A.  Waco.
20      Q.  And how about John Wear?
21      A.  Special agent in charge, FBI.
22      Q.  And what office does he work out of?
23      A.  Waco.
24      Q.  And what -- what evidence did you provide
25  them?

Page 58

1      A.  Once again, only because I don't think I have
2  permission to discuss this beyond what I've stated
3  here, I would like to talk to the U.S. attorney that
4  has these things in their possession before I comment
5  on this, but those other two people.  And that is my
6  posting.
7          Actually, it looks like I made quite a
8  few postings on --
9      Q.  Right.
10      A.  This is that newspaper that wrote up you guys
11  out there in Arizona.  Yeah, I've got about five or --
12  more than that.
13      Q.  Yeah.  I've got a few here too.  We'll go
14  through -- we'll go through them.
15      A.  Any more questions on Exhibit 11?
16      Q.  No.  We're done with 11.  We're going to go
17  to 12.
18          (Exhibit Number 12 was marked.)
19      Q.  (BY MS. SPETH)  And Exhibit 12 is also a
20  New Times comment.  It looks like -- it's the one that
21  says Shawn 12/01/2009.
22      A.  12/01?
23      Q.  Yeah.  At 1:45:46 p.m.
24      A.  12/01?
25      Q.  Yeah.  Look at that and see if that matches

Page 59

1  anything that you've got or if it looks like it's
2  yours.
3          So on -- on this page, there are
4  actually three postings: two that say they're from
5  Shawn --
6      A.  Oh, okay.
7      Q.  -- and one that says it's from somebody --
8  oh, no.  One that says it's from the Real Ripoff
9  Report.
10      A.  I'm not sure if that is mine.
11      Q.  Okay.  So the 12-01-2009 posting at
12  1:45:46 p.m. that says, "The video looked real to me.
13  Maybe I'm blind, but take a look at it closely and
14  comment on my blog."
15          And then it's got a link to
16  ClickaNerd/forums/topic/asp.  You don't think that's
17  yours?
18      A.  It would have to be -- it has to be mine,
19  because that is clearly one of our forms.  So, yeah,
20  that has --
21      Q.  Although you don't recall it --
22      A.  Yeah.  Yeah, it has to be mine.
23      Q.  Okay.  And then the last one on this page
24  that says 11/29/09, 10:33:24, I think that's
25  duplicative of Exhibit 11?

Page 60

1      A.  Yes, ma'am.
2      Q.  Okay.  Then let's go to the next exhibit.
3      A.  Are you done with Exhibit 12?
4      Q.  I am.
5      A.  Okay.
6      Q.  And I'll let you get -- get going on your
7  vacation.
8      A.  Okay.
9          (Exhibit Number 13 was marked.)
10      Q.  (BY MS. SPETH)  Exhibit 13 -- oh, you know
11  what, I didn't mark that.  Let me put a 13 on this
12  little sticker, and ask you to put it on there.
13      A.  Okay.
14      Q.  Thank you.  Okay.  Exhibit 13 is also a
15  New Times blog, and this one has some postings -- a
16  posting from you, the one that we already saw.  And
17  underneath it, there's a posting from somebody who
18  identifies himself as Andy, and a posting from
19  PaladinPI.
20          My question to you, if I can direct your
21  attention to the posting from Andy, do you know who
22  Andy is?
23      A.  Hang on just a minute here.  That's me.
24  That's -- that's clearly my words.
25      Q.  Do you know why you've chosen in this

                              15 (Pages 57 to 60)

Page 61

1  particular instance to sign it Andy instead of Shawn?
2      A.  Yeah.  I wanted to draw out Magedson.  I know
3  he likes to post on this one too.
4      Q.  All right.  Let's take a look at the next
5  one.  This is going to be 14.  Now I'm going to forget
6  what number we're on because they're not numbered
7  anymore.  Exhibit 14, right?
8      A.  Yes, ma'am.
9      Q.  Okay.
10         (Exhibit Number 14 was marked.)
11     Q.  (BY MS. SPETH)  All right.  Exhibit 14 is an
12  e-mail dated March 30th, 2008, from -- well, there's a
13  little top section where Mr. Magedson is forwarding it
14  to me, but right below that, it looks like it was from
15  me to Ed Magedson on March 30th, 2008.  Do you see
16  that?
17     A.  I have Exhibit 14, which purports to be an
18  e-mail from EDitor@RipoffReport to Maria Crimi Speth.
19  And it's a one, two, three, four, five -- five-page
20  exhibit, yes.
21     Q.  Right.  And so the e-mail that's just below
22  the forwarding e-mail that says it's from Service
23  Manager, Shawn@ClickaNerd.com, on March 30th, 2008, to
24  EDitor@RipoffReport, if you will look through that
25  e-mail, please, and tell me whether that's a true and

Page 62

1  accurate copy of an e-mail that you sent to
2  Ed Magedson.  And, in -- in all fairness, it looks
3  like it also has a reply behind it, so I'm just asking
4  about the March 30th at 1:35 p.m. for now.
5      A.  You know what, I believe this to be one of
6  the e-mails that Mr. Magedson doctored up, yeah.
7         Now, it looks like some parts and bits
8  and pieces of my work, but it looks cut and paste
9  together by Mr. Magedson.
10     Q.  Okay.  So let's see if we can figure out what
11  parts you agree that you sent to him in e-mail and
12  what parts you don't.
13        It says "Dear Ed:
14        "I will give you all the things you are
15  asking for.
16        "I was solicited by a guy named John
17  Brewington, who is a private investigator in your
18  town."
19        Do you know if those are your words?
20     A.  No.
21     Q.  You don't know, or are they not?
22     A.  I don't think any of this is.  I don't think
23  any of this e-mail is legit at all, actually.
24     Q.  Okay.  So it's not just a cut and paste.  You
25  think the entire thing is made up?

Page 63

1      A.  I think he -- I think he just cut and paste
2  from various e-mails and maybe took some of my words
3  and pasted it together the way he wanted it.  But,
4  yeah, I do; I believe this to be a forgery.
5      Q.  Okay.  Who's Jim Worrell?
6      A.  Jim Worrell.  Now, that one is legit.
7      Q.  The reference to Jim Worrell is legit?
8      A.  Yeah.  I posted about Jim Worrell, who was a
9  next door neighbor of ours, who is a child molester.
10     Q.  Okay.
11     A.  As a matter of fact, that was one of the
12  conversations I had with Ed Magedson.
13     Q.  Okay.  And I'm -- I'm very sorry to ask this,
14  but I want to know if this is accurate.  Is this --
15  did you write that your daughter was killed in a car
16  accident?  Is that something you wrote?
17     A.  She wasn't killed in a car accident.
18     Q.  She wasn't.  Okay.  Well, then that makes me
19  feel a little better about asking you, because I'd
20  hate to bring up something like that.
21     A.  But that right there, she was in a near-fatal
22  car accident on January 1st --
23     Q.  I'm sorry.  It says "near fatal."  Oh, okay.
24  Near fatal.  Got it.
25     A.  Yeah.

Page 64

1      Q.  Okay.  So you did write that.  It's --
2      A.  I don't know how --
3      Q.  -- just that I said it wrong?
4      A.  -- in the hell he would know that.
5      Q.  Okay.  Well, is it possible that you did
6  write that portion of this?
7      A.  In 2006?  I didn't think I really liked him
8  enough to talk to him, so --
9      Q.  This is a 2008 e-mail.
10     A.  Oh, it is?
11     Q.  Yeah.  It's just referring to this terrible
12  accident in January.
13     A.  Oh, okay.  Possibly then.
14     Q.  Okay.  And you blamed Jim Worrell for that in
15  part --
16     A.  Yes.
17     Q.  -- is that accurate?  Yes?  Okay.
18        Have you ever had a conversation with
19  Sarah Fenske at -- at an Arizona newspaper?
20     A.  Yes, I did.
21     Q.  Okay.  And you've had some conversations or
22  some communications with Rob Russo, correct?
23     A.  Yes.
24     Q.  And was there somebody who you dealt with
25  named Kelly Gilmore who sent their hard drive in for

Gwendolyn Parker and Associates, Inc.
214-747-8007

Page 65

1  repair?
2  A.  Kelly Gilmore.  Oh, that was a customer of
3  mine, yes.  Yes.
4         That's what this looks like.  It looks
5  like he went to various postings that I did on his
6  Ripoff Report site and just grabbed little bits and
7  pieces and slammed it together on this.
8  Q.  Okay.  So I take it it's your testimony that
9  you didn't say that you made up the FBI thing?
10         So on the first page, it says, "As far
11  as the FBI, I made the entire thing up."
12         Are those your words, or is that
13  something that you contend Mr. Magedson --
14  A.  That's something Mr. Magedson made up.
15  Q.  Okay.  And so you didn't say no FBI agent
16  ever came to my house and asked questions about you?
17  A.  No.  I'm swearing under oath, the FBI came to
18  my house, came to my office on Rancier.
19  Q.  Okay.  And you didn't try to mislead Ed into
20  thinking that it never happened?
21  A.  No.
22  Q.  The very end of the -- that particular
23  e-mail, there's a P.S., and it says, "You pegged me
24  right in the previous conversation; I am (was) a loose
25  cannon."

Page 66

1         Do you know if you said that?
2  A.  It sounds like Ed Magedson's words.
3  Q.  Okay.  You don't think you had said that?
4  A.  No.
5  Q.  Okay.
6  A.  I'm going to have to state one more time,
7  this whole thing looks like just a series of
8  cut-and-paste things from his website into a
9  hodgepodge of e-mail --
10  Q.  Okay.
11  A.  -- although it is indicative of his
12  personality.  So, yeah, it does look like something
13  he'd do.
14  Q.  So your testimony under oath is that this is
15  not a true and accurate copy of an e-mail you sent to
16  Ed Magedson?
17  A.  It doesn't make any sense to me.  I don't
18  see -- because, see, something like this, these words
19  right here, if I were to talk to him, it would be
20  carbon copied to my lawyers.  So, no, I don't believe
21  this to be -- I believe this to be a fraud.
22         (Exhibit Number 15 was marked.)
23  Q.  (BY MS. SPETH)  I'm showing you what's been
24  marked as Exhibit 15.  And Exhibit 15 has a QED 166 at
25  the bottom.  It is an e-mail from Service Manager

Page 67

1  shawn@690-nerd.com, dated May 28, 2007, to
2  qedonline@gmail.com.  Is this a true and accurate copy
3  of an e-mail that you sent to Rob Russo?
4  A.  And this is dated May 28th, 2007, at
5  2:03 p.m., one --
6  Q.  Correct.
7  A.  -- two, three -- third page being blank.
8  Q.  Yes.  That's correct.
9  A.  It sure looks like something I would say.  I
10  can't tell you for sure it is, but based on the way
11  that the e-mail is structured, it looks like something
12  I would say.
13  Q.  On the second page of this e-mail, it says,
14  "Magedson is like a cockroach.  He survived this long
15  because no one has stomped his guts like a cockroach
16  (metaphorically speaking)."
17         Is that what you wrote?
18  A.  That definitely sounds like my words.
19  Q.  And it says, "Ultimately, it will take a
20  meaner junk yard dog to finally get a bite of his
21  ass."
22         Did you say that?
23  A.  That definitely sounds like my words.
24  Q.  Okay.
25  A.  And just so the record is straight, I don't

Page 68

1  really remember Mr. Russo, but didn't you-all have a
2  lawsuit against him?  Is that -- is that the person
3  we're talking about?  Or do you have a lawsuit against
4  him?
5  Q.  I'm not here to answer your questions, but I
6  will say that this does say it's qedonline@gmail.com,
7  if that helps you.
8  A.  Qedonline.  Okay.  Okay.  Because that name
9  does ring a bell from the time frame.
10         (Exhibit Number 16 was marked.)
11  Q.  (BY MS. SPETH)  I'm showing you what's been
12  marked as Exhibit 16.  It is -- it looks like it's a
13  printout from CNETnews.com.  And it's dated at the
14  bottom 7-20 -- I'm sorry -- 7-2-2007 at the bottom.
15  A.  Okay.
16         MS. SPETH:  Chris, have you found that?
17         MR. INGLE:  I've got some documents from
18  CNET.com.  What did you say is at the bottom?
19         MS. SPETH:  It says -- it looks like it
20  was printed on July 2nd, 2007.  It's "TalkBack:
21  Police Blotter:  Dark side of 'reputation defending'
22  service."
23  A.  Yeah.  I've got it in front of me.  Go ahead.
24  Q.  (BY MS. SPETH)  Okay.  Mr. Richeson, on the
25  first page of Exhibit 16, there's a posting from -- I

17 (Pages 65 to 68)

Page 69

1  believe it's from CNET News, if I'm reading this
2  correctly, and it indicates that it was posted by
3  "thetopnerd" on June 29th, 2007.
4           Is that a posting that you made?
5       A.  The -- I've got Exhibit 16, which is one,
6  two, three, four, five -- six pages, and June 29th,
7  2007, at 2:39 p.m.  I guess it's Pacific Daylight
8  Time.
9           This does sound like me, yes.  I seem to
10 recall writing in response to this, yes.
11      Q.  Now, you say in this posting that you had
12 attended a motion for summary judgment hearing in
13 Cause of Action 206117 C --
14      A.  Uh-huh.
15      Q.  in Bell County, and that the Defendant was
16 Glenda Chappell.
17      A.  Yes.
18      Q.  Do you remember that lawsuit?
19      A.  Yes.
20      Q.  And you say that Glenda Chappell announced
21 under oath that the report in question on Ripoff
22 Report was not the report she had drafted and then, in
23 fact, Magedson himself was a co-author.
24           Do you see that?
25      A.  Yes, ma'am.

Page 70

1       Q.  Did you write that?
2       A.  I must have.
3       Q.  Is it --
4       A.  Yeah, I must have.
5       Q.  Is it a true statement?
6       A.  If I put it on there, it had to have been.
7       Q.  So there is some testimony under oath that we
8  can get a transcript of Glenda Chappell saying that
9  she didn't draft the report on Ripoff Report?
10      A.  I believe this case was a 2004 case.  And if
11 you look at the posting on your website
12 RipoffReport.com, there should be a copy -- yeah,
13 there should actually be a copy of the transcript on
14 your website now.  I posted it.
15      Q.  And so then you ordered the transcript from
16 the court reporter?
17      A.  I had to have, if I posted it on there.
18      Q.  And --
19      A.  I mean, I would have had to have.
20      Q.  Does the 206 in the -- in the action number,
21 is that an indication of what year the action was, or
22 no?
23      A.  No, I don't think so.  Because this case
24 stemmed from 2004, and I think it's how I first even
25 learned of the existence of you guys' website, so it

Page 71

1  had to have been the September-October time frame of
2  2004.
3       Q.  Okay.  So it was a 2004 case.  Glenda
4  Chappell was the Defendant.  And who was the
5  Plaintiff?
6       A.  Me.
7       Q.  So there should be -- I should be able to
8  find a case called Shawn Richeson versus Glenda
9  Chappell, correct?
10      A.  Right.  If you go to Bell County court and
11 look up that cause of action, that file will still
12 exist and everything associated with it will still be
13 there.
14      Q.  And you believe in that file there is some
15 transcript of Ms. Chappell saying that she
16 wasn't the -- that the report on Ripoff Report was not
17 the same one that she drafted?
18      A.  I would assume so, yeah.
19      Q.  And this posting on June 29th, 2007, also
20 says that you had -- a few days ago, you had a
21 telephone conversation with Ed Magedson, and that you
22 taped the telephone conversation, and that one could
23 listen to the conversation at www.freeripoffreport.com.
24      A.  Uh-huh.
25      Q.  So do you still have that audiotape?

Page 72

1       A.  I do not know, but the domain,
2  freeripoffreport.com, looks like something that I
3  posted it on, so... I can dig and see if I still have
4  it, but I -- I think so.
5       Q.  And is freeripoffreport.com still a website
6  that's up and accessible?
7       A.  It's one of my domains, so I don't know if
8  it's actually posting anything right now.  But the
9  directory is associated with it.  I can dig around in
10 there and see if there's any audio to back that up, if
11 that's what you're asking about.
12      Q.  Okay.  On the fourth page of Exhibit 16,
13 there is a posting dated July 2nd, 2007, by
14 "thetopnerd."  Did you make that posting?
15      A.  That looks like mine, yes, ma'am.
16      Q.  What did you mean when you said the
17 "(unedited) telephone recording made by Ed Magedson"?
18 Why did you put in parenthesis "(unedited)"?
19      A.  I don't see.  Where -- where did I put it?
20      Q.  Sure.  I'm sorry.  I shouldn't have just
21 jumped in on that.  It says, "I would wholeheartedly
22 invite Ed Magedson, Maria Crimi Speth, the Law Firm of
23 Jaburg and Wilk, P.C., to take the original (unedited)
24 telephone recording made by Ed Magedson and post it on
25 the web.  We would all like to hear it."

Page 73

1          What --
2     A.  Oh, I remember this.  He was making all those
3  Jew jokes.  I remember that.
4     Q.  I'm sorry.  Who was?
5     A.  I spoke to Magedson, and he was making all
6  those Jew jokes.
7     Q.  And what's that got to do with a telephone
8  recording?
9     A.  Other than the fact that he looked like a
10  complete idiot, or sounded like a complete idiot, in
11  the recording.
12     Q.  Okay.  A recording that you made?
13     A.  The one that he -- he said he made.  He said
14  he was recording it.
15     Q.  Oh, I see.  So you're saying he should have
16  posted this recording that he said he made?
17     A.  Right.  He made some posting, and he kind of
18  edited out all the stuff that he had joked about.  And
19  I remember him making some really kind of funny Jewish
20  comments, and coming from -- I think he's Jewish.
21  Coming from him, I found that to be a little bit
22  crazy.
23     Q.  Okay.
24     A.  And that's why I was kind of delighted with
25  getting him in front of the jury down here.

Page 74

1     Q.  Okay.  Now, the second to last paragraph on
2  that page, that same page, which is this posting of
3  July 2nd, 2007, that he made on CNET, says, "Thank you
4  for pointing out the editing of the audio recording."
5  And then it says, is it, i-m-a-o or l-m-a-o?
6     A.  It would be a "laughing my ass off."  I think
7  that's what that means.
8     Q.  Oh, l-a-m-o.  Okay.  I understand.
9          And so what editing of the audio
10  recording are you talking about?
11     A.  I think -- I think I took some of his words
12  and kind of amplified the nasal effect that he had in
13  that recording.  I mean, I just know him to be sort of
14  a clown, so I made it look a little bit worse than
15  what it was.
16     Q.  By messing with the sound quality?
17     A.  By removing the background noises and
18  enhancing his characteristics as a person.
19     Q.  Did you do anything to change his words in
20  that recording?
21     A.  No.  No.
22     Q.  You don't -- you didn't -- did you remove
23  parts of what he said?
24     A.  Not to my knowledge.
25     Q.  Okay.  Did you ever take an audiotape

Page 75

1  recording of Ed Magedson and basically splice two
2  parts together?
3     A.  No.
4     Q.  And maybe "splice" is not a great word
5  because that's sort of an old fashion term.  But edit
6  it in such a way that a part of the content was
7  missing and two parts of it that were not supposed to
8  be together seemed like they were together?
9     A.  It doesn't sound like -- no.
10     Q.  No?  Okay.  Did you ever post on the internet
11  photographs of -- speaking of enhancing audio
12  recordings, did you ever post on the internet a
13  photograph -- photographs of me and my partners --
14     A.  Yes, yes.
15     Q.  -- and sort of modified the pictures to make
16  us look like aliens?
17     A.  Yes, ma'am.
18     Q.  And did you say in that posting that we were
19  aliens from another planet?
20     A.  Yes, ma'am.
21     Q.  And what was your purpose of that?
22     A.  I would say after about a half a box of wine,
23  I was in one of my moods.
24     Q.  Okay.  So you were just messing with us?
25     A.  Right.  I don't think I said anything

Page 76

1  inflammatory other than playing with the Adobe
2  Photoshop.
3          MS. SPETH:  All right.  Let's go to
4  Exhibit 17.
5          (Exhibit Number 17 was marked.)
6     Q.  (BY MS. SPETH)  Exhibit 17 is Xcen 1086 to
7  1088.  This -- again, once -- other than the header,
8  this appears to be an e-mail dated July 3rd, 2007, at
9  9:17 a.m., to EDitor@RipoffReport and to Maria
10  Crimi Speth, carbon copy to your wife, Annette, and
11  carbon copy to Larry Greenwood.  First of all, let me
12  ask if it's an e-mail that you actually sent?
13     A.  Let me look through the exhibit.  It does
14  look like my e-mail, but just let me look through it
15  real quick and see if everything in here looks...
16          All right.  This was dated July 3rd,
17  2007.
18     Q.  Correct.
19     A.  And I pretty much had about all I wanted to
20  do with search engine optimization, and I was -- yes.
21  Okay.  This is definitely my -- this is my e-mail.
22     Q.  Okay.  And who's Larry Greenwood?
23     A.  That's another one of my attorneys.
24     Q.  Was -- would it be fair to say that one of
25  the goals of this e-mail was to try to convince Ed to

Page 77

1  take down the report on Ripoff Report that was posted
2  about you?
3      A.  No, not take it down, because I'm pretty much
4  in agreement of his philosophy of leaving everything
5  up there.  Just that I know that we don't like each
6  other, so he goes out of his way to resubmit and do
7  keyword stuffing and the title tags so it ranks highly
8  on Google and Yahoo.
9      So, no, I wouldn't -- I don't care about
10  it staying up there.  I just care about the degree of
11  effort that he puts into trying to extort me.
12     Q.  Okay.  So are you saying that one of the
13  goals -- and if I'm wrong -- you know, I don't want to
14  put words in your mouth.
15     Is one of the goals of this e-mail to
16  convince Ed to stop trying to optimize the report so
17  that it comes up so high on Google?
18     A.  Right.
19         MS. SPETH:  I'm understanding from our
20  videographer that our videotape is almost out.
21         THE WITNESS:  Okay.
22         MS. SPETH:  So we need to take a break
23  so we can change the videotape.  And so we'll go off
24  the record now.
25         THE VIDEOGRAPHER:  Going off the record

Page 78

1  at 12:26.
2         (Recess from 12:26 p.m. - 12:35 p.m.)
3         THE VIDEOGRAPHER:  We're back on the
4  record at 12:35.  This is the beginning of tape two.
5      Q.  (BY MS. SPETH)  Mr. Richeson, you understand
6  you're still under oath?
7      A.  Yes, ma'am.
8      Q.  We're still looking at Exhibit 17.  I'm not
9  sure what you did with your pile, but go ahead and
10  grab 17 again.
11     A.  Okay.
12     Q.  And on the last page of Exhibit 17, you say,
13  "I went to prison for six months for running scams."
14     Is that accurate?
15     A.  Yes.
16     Q.  And also you said, I mis -- in a couple of
17  paragraphs down, "I mislead" -- "I mislead you when I
18  first met you, because I did not trust you and I
19  believe then, as I do now wholeheartedly, that you are
20  running an extortion scam."
21     In what way did you mislead Ed Magedson
22  when you first met him?
23     A.  I'm not sure which incident I'm referring to,
24  but -- I can't comment.  I don't know.  I mean, my
25  answer would be I don't know.

