**<u>EXHIBIT E</u>**

**Page 3**

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

XCENTRIC VENTURES, LLC, an     )
Arizona limited liability          )
company; ED MAGEDSON, an        )
individual,                     )
                                ) No.
        Plaintiffs,             ) CV2008-008275
                                )
vs.                             )
                                )
JOHN F. BREWINGTON and JANE DOE  )
BREWINGTON, husband and wife; and )
JFB ACQUISITIONS, LLC, an Arizona )
limited liability company,      )
                                )
        Defendants.             )
                                )

VIDEOTAPED DEPOSITION OF KRYSTA MARIE AGERONE
Tempe, Arizona
March 18, 2010
9:30 a.m.

PREPARED FOR:

PREPARED BY:
Robin L. B. Osterode, RPR, CSR
AZ Certified Reporter No. 50695

1            I N D E X
2   EXAMINATION BY              PAGE
3   Ms. Speth.................................5, 43
4   Mr. Ingle..................................34, 49
5
6
7
8
9   EXHIBITS        DESCRIPTION        PAGE
10
11  1  DVD labeled JFB 680           9
12
13  2  DVD labeled JFB 681           9
14
15  3  Declaration of Rima L. Rhodey;   24
16     6 pages
17
18  4  U.S. District Court District of   39
19     Arizona (Phoenix Division) Civil
20     Docket for Case #: 2:01-cv-01227-FJM;
21     12 pages
22
23
24
25

**Page 2**

1
2       DEPOSITION OF KRYSTA MARIE AGERONE,
3   commenced at 9:30 a.m. on March 18, 2010, at Tempe,
4   Arizona, before Robin L. B. Osterode, RPR, CSR,
5   Arizona Certified Reporter No. 50695.
6
7
8                    * * *
9
10  APPEARANCES:
11      For Plaintiffs:
12      JABURG & WILK, P.C.
        By: Maria C. Speth
13      3200 North Central Avenue, Suite 2000
        Phoenix, Arizona  85012-2415
14      (602) 248-1000
15      For Defendants:
16      GUST ROSENFELD
        By: Christopher B. Ingle
17      201 East Washington, Suite 800
        Phoenix, Arizona  85004-2327
18      (602) 257-7498
19      The Videographer:
20          Brent Jensen, K-Video Productions
21
22
23
24
25

**Page 4**

1               Tempe, Arizona
                March 18, 2010
2               9:30 a.m.
3       THE VIDEOGRAPHER:  Good morning, my name is
4   Brent Jensen, certified legal video specialist with
5   K-Video Productions.  Our court reporter is Robin
6   Osterode, representing Palmer Reporting Services,
7   2108 East Evans Drive in Phoenix, Arizona.  We are at
8   1095 West Rio Salado Parkway, Suite 104, in Tempe,
9   Arizona, to take the deposition of Krysta Marie
10  Agerone on behalf of the plaintiffs in the Superior
11  Court of Arizona, Maricopa County case of Xcentric
12  Ventures, et al., versus Brewington, et al., case
13  number CV2008-008275.  The date is March 18th, 2010,
14  and the time is 9:39 a.m.
15      The attorneys will now introduce
16  themselves, plaintiffs first, please.
17      MS. SPETH:  Maria Speth with Jaburg & Wilk
18  on behalf of Ed Magedson and Xcentric Ventures and Ed
19  Magedson.
20      MR. INGLE:  Chris Ingle on behalf of
21  defendants John Brewington and JFB Acquisitions, LLC.
22      THE VIDEOGRAPHER:  Thank you.  Please swear
23  in the witness.
24
25

**Videotaped Deposition of Krysta Marie Agerone - 03/18/2010**

Page 5

1  KRYSTA MARIE AGERONE,
2  having been first duly sworn, was examined and
3  testified as follows:
4
5  E X A M I N A T I O N
6  BY MS. SPETH:
7  Q.  Ms. Agerone, my name is Maria Speth, and as
8  I explained briefly before we started today, I
9  represent Xcentric Ventures, which is the company
10  that operates Ripoff Report, and I represent Ed
11  Magedson in a lawsuit that they've brought against
12  John Brewington and John Brewington's company.
13  You're here as a nonparty witness to answer some
14  questions about a couple topics.  The court reporter
15  has just sworn you in, meaning you're under oath as
16  if you were in a court of law.  Do you understand
17  that?
18  A.  Yes.
19  Q.  I'm going to be asking you some questions;
20  if at any time you don't understand my question,
21  please let me know and I'll be happy to rephrase it,
22  okay?
23  A.  Yes.
24  Q.  Because the court reporter is taking down
25  what you and I say, it's important that you and I

Page 6

1  always wait until the other one is finished before we
2  talk.  So wait until my question is complete before
3  you answer and I'll wait until your answer is
4  complete before I start my next question, okay?
5  A.  Yes.
6  Q.  And also all your responses should be
7  verbal; so far they have been, but if there are
8  nonverbal responses, then it's hard for the court
9  reporter to get them down on the record, okay?
10  A.  Yes.
11  Q.  All right.  Have you spoken to anybody to
12  get sort of ready for this deposition about this
13  deposition?
14  A.  No.  Maybe my boyfriend.  I was a little
15  nervous.  Coming this far and all that, but no.
16  Q.  How about your dad, did you talk to your
17  dad about the fact that your deposition was going to
18  be taken in this --
19  A.  I did.  I called him.
20  Q.  And what did you talk to him about?
21  A.  I told him -- I said, you know, did you
22  remember when the guy came to the house and that.
23  And we just talked about when he came.  He told me
24  that there was a video if I Googled my name on the
25  Internet, so I did that, and there was a short video.

Page 7

1  Nothing much.  And just a little short blurb about
2  me.
3  Q.  And you looked that up?
4  A.  I did.
5  Q.  Of course.  Have you ever -- and I think I
6  know the answers to some of these questions and I
7  just want to make sure it's clear on the record.
8  Have you ever worked for Ed Magedson?
9  A.  No.
10  Q.  Have you ever worked for Xcentric Ventures?
11  A.  No.
12  Q.  Have you ever worked for Ripoff Report?
13  A.  No.
14  Q.  Now, in July of 2008, you were interviewed
15  by Mr. Brewington and the interview was videotaped;
16  do you remember that?
17  A.  Yes.
18  Q.  How did that interview get arranged, like
19  what happened to lead up to that interview happening?
20  A.  I got a phone call from John Brewington.
21  He said he was a private investigator, he asked me
22  about my ex, who was Matthew Mott.  He asked me
23  mostly questions about him, and told me that he
24  understood I had a pretty brutal custody case going
25  on, and that my ex had gotten custody of my son.  And

Page 8

1  he said he knew a lot of things about Matt, but that
2  he was interested in knowing a few more things as
3  they pertained to Ed Magedson.  And he said that he
4  would like to set up an interview with me to talk
5  about a few things if I could remember anything.
6  And since he knew about my custody case and
7  he knew things about my ex, I was inclined to believe
8  that he could possibly help me in the future, maybe
9  as a witness to some of the things that he had
10  learned about my ex.
11  Q.  And I did notice during the interview
12  that -- there's two videotapes of interviews, and I'm
13  going to mark both of them as exhibits today.
14  There's one long one and one short one.  And I
15  noticed during the longer one it seemed like the vast
16  majority of the conversation was about Matt Mott and
17  your custody battle; does that comport with your
18  recollection?
19  A.  Right.  It mostly, to me, that's what it
20  had to do with, because there wasn't a lot I could
21  tell him about Ed, because I didn't -- I mean, I
22  wasn't friends with him.  I only knew things about
23  him because I had met him a couple of times and
24  through my ex, because he knew him.
25  Q.  Did -- did you -- did John Brewington ever

Videotaped Deposition of Krysta Marie Agerone - 03/18/2010

Page 9

1  tell you that he could help you with the custody
2  battle?
3      A.  He said -- in not so many words, yes.  He
4  said that if there were things I could tell him about
5  Matt, maybe there were more things he could find out
6  if he had more information, and that it might help me
7  in the future; he said it might not help me, but --
8      Q.  I have, like I said, I have two DVDs.  One
9  is marked, and this probably won't mean anything to
10  you, I'm mostly saying it for the record, one is
11  marked JFB 680 and it was produced in our case and
12  the other one is marked JFB 681.  I am going to mark
13  JFB 680 as Exhibit 1 in this case, and I'm going mark
14  JFB 681 as Exhibit 2 in this case.
15          (Marked for identification Exhibits
16      1 and 2.)
17  BY MS. SPETH:
18      Q.  I want to go ahead and start playing
19  Exhibit 1, which is JFB 680, and just going to show
20  you the very beginning of it, and I think it's
21  pretty -- very consistent with what you remember, but
22  I want to go ahead and show you that.
23          Now, for the record, we don't need a record
24  of this video.  You know what, I take that back.  If
25  you are picking up the audio, if you want to go ahead

Page 10

1  and -- I'm only going to play a tiny little piece of
2  it.  So if the court reporter can hear it, great, go
3  ahead and transcribe it.  It's not critical to me,
4  but if you can.
5          All right.  And I'm going to turn this
6  around and show it to you as soon as I get it going.
7  Let's make it bigger.  Oops, there we go.
8      A.  I haven't seen my dad for a long time.
9          (Inaudible video playing.)
10  BY MS. SPETH:
11      Q.  I'm going to stop it.  It's a 45-minute
12  videotape.
13      A.  Sure.  I can imagine my life story.
14      Q.  What I wanted to do there -- whoops, let me
15  get -- what I wanted to do there is show you the
16  introduction, and now that I've done that and I've
17  refreshed your recollection of the beginning of the
18  interview, it seems that that's quite consistent with
19  what you told me and that is that John Brewington
20  introduced the interview by saying that there was
21  some information about Matt Mott about a criminal
22  history, about maybe some issues of maybe him abusing
23  your son, and that was really a big part of what this
24  topic was going to be about; that is consistent with
25  your memory, right?

Page 11

1      A.  Mostly.
2      Q.  What part of it, if any, is not?
3      A.  Well, he was honest with me about the fact
4  that he was actually trying to get information about
5  Ed Magedson.  He opened up that way about Matt, and
6  that's what initially caught my interest, and that's
7  obviously the person that I would know the most
8  about.  But he was pretty honest about the fact that
9  Matt was not his -- that Matt was the small fry and
10  he was a side issue.
11      Q.  Okay.  On this videotape, the subject of
12  Matt Mott -- it's a 45-minute videotape, I think
13  maybe 47 minutes -- the subject of Matt Mott is
14  discussed for the first 25 or 28 minutes of it, and
15  then there's some conversation about Eric Skelly
16  [phonetic] and Ed Magedson.  Again, does that -- is
17  that consistent with your recollection that most of
18  the time that you guys talked about Matt Mott and his
19  history?
20      A.  Yes.
21      Q.  Excuse me.  What conversations, if any,
22  occurred before the videotape was turned on?
23      A.  Gee, it's probably not something I could
24  remember very clearly.  He wasn't there very long.
25  Mostly he was, I think -- it was mostly background, I

Page 12

1  think, probably, from what I recall, because the way
2  the video opened up, it was just -- I think he just
3  showed me the papers.  The papers that you see in the
4  video, and that's why I was pretty eager to look at
5  those, you can tell in the video, because it was
6  information that I did not have.
7      Q.  About Matt Mott?
8      A.  Yes.  So yes, it was probably just mostly
9  background; we introduced ourselves because we had
10  never met, and we talked one time on the phone, so --
11      Q.  And how did it come to be that your dad was
12  there for the interview?
13      A.  It's my dad's house, and I wasn't
14  comfortable meeting a stranger in my own house.  I
15  just live down the street from him, and I spent a lot
16  of time there.  I actually live there now, so -- and
17  he doesn't live in Arizona anymore, so --
18      Q.  So at that time your dad was living in the
19  house where the interview took place?
20      A.  Yes.
21      Q.  And you arranged to meet Mr. Brewington
22  there --
23      A.  Yes.
24      Q.  -- at your dad's house?
25      A.  I did.