Page 79

1      Q.  Okay.
2      A.  But I do believe that this is something that
3  I said to him.
4      Q.  Okay.
5         (Exhibit Number 18 was marked.)
6      Q.  (BY MS. SPETH)  Let's take a look at what
7  we'll mark as Exhibit 18 then --
8      A.  Okay.
9      Q.  -- which is Bates labeled Xcen 1090 through
10  1093.
11     A.  Okay.
12     Q.  And --
13     A.  I have Exhibit 18.
14     Q.  Actually -- this is actually the same e-mail
15  as Exhibit 17.  And all I would note is it looks to me
16  from looking at the headers, that you sent Exhibit 17
17  to both EDitor@RipoffReport and to Maria Crimi Speth,
18  but Exhibit 18 is the same e-mail directed only to
19  Maria Crimi Speth.
20     And I know this is 2007, and this is a
21  tough question, but do you have any idea why you did
22  that?  And let me also say one is -- one was at
23  9:17 a.m. and one was at 1:18 p.m.
24     A.  No.  I can't think of any reason that I would
25  do that, but it looks like the same e-mail as the

Page 80

1  other exhibit.
2      Q.  Yeah.  Okay.
3         (Exhibit Number 19 was marked.)
4      Q.  (BY MS. SPETH)  I'm showing you Exhibit 19,
5  which is Xcen 1100 through 1101.  And my only question
6  about -- well, I guess I should ask you first if it's
7  yours.  This is an accurate e-mail that you sent to
8  ed@ripoffreport -- EDitor@RipoffReport on July 3rd,
9  2007?
10     A.  Freeripoffreport.com is one of my domains
11  pointing it at ripoffrevenge.com.  That looks -- yeah,
12  this does look like an e-mail that I sent to
13  EDitor@RipoffReport.com.
14     Q.  Okay.  And you say, "By the way, I'm sorry
15  for editing the audio recording."
16     What reference -- what editing are you
17  referring to in Exhibit 19 of an audio recording?
18     A.  Enhancing those things that I was speaking
19  about before.
20     Q.  So the same thing as before, just changing
21  the sound of his voice?
22     A.  Right.
23         (Exhibit Number 20 was marked.)
24     Q.  (BY MS. SPETH)  Let me show you what's been
25  marked as Exhibit 20, which is Xcen 1106 to 1108.  Did

Page 81

1  you send this e-mail to Ed Magedson, which is dated
2  July 3rd, 2007, at 2:55 p.m., copy to -- well, first
3  copied to mcs@jayburg -- spelled wrong --
4  jayburgwilk.com, and then forwarded to the correct
5  address for me?
6      A.  Exhibit 20 is a three-page -- I don't think
7  so.  I don't think this is mine.  The font doesn't
8  look like mine.  Yeah, I would say no.  No, this looks
9  like a forgery to me.
10      Q.  All right.  The "cc" is to
11  Annette@690-nerd.com.  Was that an e-mail address your
12  wife ever had?
13      A.  It's the one she uses now.
14      Q.  Okay.  But you don't think you sent this
15  e-mail?
16      A.  No.
17      Q.  And this particular e-mail indicates that --
18  and I understand that you're not -- you're saying you
19  don't think you sent it, but it says, "I lied to you
20  and told you the FBI was over here asking questions
21  about you, when, in fact, no one was ever here asking
22  anything about you."
23          You didn't say that?
24      A.  I wouldn't tell him that.
25      Q.  Well, is it because it's not true, or

Page 82

1  because --
2      A.  No.  I'm just saying that this e-mail here
3  looks like a forgery.
4      Q.  Okay.  It says, "I edited the audio recording
5  to make you look worse than you already looked."
6          You didn't say that to him, at least not
7  in this e-mail?
8      A.  I think I told him that by phone.
9      Q.  Okay.  I want to take a look at the header on
10  this particular e-mail.  As I said, it -- as you can
11  see, on Page 1, that same e-mail was forwarded to me
12  on July 3rd, 2007, at 1:34 p.m.
13      A.  Okay.
14      Q.  If you look at the header information, it
15  says that the e-mail is from 690-nerd.
16      A.  Okay.
17      Q.  And that it's by goliath.bcentralhost.com --
18      A.  Okay.
19      Q.  -- (ConcentricHost).  That is your host,
20  correct?
21      A.  Yes.
22      Q.  Do you know of any way to spoof a header?
23      A.  I'm -- I'm unaware of that.
24      Q.  Let's go to the next --
25      A.  But I do want to say that if Ed Magedson is

Page 83

1  the one that printed this, if you print this to a
2  piece of paper, you can alter the header information
3  that's up here to make it appear any way that you
4  want.  And he does have the technical know-how to
5  accomplish that.
6      Q.  How do you know that?  How do you know --
7      A.  He actually bragged to me about that one
8  time.
9      Q.  That he has the technical know-how to do
10  what?
11      A.  To print the e-mails up and then alter this
12  header information to make it appear it came from one
13  place or another.  We had a technical debate one time
14  a couple number of years ago, and he actually bragged
15  about that.
16      Q.  Okay.
17      A.  Did you have anything else on this exhibit?
18      Q.  No, not on that exhibit.  Thank you.
19          (Exhibit Number 21 was marked.)
20      Q.  (BY MS. SPETH)  All righty.  Forgot to put a
21  number on it.
22          I'm giving you Exhibit 21, which is Xcen
23  1110 through 1111.  Is the e-mail dated October 27th,
24  2007, at 9:24 a.m., a -- an e-mail that you actually
25  sent.

Page 84

1      A.  Although the font of this two-page Exhibit 21
2  does not look like my font, the words and styling of
3  everything looked like it could very well be mine, so
4  my answer is I don't know if it is, but based on the
5  way it's worded, I would say it is mine.
6      Q.  I think that's all I have on that one, is
7  just to figure out if it was yours.
8          (Exhibit Number 22 was marked.)
9      Q.  (BY MS. SPETH)  Okay.  Let's look at
10  Exhibit 22.  Exhibit 22, it does not have a Bates
11  label on it.  It is dated April 12, 2008.  It's an
12  e-mail.  And it cut and -- it pastes into the e-mail a
13  posting perhaps to a website called WIRED, but I'm not
14  positive.
15      A.  Okay.
16      Q.  Maybe you can help me figure out where that
17  posting was.
18          My first question will be whether or not
19  you made the posting, which is on the first page of
20  Exhibit 22.
21      A.  All right.  Exhibit 22 is one, two, three,
22  four, five -- six pages.
23      Q.  Yes.
24      A.  And it shows from EDitor@RipoffReport.com to
25  EDitor@RipoffReport.com.  It looks like it's coming

Page 85

1    from EDitor@RipoffReport --
2    Q.  Correct.  It's an e-mail from Ed to himself
3    cutting and pasting in a posting that indicates it was
4    made by Shawn Richeson.  And what I'm trying to figure
5    out is whether or not it really was a posting that you
6    made.
7    A.  I can't say, but I don't think so.  And the
8    reason I say that is -- the reason I say, it's got the
9    word "free" in there, and that's not me.  I mean, I
10   wouldn't offer anything for free.  But let me finish
11   reading the e-mail and let me see.
12   Q.  Okay.
13   A.  Let me take that back.  I think this is me.
14   And the reason I say that is I was letting people know
15   how to use Yahoo! as a -- Yahoo! answers as a blogging
16   technique to lower the search results of Ripoff
17   Report.  Yeah.  So this does look like mine.
18       Now, the rest of this stuff back here,
19   this just looks like a forgery, Page 2 through the
20   rest.
21   Q.  Right.  The following pages of Exhibit 22 are
22   the same e-mails that you told me earlier that you
23   didn't think were accurate, or --
24   A.  Yeah.  Page -- Page 2 through 6 --
25   Q.  Uh-huh.

Page 86

1    A.  -- looks like a forgery, but this posting
2    here looks like something that I would say, but I
3    can't tell you for sure where I would have posted it.
4        But I do recall putting out free
5    information, which is really unlike me to do free.
6    But I did say that you could freely do this at
7    Yahoo's -- Yahoo! questions to produce high search
8    relevance.  That would in itself reduce the damages
9    caused by Ripoff Report.
10   Q.  And this was, in fact, a method that you used
11   to help push down Ripoff Report results, isn't it?
12   A.  Yes.
13   Q.  And so you were telling other people about
14   that method?
15   A.  Right.  Right.  Anything more on 22?
16   Q.  We're done with 22.
17   A.  Okay.
18       (Exhibit Number 23 was marked.)
19   Q.  (BY MS. SPETH)  I'm marking Exhibit 23, which
20   looks like it's a CNET posting by -- it appears to be
21   from you.  We're going to check and see if you agree.
22   MS. SPETH:  It's the one that says My
23   Comments on it, Chris.
24   MR. INGLE:  I got it.
25   MS. SPETH:  Okay.

Page 87

1    A.  Hold on just a second here.  Exhibit 23 is
2    one, two, three, four, five, six -- seven pages, and
3    it appears to be from CNET.  And it's got my name and
4    telephone number in it, which is indicative of my
5    responses, so, yes, I would say this is me.
6    Q.  (BY MS. SPETH)  Okay.  So when we say "this,"
7    I want to make sure we have a clear record.  The first
8    posting that we see on Exhibit 23 is dated May 7,
9    2008, and it does, at least, purport to be posted by
10   you.  It appears it's got your name and address at the
11   bottom.  It says "ClickaNerd" and "Damn Skippy."  If
12   you'll just look at that real quick and tell me if
13   that appears to be your posting.
14   A.  Let's see.  It looks to be like this might
15   have been a subject about online posting, and some
16   judge that entered some ruling that was of interest to
17   me.  So it does look like my posting.  And as a matter
18   of fact, Washingtonpost.com... This rings a bell.
19   Q.  Okay.  On the second page of Exhibit 23, in a
20   posting that also purports to be -- actually, I'm not
21   sure if that one purports to be from you.
22       So the posting that starts -- yeah, it
23   does.  It starts out on the bottom of Page 23.  And it
24   says "ClickaNerd -- It's about time - Great job."
25       And it goes over to the next page.  I

Page 88

1    guess it's from you because it says ClickaNerd.  It
2    says sort of in the middle of that posting that where
3    "Ed Magedson has boasted under oath that he is certain
4    that his website is filled with libel and falsehoods."
5        What were you referring to there?
6    A.  As we were talking about off the record, that
7    gentleman out in Florida, I believe he's got a website
8    that actually makes those claims, a Mr. Miller.  I
9    believe I read something on his website about
10   something to that effect.  That's what I'm referring
11   to.
12   Q.  Okay.  And you believe his website said that
13   Ed said under oath that his website is filled with
14   libel and falsehoods?
15   A.  I don't think the word "under oath" is
16   accurate for anything when it comes to postings, but
17   he did say -- well, I can't even really tell you that
18   he did say that.  I can just say what's printed on the
19   website.
20   Q.  And the website being probably Miller's
21   website --
22   A.  Right.
23   Q.  -- is your best recollection?
24   A.  Right.  So -- so the record is clear, I don't
25   constitute anything printed on the web as under oath,

Page 89

1  but that kind of looks like my words there, so I might
2  have said that.
3      Q.  On the second -- I'm sorry.  On the -- on the
4  page, at the top, it says 6 of 8.
5      A.  One, two, three, four, five --
6      Q.  Well, it actually says 6 of 8 at the top.
7  See if that helps you --
8      A.  Okay.
9      Q.  -- okay?  There's a posting that says
10 "Killeen Texas Computer Nerds - Make no deals with
11 Novell," dated September 22nd, 2007.  Did you post
12 that?
13     A.  Yes.
14     Q.  Tell me about this Novell case that you dealt
15 with.
16     A.  In 1994, I owned a business called RTI
17 Computers.  Actually, that wasn't the business.  It
18 was called Star Soft Software.  And it was a trademark
19 and copyright infringement suit.  And Novell sent in
20 some retired FBI agents to seize the equipment that
21 allegedly was used in that scheme.
22     Q.  How did that case turn out?
23     A.  Ultimately they got a summary judgment
24 against me in November of 1994 -- or, I'm sorry, '96.
25     Q.  For how much?

Page 90

1      A.  250,000, I think.
2      Q.  And was there all --
3      A.  Actually, I'm sorry.  It was 200,000, plus
4  50,000 in attorneys' fees.
5      Q.  Was there also a component of that judgment
6  that was an injunction?
7      A.  Yes.
8      Q.  A permanent injunction?
9      A.  Yes.
10     Q.  And I think you say someplace that you have
11 complied with that injunction; is that accurate?
12     A.  Yes.
13     Q.  How about the current status of the money
14 part of the judgment; is that still in effect?  Have
15 you paid -- I know you paid some portion of it through
16 some sort of asset that you turned over.
17         But let me ask you this:  Currently, as
18 you sit here today, is there still money owed on that
19 judgement, to your knowledge?
20     A.  To my knowledge, there's a deficiency.  I
21 wasn't given full credit for the duplicating machines,
22 and there's still a balance, but I don't know what it
23 is on there.
24         And I do know that they made a writ --
25 or applied for a Writ of Scire Facias to Revive the

Page 91

1  Judgment after it went dormant after ten years, and
2  that much I do know.
3      Q.  Okay.  So the judgement hadn't expired
4  because they did whatever they needed to do to keep it
5  going?
6      A.  Right.  Right.
7      Q.  I think we're done with 23.
8          (Exhibit Number 24 was marked.)
9      Q.  (BY MS. SPETH)  I'm going to show you what's
10 been marked as Exhibit 24, which is Xcen 1116 through
11 1118.
12     A.  I have Exhibit 24.  It is a one, two --
13 three-page exhibit.
14     Q.  My only question to you is whether the e-mail
15 dated November 15th, 2008, from yourself to
16 EDitor@RipoffReport, copied to
17 legal-support@google.com and Maria Crimi Speth is a
18 true and accurate copy of an e-mail that you sent?
19     A.  This looks like my fonts, my style.  Yeah,
20 this looks like my fonts and my style, so I'm going to
21 say, yes, this looks -- this is mine.
22     Q.  All right.  That's all I have on that one.
23         (Exhibit Number 25 was marked.)
24     Q.  (BY MS. SPETH)  Let's take a look at
25 Exhibit 25.  I am collecting quite a collection of

Page 92

1  clips in front of me here.
2          And Exhibit 25 is -- has the words Free
3  Press Release at the top.  And -- you got that?
4      A.  This looks like a Ripoff Report.
5      Q.  No.  Well, I think it looks like something
6  that's off of a website called Free-Press-Release.com.
7      A.  Oh, okay.  I've got Exhibit 25, a two-page
8  exhibit.
9      Q.  Uh-huh.
10     A.  Okay.
11     Q.  And the URL at the bottom is
12 www.free-press-release.com/ne...
13     A.  Okay.
14     Q.  Okay?  Do you recognize this posting, I'll
15 call it, this posting on Free Press Release?
16     A.  No.
17     Q.  It purports to be by Ed Magedson.  And it
18 says, "My name is Ed Magedson, the owner of Ripof
19 Report.  My website" --
20     A.  I'm sorry.  Where do you see that at?
21     Q.  The first page.
22     A.  Oh, okay.  All right.  Go ahead.
23     Q.  The title is Ripoff Report: ClickaNerd -
24 Impressive Operation, and it says by Jerry Melfy, on
25 July 18th, 2009.

23  (Pages 89 to 92)

Page 93

1   And then it says, "My name is
2 Ed Magedson, the owner of Ripoff Report. My website
3 is www.ripoffreport.com. I have conducted an
4 investigation on ClickaNerd and have found it to be a
5 very impressive operation."
6   And then a little bit further down, it
7 says, "Recently Ripoff Report had its own computer
8 problems and we were brought back online by ClickaNerd
9 in short order."
10   Did you have anything to do with this
11 posting?
12   A.  Well, I can't imagine -- no.  To answer your
13 question, no.  But I can't imagine Ed Magedson writing
14 up something nice about me, so I don't know what this
15 is.
16   Q.  Okay.  But you didn't write it about
17 yourself?
18   A.  No.
19   Q.  In other words, you didn't use Ed -- it's
20 your testimony that you didn't use Ed Magedson's name
21 to make it look like Ed Magedson was saying that you
22 had an impressive operation?
23   A.  No.  And I don't understand why anybody would
24 do this.
25   Q.  Well, the --

Page 94

1   A.  I mean, the association with RipoffReport.com
2 alone would be a real problem for me, so...
3   Q.  Have you ever used the Free Press Release
4 service for anything?  I'm not asking for this.  But
5 for anything?
6   A.  Today, it looks like -- it looks -- this is
7 the first time I've ever seen the URL.  I mean, I
8 didn't even know there was such a place.
9   Q.  Okay.  I'm done with that exhibit.
10   (Exhibit Number 26 was marked.)
11   Q.  (BY MS. SPETH)  Let's look at Exhibit 26,
12 which is a -- can I put it up at the top, the sticker,
13 because it's not -- there's no place at the bottom.
14   I'm showing you what's marked as
15 Exhibit 26, which is a December 31st, 2008, e-mail.
16 It says it's from Service Manager Shawn@ClickaNerd.com
17 to Info@RipoffReport.  The subject is Prepaid $250.
18   A.  Okay.
19   Q.  Did you send that e-mail?
20   A.  I am looking at Exhibit Number 26, one, two,
21 three, four, five... oh, yeah.  This is when I tried
22 to join his program.  I'm going to read it to make
23 sure this is mine, but I think so.
24   Q.  Okay.
25   A.  Yeah.  This looks like mine.