3 (Pages 9 to 12)

**Videotaped Deposition of Krysta Marie Agerone - 03/18/2010**

---

Page 13

1    Q.   Did Mr. Brewington provide you with
2 information about Matt Mott that day?
3    A.   Yes.
4    Q.   And he gave you some paperwork?
5    A.   Yes.
6    Q.   After that, did you ever have any further
7 conversations with him --
8    A.   No.
9    Q.   -- about anything?
10    A.   Not that I know of.  He may have called me
11 or something, or I may have called him to catch up,
12 but not that I recall.  I was surprised by the lack
13 of communication afterward.  This is the first time
14 I've heard of any of it, so --
15    Q.   Okay.  So between that day that the
16 interview was taken that we just watched a piece of
17 in Exhibit 1 and today, you've had no communications
18 that you can recall --
19    A.   Right.
20    Q.   -- with Mr. Brewington?
21        And we talked about this in the beginning,
22 and this is human nature, but you tend to answer the
23 question before I'm done with it.  And I'll only do
24 that for Robin's sake, for the court reporter's sake.
25        What did Mr. Brewington tell you about why

---

Page 14

1 he was videotaping this interview?
2    A.   You know, I don't have any specific
3 recollection of that explanation.  My understanding
4 as it is now is for posterity, I guess.  You have
5 proof of what people said and you know that they were
6 there, so --
7    Q.   Okay.
8    A.   I didn't know that it was going to be on
9 the Internet.
10    Q.   That was one of my questions that was
11 coming up.  He didn't tell you that he was going to
12 put that up on the Internet?
13    A.   No.
14    Q.   We'll come back to that issue.  Did he tell
15 you he was interviewing you and making this video to
16 defend himself in a complaint that was filed against
17 him?
18    A.   Not that I know of, no.  It was a while
19 back, and like I said, my son was just a few months
20 old, but what I do recall is that he had he had
21 suffered, I think, anyway, some kind of personal
22 accusations because of his pursuit, is the way I
23 understood it.  Like I said, I can't remember
24 specific conversation, but the way I understand it
25 was that he had spent some time and effort in this

---

Page 15

1 case, and that it was not something the other party
2 was happy with.
3    Q.   Okay.  So he did mention something like
4 that?
5    A.   Something like that.
6    Q.   Now, you provided some records about
7 Matt Mott, actually, to Mr. Brewington.  One of the
8 things is that later on in the tape I see, is that
9 you provided Mr. Brewington some records from
10 Craigslist when Matt Mott was offering some cars for
11 sale?
12    A.   Maybe.
13    Q.   Now, I know why you did that in the sense
14 of what the importance was of the Craigslist cars,
15 because you explained that, but why were you
16 providing that information to Mr. Brewington; did you
17 expect him to do something with it, I guess, is what
18 I'm really asking?
19    A.   Well, to tell you the truth, I don't
20 particularly remember providing him with those, but I
21 do remember having them, so I believe you.  Probably
22 it was just -- to tell you the truth, he and I, my ex
23 and I, Matthew, had a rocky past, and I felt like
24 people didn't always believe me, because he seems
25 like such a nice guy.  So in that situation, it was

---

Page 16

1 more of sort of proof on my behalf of what I was
2 saying was true, because people wouldn't necessarily
3 listen to you when you tell them things sometimes,
4 you know.
5    Q.   Okay.  All right.  Did you expect
6 Mr. Brewington to do anything with the records that
7 you gave him?
8    A.   Maybe in the back of my mind somewhere I
9 expected him to do something.  I was hoping, I should
10 say.
11    Q.   All right.  You also gave him your hair
12 follicle test; I imagine same thing, you were telling
13 him that you had no drugs in your system --
14    A.   Right.
15    Q.   -- and that it was clean, right?
16    A.   I was trying to show, you know, what I was
17 saying is true; I was trying to see if maybe there
18 was any way he could help me.
19    Q.   At the very end of this interview
20 Mr. Brewington says, "Okay, now, I'm going to turn
21 the recorder off."  Now, we have a second interview
22 that starts off by saying this is the supplemental to
23 the first one.  Do you recall the conversation that
24 occurred between the two times that the recorder was
25 on, in other words, during the time the recorder was

---

4 (Pages 13 to 16)

Videotaped Deposition of Krysta Marie Agerone - 03/18/2010

| Page 17 |
| --- |

1  off?
2    A.  I do remember we were wrapping up, and then
3  my dad started to say something and it was something,
4  I guess, that John Brewington was interested in,
5  because he said, oh, hold on a second, and he turned
6  the recorder back on.
7    Q.  Do you remember what it was that your dad
8  said that interested him?
9    A.  Absolutely not.  It was probably something
10  to do with Ed Magedson and the Ripoff Report.
11    Q.  Do you know how long the conversation was
12  in between the two recordings?
13    A.  It was probably a minute or two.  I don't
14  remember specifically, but it wasn't something that I
15  remember, like it was impactful.  It wasn't
16  important.
17    Q.  Did you and Matt Mott, when you were
18  together, ever go over to John Unger's house?
19    A.  Yes.
20    Q.  How often?
21    A.  At one point we were there quite a bit.  He
22  was a lonely guy and Matt was doing some work up
23  there; I think it was his parents' house.  We were
24  probably there a few times a week for a few months,
25  and then it sort of tapered off.

| Page 18 |
| --- |

1    Q.  What kind of work was Matt doing there?
2    A.  He was doing some remodeling work on John's
3  parents' house, which was next door.
4    Q.  Okay.  Now, what was your understanding of
5  John Unger's relationship to the Ripoff Report?
6    A.  My understanding was that he edited and
7  posted content.
8    Q.  Are you aware of a posting on Ripoff Report
9  about the Pizza Hut case and about the Ripoff Report
10  investigation into how the Apache Junction Pizza Hut
11  was treating its employees?
12    A.  I'm only aware because I worked for Pizza
13  Hut, and Ed Magedson contacted me in relationship to
14  a lawsuit.  I did not research it.
15    Q.  Were you aware of a posting on Ripoff
16  Report about it, an investigative posting?
17    A.  No, not that I recall.
18    Q.  Now, when you say you're generally aware
19  that Mr. Unger was editing and posting things or
20  content on Ripoff Report, how are you aware of that?
21    A.  Oh, because he would be doing it when we
22  were at his house, he would be complaining about it,
23  or -- he had his computer there and he had paperwork
24  and lots of things.
25    Q.  What do you -- can you tell me anything

| Page 19 |
| --- |

1  more about what he was working on and what you
2  remember about what he was working on?
3    A.  I know, as far as I understood it from John
4  Unger, that he would edit and change things for Ed.
5    Q.  Now, there's -- did you ever hear him call
6  himself a monitor, that he was a monitor for Ripoff
7  Report?
8    A.  No, but I understand his position as
9  something kind of similar, I suppose.
10    Q.  There's a group of people whose job it is
11  to look at reports as they come in and remove from
12  those reports curse words, threats, Social Security
13  numbers, credit card numbers; did you ever hear John
14  Unger talk about that; did he play a role like that,
15  if you know?
16    A.  No, it didn't seem like that to me.
17    Q.  What did you think he was doing?
18    A.  It seemed like he was -- he was changing
19  things for people, basically, things that maybe he
20  didn't want on there.
21    Q.  For who, I mean, could you tell --
22    A.  As I understood it, I mean, he never came
23  out and said "Oh, Ed makes me lie," but he -- I know
24  that he changed things on the report that people
25  would report.  And I know there were people that

| Page 20 |
| --- |

1  would be angry at him.  He would even inspect e-mails
2  and things like that and edit posts.  I don't know
3  that much about the Ripoff Report.
4    Q.  When you say he would inspect e-mails, what
5  do you mean?
6    A.  Like people would send him angry e-mails,
7  and things -- I remember him complaining about it,
8  vaguely.
9    Q.  Okay.  Complaining about nasty e-mails?
10    A.  Things like that, yes.
11    Q.  And then you think that those nasty e-mails
12  would cause him to change posts?
13    A.  I don't think he -- no, no, no.  I think
14  that he did a combination of things for the Ripoff
15  Report, and that those are just a few of the things
16  that I remember.
17    Q.  Okay.  And did you ever actually look over
18  his shoulder and actually see what he was doing?
19    A.  I saw the Ripoff Report.  I never saw him
20  typing or anything like that.
21    Q.  Okay.  So you never actually watched him
22  change something?
23    A.  No.
24    Q.  Okay.  You just heard him talk about it?
25    A.  Yes.  Sorry, I'm still interrupting you.

Driver and Nix Court Reporters  602.266.6525
www.drivernix.com

Videotaped Deposition of Krysta Marie Agerone - 03/18/2010

Page 21

1  Q.  No, you're okay.
2  A.  I'm treating this like a conversation.
3  Q.  And that's what's normal, that makes sense.
4      John Unger -- my understanding is that John
5  Unger was one of the people who either wrote or
6  edited the posting about Pizza Hut that's on Ripoff
7  Report, the big, long report on Ripoff Report about
8  Pizza Hut.  Did he ever talk to you about that?
9  A.  Yes.  I know -- now you're jogging my
10  memory a little more too -- I know that he worked on
11  the Pizza Hut case, and he worked at Pizza Hut, as I
12  understand it, but if he worked there when I was
13  there, it's not something I remember.
14  Q.  But I'm talking more about the Pizza Hut
15  story on Ripoff Report?
16  A.  Right, yeah, I know that he worked
17  extensively on the Pizza Hut story.  And that was
18  most of his complaining, the poor guy; he was very
19  emotionally distraught over that case.
20  Q.  And John Unger, I think you say this in the
21  video -- I mean, I know you're not an expert -- in
22  your opinion, did he have some emotional or mental
23  issues?
24  A.  It seems like maybe he was pretty upset
25  about a few things.  I don't know what it has to do

Page 22

1  with or anything like that.  We all get upset, but --
2  Q.  Okay.  So when you would hear him complain
3  about the Ripoff Report and working on the Ripoff
4  Report, sometimes it was related to Pizza Hut?
5  A.  Yes.
6  Q.  Okay.  And I think you may have said
7  "often," but I don't want to put words in your mouth,
8  but did it have a lot to do with the Pizza Hut story
9  or --
10  A.  I know he did work extensively on it, and
11  he did a lot of work on it.
12  Q.  How about Matt Mott, did he ever work on
13  Ripoff Report that you know of?
14  A.  I know he worked -- he helped John with a
15  few things, like he would run for copies and things
16  like that, but actually working on the Ripoff Report,
17  not that I know of.  I know that he knew Ed and he
18  did work at his house and things like that, and did
19  other things for him, but I don't know about the
20  Ripoff Report, no.
21  Q.  Okay.  I'm going to go ahead and put on the
22  second interview, and actually, let me go to the
23  right spot here.
24      So I'm going to show you what we've marked
25  as Exhibit 2 to your deposition.  We're going to