Page 95

1   Q.  And so you did, in fact, send $250 via
2 Pay Pal to Ripoff Report, correct?
3   A.  Uh-huh.
4   Q.  And you did that without him -- without
5 Ed Magedson asking you to.  As you put it here, you
6 took a chance and just gave it a shot?
7   A.  Yeah.  I went on his website and clicked on
8 his link.
9   Q.  Okay.  And what did you think that you would
10 be getting for the $250?
11   A.  He had a program that he called Corporate
12 Advocacy.
13   Q.  Okay.  And you thought you'd be getting the
14 Corporate Advocacy Program?
15   A.  Yes, ma'am.
16   Q.  And what -- why did you think it would be
17 $250 for that?
18   A.  I can't answer that.  I don't know.  I mean,
19 I don't know if I talked to him and he gave me that
20 price or if he had it posted that way.  I don't know.
21 And I notice this is -- e-mail is made out to
22 info@ripoffreport.com --
23   Q.  Right.
24   A.  -- prepaid 250.  The fact that it's prepaid
25 250, I would think that he probably told me that

Page 96

1 price.
2   Q.  All right.  I think I'm done with 26.
3   A.  And before we go on to any other ones, do you
4 mind if I use the bathroom real quick?
5   MS. SPETH:  Sure.
6   THE WITNESS:  I'll be right back.
7   MS. SPETH:  Let's take a break.
8   THE VIDEOGRAPHER:  Going off the record
9 at 12:59.
10   (Recess from 12:59 p.m. - 1:01 p.m.)
11   THE VIDEOGRAPHER:  We're back on the
12 record at 1:01.
13   Q.  (BY MS. SPETH)  Mr. Richeson, do you
14 understand you're still under oath?
15   A.  Yes, ma'am.
16   (Exhibit Number 27 was marked.)
17   Q.  (BY MS. SPETH)  Okay.  Let's go ahead and
18 move on to Exhibit 27.  Be careful with Exhibit 27.
19 It has a staple sticking out of the back that's really
20 sharp.
21   A.  All right.  Exhibit 27 is called Scamming as
22 an Art Form:  Ed Magedson and Ripoff Report.  And it's
23 one, two, three, four, five, six, seven, eight, nine,
24 ten -- eleven pages long.
25   Q.  Okay.  And this appears to be some postings

1    on a blog, .USASEOPros.com website.
2        A.  Okay.
3        Q.  And if you will turn to the page that says at
4    the top, 5 of 11, there's a posting that purports to
5    be from you, dated May 23rd, 2009, at 3:30 p.m.
6            Would you take a look at that and tell
7    me if you actually made that posting?
8        A.  On Page Number 5, let's see, "Ripoff Report
9    is without question the most sophisticated extortion
10   scheme..."
11       Q.  Yes, that one.
12       A.  Okay.  Yeah, that looks legit.
13       Q.  And so you agree, don't you, that one of the
14   reports on Ripoff Report about you was filed by a
15   disgruntled customer of yours?
16       A.  Yes, ma'am.
17       Q.  And was that the Glenda Chappell?
18       A.  That sounds right, Glenda Chappell, yeah.
19   That was 2004.
20       Q.  Uh-huh.  And you say a little further down
21   that you contacted the domain owner at Magedson and
22   actually recorded the conversation, that he asked for
23   $5,000 up front and $1500 a month as a monitoring fee.
24       A.  Yeah.
25       Q.  "He said he would change the title tags of

1    the report and ensure it would not continue to cause
2    damage."
3            Do you have that recording?
4        A.  Not anymore.
5        Q.  And what did you do with it?
6        A.  I believe that was one of the recordings that
7    was turned over.
8        Q.  Okay.  And so when you turned it over -- when
9    you say you turned it over, you mean you turned it
10   over to the FBI?
11       A.  I don't remember who I originally turned it
12   over, but copies of that recording... Honestly, I
13   can't tell you for sure.
14       Q.  Okay.
15       A.  I can't tell you for sure.
16       Q.  This posting says, "I subsequently declined
17   his offer and turned the extortion attempt over to the
18   FBI."
19            I can't tell if you mean you turned the
20   recording over or just turned the information over.
21       A.  I'm thinking -- I'm thinking I made a report.
22       Q.  You just made a report?
23       A.  Right.
24       Q.  Okay.  And who did you make that particular
25   report to?

1        A.  Well, considering that this was -- this was
2    filed -- oh, this isn't 2004.  I must be talking about
3    a 2004 --
4        Q.  Yeah.
5        A.  -- thing.
6        Q.  If you look at the beginning, it seems that
7    you're talking about something that happened in 2004
8    because you reference 2004.
9        A.  Yeah.  The title -- I'm sorry.  The date of
10   this report purports to be May 23rd, 2009 --
11       Q.  Right.
12       A.  -- at 3:30 p.m. --
13       Q.  Right.
14       A.  -- but I must have been talking about an
15   event that took place in 2004.  And this looks to be
16   some sort of group of people that was talking about
17   Ed Magedson and RipoffReport.com.  There's quite a few
18   postings.
19       Q.  Right.  So my question is, who did you turn
20   over or make a report to at the FBI, probably back in
21   2004?  There appears to be a reference to that.
22       A.  In 2004?  I cannot remember.  I can't answer
23   it.  I can't remember.
24       Q.  Okay.  Can you tell me all FBI agents that
25   you've ever made any sort of report or provided any

1    sort of evidence or information about Ripoff Report
2    to?
3        A.  I can't.
4        Q.  Can you remember any of them?
5        A.  Just those two names.
6        Q.  That we talked about earlier, that I.R.S.
7    person and that FBI person?
8        A.  Uh-huh.  Are there any more of my postings in
9    this exhibit?
10       Q.  That's what I was just looking for.  I'm not
11   sure yet.  No.  I think that was it.
12            So that was Exhibit 27.  Okay.
13            (Exhibit Number 28 was marked.)
14       Q.  (BY MS. SPETH)  We'll look at Exhibit 28 now,
15   which is an affidavit that you executed, or appear to
16   have executed.  And we'll double-check and see.
17            All right.  Exhibit 28.  Is this an
18   affidavit that you actually executed, which is a
19   three-page document, Bates labeled JFB 174 through
20   176?
21       A.  This was given to -- are you asking did I --
22   did I sign this and give this to Mr. Brewington; is
23   that what you're asking?
24       Q.  Well, you've jumped ahead a question on me.
25   For now, I was just asking whether you signed it.

Page 101

1  A.  Okay.  Let me read the three-page exhibit
2  which purports to be my affidavit.
3        This looks like my affidavit.
4  Q.  Okay.  And then I'll follow up with a
5  question that I think you've already answered:  Did
6  you provide this in some way to John Brewington?
7  A.  Well, it doesn't say that, but it looks like
8  I did.
9  Q.  Do you have any memory of either mailing,
10  e-mailing, or handing an affidavit to Mr. Brewington,
11  or his attorneys, of this affidavit specifically?
12  A.  I'm going to go back to Page 3.  Just based
13  on the fact that this label is back here, leads me to
14  believe that I executed this affidavit on the 23rd
15  of April 2009 and then gave it to Mr. Brewington.
16  Q.  Okay.  And how do you think you would have
17  conveyed this to him?  Would it have been through an
18  e-mail or maybe fax or maybe regular mail?
19        MR. INGLE:  Form.
20  A.  Well, I'm gonna --
21        MS. SPETH:  There was a form objection,
22  and I'm not sure if you guys grabbed that, but...
23  A.  I don't know.  I would think that I would
24  have signed the original and put it in a Federal
25  Express and sent it to him.  I mean, I would think

Page 102

1  that.
2  Q.  (BY MS. SPETH)  That's your memory -- I mean,
3  that's your best guess, but is that your memory?
4  A.  I guess so.
5  Q.  Okay.  Do you know if it was as a result of
6  either he or his attorneys asking you for it?  In
7  other words, was there a conversation where either
8  Mr. Brewington or his counsel said, will you write an
9  affidavit for us in this matter?
10  A.  I can't piece together what we were
11  discussing, but I have a feeling that when Mr. --
12  just -- just based on the way this is languaged, I
13  have a feeling that once I had started reading up on
14  your causes of action down there in Arizona, I believe
15  that the case that you had filed against
16  Mr. Brewington to be frivolous.  So I would think that
17  I probably just voluntarily gave this to him --
18  Q.  Okay.
19  A.  -- because, I mean, that's something that I
20  would have believed at the time.
21  Q.  Okay.  Now, did you draft this yourself, or
22  did somebody write it out for you?
23  A.  No.  I wrote this up.  This is my form.
24  Q.  Okay.  And I think I saw you use this
25  phraseology earlier, but on -- on Page 1 of

Page 103

1  Exhibit 28, you say, "I met Edward Magedson in around
2  September 2004."
3        I think I've noticed before that you
4  use the phrase "met" when you really mean basically
5  met over the internet.
6  A.  Right.  So the record is clear, I've never
7  physically seen Ed Magedson.  All of our communication
8  has been limited to electronic mail, telephone, or
9  some form like that, but I've never physically seen
10  him before.
11  Q.  Okay.  And on Paragraph 5 of this affidavit,
12  you say that Ed Magedson indicated in a conversation
13  that he and his partner, Maria Crimi Speth, would make
14  changes to the report and clean up its appearance as
15  soon as you paid a fee demanded by them using their
16  Pay Pal donation link on their website.
17        Do you have a recording of this
18  particular conversation that you're referring to in
19  Paragraph 5?
20  A.  I don't think that I do, but I'm fairly
21  certain in Paragraph 5, I was referring to 2004
22  conversations.  And he did refer to you as his
23  partner, and I found that to be a little bit strange.
24  But he did refer to you as his partner, and he did
25  refer to the legal donation link as his way of

Page 104

1  funneling money to you.
2  Q.  Okay.  And he did ask for some sort of
3  donation in order to clean up the appearance of the
4  report?
5  A.  Right.  And the fact that you used the word
6  "donation" kind of just ringed a bell in my mind.
7  He -- he did use that word "donation," with a little
8  bit of a chuckle to it.
9  Q.  And he told you you should -- how much was
10  the fee supposed to be?  I'm sorry.
11  A.  Well, if I'm -- if we're referring to 2004,
12  it seems like -- like a few thousand dollars and then
13  a monthly maintenance fee.  I'm -- I'm guessing that.
14  But I didn't put any numbers in there, so I'm not
15  sure.
16  Q.  Okay.  And, actually, in Paragraph 7, it
17  says, "Shortly after that recorded conversation,
18  I contacted the Waco FBI field office and surrendered
19  a copy of that recording to the CID investigating
20  agent."
21        Did I say that right, CID?
22  A.  Criminal Investigation Division.  Yes.
23  Q.  Okay.  And who did you provide that to, who
24  at the Waco FBI office?
25  A.  Honestly, the only two people I've ever dealt

26  (Pages 101 to 104)

Page 105

1  with at the FBI office were John Wear and Brenda
2  Heeney.
3      Q.  Well, and Brenda was I.R.S., right?
4      A.  Right.  But I think they're part of the same
5  team.
6      Q.  And you didn't -- I think we've talked about
7  this today, except I'm not sure which recording is
8  which.  You didn't keep a copy of that recording --
9      A.  No.
10     Q.  -- or you're not sure if you did?
11     A.  No.  No, I don't.  I don't have a copy of it.
12     Q.  In Paragraph 9, you say, "I stumbled upon a
13  posting on Ripoff Report about John Brewington, a
14  local private investigator in proximity to the above
15  mentioned parties."
16         So this is -- this is Exhibit 28,
17  Paragraph 9.  Is that accurate that -- oh, and it
18  says -- in Paragraph 10, it says I contacted him.
19         Is that accurate that you contacted him?
20     A.  "I stumbled upon John Brewington..."
21         Yeah, he owns the website called Paladin
22  Investigations, and I believe that he is listed on
23  Ripoff Report too.
24     Q.  Right.  But my question was, was it you that
25  reached out to Mr. Brewington as opposed to the other

Page 106

1  way around?
2      A.  Yes.  Yes.
3      Q.  In Paragraph 16 you say, "I have physically
4  witnessed an attempt at criminal extortion perpetrated
5  by Edward Magedson."
6         Explain that statement.
7      A.  The attempt to extort me.
8      Q.  The phone call that you talked about earlier?
9      A.  Right.
10     Q.  And you refer to a recording of a
11  conversation with both Magedson and Speth that you
12  turned over to the FBI.  Did you keep a copy of that
13  recording?
14     A.  No.  And that one was with you personally.  I
15  remember you had called me -- you had called me for
16  some reason.
17     Q.  Okay.  And according to Paragraph 17, I had
18  called you in order to tell you I wanted copies of the
19  evidence that you turned over to the FBI.  Is that
20  what you remember about that?
21     A.  Correct.
22         (Exhibit Number 29 was marked.)
23     Q.  (BY MS. SPETH) All right.  Let's look at 29.
24     A.  We're done with this one?
25     Q.  I believe so.  Exhibit 29 is Xcen 1134

Page 107

1  through 1136.  And it is an e-mail dated November 25th,
2  2009, to my office and to tstorey@gustlaw.com.
3      A.  Okay.
4      Q.  Do you know who tstorey@gustlaw.com is?
5      A.  Exhibit 29 through page -- exhibit -- Tiffany
6  Storey.  Oh, okay.  She works -- oh, yeah.  She works
7  as, I guess, a paralegal.
8      Q.  Okay.  Somebody at Mr. Brewington's attorneys
9  offices, right?
10     A.  Yes, ma'am.
11     Q.  Is this an accurate e-mail that -- is it an
12  accurate copy of an e-mail that you sent on
13  November 25th, 2009?
14     A.  "Dear Maria Speth..."
15         Yeah, that does look like mine, because
16  I got the little smiley face down there.
17     Q.  It says in the second paragraph, "Here is the
18  link to all the e-mails, audio recordings and other
19  forensic data in our possession on John Brewington."
20     A.  Right.
21     Q.  And then there's a link there?
22     A.  Right.
23     Q.  Isn't it accurate to say that that link
24  actually led to stuff about someone other than John
25  Brewington?

Page 108

1      A.  Yeah.  And like I said in previous
2  conversation, I was basically baiting you to come into
3  Killeen, Texas, so I sent you this.  I think I
4  probably did it just to draw you out.  That does look
5  logical.
6      Q.  Because there was no actual information about
7  John Brewington at that link, correct?
8      A.  Right.  There was never any information about
9  John Brewington.
10     Q.  Do you capture IP addresses when people visit
11  your websites?
12     A.  Ask that question again.
13     Q.  Do you capture IP addresses when people visit
14  your websites?
15     A.  Yes.
16         (Exhibit Number 30 was marked.)
17     Q.  (BY MS. SPETH) Let's take a look at
18  Exhibit 30.  This is going to be real quick.  I just
19  want to ask you if it's an accurate -- I did it again.
20         I want to ask you if it's an accurate
21  copy of an e-mail that you sent on November 25th,
22  2009.  It's Xcen 1138 to 1139.
23     A.  That will be -- this is a two-page exhibit
24  referred to Exhibit 30.  "Hi, Tiffany..."
25         If we're referring to Tiffany at the law

Gwendolyn Parker and Associates, Inc.
214-747-8007

Page 109

1  firm, then yes. Yeah, Tiffany Storey, I -- yeah, I
2  did; I sent this.
3      Q.  Okay. That's all I wanted to do, is just
4  authenticate that.
5          (Exhibit Number 31 was marked.)
6      Q.  (BY MS. SPETH)  Let's take a look at
7  Exhibit 31. Is Exhibit 31 an accurate copy of an
8  e-mail that you sent to me on December 3rd, 2009, at
9  4:26 p.m.?
10     A.  Except for there was a picture of a Barbie.
11     Q.  Oh, that's a different one.
12     A.  Huh?
13     Q.  The Barbie --
14     A.  Yeah.
15     Q.  -- isn't that a different one?
16     A.  Oh, is it?
17     Q.  I think it is.
18     A.  Oh, okay. You sent it -- my wife had sent it
19  to me, so I sent it to you.
20     Q.  But this one -- not the Barbie one, but this
21  one, did you send this one to me? The Barbie one was
22  more -- much more recent, I think?
23     A.  December 3rd, 2009, at 4:26 p.m.? I think
24  so.
25     Q.  Do you know why you sent this to me, except

Page 110

1  as a joke? I mean, I know it's a joke. But why did
2  you send this particular joke to me?
3      A.  I would think, so when you responded to it, I
4  could track some information on you.
5      Q.  Did you get a response to this e-mail?
6      A.  I don't think so. I don't think -- I think
7  ever since I made my intentions known that I was going
8  to sue you guys, you kind of clammed up.
9      Q.  Let's go to the next document, which I
10  think -- oh, now I've lost where we're up to. That
11  was 31. Let's go to 32.
12         (Exhibit Number 32 was marked.)
13     Q.  (BY MS. SPETH)  I'm showing you what's been
14  marked as Exhibit 32. It's Xcen 1151 through 1152.
15  And, once again, I just want to ask you if this is an
16  accurate copy of an e-mail that you sent on
17  December 11th, 2009, to Kristine Schlott; carbon copy
18  Adam Kunz and Maria Crimi Speth?
19     A.  Referencing Brewington adversary Magedson,
20  this is a two-page exhibit marked Exhibit 32, and it
21  does look to be an e-mail that I had sent to Kristine
22  Schlott. I don't -- I guess she's with the same law
23  firm, so she must be another paralegal. Right. Okay.
24     Q.  So it is an e-mail that you actually sent,
25  right --

Page 111

1      A.  Yes, ma'am.
2      Q.  -- Exhibit 32? Okay.
3          (Exhibit Number 33 was marked.)
4      Q.  (BY MS. SPETH)  Let's look at Exhibit 33. I
5  think I just have the same question about that one,
6  but let me just double-check.
7          No. Actually, I have some questions
8  about this. So this is Xcen 1154 through 1155. And
9  first off, it's a February 17th, 2010, e-mail; at
10  least it purports to be.
11         Did you actually send this e-mail that
12  is Exhibit 33?
13     A.  This one looks like it goes to Maria
14  Crimi Speth, Ed@RipoffReport.com, and John Brewington.
15  "Subject: Deposition."
16         MR. INGLE:  Can we go off real quick? I
17  think I've got my exhibits out of order.
18         MS. SPETH:  Okay.
19         MR. INGLE:  What is the Bates number on
20  this?
21         MS. SPETH:  This one is Exhibit 33, and
22  it should be Bates Number 1154 through 1155.
23         MR. INGLE:  All right. Hang on one
24  second.
25         MS. SPETH:  Sure.

Page 112

1          MR. INGLE:  Okay. I've got it. Go
2  ahead.
3          MS. SPETH:  I don't remember my last
4  question. Can you read back the last question? I'm
5  sorry.
6          COURT REPORTER:  "QUESTION: Let's look
7  at Exhibit 33. I think I just have the same question
8  about that one, but let me just double-check.
9          "No. Actually, I have some questions
10  about this. So this is Xcen 1154 through 1155. And
11  first off, it's a February 17th, 2010, e-mail; at
12  least it purports to be.
13         "Did you actually send this e-mail that
14  is Exhibit 33?
15         "ANSWER: This one looks like it goes to
16  Maria Crimi Speth, Ed@RipoffReport.com, and John
17  Brewington. "Subject: Deposition."
18     Q.  (BY MS. SPETH)  Okay. So did you actually
19  send this e-mail?
20     A.  Let me comment on it this way: I did send
21  the e-mail. But there's a portion at the top here
22  about one of the addresses, and I don't recall that
23  ever being in an e-mail, but I might be wrong about
24  that.
25     Q.  You mean the thing that has "ClickaNerd

28 (Pages 109 to 112)

Page 113

1  library..."
2     A.  Yeah.  It says -- it's got --
3     Q.  No, it's "Henry Lawson Avenue..." I'm sorry.
4  It's hard to read.
5        Is that what you're talking about when
6  you said you didn't remember that being --
7     A.  Right.  The substance of the e-mail looks
8  like -- looks like what I sent, but the top part of it
9  doesn't.
10    Q.  Again, just to have a clear record, the top
11 part of it.  Meaning the little --
12    A.  Yeah, where it --
13    Q.  -- address box that has ClickaNerd?
14    A.  Right.  Yeah.  I don't normally -- I don't
15 normally do that.  I just write an e-mail and then
16 send it out.
17    Q.  And you don't have an office in Sydney,
18 Australia, do you?
19    A.  No.
20    Q.  All right.  So -- but the body of it --
21    A.  Right.
22    Q.  -- where it says, "Dear Maria - Ed - John, I
23 don't know if you still need my deposition for this
24 case," that's yours?
25    A.  Right.