Page 23

1  watch this in its entirety, because it's real short.
2  A.  I'll try not to get teary-eyed when I see
3  my dad again.
4  Q.  What is it about seeing your dad that makes
5  you teary-eyed?
6  A.  Because he moved and all my brothers lived
7  at the house and my grandma, and they moved about a
8  year and a half ago, and I haven't seen them since,
9  so, I miss him.
10  Q.  Gotcha.  Is he in Florida now?
11  A.  Yes.
12  Q.  I think that's what I remember.
13  A.  I'm just a baby.  I haven't had much sleep.
14  Q.  How old is your son now?
15  A.  I have a 6 1/2-year-old and my other son
16  will be 2 in April, so it's a little hectic.
17  Q.  So it was the 2-year-old that was just born
18  when --
19  A.  He was pretty young, as I recall.  Maybe he
20  was six months, maybe.  Let's see, 2008, you say
21  June.  So this is 2010, wow, he would have been,
22  April, May, June, he would have been two or
23  three months.  Yes.  That was a while back, was it
24  two years or one?  Two years.
25  Q.  Oh, before I play this, let's go ahead and

Page 24

1  mark Exhibit 3, which is actually a transcript of the
2  video, and let's follow along.  This way it will be
3  easier.  Let's give one to you.
4      (Marked for identification Exhibit 3.)
5      MR. INGLE:  For the record, I have an
6  objection to this exhibit; it contains errors.
7  BY MS. SPETH:
8  Q.  I'm showing you what's been marked as
9  Exhibit 3.  The first page is just a declaration of
10  the person who transcribed it, and then the next page
11  is the actual transcript.  If you see any errors,
12  make a note of them and let me know, because we'll
13  put them on the record, okay?  I'm not asking you
14  to --
15  A.  I don't know how I would know if there are
16  errors.
17  Q.  No, no, we're going to listen to the tape.
18  I'm saying if you see anything that says, wow, that's
19  not what I said or that's not what it says in the
20  transcript, please let me know?
21  A.  Would you mind if I read it first?
22  Q.  You don't want to read it as we look at the
23  tape?  I don't care, it doesn't matter to me.
24  A.  Sure, go ahead.
25  Q.  We can do it together or if you want to do

Driver and Nix Court Reporters 602.266.6525
www.drivernix.com

Videotaped Deposition of Krysta Marie Agerone - 03/18/2010

Page 25

1  it separately, that's okay too, or if you --
2       A.   Does it start at the top or is this his
3  introduction here?
4       Q.   Okay, actually, before I play it, stop --
5  here's what you need to know; Exhibit 2, which is the
6  video I'm about to show you, is not the version
7  that's on the Internet; it's -- we're going to look
8  at the version that's on the Internet as well, and
9  Exhibit 3 has an introduction that's not on
10 Exhibit 2.  The first thing we're going to hear on
11 Exhibit 2 is "This is the supplemental to the
12 interview that we were having."  Okay.  So that
13 little introduction before that, that you see in
14 Exhibit 3 of the transcript, we won't see that until
15 we see the Internet version of it, okay?
16      A.   Okay.
17      Q.   So let me -- okay.
18           (Inaudible videotape playing.)
19           THE WITNESS:  There's my brother.
20 BY MS. SPETH:
21      Q.   I think there's -- he turns off the tape
22 here at this point.  I forgot to ask you a question
23 earlier; when you were going over to John's house
24 with Matt, what time frame was that?
25      A.   Gee, that's a difficult question.  I met

Page 26

1  Matt between -- well, would have been before I had my
2  son, so it would have been before 2003.  I was
3  probably pregnant then, so it was probably end of
4  2002 through mid-2003, something like that.
5       Q.   And was -- was it all during that time
6  period; in other words, was there any later time that
7  you saw John working on Ripoff Report?
8       A.   You know, I can't be too specific about the
9  months, I suppose, so maybe a few months after my son
10 was born, possibly, but I don't think we really went
11 there a lot after my son was born, so --
12      Q.   And when is your son's birthday?
13      A.   November 1st, 2003.  So quite possibly --
14 there was a time when we stayed in his parents' house
15 for a few days, our water was out, and I can't
16 remember, I think it was when my son was small.  So
17 it may have been sometime like we jumped back in and
18 said, "Hey, John, what's going on; we could use your
19 help."  But as far as Ripoff Report and that, I
20 couldn't say -- I would say no.
21      Q.   Right.  Okay.  So even when you stayed
22 there when your son was little, that's not when you
23 saw John working on Ripoff Report?
24      A.   No.  Right.  Not when I saw it.
25      Q.   When you saw it it was in 2003 or maybe

Page 27

1  2002?
2       A.   Right.
3       Q.   Fair enough.  Thank you.  Okay.  I want to
4  show you one more video, because when it gets on the
5  Internet, it's got some introduction and some other
6  stuff.  So let's look at that one.
7            Okay.  So what I'm showing you now is the
8  actual YouTube version of the videotape, and once
9  again, if you want to follow through -- follow it
10 with the transcript, you're welcome to do that.
11           (Inaudible video playing.)
12 BY MS. SPETH:
13      Q.   Have you ever watched any of these videos
14 before?  I know you said you watched some portion of
15 it on the Internet; did you watch this last one?
16      A.   That's, I think, the one that I saw.
17      Q.   The one that's currently on YouTube?
18      A.   Probably, yes, that's probably where I went
19 first.
20      Q.   Makes sense.  We talked about this a little
21 bit; did John Brewington ever tell you that he was
22 going to use the interview to advertise his
23 investigative services?
24      A.   No.
25      Q.   And in this video you see how he says it's

Page 28

1  Paladin Investigations ahead of time; he says if
2  there's anything we can do to help you.  Does it
3  bother you at all that he used your interview to
4  advertise his investigative services?
5       A.   I'm a very understanding person, and since
6  I was aware that I was being videotaped and that, I
7  was a little disturbed to see it on the Internet, but
8  it didn't have my face in it, and so I would say no,
9  it probably doesn't upset me.
10      Q.   Did he ever ask your permission to do that?
11      A.   No.
12      Q.   Now, if you look at Exhibit 3, which is the
13 transcript we were just looking at, on the second
14 page, at one point right in the middle of the page
15 after your dad was talking about the $500,
16 Mr. Brewington turns to you and he says "You had said
17 something about Matt and the Ripoff Report"; now,
18 there's nothing in this videotape where you said
19 something about Matt and the Ripoff Report, and I
20 will tell you that in the previous tape you didn't
21 talk about that; was that one of the things that was
22 mentioned in the interim, if you know?
23      A.   You know, I notice in the beginning of the
24 supplemental, that I was very excited to tell him
25 something that I remembered.

7  (Pages 25 to 28)

Videotaped Deposition of Krysta Marie Agerone - 03/18/2010

Page 29

1    Q.   You said "Oh, I just remembered."
2    A.   Right.  I couldn't tell you exactly what it
3  was that I remembered, but I can tell you that it
4  looks like I remembered something, so --
5    Q.   And your dad interrupted you and we never
6  got to hear what you remembered.
7    A.   Yeah, so is life.  That's how it goes.
8  That's why I interrupt you so much.
9    Q.   So you don't remember what it was that you
10 remembered back then, right?
11   A.   I doubt it.  It seems to be something to do
12 with Matt and John and the Ripoff Report.  I suppose
13 we hadn't previously discussed him editing the Ripoff
14 Report; that may have been what I remembered.
15   Q.   Okay.  But when Mr. Brewington said to you
16 "You had said something about Matt and the Ripoff
17 Report," do you know what it was that you said to
18 him, because it's not in the tape?
19   A.   I don't know.
20   Q.   If you look down a couple more lines on
21 that same page, your description of what John did was
22 first you said "like editing and stuff," and you said
23 "take things off, putting things on, rewriting things
24 to be published."  John Brewington said, "So people
25 would post particular complaints and John Unger would

Page 30

1  go in there and change the wording of it?"  Do you
2  agree with me that John Brewington was paraphrasing
3  what you said in a way that added things that you
4  hadn't said?
5          MR. INGLE:  Form.
6          THE WITNESS:  No.
7  BY MS. SPETH:
8    Q.   You never said that people would post
9  complaints and John Unger would go in there and
10 change the wording of it; those are John Brewington's
11 words, aren't they?
12         MR. INGLE:  Form.
13         THE WITNESS:  Possibly.  I think he was
14 maybe trying to get a better understanding.  I mean,
15 obviously the man has an agenda.  But I would say,
16 clearly, I was trying to convey to him that I thought
17 that John was doing things that maybe he shouldn't
18 have been doing.
19 BY MS. SPETH:
20   Q.   Okay.  Your father said, in the first
21 videotape, that Ed Magedson, I don't think he used
22 the word "harassed" but he described it as like
23 harassed you guys, I mean, constantly called, kept on
24 bugging you for more information; he said there were
25 multiple calls by Ed Magedson with respect to the

Page 31

1  Pizza Hut case, where he wanted your cooperation on
2  the Pizza Hut case, and apparently, according to your
3  dad, he pushed you -- Ed Magedson pushed pretty hard.
4  Is that consistent with your recollection?
5    A.   Yes.
6    Q.   When Ed Magedson first approached you about
7  the Pizza Hut case, was that the first time that you
8  ever met him?
9    A.   Yes.
10   Q.   Had you ever talked to him before that?
11   A.   No.
12   Q.   How about your dad, did he -- was that the
13 first time that he ever met Ed Magedson?
14   A.   I couldn't tell you.  My dad knows a lot of
15 people and he talks to a lot of people, so it's
16 possible that he had talked to him before.  It's
17 possible he hadn't.  My dad doesn't remember meeting
18 him before that.
19   Q.   Oh, okay.  So when you first -- when
20 Mr. Magedson first approached you and your dad and
21 said "I want your cooperation about the Pizza Hut
22 case," did your dad say anything to you like, "Hey, I
23 know that guy, I've met him before"?
24   A.   No.  He said "That guy looks like a creep."
25   Q.   He said it like that's as if that's the

Page 32

1  first --
2    A.   Yeah.
3    Q.   Okay.  And when do you think that was when
4  Ed Magedson first approached you and talked to you
5  about the Pizza Hut case?
6    A.   I couldn't tell you.  It was a very long
7  time ago.  I think Pizza Hut was my first job when I
8  came to Arizona, I think.  My teenage years are a
9  little bit of a blur.  There wasn't a lot of sleep
10 and a lot of working and going to school.  So I would
11 say '99 or 2000, probably closer to 2000.  And who
12 knows, maybe it's closer to '99, I'm not really good
13 with those --
14   Q.   No, I think that's a pretty good time
15 range.  And when did your dad work at Putt Putt?
16   A.   I couldn't tell you about any of that.
17   Q.   Okay.  So some of the things that we see in
18 this videotape that's on YouTube and on the Exhibit 2
19 today is your dad talking about hearing Ed make a
20 proposal to Lloyd Jorgenson about taking down the
21 post for $500; you were not involved in that,
22 correct?
23   A.   I don't know anything about Lloyd and the
24 Ripoff Report.
25   Q.   Right.  Do you know when -- well, do you

8  (Pages 29 to 32)

Videotaped Deposition of Krysta Marie Agerone - 03/18/2010

Page 33

1  know which thing happened first, Ed approached you
2  guys about the Pizza Hut case, or your dad's
3  explanation of what happened with Lloyd Jorgenson; do
4  you know which one of these things came first?
5      A.   No.  I would say it would probably be the
6  Pizza Hut thing, because my dad didn't mention
7  recognizing him.
8      Q.   And that's what I kind of figured, but I
9  didn't know for sure --
10     A.   Yeah, but my dad might not remember.
11     Q.   Well, again, it's a little bit of an
12 educated conclusion here, but when your dad -- well,
13 let me do it this way; when your dad first -- when
14 you guys first got approached by Pizza Hut, your dad
15 didn't say to you, "Hey, I know that guy, he went to
16 Lloyd Jorgenson and tried to get him to pay him
17 money"; he didn't say that to you, right?
18     A.   No, I'm not sure my dad would, in fact,
19 have said to me, though.  My dad and I don't
20 talk a lot about business, and as far as I know, my
21 dad doesn't remember people's faces or what they say
22 very well, so -- I don't think my dad remembered him.
23     Q.   Okay.  During the time that Ed Magedson was
24 pestering you and your dad to cooperate with the
25 Pizza Hut case, did he make it clear to you that he