Page 114

1     Q.  All right.  In the middle of that e-mail, it
2  says, "It sounds like you guys have worked everything
3  out now.  That is great."
4        What did you base that on?  What gave
5  you the idea that we had worked everything out?
6     A.  It seems at one point the -- the attorneys
7  had made mention how -- either the attorneys or John
8  Brewington -- I'm not sure -- but someone had made
9  mention that -- that the frivolous nature of the case
10 has pretty much been laid out in Arizona and basically
11 is just running up a few attorneys' fees and wrapping
12 things up.  At least, that's the impression I got.
13    Q.  Okay.  As of February 17th, 2010, did you
14 have knowledge that the Arizona court had granted a
15 request to issue a subpoena to you for your deposition
16 for March 12th, 2010?
17    A.  I can't tell you precisely when I got wind of
18 it, but I know when I got wind of it locally, which
19 would have been the time that I was at the courthouse
20 and the clerk brought it to my attention.
21        But the -- out there, I don't think I
22 started digging into all the minute notes and stuff
23 until, like, in the last month or so.
24    Q.  Okay.  So you don't know if you knew -- as of
25 the date of this Exhibit 33 e-mail, which was February

Page 115

1  of 2010, you don't know whether you knew that we had
2  scheduled your deposition for March 12th?
3     A.  Oh, scheduled it for March 12th?
4     Q.  Right.  We had picked March 12th as the date;
5  were you aware of that?
6     A.  I can't -- I can't comment.  I don't recall
7  receiving anything from you to that effect.
8     Q.  Yeah.  That wasn't my question, because I
9  know that --
10    A.  No, no.  I mean, no, I don't remember that.
11    Q.  Okay.
12    A.  The only subpoena duces tecum that I've
13 actually seen was for today.
14    Q.  No.  I understand that too, and so I wasn't
15 asking you if you got a subpoena or received a
16 subpoena.  I'm asking you if you caught wind of
17 whether it was through some of your research on the
18 internet or through Mr. Brewington --
19    A.  Oh, okay.  I see what --
20    Q.  -- of the fact that your deposition was
21 scheduled?
22    A.  Right.  I was sort of tracking it.  But like
23 I've been trying to be forthright with you, I was
24 jerking you off, so you'd come here.  I wanted to get
25 you down here.

Page 116

1        So I would think that at some point in
2  there, between the February and March time frame, I
3  started to have notice of -- that you were coming out
4  to my deposition, and I'd seen that as an opportunity
5  to get you into Texas.
6        (Exhibit Number 34 was marked.)
7     Q.  (BY MS. SPETH)  Okay.  All right.  Let's look
8  at Exhibit 34, which is Xcen 1164 through 1165.
9     A.  Do you have the little sticker to go on it?
10    Q.  Did I not?  Oh, here.  Let's trade.
11    A.  Okay.
12    Q.  I kept the one -- I kept the wrong one.
13 Okay.  Thank you.
14        Did you actually send this e-mail, which
15 is Exhibit 34?
16    A.  Exhibit 34 purports to be an e-mail from me
17 to -- to you directly.  "Attached is my original
18 petition and motion to quash.  I will be setting a
19 hearing..."
20        Yes, this is from me to you.  Yes,
21 Exhibit 34 is an e-mail from me to you.
22    Q.  Okay.  Thank you.  I think I'm skipping an
23 exhibit, so I'll just take a minute here to do that.
24 Okay.
25        (Exhibit Number 35 was marked.)

Page 117

1    Q.  (BY MS. SPETH)  I'm showing you Exhibit 35.
2  It says in big print at the top, Stop Ed Magedson.
3         MS. SPETH:  And Chris might need a
4  minute to find that one, I'm sure.
5         MR. INGLE:  Yeah.  I'll let you know
6  when I've found it.  I've got it.  Go ahead.
7    Q.  (BY MS. SPETH)  Did you ever -- or did you
8  post on that website, Magedson.com, on that forum, the
9  posting that says "ClickaNerd - Stopping Ed Magedson -
10  DEAD"?
11    A.  Yeah.  This three-page exhibit referred to as
12  Exhibit Number 35 goes to -- or points to a URL called
13  Block-Annoying-Sites, and with the exception of the
14  inflated number of 30 million downloads, this is --
15  this is true.  This is me.
16    Q.  Okay.  So I want to make sure I understand
17  that we have a clear record.  You posted that posting,
18  but you didn't post the part that said, we have close
19  to 30 million downloads?  Or you're saying you did
20  post it --
21    A.  I did post it, but I was looking for a
22  response from Ed Magedson for doing it.  Obviously, we
23  don't get 30 million downloads.
24    Q.  Okay.  So you posted it, but there's one
25  little piece of it that's not accurate?

Page 118

1    A.  Right.
2    Q.  I got you.  Now, the last page of Exhibit 35
3  is posted by somebody who has a user name Unmaskthem.
4  Did you post that?
5    A.  "According to public records, Maria
6  Crimi Speth handles legal inquiries..."
7         No.  Is it just not this one.
8    Q.  Do you have any knowledge of who did?
9    A.  No.  This one -- if we're referring to the
10  same thing, a user I.D. by the name of Unmaskthem --
11    Q.  Uh-huh.
12    A.  -- has pointed out a private detective at
13  PaladinPi.com, John F. Brewington... No.
14    Q.  Okay.  That one is not yours?
15    A.  No.  I don't know who that is.
16    Q.  All right.  Are you done with that one?
17         (Exhibit Number 36 was marked.)
18    Q.  (BY MS. SPETH)  Let's look at Exhibit 36.
19    A.  Exhibit 36, another e-mail, which is two
20  pages.
21    Q.  And did you send this e-mail on March 17th,
22  2010, to EDitor@RipoffReport, cc-ing Gary Jaburg, Dean
23  Robertson, Maria Crimi Speth, Chris Ingle, Kristine
24  Schlott?
25    A.  "To: Maria Speth and Cerebrally

Page 119

1  Challenged - Magedson."  That would be me.  Yes,
2  sent this one.
3    Q.  You say in the second paragraph, "While
4  pro se, I have never lost a case - ever."
5         Is that a true statement?
6    A.  I have never lost.
7    Q.  You've never lost a case?
8    A.  As pro se.
9    Q.  As a pro se?
10    A.  With representation, with lawyers that I've
11  paid for, I've lost a few cases.  But pro se, never.
12    Q.  Okay.  In Number 6 of that second page you
13  say, "Did I mention that I'm 100 percent judgment
14  proof?"
15         What do you mean by that?
16    A.  Precisely as it says, "I'm 100 percent
17  judgment proof."
18         Are you asking for a legal definition of
19  that?
20    Q.  No, not legal definition.  I just want to
21  know what you meant by that.
22    A.  Exactly as written, "I'm 100 percent judgment
23  proof."
24    Q.  Let me see if I can -- let me see if I can
25  understand.  So meaning that if we were to get a

Page 120

1  judgment against you, there's no way we could collect
2  it; is that what you mean?
3    A.  Yes.
4    Q.  Okay.
5    A.  Are we done with 36?
6    Q.  We are done with 36.  Thank you for asking.
7         (Exhibit Number 37 was marked.)
8    Q.  (BY MS. SPETH)  Let's look at 37.  And
9  Exhibit 37 is a Judgment on Jury Verdict of Guilty.
10  It looks like it's from your criminal case, which I
11  believe we talked about it, at least, briefly before.
12    A.  Okay.
13    Q.  Is that a true and accurate copy of a court
14  document that was the final judgment in the criminal
15  case against you?
16    A.  Yes, it is.  But I do need to make it
17  abundantly clear on the record, I was not pro se.
18    Q.  No.  I understand.
19    A.  Okay.
20    Q.  You were very clear about that, the fact when
21  it was pro se.  But this one, you were represented by
22  counsel, right?
23    A.  Right.
24    Q.  Larry Greenwood, in fact?
25    A.  Larry Greenwood was my attorney, and

Page 121

1    Stephen Hughes was the district attorney.
2        Q.   All right.  And you were found guilty of
3    theft, correct?
4        A.   Yes.
5        Q.   And your judgement is dated March 29th, 2000,
6    correct?
7        A.   Yes.
8        Q.   And it was a felony, correct?
9        A.   Yes.  Any more on the --
10       Q.   We are done with that one.  And we are up to
11   38.
12           MS. SPETH:  And 38 is called Final
13   Judgment and Order for Sanctions, just for Chris' sake
14   while I'm marking it.
15           MR. INGLE:  Okay.  I've got it.  Go
16   ahead.
17           MS. SPETH:  Okay.
18       Q.   (BY MS. SPETH)  I'm going to put the sticker
19   at the top.  I can't find a spot at the bottom.
20           (Exhibit Number 38 was marked.)
21       Q.   (BY MS. SPETH)  Exhibit 38 I think, well --
22       A.   Right.
23       Q.   -- is an accurate court document?
24       A.   It is.  And, once again, Exhibit 38 was a
25   Final Judgment and Order for Sanctions in Rick

Page 122

1    Morris', Judge Morris' court.  And I used the exhibit,
2    which was a --
3            Actually, the reason I got sanctioned in
4    this court is because I made a pleading for
5    intentional infliction of emotional distress after the
6    judge told me not to do it, and he sanctioned me
7    sua sponte.
8            However, for the record, I still won
9    this case because I got a copy of the pleading -- or,
10   I mean, a copy of the trial transcript from the
11   stenographer, and then refiled it in a small claims
12   court and got a final judgment against Michael Entler
13   and executed a writ of garnishment on him and got
14   paid.
15       Q.   According to this document, this is a final
16   judgment against you.
17       A.   Right.
18       Q.   You were pro se --
19       A.   Right.
20       Q.   -- and you lost.  It says the jury rendered a
21   judgment for defendant.
22       A.   Okay.  Now, let me stop you.  In this cause
23   of action, it was pro se.  In this cause of action, it
24   was final.  In this cause of action, it was rendered
25   against me.  But the trial transcript that I obtained

Page 123

1    from the court reporter was refiled in Judge Cook's
2    court.  And I successfully prevailed in Judge Cook's
3    court, and then got a writ of garnishment against
4    Michael Entler.
5            So, once again, I'm 100 percent correct
6    on the fact that pro se, I've never lost a case.  This
7    is just a momentarily delay of the case.
8        Q.   Okay.  When you say Judge Cook's court, what
9    are you talking about?
10       A.   Judge Cook is a justice of the peace in
11   Killeen, Texas.
12       Q.   And it's your testimony under oath that a
13   justice of the peace reopened a final judgment by a
14   Bell County district court judge and then --
15       A.   No.
16       Q.   -- ruled the opposite way?
17       A.   No.  When the evidence -- well, let me --
18   let's discuss this case since you brought this up.
19           This guy by the name of Michael Anthony
20   Entler, he -- I don't want to go into what the whole
21   case was about.  But I got a judgment in Judge Cook's
22   court -- well, let me just back up a little bit more.
23           Judge Morris would not allow me to take
24   his deposition because some of the assertions that he
25   made in that cause of action were inflammatory and -

Page 124

1    he basically said he was sleeping with my wife.  Out
2    of an abundance of caution, the judge, in fear of his
3    life, said, you're not taking his deposition.
4            So I turned it into a jury trial to get
5    his deposition, which was the transcript of the jury
6    trial, which I momentarily lost that.  I took that
7    transcript, refiled from -- stemming from the same set
8    of fact patterns, in a -- in a JP court.  That cause
9    of action was successfully prevailed against
10   Mr. Entler.
11           After he blew off the judgment, I waited
12   for the time period to run.  I abstracted the
13   judgment, and then I did a writ of garnishment.  And
14   it's all covered in Judge Cook's court.
15       Q.   Okay.  And what county court is Justice Cook
16   in?  I understand he's a justice of the peace.  Is it
17   still Bell County?
18       A.   Yeah.  Except he's a JP and he's located on
19   Priest Drive.
20       Q.   You said something about somebody being in
21   fear for his life.  Did you mean the judge?
22       A.   No.
23       Q.   Entler?
24       A.   Mr. Entler made some assertions against my
25   wife.  And the judge, using judicial efficiency,

31 (Pages 121 to 124)

Page 125

1 decided that it would not be a good idea to trap him
2 and I in a room alone with a stenographer. So using
3 judgement, he said, you guys exchange your exhibits,
4 go to trial, and run the whole thing.
5 Q. So "fearing for his life" is a reference to
6 the judge fearing for whose life?
7 A. Michael Entler's life, thinking that I might
8 become violent upon Mr. Entler because of those
9 assertions about my wife.
10 Q. Because he didn't want to put you in the room
11 together?
12 A. Right.
13 Q. I got you.
14 A. So in a way to control the misguided outcome
15 of the -- the judge was incorrect anyways. But I'm
16 just saying, in a way to control that, he decided, you
17 guys are ordered to a jury trial, exchange your
18 exhibits. Once you go through your jury trial --
19 which I made the fundamental mistake of amending my
20 pleadings to include a -- to include a cause of
21 action of intentional infliction of emotional
22 distress. The judge got pissed at me for doing that
23 and sanctioned me for doing that.
24     But in the process of that, the court
25 reporter grabbed the information, which made my

Page 126

1 prima facie case, only I decided to go refile it in
2 Cook's court because of the amount in controversy was
3 only, like, $1800 or $2,000, or something like that.
4 And then --
5 Q. What was the claim you filed in justice of
6 court [sic] against him? In other words, what was the
7 cause of action?
8 A. It was just a breach of contract.
9 Q. Okay. It was a breach of contract claim?
10 A. Right.
11 Q. And did he -- did you win because he
12 defaulted, or did you win because -- on the merits?
13 A. In the district court case --
14 Q. No. I'm talking about the justice of the
15 peace case.
16 A. Oh, okay. Sorry. In the justice of the
17 peace case, it was found, through his own testimony,
18 that the breach of contract didn't occur against me.
19 It occurred against her.
20 Q. Against Annette?
21 A. Annette. So Annette went and filed in
22 Judge Cook's court and got a judgement in the amount
23 of -- I don't remember what it was, but a couple of
24 thousand dollars. I don't know if that number is
25 accurate. It's either between 1500 and the $2,000

Page 127

1 range. That judgment became right.
2     I had her transfer that judgment to me.
3 I turned around and refiled in Judge Cook's court
4 under a writ -- I did an application for writ of
5 garnishment, and then I popped a bank account and got
6 the money.
7 Q. So it was not you who filed in the justice
8 court -- I mean, the justice of the peace court. It
9 was Annette?
10 A. Correct.
11 Q. So you didn't win in the justice court.
12 Annette did?
13 A. I'm still going to take the win. I'm taking
14 credit for the win.
15 Q. Okay. I think you should give your wife the
16 credit for the win.
17     (Exhibit Number 39 was marked.)
18 Q. (BY MS. SPETH) Let's take a look at
19 Exhibit 39.
20 MS. SPETH: Chris --
21 MR. INGLE: Yes.
22 MS. SPETH: -- Exhibit 39, I have three
23 of. That's a bad sign. If I have three of them, it
24 tells me perhaps you didn't get one of them. It's
25 very thick. And it's called U.S. Party/Case Index.

Page 128

1 It's a big printout from PACER.
2 MR. INGLE: I don't have that one.
3 MS. SPETH: Ah, darn. I don't think I
4 have a lot of questions about it, but if I need -- if
5 you need me to explain anything more carefully, I
6 will. It's -- it's actually pretty straightforward.
7 Do you need to go off --
8 THE WITNESS: I need to go to the
9 bathroom.
10 MR. INGLE: I have no objection, just
11 for the record, for me not having the exhibit, but I
12 would encourage you to just go ahead and work your way
13 through it.
14 MS. SPETH: We're going to take a short
15 break. Shawn would like to take a bathroom break.
16 MR. INGLE: All right.
17 THE VIDEOGRAPHER: Off the record at
18 1:39.
19     (Recess from 1:39 p.m. - 1:42 p.m.)
20 THE VIDEOGRAPHER: We're back on the
21 record at 1:42.
22 Q. (BY MS. SPETH) Mr. Richeson, you understand
23 you're still under oath?
24 A. Yes, ma'am.
25 Q. Okay. I'm going to show you what's been

32 (Pages 125 to 128)

Page 129

1  marked as Exhibit 39.
2      A.  Okay.
3      Q.  And Exhibit 39, I will tell you, is a
4  printout from PACER.  It's got a -- a URL at the
5  bottom, Pacer.uspci.uscourts.gov.
6      A.  Uh-huh.
7      Q.  And it's entitled U.S. Party/Case Index.
8      A.  Okay.
9      Q.  And there are several cases listed that
10 appear to be cases that you've been a party to.
11     A.  Yes, ma'am.
12     Q.  The first one that I want to ask you about is
13 at the top, under bankruptcy cases, and it says
14 Shawn Richeson, and it's a bankruptcy case filed
15 March of 2000.
16         What is the status of that 2000
17 bankruptcy filing which indicates it was a Chapter 13?
18     A.  It was originally filed by me pro se and then
19 withdrawn by me.
20     Q.  Okay.  So it went away?
21     A.  Right.
22     Q.  Without a discharge?
23     A.  Right, no findings.
24     Q.  Okay.  And then there's a bankruptcy
25 underneath that from 2000 -- I'm sorry -- from 1995.

Page 130

1  And although there's -- there's two entries with the
2  same dates and the same case number, so I'll just ask
3  you about that bankruptcy.  Did that bankruptcy from
4  1995 result in a discharge?
5      A.  It did, sort of.  The debts that were
6  incurred up until that bankruptcy in 1995, they -- all
7  of them launched with that bankruptcy, with the
8  exception of the Novell judgment, which was a tort
9  claim that they successfully prevailed in my
10 bankruptcy, and kept their judgement alive through my
11 bankruptcy.
12     Q.  All right.  So the Novell, that's -- you've
13 anticipated my question.  The Novell judgment did not
14 go away as part of that 1995 bankruptcy?
15     A.  No, no.  It's still valid today.
16     Q.  Okay.  And then the fifth case on the list is
17 a -- is a -- not a bankruptcy case.  It looks like it
18 may perhaps be a civil case.  And it -- it doesn't
19 state on this page, but when I look up that case
20 number, it appears to be a case called Richeson versus
21 Thomas.
22     A.  Thomas...
23     Q.  It's in here someplace, so let's find it.
24     A.  Thomas is -- oh, okay.  Mr. Thomas was a
25 representative of a company called Clearwire

Page 131

1  Corporation.
2      Q.  Okay.  And how -- how did the -- and just so
3  you know, the last part of Exhibit 39 is the docket
4  from that matter.  How did that matter turn out?
5      A.  In Mr. Thomas, the cause of action was filed.
6  It was a tort claim that I made against him for
7  trademark infringement.  And then before it actually
8  got into the merits of the case, they hired an
9  attorney from Houston that entered an appearance, and
10 we settled, and he paid me 5200-and-some dollars, I
11 think.
12     Q.  Yeah.  It says -- it's Docket Number 14 in
13 the case.  But a joint stipulated dismissal was filed.
14     A.  Right.
15     Q.  So it was some sort of agreed stipulated
16 dismissal.
17     A.  Right.
18     Q.  And you're saying he paid you $5,000?
19     A.  Approximately, yeah.  I think it was 5200.
20     Q.  Okay.  Then the next matter that's listed on
21 the first page of Exhibit 39 is -- has a case number
22 of -- ending in 229.  And when I looked that up, it
23 appears to be Richeson versus Cullen (phonetic), which
24 I've also printed the docket of.
25     A.  Right.

Page 132

1      Q.  What was that case about?
2      A.  It was the same set of facts, only this guy
3  owned a website called computernerds.com.  I filed it
4  in the Western District of Texas.  I could not
5  properly assert personal jurisdiction over him, so it
6  was dismissed in the Western District of Texas.  And I
7  was just about ready to refile in the Southern
8  District of Florida, when Novell came back into my
9  life and got control over that cause of action.
10         And -- actually, two things happened:
11 Novell came back into my life and got control over
12 that cause of action, and I got sued by a company
13 called Computer NERDZ! with a "Z," down in
14 San Antonio.
15         And as a part of that settlement, the --
16 a receiver that was assigned by the name of Patricia
17 Nolan, in exchange for dismissing what claims I would
18 have had, transferred a service mark Computer Nerds
19 and a domain named ComputerNerds.net to Lee Robin, the
20 owner of Computer NERDZ! down in San Antonio.
21     Q.  So you no longer cared about your lawsuit
22 against Steve Cohen because you no longer had that
23 trademark?
24     A.  Right.  Right.  I didn't have any standing.
25     Q.  So today, does that mean you don't use

Page 133

1  Computer Nerds anymore?
2     A.  No.
3     Q.  Are you done with that trademark?
4     A.  Right.
5     Q.  You've transferred it to someone else?
6     A.  Right.  It belongs to Lee Robin in
7  San Antonio.
8     Q.  Then let's take a look then -- well, we've
9  talked about the Novell case.  Actually, let me -- do
10  you know what Item Number 7 is on the list on
11  Exhibit 39?  And I don't know.  I wasn't able to find
12  that particular case, or at least I didn't print it.
13     A.  229?
14     Q.  All I know is it was a 1997 case.  No.
15  Ending in 320.  Filed in 1997, closed in 1998.
16     A.  I'm not real sure.  That's quite a ways back.
17  I'm not sure what that is.
18     Q.  Okay.  Now, Number 8, I do know is Novell.
19     A.  Right.
20     Q.  And we talked about the Novell case.  I don't
21  think I have any more questions about it, but let me
22  just double-check.  Yeah.
23        The only other thing that's on here is a
24  criminal case that was filed in 1997, but it appears
25  to have been closed seven months later.  What do you

Page 134

1  recall about that criminal case?
2     A.  While --
3     Q.  This is all federal, by the way, so this
4  would have been in federal court.
5     A.  While under the name Computer Nerds, we
6  processed a credit card payment for the government in
7  the amount of.  I'm not going to speculate -- but I
8  think it was between two- and five-thousand-dollar
9  range, somewhere in there, and I was charged with
10  unlawful charging of the credit card.
11        Once the U.S. attorney looked at the
12  facts of the case and we got closer to trial, she did
13  the equivalent of nonsuit, or withdrew the case,
14  dismissed the case.
15     Q.  Dismissed it before it ever went to trial?
16     A.  Right.
17     Q.  And you were not convicted of that crime?
18     A.  No.  No.
19        (Exhibit Number 40 was marked.)
20     Q.  (BY MS. SPETH)  All right.  I believe we're
21  up to Exhibit 40 now.  Exhibit 40 is a Westlaw
22  decision citation -- I'm sorry -- cited decision.  It
23  looks like your appeal of your criminal conviction, if
24  I'm reading it correctly.
25     A.  Court of Appeals, State of Texas.  Yes.