Page 34

1  was the guy calling the shots with respect to Ripoff
2  Report?
3      A.   No.
4      Q.   No.  Okay.  My understanding is that
5  there's some sort of YouTube video of your dad in a
6  fistfight or in some sort of fight; do you know
7  anything about that?
8      A.   It's actually my brother who is in the
9  fight, yes.
10     Q.   And it's on YouTube?
11     A.   Yes, there's probably a couple of different
12 editings of the video.
13     Q.   Was your brother prosecuted for that?
14     A.   No, my brother was only 16 at the time, so
15 I don't see where he could be.
16     MS. SPETH:  I have no further questions,
17 thank you.
18
19        E X A M I N A T I O N
20 BY MR. INGLE:
21     Q.   I have a few follow-up questions.  You said
22 you talked to John Brewington one time on the phone
23 before the videotaped interview; is that right?
24     A.   Uh-huh, yes.
25     Q.   Was that just to set up the interview time,

Page 35

1  place, locations?
2      A.   Yes.
3      Q.   Okay.  And you said Matt Mott did some work
4  over at Ed's house; where is Ed's house?
5      A.   At the time it was -- okay, he always
6  called it "up on the hill"; it's on this dirt road
7  off of McKellips -- I'm horrible with directions, I
8  was telling them before I got here -- in Apache
9  Junction around Ironwood, if you head north, it is, I
10 believe, towards the mountain there, there's a --
11 where the road ends there's a dirt road that you take
12 a left on and that dirt road lives John Unger's
13 parents, John Unger, some other people whose names
14 rhyme that I can't recall and Ed Magedson.
15     Q.   Okay.  Got it.  The video you watched on
16 the Internet before your deposition today, do you
17 remember what website you watched it on?
18     A.   No, but I think it was YouTube.
19     Q.   This document has been marked as Exhibit 3;
20 Ms. Speth asked you a question about John
21 Brewington's statement so people would post
22 particular complaints and John Unger would go in
23 there and change the wording of it.  That paraphrase,
24 is it accurate?
25     A.   Could you ask the question in a different

Page 36

1  way?
2      A.   Yes.  Yeah, I might not have stated that
3  too clearly.  John's statement right here, as people
4  would post particular complaints, yada, yada, yada,
5  is this accurate, is what John's saying here, is that
6  true?
7      A.   Yes.
8      Q.   Okay.  The video -- the statements you made
9  in the video that's been marked as Exhibit 2, I
10 believe, yes, did John tell you what to say in that
11 video?
12     A.   No.
13     Q.   Did he give you a script?
14     A.   No.
15     Q.   Did you rehearse what you were going to say
16 in the video?
17     A.   No.
18     Q.   Did you do multiple takes --
19     A.   No.
20     Q.   -- or was it all just one take?
21     A.   Just the few seconds in between.  We were
22 wrapping up and then I -- I guess I remembered
23 something; I thought it was my dad that remembered
24 something, although we both looked pretty eager to
25 talk.  We remembered something and then he turned his

9  (Pages 33 to 36)

Videotaped Deposition of Krysta Marie Agerone - 03/18/2010

Page 37

1  tape back on; that was it.
2      Q.   Okay.  That's what gave us the long video
3  and then the short video?
4      A.   Yes.
5      Q.   Okay.  The statements you make in the
6  video, are they true?
7      A.   Yes.
8      Q.   Before today, did Ed Magedson or any of his
9  agents ever contact you to ask if the statements were
10 true?
11     A.   No.
12     Q.   Are you aware that Ed Magedson testified
13 that the statements you made in the video are lies?
14     A.   No.
15     Q.   Can you think of any explanation as to why
16 Ed would say that?
17     A.   Because he doesn't want to get in trouble.
18     Q.   What is your opinion of Ed Magedson?
19     A.   I don't know him very well, but the last
20 interaction I recall with him personally, he spilled
21 a really hot cup of coffee on me and I was about
22 eight months pregnant, and it went all over my
23 stomach.  So I don't have a fond memory of the guy,
24 I'll just put it that way.  He didn't apologize or
25 anything, so --

Page 38

1      Q.   Do you know of Ed's reputation in the
2  community?
3          MS. SPETH:  Form.
4  BY MR. INGLE:
5      Q.   Do you know what I'm asking?
6      A.   No.
7      Q.   Okay.
8      A.   I'm not a community-type person.
9      Q.   That's all right.
10         Did Ed Magedson ever tell you that he was
11 an attorney?
12     A.   Not that I recall, but when I first met
13 him, my understanding of the situation was that he
14 was the lawyer representing people who were ripped
15 off by -- in the Pizza Hut case.  And it was weird
16 that I assumed he was a lawyer, because I don't think
17 he ever told me he was, but my dad thought he was a
18 lawyer too; I do remember that.
19     Q.   Do you know why?
20     A.   I mean, probably just the way he presented
21 himself --
22         MS. SPETH:  Form.
23         THE WITNESS:  But no, I don't think he ever
24 said "I'm a lawyer."
25 BY MR. INGLE:

Page 39

1      Q.   Okay.
2      A.   I remember John Brewington asking me about
3  that too.
4      Q.   Have you heard of the case James Louy, et
5  al., v. Pizza Hut Apache Junction, et al.?
6      A.   No.
7      Q.   Are you aware that you were listed as a
8  witness in that case?
9      A.   I was supposed to be involved in a class
10 action lawsuit against a Pizza Hut that Ed approached
11 me about.  That I'm aware of.  He promised me I was
12 going to get some kind of a settlement, and I don't
13 remember anything else ever coming of it, except for
14 John Unger's complaints about not getting his
15 settlement.
16         MR. INGLE:  I think we're up to Exhibit 5.
17         THE REPORTER:  4.
18         MR. INGLE:  4.  I'm going to have this
19 marked as Exhibit 4 to your deposition.
20         THE REPORTER:  Can I mark that?
21         MR. INGLE:  Yeah.  If you can give that to
22 the court reporter, she's just going to put a sticker
23 on there and give it back to you.
24         (Marked for identification Exhibit 4.)
25 BY MR. INGLE:

Page 40

1      Q.   What I'd like you to do is take a look at
2  the second-to-last page.  You see this box number 99,
3  it's towards the bottom?
4      A.   Yes.
5      Q.   And it reads "Notice of Filing Consents for
6  Collective Action, Former Pizza Hut of Apache
7  Junction Employee Krysta Agerone."  Did I read that
8  correctly?
9      A.   No, it's okay, though, I'm used to it.
10     Q.   Did I mispronounce your name?
11     A.   It's Agerone.
12     Q.   Agerone.
13     A.   I think you read it correctly.
14     Q.   Okay.  Agerone.  My apologies.  Were you
15 aware of that notice being filing -- or being filed?
16     A.   I want to say no, but I'd like to say yes
17 too, because I was aware that there was a class
18 action lawsuit, and that I was supposed to be
19 involved with it, but I didn't know I was supposed to
20 go to court, if that's what you're asking.
21     Q.   Were you aware that you were, you know,
22 basically listed as somebody who was going to be
23 joining the class as the plaintiff against Pizza Hut?
24     A.   Yes.
25     Q.   Were you aware that the class was being

10 (Pages 37 to 40)

Videotaped Deposition of Krysta Marie Agerone - 03/18/2010

Page 41

1 represented by Maria Speth?
2    A.   Not that I know of.
3    Q.   So you were unaware that Maria Speth was
4 representing you in that lawsuit?
5    A.   I was unaware.  I've never met her before.
6    Q.   Okay.  Are you aware that Ms. Speth has
7 stated in court in this case that the statements you
8 make in the video are lies?
9    A.   I was not aware.
10       MS. SPETH:  Form, foundation,
11 misrepresents.
12 BY MR. INGLE:
13    Q.   You know, here's why we're asking about the
14 video; here's the allegation that this all relates
15 to: Ed Magedson alleges that John Brewington made
16 this video as a part of a conspiracy to blackmail
17 him.  He said John had you make false and defamatory
18 statements on video and then gave the video to a man
19 named Shawn Richeson.  He claims that Richeson then
20 tried to blackmail him with that video.  Are you
21 aware of any of that?
22    A.   No.
23    Q.   Are you aware of any such blackmail
24 conspiracy?
25    A.   No.  Oh, wait, when I went on YouTube and I

Page 42

1 read the blurb with the video, my name is in there in
2 a paragraph.  I think somewhere in the beginning of
3 his blurb he states that he is being, maybe,
4 "blackmailed" is not the terminology he uses.  I did
5 get the distinct impression that Ed Magedson felt
6 badgered in the statement on the Internet.  That's
7 all I can tell you.
8    Q.   Okay.  After this video came out -- well,
9 has Ed Magedson or any of his agents ever harassed
10 you about this video?
11    A.   No.
12    Q.   Are you aware of whether they've harassed
13 your father?
14    A.   Yes.
15       MS. SPETH:  Form, foundation.
16 BY MR. INGLE:
17    Q.   What are you aware of?
18    A.   My dad doesn't talk a lot to me about
19 business, but he did tell me that there were private
20 investigators that came to Florida, repeatedly and
21 asked him questions and tried to get him to change
22 what he said on the video.  He stated what he said
23 wasn't true and would he like to rephrase his
24 statement and he said no.  That's what my dad told
25 me, but not what -- I don't know anything about those

Page 43

1 investigators.
2    Q.   Okay.  Has anyone else approached you
3 recently asking questions about John Brewington or Ed
4 Magedson?
5    A.   Not that I'm aware of.  Not that I recall.
6    Q.   Has anyone contacted you recently to talk
7 about the video?
8    A.   Not that I recall.  To tell you the truth,
9 I don't answer private calls or numbers that I don't
10 know.
11    Q.   Neither do I.
12    A.   So I couldn't tell you.
13    Q.   I'm just making sure that I don't have any
14 other questions, just give me one second to look at
15 my notes.
16       No, I don't have any other questions, thank
17 you.
18
19      F U R T H E R   E X A M I N A T I O N
20 BY MS. SPETH:
21    Q.   I'm sorry, I have a couple of follow-ups.
22    A.   Sure, I can understand that.
23    Q.   Ms. Agerone, Mr. Ingle told you that
24 Mr. Magedson and I basically called you a liar.
25 In -- if you look at Exhibit 3, which is the

Page 44

1 transcript, there's no issue with your statement that
2 John Unger would work on the Ripoff Report and would
3 write things and publish things on the Ripoff Report.
4 There's no issue with that.  The issue comes when
5 Mr. Brewington says "So people would post particular
6 complaints and John Unger would go in there and
7 change the wording of it."  And on the video when you
8 respond to that you kind of hesitate and you go
9 "Sometimes, yeah."  You don't seem real sure about
10 that or didn't seem real sure about that at the time,
11 and you heard my questions about how those were John
12 Brewington's words and not yours, and here's what
13 I -- here's the point of this; when I asked you
14 questions, you said you never watched over John
15 Unger's shoulder, you don't actually know that he was
16 changing someone else's posts as opposed to his own
17 posts, and our only point here is do you have any
18 personal knowledge that John Unger was changing an
19 actual complaint that was posted by someone else, as
20 opposed to him working on a story or changing
21 postings that either he posted or that Ripoff Report
22 posted?
23    A.   This is a long, long time ago.  I was under
24 the impression, I still am, that Ed was kind of -- I
25 feel bad talking to you and I know you're his