Page 135

1     Q.  Okay.  So you did appeal your criminal
2  conviction, the one that was against you in state
3  court for theft?
4     A.  Right.
5     Q.  And you lost that appeal, correct?
6     A.  Correct.
7     Q.  So when was that final decision made
8  affirming, I would say, the conviction?
9     A.  The original conviction was in 1999.  By the
10  time it was -- I exhausted all my appeals, I think it
11  was -- I went to jail in 2002, so it would have been
12  January of 2002.
13     Q.  Okay.  Now, you said the original conviction
14  was in 2009 [sic].  I think we determined that it was
15  in March of -- I'm sorry -- you said originally in
16  1999.
17     A.  Right.
18     Q.  I think we determined that it was in March of
19  2000.  Does that --
20     A.  No.  Actually, I was convicted in April of
21  19 -- I take that back.  I was convicted in April of
22  2000.  I entered -- posted bond, entered an appeal,
23  and it drug out two more years, but I eventually went
24  to jail in January of 2002.
25     Q.  Now, when you say "I was convicted in April

Page 136

1  of 2000," are you referring to when the jury verdict
2  came out, or when the actual judgment came out?
3  Because I think we saw that the judgment came out in
4  March -- on March 29th or March 30th --
5     A.  Oh, okay.
6     Q.  -- of 2000.  And maybe you're thinking of the
7  jury decision.
8     A.  Well, a jury decision came out either that
9  day or the very next day.  I don't remember.  But it
10  was -- that was the right time frame.
11     Q.  Okay.  All right.  When -- have you ever seen
12  more than one version of the video that we were
13  talking about earlier, the video that you had posted
14  on your website, of John Brewington interviewing two
15  people about -- about Ripoff Report and Putt Putt car
16  sales?
17     A.  Conversions [sic]?  No --
18     Q.  Yes.
19     A.  -- I don't think so.
20     Q.  Okay.  So I'm going to do the best to try to
21  figure out -- because I have seen more than one
22  version of it, meaning that some of it has graphics;
23  some of it doesn't.
24     A.  Oh, okay.  If you're referring to -- I know
25  that the faces appear to be blocked out and it has

Gwendolyn Parker and Associates, Inc.
214-747-8007

Page 137

1 some music and stuff in it.
2 Q. Right. So do you remember -- the one that
3 you have possession of, what does -- first of all,
4 does that one have music?
5 A. Actually, I don't even have it anymore. All
6 I did is just post a link to the UTube, so I don't
7 know if it does or not. I don't know. But I -- I
8 think it has music and stuff to it now. It looks a
9 little more commercialized, I guess.
10 Q. Yeah. Now, you said all you did was post a
11 link to the Utube. Actually, what you sent to me back
12 then wasn't a link to UTube. It was a link to your
13 own website. You had it on your own website.
14 A. Okay.
15 Q. And that version of it, do you remember
16 whether the faces were blocked out?
17 A. I don't think so. I don't think so. I don't
18 think so originally. I think it was more of until the
19 witnesses that were in the video could be, you know,
20 ascertained if they were telling the truth or not, I
21 think.
22 Q. So you had a version that didn't have faces
23 blocked?
24 A. I can't really say. I don't remember. I
25 don't really remember. But I just remember seeing it

Page 138

1 one time with faces blocked out and some music on it.
2 Q. Right. And do you ever remember seeing it
3 without the faces blocked out?
4 Let me do it this way: Think in your
5 head; can you remember what those witnesses actually
6 look like?
7 A. As I recall, everybody was sitting around the
8 kitchen table, and they were all talking about how
9 they were participating in a extortion scheme to go
10 into the Putt Putt car lot -- correct me if I'm wrong,
11 if that's not the name of it, but it was something
12 called Putt Putt car lot -- and one of the guys in the
13 video asserted that he actually was there with
14 Ed Magedson during an actual extortion scheme.
15 Q. Do you remember ever seeing his face, or do
16 you only remember the one with his face blocked out?
17 A. I would say I do not remember what his face
18 looks like, so no.
19 Q. Okay. Well, just to make sure we have a
20 clear record when you say "so no," so you don't think
21 you've ever seen the one where his face was not
22 blocked out or...
23 A. Oh. Yeah --
24 Q. I mean, I know you may not remember what his
25 face looked like.

Page 139

1 A. Time-wise, I don't remember when they decided
2 to block out the witnesses' faces. But if your
3 question is did I ever see a video without the
4 blocking of the faces --
5 Q. That's my question.
6 A. -- I know -- I know I did at sometime, but I
7 don't remember exactly when.
8 Q. That was my question --
9 A. Okay.
10 Q. -- exactly. And did you in any way
11 participate in blocking out the faces?
12 A. No.
13 Q. I mean, I know that you're pretty good on the
14 computer. You didn't provide that service to
15 Mr. Magedson -- to Mr. --
16 A. No.
17 Q. -- to Mr. Brewington, did you?
18 A. No, no.
19 Q. And how about, there's an -- in one version
20 of the video, in the one that's currently up on UTube,
21 there's an introduction by John Brewington. It starts
22 off -- it says Paladin Investigations, and
23 Mr. Brewington talks about what we're about to see on
24 the video.
25 Do you have any recollection of that?

Page 140

1 A. When that was done?
2 Q. No. Any recollection of seeing a version
3 that has this introduction.
4 A. Oh, yeah, I've seen it. I've seen it
5 actually from UTube or wherever it's hosted. I've
6 seen it with the commercialization added to it.
7 Q. Okay. Now, then, my -- my next question is,
8 have you ever seen it without that? Have you ever
9 seen it without the introduction by John Brewington?
10 A. Yeah. Because the faces and music and stuff
11 like that, I don't think that was added in until
12 later, until they wanted to get it up on -- you know,
13 circulated more.
14 Q. Okay.
15 A. But -- but so the record is clear, I don't
16 recall any derivative or variation between the
17 accuracy in testimony in that first video and in that
18 second video. I don't think there's any difference,
19 other than the fact that there's just some music and
20 some titles.
21 Q. Right. And thank you for your clarification,
22 but that is exactly what my question was. It had to
23 do with, you know, the -- the titles, the intro. Not
24 with the content itself.
25 A. Oh. Oh, okay.

35 (Pages 137 to 140)

Page 141

1      Q.  So when I said there's more than one version,
2  I didn't mean to infer with respect to the
3  witnesses --
4      A.  Oh, okay.
5      Q.  -- or, I should say, the -- the -- I'll call
6  them actors themselves.
7      A.  Okay.
8      Q.  What I mean is the -- the front matter, the
9  back matter, the conclusion, the graphics, I've --
10  I've seen a couple of different versions, and I'm
11  trying to figure out which ones you've seen.
12      A.  Oh, okay.
13      Q.  So then I'll ask you a similar question, and
14  that is, with respect to there is some -- some
15  graphics that say, like, some words that sort of
16  appear on the screen, and they're in a font that looks
17  like it's similar to the font that Ripoff Report uses,
18  and it says something about Ripoff Report and
19  Ed Magedson, and it sort of pops up on the screen,
20  have you ever seen it without those graphics, if you
21  know?
22      A.  Honestly, I don't know.  I mean, that's a
23  detail that I didn't pay that close attention to, so I
24  would just say I don't know.
25      Q.  Okay.  Have you ever accessed the video from

Page 142

1  anyplace other than UTube?
2      A.  I'm going to say, yeah, because there were
3  links to quite a few of the sites out there for that
4  video, so -- I don't know if it's physically hosted at
5  UTube and being hyperlinked there or if people have
6  just downloaded copies of it and distributed on their
7  own.  So I couldn't say how it's being done, because I
8  didn't look that close.  But of the ones that I've
9  seen and the ones that are on the internet, they all
10  look to be the same video.
11      Q.  Okay.  Now, the version that's on UTube has
12  music, graphics, an advertisement about Paladin
13  Investigations, an introduction by John Brewington and
14  a conclusion by John Brewington.
15          The version that you sent me back in
16  December of 2009 does not have any advertisement about
17  Paladin.  It doesn't have an introduction by
18  John Brewington.
19          How can you -- do you have any
20  explanation for how it is that the version that you
21  sent me was different from what was on -- on UTube,
22  assuming that it is different?
23      A.  I honest --
24      Q.  I'm asking you to assume for purposes of this
25  question that it is.

Page 143

1          MR. INGLE:  Form.
2      A.  Okay.
3      Q.  (BY MS. SPETH)  He objected on form.
4      A.  Okay.  I can't honestly answer what time
5  frame any of these graphics and audio and that kind of
6  stuff got put in.  And I can't even actually answer
7  what form it was in when I sent you the e-mails --
8      Q.  Right.
9      A.  -- because I honestly didn't pay that close
10  attention to it.  The only thing that was being --
11  ringing in my mind at that time was I can't believe
12  they actually caught -- I'm not trying to be offensive
13  to you, but I just couldn't believe they actually
14  caught you in a scheme.  That's what I -- that's what
15  I was thinking at the time.
16      Q.  Okay.
17      A.  That's, like, it seemed to me that the video
18  was a good case.
19      Q.  Okay.  Now, and --
20          MS. SPETH:  And I think that's
21  non-responsive.  So I'm going to state for the record,
22  I believe that's non-responsive.
23      Q.  (BY MS. SPETH)  But -- because my question
24  is, if I ask you to assume that the video that you had
25  back in September of 2009 is not the same as the video

Page 144

1  that appears on UTube --
2      A.  Okay.
3      Q.  -- do you have any explanation for that?  Do
4  you know how it could be that you would have a video
5  that isn't the one that was pulled off of UTube?
6      A.  If it didn't come from UTube and if it didn't
7  come from one of the other sites that linked to it, I
8  don't know.  I mean, I don't know where else it can
9  come from.
10      Q.  It could have come directly from
11  Mr. Brewington to you?
12      A.  No.
13      Q.  That didn't happen?
14      A.  No.
15      Q.  Okay.
16          MS. SPETH:  Let me make sure I don't
17  have any other questions.  I think I may be done, or
18  close to done.
19          THE WITNESS:  This is all yours now,
20  isn't it?
21          COURT REPORTER:  Uh-huh.
22          MS. SPETH:  I believe I have no further
23  questions.  Chris, I'll turn it over to you.
24          MR. INGLE:  All right.  Thank you.
25

Page 145

1         CROSS-EXAMINATION
2 BY MR. INGLE:
3    Q. Shawn, I have a couple of introductory
4 questions. Have you taken any drugs or alcohol that
5 would affect your ability to testify truthfully today?
6    A. No, sir.
7    Q. Do you have any mental health diagnoses that
8 would affect your ability to testify truthfully today?
9    A. No, sir.
10    Q. This video we've been talking about, I'm
11 going to call it the Putt Putt Video.
12    A. Okay.
13    Q. Do you know what video I'm talking about,
14 that one that's posted up on UTube?
15    A. Right. I don't -- I don't know which form
16 that she's referring to it in, but I'm just going to
17 refer to one video 'cause the content is all the same
18 regardless if it's got graphics or music. So I'm just
19 going to call it the Putt Putt Video too.
20    Q. Okay. The Putt Putt Video, did you get that
21 from UTube?
22    A. From UTube? UTube or a website.
23    Q. Okay. Did John Brewington ever send the
24 Putt Putt Video to you?
25    A. No.

Page 146

1    Q. The -- the term "actors" has been used to
2 refer to the people who were being interviewed in the
3 Putt Putt Video. Do you believe that the people on
4 that video were actors?
5    A. No.
6      MS. SPETH: Form.
7      He said "no." And I don't know if she
8 heard it, but I was objecting.
9      MR. INGLE: Okay. Can we go off the
10 record just one second?
11      THE VIDEOGRAPHER: Going off the record
12 at 2:02.
13      (Recess from 2:02 p.m. - 2:12 p.m.)
14      (Exhibit Numbers 41 - 49 were marked.)
15      THE VIDEOGRAPHER: We're back on the
16 record at 2:12.
17    Q. (BY MR. INGLE) Okay. Mr. Richeson, I'd like
18 you to look at Exhibit 41, please. Let me know when
19 you've got that in front of you.
20    A. 41. I've got it.
21    Q. Okay. Why don't you take a look at it? And
22 look at the -- it looks like the top of the e-mail is
23 from Maria Speth to you, and then below that there was
24 another e-mail which purports to be one from you to
25 her. Do you see where I'm looking?

Page 147

1    A. Okay. It looks like in this Exhibit 41,
2 two-page exhibit, Maria Speth asserts, in a response
3 back to me, that the statements in the videotape are
4 false. Is that the one?
5    Q. Yeah. That's -- that's right.
6    A. Okay.
7    Q. What I'd like to ask you about is actually
8 the e-mail below that, from Shawn - Field Manager to
9 Maria Crimi Speth, on December 15th, 2009.
10    A. Correct.
11    Q. Did you send that e-mail to Ms. Speth?
12    A. It does look like the beginning of my baiting
13 of her. And I do recall her actually e-mailing me
14 back saying that the statements in the videotape are
15 false.
16      So based on my memory and based on the
17 fact that it's carbon copied to legal@dancorbin.com
18 and jerry@jerryscarbrough.org, I would have to say
19 that this is an accurate e-mail.
20    Q. Okay. Are you sure? Because I want to be
21 sure. Are you sure that this is an e-mail that you
22 sent to Ms. Speth, that it hasn't been changed in any
23 way?
24      MS. SPETH: Objection, leading. It's
25 been asked and answered twice, and now you're leading

Page 148

1 him to change his answer.
2      MR. INGLE: Your objection is noted.
3    Q. (BY MR. INGLE) Mr. Richeson, please take a
4 look at it and let me know.
5    A. All right. Let me look at the second page.
6 Hold on a second.
7      All right. Report and Ed Magedson.
8 This video is around 76 megabyte, in wmv format.
9      I put the words, "Just to be absolutely
10 clear on my intentions, I'm not interested in any
11 payment of money for this video."
12      So that's me.
13    Q. Okay.
14    A. Honestly, I can't comment, because this isn't
15 the original e-mail. But I do recall Mrs. Speth
16 writing me back -- on the date and time, I don't
17 know -- saying that the statements of the videotape
18 are false. So I do remember seeing that from her.
19      But it's just back to me, and it doesn't
20 carbon copy any of her responses to Larry -- or, I
21 mean, jerry@jerryscarbrough.org or larry@dancorbin.com.
22 So I'm unable to authenticate the truthfulness of the
23 e-mail, but the portion of it -- you know, as far as
24 it being put together. But the portion of it, which
25 has a date and time in it -- let me just read it one

Page 149

1   more time and I'll tell you.
2       Q.  Okay.
3       A.  Okay.  This is how I'd like to respond to
4   this:  This clearly is my words to Mrs. Speth, but not
5   for the purposes of anything other than a rouse to
6   draw her out to bring her down to Killeen, Texas, for
7   my lawsuit.
8           So the assertions that I made in here
9   that do I believe that the video that -- John
10  Brewington might be using me for some hidden purpose,
11  I never believed that for a second.  So I want to make
12  sure the record is absolutely clear on that.  As a
13  matter of fact, I'm quite sure that John Brewington
14  was just being an investigator doing his job, so I
15  wanted that to be clear.
16          But my assertion in the e-mail, making
17  that, was the rouse that would give her belief, "her"
18  meaning Mrs. Speth, belief, that there might be some
19  merit to taking my deposition.
20      Q.  Okay.  Let me ask you, did you ever send
21  Maria Speth a copy of the video, or did you only ever
22  send her a link to the video?
23      A.  The only thing I ever sent to Mrs. Speth was
24  a link to a website, which is ClickaNerd.com/legal/
25  Magedson.  And then that website would further

Page 150

1   redirect to wherever the video was hosted.
2       Q.  And --
3       A.  So that we're clear on the technical reasons
4   for why I did what I did, the minute that she clicked
5   on that link, it would trap computer forensics that I
6   was looking for.
7           And the -- but the tape -- or I'm
8   sorry -- the video clip that she was looking at is the
9   same video clip that we've been talking about all
10  along.  There's been no alterations or changes or
11  anything.
12      Q.  Okay.  Thank you.  We're done with that
13  Exhibit 41.  Can you pick up Exhibit 42, please?
14      A.  42 is In The Superior Court of the State of
15  Arizona?
16      Q.  Yeah.  It's the Declaration of John F.
17  Brewington.
18      A.  Okay.  A two-page exhibit.  All right.
19      Q.  That's correct.  What I'd like you to do is
20  go ahead and read John's declaration and let me know
21  when you're done.
22      A.  All right.  There's eight line items, a
23  two-page exhibit.  Okay.  I'm done.
24      Q.  What I'd like to ask you about those eight
25  line items, do you have any information, knowledge or

Page 151

1   belief that any of those eight line items are false or
2   untrue?
3       A.  No.  No.  I believe them to be true.
4       Q.  All right.  Thank you.  I'm done with
5   Exhibit 42?
6           MS. SPETH:  Form.
7       Q.  (BY MR. INGLE)  Let me ask you, do you -- the
8   Putt Putt Video, do you have any reason to believe
9   that any portion of that video is false?
10      A.  No.
11          MS. SPETH:  Form.
12      Q.  (BY MR. INGLE)  Do you have any understanding
13  as to why Plaintiffs would suggest that the video was
14  false?
15          MS. SPETH:  Form.
16      A.  Could you ask that question again?  I'm not
17  sure I understand that.
18      Q.  (BY MR. INGLE)  Well, the question is, do you
19  have any understanding as to why Plaintiffs would
20  suggest that the statements in the video are false?
21          MS. SPETH:  Form.
22      Q.  (BY MR. INGLE)  I can ask a different
23  question if you don't understand what I'm asking.
24      A.  Okay.  No.  I get it.  Well, yeah.  I mean,
25  it's fairly obvious.  The -- the video implicates the

Page 152

1   parties in question.  And my gut feeling is once it's
2   widely known by all the other people with causes of
3   action against them, that it would tend to, you know,
4   add credibility to the fact that -- that Mrs. Speth
5   and Mr. Magedson engaged in -- in authoring content on
6   their website.  I mean, that's my guess of why I think
7   it's -- they're worried about it.
8       Q.  All right.  Thank you.  Let me ask you, do
9   you have any reason to believe that John Brewington
10  was working for somebody else at the time that he made
11  the video?
12      A.  Do I believe John Brewington was working for
13  somebody else other than who?
14      Q.  Other than just himself.
15      A.  No, no.  I believe John Brewington to just be
16  doing like, whatever you call it in your world,
17  pro bono, or whatever they call it.
18      Q.  Okay.  Can you pick up Exhibit 43, please.
19      A.  Okay.
20      Q.  I'd like to ask you about the very last line
21  of Exhibit 43.  Well, actually, first, let me -- let
22  me ask you, take a look at this and let me know if you
23  recognize those comments.
24      A.  Okay.  This looks to be Comment Number 136 on
25  Exhibit 43, assuming that this is the ones that are on

38  (Pages 149 to 152)

Page 153

1 that website for the newspaper in Arizona.  Okay.
2    Q.  Is -- is this your comment?
3    A.  "Dear Ed Magedson and Maria Speth:  To clear
4 up..."
5        Yeah.  Let me verify it against my own
6 list.
7    Q.  Okay.  Take your time.
8    A.  It was written on 11-29-2009 at 10:33 a.m.,
9 so, yes.  It looks to match it.  Wait a minute here.
10 Wait a second here.
11   Q.  Are you ready?
12   A.  Just one second here.
13   Q.  Okay.
14   A.  Well, the content of it appears to be the
15 same, but there's some spacing and stuff on here
16 that's different, and I'm not sure why.  Maybe it's
17 the layout, orientation of the screen, but the content
18 appears to be the same.
19   Q.  Okay.  I'd like to ask you about the very
20 last sentence:  "All of this is simply my opinion and
21 I am entitled to my opinion."
22       Do you see where I'm reading?
23   A.  Right.
24   Q.  When you say "All of this is simply my
25 opinion," what is "all of this"?  What does that refer

Page 154

1 to?
2    A.  Let me read my language again -- or my
3 wording again here, and I'll comment.
4        I'm -- I'm talking about, in this
5 comment, about how I believe that video to be true.  I
6 don't know the two parties that are in the video that
7 were making the assertions against Mrs. Speth and
8 Magedson.  But at the point that I wrote this, which
9 would have been on November 29th, I would have
10 believed it to be true, so I'm stating it as a matter
11 of an opinion.
12       Now that I know that the parties that
13 were in the video, or at least one of them, anyway,
14 has authenticated the truthfulness of the video, then
15 I'm pretty much saying the video is a legitimate
16 video.
17       But my comment on here, at that moment,
18 which would have been November 29th, it's just my
19 opinion that it's all true.
20   Q.  I'm sorry.  Was there more?
21   A.  No.  That was it.
22   Q.  What I'd like to ask you about is, the
23 sentence right before the one I quoted to you, it says
24 "Ed Magedson and Marie Crimi Speth are extortionists
25 and need to be behind bars."