**Driver and Nix Court Reporters 602.266.6525**
**www.drivernix.com**

**Videotaped Deposition of Krysta Marie Agerone - 03/18/2010**

Page 45

1  attorney and he tells me that you said I'm a liar,
2  but I can see both sides of the situation. I am
3  still under the impression that Ed -- John worked for
4  Ed to change things for Ed's benefit. I don't want
5  to get anyone in trouble or help you with his case or
6  hurt yours. I feel like John was changing things on
7  Ed's behalf to -- for Ed's benefit.
8     Q.   Okay. And I understand that. But the
9  things that he was changing is what's the issue. Do
10 you know what those postings were?
11    A.   They -- I have a vague recollection of an
12 impression I had that they were complaints or things
13 that people would post for rip-offs that they would
14 then edit for their own personal benefit. What that
15 benefit was, it was probably monetary, but I couldn't
16 tell you, because I don't know.
17    Q.   Okay. And this impression that you got,
18 you got it from John Unger?
19    A.   John Unger.
20    Q.   And not from anything you saw yourself?
21    A.   No.
22    Q.   Okay. Now, Mr. Ingle asked you if the
23 conversation on the phone that you had with
24 Mr. Brewington was to set up the time and location of
25 the video; it was also a general introduction as to

Page 46

1  what he was looking for from you and who he was and
2  some basics about why he was interviewing you, right?
3     A.   Yes.
4     Q.   And he asked you some questions, right?
5     A.   Yes.
6     Q.   Mr. Magedson spilled a hot cup of coffee on
7  you; did it burn you?
8     A.   Yes.
9     Q.   And he didn't even apologize?
10    A.   No, he didn't.
11    Q.   And you said that gave you a bad impression
12 of him?
13    A.   Yes, it did.
14    Q.   When did that happen? Oh, you said while
15 you were pregnant, the --
16    A.   Yes --
17    Q.   -- first time?
18    A.   With my first child. It was a very long
19 time ago; it was probably the last time I saw the man
20 and it had probably been a long time since I had seen
21 him personally myself.
22    Q.   Okay. Would you approve of your statements
23 being videotaped and then used to blackmail Ed
24 Magedson?
25    A.   No.

Page 47

1        MR. INGLE:  Form.
2  BY MS. SPETH:
3     Q.   That was certainly not your intention?
4     A.   No.
5     Q.   And did any investigators ever contact you
6  and try to get you to change your testimony?
7     A.   No.
8     Q.   Or your statement?
9     A.   No. It is kind of weird that they'd go all
10 the way to Florida, though, and not bother me when
11 I'm still in the same place. So maybe they called --
12 maybe they came over, I wouldn't have answered or --
13    Q.   Or maybe your dad exaggerated his
14 conversations with them; is that possible?
15        MR. INGLE:  Form.
16 BY MS. SPETH:
17    Q.   Let me ask you this, does your dad ever
18 exaggerate?
19    A.   Well, everyone exaggerates. But he did
20 call me a couple of separate times and told me they
21 came again, which I really was weirded out by because
22 they hadn't -- I mean, I had not heard from the man
23 in so long, so I thought it was weird, and yes, we
24 all exaggerate. I exaggerate myself.
25    Q.   I want to -- in the longer interview

Page 48

1  there's some conversations about this issue about
2  whether Ed represented himself to be a lawyer. And I
3  know you told Mr. Ingle that he never told you he was
4  a lawyer, but you got that impression. Is it
5  possible you got that impression from your father, as
6  opposed to from Ed Magedson?
7        MR. INGLE:  Form.
8        THE WITNESS:  I don't think so.
9  BY MS. SPETH:
10    Q.   Okay. I'm going to show you just a little
11 piece of that interview.
12    A.   I believe I am the one who told my father
13 that he was a lawyer; maybe that's why my father had
14 that impression, because I had spoken with him
15 several times on the phone before I had brought my
16 dad into it.
17    Q.   Let me show you this portion of the tape,
18 with the bird in the background.
19    A.   I miss the bird.
20        (Inaudible video playing.)
21        THE WITNESS:  McDowell.
22 BY MS. SPETH:
23    Q.   What's the number say at the bottom?
24    A.   2926.
25    Q.   Okay.

**Driver and Nix Court Reporters 602.266.6525**
**www.drivernix.com**

Videotaped Deposition of Krysta Marie Agerone - 03/18/2010

Page 49

1    Okay.  So the reason I showed you that
2  part, and I'll ask you if I'm accurately paraphrasing
3  this, it seems to me that what you told John
4  Brewington is that Ed Magedson when he first started
5  contacting you told you that he was a facilitator for
6  the lawsuit and that he dealt with the lawyer.
7    A.    I was under the impression, yes, that he
8  was somewhere up there.  Like I said before, he
9  didn't tell me he was a lawyer.
10    Q.    But he told you he dealt with the lawyer?
11    A.    Something like that.  I was under the
12  impression he was calling the shots, and that I was
13  going to get money.
14    MS. SPETH:  Okay.  I think I have no
15  further questions.
16    THE WITNESS:  Okay.
17
18    F U R T H E R   E X A M I N A T I O N
19  BY MR. INGLE:
20    Q.    I just have one last question.  Actually,
21  about that facilitator.  You said at the time you
22  were under the impression that he was an attorney.
23  In the video you said he was a facilitator; did the
24  understanding that he was a facilitator arise
25  after --

Page 50

1    A.    After the fact.
2    Q.    Okay.
3    A.    Initially I thought, obviously -- I was
4  under the impression when he approached me about the
5  case that he was an attorney or working with
6  attorneys.  I mean, he didn't look like an attorney,
7  but I mean, who knows, you never can judge a book by
8  its cover.  He never said specifically to me that he
9  was either an attorney or not, as I recall.  But
10  after the fact I knew he was not a lawyer, so by the
11  time the video was taped, I was probably not under
12  the impression he was an attorney.
13    MR. INGLE:  Okay.  That's the last question
14  I had.
15    MS. SPETH:  We're all done.
16    THE VIDEOGRAPHER:  This concludes the
17  deposition of Krysta Marie Agerone.  We are off the
18  record at 10:47.
19    MS. SPETH:  Krysta, you have an option of
20  either reading the transcript and making sure that
21  the transcript is accurate or not.  You can waive it
22  and say I don't care, not my issue, or you can read
23  it, totally up to you.
24    THE WITNESS:  I think it's all right.
25    MS. SPETH:  It's good.  So you can waive

Page 51

1  signature.
2    MR. INGLE:  I would say especially since
3  there's a video.
4    MS. SPETH:  Yeah, we have to give you the
5  option, but yes.
6    THE REPORTER:  Mr. Ingle, would you like a
7  copy of the transcript?
8    MR. INGLE:  Yes, please.  Miniscript,
9  exhibits, word index.
10
11    (Deposition concluded at 10:47 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 52

1    CERTIFICATE
2    I, ROBIN L. B. OSTERODE, Certified
3  Reporter for the State of Arizona and Certified
4  Shorthand Reporter for the State of California
5  certify:
6    That the foregoing deposition was taken
7  by me; that I am authorized to administer an oath;
8  that the witness, before testifying, was duly sworn
9  by me to testify to the whole truth; that the
10  questions propounded by counsel and the answers of
11  the witness were taken down by me in shorthand and
12  thereafter reduced to print by computer-aided
13  transcription under my direction; that deposition
14  review and signature was not requested; that the
15  foregoing pages are a full, true, and accurate
16  transcript of all proceedings and testimony had upon
17  the taking of said deposition, all to the best of my
18  skill and ability.
19    I FURTHER CERTIFY that I am in no way
20  related to nor employed by any of the parties hereto,
21  nor am I in any way interested in the outcome hereof.
22    DATED this 31st day of March, 2010.
23
24
    _____
25    ROBIN L. B. OSTERODE
    AZ CR No. 50695

13  (Pages 49 to 52)

Page 52

CERTIFICATE

1
2          I, ROBIN L. B. OSTERODE, Certified

3   Reporter for the State of Arizona and Certified

4   Shorthand Reporter for the State of California

5   certify:

6          That the foregoing deposition was taken

7   by me; that I am authorized to administer an oath;

8   that the witness, before testifying, was duly sworn

9   by me to testify to the whole truth; that the

10  questions propounded by counsel and the answers of

11  the witness were taken down by me in shorthand and

12  thereafter reduced to print by computer-aided

13  transcription under my direction; that deposition

14  review and signature was not requested; that the

15  foregoing pages are a full, true, and accurate

16  transcript of all proceedings and testimony had upon

17  the taking of said deposition, all to the best of my

18  skill and ability.

19         I FURTHER CERTIFY that I am in no way

20  related to nor employed by any of the parties hereto,

21  nor am I in any way interested in the outcome hereof.

22         DATED this __31st__ day of__March___, 20_10_.

23

24   _____
      ROBIN L. B. OSTERODE

25   AZ CR No. 50695
      CA CSR No. 7750

Maria Crimi Speth, # 012574
Adam S. Kunz, #018827
Laura Rogal, #025159
**JABURG & WILK, P.C.**
3200 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
mcs@jaburgwilk.com
ask@jaburgwilk.com
lar@jaburgwilk.com
(602) 248-1000

Attorneys for Plaintiff

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

XCENTRIC VENTURES, LLC, an
Arizona limited liability company; ED
MAGEDSON, an individual,

      Plaintiffs,

v.

JOHN F. BREWINGTON and JANE DOE
BREWINGTON, husband and wife; and
JFB ACQUISITIONS, LLC, an Arizona
limited liability company,

      Defendants.

Case No:  CV2008-008275

**DECLARATION OF RIMA L.
RHODEY**



EXHIBIT NO. 3
3/18/10
agerone
jmsteno.com

1.     My name is Rima L. Rhodey and I am a legal assistant and Jaburg & Wilk.

2.     On or about December 3, 2009, I transcribed a video from a CD entitled "Putt-Putt Video."

3.     A true and accurate copy of the transcription was disclosed in this litigation on 1/04/10 as documents Bates numbered Xcen 00520 to Xcen 00523.

4.     On March 10, 2010, I compared my transcription to video which I listened to as streaming video from the website www.Paladinpi.com, and the video disclosed by John Brewington as Document JFB 06081, which all depict the same interview.  I verify that my transcription of what I originally heard was an accurate transcription.  The recording disclosed as JFB 681 had better sound quality than the original, and I was

10297-30/ASK/LSM/789433_v1

able to hear a few words more clearly than before.  Exhibit A is a revised copy of the Memorandum dated December 3, 2009, with a few words changed to reflect the better audio quality in the recordings I reviewed on March 10, 2009. The changes do not affect the meaning or accuracy of the transcription.

I declare under penalty of perjury that the foregoing statements are true and correct.

DATED this ___16th___ day of March, 2010.

Kima L. Rhodes

JABURG & WILK, P.C
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX. ARIZONA 85012

2

JABURG & WILK, P.C.

# MEMORANDUM

| Re: | 10297-30 |
| --- | --- |

**To:**   File

**From:**   Adam S. Kunz

**Date:**   March 10, 2010

Brewington:  My name is John Brewington.  I am a private investigator licensed through the Arizona Department of Public Safety.   I am the managing member of Paladin Investigations in Phoenix, Arizona.   For the past two and half years I have been conducting an independent investigation on the consumer advocacy industry.  The local industry here is the focus of the video-clip you are about to see.  The two witnesses that are testifying understood they were being recorded.   I think it's important to the American public that they view this, they make their own decisions about what they're saying and that they should understand that everyone is innocent until proven guilty.

Ed Magedson and the Rip Off Report.

We decided to hide the faces of those interviewed.

Brewington:  This is a supplemental to the interview that we were having.