Page 155

1    Q.  That sentence, is that -- is that your
2 opinion?
3    A.  It's my opinion and it's my belief that it
4 should happen.
5    Q.  All right.  I'm done with Exhibit 43.  I'd
6 like you to look at Exhibit 44.
7    A.  Okay.  Exhibit forty -- Exhibit 44 is a one,
8 two -- three-page exhibit that comes in the form of an
9 e-mail to paladin@paladinPI.com, with a carbon copy
10 going to Maria Crimi Speth, ed@RipoffReport.com,
11 david.osbourne@fbi.gov, legal@dancorbin.com,
12 lgreenwood@satx.rr.com, jws@jerryscarbrough.org.
13 Okay.
14       MS. SPETH:  I'm sorry --
15   Q.  (BY MR. INGLE)  Is this a true and correct
16 copy of an e-mail that you sent to -- well, to the
17 individuals you just listed on November 21st, 2009?
18   A.  The first page is definitely my -- my
19 writing.
20   Q.  Well, I was going to ask you about that first
21 page --
22   A.  Oh, okay.
23   Q.  -- so that's good enough.
24   A.  Okay.  Yeah, that's my writing.
25   Q.  All right.  I'd like to ask you about the

Page 156

1 second paragraph.  It begins, "Jaburg & Wilk (Maria
2 Speth) hires a private investigator in your area to
3 pimp one out in my area."
4        Do you see where I'm looking?
5    A.  Yes, I see it.
6    Q.  What -- what are you talking about there?
7    A.  Maria Speth hired a local private
8 investigator, according to Detective St. John of the
9 Killeen Police Department, asking questions about me
10 in this area.
11   Q.  How did you come to learn about that?
12   A.  The detective at the Killeen Police
13 Department, St. John, called me.
14   Q.  Did you ever learn of what kind of questions
15 this private investigator was asking about you?
16   A.  It never came to that because as soon as --
17 oddly enough, the detective at the Killeen Police
18 Department and myself, and the guy who is in the same
19 mailing list, picked up on the fact of the name Shawn
20 Richeson when he was hired by whatever detective is
21 out in your area, and knew of me -- I guess we get the
22 same jokes and stuff.  Jack sends me little jokes from
23 time to time.  And he picked up on my name in there
24 and started asking Jack about me.
25       Jack called to let me know that he was

39  (Pages 153 to 156)

Page 157

1 asking about me. And then I called the detective --
2 and I'm going to call him Scott because you guys used
3 that name earlier -- and Scott, he really didn't ask
4 anything. I was more feeling him out to find out what
5 he was about and who was paying him to do what.
6        So I would say I was more on the -- I
7 was more of the aggressive party there. I was getting
8 information from him.
9    Q.  Okay. Let's move down a couple of
10 paragraphs, to the one that begins, "If I were you, I
11 would trust neither attorney Maria Speth nor
12 Ed Magedson..."
13        Do you see where I'm looking?
14   A.  Uh-huh.
15   Q.  Let me ask you, do you trust Ed Magedson?
16   A.  No.
17   Q.  Do you find him a credible person?
18   A.  No.
19   Q.  Why not?
20   A.  Every indication that I've had with him from
21 2004 forward would indicate that he is pathological.
22 He's clearly a public nuisance. He's pawning himself
23 off as a legitimate businessman while simultaneously
24 running an online extortion scheme, and doesn't appear
25 to have any revenue source that's derived from

Page 158

1 something legitimate, other than just an online
2 extortion scheme.
3        So I would have to answer that now, he's
4 not a legitimate or honorable person.
5    Q.  Do you trust Ms. Speth?
6    A.  I'm going to pass no judgment at this point.
7 My gut feeling is -- and based on everything that
8 I've just found, she is a partner with him. If that
9 turns out to be true, then I can only assume that
10 she's -- you know, birds of a feather flock -- you
11 flock together. So I'm going to say, no, I don't.
12   Q.  All right. Why don't you take a look at
13 Exhibit 45 for me.
14   A.  Okay. All right.
15   Q.  And you might not have seen this before, so
16 why don't you take a look through it and let me know
17 if you've ever seen this one before.
18   A.  This is a Ripoff Report. I guess I'm on
19 another one now. No, I haven't seen this one.
20        But the -- well, he's listed all of us
21 this time. I don't know who wrote this one.
22   Q.  Well, I -- I don't know either. I wanted to
23 ask you about some of the comments that are made in
24 here.
25   A.  Oh, okay.

Page 159

1    Q.  But if you haven't had a chance to look at
2 it, why don't you take a moment and read through it.
3 It looks kind of long, so that might take a while. If
4 you want to go off the record, that's fine.
5    A.  Let me just scan over it real quick, and I'm
6 referring to Exhibit 45. It's one, two, three,
7 four -- with the fourth page being mostly blank,
8 except for one line.
9        The comments that are in here -- well, I
10 didn't make any comments on this page, but my name is
11 listed on this page. And Computer Nerds is listed on
12 this page. And it looks like Putt Putt Auto...
13        Okay. I got enough of it to understand
14 what you're talking about.
15   Q.  All right. Let me ask you first, it says,
16 "Reported by Ripoff Report, Tempe, Arizona." That's
17 up at the top near the title. Do you see where I'm
18 looking?
19   A.  Yes.
20   Q.  And I'm pretty sure I know the answer to
21 this, but do you know who Ripoff Report is, who made
22 this posting?
23        MS. SPETH: Form.
24   A.  I'm going to -- the only two that would write
25 this would be Mrs. Speth and Mr. Magedson. I mean,

Page 160

1 they're the only ones that would print all this stuff,
2 because it looks like sort of a character
3 assassination on me, on the girl that's in the video.
4 So based -- based on that, I would just guess that.
5    Q.  (BY MR. INGLE) All right. Let's go down to
6 the bottom where the text of the actual report starts.
7    A.  Okay.
8    Q.  And the very first sentence reads: "This
9 videotape, floating around the internet posted by
10 John F. Brewington, which we are calling the
11 'Putt Putt Video,' contains deliberately orchestrated
12 lies."
13        Do you see where I'm looking?
14   A.  Yes. I see it.
15   Q.  Are you aware of any deliberately
16 orchestrated lies in the Putt Putt Video?
17   A.  No.
18   Q.  Let's look at the last sentence of that same
19 paragraph: "The 'star' of this videotape told
20 investigators that John Brewington did three different
21 takes to make the video the way he wanted it."
22        Do you see where I'm looking?
23   A.  I see the text you're talking about.
24   Q.  Are you aware of three different takes being
25 taken of the video?

Page 161

1          MS. SPETH:  Form.
2      A.  I've never seen anything but one version of
3  it, so I -- I would have to answer no.
4      Q.  (BY MR. INGLE)  All right.  Please turn the
5  page.  And there's a couple of paragraphs that appear
6  under a bold heading that says "The Maker of the
7  Videotape, John F. Brewington."
8      A.  Okay.
9      Q.  Do you see that title?
10     A.  I see it.
11     Q.  Skip down to the fourth paragraph underneath,
12  that says "The beginning of the Putt Putt Video."
13     A.  "Beginning..."  Okay.  I see it.
14     Q.  And then look around halfway through that
15  paragraph.  It says, "Mr. Brewington paused the camera
16  in between the long interview and the shorter
17  interview perhaps to rehearse or get straight what he
18  wanted the people in the video to say."
19          Do you see that sentence?
20     A.  I see it.
21     Q.  Do you have any knowledge or information or
22  evidence that Mr. Brewington rehearsed the statements
23  in the video with Krysta Agerone and Tony Agerone?
24     A.  Now I can clearly see this was Mr. Magedson
25  that wrote this, so...  No, no.  To answer your

Page 162

1  question, no.  I'd -- I'd be willing to wage my life
2  that Mr. Brewington didn't stage a thing there and he
3  just recorded the -- he just recorded the witnesses.
4  But I'm a hundred percent certain that Ed Magedson
5  just posted this on his own website in an attempt to
6  deflect criticism from himself.
7      Q.  Are you aware that Krysta Agerone testified
8  that there was no rehearsing and there was no script
9  for the video?
10     A.  I wasn't aware of that.
11     Q.  Let's look at the next sentence:  "During the
12  video, Mr. Brewington guides the two people in the
13  video by rephrasing and spinning their statements..."
14          Let me stop right there.  Do you see
15  where I'm looking?
16     A.  I see it.
17     Q.  Now, you've watched the video, haven't you?
18     A.  Correct.
19     Q.  Did you see Mr. Brewington guiding them and
20  spinning their statements?
21     A.  No.
22     Q.  Okay.
23     A.  In fact, Mr. Brewington looked like nothing
24  more than a cop showing up talking to witnesses.
25     Q.  Let's go to the page after that, JFB 02240.

Page 163

1      A.  Where is that?
2      Q.  It's the third page of the exhibit.
3      A.  Okay.
4      Q.  Now, I'd like to ask you about the -- a
5  couple of sentences underneath the heading Texas Small
6  Business Owner Shawn Richeson.
7      A.  Oh, okay.  I see it.
8      Q.  Okay.  Let's look at that first sentence.
9  "Shawn Richeson of Computer Nerds and ClickaNerd in
10  Killeen, Texas, is not in the Putt Putt Video, but he
11  and Mr. Brewington have tried to use it against
12  RipoffReport.com."
13          Do you see the sentence?
14     A.  I see it.
15     Q.  Is that true?
16     A.  No.
17     Q.  Did you and Mr. Brewington try to use the
18  video against RipoffReport.com?
19     A.  No.
20     Q.  So that's a lie, isn't it?
21     A.  Yeah.  That is clearly, clearly propaganda
22  written by Mr. Magedson in an attempt to deflect
23  criticism from his own criminal actions.
24     Q.  Now I'd like to look -- it looks like one or
25  two sentences later, it says, "Richeson's e-mail

Page 164

1  essentially threatened to post the videotape if
2  RipoffReport.com did not take down postings on the
3  website about Richeson and his business, Computer
4  Nerds and ClickaNerds."
5      A.  I would state that that is absolutely and
6  totally false and another fraudulent statement made by
7  Mr. Magedson.
8      Q.  Let's look at the next paragraph, the last
9  sentence.  It reads:  "However, whether Richeson is a
10  hardened criminal or just a small time crook, it is
11  clear that he and John Brewington are working
12  together."
13          Do you see where I'm looking?
14     A.  No, I don't see that.
15     Q.  Okay.  It's the second paragraph under the
16  heading Texas Small Business Owner Shawn Richeson --
17     A.  Okay.
18     Q.  -- the last sentence of that paragraph.
19     A.  Okay.  I see that.
20     Q.  Are you and John Brewington working together?
21     A.  No.
22     Q.  So these statements about you are false,
23  right?
24     A.  Well, I'm not a hardened criminal, and I'm
25  not a small time crook.  I'm just a guy that got into

41 (Pages 161 to 164)

Page 165

1  trouble for doing some stupid things. So I guess
2  technically the assertions were correct there.
3          But the one dealing with
4  Mr. Brewington -- like I said, I respect
5  Mr. Brewington, and I think what he's doing is proper.
6      Q. Well, this post appears to imply that you and
7  Mr. Brewington are working together to blackmail the
8  Ripoff Report. Is that the impression that you got
9  from this?
10     A. That couldn't be further from the truth
11 because there's nothing that I could hope to gain from
12 the Ripoff Report, other than just exposing the
13 criminal wrongdoings of its owners.
14     Q. Do you feel like whoever posted this comment
15 about you is slandering your name?
16     A. No, not really. I mean, it's -- it's a
17 little gray as far as how they've portrayed me. But
18 in an attempt to smear John -- it looks to me like
19 they're just trying to smear things together in a way,
20 like I said, just to -- just to deflect criticism --
21 criticism away from Mr. -- or, I mean, from
22 Mr. Magedson and what he's doing.
23     Q. Do you believe that these comments were made
24 to damage your credibility as a witness?
25         MS. SPETH: Form.

Page 166

1      A. Ultimately, yes. But I think the damage to
2  my credibility is automatic as a result of my previous
3  criminal convictions, so I don't see anything in here
4  that he said about me that is flatly untrue. But it
5  is indicative of Mr. Magedson and his techniques of
6  trying to extort money from people and cause damage.
7      Q. (BY MR. INGLE) All right. I'm done with
8  Exhibit 45. I got Exhibit -- I'm looking at Exhibit
9  46, but as it turns out, I don't need to ask you about
10 anything specifically in it.
11         I read through Exhibit 46, and it seems
12 to me that Ed Magedson has rejected you from the
13 Corporate Advocacy Program. And I meant to ask you
14 about that. Did that ever happen?
15     A. Yeah. I -- I Pay Paled that $200 to him,
16 and I never heard back, actually. I think he just did
17 a refund, and I never heard anything from him.
18     Q. Was there ever any explanation as to why you
19 were not allowed to participate in the Corporate
20 Advocacy Program?
21     A. No explanation, but I think by -- by the time
22 that I was doing that, I think he believed that I was
23 gathering additional information in my prosecution of
24 my claims against him, so I guess -- I guess that's
25 his motive.

Page 167

1      Q. Have you ever received --
2          MS. SPETH: Form.
3      Q. (BY MR. INGLE) -- a letter or an e-mail or
4  any sort of communication denying your application for
5  that Corporate Advocacy Program?
6      A. Not that I remember.
7      Q. All right. I'm done with 46.
8      A. Okay.
9      Q. And actually, I have -- I have marked -- I've
10 pre-marked Exhibit 47. I don't need to ask you any
11 questions about it. So why don't we pick up Exhibit
12 48 instead.
13     A. Okay.
14     Q. What I'd like to ask you about is that it
15 looks like on Page 1 and continuing on to Page 2,
16 there's an e-mail from you to Declan McCullagh. Do
17 you see that?
18     A. From -- it looks like from Declan McCullagh
19 mailed to declan.mccullagh@cnet.com, to Service
20 Manager.
21     Q. Yeah. Actually, below that, it looks like --
22 it says "Service Manager wrote," and then there's a
23 colon. And then there's some more text underneath
24 that. So it looks like you e-mailed Declan
25 McCullagh --

Page 168

1      A. Oh, okay.
2      Q. -- and he e-mailed you back.
3      A. Oh, okay. I see it. Okay.
4      Q. And what I want to ask you about is the
5  e-mail that you sent to Declan McCullagh. You know,
6  did -- did you send this in e-mail, or is this the
7  text of that e-mail? Basically, is this accurate?
8      A. Let me dig --
9          MS. SPETH: Form.
10     A. Let me dig through the e-mail really quick.
11 The name seems to ring a bell. He seems like he's a
12 writer at CNET, and I was -- I think what I was doing
13 with this e-mail was finding out where he was at in
14 all of this, so I made some assertions about
15 Mr. Magedson being a homosexual and all that. So this
16 does look like my words, but let me just read the
17 e-mail.
18     Q. (BY MR. INGLE) Yeah. Just look through it
19 and tell me if you recognize this.
20     A. Yeah, yeah. I was leading Mr. McCullagh to
21 believe in this e-mail that I became a buddy with
22 Ed Magedson.
23     Q. I'd like to -- I'd like to ask you about some
24 comments at the very end of Page 1 --
25     A. Okay.

Page 169

1    Q.  -- specifically the part that says, "During
2  one of those conversations, he had admitted that he
3  had authored a death threat letter in order to obtain
4  a temporary injunction in another lawsuit."
5        Are you aware of whether Ed Magedson
6  admitted to authoring death threat letters?
7    A.  I'm going to state that I made that comment
8  in there, but I'm also going to state that I falsified
9  that comment to Declan.  Like I said, I was trying to
10  figure out who he was.
11        Mr. Magedson did not make that comment
12  to me about the death threat letter, but it was common
13  belief amongst all of us that were investigating him
14  that he did author that.
15        As a matter of fact, that's another one
16  of those pieces of evidence, that I would risk my life
17  on, that Mr. Magedson authored his own death threat
18  letter in an attempt to secure some assistance of the
19  Mesa Police Department, until the detective looked at
20  the facts and threw him out on it -- threw him out.
21    Q.  And that actually dovetails perfectly with my
22  next question.  If you turn the page, at the bottom it
23  says Xcen 00618.  I want to ask you about the second
24  to last sentence in the e-mail.  It says, "In fact,
25  the detective at the Mesa Police Department believes

Page 170

1  it was Magedson."
2        Do you see where I'm looking?
3    A.  Now, that conversation was a fact.  I
4  actually did talk to the detective at the Mesa Police
5  Department and he point blank told me, we believe it
6  was Magedson that authored that letter.
7    Q.  Okay.  That's what I was going to ask you.
8  All right.  Why don't you take a look at my last
9  exhibit, Exhibit 49.  And this appears to be comments
10  that were posted on the Phoenix News Times newspaper
11  article.
12        Why don't you take a look at this
13  comment and tell me if you recognize it.
14    A.  I'm looking at Exhibit 49, reading it right
15  now.  I'm sorry.  It's going to take me a while.  This
16  is, like, really, really teeny print.
17        MS. SPETH:  I'm glad I'm not the only
18  one.  It's hard to read.
19    A.  I can't read this.
20    Q.  (BY MR. INGLE)  I apologize for the print.
21  That's the only copy I have, so just let me know when
22  you've worked your way through it.
23    A.  This looks like one of my comments because
24  I've got my number posted in here.  And I was
25  discussing various PACER findings -- PACER findings

Page 171

1  that I found about various federal lawsuits.  So,
2  yeah, I'm pretty sure this is mine.
3    Q.  All right.  Towards the end of this comment,
4  it says, "A private investigator has been hired in the
5  Phoenix area that has secured the physical address and
6  location of Ed Magedson."
7    A.  Uh-huh.
8    Q.  Do you see that sentence?
9    A.  Yes.
10    Q.  The private investigator you're referring to,
11  that is not John Brewington, is it?
12    A.  I don't know that -- hang on.  Let me just
13  read the comment here real quick.
14    Q.  It might help to read the next two sentences
15  after that as well.
16        MS. SPETH:  Form.
17    A.  In the time frame that this thing was
18  published, I don't believe John Brewington was the
19  original investigator out there that was looking at
20  him.  I think there was a -- I think there was a
21  Maricopa County, either Sheriff, or something to that
22  effect, that was looking at him.
23        But I -- I see my next comment here
24  about John Brewington -- yeah.  I think that's kind of
25  when John Brewington and I learned of each other, was

Page 172

1  he -- he was either talking to another person in
2  another lawsuit or something to that effect.  Yeah, I
3  see it.  It references Magedson versus Russo.
4        So to answer your question, the first
5  line of "A private investigator has been hired in the
6  Phoenix area," I believe I was referring to somebody
7  with the Sheriff's department in Maricopa County.
8        And then another private investigator by
9  the name of John Brewington -- well, it couldn't be a
10  private investigator then.  Maybe there was a second
11  one.
12    Q.  (BY MR. INGLE)  Well, actually, if you don't
13  remember or if you don't know, you can just say I
14  don't remember or I don't know.
15    A.  I don't know, but I do recall another
16  investigator out there, but I cannot remember the
17  guy's name.  And I cannot remember for sure if he was
18  an official police department investigator or private.
19    Q.  All right.  I'm done with Exhibit 49.
20        I've got a couple more questions for
21  you, and these are ones I kind of jotted down as you
22  were talking earlier, so they're going to jump around
23  a little bit.  I apologize.
24    A.  Okay.
25    Q.  Let me ask you, did John Brewington ever

43  (Pages 169 to 172)

Page 173

1  assist you in using the Putt Putt Video for the
2  purpose of blackmailing Ed Magedson?
3      A.  No.
4      Q.  How about blackmailing Xcentric Ventures,
5  LLC?
6      A.  No.
7      Q.  Did John Brewington ever give you substantial
8  assistance or encouragement in the commission of a
9  tort?
10      A.  No.
11      Q.  Have you recently received e-mails for Ripoff
12  Report regarding the bidder/buyer?
13      A.  The bidder/buyer... oh, yes.
14      Q.  Have you asked that Ripoff Report e-mail you
15  about that, or is that something that came unsolicited
16  to you?
17      A.  It came as -- well, it showed up in my spam
18  box, but I read it.  And it looked like it came from
19  Ed Magedson, but I'm not sure.
20      Q.  Well, I guess what I was asking is that have
21  you desired to receive those types of e-mails from the
22  Ripoff Report?
23      A.  No.
24      Q.  Did you ever sign up on a mailing list to
25  receive anything like that?