Krysta Agerone ("Krysta"):  I just remembered…

Tony Agerone ("Agerone"):  Ok, one thing about the Rip Off Report.  They had Putt Putt Car Sales on the Rip Off Report.  He had went into the car lot and said that he could take care of that for the owner, if the owner would pay him to get that off of there.  And it was with some customers he had. Their name was Silvers.

Brewington:  How do you know that?

Agerone:  Because I was there.  Because my friend owned the car lot.  His name was Lloyd Jorgenson.

Brewington:  I know Mr. Jorgenson; I know Lloyd.  Where is he?

Agerone:  He's gone.

Brewington:  All right so he was a friend of – that's interesting.  Putt Putt Car Lot apparently, if I understood what you just said, had some disgruntled customers that had gone on to the Rip Off Report and complained.  You're saying to me that Magedson went to … physically?

Agerone:  Oh yeah he went in there. He came in there during the day time and asked them what time the owner would be in.  Well they always said the owner was never in.

Brewington:  Were you there?

Agerone:  Yeah.  And they would always say the owner was never in.  And he came at night and he came up to the window and he says are you the owner.  And he said no I'm the manager.  And because Lloyd never said that he owned the car lot.  And then he came inside and said well, you know, I know that you are the owner because blah, blah, blah Jay Silvers said that you are the owner.  He says I know that they're pieces of shit.  He goes I could clear that Rip Off Report, you know, if you'll pay me some money.

Brewington:  Did he say how much?

Agerone:  Uh, I think he was like trying to get $500 and he said it was like a donation or something.  But what happened was Lloyd got so mad.  He told him to get the hell out of here.  He says I don't care about the Rip Off Report, I don't care about nothing.  Then Lloyd had me go on the computer and look it up and, sure enough, it was on there.

Brewington:  You had said something about Matt and the Rip Off Report.

Krysta:  Matt and John - We went to John's house every day for a long, long time.  John was doing a lot of work on the Rip Off Report, like editing it and stuff.  A lot of work that Ed was supposed to pay him for. And then Matt used to help him with that.

Brewington:  Editing it how?

Krysta:  Like taking things off of it, putting things on it, rewriting things to be published on the website.

Brewington:  So people would post particular complaints and John Unger would go in there and change the wording of it?

Krysta:  Sometimes, yeah.

Agerone:  Or get paid to take it out.

Krysta:  They would take stuff out.

Agerone:  Lloyd was so mad, Lloyd was so mad and ah Lloyd goes who is that guy?  He says I don't know it's a guy who said he was a lawyer.

Krysta:  I don't know anything about that.

Agerone:  You know he said uh, that's when Elliott Fisher and stuff was coming over here.  He come over here – I think Elliott Fisher, he knows him too.  So what happened was that's when that guy was talking all this crap, saying he was a lawyer and stuff.  He didn't say he ran the Rip Off Report, he said his friend did.  And he could get that off of there for $500 bucks or something like that.  And ah…

Brewington:  Ok, let me stop.  Magedson said his friend owned it and could get it off?

Agerone:  Yeah.

Brewington:  But you know it was Magedson that was …?

Agerone:  Oh yeah cause I seen him.

Brewington:  Ok. And you heard that?

Agerone:  Yeah, I heard it.  I was right there.  I was always sitting with Lloyd. Lloyd would order pizzas and stuff and me and Frankie would be sitting there all the time, eating pizza with him at night.  And my kids worked there.

Krysta:  I worked there too.

Brewington:  I want to be very clear on this.  The gentleman that you knew, to be Edward Magedson later on, approached Lloyd Jorgenson at Putt Putt Auto and suggested that he would be able to remove the post from the Rip Off Report?

Agerone:  Yeah.

Brewington:  If he was given money?

Agerone:  Right.

Brewington:  He said remove?

Agerone:  Take it off.  He said that those people were pieces of shit.  He knows Jay Silvers and he knows anybody can get at them and all that stuff and he would take care of it.  And Lloyd got so mad he threw him out.

Brewington:  Did Matt ever get on the Rip Off Report and post anything?

Krysta:  You know, I don't… He reported on Thrifty Transmission. He got some work done on his truck. That was a long time after that though. I didn't even know…

Brewington:  Thanks for watching that video-clip. If you're like me, you found the contents of it very disturbing and it brings up even more questions. If you need help Paladin Investigations is here for you. Call us, email us, communicate with us any way that you can and we would be happy to help you.

STD, TERMED

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:01-cv-01227-FJM

Louy, et al v. Pizza Hut Apache Jct, et al
Assigned to: Judge Frederick J Martone
Demand: $0
Cause: 28:1331 Fed. Question: Breach of Contract

Date Filed: 06/29/2001
Date Terminated: 07/23/2003
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Federal Question

**Plaintiff**

**James Louy**
*a single man*

represented by **Maria Crimi Speth ,**
Jaburg & Wilk PC
Great American Tower
3200 N Central Ave
Ste 2000
Phoenix, AZ 85012
602-248-1000
Fax: 602-248-0522
Email: mcs@jaburgwilk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Shay Ryan**
Kent & Ryan PLC
Luhrs Tower
45 W Jefferson
Ste 206
Phoenix, AZ 85003
602-277-8888
Fax: 602-253-3105
Email: ryan@kentandryan.com
*TERMINATED: 02/11/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Josh Littell**
*a single man, on behalf of themselves and
on behalf of all others similarly situated*

represented by **Maria Crimi Speth ,**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Shay Ryan**
(See above for address)
*TERMINATED: 02/11/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*



EXHIBIT NO. 4
3/18/10
agerone

V.

**Defendant**

**Pizza Hut of Apache Junction, Inc.**
*an Arizona corporation*

represented by **Andrew B Cripe**
Hinshaw & Culbertson
222 N LaSalle St
Ste 300
Chicago, IL 60601
(312)704-3000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frederick C Hickle**
-
PO Box 31807
Tucson, AZ 85751-1807
(520)298-9676
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark L Karasik**
Baker & McKenzie
1 Prudential Plaza
Ste 3500
Chicago, IL 60601
(312)861-8000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Thompson & Brock Management, Inc.**
*a Florida corporation*

represented by **Andrew B Cripe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frederick C Hickle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark L Karasik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tricon Restaurant Services Group, Inc.**
*a Delaware corporation*
*TERMINATED: 01/31/2002*

represented by **Andrew B Cripe**
(See above for address)
*TERMINATED: 01/31/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frederick C Hickle**

(See above for address)
*TERMINATED: 01/31/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark L Karasik**
(See above for address)
*TERMINATED: 01/31/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Betty Carter**
*wife*

represented by **Andrew B Cripe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frederick C Hickle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark L Karasik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Micky Carter**
*husband*

represented by **Andrew B Cripe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frederick C Hickle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark L Karasik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rick Carter**
*husband*

represented by **Andrew B Cripe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frederick C Hickle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark L Karasik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Vanessa Carter**
*wife*

represented by **Andrew B Cripe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frederick C Hickle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark L Karasik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tim Carter**
*husband*

represented by **Andrew B Cripe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frederick C Hickle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark L Karasik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michelle Carter**
*wife*

represented by **Andrew B Cripe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frederick C Hickle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark L Karasik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Unknown Parties**
*Named as Does - I-X*
*TERMINATED: 02/11/2002*

**Defendant**

**Unknown Parties**
*Named as Corporations - A-Z*
*TERMINATED: 02/11/2002*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/29/2001 | 1 | COMPLAINT FILED (MAP) (Entered: 07/02/2001) |
| 08/02/2001 | 2 | ORDERED that pla James Louy, pla Josh Littell show cause for failure to comply with Local Rule 1.2(e) ; show cause hearing set for 1:30 8/27/01 for Josh Littell, for James Louy before Judge Stephen M. McNamee (cc: all counsel/AL) (MAP) (Entered: 08/02/2001) |
| 08/07/2001 | 3 | Party elects assignment of case to district judge ; mag election form ddl satisfied 8/7/01 ; show cause hearing ddl satisfied 8/7/01 (MAP) (Entered: 08/09/2001) |
| 08/09/2001 | 4 | MINUTE ORDER that pursuant to Local Rule 1.2(e), a request has been received for a random reassignment of this case to a District Judge FURTHER ORDERED Case reassigned by random draw to Judge Robert C. Broomfield All further pleadings shall now list the following COMPLETE case number: CIV-01-1227-PHX-RCB (cc: all counsel/VAM/RCB) [4-2] (MAP) (Entered: 08/09/2001) |
| 08/28/2001 | 5 | WAIVER of Service of summons and complaint upon dft Pizza Hut Apache Jct ; waiver sent on 8/20/01 (MAP) (Entered: 08/30/2001) |
| 08/28/2001 | 6 | WAIVER of Service of summons and complaint upon dft Thompson & Brock Mgt ; waiver sent on 8/20/01 (MAP) (Entered: 08/30/2001) |
| 08/28/2001 | 7 | WAIVER of Service of summons and complaint upon dft Betty Carter ; waiver sent on 8/20/01 (MAP) (Entered: 08/30/2001) |
| 08/28/2001 | 8 | WAIVER of Service of summons and complaint upon dft Tricon Rest Services ; waiver sent on 8/20/01 (MAP) (Entered: 08/30/2001) |
| 08/28/2001 | 9 | WAIVER of Service of summons and complaint upon dft Rick Carter ; waiver sent on 8/20/01 (MAP) (Entered: 08/30/2001) |
| 09/19/2001 | 10 | ATTORNEY APPEARANCE for Pizza Hut Apache Jct, Thompson & Brock Mgt, Tricon Rest Services, Betty Carter, Micky Carter, Rick Carter, Vanessa Carter, Tim Carter, Michelle Carter by Frederick C Hickle (former emp) (Entered: 09/26/2001) |
| 10/10/2001 | 11 | ANSWER to complaint and affirmative defenses by dfts (former emp) (Entered: 10/12/2001) |
| 10/10/2001 | 12 | MOTION for summary judgment purs to Rule 56 as there is no genuine issue as to any material fact by dft Tricon Rest Services [12-1] (former emp) (Entered: 10/12/2001) |
| 11/13/2001 | 13 | CROSS-MOTION for Discovery as to records, testimony and information in Tricon's |