Page 174

1      A.  No.
2      Q.  As I was going through some of the evidence
3  in this case, I came across the statements that some
4  government entities have blocked Ripoff Report.  Are
5  you aware of whether that's true?
6          MS. SPETH:  Form.
7      A.  My response to that is I can't comment one
8  way or another on that.  I -- I believe it to be true.
9      Q.  (BY MR. INGLE)  Okay.  I also came across a
10  comment that Symantec -- Symantec Corporation, the
11  antivirus software people, Symantec has been notified
12  to include it in the host file block update.
13          Do you have any knowledge about that?
14      A.  The way I understand, when a site has been
15  determined -- I'm talking about a website.  When a
16  website has been determined to have any type of
17  cookie-tracking or malware or spyware, then those
18  submissions are made by the affected parties to Norton
19  and Symantec.  Then the software is modified to
20  include that in the host file, similar to the way that
21  we did it with our own software.
22          So to put it into simple technical
23  terms, we've blocked access to Ripoff Report by all of
24  our customers.
25      Q.  Got it.  Can you go back and pick up

Page 175

1  Exhibit 3?  It's from the very beginning of your
2  deposition, but I have a question I wanted to ask you
3  about it.
4      A.  I do not have Exhibit 3.
5          MS. SPETH:  Oh, okay.  It's in this big
6  pile here.  Why does it start with 4, though?  Oh,
7  they're just out of order.  It's there.
8      A.  All right.  Exhibit 3 is an e-mail, it looks
9  like, and it was written, or purports to be written,
10  from Shawn to Maria Speth and legal@dancorbin.com and
11  jerryscarbrough.org.
12      Q.  (BY MR. INGLE)  I'd like you to look at the
13  second page of Exhibit 3.
14      A.  Okay.
15      Q.  Around about the middle, it says, "I would
16  like to work out a deal with you and Ed Magedson to
17  see if we can come up with some mutually agreeable
18  contract as to what I should do with the video."
19          Do you see where I'm looking?
20      A.  I see it.
21      Q.  Did you ever have any actual intention to
22  work out a deal with Ed Magedson?
23      A.  No.  Like I said, from the get-go, I know of
24  Mrs. Speth's legal expertise and her rather successful
25  success rate under the Communication Decency Act.  So

Page 176

1  as I strategized how to get her down into Texas, I
2  felt the only way that that was going to be possible
3  is to throw out a few feelers and see if I can get her
4  interested in taking a bite on the worm, and as it
5  turns out, it did.
6      Q.  You know, earlier you were asked about
7  conversations that you had had with me personally.  Do
8  you remember answering questions about that?
9      A.  Yes.
10      Q.  Now, to my memory, I recall speaking to you
11  on Friday, March, what, 26th, I guess --
12      A.  Okay.
13      Q.  -- around 3 p.m. in the afternoon for about
14  half an hour.  Do you remember that?
15      A.  Yes.
16      Q.  Have you ever had any other conversations
17  with me, or has anybody ever called you and said that
18  they were me, other than that one call last Friday?
19      A.  Well, yeah.  I mean, when I was in Judge
20  Morris' court, I recall you being on conference in
21  there for the hearing, and...
22      Q.  That is correct.  Yeah, I was on the -- I was
23  on the speaker phone listening to the hearing.
24      A.  Right.
25      Q.  Other than those two instances, has anybody

44  (Pages 173 to 176)

Page 177

1  else ever called you and spoken to you representing
2  that they were me, Chris Ingle?
3      A.  No, no.  I recognize your voice.  So it seems
4  like the time in Judge Morris' court, today, and the
5  one we had, you know, just whatever day you're talking
6  about, those seem to be the three I had with you.
7      And then I might have been mistaken on
8  who else I am talking to, but it seems like there was
9  another lawyer there.
10     And when I say "talking," I'm terrible
11 about not putting the communication forms into
12 perspective.  It might have been e-mail.
13     Q.  Okay.  Now, you've said throughout your
14 deposition today that you made certain
15 misrepresentations intentionally.
16     Let me ask you, the misrepresentations
17 that you have admitted to making, were those designed
18 to draw Ed Magedson and Maria Speth to Texas so you
19 could obtain personal jurisdiction over them?
20     A.  Yes.
21     Q.  Did you make any misrepresentations for any
22 other purpose?
23     A.  No.
24         MR. INGLE:  I don't think I have any
25 further questions for you.  Let me look around to make

Page 178

1  sure real quick.
2         No.  That's all the questions I have for
3  you.  Thank you very much.
4         MS. SPETH:  I have just a couple of
5  follow-ups to yours, actually, one that I'd forgotten,
6  and then a couple of follow-ups.  And then we're done.
7              REDIRECT EXAMINATION
8  BY MS. SPETH:
9      Q.  Mr. Richeson, did you ever -- have you ever
10 done any forensic work or computer work for the
11 Killeen Police Department?
12     A.  I'm very -- the answer is, yes, but I don't
13 want to go into what I've done for them, because I
14 need a permission to discuss that kind of thing.
15     Q.  No.  I wasn't going to ask you what you've
16 done.  But you have done some forensic work for them?
17     A.  Yes.
18     Q.  Do you think that the video that we've been
19 talking about, this Putt Putt Video, is likely to
20 cause people to file lawsuits against Ripoff Report?
21         MR. INGLE:  Form, foundation.
22     A.  My answer to that is, no, I don't see the
23 video in itself causing people to file lawsuits.
24 People are filing lawsuits for reasons that are beyond
25 me.  It just seems wrong that this many occurrences of

Page 179

1  those suits have been filed.
2         I think what the video does is clear up
3  what everybody already knew.  It just made a
4  prima facie case now that we know that you -- and I'm
5  going to say "you" because I -- Ripoff Report,
6  Ed Magedson and Maria Speth are a single entity, in my
7  mind.  I might be wrong.  You may prove me different,
8  that you're not a part of it.
9         But my gut feeling is -- or at least I
10 know for a fact, Ed Magedson, Ripoff Report and
11 Xcentric Ventures is running an online extortion
12 scheme.  And what this video does is prove that he's
13 using surrogates to write a good portion of the
14 reports to inflame people into giving him money to
15 mitigate the damages that he's creating.  Whether
16 you're actually participating in that scam or not is
17 for the courts to decide.  I believe it in my heart
18 that that's the case.
19         But I do believe, Ed Magedson: Ripoff
20 Report, and Xcentric Ventures, that is the sole
21 purpose of this business.
22     Q.  (BY MS. SPETH)  So do you think that the
23 video then gives people evidence or ammunition to make
24 claims of extortion against Mr. Magedson and the
25 website and perhaps me?

Page 180

1      A.  I think it confirms what they already know.
2      Q.  Okay.  When you had your conversation with
3  that private investigator, Scott, down here in
4  Killeen, did you then tell Mr. Brewington about your
5  conversation?
6      A.  It seems like I sent an e-mail to him about
7  it.  I -- it was either him or one of the lawyers, or
8  maybe the paralegal, but somebody.  I've talked to
9  some people about it.
10     Q.  And I think Mr. Ingle asked this question,
11 and I want to make sure I understand you, though:  So
12 when you say that Ed Magedson is running an extortion
13 scheme, you agree that's nothing more than your
14 own opinion, right?
15     A.  I would say it's the collective opinion of
16 thousands of businesses across the country.
17     Q.  Okay.  It's just opinion, though; it's not a
18 fact.  Right?
19     A.  Well, it's a fact that has yet to have been
20 proven in criminal court.
21     Q.  Okay.  But it is a statement of fact; is that
22 what you're saying?  If you say that --
23         MR. INGLE:  Form.
24     Q.  (BY MS. SPETH)  If you say that Ed Magedson
25 is running an extortion scheme, do you agree that

45 (Pages 177 to 180)

Gwendolyn Parker and Associates, Inc.
214-747-8007

Page 181

```
 1   that's a statement of fact?
 2      A.  I would say it is a fact.
 3      Q.  Okay.  Now, you told Mr. Ingle that you were
 4   not aware that there were three different takes or
 5   rehearsals or whatever on this videotape when it was
 6   done.  You weren't there when the videotape was made,
 7   were you?
 8      A.  No.
 9      Q.  So you have no idea of how the videotape was
10   actually made, other than what Mr. Brewington has told
11   you?
12      A.  The fact that Mr. Brewington struck me as an
13   honest individual leads me to believe that there's
14   been no alterations.
15      Q.  Okay.  But it would be based upon your
16   opinion of him as a person and what he's told you.
17   All I'm trying to establish is you don't have personal
18   knowledge of how the video was made?
19      A.  I have extremely good clean reads on people,
20   and I believe him to be an honest person.
21      Q.  But you don't have any personal knowledge in
22   the sense that you weren't there?
23      A.  I would respond with I have no personal
24   knowledge that anything has been altered whatsoever.
25      Q.  And you have no personal knowledge that it
```

Page 182

```
 1   wasn't altered?
 2      A.  Correct.
 3      Q.  I think you've said this, but I want to make
 4   sure it's clear.  I think you told Mr. Ingle this.
 5          When you paid that $250 to Pay Pal,
 6   Mr. Magedson and/or Xcentric Ventures refunded it to
 7   you, correct?
 8      A.  Yes.
 9          MS. SPETH:  That's all I have.  Chris,
10   any follow-up?  I'm all done.
11          MR. INGLE:  I just have one question.
12              RECROSS EXAMINATION
13   BY MR. INGLE:
14      Q.  Shawn, would you agree with me that the
15   Putt Putt Video is not prompting lawsuits against
16   Magedson and Xcentric Ventures; extortion is prompting
17   lawsuits against Magedson and Xcentric Ventures?
18   Would you agree with that?
19          MS. SPETH:  Form.
20      A.  I would agree that there are a huge array of
21   state and federal suits that happen now against
22   RipoffReport.com that have gone nowhere because it's
23   difficult to get proof when somebody of a criminal
24   master mind at his level hasn't been caught.
25          And I believe the tape is like a
```

Page 183

```
 1   fingerprint in a crime.  I think it will be -- work on
 2   the same principle as DNA now; it's going to go out
 3   and actually connect a lot of things together.
 4          And I don't believe in any way, shape,
 5   or form that it's prompting a lawsuit.  I believe it's
 6   going to be prima facie evidence in existing lawsuits.
 7   And the people that were afraid to file, they'll
 8   probably look at the situation and investigate it,
 9   giving whatever credibility they want for that tape.
10   And I don't think in and of itself it's sufficient
11   evidence for another party to file a lawsuit.
12          So to answer your question, no, it
13   doesn't -- it doesn't generate a lawsuit.
14          MR. INGLE:  All right.  That's the only
15   question I had.  Thanks, Shawn.
16          THE WITNESS:  You bet.
17          MS. SPETH:  Okay.  We're all done.
18          THE VIDEOGRAPHER:  Off the record at
19   2:58.
20          MS. SPETH:  Signature is waived.
21          (Deposition concluded at 2:58 p.m.
22          Signature was waived by agreement
23          of counsel and the witness.)
24
25
```

Page 184

```
        CAUSE NO. 241724
XCENTRIC VENTURES, LLC,   ) IN THE DISTRICT COURT
an Arizona limited        )
liability company, and    )
ED MAGEDSON, an           )
individual,               )
                          )
Plaintiffs,               )
                          )
                          )
VS.                       ) 146TH JUDICIAL DISTRICT
                          )
SHAWN RICHESON,           )
                          )
Non-party Deponent.       ) OF BELL COUNTY, TEXAS

        REPORTER'S CERTIFICATION
        DEPOSITION OF SHAWN RICHESON
            MARCH 29, 2010

    I, GINA OERTLI, Certified Shorthand
Reporter in and for the State of Texas, hereby certify
to the following:
    That the witness, SHAWN RICHESON, was
duly sworn by the officer and that the transcript of
the oral deposition is a true record of the testimony
given by the witness;
    That examination and signature of the
witness to the deposition transcript was waived by the
witness and agreement of the parties at the time of
the deposition;
    That the original deposition was
delivered to Ms. Maria Crimi Speth;
    That the amount of time used by each
```

Gwendolyn Parker and Associates, Inc.
214-747-8007

Page 185

```
 1   party at the deposition is as follows:
 2         Ms. Maria Crimi Speth - (2:49)
 3         Mr. Christopher B. Ingle - (0:49)
 4         That $       is the deposition
 5   officer's charges to the Plaintiffs for preparing the
 6   original deposition transcript and any copies of
 7   exhibits;
 8         That pursuant to information given to the
 9   deposition officer at the time said testimony was
10   taken, the following includes counsel for all parties
11   of record:
12         Ms. Maria Crimi Speth, Attorney for
     Plaintiffs;
13         Mr. Christopher B. Ingle, Attorney for
     Defendants.
14
15         That a copy of this certificate was
16   served on all parties shown herein on
17   and filed with the Clerk pursuant to the Texas Rules
18   of Civil Procedure.
19         I further certify that I am neither
20   counsel for, related to, nor employed by any of the
21   parties or attorneys in the action in which this
22   proceeding was taken, and further that I am not
23   financially or otherwise interested in the outcome of
24   the action.
25
```