| | | control by plas James Louy, and Josh Littell [13-1] and RESPONSE to motion for summary judgment purs to Rule 56 as there is no genuine issue as to any material fact by dft Tricon Rest Services [12-1] [12-1] by pla James Louy, pla Josh Littell (KMG) Modified on 11/29/2001 (Entered: 11/14/2001) |
|---|---|---|
| 11/15/2001 | 14 | MOTION for admission pro hac vice as to Andrew Cripe, atty for dfts [14-1] (MAP) (Entered: 11/19/2001) |
| 11/15/2001 | 15 | MOTION for admission pro hac vice as to Mark L Karasik, atty for dfts [15-1] (MAP) Modified on 11/21/2001 (Entered: 11/19/2001) |
| 11/21/2001 | 16 | ORDER by Judge Robert C. Broomfield granting motion for admission pro hac vice as to Mark L Karasik, atty for dfts [15-1] (cc: all counsel) (former emp) (Entered: 11/21/2001) |
| 11/21/2001 | 17 | ORDER by Judge Robert C. Broomfield granting motion for admission pro hac vice as to Andrew Cripe, atty for dfts [14-1] (cc: all counsel) (former emp) (Entered: 11/21/2001) |
| 12/11/2001 | 18 | REPLY by dft Tricon Rest Services to response to motion for summary judgment purs to Rule 56 as there is no genuine issue as to any material fact by dft Tricon Rest Services [12-1] (MAP) (Entered: 12/12/2001) |
| 01/09/2002 | 19 | NOTICE of service of discovery by pla James Louy, pla Josh Littell . (SAT) (Entered: 01/10/2002) |
| 01/11/2002 | 20 | STIPULATION to dismiss Dft Tricon Restaurant Svc by Plas, Dft Tricon Rest Services (MAP) (Entered: 01/14/2002) |
| 01/31/2002 | 21 | ORDER by Judge Robert C. Broomfield granting stipulation to dismiss Dft Tricon Restaurant Svc by Plas, Dft Tricon Rest Services party Tricon Rest Services without prejudice, each party to bear its own costs (cc: all counsel) (former emp) (Entered: 01/31/2002) |
| 02/01/2002 | 22 | ORDER SETTING RULE 16 SCHEDULING CONFERENCE by Judge Robert C. Broomfield this case is designated a standard track case; prel scheduling conf set for 2:30 4/15/02; FURTHER ORDERED the parties shall meet before the conference; FURTHER ORDERED counsel shall file not less than 10 days before the scheduling conference, a joint report reflecting the results of their discussions (cc: all counsel) (former emp) (Entered: 02/01/2002) |
| 02/01/2002 | 23 | MOTION to dismiss unnamed defendants as to dft Does, dft Corporations by plas [23-1] without prejudice (SAT) (Entered: 02/05/2002) |
| 02/11/2002 | 24 | ORDER by Judge Robert C. Broomfield granting motion to dismiss unnamed defendants, without prejudice as to dft Does, dft Corporations by plas [23-1] without prejudice party Corporations, party Does (cc: all counsel) (KMG) (Entered: 02/11/2002) |
| 02/11/2002 | 25 | ATTORNEY SUBSTITUTION: terminating attorney Michael Shay Ryan for Josh Littell, attorney Michael Shay Ryan for James Louy and substituting attorney Maria Crimi Speth (SAT) (Entered: 02/13/2002) |
| 02/19/2002 | 26 | The Court has ORDERED that effective February 25, 2002, the above captioned matter is reassigned to Judge Frederick J. Martone for all further proceedings. Any deadline, hearing, conference, or trial scheduled on or after 2/25/2002 in this action will remain in effect and will be placed on the calendar of Judge Frederick J. |

| | | Martone . All further pleadings and papers filed in this action should bear the complete case number and judge's initials, as shown above. (cc: all counsel/RCB/FJM) [26-1] (MAP) (Entered: 02/19/2002) |
|---|---|---|
| 03/05/2002 | 27 | NOTICE of service of discovery documents by plas. (SAT) (Entered: 03/06/2002) |
| 03/29/2002 | 28 | JOINT REPORT PURSUANT TO RULE 16 by pla (SAT) (Entered: 04/01/2002) |
| 04/15/2002 | 29 | MINUTE ENTRY before Judge Frederick J. Martone . Crt Rptr: Linda Schroeder-Willis. denying motion for summary judgment purs to Rule 56 as there is no genuine issue as to any material fact by dft Tricon Rest Services [12-1] ; prel scheduling conf held ; discovery ddl set for 1/24/03 ; dispositive motions due 2/27/03 ; PTO ddl set for 4/28/03 ; Pretrial conference set for 9:30 5/5/03 ; jury trial set for 9:30 5/13/03. The court directs counsel regarding answers to interrogatories and requests for documents. [cc: FJM] [29-2] (KCB) (Entered: 04/15/2002) |
| 04/17/2002 | 30 | ORDER by Judge Frederick J. Martone that all discovery is due by 1/24/03; discovery ddl set for 1/24/03; FURTHER ORDERED that all dispositive motions be filed by 2/27/03 dispositive motions due 2/27/03; FURTHER ORDERED that a Joint Proposed Pretrial Order shall be lodged by 4/28/03; PTO ddl set for 4/28/03; FURTHER ORDERED that the attorneys for each party who will be responsible for trial of the lawsuit shall appear and participate in a Pretrial Conference on 5/5/03 at 9:30 a.m.; Pretrial conference set for 9:30 5/5/03; FURTHER ORDERED setting jury trial on 5/13/03 at 9:30 a.m., estimated length: 21 days; trial set for 9:30 5/13/03 (cc: all counsel) (SAT) (Entered: 04/17/2002) |
| 04/22/2002 | 31 | Transcript Designation and Ordering Form by plas re Pre-Trial Proceeding held on 4/15/02 (SAT) (Entered: 04/23/2002) |
| 04/29/2002 | 32 | TRANSCRIPT of Pretrial Scheduling Conference by Court Reporter: Linda Schroeder-Willis, RDR,CRR for the following date(s): 4/15/02 (SAT) (Entered: 04/30/2002) |
| 05/14/2002 | 33 | NOTICE of service of discovery by plas. (SAT) (Entered: 05/16/2002) |
| 05/14/2002 | 34 | MOTION for leave to amend complaint [1-1] by pla [34-1] (Amended complaint not submitted) (SAT) (Entered: 05/16/2002) |
| 06/14/2002 | 35 | MOTION to Certify Class by plas [35-1] (SAT) (Entered: 06/18/2002) |
| 06/18/2002 | 36 | ORDER by Judge Frederick J. Martone granting Plaintiff's Motion for leave to Amend [34-1] complaint [1-1] (cc: all counsel) (SAT) (Entered: 06/18/2002) |
| 06/28/2002 | 37 | CROSS-MOTION to dismiss case by dfts [37-1] and RESPONSE in Opposition to motion to Certify Class by plas [35-1] by dfts (MAP) (Entered: 07/02/2002) |
| 07/08/2002 | 38 | ORDER by Judge Frederick J. Martone denying as moot Motion for Discovery as to records, testimony and information in Tricon's control by plas James Louy, and Josh Littell [13-1] (cc: all counsel) (SAT) (Entered: 07/08/2002) |
| 07/10/2002 | 39 | REPLY by plas to response to Motion to Certify Class by plas [35-1] (SAT) (Entered: 07/15/2002) |
| 07/11/2002 | 40 | MOTION to Extend Page Limitation [40-1] Regarding Plaintiffs' Reply in Support of Motion to Certify Class [39-1] by pla (SAT) (Entered: 07/15/2002) |
| 07/19/2002 | 41 | RESPONSE by plas James Louy, and Josh Littell to motion to dismiss case by dfts [37-1] (KMG) (Entered: 07/22/2002) |

| 07/26/2002 | 42 | REPLY by dfts in support of motion to dismiss case by dfts [37-1] (MAP) (Entered: 07/31/2002) |
| 07/30/2002 | 43 | MOTION to Compel Discovery by plas [43-1] (SAT) (Entered: 08/05/2002) |
| 08/16/2002 | 44 | RESPONSE by dfts to motion to Compel Discovery by plas [43-1] (MAP) (Entered: 08/20/2002) |
| 08/16/2002 | 44 | MOTION to Stay Discovery by dfts [44-1] (part of response [44-1]) (SAT) (Entered: 11/22/2002) |
| 08/23/2002 | 45 | REPLY by plas to response to Motion to Compel Discovery by plas [43-1] (SAT) (Entered: 08/26/2002) |
| 09/06/2002 | 46 | NOTICE by plas of Change of Address of Grant Williams PC to: Great American Tower, 3200 N Central Avenue, Suite 2400, Phoenix, AZ 85012 (SAT) (Entered: 09/10/2002) |
| 09/12/2002 | 47 | MOTION for Proposed Order providing Notice to Potential Class Members by plas [47-1] (SAT) (Entered: 09/13/2002) |
| 09/20/2002 | 48 | RESPONSE by dfts to motion for Proposed Order providing Notice to Potential Class Members by plas [47-1] (MAP) (Entered: 09/23/2002) |
| 09/30/2002 | 49 | REPLY by pla James Louy, pla Josh Littell in support of motion for Proposed Order providing Notice to Potential Class Members by plas [47-1] (former emp) (Entered: 10/02/2002) |
| 10/02/2002 | 50 | NOTICE of service of discovery by pla James Louy, pla Josh Littell (former emp) (Entered: 10/03/2002) |
| 11/22/2002 | 51 | ORDER by Judge Frederick J. Martone denying Plaintiffs' Motion to Certify Class [35-1]; FURTHER ORDERED granting in part (with rewspect to state law claims) and denying in part Defendants' Motion to Dismiss case [37-1]; FURTHER ORDERED granting Plaintiffs' Motion to Extend Page Limitation [40-1] Regarding Plaintiffs' Reply in Support of Motion to Certify Class [39-1]; FURTHER ORDERED granting Plaintiffs' Motion to Compel Discovery [43-1]; FURTHER ORDERED denying Defendants' Motion to Stay Discovery [44-1] (part of response [44-1]); FURTHER ORDERED denying Plaintiffs' Motion for Proposed Order providing Notice to Potential Class Members [47-1] (cc: all counsel) (SAT) (Entered: 11/22/2002) |
| 01/06/2003 | 52 | MINUTE ORDER: On the Court's own motion, IT IS ORDERED advancing the final pretrial conference to 3:00 p.m. on May 2, 2003 before the Honorable Frederick J. Martone, Courtroom 506, Sandra Day O'Connor U.S. District Courthouse, Phoenix, Arizona. (cc: all counsel) [52-2] (KCB) (Entered: 01/06/2003) |
| 01/07/2003 | 53 | NOTICE of Filing Consents For Collective Action by plas (signed consent forms by former Pizza Hut of Apache Jucntion employees Mabel L Torkelson, Christopher Shon White, Eric Peterson attached to this notice) (SAT) Modified on 01/15/2003 (Entered: 01/08/2003) |
| 01/10/2003 | 54 | NOTICE of Filing Consents for Collective Action by plas (signed consent form by former Pizza Hut of Apache Junction employee Roberta Helton) (SAT) Modified on 01/15/2003 (Entered: 01/13/2003) |
| 01/14/2003 | 55 | NOTICE of Filing Consents for Collective Action by plas (signed consent forms for |

| | | |
|---|---|---|
| | | former Pizza Hut of Apache Junction employees: Selene R Adams, Rayana Hansen, Mary Woolley) (SAT) (Entered: 01/15/2003) |
| 01/14/2003 | 56 | NOTICE of Filing Consents for Collective Action by plas (signed consent forms for former Pizza Hut of Apache Junction employees: Jason Daniel Aragon, Anthony R Carter and Stephanie L Gardner) (SAT) (Entered: 01/15/2003) |
| 01/17/2003 | 57 | NOTICE of Filing Consents for Collective Action (former employees of Pizza Hut of Apache Junction: Sarah Bink, Christopher M Gray, Adam Hatfield, Barbara Hoferica) by plas (SAT) (Entered: 01/21/2003) |
| 01/21/2003 | 58 | NOTICE of Filing Consents for Collective Action by plas (former Pizza Hut of Apache Junction employees: Chris Fredock, Erik B Tonne, Douglas Williams, Christine Oba) (SAT) (Entered: 01/23/2003) |
| 01/23/2003 | 59 | NOTICE by dfts OF TAKING Amended DEPO OF James Louy on the following date(s): 1/22/03 (SAT) (Entered: 01/24/2003) |
| 01/23/2003 | 60 | NOTICE by dfts OF TAKING Amended DEPO OF Josh Littell on the following date (s): 1/22/03 (SAT) (Entered: 01/24/2003) |
| 01/23/2003 | 61 | NOTICE by dfts OF TAKING DEPO OF Eric Peterson on the following date(s): 1/22/03 (SAT) (Entered: 01/24/2003) |
| 01/23/2003 | 62 | NOTICE by dft OF TAKING DEPO OF Christopher Shon White on the following date(s): 1/22/03 (SAT) (Entered: 01/24/2003) |
| 01/23/2003 | 63 | NOTICE by dfts OF TAKING DEPO OF Mable Torkelson on the following date(s): 1/22/03 (SAT) (Entered: 01/24/2003) |
| 01/23/2003 | 64 | NOTICE by dfts OF TAKING DEPO OF Roberta Helton on the following date(s): 1/22/03 (SAT) (Entered: 01/24/2003) |
| 01/23/2003 | 65 | NOTICE by dfts of change of firm name and address for Andrew B Cripe to: Hinshaw & Clubertson, 222 N La Salle Street, Suite 300, Chicago, IL 60601 (SAT) (Entered: 01/24/2003) |
| 01/23/2003 | 66 | NOTICE of Filing Consents for Collective Action by plas (former Pizza Hut of Apache Junction employees: Jimmy Huffman, James M Lindstrom, Amber Richau, Larry L Turner) (SAT) (Entered: 01/24/2003) |
| 01/23/2003 | 67 | Joint Stipulated MOTION to Allow Deposition of Betty Carter After Discovery Cut-Off by plas, dfts [67-1] (SAT) (Entered: 01/24/2003) |
| 01/23/2003 | 68 | MOTION to Extend the Discovery Cut-Off until 6/27/03 by plas [68-1] and to Continue Trial Date by plas [68-2] (SAT) (Entered: 01/24/2003) |
| 01/28/2003 | 69 | NOTICE of Filing Consents for Collective Action by plas (former Pizza Hut of Apache Junction employees: Chad James Kunkle, Robert Allan Stogner, John Vearrier) (SAT) (Entered: 01/29/2003) |
| 01/28/2003 | 70 | NOTICE of Filing Consents for Collective Action by plas (former Pizza Hut of Apache Junction employees: Gretchen Huyard Pruitt, Julie Ann Thiel) (SAT) (Entered: 01/29/2003) |
| 01/29/2003 | 71 | MOTION for Sanctions against Defendants' Pursuant to Rule 37(b) and Rule 37(d) by plas [71-1] and to Compel Continued Depositions (of Tim Carter and Betty Carter) by plas [71-2] (SAT) (Entered: 01/30/2003) |