Page 186

```
 1         Certified to by me this _____ day
 2   of April, 2010.
 3
 4
 5
 6
 7         GINA OERTLI, CSR
           Texas CSR No. 1897
           Expiration Date:  12/31/2011
 8         Firm Registration No. 244
           3827 Travis Street
 9         Dallas, Texas  75204
           Phone:  (214)747-8007
10         Fax: (214) 747-8087
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

47  (Pages 185 to 186)

ttt-------

## A

ability 145:5,8
able 15:4 25:10
  42:17 55:13 71:7
  133:11
abovestyled 1:18
absence 22:21
absolutely 148:9
  149:12 164:5
abstracted 124:12
abundance 124:2
abundantly 120:17
accept 8:25 22:23
accepting 9:1
access 174:23
accessed 141:25
accessible 72:6
accident 63:16,17
  63:22 64:12
accomplish 83:5
accord 30:9
account 31:16
  33:12,17,23 127:5
accuracy 47:21
  49:1 52:13,19
  140:17
accurate 27:24,25
  28:18,21 30:14
  44:25 57:12 62:1
  63:14 64:17 66:15
  67:2 78:14 80:7
  85:23 88:16 90:11
  91:18 105:17,19
  107:11,12,23
  108:19,20 109:7
  110:16 117:25
  120:13 121:23
  126:25 147:19
  168:7
accurately 40:6
acquired 47:7
acquisitions 2:9
act 175:25
action 9:13 24:21
  24:23 31:24 32:12
  48:11 50:8 54:13

54:14 69:13 70:20
  70:21 71:11
  102:14 122:23,23
  122:24 123:25
  124:9 125:21
  126:7 131:5 132:9
  132:12 152:3
  185:21,24
actionable 42:2
actions 31:19
  163:23
actors 18:22 19:4
  141:6 146:1,4
actual 108:6 136:2
  138:14 160:6
  175:21
adam 110:18
add 152:4
added 18:10 140:6
  140:11
additional 42:17
  166:23
address 10:10
  38:24 39:1 81:5
  81:11 87:10
  113:13 171:5
addresses 21:16
  108:10,13 112:22
admitted 169:2,6
  177:17
adobe 76:1
adversary 110:19
advertisement
  142:12,16
advocacy 95:12,14
  166:13,20 167:5
affect 145:5,8
affidavit 3:23 5:7
  43:20 44:1,6,12
  44:23 45:1,5,16
  45:23 100:15,18
  101:2,3,10,11,14
  102:9 103:11
affirming 135:8
aforesaid 30:10
  54:5
afraid 183:7

afternoon 176:13
agenda 19:9,19
  20:4,22,22 21:2
  22:24 23:1,3
agent 57:21 65:15
  104:20
agents 37:4,7,10
  89:20 99:24
agerone 47:20,25
  52:12 53:12
  161:23,23 162:7
agerones 53:2
aggressive 157:7
ago 71:20 83:14
agree 51:12 62:11
  86:21 97:13
  180:13,25 182:14
  182:18,20
agreeable 21:19
  175:17
agreed 50:7 51:2,4
  131:15
agreement 77:4
  183:22 184:21
ah 128:3
ahead 36:9 44:19
  44:20 68:23 78:9
  92:22 96:17
  100:24 112:2
  117:6 121:16
  128:12 150:20
alcohol 145:4
aliens 75:16,19
alive 130:10
allegedly 89:21
alleging 11:10
allen 7:9
allow 123:23
allowed 166:19
alphanumeric 39:1
alter 83:2,11
alterations 150:10
  181:14
altered 181:24
  182:1
amending 125:19
america 33:24

ammunition
  179:23
amount 43:1 126:2
  126:22 134:7
  184:25
amplified 74:12
andy 60:18,21,22
  61:1
annette 2:20 4:15
  41:3 76:10 81:11
  126:20,21,21
  127:9,12
announced 69:20
answer 7:23,24
  40:7,16 54:17
  68:5 78:25 84:4
  93:12 95:18 99:22
  112:15 143:4,6
  148:1 158:3
  159:20 161:3,25
  172:4 178:12,22
  183:12
answered 101:5
  147:25
answering 7:18 8:2
  14:23 176:8
answers 85:15
anthony 123:19
anticipated 130:13
antivirus 174:11
antonio 132:14,20
  133:7
anybody 13:16
  93:23 176:17,25
anymore 61:7 98:4
  133:1 137:5
anyplace 142:1
anyway 154:13
anyways 125:15
apologize 37:23
  45:11 170:20
  172:23
appeal 134:23
  135:1,5,22
appeals 134:25
  135:10
appear 11:8 13:1

13:24 37:12 57:12
  57:14 83:3,12
  100:15 129:10
  136:25 141:16
  157:24 161:5
appearance 103:14
  104:3 131:9
appeared 10:19
  13:20 14:14
appears 17:20
  33:11 40:21 41:20
  42:4 56:15 76:8
  86:20 87:3,10,13
  96:25 99:21
  130:20 131:23
  133:24 144:1
  153:14,18 165:6
  170:9
appellate 6:3
application 42:10
  42:24 127:4 167:4
applied 90:25
approximately
  131:19
april 44:14 84:11
  101:15 135:20,21
  135:25 186:2
archive 26:22,25
  27:4 38:6
area 156:2,3,10,21
  171:5 172:6
argue 31:25 55:16
arizona 1:2 2:5,12
  9:9 21:25 33:24
  41:4 42:3 47:6,20
  48:2,11 58:11
  64:19 102:14
  114:10,14 150:15
  153:1 159:16
  184:2
array 182:20
art 96:22
article 4:11 6:7,10
  57:10 170:11
ascertain 55:13
ascertained 137:20
asked 11:14 32:5

32:17 40:2,3
48:13,14,16 65:16
97:22 147:25
173:14 176:6
180:10
**asking** 7:17 8:21
14:22 20:20 22:6
22:8 25:21,22
32:9 54:20,24
62:3,15 63:19
72:11 81:20,21
94:4 95:5 100:21
100:23,25 102:6
115:15,16 119:18
120:6 142:24
151:23 156:9,15
156:24 157:1
173:20
**asp** 59:16
**ass** 24:5 67:21 74:6
**assassination** 160:3
**assert** 132:5
**asserted** 138:13
**assertion** 149:16
**assertions** 13:5
123:24 124:24
125:9 149:8 154:7
165:2 168:14
**asserts** 147:2
**asset** 90:16
**assigned** 132:16
**assist** 173:1
**assistance** 169:18
173:8
**assisting** 53:8
**associated** 71:12
72:9
**association** 94:1
**assume** 26:16 71:18
142:24 143:24
158:9
**assuming** 142:22
152:25
**assumption** 21:22
**assumptions** 19:12
**attached** 1:25
42:13 43:12 44:2

44:3,17 45:3,5
116:17
**attachment** 5:5
**attempt** 30:25 42:6
51:8 54:10 98:17
106:4,7 162:5
163:22 165:18
169:18
**attempted** 54:4
55:19
**attended** 69:12
**attention** 60:21
114:20 141:23
143:10
**attorney** 18:16
31:20 39:19 51:18
52:17 53:22 58:3
120:25 121:1
131:9 134:11
157:11 185:12,13
**attorneys** 23:19,20
24:1,3,5 26:8
45:21 49:11,15
51:5,24,25 52:15
53:1,22 76:23
90:4 101:11 102:6
107:8 114:6,7,11
185:21
**audio** 39:12 72:10
74:4,9 75:11
80:15,17 82:4
107:18 143:5
**audiotape** 71:25
74:25
**audiotapes** 39:21
40:3,5
**australia** 113:18
**authenticate** 48:2
49:6 109:4 148:22
**authenticated**
47:20 48:5,9,25
52:13 154:14
**authenticity** 52:19
**author** 19:8,18
28:17 169:14
**authored** 169:3,17
170:6

**authoring** 152:5
169:6
**authorities** 53:9
**authorization** 30:9
**auto** 159:12
**automatic** 166:2
**automatically** 38:1
**avenue** 2:5 113:3
**aware** 115:5 160:15
160:24 162:7,10
169:5 174:5 181:4

**B**
**back** 11:5 12:4
23:11 27:14 29:17
34:16 35:8 38:9
39:25 52:12 54:19
55:14,21 72:10
78:3 85:13,18
93:8 96:6,11,19
99:20 101:12,13
112:4 123:22
128:20 132:8,11
133:16 135:21
137:11 141:9
142:15 143:25
146:15 147:3,14
148:16,19 166:16
168:2 174:25
**background** 74:17
**bad** 127:23
**bag** 50:11,21
**bait** 18:17 19:14
**baited** 20:8
**baiting** 108:2
147:12
**balance** 90:22
**bank** 31:16 33:7,12
33:20,23,23 127:5
**banking** 34:15
**bankruptcy** 129:13
129:14,17,24
130:3,3,6,7,10,11
130:14,17
**bar** 42:3
**barbie** 109:10,13
109:20,21

**bars** 154:25
**base** 114:4
**based** 13:20 19:12
31:23 45:20 46:4
53:15,19 67:10
84:4 101:12
102:12 147:16,16
158:7 160:4,4
181:15
**basically** 75:1
103:4 108:2
114:10 124:1
168:7
**bates** 16:18 17:14
25:3 40:19 43:19
79:9 84:10 100:19
111:19,22
**bathroom** 96:4
128:9,15
**bcentralhost** 17:3,4
17:7 82:17
**beginning** 25:17,21
78:4 99:6 147:12
161:12,13 175:1
**begins** 156:1
157:10
**belief** 31:15 33:6
47:5,19 53:15,18
55:4,6,9 149:17
149:18 151:1
155:3 169:13
**believe** 12:22,25
13:11,14 15:12,24
18:22 19:5 21:2,4
22:12,13,14,15
31:11,16 32:22
33:16,22,23 48:5
49:2 50:19 52:23
54:8 62:5 63:4
66:20,21 69:1
70:10 71:14 78:19
79:2 88:7,9,12
98:6 101:14
102:14 105:22
106:25 120:11
134:20 143:11,13
143:22 144:22

146:3 149:9 151:3
151:8 152:9,12,15
154:5 165:23
168:21 170:5
171:18 172:6
174:8 179:17,19
181:13,20 182:25
183:4,5
**believed** 18:22 21:1
23:12 26:18 53:8
102:20 149:11
154:10 166:22
**believes** 169:25
**believing** 30:10
**bell** 1:8 20:12 42:23
68:9 69:15 71:10
87:18 104:6
123:14 124:17
168:11 184:8
**belongs** 133:6
**best** 8:5 45:13 48:8
88:23 102:3
136:20
**bet** 183:16
**better** 11:23 56:3
63:19
**beyond** 58:2 178:24
**bidder** 173:12,13
**big** 41:2 117:2
128:1 175:5
**birds** 158:10
**bit** 14:15 38:10
73:21 74:14 93:6
103:23 104:8
123:22 172:23
**bite** 67:20 176:4
**bits** 62:7 65:6
**blackmail** 165:7
**blackmailing** 173:2
173:4
**blamed** 64:14
**blank** 40:23 67:7
159:7 170:5
**blew** 124:11
**blind** 59:13
**block** 139:2 174:12
**blockannoyingsit...**

117:13
**blocked** 136:25
  137:16,23 138:1,3
  138:16,22 174:4
  174:23
**blocking** 139:4,11
**blog** 5:6 57:13
  59:14 60:15 97:1
**blogging** 85:15
**blogs** 15:25
**blotter** 68:21
**boardroom** 1:22
**boasted** 88:3
**body** 113:20
**bold** 161:6
**bond** 135:22
**bono** 152:17
**bottom** 16:19 56:24
  57:1 66:25 68:14
  68:14,18 87:11,23
  92:11 94:13
  121:19 129:5
  160:6 169:22
**box** 34:11 75:22
  113:13 173:18
**boxes** 38:7
**bragged** 83:7,14
**breach** 126:8,9,18
**break** 8:8,8 10:25
  77:22 96:7 128:15
  128:15
**brenda** 57:16 105:1
  105:3
**brewington** 2:8,9
  6:6 7:12 12:17
  14:11,17 19:8,19
  20:1,7,10,21,23
  21:1,2,5 22:12
  23:12,14 28:22
  29:3 30:6 32:11
  34:20 35:5 37:3,7
  37:10 47:6,16
  49:7,9,10 50:8
  52:14,16 53:1,23
  62:17 100:22
  101:6,10,15 102:8
  102:16 105:13,20

105:25 107:19,25
  108:7,9 110:19
  111:14 112:17
  114:8 115:18
  118:13 136:14
  139:17,21,23
  140:9 142:13,14
  142:18 144:11
  145:23 149:10,13
  150:17 152:9,12
  152:15 160:10,20
  161:7,15,22 162:2
  162:12,19,23
  163:11,17 164:11
  164:20 165:4,5,7
  171:11,18,24,25
  172:9,25 173:7
  180:4 181:10,12
**brewingtons** 18:23
  52:15 53:22 107:8
**briefly** 120:11
**bring** 35:13 36:23
  51:15 63:20 149:6
**brought** 15:8 32:21
  93:8 114:20
  123:18
**buddy** 168:21
**built** 32:2
**bury** 55:5
**business** 89:16,17
  163:6 164:3,16
  179:21
**businesses** 30:23
  180:16
**businessman**
  157:23
**buyer** 173:12,13

C

**call** 21:14 24:6
  29:17,20,22,23
  92:15 106:8 141:5
  145:11,19 152:16
  152:17 157:2
  176:18
**called** 9:3 10:22
  21:14 30:1 46:14

46:14 56:16 57:10
  71:8 84:13 89:16
  89:18 92:6 95:11
  96:21 105:21
  106:15,15,18
  117:12 121:12
  127:25 130:20,25
  132:3,13 138:12
  156:13,25 157:1
  176:17 177:1
**calling** 160:10
**camera** 161:15
**canada** 21:10 41:4
**cannon** 65:25
**cant** 23:16 24:18
  40:16 45:19 67:10
  78:24 79:24 85:7
  86:3 88:17 93:12
  93:13 95:18 98:13
  98:15,19 99:22,23
  100:3 102:10
  114:17 115:6,6
  121:19 137:24
  143:4,6,11 148:14
  170:19 174:7
**capture** 108:10,13
**car** 13:21,24 14:3
  32:23 63:15,17,22
  136:15 138:10,12
**carbon** 18:4 23:10
  23:18 28:8 29:3
  45:21 66:20 76:10
  76:11 110:17
  147:17 148:20
  155:9
**card** 31:16 33:6
  134:6,10
**care** 77:9,10
**cared** 132:21
**careful** 96:18
**carefully** 128:5
**case** 5:24 32:2 48:2
  48:20 50:11,21
  70:10,10,23 71:3
  71:8 89:14,22
  102:15 113:24
  114:9 119:4,7

120:10,15 122:9
  123:6,7,18,21
  126:1,13,15,17
  127:25 129:7,14
  130:2,16,17,18,19
  130:20 131:8,13
  131:21 132:1
  133:9,12,14,20,24
  134:1,12,13,14
  143:18 174:3
  179:4,18
**cases** 6:3 24:12
  119:11 129:9,10
  129:13
**catch** 46:19
**categories** 36:22
**category** 36:25
**caught** 21:2 24:23
  115:16 143:12,14
  182:24
**cause** 1:1,18 8:14
  9:4,13 24:21
  31:24 32:12 48:11
  50:7 54:13,14
  56:5 69:13 71:11
  98:1 122:22,23,24
  123:25 124:8
  125:20 126:7
  131:5 132:9,12
  145:17 166:6
  178:20 184:1
**caused** 86:9
**causes** 24:23
  102:14 152:2
**causing** 178:23
**caution** 124:2
**cc** 81:10
**ccing** 118:22
**central** 2:5
**cerebrally** 118:25
**certain** 88:3 103:21
  162:4 177:14
**certainly** 45:22
**certificate** 3:7
  185:15
**certification** 184:9
**certified** 184:12

186:1
**certify** 184:13
  185:19
**challenged** 119:1
**chance** 95:6 159:1
**change** 74:19 77:23
  97:25 148:1
**changed** 147:22
**changes** 103:14
  150:10
**changing** 80:20
**chappell** 69:16,20
  70:8 71:4,9,15
  97:17,18
**chapter** 129:17
**character** 160:2
**characteristics**
  74:18
**charge** 57:21
**charged** 134:9
**charges** 185:5
**charging** 134:10
**chase** 22:12
**check** 26:7 86:21
**child** 63:9
**chosen** 60:25
**chris** 9:21 25:9
  36:2 41:17 43:18
  43:22 46:18 49:12
  49:13 50:14,17
  51:18,20 52:2,7,8
  52:9 56:24 68:16
  86:23 117:3
  118:23 121:13
  127:20 144:23
  177:2 182:9
**christmas** 41:4
**christopher** 2:10
  185:3,13
**chuckle** 104:8
**cid** 104:19,21
**cingle** 2:13
**circulated** 140:13
**citation** 8:17,22,24
  9:6 134:22
**cited** 134:22
**civil** 1:23 130:18

**claim** 34:17 55:14
126:5,9 130:9
131:6
**claims** 9:12 22:23
88:8 122:11
132:17 166:24
179:24
**clammed** 110:8
**clarification**
140:21
**clarify** 55:25
**clarifying** 53:25
**clean** 103:14 104:3
181:19
**cleans** 38:2
**clear** 32:18 35:22
53:21 87:7 88:24
103:6 113:10
117:17 120:17,20
138:20 140:15
148:10 149:12,15
150:3 153:3
164:11 179:2
182:4
**clearly** 42:2 47:9
59:19 60:24 149:4
157:22 161:24
163:21,21
**clearwire** 130:25
**clerk** 42:23 43:7
114:20 185:17
**click** 15:1,4,7 30:21
33:25,25 34:1,13
**clickaner2** 2:19
10:11,20,23 11:17
11:19,21 15:11,14
59:16 61:23 87:11
87:24 88:1 92:23
93:4,8 94:16
112:25 113:13
117:9 149:24
163:9
**clickanerds** 164:4
**clicked** 95:7 150:4
**client** 31:20
**clip** 150:8,9
**clips** 92:1

**close** 117:18 141:23
142:8 143:9
144:18
**closed** 133:15,25
**closely** 59:13
**closer** 134:12
**clown** 74:14
**cnet** 4:11,22 68:18
69:1 74:3 86:20
87:3 167:19
168:12
**cnetnews** 68:13
**coauthor** 69:23
**cockroach** 67:14,15
**cohen** 132:22
**collect** 120:1
**collected** 11:9
**collecting** 91:25
**collection** 91:25
**collective** 180:15
**colon** 167:23
**com** 2:7,13,19
10:11,20,23 11:17
11:19,21 15:11,14
17:3,4 27:20 28:9
28:10,11 39:4
41:24 61:23 67:1
67:2 68:6,13,18
70:12 71:23 72:2
72:5 80:10,11,13
81:4,11 82:17
84:24,25 87:18
91:17 92:6,12
93:3 94:1,16
95:22 97:1 99:17
107:2,4 111:14
112:16 117:8
118:13 132:3
147:17 148:21
149:24 155:9,10
155:11,12 163:12
163:18 164:2
167:19 175:10
182:22
**come** 21:19 29:7
49:7 52:16 55:9
108:2 115:24

144:6,7,9,10
156:11 175:17
**comes** 77:17 88:16
155:8
**coming** 73:20,21
84:25 116:3
**comment** 53:23
54:19 56:16,19
57:2,10,14 58:4
58:20 59:14 78:24
112:20 115:6
148:14 152:24
153:2 154:3,5,17
165:14 169:7,9,11
170:13 171:3,13
171:23 174:7,10
**comments** 4:22
22:21,23 73:20
86:23 152:23
158:23 159:9,10
165:23 168:24
170:9,23
**commercialization**
140:6
**commercialized**
137:9
**commission** 173:8
**common** 169:12
**communication**
103:7 167:4
175:25 177:11
**communications**
37:3 64:22
**company** 1:3 43:7
130:25 132:12
184:3
**complete** 7:22,24
73:10,10
**completely** 55:13
**complied** 90:11
**comply** 41:5
**component** 90:5
**computer** 4:11
89:10 93:7 132:13
132:18,20 133:1
134:5 139:14
150:5 159:11

163:9 164:3
178:10
**computernerds**
132:3,19
**computers** 38:6
89:17
**concentrichost**
82:19
**concluded** 183:21
**conclusion** 141:9
142:14
**conduct** 47:8
**conducted** 12:17
49:5 93:3
**conference** 176:20
**confirmed** 52:20
**confirms** 180:1
**confused** 55:18
**confusing** 23:24
**confusion** 47:14
**connect** 183:3
**consider** 24:7 31:5
**considering** 99:1
**constitute** 88:25
**contact** 29:13
**contacted** 29:11
30:3 97:21 104:18
105:18,19
**contains** 160:11
**contemporaneou...**
37:21
**contend** 24:9 65:13
**content** 10:15,17
10:19 11:25 18:6
18:8 27:22 30:10
75:6 140:24
145:17 152:5
153:14,17
**contents** 20:24 50:4
**continue** 98:1
**continued** 4:1 5:1
6:1
**continuing** 167:15
**contract** 21:20
126:8,9,18 175:18
**contradict** 24:6
**control** 11:18

125:14,16 132:9
132:11
**controversy** 126:2
**conversation** 51:1
52:25 64:18 65:24
71:21,22,23 97:22
102:7 103:12,18
104:17 106:11
108:2 170:3 180:2
180:5
**conversations**
23:16 39:9,11,22
39:22 40:4 49:12
50:2,5 51:18,22
51:24,25 63:12
64:21 103:22
169:2 176:7,16
**conversions** 136:17
**conveyed** 101:17
**convicted** 134:17
135:20,21,25
**conviction** 134:23
135:2,8,9,13
**convictions** 166:3
**convince** 76:25
77:16
**cook** 123:10 124:15
**cookietracking**
174:17
**cooks** 123:1,2,8,21
124:14 126:2,22
127:3
**cop** 162:24
**copied** 28:8,25 29:3
66:20 81:3 91:16
147:17
**copies** 24:5 45:21
98:12 106:18
142:6 185:6
**copy** 18:4 23:11,19
27:1,25 28:19
36:17 42:23 45:1
62:1 66:15 67:2
70:12,13 76:10,11
81:2 91:18 104:19
105:8,11 106:12
107:12 108:21

109:7 110:16,17
120:13 122:9,10
148:20 149:21
155:9,16 170:21
185:15
**copyright** 89:19
**corbin** 23:22
**corporate** 31:20
95:11,14 166:13
166:19 167:5
**corporation** 131:1
174:10
**correct** 9:15 14:20
14:23 15:15 16:8
23:7 28:23 33:8
38:13,22 43:3
45:1,18 46:6,9
49:17 52:4 53:13
64:22 67:6,8 71:9
76:18 81:4 82:20
85:2 95:2 106:21
108:7 121:3,6,8
123:5 127:10
135:5,6 138:10
147:10 150:19
155:15 162:18
165:2 176:22
182:2,7
**correctly** 29:25
30:12 69:2 134:24
**correspondence**
45:17
**corroborate** 53:20
**couldnt** 13:19 16:7
142:7 143:13
165:10 172:9
**counsel** 102:8
120:22 183:23
185:10,20
**country** 180:16
**county** 1:8 20:12
42:23 69:15 71:10
123:14 124:15,17
171:21 172:7
184:8
**couple** 14:10 21:8
27:21 31:14 49:20

49:21 78:16 83:14
126:23 141:10
145:3 157:9 161:5
163:5 172:20
178:4,6
**course** 50:9
**court** 1:2 7:16 10:3
27:14 46:15 49:24
70:16 71:10 112:6
114:14 120:13
121:23 122:1,4,12
123:1,2,3,8,14,22
124:8,14,15
125:24 126:2,6,13
126:22 127:3,8,8
127:11 134:4,25
135:3 144:21
150:14 176:20
177:4 180:20
184:2
**courthouse** 114:19
**courts** 179:17
**cover** 24:4
**covered** 124:14
**covers** 56:20
**crash** 38:7
**crazy** 41:4 73:22
**create** 43:1
**creating** 179:15
**credibility** 152:4
165:24 166:2
183:9
**credible** 13:1,2,10
157:17
**credit** 90:21 127:14
127:16 134:6,10
**crime** 134:17 183:1
**crimi** 2:4 10:12
18:3,16 28:9 54:3
61:18 72:22 76:10
79:17,19 91:17
103:13 110:18
111:14 112:16
118:6,23 147:9
154:24 155:10
184:24 185:2,12
**criminal** 14:17

39:20 47:8 53:9
54:6 104:22 106:4
120:10,14 133:24
134:1,23 135:1
163:23 164:10,24
165:13 166:3
180:20 182:23
**criticism** 162:6
163:23 165:20,21
**crook** 164:10,25
**crossexamination**
145:1
**csr** 1:20 186:6,7
**cullen** 131:23
**current** 46:4 90:13
**currently** 21:9
90:17 139:20
**customer** 21:15
65:2 97:15
**customers** 21:9,13
174:24
**cut** 25:18 62:8,24
63:1 84:12
**cutandpaste** 66:8
**cutting** 85:3

**D**
**dallas** 186:9
**damage** 98:2
165:24 166:1,6
**damages** 56:5 86:8
179:15
**damn** 87:11
**dan** 23:22
**dancorbin** 28:10
41:24 147:17
148:21 155:11
175:10
**dark** 68:21
**darn** 128:3
**data** 11:8 107:19
**database** 31:4,5
**date** 16:7 36:7 42:9
44:6,7,8 46:5
56:21 99:9 114:25
115:4 148:16,25
186:7

**dated** 6:16 12:6
28:2,18 41:22
43:20 44:23 57:3
61:12 67:1,4
68:13 72:13 76:8
76:16 81:1 83:23
84:11 87:8 89:11
91:15 97:5 107:1
121:5
**dates** 130:2
**daughter** 63:15
**david** 28:10 155:11
**day** 44:9 45:6 136:9
136:9 177:5 186:1
**daylight** 69:7
**days** 71:20
**dead** 117:10
**deal** 21:18 22:18
175:16,22
**dealing** 55:3 165:3
**deals** 89:10
**dealt** 64:24 89:14
104:25
**dean** 52:3,4,7
118:22
**dear** 18:15 26:5
62:13 107:14
113:22 153:3
**death** 169:3,6,12,17
**debate** 83:13
**debts** 130:5
**december** 94:15
109:8,23 110:17
142:16 147:9
**decency** 175:25
**decide** 179:17
**decided** 125:1,16
126:1 139:1
**decision** 23:8
134:22,22 135:7
136:7,8
**declan** 167:16,18
167:19,24 168:5
169:9
**declaration** 6:6
150:16,20
**declined** 98:16

**defaulted** 126:12
**defendant** 8:14
69:15 71:4 122:21
**defendants** 2:8
185:13
**defending** 68:21
**deficiency** 90:20
**definitely** 33:12
67:18,23 76:21
155:18
**definition** 119:18
119:20
**deflect** 162:6
163:22 165:20
**degree** 77:10
**delay** 123:7
**delete** 37:23 38:1
**deleting** 37:20
**deliberately** 160:11
160:15
**delighted** 73:24
**delivered** 184:24
**demanded** 103:15
**denying** 167:4
**department** 29:18
156:9,13,18
169:19,25 170:5
172:7,18 178:11
**deponent** 1:8 2:15
184:8
**deponents** 45:16
**deposed** 21:25
**deposit** 33:16,25
**deposition** 1:11,15
7:11 20:10 22:1
35:10 47:14 48:7
48:8,10,17,18,20
48:22 49:4 52:23
53:2 54:16 111:15
112:17 113:23
114:15 115:2,20
116:4 123:24
124:3,5 149:19
175:2 177:14
183:21 184:10,17
184:20,22,23
185:1,4,6,9