| | | |
|---|---|---|
| 01/29/2003 | 72 | AFFIDAVIT of Maria Crimi Speth in support of Motion for Sanctions against Defendants' Pursuant to Rule 37(b) and Rule 37(d) (titled Application for Attorney's Fees) by plas [71-1] by plas (SAT) (Entered: 01/30/2003) |
| 01/30/2003 | 73 | NOTICE of Filing Consents for Collective Action (former Pizza Hut of Apache Junction employees: Natalie Jimenez Cline; Jeremiam James DeWitt; Jaclyn M Toranzo) by plas (SAT) (Entered: 01/31/2003) |
| 01/31/2003 | 74 | NOTICE of Filing Consents for Collective Action by plas (former Pizza Hut of Apache Junction employee: Agnes L Sharpe, fka Agnes L Metzger) (SAT) (Entered: 02/03/2003) |
| 02/04/2003 | 75 | NOTICE of Filing Consents for Collective Action (former Pizza Hut of Apache Junction employees: Marguerite E Germany, Mike E Smith) by plas (SAT) (Entered: 02/05/2003) |
| 02/07/2003 | 76 | NOTICE of Filing Consents for Collective Action (former Pizza Hut of Apache Junction employees: Lauri N Ruiz (Blake) and Warren J Lorentz) by plas (SAT) (Entered: 02/10/2003) |
| 02/10/2003 | 77 | NOTICE of Filing Consents for Collective Action (former Pizza Hut of Apache Junction employees: Terri Lynn Ryan and Brenda R Wahlert) by plas (SAT) (Entered: 02/11/2003) |
| 02/11/2003 | 78 | ORDER by Judge Frederick J. Martone granting Stipulated Motion to Allow Deposition of Betty Carter (on 1/27/03) After Discovery Cut-Off by plas, dfts [67-1] (cc: all counsel) (SAT) (Entered: 02/11/2003) |
| 02/12/2003 | 79 | CROSS-MOTION for Rule 26 Sanctions against Plaintiffs' counsel by dfts [79-1] and for Protective Order by dfts [79-2] and RESPONSE in Opposition to Motion to Extend the Discovery Cut-Off until 6/27/03 by plas [68-1] and Motion to Continue Trial by plas [68-2] by dfts (SAT) (Entered: 02/12/2003) |
| 02/14/2003 | 80 | NOTICE of Service of Discovery Documents by plas. (SAT) (Entered: 02/18/2003) |
| 02/18/2003 | 81 | REPLY by pla to response to Motion to Extend the Discovery Cut-Off until 6/27/03 by plas [68-1 and Motion to Continue Trial Date by plas [68-2] (SAT) Modified on 02/19/2003 (Entered: 02/19/2003) |
| 02/18/2003 | 81 | RESPONSE by plas to Cross-Motion for Rule 26 Sanctions against Plaintiffs' counsel by dfts [79-1] and Motion for Protective Order by dfts [79-2] (SAT) (Entered: 02/19/2003) |
| 02/24/2003 | 82 | RESPONSE by dfts in Opposition to Motion for Sanctions against Defendants' Pursuant to Rule 37(b) and Rule 37(d) by plas [71-1] and Motion to Compel Continued Depositions (of Tim Carter and Betty Carter) by plas [71-2] (SAT) (Entered: 02/25/2003) |
| 02/26/2003 | 83 | REPLY by plas to response to Motion for Sanctions against Defendants' Pursuant to Rule 37(b) and Rule 37(d) by plas [71-1] and Motion to Compel Continued Depositions (of Tim Carter and Betty Carter) by plas [71-2] (SAT) Modified on 02/27/2003 (Entered: 02/27/2003) |
| 02/27/2003 | 84 | MOTION for Summary Judgment by dfts [84-1] (SAT) (Entered: 02/28/2003) |
| 02/27/2003 | 85 | STATEMENT OF FACTS by dfts in Support of Motion for Summary Judgment by dfts [84-1] (SAT) (Entered: 02/28/2003) |

| 04/01/2003 | 86 | RESPONSE by plas to Motion for Summary Judgment by dfts [84-1] (SAT) (Entered: 04/02/2003) |
| 04/01/2003 | 87 | STATEMENT OF FACTS by plas in Support of Response to [86-1] Motion for Summary Judgment by dfts [84-1] (SAT) (Entered: 04/02/2003) |
| 04/01/2003 | 88 | NOTICE of Filing Consents for Collective Action (former Pizza Hut of Apache Junction employees Ken L Bay and Richard W Stansbery) by plas (SAT) (Entered: 04/02/2003) |
| 04/09/2003 | 89 | MINUTE ORDER: On the court's onw motion, IT IS ORDERED resetting the following deadlines: PTO ddl reset to May 23, 2003; final pretrial conference reset to 3:00 p.m. on May 30, 2003; jury trial reset to 9:30 a.m. on June 10, 2003. (cc: all counsel) [89-2] (KCB) (Entered: 04/09/2003) |
| 04/10/2003 | 90 | MOTION to Expedite Ruling on Pending Motions: Motion to Extend the Discovery Cut-Off until 6/27/03 by plas [68-1], Motion to Continue Trial Date by plas [68-2], Motion for Sanctions against Defendants' Pursuant to Rule 37(b) and Rule 37(d) plas [71-1] by pla [90-1] (SAT) (Entered: 04/11/2003) |
| 04/17/2003 | 91 | NOTICE of Filing Consents for Collective Action by plas (former Pizza Hut of Apache Junction employee Robert Brennan) (SAT) (Entered: 04/18/2003) |
| 04/25/2003 | 92 | REPLY Brief by dfts to response to Motion for Summary Judgment by dfts [84-1] (SAT) (Entered: 04/28/2003) |
| 04/25/2003 | 93 | NOTICE of Filing Consents For Collective Action by plas (former Pizza Hut of Apache Junction employee: Clint Doan) (SAT) (Entered: 04/28/2003) |
| 04/25/2003 | 94 | NOTICE of Filing Consents for Collective Action by plas (former Pizza Hut of Apache Junction employees: Shannon French, Heather Henderson) (SAT) (Entered: 04/28/2003) |
| 04/25/2003 | 95 | MOTION for Continuance of trial date (currently set for 6/10/03) by pla [95-1] (SAT) (Entered: 04/28/2003) |
| 04/29/2003 | 96 | NOTICE of Filing Consents for Collective Action (former Pizza Hut of Apache Junction employee: Alison Harling) by plas (SAT) (Entered: 04/30/2003) |
| 05/05/2003 | 97 | NOTICE of Filing Consents for Collective Action by pla (former Pizza Hut of Apache Junction employees: Clarence Davis, Trevor Gomez) (SAT) (Entered: 05/06/2003) |
| 05/07/2003 | 98 | NOTICE of Filing Consents for Collective Action (former Pizza Hut of Apache Junction employee: Mary E Elston) by plas (SAT) (Entered: 05/08/2003) |
| 05/19/2003 | 99 | NOTICE of Filing Consents for Collective Action (former Pizza Hut of Apache Junction employee: Krysta Agerone) by plas (SAT) (Entered: 05/22/2003) |
| 05/19/2003 | 100 | NOTICE of Filing Consents for Collective Action (former Pizza Hut of Apache Junction employee: Jonathan Anastos) by plas (SAT) (Entered: 05/22/2003) |
| 05/23/2003 | 101 | NOTICE of Filing Consents for Collective Action (former Pizza Hut of Apache Junction employee: Pat Crable) by plas (SAT) (Entered: 05/27/2003) |
| 7/17/2003 | 102 | ORDER by Judge Frederick J. Martone granting plaintiffs' Motion for Continuance of trial date (currently set for 6/10/03) [95-1]; FURTHER ORDERED resetting this trial to 10/14/03 at 9:30 AM; FURTHER ORDERED resetting the final pretrial conference |

| | | |
|---|---|---|
| | | to 10/3/03 at 3:00 PM; The time for filing the pretrial order is extended to 9/26/03 ; jury trial re-set for 9:30 10/14/03 ; Pretrial conference re-set for 3:00 10/3/03 ; PTO ddl re-set for 9/26/03 (cc: all counsel) (SAT) (Entered: 07/17/2003) |
| 07/23/2003 | 103 | ORDER by Judge Frederick J. Martone granting Defendants' Motion for Summary Judgment [84-1]; FURTHER ORDERED denying as moot Plaintiffs' Motion to Continue the Trial Date [68-2] FURTHER ORDERED denying as moot Plaintiffs' Motion to Extend the Discovery Cut-Off until 6/27/03 [68-1]; FURTHER ORDERED denying Plaintiffs' motion to extend the class certification deadline [81-1]; FURTHER ORDERED granting Plaintiffs' Motion for Sanctions against Defendants' in the amount of $2,467.50 [71-1]; FURTHER ORDERED denying as moot Plaintiffs' Motion to Compel Continued Depositions of Tim Carter and Betty Carter [71-2]; FURTHER ORDERED denying Defendants' Motion for Rule 26 Sanctions against Plaintiffs' counsel [79-1]; FURTHER ORDERED denying as moot Defendants' Motion for Protective Order [79-2] ; FURTHER ORDERED denying Plaintiffs' Motion to Expedite Ruling on Pending Motions [90-1] case terminated (cc: all counsel) (SAT) Modified on 07/23/2003 (Entered: 07/23/2003) |
| 07/23/2003 | 104 | JUDGMENT: that the Court has granted the Defendant's Motion for Summary Judgment, therefore, the Plaintiff shall take nothing. This complaint and action are hereby dismissed. (cc: all counsel) re: judgment [104-1] (SAT) (Entered: 07/23/2003) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 03/17/2010 11:40:36 | | |
| PACER Login: | gr0028 | Client Code: | 019776-00023 |
| Description: | Docket Report | Search Criteria: | 2:01-cv-01227-FJM |
| Billable Pages: | 9 | Cost: | 0.72 |